# EXHIBIT 1

```
                                        Page 1
 1    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
 2              IN AND FOR COWLITZ COUNTY
 3    RACHEL McKIBBAN, individually and
      as Personal Representative of the
 4    Estate of JORDAN McKIBBAN, deceased,
 5          Plaintiff,
 6                                        CASE NUMBER
      v.                                  23-2-01183-08
 7
 8    JOPEN, LLC, Texas limited liability
      company; JOHNSON FOODS, LLC, a Wyoming
 9    limited liability company; LP IND.,
      LLC, a Wyoming limited liability
10    company; CAG HOLDINGS, LLC, a Wyoming
      limited liability company; RMH HOLDINGS,
11    INC., a Wyoming corporation; OLISTICA,
      an unincorporated association; MIT
12    THERAPY INC., an Idaho corporation;
      DURITY DISTRIBUTION, INC., an Idaho
13    corporation; HUSH WORLDWIDE LLC, a
      Wyoming limited liability company; DRIP
14    DROP DISTRO LLC, an Idaho limited
      liability company; BEDROCK MFG LLC, a
15    Wyoming limited liability company; CLOUD
      HOUSE VAPORZ, INC., a Washington
16    corporation; AMERICAN KRATOM ASSOCIATION,
      a Virginia non-profit corporation, and
17    JOHN & JANE DOES 1 THROUGH 10,
18          Defendants.
19       ORAL AND VIDEOTAPED CR 30(b)(6) DEPOSITION
                (VIA ZOOM VIDEOCONFERENCING)
20                        OF
         JOPEN, LLC, A TEXAS LIMITED LIABILITY COMPANY
21                   BY AND THROUGH
                   EYAL DAVID GABBAY
22                   MARCH 14, 2025
23    Reported by:
24    TOMMI RUTLEDGE GRAY, CSR No. 1693
25    Job No: MDLG 7170831
```

Page 2

1           ORAL AND VIDEOTAPED CR 30(b)(6) DEPOSITION

2     (VIA ZOOM VIDEOCONFERENCING) OF JOPEN, LLC, BY

3     AND THROUGH EYAL DAVID GABBAY, produced as a

4     witness at the instance of the Plaintiff, Rachel

5     McKibban, individually and as Personal

6     Representative of the Estate of Jordan McKibban,

7     deceased, and being remotely duly sworn, was

8     taken in the above-styled and -numbered cause on

9     the 14th day of March, 2025, from 9:52 a.m. to

10    6:11 p.m., before Tommi Rutledge Gray, CSR, RPR,

11    and CRR in and for the State of Texas, reported

12    remotely by machine shorthand, all parties

13    appearing remotely, the witness appearing

14    remotely from Dallas, Texas, in accordance with

15    Amended Notice of 30(b)(6) Deposition, and

16    pursuant to the Washington Civil Rules.

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF, RACHEL MCKIBBAN, INDIVIDUALLY
     AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF
 4   JORDAN MCKIBBAN, DECEASED:
            Michael J. Cowgill, Esq. (Via Zoom
 5              videoconferencing)
            Tamara Spires, Esq. (Via Zoom
 6              videoconferencing)
            MCTLAW
 7          1515 Ringling Boulevard
            Northern Trust Plaza Building, Suite 700
 8          Sarasota, Florida  34236
            941.952.5042
 9          email:   mcowgill@mctlaw.com
                     tspires@mctlaw.com
10
                     - A N D -
11
            Talis Abolins, Esq. (Via Zoom
12              videoconferencing)
            MCTLAW
13          1325 4th Avenue
            Puget Sound Plaza, Suite 1730
14          Seattle, Washington  98101
            888.720.8685
15          email:   tabolins@mctlaw.com
16
17   FOR THE DEFENDANTS, JOPEN, LLC, TEXAS LIMITED
     LIABILITY COMPANY, LP IND., LLC, A WYOMING
18   LIMITED LIABILITY COMPANY, CAG HOLDINGS, LLC, A
     WYOMING LIMITED LIABILITY COMPANY, RMH HOLDINGS,
19   INC., A WYOMING CORPORATION, AND OLISTICA, AN
     UNINCORPORATED ASSOCIATION:
20          Gwendolyn C. Payton, Esq. (Via Zoom
                videoconferencing)
21          KILPATRICK TOWNSEND & STOCKTON LLP
            1420 Fifth Avenue
22          Suite 3700
            Seattle, Washington  98101
23          206.467.9600
            206.623.6793 - Fax
24          email:   gpayton@ktslaw.com
25
```

```
 1          A P P E A R A N C E S (Continued)
 2
 3    FOR THE DEFENDANTS, DRIP DROP DISTRO, LLC, AN
      IDAHO LIMITED LIABILITY COMPANY AND BEDROCK MFG
 4    LLC, A WYOMING LIMITED LIABILITY COMPANY:
              Brianna J. Morrison, Esq. (Via Zoom
 5                videoconferencing)
              MILLER NASH LLP
 6            1140 SW Washington Street
              Suite 700
 7            Portland, Oregon  97205
              503.224.5858
 8            503.224.0155 - Fax
              email:    brianna.morrison@millernash.com
 9
10
      FOR THE DEFENDANT, HUSH WORLDWIDE LLC, A WYOMING
11    LIMITED LIABILITY COMPANY:
              Taryn Basauri, Esq. (Via Zoom
12                videoconferencing)
              SINARS SLOWIKOWSKI LLC
13            221 1st Avenue West
              Unit 200
14            Seattle, Washington  98119
              206.705.2115
15            email:    tbasauri@sinarslaw.com
16
17    FOR THE DEFENDANT, JOHNSON FOODS, LLC, A WYOMING
      LIMITED LIABILITY COMPANY:
18            Gretchen J. Hoog, Esq. (Via Zoom
                  videoconferencing)
19            RYAN, SWANSON & CLEVELAND, PLLC
              401 Union Street
20            Suite 1500
              Seattle, Washington  98101-2668
21            206.464.4224
              email:    hoog@ryanlaw.com
22
23
      THE VIDEOGRAPHER:
24            Ms. Karen Keebler (Via Zoom
                  videoconferencing)
25
```

Page 66

```
 1   we've already covered.
 2               You're familiar with them and their
 3   relationship to OPMS?
 4        A.    Uh-huh; yes.
 5        Q.    Are you familiar with Shaman
 6   Supplies, LLC?
 7        A.    I don't believe so.
 8        Q.    Are you familiar with KonoLabs?
 9        A.    Yes.  That's Whole Herbs, a d/b/a --
10   or not a d/b/a, but like -- but yes, it --
11   it's -- it's associated with Whole Herbs.
12        Q.    So is KonoLabs a d/b/a for Whole
13   Herbs Company?
14        A.    It's -- it's for marketing purposes.
15        Q.    So I want to make sure I understand
16   that.
17               So it's not formerly a d/b/a; it's
18   not legally filed as an assumed name?
19        A.    No.  It was -- it was put in place
20   for compliancy -- state compliancy.
21        Q.    Compliance what?
22        A.    Compliance; like, state compliance.
23        Q.    With the State of Texas?
24        A.    The State of Utah.
25        Q.    Utah.
```

Page 67

```
 1              Why was it necessary to have
 2   KonoLabs be created as a d/b/a for compliance in
 3   the State of Utah?
 4        A.    And I believe it's Utah.   This
 5   stuff's a long time ago.   Utah required that, in
 6   general -- I guess it's not just kratom
 7   products -- but in general, they require that
 8   labels would have, you know, like, some sort of
 9   company name, distributed by, a phone number,
10   and an email.
11              And if they didn't have it,
12   they -- they would start -- and they did
13   start -- they pulled products off the shelf and
14   just basically destroyed it.
15              So there was a -- like, a little mad
16   scramble to put stick -- stickers or something,
17   a name or something on -- on products.
18        Q.    What was the reason for not using
19   Whole Herbs Company?
20        A.    Marketing, originally.
21        Q.    What's the marketing reason?   I'm
22   just trying to understand.
23        A.    It's a long time ago.   I -- and it
24   was done in five minutes, so it was --
25        Q.    Done in urgency --
```

Page 68

1          A.    Yes.
2          Q.    -- for -- like, is there some sort
3    of marketing benefit to having KonoLabs and
4    Whole Herbs as, like, two names?  Does that in
5    any way drive the business?
6          A.    No.  Well, it -- originally for
7    marketing, I think it was, like, this, you know,
8    Whole Herbs brand, you know, nice, clean, white
9    label type of thing.
10          So KonoLabs makes Whole Herbs, and
11    you know, kratom products.  It also made -- I
12    want to say back then it also made some kava
13    products and maybe some canna products and --
14    and so on.
15          So it wasn't going to be just a
16    specific -- just a, you know, like,
17    kratom-specified.  It was supposed to be this --
18    you know, this -- I guess, demographic-wise,
19    female-oriented, demographic product, and that's
20    just what we had come up with as far as what
21    would look good, work, and so on.
22          So in a mad scramble of trying to
23    get stuff on the labels, that's what was chosen
24    in five minutes.
25          Q.    And you refer to Utah's regulations

1  of having to have an entity, address, phone

2  number identified in relation to the product.

3           Are you aware of any other states

4  that have regulations like that?

5      A.   You know, I -- I wouldn't be

6  surprised if even Utah had that prior; they just

7  was enforcing it.

8           So, you know, and I wouldn't be

9  surprised if that's the case everywhere, and I

10  wouldn't be surprised if there's federal

11  requirements.

12          It -- and I don't know that it

13  didn't have some part of that already on the

14  label; it just didn't have all of it on the

15  label at the time.

16          So the mad scramble was to fix

17  the -- having every part of it on the label.

18  And -- and if I have to, like, think back, maybe

19  it already said, like, "KonoLabs" as, like, a

20  marketing thing on it, and they just now needed

21  the, you know, email and phone number and some

22  other verbiage on there.

23          It -- it wasn't just about that

24  language there, but it was other language, as

25  well, that was required on the label; that Utah

1    required.

2        Q.    Okay.    You mentioned the feds a

3    second ago.

4            Do you know one way or another

5    whether the -- there's a federal regulation

6    that's similar that would require some sort of

7    identification and contact information for an

8    entity behind a certain product?

9        A.    And so I'm going to take, like, one

10   step back for a second and just -- because I'm

11   talking a lot right now as -- not as A1, right?

12   So we've kind of, like, gone --

13       Q.    You were speaking as Whole Herbs

14   Company?

15       A.    Yes.    You know, and I just want to

16   make sure, because we've kind of completely gone

17   in that direction.    I just want to clarify that.

18       Q.    Yeah, so let me ask you that

19   question in your capacity here as -- as JOpen.

20           Does JOpen know one way or another

21   whether there is federal regulation that, you

22   know, a product -- the entity that is, you know,

23   distributing a product, have its name on the

24   product and have any contact information on the

25   product?

Page 79

```
 1          Q.    Are you familiar with Liv Group?
 2          A.    Yes.
 3          Q.    How so?
 4          A.    Also in the same capacity as
 5   paying -- I believe we paid Liv Group invoices
 6   for Martian.
 7          Q.    Liv Group invoices for Martian;
 8   okay.
 9          A.    I believe.
10          Q.    Okay.  I want to just clarify
11   something, because I might have been confused.
12                Was it JOpen has paid invoices on
13   behalf of Skamandros; is that correct?
14          A.    It has at one point, yes.
15          Q.    Okay.  But Skamandros has not paid
16   invoices on behalf of Martian?
17          A.    No, it would not.  There's no reason
18   to.
19          Q.    Are you familiar with Choice
20   Organics?
21          A.    I'm fam -- familiar with that --
22   that name, yes.
23          Q.    How are you familiar with that name?
24          A.    It was something that also in a
25   scramble was put on labels at the same timeframe
```

Page 80

1    as KonoLabs was.

2            Q.    What labels was Choice Organics put

3    on?

4            A.    On OPMS products.

5            Q.    Only OPMS?

6            A.    Correct.

7            Q.    And JOpen played a role in -- in

8    getting Choice Organics on those labels?

9            A.    A1 did.  I'm just trying to -- yes.

10           Q.    Why did A1 or JOpen play a role in

11   updating OPMS labels?

12           A.    We were distributing products of

13   OPMS, and product was getting pulled off the

14   shelf, which was directly impacting our bottom

15   end.  So our distribution contract somewhat said

16   that we were the ones responsible for things

17   like this in distribution, we were responsible

18   to make sure that everything that was required

19   for distribution, if it was licensing or

20   compliancy as far as like the State goes for the

21   distribution part, was there.

22               So we -- I specifically contacted

23   Mark and said, "Hey, I need to do this.  Can I

24   do this?"

25               And he said, "Do whatever you need

1    to do to make the label correct."

2            So I took care of it.  As Manager of

3    A1, I took care of this.

4        Q.    Just to unpack that a little.  When

5    you refer to "Mark," you mean Mark Reilly; is

6    that right?

7        A.    Correct.

8        Q.    And how -- so I might be --

9                    MR. COWGILL:  Strike

10        that.

11    BY MR. COWGILL:

12        Q.    I'm just trying to understand, like,

13    the -- how that happens, right?

14            So does JOpen have the OPMS labels

15    in its warehouse and it's able to change those

16    labels, or how does that actually function?

17        A.    So specifically for that particular

18    act right there, we had to produce stickers that

19    had that information on it.

20            And I believe it also had to say,

21    like, "All Natural Product" or something of the

22    sort, like, they were required to have for the

23    Utah specifically.

24            What they had put out there, they

25    had said, like, -- I don't want to guess, right,

1            So Johnson Foods -- my question to

2    you is:  Does JOpen have any relationship with

3    Johnson Foods?

4        A.   Not -- not directly.

5        Q.   Okay.  But it sounds like you

6    personally know of Johnson Foods?

7        A.   No.

8        Q.   You know of them through litigation?

9        A.   No.  Like, through a different

10   company.

11       Q.   Okay.

12       A.   I think that was the company that

13   was deposed yesterday, so I just --

14       Q.   Okay.  So my next question for you,

15   which is probably going to get us there, does

16   JOpen have any relationship with Telescaph Inter

17   Texas, LLC?

18       A.   There you go; yes.

19       Q.   What is JOpen's relationship with

20   Telescaph?

21       A.   It hired Telescaph to do some work.

22   It, in turn, hired Johnson Foods.

23       Q.   What work did JOpen hire Telescaph

24   to do?

25       A.   It wanted -- it wanted basically

Page 92

1   blind reports into -- most importantly, into the
2   ability to distribute in -- in other markets
3   outside the U.S., so...
4           Q.    And so Telescaph engaged Johnson
5   Foods to provide those reports?
6           A.    Correct.
7           Q.    And is JOpen distributing products
8   outside the United States?
9           A.    It chose not to.
10          Q.    So the reports did not provide a
11  favorable analysis of that?
12          A.    Not at all.
13          Q.    Do you have any understanding of
14  whether Johnson Foods has any clients other than
15  Telescaph?
16          A.    Only through litigation.
17          Q.    What's your understanding through
18  litigation other than any conversation you've
19  had with your attorneys?
20          A.    Well, it's -- that's -- that's what
21  I mean, through counsel.  That's what I mean
22  "through litigation," just through sitting down
23  with Gwendolyn.
24          Q.    Was -- was A1 provided with the
25  reports produced by Johnson Foods?

1          A.    The Manager of A1 was provided the

2     overall understanding of the reports.

3          Q.    I want to make sure I understand.

4          So were there -- there were physical

5     reports in the sense of maybe hard-copy paper or

6     emailed PDF?  Was there, like, an actual

7     document that was shared as a report?

8          A.    Not to A1.

9          Q.    But to Telescaph, "yes"?

10         A.    Yes.

11         Q.    And so Telescaph -- if I understand

12    what you're saying, Telescaph provided -- was it

13    verbal?

14         A.    Yes.

15         Q.    Well, what did Telescaph --

16                    THE WITNESS:   Can

17         I clari --

18                    MS. PAYTON:   Yeah, you

19         can clarify, if -- if you want.

20         A.    I apologize.  I -- I managed that

21    duty for Telescaph, so I -- as far as, like,

22    Manager of David for Telescaph telling Manager

23    David for A1, it didn't have to have any sort of

24    verbal communication to, you know, --

25    BY MR. COWGILL:

Page 94

1      Q.    Yeah, so -- so it says -- and just
2   to simplify this, Johnson Foods provided the
3   documents to Telescaph.
4           You, David Gabbay, manage both JOpen
5   and Telescaph.  You read the reports --
6           A.    Yes.
7           Q.    -- as being, you know, both a
8   Manager of Telescaph and a Manager of JOpen.
9           The information was retained, and
10  that's how JOpen knows it?
11          A.    Yes.
12          Q.    Okay.  So if I understand correctly,
13  Telescaph is in possession of the reports; JOpen
14  is not?
15          A.    Correct.
16          Q.    But you -- as far as -- well, let's
17  take it -- let me ask it this way:  Do you as
18  the Manager of JOpen have any specific
19  recollection of what was contained in those
20  reports?
21          A.    Yeah; of course.
22          Q.    What do you recall?
23          A.    Just the complications in
24  distribution in other markets.  I remember South
25  America, it was not even something you can --

1          Any relationship there?

2     A.    None whatsoever.

3     Q.    How about someone named Pudgi?

4     A.    No.

5     Q.    How about OPMKratom?

6     A.    I believe that's the old websites.

7 Is that what you mean?

8     Q.    Yes.  We'll -- we'll talk more about

9 it later, but there -- there is an -- an older

10 website that was OPMKratom.com; is that your

11 understanding?

12     A.    Correct.

13     Q.    And there's now a website that

14 OPMSKratom.com, right?

15     A.    Correct.

16     Q.    And so if I understand you,

17 OPMKratom.com is just the old website for

18 OPMSKratom?

19     A.    Correct.

20     Q.    How was JOpen familiar with that

21 website?

22     A.    I'll put it in the context of A1.

23 OPMKratom, I believe, was Mark Reilly's website,

24 I believe.  But he had, I believe, lost his

25 credentials for controlling it, so it was, like,

Page 99

1    overlaid over OPMSKratom, and eventually
2    OPMKratom had died, meaning it ran out of time.
3            Q.    So just to understand, when you say
4    "it" -- "it died" or "ran out of time," do you
5    mean the web hosting?
6            A.    Right; yeah.
7            Q.    Okay.
8            A.    The purchase -- whatever he
9    purchased or whatever expired.
10           Q.    Okay.  And do I understand
11    correctly, your recollection is that Mark just
12    lost the ability to log in to it; his
13    credentials to log in and manage it were just
14    lost?
15           A.    Correct.
16           Q.    All right.  Did JOpen play any role
17    in managing that website, OPMKratom?
18           A.    We hired Onix to update the website
19    per, you know, agreement with Mark.  And so we
20    had the ability to get in, but he didn't have
21    the ability -- which is two different things,
22    right, where the server was or whatever.  But he
23    didn't have the ability to -- to log in and
24    continue paying for it.
25           Q.    Okay.  So there -- there was the

Page 143

1    addicted to a substance, it -- you wouldn't

2    build a tolerance.  Or if the -- you know?  If

3    the item was not addictive, that you wouldn't

4    build a tolerance.

5                You know, we build tolerance to --

6    to pain, right?  And that's not necessarily

7    addictive.

8            Q.    All right.  We'll revisit that.

9    Let's -- let me go back to asking you some

10   questions here about JOpen.

11               I know we covered Beeman, right?

12   What is the address for that warehouse that's

13   off Beeman?  You said -- was it 4949?

14           A.    That is correct.

15           Q.    Are there any other physical

16   locations associated to JOpen?

17           A.    Like, a mailbox for -- for receiving

18   billing.

19           Q.    Where's that at?

20           A.    4848 Lemmon Avenue.

21           Q.    And is that also in Dallas, Texas?

22           A.    It is.

23           Q.    Any other physical addresses?

24           A.    No.

25           Q.    Does 3200 Broadway ring a bell at

Page 144

1    all?

2        A.    That's just an office space.

3        Q.    That's an office space --

4        A.    Yes.

5        Q.    -- that JOpen operates out of?

6        A.    A1 does, yes.

7        Q.    A1.

8              And that's -- that's also in Dallas?

9        A.    It is.  Or Garland/Dallas area.

10       Q.    Garland; okay.  Metroplex area?

11       A.    Yes.

12       Q.    What was the business reason for

13   shifting to Skamandros, LLC from whatever the

14   predecessor entity was?

15       A.    Advice by counsel.

16       Q.    Do you know who the owner of

17   Skamandros is?

18       A.    I would have to look it up.  I had

19   it.  I just --

20       Q.    Go ahead; I'm sorry.

21       A.    -- don't remember right now.  Give

22   me a couple of -- a few minutes, I may remember

23   it.

24       Q.    All right.  Just chime in if you do.

25             I know you gave us an email earlier,

Page 212

```
 1   just -- anything can be clearer, right?
 2   BY MR. COWGILL:
 3        Q.    Do you know whether drug
 4   interactions between kratom and prescription
 5   drugs, whether those have been fully fleshed out
 6   through research and scientific literature?
 7                    MS. PAYTON:   Object to
 8        the form of the question.
 9        A.    I do not.
10   BY MR. COWGILL:
11        Q.    I want to direct your attention to
12   this part of the package.   There's a glare on
13   it, but I'm going to read it.   If you can't make
14   it out, let me know.
15             But it says "Distributed by:   Choice
16   Organics," gives a phone number, "(213)
17   221-8049," an address of "3680 Wilshire
18   Boulevard, Suite P04 1084" in L.A., California.
19   I can't read that ZIP, but that's the ZIP.   And
20   it says "info@OPMSKratom.com" as the email.
21             Do you see all that?
22        A.    I do.
23        Q.    And I think you explained earlier
24   that this was what initially was a sticker, then
25   incorporated in a label in response to a -- the
```

Page 213

1    situation in Utah?

2            A.    Correct.

3            Q.    And so Choice Organics, that's --

4    that's not an actual entity anywhere?

5            A.    It is not.

6            Q.    So what -- what does Choice Organics

7    refer to?

8            A.    I don't know.  It changed over the

9    years.  But originally it was there -- it's like

10   a marketing thing, like a Choice Organics.  You

11   know, OPMS by Choice Organics as a marketing

12   thing.

13           It's -- when the label was put on,

14   it was also a way to distinguish, you know,

15   which brand was associated with the

16   distribution.  And obviously once all that

17   information was there, you know, then you had

18   people contact and say, "Hey, I want to sell

19   this" or whatever.

20           Q.    So is there someone that answers

21   this phone number here, this 23 -- 213 phone

22   number?

23           A.    It -- it actually goes into -- I

24   forget what it's called.  Lie, where it's -- it

25   takes it -- whatever message you leave, it

Page 214

```
 1    trans -- not trans.  It's whatever it's called.
 2    Trans --
 3            Q.     "Scribes"?
 4            A.     Huh?
 5            Q.     "Transcribes"?  "Transcribes"?
 6            A.     Transcribes, yes.  It transcribes
 7    the message and sends it into the email.
 8            Q.     Which email does it send it to?
 9            A.     The one below that.
10            Q.     The info@OPMSKratom.com email?
11            A.     Yes.
12            Q.     Then who -- who's in charge of that
13    email?
14            A.     It is currently done by a third-
15    party -- third-party company.  I don't know the
16    name off the bat.
17            Q.     When was that -- so that
18    transcription service for the calls, was that
19    set up, you know, when you set this up in
20    response to the Utah thing, I think in 2015, or
21    was that done later?
22            A.     Somewhere around that timeframe.
23            Q.     And same for the email?  That's
24    always been monitored by a third party?
25            A.     Not always by a third party.  I
```

Page 215

1   originally monitored it.

2          Q.    When did it shift to third-party

3   monitoring?

4          A.    Maybe a year-plus ago, a year ago.

5          Q.    And up until then, it was always

6   you?

7          A.    It was.

8          Q.    Do you still have access to that

9   email account?

10         A.    I do not.

11         Q.    Do you still have those emails

12  stored somewhere?

13         A.    They were given to counsel.

14         Q.    Have you ever received customer

15  complaints at that email?

16         A.    Of course.

17         Q.    What sort of complaints have you

18  received?

19         A.    It's -- it's like "Oh, it was not

20  the right color," or, "It wasn't what I

21  expected," or, you know, stuff like that.

22         Q.    Did you respond to those?

23         A.    Not always.

24         Q.    What determined whether or not you

25  would respond to a complaint?

1        A.    I -- I mean, I guess I realized that

2    the -- the majority of contacts were from

3    customers trying to get free product, so after a

4    while, it becomes a little bit, you know,

5    difficult to deal with.

6        Q.    Do you recall ever receiving a copy

7    of a lawsuit at that email?

8        A.    I do not.   This may have happened --

9    if it happened, it may have happened after.

10       Q.    Okay.   And were -- were you ever

11   made aware by anyone that that phone number

12   doesn't seem to be functioning at any point in

13   time?

14                   MS. PAYTON:   Object to

15       the form.

16       A.    I believe it is functioning.   I know

17   the number has changed over time.

18   BY MR. COWGILL:

19       Q.    And that's why I'm asking.

20            Just over the time that you've had a

21   phone number on the package, did you ever

22   receive any -- any complaints or any statement

23   that, "Hey, this number's not working"?

24       A.    I -- I don't remember

25   specifically -- specifically to that number,

Page 219

```
 1        Q.   And you notice that this label
 2   doesn't have the same warning language that we
 3   saw on the package earlier, the Silver package?
 4        A.   I do.
 5        Q.   Do you know why that is?
 6        A.   Why it doesn't have the same --
 7        Q.   Why it doesn't have the same
 8   language, yeah.
 9        A.   I mean, for one, it's not the same
10   product.
11        Q.   Any other reason?
12        A.   I -- I don't know if it's the same
13   timeframe or not.
14        Q.   Do you know what would go here in
15   this black box, (indicating)?
16        A.   Lot number, serial number.
17        Q.   Choice Organics, was there any
18   reason that y'all picked the 213 phone number
19   and an L.A., California address?
20        A.   At the time, for marketing purposes,
21   you know, OPMS was a fairly small company, so
22   this was a way to just market a more glamorous
23   type of address versus Dallas, Texas type of
24   thing.
25        Q.   Is there some sort of marketing
```

Page 220

1    advantage to an L.A. or -- or New York, maybe,
2    type of address?
3          A.    I mean, L.A. is known for all the
4    big distributors, all the big wholesalers.
5          Q.    Okay.  I asked this earlier about
6    the Silver package.  I can ask it generally, but
7    I'll ask specifically about this Gold two-pack.
8          Are you able to have sort of like a
9    timeline showing the different labels as they
10   evolved over time?  Is that something that
11   JOpen's able to provide?
12         A.    I'm sure the brand can.  Not --
13   again, it's not necessarily A1, but I -- we can
14   get it.
15         Q.    Is it fair to say that would be true
16   of just OPMS labels in general?
17         A.    Yeah.  I mean, we would have to
18   reach out, but we can.
19         Q.    It would be Martian that you'd need
20   to work with, and -- and Onix, I -- I guess?
21         A.    Yes, yes.
22         (Exhibit 11 marked for identification.)
23   BY MR. COWGILL:
24         Q.    Okay.  Now I want to switch gears a
25   little bit to Whole Herbs.

Page 268

1    right?

2         A.   Yes.  I guess we should define

3    "manage" maybe if we're going to get into

4    details on the website.

5         Q.   Well, let me ask you this:  Who --

6    who creates the content for OPMSKratom.com?

7         A.   The content was originally created

8    by Martian, and over time, with the help of

9    Martian, and with work with Martian, it was

10   modified, and with, of course, attorneys over

11   time.

12        Q.   And does JOpen view its online

13   marketing as B2B marketing, not as something

14   that a consumer would find online when

15   researching the product?

16        A.   Would -- okay.  The OPMS website is

17   not JOpen's website.

18        Q.   How does JOpen view the marketing on

19   the website, then?

20        A.   On OPMS's website?

21        Q.   Right.

22        A.   OPMS's website doesn't belong to

23   JOpen.

24        Q.   Who does it belong to?

25        A.   It belongs to Martian Sales.

Page 269

1        Q.    Have you ever been made aware that
2    Martian Sales has said that you own the website,
3    JOpen?
4        A.    I don't know what he says.    It's his
5    website.    We -- even the content that was there
6    originally came from Martian Sales, and our
7    contract specifically only gives us the right to
8    work with him and get approval from him on
9    anything we do on our website.
10       Q.    All right.    Now let's -- let's talk
11   more about Martian.
12              And so I -- I think you said --
13   well, I'll just ask it:    How did your
14   relationship -- how did JOpen's relationship
15   with Martian Sales first start?
16       A.    I was introduced to Mark Reilly
17   through Peyton, and he gave me a pitch on OPMS
18   products, and eventually I started buying
19   products from him and selling.
20       Q.    Was that -- that meeting and pitch,
21   was that at the trade show that you described
22   earlier today?
23       A.    It is.
24       Q.    And so when that relationship first
25   started, was that roughly 2012, you said, or --

Page 270

1      A.    Somewhere around that timeframe.

2      Q.    Okay.  So going back to that

3    timeframe, let's say, from roughly 2012, was --

4    was it -- so if I -- if I understand, or if I

5    understood your earlier testimony, I'm trying to

6    work up from earlier today and understand how

7    it's evolved, initially you were just buying the

8    product -- the OPMS product directly from

9    Martian, and then distributing it?

10     A.    Correct.

11     Q.    Okay.  Now I understand that that's

12   changed.

13           Can you give me a sense of how

14   that's changed and along -- well, let's do how

15   it's changed, first.

16     A.    So originally this was strictly a

17   purchase the product and sell the product from

18   Martian, and then after a while it was, like,

19   the ability to distribute product was a little

20   bit more, but it was obviously still selling the

21   product; it was his product.

22           And then there was a timeframe where

23   he needed help with packaging the product, and

24   so he -- he came to me and said, "Hey, I

25   can't -- I can't package product fast enough.

1    I'm not capable of doing this.  Can you package
2    product?  Can you find" -- well, he knew I had
3    somebody, so he asked me to find somebody for
4    him.
5              And over time, he couldn't afford to
6    pay the bills on stuff because it takes a while
7    to get the money back from selling the product,
8    so then he was like, "Can you pay this bill?
9    Instead of giving me money later, can you pay
10   that bill?"  And it just developed over time.
11        Q.    And so those changes where it's just
12   starting off as distribution, then assisting
13   with packaging, then with billing, do you have a
14   sense of roughly when those changes occurred?
15             Like, when did the packaging come
16   into the picture?
17        A.    Maybe 2013-ish?
18        Q.    Okay.
19        A.    I'm trying to remember.  I don't
20   remember the exact dates.  But it was, I want to
21   say, like, a year later or two years later after
22   we started -- after I started selling his
23   products.
24        Q.    And then how about the -- the shift
25   to paying some of the bills?

Page 272

```
 1          A.    That didn't take very long, because
 2    once we had to start packaging, then the
 3    costs -- his costs went up to where he couldn't
 4    afford to do.  So it was just a short while
 5    after that.
 6          Q.    And then how about the -- the sort
 7    of collaboration between, you know, Martian, A1,
 8    and Onix or any other entity in terms of
 9    labeling or website work?  When did that begin?
10          A.    I mean, I think at one point -- I
11    can't remember.  It was '14?  '13?  I can't
12    remember what timeframe.
13              It just -- at that point, there was
14    a comfort level between us to where he was just,
15    like, "Hey, can you just do this for me?  Do
16    this for me?"
17              And I'm a distributor who -- whose
18    sales are going up, and, you know, we
19    struggled -- struggled a little bit less as the
20    sales are going up, and here's a customer that's
21    basically asking me for favors, and you say,
22    "Yes, sir."
23              You just -- that's what you do.  You
24    make whatever the customer wants, happen.
25    That's part of doing business.  And -- and just
```

Page 273

1    go from there.

2         Q.    And so those arrangements, as these

3    changes were made, were those being memorialized

4    in writing?

5         A.    They were not.  Not -- back then, it

6    wasn't.

7         Q.    When was the first agreement that

8    memorialized those changes in writing?

9         A.    Circa 2022, maybe?  I don't

10   remember.  Later on.

11        Q.    Okay.  And I'm going to pull up

12   the -- the Agreements with Martian here in a

13   second, so...

14             All right.  So before that

15   Agreement, it's just sort of a handshake deal;

16   verbal agreement?

17        A.    It was just more tasks given to us

18   as time went by.

19        Q.    And so as you're paying these bills

20   for -- on behalf of Martian, is there any

21   arrangement with, like, a loan structure between

22   you and Martian, or how -- how does that

23   function?

24        A.    It just --

25                  MS. PAYTON:   Object to

Page 274

1          the form.
2          A.    There -- there's no -- it's -- I'm
3   distributing a product, and if I don't pay that
4   bill, then there's no product to distribute.
5                So there is -- you know, you just
6   do, right?  I mean, you're -- you're basically
7   just saying, "Okay.  I'll pay this, and we'll
8   square up later," and -- and that's just how it
9   starts.
10  BY MR. COWGILL:
11         Q.    Did y'all square up?
12         A.    We did.  We came to an agreement.
13         Q.    That 2020 Agreement?
14         A.    That eventually is the Agreement on
15  paper, yes.
16         Q.    And so during this timeframe, you
17  know, pre-2020, Martian is -- is, as I
18  understand it, technically providing the OPMS
19  product to you.
20                Are you paying any sort of money to
21  Martian for its provision of that product?
22         A.    In the beginning, we were, yes.
23         Q.    So is there any -- any document that
24  sort of lays out -- we'll call it "the square-up
25  agreement," you know, using "squaring up" as

Page 275

1    we're using it here -- where it would lay out

2    pay -- "Between 2012 to 2020, JOpen paid out all

3    these bills on your behalf; you know, this is

4    what you owe us"?

5              Is that documented somewhere?

6                   MS. PAYTON:  Object to

7         the form of the question.

8         A.    No, there isn't.

9         (Exhibit 6 marked for identification.)

10   BY MR. COWGILL:

11        Q.    So how -- how was the 2020 -- and

12   let me just pull it up.

13              So this is Exhibit 6.  I -- I

14   understand this to be the 2020 Distribution

15   Agreement.

16              Do you see that here, "January 23rd,

17   2020"?  It's pretty hard --

18        A.    Yes.

19        Q.    Is this the Distribution Agreement

20   you're referring to?

21        A.    It is.

22        Q.    Okay.  So can you tell me how this

23   Agreement is -- is you and Martian squaring up

24   on those -- those past payments.

25        A.    It is not.

Page 276

1        Q.   So I'm not sure I understood your --
2   your prior testimony.
3             How did you and Martian square up,
4   then?
5        A.   I mean, at first we would, like,
6   square up, meaning I'd pay him, but there would
7   become a negative as the business grew.  It
8   always was negative, negative, negative as more
9   money was spent than money was coming in.
10            And at one point he had said he had
11  worked something out with the supplier where he
12  would get something in return, and he just said,
13  "Keep on going."
14            And that went on for a while, and
15  then in 2020 -- or circa 2020 he was like, "I
16  need to rework something out with you."
17       Q.   What -- what do you mean he worked
18  something out with the supplier to just keep on
19  going?  What does that mean?
20       A.   I mean, I didn't get the details,
21  but I'm assuming that he was getting something
22  as -- as a commission or something from the
23  supplier, and I didn't get into it.  I just was
24  doing my thing.
25       Q.   Do you know who the supplier was

Page 281

```
 1              MR. COWGILL:  Sorry.
 2       Did somebody say something there?
 3       No?  Okay.
 4              MS. PAYTON:  No.
 5       When -- to the court reporter,
 6       when we take the next break,
 7       we're going to want the time on
 8       the record.
 9              THE VIDEOGRAPHER:
10       You've been on 5 hours and 22
11       minutes so far.
12              MS. PAYTON:  Thank
13       you.
14   BY MR. COWGILL:
15       Q.   All right.  So I think I've got
16   Exhibit 7 back up.
17              Are you able to see that, Mr.
18   Gabbay?
19              Can you see it, Mr. Gabbay?
20       A.   I can; yes.
21       Q.   So this is the 2023 Distribution
22   Agreement between Martian Sales and A1
23   Wholesale.
24              I'm going to ask you some questions
25   about it, and to the extent that you know it's
```

Page 282

1    different from 2020, this Agreement, can you
2    just let me know?
3        A.    Of course.
4        Q.    Thank you; all right.
5            So these "Recitals," just know that
6    the "Supplier is a supplier of OPMS Products,"
7    meaning Martian Sales is supplying OPMS to
8    JOpen, right?
9        A.    Correct.
10        Q.    Okay.  And it refers to the prior
11    Agreement; the January 23rd, 2020 Agreement.
12            Do you see that?
13        A.    I see it.
14        Q.    And it expresses a mutual desire to
15    terminate that Agreement and enter a new
16    Agreement, being this 2023 Agreement.
17            Do you understand that?
18        A.    I do.
19        Q.    Okay.  There's reference here to a
20    "Distribution Fee," meaning the "fee charged by
21    the Distributor for the services performed by or
22    at the direction of Distributor on Supplier's
23    behalf, less all costs, including but not
24    limited to administrative, financial,
25    managerial, logistics, accounting, invoicing,

1  payment processing, research and development,

2  testing and analysis, customer services, and

3  expense management services for Supplier."

4          Did I read that correctly?

5      A.    You did.

6      Q.    What is the Distribution Fee?  Does

7  that change from month to month?

8      A.    The dollar amount does, yes.

9      Q.    And how -- how is that calculated?

10     A.    It's a percentage of sales.

11     Q.    What percentage?

12     A.    29 percent.

13     Q.    Has that always been the percentage,

14  or it's changed year-over-year?

15     A.    It's been generally that number.

16     Q.    And so given that it's a percentage

17  of sales, does that just mean JOpen retains that

18  percentage of sales, or is there actually money

19  coming from Martian to JOpen for payment of a

20  distributor fee?

21     A.    It retained that percentage.

22     Q.    And then the remaining -- the

23  remaining percentage, is that -- is that then

24  passed to Martian after deductions for costs?

25     A.    No.  There's a -- there's an amount

Page 284

1    he receives.

2         Q.    Does any percent of those sales go

3    to manufacturers?

4         A.    Of the 29 percent?

5         Q.    No.   Of the remaining -- I guess,

6    was that 71?

7         A.    It's whatever their bills are.

8         Q.    So what happens to the remaining 71

9    percent?

10         A.    It pays for -- it pays for

11    everything else, like the manufacturer,

12    packager.   I'm trying to remember the exact --

13    the sourcing company, and there's donations made

14    on its behalf of -- of a -- on OPMS's behalf.

15         Q.    So that 71 percent, if that's not

16    actually all used up for the purposes you're --

17    you're expressing, so if that doesn't zero out,

18    where does the balance go?

19         A.    It usually goes into "We'll talk

20    about it," and then maybe do promos or lower

21    pricing so that way a better -- better ability

22    to get into the market, especially if the prices

23    have gone down in the market, which they do,

24    like any business, year to year.   So we'll do

25    promotions and so on.

Page 285

1        Q.   So just so I understand, you're
2   saying of that 71 percent, if anything's left
3   over after paying the bills, --
4        A.   Correct.
5        Q.   -- you and Martian talk and decide,
6   "Hey, we're going to spend that in this way to
7   further more sales"?
8        A.   Correct.
9        Q.   Okay.  And so before that money is
10  actually spent for those purposes, is that just
11  sitting in one of JOpen's business accounts?
12       A.   I mean, we're -- technically
13  speaking, it's always a -- almost like a
14  negative, right, because there's always expenses
15  out, and money coming in later.
16       Q.   And you brought up donations.  I
17  just want to revisit that real quick.
18            When JOpen has made donations to the
19  AKA, have those been charitable donations that
20  would then be reported on JOpen's taxes?
21       A.   Correct.
22       Q.   And so now when you're talking about
23  paying Martian's -- or -- or making donations on
24  behalf of Martian, are those donations there
25  then being associated to Martian for its taxes?

Page 286

1          A.    I don't believe so.
2          Q.    Those are still going on JOpen's
3    taxes?
4          A.    I -- I believe so, because it's
5    coming out of money still held up by -- it's
6    basically done on behalf of.
7          Q.    But it's money coming out of JOpen's
8    account?
9          A.    Yes.
10         Q.    Okay; all right.
11               So I want to look at this Article
12    II.
13               Or, I'm sorry, let me ask:  Do -- do
14    you remember -- where was it?  The Distribution
15    Fee.  Was this provision any different than in
16    2020?
17         A.    Other than maybe the attorneys
18    making it per year, no.
19         Q.    Okay.  "Article II:  Distribution
20    Grant and Responsibilities."  It says "Supplier
21    hereby appoints Distributor, and Distributor
22    accepts from Supplier the non-exclusive right to
23    distribute the Products subject to all terms and
24    conditions set forth in this Agreement.
25               "Distributor acknowledges and agrees

Page 287

1    that nothing in this Agreement shall restrict
2    Supplier from selling the Products to any other
3    Person.  For the avoidance of doubt, this
4    Agreement and the distribution rights contained
5    herein are non-exclusive."
6              Do you know whether any other
7    distributors distribute OPMS products?
8         A.    Currently?  Not that I know of.
9         Q.    Do you know if there has been in
10   2021 or '22 -- sorry -- 2022?
11        A.    I may have misunderstood that
12   question.  You know, I mean, obviously there's a
13   lot of distributors selling OPMS products,
14   right, besides A1.
15             But this relationship specifically
16   is -- as -- as I know it, it's exclusive -- not
17   exclusive, but it's only done with us current --
18   currently.
19        Q.    Gotcha.  So I think what you're
20   referring to is A1 provides OPMS to a number of
21   other distributors, and of course they're
22   selling OPMS, right?
23        A.    Correct, correct.
24        Q.    But as far as the direct
25   relationship between Martian and a distributor,

Page 288

1    that's only you and Martian?

2         A.    Currently, yes.

3         Q.    And was there ever a time when that

4    was not the case?

5         A.    Obviously in the beginning of our

6    relationship, it was not the case.

7         Q.    Meaning back in 2012?

8         A.    '12, '13, '14, in that timeframe,

9    yes.  Maybe -- maybe a little bit further, but

10   around that timeframe, yes.

11        Q.    And then when would you say that it

12   became, you know, just you and Martian?

13        A.    I -- I didn't really have a hundred

14   percent control of that, so I don't know.

15        Q.    Okay.  Are you familiar with the

16   website OPMSWholesale.com?

17        A.    I'm familiar with a website called

18   OPMSWholesale.com.

19        Q.    Does JOpen have any involvement in

20   that website?

21        A.    It does not.

22        Q.    Do you know who owns that, by any

23   chance?

24        A.    It's third party.  It has nothing to

25   do with anyone.  Like, it doesn't have anything

Page 295

1    A.    It's automated based on demand.

2    Q.    Okay.  So the system can tell --

3 there's some sort of technology in place that

4 can tell, "All right.  X number of orders have

5 gone out through JOpen, so we need to restock"?

6    A.    Exactly.

7    Q.    Okay.  Is that the same Odoo pick-

8 and-pull system, or is there some other --

9    A.    I -- I think it's some sort of patch

10 to that or a patch that pulls the information

11 off of that.  That's a little bit above my pay

12 grade to understand exactly how the software

13 works, but it basically understands what is

14 needed, and it informs -- it informs Flo-Tech.

15    Q.    Okay.  And so you see here on No.

16 2, "Distributor will work" -- will work "with

17 various parties involved in the supply chain to

18 secure an adequate supply of the Products at

19 Supplier's expense"?

20        Did I read that right?

21    A.    You did.

22    Q.    Okay.  So who -- who are "the

23 various parties involved in the supply chain"

24 this refers to?

25    A.    We'll work with Flo-Tech to get

Page 296

1  packaging; we'll work with Calibre to get

2  product; and -- and then supply them -- you

3  know, like, Flo-Tech, for example, what we were

4  just talking about a second ago, supplying the

5  actual needs, we'll work with Nuza to pay them.

6      Q.   You work with Nuza for the -- the

7  sourcing of the raw kratom; is that correct?

8      A.   We pay -- we pay Nuza is more like

9  what we do.

10      Q.   Okay.  And so let me -- let me

11  clarify.

12          So talking about Jordan McKibban

13  passing in April of '22, in early '22 -- so

14  let's say January to April -- would that have

15  been the same entities, Flo-Tech, Calibre, and

16  Nuza, or would it have been any different set of

17  entities at that time?

18      A.   I think it's the same.  I'm not a

19  hundred percent sure.

20      Q.   Do you have any way of documenting

21  that or confirming that?

22      A.   What dates do you need?

23      Q.   Between January 1st of '22 to April

24  5th of '22?

25      A.   Yes; I'll find out.

Page 297

1          Q.    What would you do to find out?

2          A.    I would have to look it up.

3          Q.    Is it possible at that time it was

4    Advanced Nutrition and Liv Group, as opposed to

5    Calibre and Nuza?

6          A.    It is very possible.

7          Q.    As we sit here today, you don't know

8    either way, though?

9          A.    I -- I'm sure there's a way to look

10   up the dates.

11         Q.    Do you see No. 5 here, "Supplier

12   Compensation"?

13         A.    I do.

14         Q.    How is this determined?

15         A.    It's negotiated.

16         Q.    So this amount is negotiated prior

17   to the signature of the Distribution Agreement?

18         A.    Correct.

19         Q.    And what's the basis in that

20   negotiation for determining the agreeable, you

21   know, fair compensation here?

22         A.    What is the basis?  I mean, David at

23   A1 Wholesale should have the best deal possible

24   for A1.  Mark, you know, should do the best

25   thing he can do for Martian.

1           But, I mean, I believe at the end of
2   the day, Mark is satisfied with what he got, and
3   was happy with the business continuing, or if
4   there was donations made in his name, he was
5   happy with the way it was going.
6          Q.   So from your -- your end of things
7   as -- as JOpen, what role exactly is -- is
8   Martian playing?
9           What -- what is their -- their role
10  in the supply chain here to get OPMS Kratom
11  created and ultimately sold?
12                    MS. PAYTON:  Object to
13       the form of the question.
14         A.   I think that was maybe more than one
15  question, so maybe I -- I don't know if you can
16  split it up, if you don't mind?
17  BY MR. COWGILL:
18         Q.   Yeah, no, that -- that's -- that's
19  totally fair.
20          So from JOpen's perspective, what
21  role does Martian play in the supply chain for
22  OPMS Kratom?
23                    MS. PAYTON:  Object to
24       the form.
25         A.   I don't know about the supply chain.

Page 299

1   And I guess it depends when you say "supply
2   chain."
3              They -- I believe they did contract
4   with Nuza and with Calibre, so they at least get
5   product to us as OPMS product.
6              They did negotiate a contract with
7   us to distribute and to get it packaged and to
8   get some marketing done.  So they've done that.
9              They've also -- you know, it's --
10  it's their organization; it's their product.
11  They originally designed the product, they've
12  made the product, they've worked specifically
13  with me on trying to get the -- the label, at --
14  at one point, obviously, the label warnings
15  updated with counsel, and -- and later on
16  they've asked us to modify the label to -- to
17  try to deal with counterfeiting.
18             And the label right now, it's --
19  it's -- another factor is it's just way more
20  expensive than it was in the past, so that also
21  eats into profits.
22             And they've lowered prices over
23  time, so they've had control over what prices
24  stuff -- what prices their products were sold
25  for in the market.

Page 302

1       Q.   Is that, like, just relying on the
2   AKA emails, or is there something specific that
3   you have set up with the AKA for that service?
4       A.   No.  We just go onto AKA's websites,
5   and then of course through our counsel.
6       Q.   Okay.  Let me pull up some other
7   exhibits here.  I'm just making sure before we
8   dive in here -- okay.
9            OPMSWholesale.com, that's not a
10  website that JOpen has played any role in?
11               MS. PAYTON:  Object to
12       the form; asked and answered.
13       A.   Correct.
14  BY MR. COWGILL:
15       Q.   But OPMSKratom.com, that is a
16  website that JOpen has been involved with in
17  collaboration with Martian and Onix?
18       A.   It -- it's something we work with
19  Martian on.
20       Q.   And Onix, as well, or --
21       A.   I mean, Onix does the physical work,
22  but if you look at the website, there's not a
23  whole lot on that website that's changed over
24  the years.  It's informational.
25       (Exhibit 12 marked for identification.)

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access

controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.