# EXHIBIT 3

```
                                                              Page 1
 1             IN THE UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF LOUISIANA
 3    KATHLEEN MOLLER,                  |
                         Plaintiff,     |
 4    V.                                | CIVIL ACTION
                                        | NO. 20-0228-WBY-DPC
 5    MARTIAN SALES INC.; JOPEN, LLC, a |
      Texas limited liability company;  |
 6    JOHNSON FOODS, LLC, a Wyoming     |
      limited liability company; CAG   |
 7    Holdings, LLC, a Wyoming limited  |
      liability company; RMH HOLDINGS,  |
 8    INC., a Wyoming corporation; ABC  |
      INSURANCE COMPANY and JOHN DOES   |
 9    1-4,                              |
                                        |
10                       Defendants.    |
      _____|
11
        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
12
                    IN AND FOR COWLITZ COUNTY
13
      RACHEL MCKIBBAN, Individually     |
14    and as Personal Representative    |
      of the Estate of JORDAN           |
15    MCKIBBAN, Deceased,               |
                         Plaintiffs,    |
16    V.                                | NO. 23-2-01183-08
                                        |
17    JOPEN, LLC, a Texas limited       |
      Liability Company; JOHNSON FOODS, |
18    LLC, a Wyoming limited Liability  |
      Company; LP IND, LLC, a Wyoming   |
19    limited liability company; CAG    | [CAPTION CONTINUED]
20
21            30(b)(6) REMOTE VIDEO-RECORDED
22         DEPOSITION OF JOHNSON FOODS, LLC, BY
23                 CATHERINE ANN MIANO
24                  November 22, 2024
25                9:03 a.m. Pacific Time
```

Page 2

```
 1    [CAPTION CONTINUED:]
 2    HOLDINGS, LLC, a Wyoming limited    |
      liability company; RMH HOLDINGS,    |
 3    INC., a Wyoming corporation;        |
      OLISTICA, an unincorporated         |
 4    association; MIT THERAPY, INC.,     |
      an Idaho corporation; DURITY        |
 5    DISTRIBUTION, INC, an Idaho         |
      corporation; HUSH WORLDWIDE LLC,    |
 6    a Wyoming Limited liability         |
      company; DRIP DROP DISTRO LLC,      |
 7    an Idaho limited liability          |
      company; BEDROCK MFG LLC, a         |
 8    Wyoming limited liability           |
      company; CLOUD HOUSE VAPORZ,        |
 9    INC., a Washington corporation;     |
      AMERICAN KRATOM ASSOCIATION, a      |
10    Virginia non-profit corporation;    |
      and JOHN & JANE DOES 1              |
11    THROUGH 10,                         |
                                          |
12                       Defendants.      |
13
14           The remote video-recorded 30(b)(6)
15    deposition of JOHNSON FOODS, LLC, through their
16    designated representative, CATHERINE ANN MIANO,
17    conducted at the location of the witness in
18    Seattle, Washington, reported by Pauline Vargo,
19    Certified Shorthand Reporter - IL C.S.R. No.
20    84-1573, Registered Professional Reporter and
21    Certified Realtime Reporter, on November 22, 2024,
22    commencing at 9:04 a.m. Pacific Time.
23
24
25
```

```
                                                    Page 3
 1                   A P P E A R A N C E S
 2                    All Parties Appearing
 3                   Via Zoom Videoconference
 4   On behalf of the Plaintiff:
 5        MCTLAW
          1325 4th Avenue, Suite 1730
 6        Seattle, Washington  98101
          (206) 487-7371
 7        BY:  MICHAEL J. COWGILL, ESQ.
               mcogill@mctlaw.com
 8             TALIS ABOLINS, ESQ.
               tabolins@mctlaw.com
 9
10   On behalf of Defendant Johnson Foods, LLC:
11        RYAN SWANSON & CLEVELAND, LLC
          401 Union Street, Suite 1500
12        Seattle, Washington 98101-2668
          (206) 654-2276
13        BY:  GRETCHEN J. HOOG, ESQ.
               hoog@ryanlaw.com
14             JULIA FLEMING, ESQ.
               jfleming@ryanlaw.com
15
16   On behalf of Defendants Martian Sales,
     Incorporated; JOPEN, LLC; LP IND, LLC;
17   CAG Holdings, LLC; RHM Holdings, LLC:
18        KILPATRICK TOWNSEND & STOCKTON, LLP,
          2001 Ross Avenue, Suite 4400
19        Dallas, Texas  75201
          (214) 922-7138
20        BY:  MAEGHAN E. WHITEHEAD, ESQ.
               mewhitehead@ktslaw.com
21
          GIEGER LABORDE & LAPEROUSE, LLC
22        701 Poydras Street, Suite 4800
          New Orleans, Louisiana 70139
23        BY:  JOHN E. BAAY, II, ESQ.
               jbaay@glllaw.com
24
25
```

```
 1    On behalf of Drip Drop Distro, LLC
      and Bedrock LLC
 2
             MILLER NASH, LLP
 3           1140 SW Washington St, Suite 700
             Portland, Oregon 97205
 4           (503) 205-2375
             BY:  BRIANNA J. MORRISON, ESQ.
 5
 6    On behalf of Defendant Hush Worldwide LLC:
 7           CORR CRONIN
             1015 Second Avenue, Floor 10
 8           Seattle, Washington 98104-1001
             (206) 501-3517
 9           BY:  TARYN BASAURI, ESQ.
                  tbasauri@corrcronin.com
10
11    On behalf of Defendant
      American Kratom Association:
12
             DLA Piper LLP (US)
13           444 West Lake Street, Suite 900
             Chicago, Illinois  60606-0089
14           (312) 368-4000
             BY:  JOE CAREY, ESQ.
15                joe.carey@dlapiper.com
16    Also Present:
17           KAREN KEEBLER, Videographer
18
19
20
21
22
23
24
25
```

1  Q. Who is your client?
2  A. Telescaph is our only client.
3  Q. So Johnson Foods has one client, which
4  is Telescaph. Does that mean Johnson Foods is
5  wholly funded by Telescaph?
6      MR. BAAY: Object to form.
7  A. Define funded.
8      THE WITNESS: I'm sorry, John.
9      MR. BAAY: No, no, that's okay. You
10 can answer if you understand.
11     THE WITNESS: Yeah, I don't
12 understand. Define funded.
13 BY MR. COWGILL:
14 Q. Is Johnson Foods' work on behalf of
15 Telescaph its only source of income?
16 A. Currently it is the only source of
17 revenue until next month, yes.
18 Q. You said only source of revenue. Does
19 that mean there are other sources of income?
20 A. Is there a difference? I don't know. I
21 don't understand the question.
22 Q. Well, is there a difference to you
23 because I phrased the question with the word
24 "income" and your response had "revenue"? So I'm
25 just trying to clarify and understand.

Page 44

```
 1        A.      I just chose a different word.
 2        Q.      Okay.  So you meant revenue to mean the
 3   same thing as income?
 4        A.      Yeah, because a business, it's revenue.
 5   We don't refer to it as income.
 6        Q.      So with Telescaph, are communications
 7   made over any ephemeral messaging platform like
 8   Signal?
 9        A.      No.
10        Q.      How does Johnson Foods communicate with
11   Telescaph?
12        A.      Just email and phone calls.
13        Q.      Is there a specific point of contact at
14   Telescaph?
15        A.      For which communications?
16        Q.      Are there multiple points of contact?
17        A.      The -- yes.  We communicate with the
18   admin office to submit invoices and work.
19        Q.      If you don't mind, just go through the
20   points of contact with Telescaph for me.  That's
21   one of them.  What other ones are there?
22        A.      I work with Mark Jennings.
23        Q.      Mark Jennings works for Telescaph?
24        A.      He doesn't work with Telescaph.  I
25   communicate with Mark about work for Telescaph.
```

Page 45

1  Q. Can you explain that a little bit? Who
2  does Mark Jennings work for?
3  A. NP Pharma, I believe.
4  Q. So why are you communicating with Mark
5  Jennings about the work Johnson Foods is doing for
6  Telescaph?
7  A. Because we -- he has a relationship with
8  Telescaph without working for them.
9  Q. What's your understanding of that
10 relationship?
11 A. I don't have an understanding of that
12 relationship. I just know that there is one.
13 Q. Other than the admin office where you
14 send invoices, is there any other point of contact
15 with Telescaph directly?
16 A. No. I send my work to that -- our work
17 to that email as well.
18 Q. What's the email?
19 A. I would have to look it up. I don't
20 know what it is off the top of my head. It is
21 Telescaph at something.
22 Q. Is there an actual person within the
23 admin office that you regularly communicate with?
24 A. Yeah. They answer my emails.
25 Q. What's the name of the person that you

Page 69

1   Q.   Do you know if any Johnson Foods-related
2   work was conducted from that address?
3   A.   I couldn't tell you.
4   Q.   Since you have been CEO in May, May 1st,
5   2024, to present, is it your understanding that no
6   work has been done at this address in Oregon on
7   behalf of Johnson Foods?
8   A.   Correct.
9   Q.   And going back to Exhibit 10.  Are you
10  familiar with this address, 2550 Sandy Plain Road
11  in Marietta, Georgia?
12  A.   Only that it's a mistake on here and
13  that I believe we've corrected.
14  Q.   Can you explain what you mean by that?
15  A.   Yeah.  It -- they were supposed to be
16  Luis's address on these documents.
17  Q.   So this document here is the original
18  articles of incorporation for Johnson Foods back in
19  August 10th of '21.  It lists the principal office
20  address for Johnson Foods as 2550 Sandy Plains
21  Road.  You are saying that was now changed.  What
22  has it been changed to?
23  A.   It was mistakenly put on there. It
24  should have been Luis's address, not whatever this
25  address is in Georgia.

Page 70

```
1        Q.     Meaning this Keizer, Oregon, address?
2        A.     I assume, if that's his, but I can tell
3   you what the address was correct at the time.
4        Q.     Do you know what the current address is
5   for Johnson Foods' principal office?
6        A.     No.  I would have to look at the
7   paperwork.  Not off the top of my head.
8        Q.     You said it changed.  Do you know when
9   it was changed?
10       A.     I believe we -- I don't know that it was
11  changed on the LLC, but I believe that we corrected
12  it in our discovery responses --
13       Q.     My question --
14       A.     -- to clarify the question, to --
15  sorry -- to clarify the issue with these questions
16  that I'm guessing you are about to ask me about.
17       Q.     Well, the question is whether this
18  address has been changed with the Secretary of
19  State for the State of Wyoming.  Do you know if
20  that's the case?
21       A.     I couldn't tell you because I don't
22  know.
23       Q.     Are you familiar with David Watson?
24       A.     I am.
25       Q.     Have you worked with him in -- with
```

Page 73

1           MR. COWGILL:  Ten is no problem.
2           THE VIDEOGRAPHER:  We are off the
3     record.  The time is 1:22 Eastern Time.
4               (Recess taken,
5               10:21 - 10:34 a.m. Pacific Time)
6           THE VIDEOGRAPHER:  We are back on the
7     record.  The time is 1:34.
8   BY MR. COWGILL:
9       Q.   All right, Miss Miano.  We are back on
10  the record here.  I want to pull up these exhibits
11  again.
12      A.   Okay.
13      Q.   So a moment ago you were testifying
14  about how this 2550 Sandy Plains Road listing as
15  the principal office for Johnson Foods was a
16  mistake when it was done in August 10th of 2021 and
17  that it should have been the Keizer address, right?
18      A.   Whatever Luis's address was at the time.
19      Q.   How did you become aware of that
20  mistake?
21      A.   Going through documents for discovery.
22      Q.   So did someone make you aware or you
23  uncovered it yourself?
24      A.   I uncovered it by reading it because I
25  know it's not correct.

Page 80

```
 1   BY MR. COWGILL:
 2        Q.     I will show you Exhibit 11, which is a
 3   State of Wyoming Secretary of State printout for
 4   CC US Holdings.  I just want to point out an
 5   address change, where there is an address change
 6   here on April 28th, 2021, and it is changed from an
 7   address in Wyoming to the same address where
 8   Johnson Foods was registered.  Do you see this,
 9   2550 Sandy Plains Road --
10        A.     I do.
11        Q.     -- suite number?
12                    (Exhibit 12 was marked for
13                    identification and is attached to
14                    the transcript.)
15   BY MR. COWGILL:
16        Q.     Likewise, Martian Sales Incorporated --
17   this is Exhibit 12 -- listed its principal address
18   at the same location.  Do you see that?
19        A.     I do.
20        Q.     Do you have any understanding of why
21   Johnson Foods would be sharing the same principal
22   address as these entities?
23        A.     As I've stated before, I believe that
24   that was a mistake when the original paperwork was
25   set up.
```

Page 134

```
1        A.    I'm sorry.  Say that again.
2        Q.    Do you know why he left?
3        A.    I couldn't comment on why he chose to
4   leave.
5        Q.    And let's just keep going in order, but
6   we will get to what you just mentioned a moment ago.
7              So Mr. Jennings, Mark Jennings, we
8   talked about him as well.  You have worked with him
9   both in his capacity with NP Pharma and NP Biotech.
10  Is that right?
11       A.    NP Pharma only.
12       Q.    That's right.  You said NP Biotech was
13  Peyton Palaio?
14       A.    Correct.
15       Q.    Apologies.  So, all right.  Getting to
16  Swift Strategy, so Sibyl Swift, I know you
17  testified she is with NP Pharma.  Correct?
18       A.    Correct.  She is now.
19       Q.    So was Swift Strategy her own
20  independent contractor sort of LLC or entity?
21       A.    Correct.
22       Q.    So can you kind of clarify the timelines
23  there where she was with Swift Strategy and where
24  she was employed with NP Pharma?
25       A.    Yeah.  Swift -- Sibyl is amazing, and so
```

Page 286

1  over.
2     Q.    So the only individual who is actually
3  getting substantive reports of that scope of work
4  verbally is Mark Jennings?
5           MS. HOOG:   Object to the form.
6     A.    No.  He is the one that I'm
7  communicating with, but he is communicating with
8  others, so he is not the only person.
9     Q.    But the only person receiving it from --
10 those communications from Johnson Foods regarding
11 what's been done under the Telescaph scope of work
12 is Mark Jennings and then followup emails?
13    A.    And then emails, yes, sending work.
14    Q.    And you actually don't know the name of
15 the person who is receiving the emails?
16    A.    I don't offhand.
17    Q.    Is that person like an owner or a
18 manager, or is it more like they are an
19 administrative, assistant type of person?
20          MS. HOOG:   Objection.
21    A.    I just said I don't know, so I can't
22 comment.  Sorry.
23    Q.    You not only don't know their name
24 offhand, but you are not even sure what role they
25 have in the company?

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.