# EXHIBIT 9

```
 1           IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
 2                      IN AND FOR COWLITZ COUNTY
 3                        NO: 23-2-01183-08
 4   *********************************
 5   RACHEL McKIBBAN, individually and
     as Personal Representative of the
 6   Estate of JORDAN McKIBBAN, deceased,
 7        Plaintiffs,
 8     vs.
 9   JOPEN, LLC, Texas limited liability
     Company, et al.,
10
             Defendants.
11
     *********************************
12
13
14
15                          VOLUME 2
16
17
18          The remote video deposition of
19          MARK JENNINGS, taken via Zoom
20          web conference on October 2,
21          2024, commencing at approximately
22          10:08 a.m. EDT
23
24
25
```

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3               MCTLAW
                 1325 4th Avenue, #1730
 4               Seattle, Washington  98101
                 BY:   Michael J. Cowgill, Esquire
 5                     Mcowgill@mctlaw.com
                       Talis Abolins, Esquire
 6                     Tabolins@mctlaw.com
                       Tamara Spires, Esq.
 7                     Tspires@mctlaw.com
 8   FOR DEFENDANTS LP IND,  LLC, CAG HOLDINGS, LLC; RMH
     HOLDINGS, INC.; OLISTICA; AND JOPEN, LLC:
 9
                 KILPATRICK TOWNSEND & STOCKTON, LLP
10               1420 5th Avenue, Suite 3700
                 Seattle, Washington  98101
11               BY:   Gwendolyn C. Payton, Esquire
                       Gpayton@ktslaw.com
12
     FOR DEFENDANT DRIP DROP DISTRO, LLC and BEDROCK MFG, LLC:
13
                 MILLER NASH, LLP
14               111 SW Fifth Avenue, Suite 3400
                 Portland, Oregon  97204
15               BY:   K. Michael Fandel, Esquire
                       Brianna Morrison, Esq.
16                     Brianna.morrison@millernash.com
17   FOR DEFENDANT HUSH WORLDWIDE, LLC;
                 Corr Cronin, LLP
18               1015 Second Avenue, Floor 10
                 Seattle, Washington  98104
19               BY:   Taryn Basauri, Esq.
                       Tbasauri@corrcronin.com
20
     FOR JOHNSON FOODS:
21
                 GEIGER, LABORDE & LAPEROUSE
22               701 Poydras Street, Suite 4800
                 New Orleans, Louisiana 70139
23               BY:   John Baay, Esquire
                       Jbaay@glllaw.com
24                     Chad Hill, Esquire
                       Chill@glllaw.com
25
```

1              A P P E A R A N C E S - (continued)
2
3    FOR DEFENDANT JOHNSON FOODS, LLC:
4              RYAN, SWANSON & CLEVELAND, PLLC
               401 Union Street, Suite 1500
5              Seattle, Washington  98101
               BY:  Gretchen J. Hoog, Esq.
6                   Hoog@ryanlaw.com
7
8    ALSO PRESENT:
9              Pamela Mauldin
               Dennis McKibban
10
               Kelly Mims, Johnson Foods corporate rep
11
12
13   VIDEOGRAPHER:
14        Karen Keebler
15
16
17
18
19
20
21      Lois Anne Robinson, RDR, CRR
        Court Reporter
22
23
24
25

Page 302

```
 1   Q        And about what year was that meeting?
 2   A        2017, I believe.
 3   Q        And do you understand that Louis Perez
 4   was identified as the first sole member of
 5   Johnson Foods and its CEO?
 6   A        Yes.
 7   Q        How did it come to be that Johnson
 8   Foods was developed, if you know?
 9   A        I don't know.
10   Q        Was the concept of Johnson Foods
11   something that was discussed among those involved
12   with Olistica before it was created?
13   A        No.
14   Q        Why did you communicate the alignment
15   strategy through phone calls rather than emails?
16   A        That's just how I prefer to operate.
17   Q        And was this --
18            You know, who was involved in setting
19   up the various Olistica emails for -- for folks
20   to use?
21   A        I believe it was the IT company that
22   was contracted.
23   Q        Is that the company you spoke of on
24   Friday?
25   A        Yes.
```

Page 318

```
 1   A        I'm the manager.
 2   Q        So as the manager of NP Pharma,
 3   Johnsons Foods is paying NP Pharma for what?
 4   MS. PAYTON:
 5            Object to the form.
 6   A        Scientific and literature review.
 7   MR. ABOLINS:
 8   Q        And what is Johnson Foods' relationship
 9   with NP Biotech?
10   A        I'm not certain of their arrangement.
11   Q        But they're involved with Johnson Foods
12   as well; correct?
13   A        Yes, I believe so.
14   Q        Is Peyton Palaio involved in any way
15   with NP Biotech?
16   A        I don't know the answer.
17   Q        Is Mr. Hoban?
18   A        I don't know the answer.
19   Q        Did you speak with Peyton Palaio about
20   how Friday's deposition went?
21   A        Briefly, yes.
22   Q        And what did you tell him?
23   A        I said "I think it went all right."
24   Q        And do you know if Mr. Hoban was told
25   about the deposition?
```

1  strategy?
2  MS. PAYTON:
3          Object to the form.  Asked and
4  answered.
5  A       Jordan Process, Companion Ag, Naturea
6  Biomaterials, Cascade Naturals, and Della Terra.
7  MR. ABOLINS:
8  Q       Okay.  And, now, Naturea Biomaterials,
9  that one -- I think you said that one never got
10 off the ground in any way?
11 A       Correct.
12 Q       Now, let's start at the top.  The CC US
13 Holdings, that does business at Centralized
14 Services; right?
15 A       Yes.
16 Q       And it was formed in 2019; correct?
17 A       I believe so.
18 Q       And you mentioned or we have
19 information indicating that it's headquarters and
20 back office for LP Industries, CAG, RMH, Calibre,
21 Pacific West Holdings and Nuza; correct?
22 A       It provides services for those
23 entities.
24 Q       What services does it provide for those
25 entities?  And if they're different, go ahead and

Page 347

```
 1   explain the difference.
 2   A         HR, accounting, and IT.
 3   Q         So does it provide the same suite of
 4   services for all of these entities?
 5   MS. PAYTON:
 6             Object to the form.
 7   A         I think we would need to go entity by
 8   entity.  I don't want to generalize.
 9   MR. ABOLINS:
10   Q         Okay.  And before we do that, what
11   other entities on this exhibit does CC US
12   Holdings provide services to?
13   MS. PAYTON:
14             Object to the form.  I think we've
15   answered that a couple times now.
16   MR. ABOLINS:
17   Q         I want to make sure this is accurate,
18   Mr. Jennings.
19   MS. PAYTON:
20             What is accurate?
21   MR. ABOLINS:
22             The statement of which entities
23   received services from CC US Holdings.
24   MS. PAYTON:
25             Object to the form.
```

Page 348

1  A         I was not asked to prepare for details
2  around CC US Holdings today.
3  MR. ABOLINS:
4  Q         Well, the -- the deposition notice
5  involves the discussion of Olistica and its
6  affiliated entities.  We have a document,
7  granted, you were not apparently aware of, which
8  shows that CC US Holdings is identified as, you
9  know, the first box in the long list of business
10 units under Olistica Life Sciences Group, and now
11 we have you testifying to which of the Olistica
12 affiliated business units that we've identified
13 are receiving services from this CC US Holdings.
14           And, so, I think it is well within the
15 scope of this deposition to clear up on this
16 exhibit, you know, which ones of these entities
17 in the blue boxes are receiving some form of
18 service or support from CC US Holdings.
19 MS. PAYTON:
20           Object to the narrative.  Object to the
21 form.  I think that was a lecture, not a
22 question.  So what's the question?
23 MR. ABOLINS:
24 Q         What other entities in the blue boxes,
25 beyond those specified in the orange box, receive

Page 349

1   services or support from CC US Holdings?
2   MS. PAYTON:
3           Object to the form of the question.
4   A       NP Pharma Holdings also receives
5   support.
6   MR. ABOLINS:
7   Q       So, going to the left, we have
8   Cascade Naturals and -- as one of the Olistica
9   business units, at least in the concept, and
10  Cascade, the d/b/a for Cascade Naturals was
11  utilized by Pacific West Holdings; correct?
12  A       Correct.
13  Q       And that entity existed in 2019; right?
14  A       Yes, I believe so.
15  Q       And that entity is involved with kratom
16  activities related to Johnson Foods; correct?
17  A       I don't believe so.
18  Q       What is your role with Pacific West
19  Holdings?
20  A       Manager.
21  Q       As a manager, shouldn't you be aware of
22  the extent to which Pacific West Holdings is
23  associated with kratom activities?
24  MS. PAYTON:
25          Object -- object to the form of the

Page 351

```
 1   activities?
 2   A         There's an offsite tree farm.
 3   Q         What city?
 4   A         Salem.
 5   Q         Okay.  So, then, moving to
 6   NP BioPharma, is there a --
 7   A         There is no NP BioPharma listed here.
 8   Sorry for interrupting.
 9   Q         Okay.  So the NP Biotech, LLC, what
10   relationship does that have to any of the
11   entities identified on this exhibit?
12   MS. PAYTON:
13             Object to the form.  Asked and
14   answered.
15   A         None.
16   MR. ABOLINS:
17   Q         Are you aware of the circumstances
18   involving NP Biotech's purchase of kratom on
19   behalf of Johnson Foods for the NDIN study?
20   A         No.
21   Q         You are familiar with the NDIN study;
22   correct?
23   A         I'm familiar with a clinical study.
24   Q         And this is a clinical study that
25   relates to Johnson Foods' efforts to prepare and
```

Page 352

1  notice -- a notice -- a new dietary ingredient
2  notification, or also known as an NDIN; correct?
3  A       Yes.
4  Q       And what is your role when it comes to
5  that clinical study and the associated NDIN?
6  A       I was managing the employee of
7  NP Pharma who was contracted by Johnson Foods to
8  review the clinical information.
9  Q       And where did the kratom come from that
10 was used in that clinical study?
11 A       I don't know.
12 Q       Was that kratom from the same source of
13 kratom identified in the Cleanview litigation for
14 national distribution in the United States?
15 MS. PAYTON:
16         Object to the form.  Vague.  Asked and
17 answered.
18 A       I don't know.
19 MR. ABOLINS:
20 Q       Who would know?
21 A       Somebody at NP Biotech.
22 Q       Where did that clinical study take
23 place?
24 A       In Canada.
25 Q       Tampa, Florida?

Page 354

```
 1   A         Yes, I think that's fair to say.
 2   MR. ABOLINS:
 3   Q         And, again, are you familiar with the
 4   MitraLeaf concept?
 5   MS. PAYTON:
 6             Object to the form.  Asked and
 7   answered.
 8   A         Yes, I am.
 9   MR. ABOLINS:
10   Q         Who owns the rights to the MitraLeaf
11   concept?
12   A         I don't know.
13   Q         Moving down to Jordan Process, that
14   business unit is -- that's -- of Olistica is the
15   d/b/a for LP Industries; correct?
16   MS. PAYTON:
17             Object to the form.
18   A         Yes.
19   MR. ABOLINS:
20   Q         And it was up and running in 2019 as
21   well; right?
22   A         It was under construction in 2019.
23   Q         But the business was formed in Wyoming
24   in 2019; right?
25   A         Yes, I believe so.
```

Page 355

```
 1   Q           And it operates the Springfield,
 2   Colorado, facility; right?
 3   A           Yes.
 4   Q           And it was involved in kratom
 5   extraction for OPMS; right?
 6   A           As of the later part of 2021, yes.
 7   Q           How late?
 8   A           I believe it was August or September.
 9   Q           How did that kratom activity or
10   contract come about?
11   MS. PAYTON:
12               Object to the form.
13   A           Liv Group had contracted LP IND.
14   MR. ABOLINS:
15   Q           What was the nature of that contract?
16   A           Contract manufacturing.
17   Q           So there's a contract manufacturing
18   agreement between Liv Group and LP IND?
19   A           Yes.
20   Q           And what are the terms of that
21   agreement?
22   A           I would need the contract in front of
23   me to relay the terms accurately.
24   Q           But who's -- who's receiving payment
25   for the contract manufacturing under that
```

Page 359

```
 1   bulk extract that's an ingredient, and it would
 2   go to Calibre Manufacturing.
 3   Q        And Calibre Manufacturing received
 4   services from CC US; right?
 5   A        Yes.
 6   Q        What are the services specifically that
 7   Calibre Manufacturing receives from CC US?
 8   A        HR, IT, and accounting.
 9   Q        Who are the common owners shared
10   between Calibre and CC US?
11   A        I'm not certain of the ownership
12   structure.
13   Q        Who are the common managers?
14   A        That would be me.
15   Q        So you manage both of these entities?
16   A        I do.
17   Q        Who do you answer to in terms of a
18   representative for the owner group?
19   A        I generally report to Peyton.
20   Q        Who put you in charge as a manager on
21   behalf of the owner group?
22   MS. PAYTON:
23            Object to the form.
24   A        That would have been Sam Palaio, his
25   grandfather.
```

Page 381

1  whether Alphabet Wholesale was a d/b/a of the Liv
2  Group business unit?
3  MS. PAYTON:
4           Object to the form.  Asked and
5  answered.
6  A        I do not.
7  MR. ABOLINS:
8  Q        Okay.  So you're not in position to
9  deny that; right?
10 MS. PAYTON:
11          Object to the form.  Asked and
12 answered.
13 A        No.
14 MR. ABOLINS:
15 Q        And were there any other kratom
16 products besides Martian Sales products that were
17 processed by Liv Group?
18 A        Not to my knowledge.
19 Q        Can RMH Holdings, Inc., and RMH
20 Holdings II, those are businesses that do
21 business as Canopy; right?
22 A        Yes, I believe so.
23 Q        And what is -- and they operate out of
24 the Springfield, Colorado, facility?
25 A        They did.  They no longer do.

877-370-3377          A Veritext Division          www.veritext.com


Page 382

1   Q          And they also purported to operate out
2   of a Washington facility; right?
3   A          No, not to my knowledge.
4   Q          Do you have any basis --
5              Is that an affirmative no, that Canopy
6   never purported to operate out of a Washington
7   facility?
8   A          That's a no.
9   Q          Okay.  What is the distinction between
10  the two entities?
11  MS. PAYTON:
12             Objection to form.
13  A          I'm not certain there is a difference.
14  MR. ABOLINS:
15  Q          Okay.  And, then, why were two
16  different entities created?
17  A          I think it was for a specific state
18  registration.
19  Q          And CAG Holdings does business as
20  Companion Ag; right?
21  A          Yes.
22  Q          And Companion Ag operates out of the
23  same Springfield facility?
24  A          At the same site but in a different
25  facility on the same site.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access

controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.