EXHIBIT 15

Page 1

```
 1      UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA
 2
    KATHLEEN MOLLER      : CIVIL ACTION NO.
 3    vs.                : 24-0228-WBV-DPC
    MARTIAN SALES, INC;  :
 4  JOPEN, LLC, a Texas  : Judge Wendy B.
    limited liability    : Vitter
 5  company; JOHNSON     :
    FOODS, LLC, a        :
 6  Wyoming limited      : MAGISTRATE DONNA
    liability company;   : PHILLIPS CURRAULT
 7  LP IND., LLC, a      :
    Wyoming limited      :
 8  liability company;   :
    CAG HOLDINGS, LLC,   :
 9  a Wyoming limited    :
    liability company;   :
10  RMH HOLDINGS, INC.,  :
    a Wyoming            :
11  corporation; ABC     :
    INSURANCE COMPANY,   :
12  and John Does 1-4.   :
13                 - - -
14           October 28, 2024
15                 - - -
16      Videotaped deposition of MARK REILLY,
    taken pursuant to notice, at the location
17  of the witness, Seattle, Washington,
    commencing on the above date at or about
18  9:00 a.m. PST/12:00 p.m. EST before
    Eileen P. Barth, C.S.R., N.P.
19
                   - - -
20
21
22
23
24  Job No. MDLG6937333
```

Page 2

```
 1    APPEARANCES:
 2          MAGLIO, CHRISTOPHER & TOALE, P.A.
             BY:  MICHAEL J. COWGILL, ESQUIRE
 3               TAMARA SPIRES, ESQUIRE
             1515 Ringling Boulevard
 4           Suite 700
             Sarasota, FL  32426
 5           mcowgill@mctlaw.com
             twilliams@mctlaw.com
 6           Attorneys for the Plaintiff
 7
             KILPATRICK TOWNSEND & STOCKTON LLP
 8           BY:  GWENDOLYN C. PAYTON, ESQUIRE
             1420 Fifth Avenue
 9           Suite 3700
             Seattle, WA  98101
10           gpayton@ktslaw.com
             Attorneys for the Defendants
11
12           GIEGER, LABORDE & LAPEROUSE
             BY:  JOHN E. W. BAAY, II, ESQUIRE
13           701 Poydras Street
             New Orleans, LA  70139
14           jbaay@glllaw.com
             Attorneys for the Defendant
15           Johnson Foods
16
17    ALSO PRESENT:
18           Phillip Todd, Videographer
19
20
21
22
23
24
```

Page 56

1              MS. PAYTON:  Object to the

2         form.

3              THE WITNESS:  I do, yes.

4    BY MR. COWGILL:

5         Q.    Is A1 Wholesale an exclusive

6    distributor for Martian Sales?

7         A.    I wouldn't say it's

8    exclusive, but it's, like, the only one

9    that I'm using right now.

10             Q.    When did you first start

11   working with A1?

12             MS. PAYTON:  I'm so sorry.

13        I missed the end of the question.

14   BY MR. COWGILL:

15             Q.    When did you start --

16             MS. PAYTON:  When did you

17        start --

18   BY MR. COWGILL:

19             Q.    When did you first start

20   working with A1 Wholesale?

21             A.    Maybe back in, like, 2015.

22             Q.    And a moment ago, you

23   testified that A1 Wholesale is the only

24   distributor you're working with right

Page 72

1    didn't you incorporate Martian Sales in

2    Georgia?

3                    MS. PAYTON:  I'm going to

4            object to the form.  It calls for

5            a legal conclusion.  The witness

6            has already testified that it is

7            privileged.

8                    Instruct you not to answer

9            that question.

10   BY MR. COWGILL:

11           Q.    Did an attorney advise you

12   to incorporate Martian Sales in Wyoming?

13           A.    Pardon?

14           Q.    Did an attorney advise you

15   to incorporate Martian Sales in Wyoming?

16           A.    I believe so, yes.

17           Q.    Were you aware that Wyoming

18   doesn't require disclosure of members of

19   an LLC or a corporation?

20                   MS. PAYTON:  Hold on.  I'm

21           going to object to the form.

22                   Instruct you not to answer

23           if it calls for information that

24           you received only from your

Page 100

```
 1    processor, then to the packager?
 2            A.     Correct.
 3            Q.     And --
 4            A.     Could I get some water?
 5            MS. PAYTON:   Yeah.
 6    BY MR. COWGILL:
 7            Q.     During what time frame has
 8    Martian Sales been working with Nuza?
 9            A.     Maybe since, like, 2018 or
10    '19.   No.   Probably -- 2020, maybe.
11            Sorry.   I'm really bad with
12    time.
13            Q.     Is Nuza located in
14    Louisiana?
15            A.     No.
16            Q.     Where is Nuza located?
17            A.     I want to say they're based
18    out of Atlanta.
19            Q.     Atlanta?
20            A.     Yes, sir.
21            Q.     Caliber -- or Calibre
22    Manufacturing, you're familiar with that
23    entity?
24            A.     Yes, sir.
```

Page 101

```
 1          Q.     What sort of work does
 2    Calibre do on behalf of Martian Sales?
 3          A.     They do the encapsulation.
 4          Q.     And just so I understand, is
 5    that literally putting kratom powder into
 6    capsules?
 7          A.     Yes, sir.
 8          Q.     And what time frame -- in
 9    what time frame have Calibre and Martian
10    Sales been working together?
11          A.     Maybe just the past couple
12    years, like three or four.
13          Q.     So roughly 2021 until today?
14          A.     Roughly, correct.
15          Q.     And is Calibre located in
16    Louisiana?
17          A.     No.
18          Q.     Where are they located?
19          A.     Georgia.
20          Q.     Where in Georgia?
21          A.     I guess the Atlanta area.
22          Q.     And I think you testified
23    earlier that you recognized the entity
24    Advanced Nutrition?
```

Page 102

```
 1           A.    Yes.
 2           Q.    And has Martian Sales done
 3    any work with Advanced Nutrition?
 4           A.    Yes, sir.
 5           Q.    What sort of work?
 6           A.    They did some -- also
 7    encapsulation.
 8           Q.    During what time frame?
 9           A.    Maybe '15 to '19 or
10    something to that extent, 2015 to 2019.
11           Q.    Was Advanced Nutrition
12    located in North Carolina?
13           A.    Say again?
14           Q.    Advanced Nutrition, was it
15    located in North Carolina?
16           A.    No.
17           Q.    Where was it located?
18           A.    Georgia.
19           Q.    In the Atlanta area?
20           A.    Yeah.
21           Q.    So not located in Louisiana?
22           A.    Correct.  Not located in
23    Louisiana.
24           Q.    All right.  And earlier you
```

```
1    aware of Olistica Life Sciences Group
2    being involved in that work at RMH?
3              A.    That's just where I heard
4    about it.
5              Q.    Who did you hear about it
6    from?
7              A.    I can't remember.
8              Q.    I think you testified
9    earlier that you recognized LIV Group,
10   LLC; is that correct?
11             A.    Yes, sir.
12             Q.    Has Martian done work with
13   LIV Group, LLC?
14             A.    Yes, sir.
15             Q.    What sort of work?
16             A.    They were doing the
17   extraction.
18             Q.    During what time period?
19             A.    2015 to 2018.
20             Q.    Is LIV Group located in
21   Louisiana?
22             A.    No.
23             Q.    Where are they located?
24             A.    They were located in North
```

Page 123

1    subject to those objection, it states,

2    JOPEN, LLC distributes OPMS-branded

3    kratom, some of which is sold in

4    Louisiana.

5              So does that refresh your

6    memory in any way as to who JOPEN, LLC

7    is?

8         A.    I mean, I use A1 to do my

9    distribution.  They must be, like, a

10   d/b/a or something like that.

11        Q.    You think A1 is a d/b/a for

12   JOPEN, LLC?

13        A.    Or vice versa.

14        Q.    Why do you think that?

15        A.    Because that's what it says

16   right there.

17        Q.    How is Martian Sales

18   compensated for sales of OPMS Kratom in

19   the state of Louisiana?

20             MS. PAYTON:    Object to the

21        form.

22             THE WITNESS:    I have a

23        contract with A1.  So I get paid

24        out pretty much once a year or

Page 124

1          however they feel like paying me,

2          I guess.

3     BY MR. COWGILL:

4          Q.    What do you mean, however

5     they feel like paying you?

6          A.    Well, there's no real set

7     time frame of where I'm supposed to be

8     paid, so as long as I'm paid within the

9     year.

10          Q.    And how is that pay

11     calculated?  Is it based on sales in any

12     fashion?  You know, sales by state?

13          A.    No.  We just agreed on a

14     number, and then it just slowly ramps up

15     over time.

16          Q.    What's the basis for the

17     ramping up?

18          A.    I guess the amount of time

19     and stuff we've been working together.

20          Q.    So to your knowledge, your

21     compensation is not related in any way to

22     the sales volume of OPMS Kratom in

23     Louisiana or any other state?

24          A.    Correct.

1          Q.     All right.  Well, let's take

2    a step back and go to Exhibit 6 here.

3                  As stated, this is the

4    Intellectual Property License Agreement,

5    and it looks like this was signed between

6    you, Mark Reilly, on behalf of Martian

7    Sales, Incorporated and -- perhaps you

8    can pronounce it better.  But I think it

9    says Eri?

10          A.     Eri.

11          Q.     -- Eri Wahyu Hidayat?

12          A.     I just know him as Eri.

13    That's what I call him.

14          Q.     Okay.

15                  Do you recall signing this

16    agreement?

17          A.     Yes, sir.

18          Q.     Where were you when you

19    signed this agreement?

20          A.     Oh, in Atlanta, I would

21    assume.

22          Q.     And it looks like this was

23    executed on October 1st, 2014.

24                  Do you see that?

Page 137

1          A.    Yeah.

2          Q.    And so who is Eri?

3          A.    Eri was essentially someone

4     that I let license my product, but really

5     that's just kind of, like, a fluffed-up

6     supply agreement.

7          Q.    What do you mean exactly?

8          A.    Like, it basically gave him

9     -- like, he was the only person that was

10    supplying us with kratom, you know.

11         Q.    So Eri was the exclusive

12    supplier of OPMS Kratom?

13         A.    Essentially, yes.

14         Q.    And so that would have began

15    on of October 1st of 2014.

16               Is this contract still in

17    effect?

18         A.    No.

19         Q.    When did it end?

20         A.    About six or seven years

21    into it.

22         Q.    So approximately 2021 or

23    2020?

24         A.    Something like that; yes,

Page 138

1      sir.

2              Q.      Do you know why that ended,

3      why the contract ended?

4              A.      Yeah.  I terminated it.

5              Q.      Why did you choose to

6      terminate it?

7              A.      He was no longer fulfilling

8      his end.

9              Q.      Meaning he was no longer

10     supplying kratom?

11             A.      Correct.

12             Q.      How did you meet Eri?

13             A.      I found him online.

14             Q.      Did you ever meet in person?

15             A.      I don't think so, no.

16             Q.      When did you first meet him?

17             A.      Probably shortly before the

18     contract was signed.

19             Q.      So 2014?

20             A.      Give or take; yes, sir.

21             Q.      Do you know if Eri ever used

22     the OPMS logos or trademarks?

23             A.      What do you mean by that?

24             Q.      Well, we'll take a look

Page 158

```
 1   sources were located in Louisiana; is
 2   that right?
 3           A.    Correct.
 4           Q.    Is Martian Sales insured?
 5           A.    Pardon?
 6           Q.    Does Martian Sales have
 7   insurance?
 8           A.    No, sir.
 9           Q.    Do you know if Advanced
10   Nutrition did?
11           A.    I do not know, no.
12           Q.    I want to ask about this
13   too, Paragraph 11(h), Notice.  This is
14   for any notices under the agreement with,
15   blank, per customer.
16                 Would notices under this
17   agreement have gone to you?
18           A.    I'm not sure.  Probably not
19   if it was blank.  Who knows?
20           Q.    Do you have any sense of
21   where notices under the agreement would
22   have gone?
23                 MS. PAYTON:  Object to form.
24                 THE WITNESS:  I didn't even
```

Page 176

1          Q.    All right.  I want to ask
2     you about this Paragraph 4 here that
3     says, Martian Sales was incorporated in
4     Wyoming on July 19th, 2012.   Martian
5     Sales' principal place of business is in
6     Wyoming at 1621 Central Avenue, Cheyenne,
7     Wyoming, 82001.
8                Do you see that?
9          A.    I do.
10         Q.    Earlier you testified that
11    you founded Martian Sales in 2014.
12                Do you know why Martian
13    Sales incorporated in Wyoming in 2012?
14         A.    I just must have been
15    misremembering.
16         Q.    So when did you found
17    Martian Sales?
18         A.    I guess July 19th, 2012.
19         Q.    And then this document
20    reiterates or iterates a few things that
21    I wanted to review, but it says, Martian
22    Sales maintains no offices, places of
23    business, post office boxes, or telephone
24    listings in Florida and has never done

Page 194

1    experts in botanical extraction in

2    Louisiana?

3            A.    I have not, no.

4            Q.    Are you familiar with the

5    Find the Store tab on your website?

6            A.    I am.

7            Q.    Let's see here.

8                  Actually, let's look at

9    Exhibit 13.  This is the contact page for

10   OPMS on the OPMS website.

11                Have you ever seen this page

12   before?

13           A.    I have seen that page

14   before.

15           Q.    Do you know where these

16   contact requests go?

17           A.    No.

18           Q.    Do you know who receives

19   them?

20           A.    No.

21           Q.    Do you know who responds to

22   them?

23           A.    No.

24           Q.    Do you know if there's a

Page 195

1    third-party contractor tasked with doing

2    so?

3           A.    No.

4           Q.    And you understand that

5    anyone who accesses the website can use

6    this form; right?

7           A.    I understand.

8           Q.    And do you have any way of

9    knowing, you know, whether you've been

10   contacted through this website from

11   individuals in Louisiana?

12          A.    Wait.  Sorry.  Start over

13   and say it again?  I lost you there.

14          Q.    No problem.

15          Do you have any way of

16   knowing whether individuals in Louisiana

17   have utilized this contact page?

18          A.    I do not.

19          Q.    But they could; right?

20   Someone in Louisiana could access this

21   and use this; right?

22          A.    Yes, they could.

23          Q.    All right.  And I know here

24   it talks about potential fake or

Page 197

1   BY MR. COWGILL:

2        Q.    And again, here it says,

3   Distributed by Choice Organics, Los

4   Angeles, California, made in the U.S.A.

5            You indicated you don't know

6   where Choice Organics is; right?

7        A.    Correct.

8        Q.    Why does your website say

9   that OPMS is distributed by Choice

10  Organics?

11       A.    Oh, I don't manage the

12  website or the content on it, so I

13  wouldn't know.

14       Q.    So A1 is the only one who

15  manages the content on the website?

16       A.    Correct.

17       Q.    Do you have access to the

18  website? Are you able to log in and make

19  alterations to this website?

20       A.    Nope. I have the same

21  access as you.

22       Q.    So who has access to

23  actually come in and edit the website?

24       A.    I don't know.

Page 244

1          A.    I believe Martian Sales has
2     always been registered to do business at
3     my mother's house.
4          Q.    And is that Marietta or
5     Atlanta?
6          A.    That's Atlanta.  Sorry.
7     That was confusing.
8          Q.    Why has it been registered
9     to do business at your mother's house?
10          A.    That's where I was living
11     when I started the company.
12          Q.    Earlier you testified that
13     Martian Sales operated out of 1880 West
14     Oak Parkway for a period of time; right?
15          A.    Correct.
16          Q.    Well, what was the period of
17     time that it operated there?
18          A.    I'm not even sure.  Maybe,
19     like, '18 to '20 or something like that.
20     I'm just guessing, honestly.  I'd rather
21     say I'm not sure, but...
22          Q.    That's fine.
23                I want to direct your
24     attention to Paragraph 3 here.  It says,

Page 245

1    Martian Sales is the owner of certain
2    intellectual property consisting of the
3    tradenames and marks for OPMS brand
4    kratom products.  Beginning in 2014 and
5    continuing since then, Martian Sales has
6    licensed the exclusive right to use the
7    OPMS tradenames and marks to
8    a third party for use in connection with
9    products manufactured, distributed, or
10   sold by that third party.
11            Is your understanding of the
12   third party being referred to here Eri?
13        A.    Yes -- well, no.  The
14   distribution would still be A1.
15            That's what you're asking;
16   right?
17        Q.    I'm just trying to
18   understand who the third party is that's
19   being referred to in this paragraph.
20        A.    That's a good question.
21        Q.    I don't know if that's
22   better for you.
23        A.    Not really because it's in
24   legalese, which I always have trouble

1    understanding.

2                        A1 did the distribution in

3    that time, and Eri was really just --

4    like I said before, that document I had

5    with him was more like a fluffed-up

6    supply agreement.

7            Q.    So Eri was never really

8    involved in the manufacture or processing

9    of kratom.  It was really just sending it

10   here to the U.S.?

11           A.    Correct.

12           Q.    And that was just raw

13   kratom?

14           A.    That's like our supplier,

15   importer, or whatever you want to call

16   it.  He did all the importation on the

17   supply.

18           Q.    And he just sent raw kratom?

19           A.    Correct.  Yes, sir.

20           Q.    He never made extracts and

21   sent those over or anything?

22           A.    Correct, sir.

23           Q.    We're going to take a look

24   at Paragraph 4.  It says, I understand

Page 247

1    that the plaintiff in this case claims

2    that Daniel Scott Paul's death in

3    July 2019 was caused, at least in part,

4    by toxicity due to consuming kratom from

5    packages bearing the OPMS brand.  Martian

6    Sales did not then and does not now

7    manufacture, market, distribute or sell,

8    or participate in any other party's

9    manufacture, marketing, distribution or

10   sale of OPMS brand kratom products.

11   Martian Sales is not involved in and does

12   not exercise any control over how OPMS

13   brand kratom products are marketed or

14   distributed for sale to the public,

15   including to residents of Oregon.

16              Did I read that correctly?

17         A.    I guess.

18         Q.    Can you read it?  You're

19   able to read that; right?

20         A.    Oh, yes.  Yes, sir.

21         Q.    Have you had an opportunity

22   to read it?

23         A.    I'm reading it right now,

24   yeah.  I just read.

1          Q.    All right.  Did I read it in
2    any way incorrectly or inaccurately?
3          A.    No, that --
4                MS. PAYTON:  I'm going to
5          object to this line of
6          questioning.  So either have him
7          read it or you read it.  I think
8          he's getting confused.
9                MR. COWGILL:  Well, I'm just
10         making sure we understand each
11         other.
12   BY MR. COWGILL:
13         Q.    So -- all right.  In terms
14   of -- in the agreements that we reviewed
15   today, you know, we reviewed an agreement
16   with Eri, an agreement with A1 Wholesale,
17   and an agreement with Advanced Nutrition.
18                Do you recall that?
19         A.    Yes, sir.
20         Q.    So Martian Sales has had
21   agreements for the supply of kratom, the
22   distribution of OPMS Kratom, and the
23   processing of OPMS Kratom; right?
24         A.    Yes, sir.

Page 249

1          Q.    So do you think it was
2     accurate to say that Martian Sales did
3     not then and does not now participate in
4     any other party's manufacturing,
5     marketing, or distribution, or sale of
6     OPMS brand products?
7          A.    Yes.
8          Q.    Why do you think that was
9     accurate?
10               MS. PAYTON:  Object to the
11          form of the question.
12               THE WITNESS:  Because I
13          don't really -- I don't do any of
14          those things.
15     BY MR. COWGILL:
16          Q.    You don't have agreements to
17     do those things through other parties?
18          A.    I mean, I do have agreements
19     to do them through other parties, but
20     Martian Sales isn't doing them itself.
21               MR. COWGILL:  All right.  I
22          want to introduce Exhibit 26, and
23          this is Martian Sales,
24          Incorporated's responses to

Page 266

1    your counsel?

2              A.    Yes.

3              Q.    Have you had any direct

4    communication or contact with LP Ind.?

5              A.    No, I don't think so.

6                    MR. COWGILL:  I want to

7              introduce Exhibit 28.  This is

8              another document from the docket

9              in the Weber case filed in Fulton

10             County, and this is an exhibit to

11             a motion, and this is Defendant LP

12             Ind.'s Supplemental Responses and

13             Objections to Plaintiff's

14             Interrogatory Numbers 3, 4, 5, 7

15             and 8.

16   BY MR. COWGILL:

17             Q.    Are you able to see this

18   clearly?

19             A.    Yeah.

20             Q.    All right.  So a couple

21   things to review here.

22                   So Interrogatory Number 7

23   says, Identify every person including job

24   title and dates of employments

Page 267

1    responsible for OPMS Kratom labeling and

2    warnings.

3                    And there's a supplemental

4    response which states, Defendant LP

5    stands on its original response that

6    there is no information responsive to

7    this interrogatory.  Defendant LP further

8    states Defendant Martian Sales identified

9    Mark Reilly in response to this

10   interrogatory.

11                   Now, do you have any

12   understanding of why you were identified

13   in response to this interrogatory?

14          A.    No.  I don't really

15   understand.

16          Q.    So are you, in fact,

17   responsible for OPMS Kratom labeling and

18   warnings?

19          A.    No.

20          Q.    I think you've testified

21   today that A1 is; is that right?

22          A.    Correct.

23          Q.    And I think we covered as

24   well that A1 is a d/b/a for JOPEN, LLC?

Page 275

1    Kratom and how it differs in

2    comparison to the role of the other OPMS

3    Defendants, including Peyton Palaio, LP

4    Ind., LLC, and LGI Holdings, LLC.

5                  There's objections here, and

6    then subject to and without waiving those

7    objections, it says, Martian Sales owns

8    the trademark for OPMS Kratom products.

9    Otherwise, Martian Sales does not have

10   sufficient information or understanding

11   to answer this interrogatory.

12                  So I want to understand.  We

13   talked today about your role regarding

14   OPMS Kratom, and one of those things is

15   owning the trademarks; right?

16          A.     Yes.

17          Q.     Martian Sales has also

18   developed the specifications for the cold

19   water extraction process for actually

20   creating OPMS extracts; is that right?

21          A.     Yes.

22          Q.     And Martian Sales has

23   contracted with other entities to obtain

24   raw kratom for processing for OPMS

Page 276

1    Kratom?

2            A.    Yes.

3            Q.    And it's contracted with

4    other entities to distribute OPMS-branded

5    products throughout the country?

6            A.    Correct, sir.

7            Q.    So with regards to these

8    entities named here, you know, what is

9    Peyton Palaio's role with regards to OPMS

10   Kratom, if any?

11           A.    None.

12           Q.    I think you testified

13   earlier he's just worked for some of the

14   processing entities as either a manager

15   or a member in some capacity?

16           A.    Exactly.

17           Q.    So Peyton's role is limited

18   to being a manager or a member of these

19   entities that process OPMS Kratom?

20                MS. PAYTON:    Object to the

21       form.

22                THE WITNESS:    Yes.

23   BY MR. COWGILL:

24           Q.    And LP Ind.'s role, if I

Page 277

1    understand correctly, is limited to

2    process and [inaudible] OPMS Kratom?

3             A.    Yes, sir.

4                 MS. PAYTON:  Wait.  Object

5         to the form.

6                 I'm sorry.  What was the

7         question?

8                 MR. COWGILL:  Court

9         reporter, can you read it back?  I

10        don't remember exactly.

11                THE COURT REPORTER:  I was

12        going to ask the same thing

13        because the end cut out for me.

14                And Palaio's role is limited

15        to being a manager or member of

16        the entities -- and that's where

17        it went out on me.

18                I'm sorry.

19                And LP Ind.'s role, if I

20        understand it correctly, is

21        limited to process...

22    BY MR. COWGILL:

23             Q.    Okay.  LP Ind.'s role is

24    limited to processing raw kratom for

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.