# EXHIBIT 22

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2                                       )
      KATHLEEN MOLLER,                   )
 3                                       )
                  Plaintiff,             )
 4                                       )
           -vs-                          )24-0228-WBV-DPC
 5                                       )
      MARTIAN SALES, INC., et al.,       )
 6                                       )
                  Defendants.            )
 7
 8
 9                    VOLUME II
10
                 Virtual Deposition of
11               30(b)(6) Designee of
                Defendant Martian Sales
12                   [MARK REILLY]
                  taken on behalf of
13                   the Plaintiff
                 on October 28, 2024.
14
15                   * * * * *
16
17
18
19
20
21
22
23
24
25
```

```
                                                        Page 2
 1                INDEX   OF   EXAMINATION
 2   BY MR. COWGILL                                       8, 71
 3   BY MS. PAYTON                                           69
 4   BY MR. BAAY                                             67
 5
 6
 7                                              EXHIBITS
 8   Ex #.          Description                          Page
 9   Exhibit 1      Notice of Deposition                   27
10   Exhibit 8      Distribution agreement between A1      38
11                     and Martian Sales                   37
12   Exhibit 29     Defendant Martian Sales                44
13                     Incorporated's Answers and
14                     Objections to Plaintiff Susan
15                     Weber's Interrogatories to
16                     Defendant Martian Sales,
17                     Incorporated
18   Exhibit 30     Complaint                              61
19   Exhibit 31     Trademark registration                 61
20   Exhibit 32     Motion to dismiss                      64
21
22
23
24
25
```

Page 3

1      REPORTER'S NOTE 1:  Italicization
2  and/or quotation marks are used for clarity and do
3  not necessarily reflect a direct quote.
4      REPORTER'S NOTE 2:  Please note
5  that due to the quality of a Zoom videoconference
6  and transmission of data, audio distortion can
7  occur which disrupts the process of preparing a
8  videoconferenced transcript.

```
 1                        APPEARANCES:
 2   Michael J. Cowgill, Esq.
     Tamara Spires, Esq.
 3   MCT Law
     1325 4th Avenue, Suite 1730
 4   Seattle, Washington 98101
     mccowgill@mctlaw.com
 5   tspires@mctlaw.com
 6          and
 7   Chip Wagar, Esq.
     Wagar Hickman, LLC
 8   1401 West Causeway Approach
     Mandeville, Louisiana 70471
 9   cwagar@wagarhickman.com
10                       On Behalf of the Plaintiff;
11   Gwendolyn C. Payton, Esq.
     Kilpatrick, Townsend & Stockton, LLP
12   1420 5th Avenue, Suite 3700
     Seattle, Washington 98101
13   gpayton@ktslaw.com
14                       On Behalf of Defendant
                         Martian Sales, Inc;
15
     John Baay, Esq.
16   Geiger, Laborde & Laperouse
     701 Poydras Street, Suite 4800
17   New Orleans, Louisiana 70139
     jbaay@glllaw.com
18
                         On Behalf of Defendant
19                       Johnson Foods, LLC;
20   COURT REPORTER:
21   Mary Joy Springer
     Golkow Litigation Services
22
23   VIDEOGRAPHER:
24   William Chan
     Golkow Litigation Services
25
```

1  A   I'm doing well.  How are you doing?
2  Q   Good.  Thank you.  As you know, we are
3  here on a continuation from the deposition that we
4  began yesterday; right?
5  A   Yes, sir.
6  Q   I know we reviewed some ground rules
7  yesterday.  Primarily try not to speak over each
8  other and to the extent you need a break, just let
9  me know.  A friendly reminder of that.  All right?
10 A   Yes, sir.
11 Q   All right.  Let's dive back in.  I
12 wanted to talk to you about some of the processors
13 we discussed yesterday that processed OPMS kratom.
14 I think you identified Advanced Nutrition as one of
15 those processors; right?
16 A   Yes.
17 Q   How does Martian Sales compensate
18 Advanced Nutrition for its processing work?
19 A   It doesn't.
20 Q   Martian Sales doesn't pay Advanced
21 Nutrition for its processing work?
22 A   Correct.
23 Q   Who pays Advanced Nutrition for the
24 processing it does for OPMS Kratom?
25 A   A1.  Well, I'm not even sure, actually.

```
                                                      Page 9
```

1    You would have to ask them, really.  I just guessed
2    there, which I'm not supposed to do.
3         Q    Why did you guess A1?
4         A    Because that's the distributor.  It just
5    seemed like a logical guess.
6         Q    Does Martian Sales maintain a business
7    account from which it issues payment for services?
8         A    I have a business account, yes.
9         Q    Do you issue payment for services
10   related to OPMS Kratom from that account?
11             MS. PAYTON:  Object to the form of
12        the question.
13        A    If needed.
14        Q    (By Mr. Cowgill) Does Martian Sales pay
15   A1 for its distribution services?
16        A    No.
17        Q    Does A1 receive any compensation for its
18   distribution services?
19        A    No.
20        Q    And yesterday you explained that A1 also
21   does the marketing services on behalf of Martian
22   Sales; correct?
23        A    Yes, sir, that's correct.
24        Q    Does A1 receive compensation for those
25   services?

Golkow Technologies,
877-370-3377         A Veritext Division          www.veritext.com

Page 10

1  A   Not from Martian Sales, no.
2  Q   Do you know if it receives compensation
3  from some other entity?
4  A   No, I do not.
5  Q   Yesterday we also discussed Martian
6  Sales' website, OPMSkratom.com.  Do you recall
7  that?
8  A   I do recall that, yes.
9  Q   And you indicated that A1 is the entity
10 who manages and maintains that website; is that
11 correct?
12 A   Yes, sir.
13 Q   And does A1 receive compensation for
14 those services in maintaining and managing the OPMS
15 Kratom website?
16 A   No.
17 Q   Does it receive any compensation at all
18 or more specifically none from Martian Sales?
19 A   You would have to ask them.  None from
20 Martian Sales, though, for sure.
21 Q   And yesterday you indicated that Nuza,
22 LLC, was the logistical agency who would purchase
23 raw kratom that would eventually be processed into
24 OPMS kratom; is that right?
25          MS. PAYTON:  Object to the form.

1       A      Yes, sir.
2       Q      (By Mr. Cowgill) Does Martian Sales pay
3    Nuza, LLC, for its acquisition of bulk imported
4    kratom?
5       A      No.
6       Q      Do you know who pays Nuza, LLC, for the
7    acquisition of kratom that eventually makes it into
8    OPMS kratom?
9       A      I do not know.
10      Q      Have you ever asked those entities who's
11   compensating them for the work they are doing on
12   your behalf?
13      A      No.
14      Q      Do you know why those entities are doing
15   work on your behalf without any compensation known
16   to you?
17             MS. PAYTON:  Object to the form of
18        the question.  Mischaracterizes the
19        testimony.
20      A      No.
21      Q      (By Mr. Cowgill) Have you ever taken
22   business trips to Louisiana?
23             MS. PAYTON:  Object to the form.
24        Asked and answered.
25      A      As we spoke yesterday, I told you I took

1  Jopen, LLC?
2      A    I don't really understand the question.
3  Could you rephrase.
4      Q    So this paragraph says that the
5  distributor, which is labeled as A1 Wholesale who
6  we have discussed is the d/b/a of Jopen, is making
7  payments on Martian Sales' behalf for services that
8  include administrative, financial, managerial,
9  logistical services.
10      Do you understand that?
11      A    I do.
12      Q    What knowledge do you have of those
13  payments being made and to who they are made to?
14      A    I don't really have any knowledge of who
15  they are making payments to unless they talk to me
16  about it. You would have to ask them.
17      Q    Have they talked to you about it?
18      A    They have made payments for me for
19  certain things.
20      Q    For what?
21      A    I can't even think over the years. I'm
22  sure they pay for some of the sourcing of the
23  product, some supplies. I'm sure they helped me
24  with logistics and stuff like that.
25      Q    Do you know if any of the entities that

Page 41

1         A    No.
2         Q    And so here is paragraph 6.1.  It says:
3    Subject to and in accordance with the terms and
4    conditions hereof, supplier agrees that distributor
5    shall distribute the products for supplier's
6    compensation.
7              So is it your understanding that your
8    compensation is based on the distribution of OPMS
9    kratom?
10              MS. PAYTON:  Object to the form of
11        the question.
12         A    I don't really understand that question
13    either.
14         Q    (By Mr. Cowgill) You're compensated by
15    Jopen, LLC, right, under this agreement?
16         A    Yes, sir.  Yes, sir.
17         Q    And do you have an understanding that
18    your compensation is based on the sale and
19    distribution of OPMS kratom by Jopen, LLC?
20              MS. PAYTON:  Object to the form of
21        the question.
22         A    Yes.
23         Q    (By Mr. Cowgill) And then here,
24    paragraph 6.5, it says:  Supplier compensation,
25    year one, $150,000.  Year two, $350,000.  Year

```
 1    in, like, mob movies and stuff like that, but I'm
 2    not exactly sure what it means.
 3         Q    Did Calibre Manufacturing ever share
 4    that space at 1880, Suite 214?
 5         A    Who did you say?
 6         Q    Calibre Manufacturing?
 7         A    I don't believe so, no.  Oh, my back.
 8         Q    Do you know whether Calibre and Nuza
 9    were once -- strike that.
10              Do you know whether Advanced Nutrition
11    split off into two separate entities, one being
12    Calibre Manufacturing and the other being Nuza?
13         A    I don't know that, no.
14         Q    Did you ever work with Peyton Palaio on
15    any synthetic cannabis products?
16         A    No.
17         Q    And does Martian Sales or did Martian
18    Sales ever own the website located at
19    opmkratom.com?
20         A    No.
21         Q    I want to show you what I'll mark as
22    Exhibit 30.
23                         (Whereupon Exhibit
24                         30 was marked for
25                         purposes of
```

Page 63

1     Q     All right.  I want to show you Exhibit
2    32.  Let's see here.  Do you see this?
3     A     Yeah.  Thank you.  Yes, sir.
4     Q     This is from the U.S. District Court,
5    Northern District of California, in that same case.
6    And this is Martian Sales, Incorporated's, notice
7    of motion and motion to dismiss the complaint that
8    we just looked at.
9          Are you familiar with this?
10    A     I think so, yes.
11    Q     Are you familiar with your prior counsel
12    in that case, Squire Patton Boggs?
13    A     I am familiar with them, yes, sir.
14    Q     Do you know if you reviewed and approved
15    anything having to do with this motion before it
16    was filed?
17    A     I'm sure I did.
18    Q     I want to ask you about -- let's see
19    here -- a particular footnote here if I can find
20    it.  Here we go.
21          There is a footnote in the motion where
22    it actually cites that opmkratom.com.  And it says:
23    Here neither Martian Sales nor OPMS do
24    direct-to-consumer sales.  See
25    https://opmkratom.com/faqs.

Page 64

1         Do you see this?
2    A    I see that.
3    Q    Do you have any understanding why your
4    attorneys in a motion submitted on your behalf
5    would cite to opmkratom.com?
6    A    If I had to take a guess, I would say
7    they missed putting in an S.
8    Q    Is it your understanding that there once
9    was a website at opmkratom.com that marketed an OPM
10   Kratom product?
11   A    I don't really remember.  I'm pretty
12   sure it was a counterfeit website or a
13   counterfeiting website, but I'm not a hundred
14   percent on that.
15   Q    What basis do you have to claim that it
16   was a counterfeiting website?
17   A    Well, it says OPM Kratom, which is
18   pretty close to my trademark.  It wasn't owned by
19   me, so I would just assume that it was
20   counterfeiting.
21   Q    Do you recall yesterday when we saw a
22   website that existed in 2010 at opmkratom.com?
23   A    Yes.  You showed me the, what was it,
24   web pastfinder, or whatever that thing was called.
25   Q    The Wayback Machine?

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.