# EXHIBIT 42

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KATHLEEN MOLLER | * | CIVIL ACTION NO. 24-0228-WBV-DPC |
| | * | |
| VERSUS | * | JUDGE WENDY B. VITTER |
| | * | |
| MARTIAN SALES, INC; JOPEN, LLC, | * | MAGISTRATE DONNA PHILLIPS |
| a Texas limited liability company; | * | CURRAULT |
| JOHNSON FOODS, LLC, a Wyoming | * | |
| limited liability company; LP IND., LLC, | * | |
| a Wyoming limited liability company; | * | |
| CAG HOLDINGS, LLC, a Wyoming | * | |
| limited liability company; RMH | * | |
| HOLDINGS, INC., a Wyoming | * | |
| corporation; ABC INSURANCE | * | |
| COMPANY and John Does 1-4. | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * | * | |

## <u>AFFIDAVIT OF KATHY LEODLER</u>

I, Kathy Leodler, am over the age of eighteen (18), competent to testify, and make this Declaration:

1.      I have personal knowledge of all the facts set forth in this Declaration and if called as a witness could testify competently thereto.

2.      I am a licensed private investigator with Washington private investigator license number 3555. I am an owner and Chief Executive Officer of Rampart Group, LLC. We frequently research and identify assets of individuals or businesses that are concealing activities or money. We have supported law firms representing insurance agencies in fraud cases, including frequent instances involving international activities by fraudulent corporations and shells.  We are adept at identifying properties and assets obtained through ill-gotten funds and activities.

3.      Before founding Rampart, I served as a Special Agent and Executive Leader for the Federal Bureau of Investigation (FBI). During my 23-year FBI career as a Special Agent and

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

Executive Leader I was trained at the FBI Academy and conducted and managed several money laundering investigations of organized crime groups and international drug traffickers who moved their ill-gotten gains to offshore banks in the Cayman Islands, Mexico, Columbia and Canada. US bank accounts were opened by persons who sought to conceal their identity and "dirty money" by registering with Secretaries of State as US based companies and filing multiple DBA's as a layered approach to avoid detection, as well as structuring deposits less than $10K to avoid currency transaction reporting (CTR's) to the IRS.

4.      Common strategies and techniques used by individuals and businesses seeking to conceal their identities, activities, and finances include: (1) efforts to create anonymous corporate vehicles and/or "shell companies" that are designed to make business owners and managers untraceable; (2) false or inconsistent representations about corporate names, officers, owners, offices, entity formations, and/or places of business; and (3) creation of sham business structures, contracts, and entities to confuse investigators, avoid detection, and sidestep the jurisdiction of U.S. authorities and courts. The more sophisticated and well-organized trafficking organizations fund shared accounts to enlist lawyers and consultants to conceal and grow their activities.

5.      This declaration sets forth my findings and opinions on how Martian Sales, Inc. is not a legitimately separate business entity but is instead one of many shell companies being used for deceptive purposes by the OPMS kratom enterprise. Recently developed evidence confirms that this enterprise has been built and operated by Peyton Palaio, David Gabbay, Mark Jennings, Mark Reilly, and others. This enterprise and its web of legal entities, including Martian Sales, Inc., have used all the strategies and techniques of deception outlined above.

6.      Although the enterprise operates through many names, I will refer to it here as the "OPMS enterprise" or "Olistica-OPMS".

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

7.      Martian Sales Inc. and JOpen, LLC (d/b/a A1 Wholesale, Choice Organics, and Kono Labs) were both established in 2012, and were among the first shell companies used by Peyton Palaio and his team of co-conspirators to smuggle and distribute their adulterated kratom into the United States for human consumption.  For years OPMS used JOpen as a piggy-bank to import the kratom needed for OPMS. As detailed below, JOpen transferred millions to finance vast quantities of kratom smuggled across the border.  First with the help of Sebastian Guthery, and then by an entity called Cleanview.

8.      In addition to funding OPMS' imports, JOpen oversees the deceptive packaging, marketing, and distribution of OPMS kratom products.

9.      Although Mr. Reilly claims he is the sole owner and operator of Martian Sales, the facts do not support this.  Mr. Reilly's actual knowledge and participation in his company's operations is very limited.  He admits that JOpen oversees virtually everything except for the kratom processing, which is handled by entities associated to Peyton Palaio and Mark Jennings. For example: (1) Martian claims no knowledge of who acquires its bulk imported kratom today; (2) JOpen pays for Martian's administrative, financial, managerial, and logistical services; (3) Martian is not sure, but believes JOpen pays for the processing of Martian products; (4) JOpen oversees the packaging of Martian's kratom products for distribution; (5) JOpen is using Martian's intellectual property even though a sham agreement assigned those rights to someone in Indonesia; (6) JOpen has been Martian's sole source of compensation since 2016; (7) JOpen distributes Martian's kratom products throughout the United States (for over ten years); (8) JOpen is responsible for and operates Martian's "opmskratom.com" website; (9) JOpen oversees tracking of adverse events related to OPMS kratom; and (10) Martian is not sure, but thinks JOpen may be responsible for kratom advocacy conducted in Martian's name.

DECLARATION OF KATHY LEODLER
Page 3 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

10.    I am stunned at the level of fraud perpetuated on consumers and courts by OPMS. Here is additional background showing how the OPMS enterprise has used Martian Sales, JOpen, and others to deceive law enforcement agencies, investigators, and courts in order to evade responsibility for the dangerous kratom products.

11.    Although Martian was created in 2012, Mr. Reilly's role in the OPMS enterprise began years earlier.

12.    In 2010 Reilly was already working closely with Peyton Palaio and a ring of large-scale distributors of synthetic cannabinoids and spice throughout the United States.

13.    By 2012 Reilly was distributing "OPMS Kratom" from a drug lab operating out of 1880 West Oak Parkway, Marietta, Georgia through the entities Omerta Labs and Lunar Labs, LLC.  In 2012 the enterprise formed a new set of shell companies, including **Martian Sales, Inc.** (d/b/a OPMS) and **JOpen, LLC** (d/b/a A1 Wholesale). See EX.s A-1 (JOpen Certificate of Formation) and A-2 (Martian Sales Articles of Incorporation). These entities would become cornerstones for what may be the largest kratom enterprise in the United States.

14.    By 2018 Palaio and his co-conspirators were operating as "Olistica Life Sciences Group" (hereinafter "Olistica") and working through a web of shell companies under their control. EX. C-1 (Olistica Organizational Chart).

15.    In 2019 Olistica incorporated a new series of Wyoming entities to serve as shell companies.  See, e.g., EX. A-6 (LP Ind., LLC Articles of Organization), A-7 (CAG Holdings, LLC Articles of Organization), A-9 (NP Pharma Holdings, LLC Articles of Organization), A-10 (NP Biotech, LLC Articles of Organization), A-11 (CC US Holdings, LLC Articles of Organization), A-13 (Pacific West Holdings, LLC Articles of Organization), A-14 (CAG International, Inc Articles of Incorporation), A-15 (Advanced Nutrition, LLC Articles of

DECLARATION OF KATHY LEODLER
Page 4 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

Organization). An "Olistica" trademark application was submitted by "Olistica Life, LLC". This fictional entity was operating out of Reilly's and Palaio's headquarters at 1880 West Oak Parkway, Marietta, Georgia. EX. B-1 and B-2 (Olistica and Jordan Process TM filings); see also EX. B-3 (Companion AG (CAG) trademark filing). Among the Olistica entities was LP, Ind., LLC doing business as Jordan Process.

16.    Jordan Process is the facility in Springfield, Colorado, where OPMS kratom is processed. The Jordan Process trademark application includes an "Our History" section dating back to 2008: "After 10 years of producing single solid doses for the natural and dietary supplement industry, we discovered that to create the greatest possible product, we needed to vertically integrate and control the supply chain..... To control and operate these separate entities, we needed to create an overarching brand to represent all the different services we provide. Thus, Olistica was born in 2018." EX. B-2.

17.    This history statement places Olistica's roots back to 2008, spanning the years Mr. Palaio, Mark Reilly, and his team used the 1880 West Oak Parkway facility as the alleged address for a supplement manufacturer "Lunar Labs". Instead of supplements the lab was used to manufacture spice, synthetic cannabinoids, and OPMS kratom. See also EX. G-6 and EX. G-7 (select GBI Investigation Docs). Investigators also learned that Palaio and Gabbay had been partnering with other large scale drug traffickers and attorneys in a so-called "Coalition of Cognitive Liberty" to strategize on how to sidestep increasing enforcement activity by law enforcement agencies. EX. G-8 (GBI Investigation Doc).

18.    The Jordan Process history document discloses that from 2018 to 2020 the organization worked to convince "one of the most respected consulting groups in pharmaceuticals" to work with them, making them "a formidable player in the next generation

DECLARATION OF KATHY LEODLER
Page 5 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

of sophisticated API's and pharmaceutical manufacturing." EX. B-2.   The "Our History" statement does not name the new partner.   But in deposition Olistica disclosed Bob Hoban's consulting group as a founding member of the Olistica strategy.   Mr. Hoban is apparently a prominent consultant in the cannabis legal and business industry.   EX C-3 (Article re Robert Hoban Leaving Chark Hill).   Further investigation turned up Mr. Hoban's curriculum vitae, where he identifies himself as "Chief Executive Officer, Olistica Life Sciences Group". EX. C-2 (Robert Hoban CV). Mr. Hoban is also identified on e-mail correspondence related to Olistica's kratom operation and the potential growth of an international market.

19.     My first introduction to Martian Sales' role in the OPMS enterprise came in 2021. The attorneys at **mctlaw** asked if I could help locate the business or persons responsible for OPMS kratom.

20.     The OPMS kratom product had been consumed by Daniel Paul, a young man whose death was found to have been caused by kratom.

21.     Even though OPMS was widely distributed throughout the United States, the task of locating the source was extraordinarily difficult.   Most consumers or families suffering harm from OPMS would have found it impossible.

22.     The OPMS website and label listed a distributor identified as **"Choice Organics"** with the following contact information: (213) 221-8049; 3680 Wilshire Blvd. Ste P04 – 1084, Los Angeles, CA 90010. *See* EX. D-1 (OPMS label) and EX. D-2 (OPMS website "Regulation Contact" page (Dec. 10, 2021)). When called, the recorded voice for Choice Organics' telephone number stated, "the customer you have called is unavailable to take your call." We verified that the address for Choice Organics is associated to the "Wilshire Shipping Center" and a post office

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

box, rather than an actual corporate office or place of business. We were unable to locate any business records for an active entity named "Choice Organics" doing business in California.

23.     Our national search also failed. We could not locate any active corporate entity registered at the state secretary of state level using the name OPMS (or Optimized Plant Mediated Solutions) for kratom sales (either as an entity or trade name). This is so even though the OPMS marketing and internet presence indicates that "O.P.M.S. was established in 2005 with the goal of finding an alternative method of extracting Kratom without damaging the alkaloids during the process," and that "O.P.M.S. has been selling kratom extract products to the public since 2009." *See* EX. D-3 (OPMS website FAQ page (last accessed December 10, 2021)).

24.     The OPMS website marketing materials revealed additional names and/or addresses leading to dead ends for corporate record searches. The OPMS website is managed through proxy web hosting company, GoDaddy.com, LLC, and information regarding the website owner was not readily available.

25.     The OPMS website listed a phone number: 888-702-5158. This number was not listed in investigative databases as an individually registered telephone number and may have been a prepaid number.

26.     The OPMS connection to an actual entity was only revealed through a search of the US Trademark Electronic Search System (TESS). This search revealed O.P.M.S. OPTIMIZED PLANT MEDIATED SOLUTIONS SILVER is a registered trademark, Serial Number 88444270, filed May 23, 2019, and registered January 26, 2021. The registrant was not an entity named OPMS. Instead, the registrant was "**Martian Sales, Inc.**" EX. B-4 (OPMS TM documents).

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

27.    The identification of the Martian Sales corporation led us to additional layers of secrecy and concealment. The entity was apparently formed in 2012 with the assistance of an entity formation company, "Wyoming Registered Agent," in Cheyenne, Wyoming. With a Wyoming business formation, Martian Sales consistently filed corporate records that concealed the identities and locations of its owners and operators, and places of business. For example, Keith Vogt, the founder of Wyoming Registered Agent, was repeatedly identified as the President of Martian Sales, Inc.  The mailing address and principal office for Martian Sales were repeatedly said to be in Cheyenne, Wyoming.  See EX. A-2 and A-3 (Martian Sales corporate records).

28.    However, on June 1, 2020, Keith Vogt passed away at age 49.  His obituary confirmed that before his death Mr. Vogt pursued opportunities at the "confluence of the emerging internet business world and corporate privacy" by founding his online business services firm in a state renowned for "strong corporate privacy protections". *See* EX. A-4 (Keith Vogt Obituary webpage, https://www.schradercares.com/obituary/Keith-Vogt (last accessed June 19, 2025)).

29.    On September 8, 2020, three months after Vogt's death, a new "Profit Corporation Annual Report" was filed on behalf of Martian Sales, Inc.  This time the document was submitted by David Watson, an attorney from the firm Gomel Davis Watson in Atlanta, Georgia.  For the first time in a corporate record, **Mark Reilly** was revealed as the President for **Martian Sales, Inc.**, also with an address in Atlanta, Georgia.  See attached EX. A-5 (Annual Report 2020).

30.    During my investigation in Daniel Paul's death case, Martian Sales' attorneys were attempting to get Martian dismissed based on lack of contacts with the Oregon jurisdiction. However, a search of an investigative database for Mark Reilly revealed a residential address at 5140 River Road S, Salem, OR 97302.

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

31.    Although we identified Mr. Reilly's connection to Oregon, Mark Reilly claimed Martian had no connection to the OPMS products. He produced a Declaration that attached an alleged Intellectual Property License Agreement ("licensing agreement"). EX. H-1 (Decl. of Reilly dated November 23, 2021).

32.    The licensing agreement described Martian's alleged "offshoring" of all OPMS operations to Indonesia, outside the Oregon court's jurisdiction.  Mr. Reilly claimed neither he nor Martian had any role or connection to the production or sale of the OPMS branded products. He made this claim even though the OPMS internet marketing continued to advertise OPMS as "Made in the USA".

33.    This was a lie.  The limited information and context provided with this suspicious "licensing" document was consistent with techniques used by entities seeking to avoid accountability before courts within the United States.  I concluded that the Martian Sales entity and related licensing agreement were being used as parts of a deceptive scheme to conceal those responsible for the OPMS business that had been operating since 2012.

34.    My conclusion was soon bolstered by the discovery of the *Cleanview* litigation, filed one month before the Daniel Paul case.

35.    A declaration filed in *Cleanview* details how in 2020, Peyton Palaio relied on a "myriad web of shell companies" under the banner of "Olistica Life Sciences Group" **and doing business as Martian Sales' "OPMS"** to take over the kratom supply of the Cleanview Distribution Group ("Cleanview"). At the time, Cleanview was one of the largest kratom importers in the United States.  EX. E-1, par. 23 (First Amended Complaint).  Cleanview had successfully developed techniques for importing large amounts of kratom into the United States under the false claim that the kratom was "for agricultural purposes".

DECLARATION OF KATHY LEODLER
Page 9 of 20

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

36.     Peyton Palaio's scheme to use Olistica-OPMS to take over Cleanview is detailed in the Declaration of Thomas Bryant and attached records filed in the *Cleanview Distribution Group LLC vs. LGI Holdings, LLC* case filed in California.

37.     Initially, Olistica-OPMS worked through the name "Alphabet Wholesale", concealing the fact that this was a d/b/a for LGI Holdings, LLC (Wyoming). EX. H-2 (Decl. of Bryant, par. 6). LGI was identified as operating under "a larger web of companies" that were self-described as the "largest kratom businesses in the United States" – including an umbrella company doing business as "Olistica Life Sciences Group", and the brand name "OPMS". EX. E-1, par. 28; EX. E-2, page 2 (Order dated March 30, 2022); EX H-2 (Bryant Decl., par. 20-22 and Bryant Ex. 45 (OPMS slide deck)).

38.     In setting up its scheme, Olistica-OPMS paid $544,200.00 for 40 metric tons of kratom through a Texas entity: JOpen LLC d/b/a A1 Wholesale. EX. H-2 (Bryant Decl. pars. 6-7 and 11, with attached Bryant Ex.s 1 and 4).

39.     Olistica-OPMS valued Cleanview's expertise at avoiding U.S. Customs seizures, apparently by designating kratom as "for agricultural uses." EX. E-1, pars. 23, 29 and 34; EX. H-2 (Decl. of Bryant, par. 27 attaching Bryant Ex. 51). Olistica-OPMS knew the kratom was intended for human consumption. EX. E-1, par. 43; see EX. D-6 (FDA Warning on illegal kratom supplements).

40.     This kratom was shipped from Cleanview's California warehouse to an undisclosed address in Oregon, that the Olistica-OPMS enterprise suspiciously designated as "Same as recipient" on invoices. EX. E-1, pars. 24-26; EX. H-2 (Bryant Decl., pars. 6-7 and Ex. 1).

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

41.     After that initial kratom delivery to Oregon, Olistica-OPMS paid many millions of dollars via its JOpen, LLC (d/b/a A1 Wholesale) for kratom shipments totaling about 900 metric tons, delivered to the mysterious operation at the Oregon address. EX. H-2 (Bryant Decl., pars. 10 and 11 with Bryant Ex.s 25 through 44 thereto).

42.     To avoid customs seizures, the invoices continued to identify the kratom as "FOR AGRICULTURAL PURPOSES." EX. H-2 (Bryant Decl., par. 10 with Ex.s 25 through 44 thereto).  I have learned that the deceptive misidentification of kratom shipments is a common practice used by those who smuggle kratom intended for human consumption into the United States.

43.     JOpen, LLC (d/b/a A1 Wholesale) was a key player in Olistica-OPMS' web of deceptive shell companies. EX. H-2 (Bryant Decl., par. 20).  JOpen repeatedly paid for Olistica-OPMS's kratom shipments.  EX. H-2 (Decl. of Bryant, par. 19; Exhibit 4, par. 11).

44.     In October of 2020, Mark Jennings signed an Exclusive Supply Agreement for millions of dollars in kratom. Consistent with Olistica-OPMS' goal on concealment, Jennings did so on behalf of a business referred to only as "DBA Alphabet Wholesale ("Alphabet Wholesale") …."  EX. H-2 (Decl. of Bryant, par. 16 and Bryant Ex. 24, page 1).  The entity was not disclosed.

45.     After the Daniel Paul case my investigations into the kratom industry focused on the **"Whole Herbs"** product.  Just like OPMS, the Whole Herbs packaging and marketing was designed to conceal the manufacturer-distributor, pointing instead to a fictitious California distributor who could not be verified: **"Kono Labs"**.  EX. D-7 (Whole Herbs Packaging).

46.     The konolabs.com website describes Kono Labs as "the parent company of Whole Herbs Kratom".  Exhibit D-4 (konolabs.com, "FAQ").  Rampart's investigation revealed that an

DECLARATION OF KATHY LEODLER
Page 11 of 20

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

entity identified as Kono Labs had incorporated in Delaware but dissolved in 2020.  This Kono

Labs business operated out of California apartments, and the CEO was listed as Yun Jeong Min.

But Min could not be located in the US.  Min's corporate records led to an apt in Seoul, South

Korea and an unknown location in Dayville, CT.  Investigative databases showed no Yun Min in

Dayville, CT.

47.    We were not the only ones having trouble finding Kono Labs. The spouse and

children of Daniel Vidrine brought a wrongful death case against Kono Labs and Whole Herbs.

Although the court gave Mrs. Vidrine three extensions of time to locate the Kono Labs - Whole

Herbs defendants for service, they could not do so, and the case was dismissed on December 21,

2021.  See Exhibit E-3 *Vidrine v. KonoLabs and Whole Herbs* case filing (exhibits omitted).

48.    The identity of Kono Labs was not revealed until this year, when the attorneys for

the Olistica-OPMS defendants (including JOpen) finally confirmed that JOpen, LLC controls the

Kono Labs website.  See EX. D-5 (Email from Gwendolyn Payton). Deposition testimony has

also confirmed that JOpen, LLC is responsible for the Whole Herbs brand through yet additional

entities, that continue to evolve as wrongful death claims have been pursued.

49.    Each year reveals more information about Martian Sales, JOpen, Olistica-OPMS

and their affiliates' joint responsibility for the OPMS and Whole Herbs products.

50.    In a recent deposition on behalf of Martian Sales, Mark Reilly confirmed how

Martian Sales and JOpen are interconnected in the import, manufacture, marketing and

distribution of their kratom products. He confirmed that A1 Wholesale (JOpen) is the OPMS

distributor, operating the "opmskratom.com" website, overseeing OPMS marketing, and

receiving tracking on adverse events from OPMS.

DECLARATION OF KATHY LEODLER
Page 12 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

51.     In the deposition Martian indicated that the "Choice Organics" on its label may actually refer to A1 Wholesale (JOpen) in Dallas, Texas, and that the label is being changed to reflect the Texas location.

52.     More recently, JOPEN admitted that Choice Organics is a non-existent entity that was added to OPMS kratom product labels after Utah regulators took enforcement action to destroy kratom packages that did not properly identify who was responsible for the product. However, rather than honestly identify themselves, JOpen identified the false front Choice Organics. Changing facts when the truth is revealed is a common practice for those responsible for OPMS kratom products.

53.     Mr. Reilly also confirmed that the OPMS licensing agreement he relied on to escape jurisdiction in Daniel Paul's case was a sham. In reality, Martian had a "fluffed-up supply agreement" for Indonesian kratom supplied to Martian Sales until a 2018 supply disruption.

54.     The disruption to Martian Sales' kratom supply dovetails with the timeframe when Olistica used JOpen to help take over the kratom supply established by the Cleanview entity.

55.     Further investigation reveals that before Cleanview, Olistica-OPMS was using the JOpen entity to get its kratom from Sebastian Guthery and Nine2Five, LLC. EX. E-4 (Complaint: *JOpen, LLC v. Nine2Five, LLC; Sebastian Guthery*).

56.     Just like Cleanview, Guthery and his Nine2Five, LLC were smuggling kratom for Olistica-OPMS by mis-declaring it as not for human consumption. Guthery repeatedly declared that the kratom was FloraFood Organic Fertilizer for his shell company "Farmland, Inc.". EX. E-5, par. 10 (Unsealed Indictment: *USA vs. Nine2Five, LLC; Sebastian Guthery*); EX. E-6, pp. 2-3 (USA Response to Motion to Travel: *USA vs. Nine2Five, LLC*). By 2018, Guthery was under

DECLARATION OF KATHY LEODLER
Page 13 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

investigation, and he later fled the country. EX. E-6, p. 3. The Nine2Five kratom supply to JOpen was disrupted in 2018. This correlates to the 2018 disruption of Martian Sales' kratom supply, testified to by Mark Reilly on pages 41-42 of Martian's deposition, taken October 28, 2024.

57.    JOpen eventually sued Guthery in open court for $1,623,000.00 worth of undelivered kratom. EX. E-4. In its lawsuit JOpen attached the invoices from Nine2Five which were paid but not fulfilled. EX. E-4, attachment. These invoices reveal that JOpen was operating under the fictitious aliases "Innovos Activas" and "American Kratom D", with a billing address at 1880 West Oak Parkway, Marietta, Georgia – the same address associated with Martian Sales and various other entities and synthetic cannabis criminal activities. EX. E-4, *JOpen v. Nine2Five,* Invoices attached to Complaint.

58.    It is now clear that JOpen serves as a major kratom importer, marketer, and distributor for the Olistica-OPMS enterprise. JOpen's direct link to Olistica-OPMS's 1880 West Oak Parkway operations – the birthplace of Martian Sales -- is verified in JOpen's own litigation. EX. E-4, *JOpen v. Guthery*, Complaint Ex. 1. JOpen also oversees the packaging and labeling of OPMS kratom in Texas.

59.    In his October 28 deposition, Mark Reilly spoke for Martian Sales and confirmed that the OPMS kratom product has tracked much of the route described on a map prepared by investigative journalists from the Tampa Bay Times. He knows that Indonesia is the OPMS kratom source; he named Advanced Nutrition as the encapsulation facility in Marietta, Georgia (later replaced by "Calibre"); and he named JOpen as the Dallas distributor controlling its website, packaging, and distribution to "wherever it goes". See EX. G-1 (OPMS Kratom Map). Martian Sales also confirmed that JOpen (d/b/a A1 Wholesale) oversees adverse event tracking

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

related to OPMS kratom, and that LP Ind. LLC (Olistica's Jordan Process) has processed OPMS kratom.

60.    The Martian Sales deposition makes clear that Martian Sales has very little knowledge or understanding about its own business activities.

61.    In November 2024 I conferenced with Ken Howard, Assistant Special Agent in Charge, Georgia Bureau of Investigation (GBI). Agent Howard discussed his role in a multi-jurisdictional investigation into drug manufacturing and distribution operations through 2012 involving Peyton Palaio; Mark Reilly; David Gabbay; and Mark Jennings. As a part of the investigation Agent Howard and a team of agents executed a search warrant at 1880 West Oak Parkway laboratory in Marietta, Georgia. Agent Howard has supported our access to the task force investigation files, and I have reviewed reports corroborating the details.

62.    The investigation provides additional detail on the use of 1880 West Oak as a major base for a kratom enterprise started by Peyton Palaio. This is where Petyon Palaio, Mark Reilly, and Mark Jennings operated drug labs doing business as "Omerta Labs, LLC" and "Lunar Labs LLC" when Palaio and the company were sued for the drug-related death of 16-year-old Chase Burnett in 2012. EX. E-7 ("Fayette father aims to bankrupt alleged synthetic pot dealer" Article).

63.    In 2012 David Gabbay and Peyton Palaio were identified through a multi-agency investigation as key members of an organization calling itself the Coalition of Cognitive Liberty. This Coalition included "large scale synthetic cannabinoid distributors" and attorneys with expertise in the "field of synthetic cannabinoids and bath salts". See EX. G-8. In December 2010, the Coalition was called to a meeting at the Embassy Suites in Roswell, Fulton County, Georgia. David Gabbay, Peyton Palaio, and Joshua Becker attended. The meeting was called to

DECLARATION OF KATHY LEODLER
Page 15 of 20

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

address new laws banning the manufacture and sale of synthetic cannabinoids. Member fees were directed into a Wells Fargo bank account to cover legal consultation and research.

64.     Within months of the Coalition meeting Palaio was working directly with David Gabbay (of JOpen, LLC), Josh Becker, and Beau Kenny to import products for drug manufacturing directly from China.

65.     By 2012 a series of entities connected to OPMS were formed, including Martian Sales, Inc. (WY, 2012) and JOpen, LLC (TX, 2012, dba A1 Wholesale). Also formed was the Gabbay affiliated entity OEWM, LLC (dba A One Wholesale) (TX, 2012), identified by the Deadly Dose journalists as a source of OPMS packaging and labeling.

66.     At least as early as January 1, 2012, Martian Sales was distributing its "O.P.M.S." kratom products in commerce as dietary or nutritional supplements from the 1880 West Oak address. EX. B-5 (Martian Sales TM filing). In a recent deposition Mark Reilly of Martian Sales described the similarity between O.P.M.S and the word "opium" was "a happy accident".

67.     In recent depositions and discovery, spokespersons for Olistica-OPMS and Martian Sales confirmed kratom-related operations throughout the web of shell company business units that Olistica controls. Many of the shell companies and facilities responsible for OPMS kratom are identified on Olistica's organizational chart, including: (1) Jordan Process = (LP Ind., LLC): the Colorado kratom processing facility for the Martian Sales kratom distributed by JOpen; (2) Companion AG = CAG Holdings, LLC (WY 2019) (another Olistica unit providing services for "kratom plant production" (EX. B-3)); (3) Canopy Biomaterials = RMH Holdings Inc. (WY 2015) (operating out of the same Colorado address as Jordan Process, and d/b/a as both RMH and Companion AG (EX. E-8, par. 28)); (4) Della Terra = NP Pharma Holdings, LLC (WY 2019): the Olistica unit providing services related to the Nutrasource-

DECLARATION OF KATHY LEODLER
Page 16 of 20

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

Johnson Foods safety studies needed to meet the basic regulatory requirements to market products containing kratom (JF 62)); (5) NP Biopharma (see NP Biotech, LLC) (WY 2019): also collaborating with Nutrasource on "foundational regulatory science behind plant-based therapeutics" and giving Johnson Foods a worldwide right to exploit its data, after a period of de-identification of its source data; (6) CC US Holdings = CC US Holdings, LLC (WY 2019) – pays for the management of shell company operations on Olistica's org chart; (7) Liv Group = Liv Group Inc.: bulk kratom extraction processing in North Carolina; (8) Cascade Naturals: Olistica's Oregon business unit, and a receiver and source of kratom; (9) CAG Int'l. = CAG International Inc. (WY 2019); (10) Advanced Nutrition = Advanced Nutrition, LLC (WY 2019): former processor of bulk kratom extract into the finished OPMS products.  See EX.s A-6 – A-15; EX. C-1.

68.    On December 17, 2023, a Tampa Bay Times article on OPMS kratom ("Deadly Dose" Part 3) reported on a federal OSHA inspection into health hazards alleged by employees exposed to kratom at Olistica's Jordan Process facility in Springfield, Colorado.  Plant manager Candy Mason produced a "safety sheet" and claimed the kratom was "for research use".  Two months later Olistica plant managers reportedly told Colorado regulators that Jordan Process manufactures a benign herb "uncaria gambir".

69.    The federal and state inspection records for Olistica's Jordan Process facility confirm the accuracy of the Deadly Dose reporting.  The Jordan Process plant manager provided OSHA with a Safety Data Sheet indicating that Jordan Process is not processing kratom products for human consumption: "This product is for research use – Not for human or veterinary diagnostic or therapeutic use."  EX. G-2, p. 12 (OSHA Notice of Alleged Safety or Health Hazards re LP/Jordan Process); see also EX. G-3 (Cayman Chemical Safety Sheets).

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

70.     A few months later Jordan Process led Colorado state inspectors to believe the Olistica facility produced an "alkaloid from a biomass called uncaria gambir". EX. G-4, p. 2 (CO Dept of Health Jordan Process Compliance Evaluation Inspection). Kratom is not mentioned. The Colorado public records also confirm that Jordan Process is doing business as Olistica. EX. G-5 ("Jordan Process Olistica Life Sciences").

71.     A study of Johnson Foods' "MitraLeaf" kratom was conducted by "SGS Nutrasource" of Canada. EX. F-1 (Johnson Foods Study Re: Della Terra Nutra MitraLeaf). This appears to be the same Canadian company that publicly announced its collaboration with Olistica Life Sciences Group in 2019.

72.     The trademark for MitraLeaf is owned by the Olistica's Della Terra business unit. The attorney responsible for the trademark is John VanOphem of VanOphem IP Law PLC. EX. B-6 (Mitragyn Mitra-Leaf Mark Information). Johnson Foods' invoices direct payments related to its work on kratom be wired into the account of VanOphem IP Law LLC. VanOphem is the lawyer for Mark Reilly's Martian Sales, Inc. and its "O.P.M.S." trademark; as well as for the "Olistica" and "Jordan Process" trademarks now owned by PNW Holdings. EX. B-4 (OPMS); EX. B-7 (Jordan Process); EX. B-8 (Olistica).

73.     Mark Jennings recently appeared before the U.S. Trademark Trial and Appeal Board. As COO for Della Terra, Mr. Jennings stated under penalty of perjury that Della Terra has manufactured and distributed products containing kratom since 2015. EX. H-3 (Jennings Decl., par. 3-6). This predates NP Pharma's Wyoming incorporation but is consistent with the "Our History" statement filed with the Jordan Process trademark, and the timeframe that law enforcement officials documented the Olistica crew distributing synthetic cannabinoids and transitioning to the OPMS kratom product.

DECLARATION OF KATHY LEODLER
Page 18 of 20

mctlaw
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

74.    Further, JOpen was billed for work the American Kratom Association, a kratom industry trade association and lobbying nonprofit, performed on behalf of Mr. Palaio and Mr. Jennings in relation to the Johnson Foods NDIN clinical study and related NDIN submission.

75.    Based on my investigation, Martian Sales, Inc. is a shell company of the Olistica-OPMS kratom enterprise.  Substantially all of Martian's business operations are controlled through Olistica's Texas company, JOpen, LLC. The Olistica-OPMS enterprise members have tried to escape the increasing scrutiny and liability created by deceptive and dangerous products like OPMS and Whole Herbs. EX. D-6 (FDA Warning that OPMS "is not lawfully marketed as a dietary supplement").

76.    Martian Sales used fraud to avoid discovery and jurisdiction in the Daniel Paul case, and Martian Sales and those involved in the production and distribution of OPMS kratom are attempting to do so in this case as well.

77.    In summation, the information collected to date continues to demonstrate that those responsible for Martian Sales are using the company as an alter ego for the larger Olistica-OPMS enterprise. Through this enterprise Martian Sales has been used and controlled as a shell company supporting the import, manufacture, and distribution of kratom products that are brought into the country and/or processed under the false pretense that they are "not for human consumption".[1]

78.    The findings and opinions set forth in this declaration are based on my training and experience, the attached documents, and sources commonly relied upon by investigators in my field including; criminal history and background reports; investigatory data bases; witness

---

[1] According to a 2012 GBI interview, the idea of manufacturing and selling illicit products as "not for human consumption" was hatched by a small group of young offenders who met in Drug Court.  Among them was Peyton Palaio.

DECLARATION OF KATHY LEODLER
Page 19 of 20

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

statements and testimony set forth in depositions, declarations, public records, regulatory proceedings, and court matters; discovery productions; corporate and business records, including marketing and internet publications; and law enforcement investigation files.

79.     Some of these materials may be subject to confidentiality restrictions. I understand that the attorneys may submit them under seal, if that becomes necessary.

My name is Kathy Leodler, my birth date is December 21, 1954, and my address is 8696 Northwest Anderson Hill Road, Silverdale, WA 98383.

I declare under penalty of perjury under the laws of the state of Washington and Texas that the foregoing is true and correct.

DATED this 25th day of June 2025.

Kathy Leodler
Rampart Group, LLC

**mctlaw**
1325 4th Avenue, Ste 1730
Seattle, WA 98101
Phone: (888) 952-5242

# EXHIBIT A-1



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801637511 08/09/2012
Document #: 436329700011
Image Generated Electronically
for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**Jopen LLC**

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

**United States Corporation Agents, Inc.**

**OR**

☐ B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**10900 South Stonelake Blvd.**
**Ste. A-320  Austin  TX  78759**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

**OR**

☑B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

Managing Member 1: **Eyal    Gabbay**    Title: **Managing Member**

Address: **203 North Prairie Ave.    Dallas  TX, USA  75246**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

**EXHIBIT A-1**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Tim McManus**     **101 N. Brand Blvd., 11th Floor, Glendale, CA 91203**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Tim McManus**

Signature of Organizer

**FILING OFFICE COPY**

**EXHIBIT A-1**

# EXHIBIT A-2

Max Maxfield, WY Secretary of State
FILED: 07/19/2012 08:22 AM
ID: 2012-000626069



# *Articles of Incorporation*

## Martian Sales Inc.

### Article I

The name of the corporation is Martian Sales Inc..

### Article II

The name and address of the registered agent of the corporation is WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne, Wyoming 82001.

### Article III

The principal office of the corporation is located at: 109 E. 17th Street, Suite 4292, Cheyenne, Wyoming 82001.

### Article IV

The corporation will have the authority to issue 50,000 Common Shares with No Par Value.

### Article V

Neither the Board of Directors of the corporation nor the Officers of the corporation are liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the corporation.

Received
JUL 17 2012
Secretary of State
Wyoming

Articles of Incorporation                                           Page 1 of 3

**EXHIBIT A-2**

## Article VI

The name and address of the incorporator of the corporation is
WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne,
WY 82001.

_____    7/16/2012
Jason DeBraal                       Date
Vice President
WyomingRegisteredAgent.com, Inc.

Articles of Incorporation                                Page 2 of 3

EXHIBIT A-2

# Consent To Appointment

## by

# Registered Agent

I, WyomingRegisteredAgent.com, Inc., with a registered office located at 1621 Central Avenue, Cheyenne, Wyoming 82001, voluntarily consent to serve as the registered agent for *Martian Sales Inc.* on the date shown below.

The registered agent certifies that he is in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

The registered agent certifies that he is a domestic corporation or not-for-profit domestic corporation whose business office is identical with the registered office.

Executed this day July 16, 2012.

_____
Jason DeBraal
Vice President
WyomingRegisteredAgent.com, Inc.

Articles of Incorporation                                    Page 3 of 3

EXHIBIT A-2

# STATE OF WYOMING
## Office of the Secretary of State

I, MAX MAXFIELD, SECRETARY OF STATE of the STATE OF WYOMING, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF INCORPORATION

## Martian Sales Inc.

Accordingly, the undersigned, by virtue of the authority vested in me by the law, hereby issues this Certificate.

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **19th** day of **July**, **2012**.



_____
Secretary of State

By: _____
Machá Bowman

Filed Date: 07/19/2012

**EXHIBIT A-2**

# EXHIBIT A-3

**2019**          **Profit Corporation Annual Report**

| | |
|---|---|
| Due on or Before: | July 1, 2019 |
| ID: | 2012-000626069 |
| State of Formation: | Wyoming |
| License Tax Due: | $50.00 |
| AR Number: | 04621518 |

ID: **2012-000626069**

Filed: 06/07/2019 09:09 AM

AR Number:     04621518

### Martian Sales Inc.

1:  **Mailing Address**

1621 Central Ave
Cheyenne, WY 82001

_Current Registered Agent:_
Wyoming Registered Agent
1621 Central Ave
Cheyenne, WY 82001

2:  **Principal Office Address**

1621 Central Ave
Cheyenne, WY 82001

Phone: (307) 637-5151
Email: info@wyomingregisteredagent.com

• Please review the current Registered Agent information and, if it needs to be changed or updated, complete the <u>appropriate</u> Statement of Change form available from the Secretary of State's website at <u>http://soswy.state.wy.us</u>

3:  **Officers and Directors**

President          Keith Vogt - 1621 Central Ave, Cheyenne WY 82001

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

|  | | |
|---|---|---|
| _____ | Angelica Espinoza | May 30, 2019 |
| Signature of Treasurer or Fiscal Agent | Printed Name of Treasurer or Fiscal Agent | Date |

**The fee is $50 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1.    Complete the required worksheet.
2.    Sign and date this form and return it to the Secretary of State at the address provided above.



**EXHIBIT A-3**

EXHIBIT A-4

Case 2:24-cv-00228-WBV-DPC    Document 132-44    Filed 06/30/25    Page 33 of 489

Provided by Schrader, Aragon & Jacoby Funeral Home

# Keith Thomas Vogt

*February 19, 1971 ~ June 1, 2020 (age 49)*



### Services

A service summary is not available

Keith Thomas Vogt, 49, of Cheyenne, Wyoming passed away June 1, 2020.

He was born February 19, 1971 in Pittsburgh, Pennsylvania, the second of two children to William G. Vogt and Molly (Thomas) Vogt.

Keith graduated from Swissvale High School in 1989 and entered Carnegie Mellon University to study computer engineering. Finding college not to his liking and demonstrating his strong, lifelong independent streak, he left after one week and moved to Denver where he was initially employed delivering pizza.

Over the next few years, Keith acquired numerous IT certifications and advanced in corporate IT jobs, including a position with Tim Gill at Quark, Inc. In the late 1990s, Keith saw an opportunity in the confluence of the emerging internet business world and corporate privacy.

He moved to Cheyenne, founding Wyoming Registered Agent, an online business services firm specializing in helping people form corporations in a state renowned for its friendly business environment and strong corporate privacy protections. This business thrived and today employs five people serving thousands of clients in the US and abroad.  Keith later founded and ran both commercial and residential real estate ventures around Cheyenne.

Keith enjoyed hiking with his dogs, fine dining and spending time with friends. An adventurous trekker, Keith enjoyed hitting the road to explore the Mountain West and international travel. He fell in love with Belize where he eventually kept a condominium on the beach in which he entertained both American and local friends.
Keith supported causes including the Matthew Shepard Foundation, the Audubon Society and animal welfare.

Keith is survived by his brother, William (Suzanne) Vogt; nieces and nephews, Christina, Acton, Bryce, and Felicity; and a group of close, long-time friends in Colorado, Wyoming and Pennsylvania.

Keith was laid to rest next to his mother in Verona Cemetery in Oakmont, Pennsylvania and was remembered in celebration of life among his brother and close friends.

Cremation is under the care of Schrader, Aragon and Jacoby Funeral Home.

# Guest Book

**EXHIBIT A-4**

Message from **Chad**                              August 9, 2021 2:08 AM

*I'm sorry that our friendship crumbled. I'm sorry I didn't reach out. You were one of my few true friends - for too short a time. Goodbye Keith. I love you.*

**EXHIBIT A-4**

# EXHIBIT A-5

**2020**                    **Profit Corporation Annual Report**

Due on or Before:        July 1, 2020
ID:                      2012-000626069
State of Formation:      Wyoming
License Tax Paid:        $50.00
AR Number:               05911619

<u>For Office Use Only</u>
Wyoming Secretary of State
Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
307-777-7311
https://wyobiz.wyo.gov/Business/AnnualReport.aspx

**Martian Sales Inc.**

1:  Mailing Address

1621 Central Ave
Cheyenne, WY 82001

2:  Principal Office Address

1621 Central Ave
Cheyenne, WY 82001

Phone: (307) 637-5151
Email: info@wyomingregisteredagent.com

*Current Registered Agent:*
Wyoming Registered Agent
1621 Central Ave
Cheyenne, WY 82001

• Please review the current Registered Agent information and, if it needs to be changed or updated, complete the <u>appropriate</u> Statement of Change form available from the Secretary of State's website at <u>http://soswy.state.wy.us</u>

3: Officers and Directors

President                President    Mark Reilly - 3760 Chattahoochee Summit Drive SE, Atlanta, GA 30339

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

David L. Watson                    David L. Watson                    September 8, 2020
Signature of Treasurer or Fiscal Agent    Printed Name of Treasurer or Fiscal Agent    Date

**The fee is $50 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1.  Complete the required worksheet.
2.  Sign and date this form and return it to the Secretary of State at the address provided above.

**EXHIBIT A-5**

EXHIBIT A-6



Secretary of State

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

WY Secretary of State
FILED: May 29 2019 10:36AM
Original ID: 2019-000858622

# Limited Liability Company
## Articles of Organization

**I. The name of the limited liability company is:**

LP Ind., LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VI.** The Company is to be managed by one or more Managers.

**VII.** A Manager (if any) shall not be personally liable to the Company or its Members for monetary damages for breach of his duty of care or other duty as Manager, and the Company shall have the power to indemnify and hold harmless any Manager or Member from and against any and all claims and demands whatsoever arising in connection with the Company; provided that this provision shall eliminate or limit the liability of a Manager or Member only to the extent permitted from time to time by the Wyoming Limited Liability Company Act or any successor law or laws.

**Signature:**     *Matthew Paolillo*                    Date:  **05/29/2019**

Print Name:     **Matthew Paolillo**

Title:              **Organizer**

Email:            **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**

**EXHIBIT A-6**

Page 1 of 4

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

*Wyoming*

Secretary of State

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☑ An Individual      ☐ An Organization

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:   *Matthew Paolillo*                          Date:   **05/29/2019**

Print Name:   **Matthew Paolillo**

Title:   **Organizer**

Email:   **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**

**EXHIBIT A-6**
Page 2 of 4

MCKIB_LP_0000051

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

Secretary of State

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **LP Ind., LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:     *Matthew Paolillo*                    Date:  **05/29/2019**

Print Name:     **Matthew Paolillo**

Title:     **Organizer**

Email:     **mpaolillo@gomeldavis.com**

Daytime Phone #:     **(404) 223-5900**

**EXHIBIT A-6**

Page 3 of 4

MCKIB_LP_0000052

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**LP Ind., LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **29th** day of **May**, **2019** at **10:36 AM.**



Remainder intentionally left blank.



Filed Date: 05/29/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/29/2019

**EXHIBIT A-6**

Page 4 of 4

MCKIB_LP_0000053

# OPERATING AGREEMENT
## OF
## LP IND., LLC

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into as of the 29th day of May, 2019, by FMK GROUP, LLC, a Wyoming Limited Liability Company, as the sole member (the "Member") of LP Ind., LLC, a Wyoming limited liability company (the "Company"), in accordance with the provisions of the Wyoming Limited Liability Company Act, Wyoming Statutes, §17-29-101 et seq., as amended (the "Act").

## ARTICLE 1

### Formation of Company

1.1    Formation.  On May 29, 2019, Matthew Paolillo, as Organizer, formed the Company as a Wyoming limited liability company by executing and filing the Articles of Organization with the Secretary of State of Wyoming.

1.2    Name.  The name of the Company is "LP Ind., LLC."

1.3    Management.  The Company will be managed by one or more Manager(s).

1.4    Location.  The principal place of business of the Company will be at 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801, or such other place as the Manager may hereafter determine. The Manager may establish additional places of business of the Company when and where required by the Company's business.

1.5    Registered Agent.  The name and address of the registered agent are as follows:  Registered Agents, Inc., 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801.

## ARTICLE 2

### Company Business

The general nature of the business of the Company shall be to engage in every phase and aspect of botanical processing and packaging; to buy, sell, own, exchange, operate, mortgage, lease and manage real and personal property of all kinds; to do all things incident or necessary to such business and, in general, to carry on any business not contrary to the limited liability company laws of the State of Wyoming; and to have and exercise all of the powers, rights and privileges conferred by the laws of the State of Wyoming upon limited liability companies thereunder.

EXHIBIT A-6

MCKIB_LP_0000054

## ARTICLE 3

### Term

3.1    <u>Term</u>.  The term of the Company commenced on the date the Articles of Organization were filed with the Secretary of State of Wyoming, and the Company shall continue to exist until dissolved pursuant to either Section 3.2 hereof or §17-29-701 of the Act.

3.2    <u>Early Dissolution</u>.  The Company shall be dissolved if and when any of the following shall occur:

      (a)    the Member determines that the Company should be dissolved; or

      (b)    the happening of any other event that makes it unlawful or impossible to carry on the business of the Company.

## ARTICLE 4

### Capital Contributions

4.1    <u>Membership Units</u>.  The Member shall receive One Hundred (100) Membership Units in the Company.

4.2    <u>Additional Contributions</u>.  The Member shall not be obligated to make any additional capital contributions to the Company.  If the Manager determines additional capital is needed in order to carry on Company business, the Member may make voluntary contributions, in such amounts as the Member may determine.

4.3    <u>Liabilities of Members</u>.  Except as otherwise provided by law, no Member shall be liable for any losses, debts or obligations of the Company or be required to contribute any capital or lend any funds to the Company other than as provided above; provided, however, that the capital contribution of the Member shall be subject to the risk of the business of the Company and subject to the claims of the Company's creditors.

4.4    <u>Services Contributed</u>.  Pursuant to §17-29-402 of the Act, a contribution to the Company's capital may be in services rendered or to be performed.

## ARTICLE 5

### Distributions

5.1    <u>Cash from Operations</u>.  Subject to maintaining the Company in a sound financial and cash position (which, without limitation of the generality of the foregoing, shall include the provision for losses affecting the cash position of the Company and paying or making provision for the payment, when due, of obligations of the Company and obligations secured by, or by lien on, property of the Company) and establishing such reserve or reserves as the Manager determines

**EXHIBIT A-6**

MCKIB_LP_0000055

may be reasonably required for the proper operation of the Company's business, the Company may distribute to the Member, from time to time, the cash generated by the business operations of the Company ("Cash Flow"). The Manager shall determine the amounts to be distributed and the time or times when distribution of such amounts shall be made.

5.2     <u>Restrictions on Distributions</u>.  No distribution to the Member, to an assignee, or with respect to the interest of the Member may be made, if after giving effect to the distribution:

      (a)     the Company would not be able to pay its debts as they become due in the usual course of business; or

      (b)     the Company's total assets would be less than the sum of its total liabilities.

5.3     <u>Capital Transactions</u>.  All proceeds from the sale, or other disposition for value, of real or personal property of the Company, condemnation, other dispositions for value, damage recoveries, receipts of insurance proceeds resulting from casualty losses and refinancing of Company borrowing may be distributed to the Member in such amounts and at such time as determined by the Manager, or may be retained by the Company.

<u>ARTICLE 6</u>

<u>Powers and Duties of Manager</u>

6.1     <u>Management by Manager</u>.  The business and affairs of the Company shall be managed by the Manager as set forth herein.  Peyton S. Palaio shall act as the initial sole Manager of the Company.  The Manager shall manage the Company in accordance with the provisions of this Agreement and the Act.

6.2     <u>Powers of Manager</u>.  Subject to any restrictions of §17-29-407 of the Act, all powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Manager, unless otherwise provided in the Act, the Articles, or this Agreement.

The Manager is an agent of the Company for the purpose of its business, and the act of the Manager, including the execution in name of the Company of any instrument for apparently carrying on in the usual way the business of the Company, binds the Company, unless such act is in contravention of the Articles or this Agreement, or unless the Manager otherwise lacks the authority to act for the Company and the person with whom the Manager is dealing has knowledge of the fact that the Manager has no such authority.  A Manager need not be a member, an individual, a resident of the State of Wyoming, or a citizen of the United States.

6.3     <u>Duties of Manager</u>.  The Manager shall manage the Company's business to the extent that the Manager shall determine is necessary for the efficient operation thereof and shall also have the duties imposed by the other provisions of this Agreement.  The Manager may also devote himself to other businesses, whether or not similar in nature to the business of the Company.

**EXHIBIT A-6**

MCKIB_LP_0000056

6.4    <u>Number of Managers; Term; Successors</u>. The number of Managers of the Company shall initially be one (1). The Member may at any time fix the number of Managers or may fix a variable range by fixing a different minimum and maximum number of Managers. Each Manager shall serve until his death, resignation or removal, whereupon one or more successors shall be elected by the Member.

6.5    <u>Removal of Manager</u>. Any Manager may be removed, with or without cause, at any time by the Member.

6.6    <u>Indemnity of the Managers, Member, Employees, and Other Agents</u>. To the fullest extent permitted under §17-29-408 of the Act, the Company shall indemnify the Manager, the Member and any officers, and make advances for expenses to them with respect to such matters to the maximum extent permitted under applicable law. The Member may also choose to indemnify the employees and other agents of the Company.

<u>ARTICLE 7</u>

<u>Officers</u>

7.1    <u>Officers of the Company</u>. The Manager may, in his discretion, decide whether the Company shall have officers, and the Manager shall elect all officers of the Company, if any, and, except to the extent that such authority is delegated to the President, fix their compensation. The officers of the Company may consist of a President, Secretary, Treasurer, and such other officers (including one or more Vice Presidents) as the Manager may from time to time select. Any two or more of said officers may be held by the same person simultaneously.

7.2    <u>Election</u>. The officers shall be selected annually by the Manager, and each shall hold office until his death, disability, removal, resignation, or until his successor shall have been elected and qualified.

7.3    <u>Removal</u>. Any officer or agents selected or appointed by the Manager may be removed by the Manager whenever in his judgment the best interest of the Company will be served thereby.

7.4    <u>Powers and Duties</u>. The officers of the Company shall have the following duties, with all powers necessary to the performance thereof, and such other duties and powers as the Manager may designate:

(a)    *President* – The President shall be the chief executive officer, and shall, subject to the control of the Manager, generally supervise and control all of the business and affairs of the Company. He shall sign, together with the Secretary or other authorized officer (if any), all deeds, certificates of ownership and other formal papers incidental to the business of the Company. The President shall vote all stock in corporations owned by the Company.

(b)    *Vice President* – In the absence of the President or in the event of his inability to act, one or more of the Vice Presidents shall perform the duties of the President, and exercise all

MCKIB_LP_0000057

the powers incidental thereto, as directed by the Manager. The Vice President also shall perform such duties and exercise such powers as may be designated from time to time by the Manager.

(c)  *Secretary* – The Secretary shall keep the Minutes and records of the Company, be responsible for the seal of the Company (if any), and see that it is affixed to such papers as may require it, have charge of the Member list and certificate transfer books of the Company, see that all notices required by law are given and, together with the President, sign all deeds, certificates of ownership and other formal papers incidental to the business of the Company.

(d)  *Treasurer* – The Treasurer shall receive and hold all funds and securities of the Company and have charge of Company finances generally. He shall be responsible for the preparation of all financial statements and returns required by law and shall sign all checks and notes of the Company.

(e)  Additional duties – The above officers shall, in addition to the duties specifically prescribed above, have all duties and powers normally incidental to their respective offices.

(f)  The Manager may delegate to any officer or agent any duties or authority hereinabove assigned to any officer, or may enlarge or restrict temporarily or permanently the duty and authority of any officer.

7.5  <u>Bond</u>. The Manager may, in his discretion, require any officer, agent or employee of the Company to give such bond for the faithful performance of their duties as may be deemed necessary or desirable.

7.6  <u>Vacancies</u>. All vacancies in any office shall be filled promptly by the Manager.

<div align="center">

ARTICLE 8

Dissolution and Winding Up

</div>

Upon dissolution, the Company shall continue solely for the purposes of winding up affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Member. The Manager shall not take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Manager shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's liabilities and property and the Company property shall, if necessary, be liquidated as promptly as is consistent with obtaining the fair value thereof. The assets of the Company shall be applied and distributed in the following order:

(a)  first, to the payment and discharge of all of the Company's debts and liabilities to creditors other than the Member;

(b)  second, to the payment and discharge of all the Company's debts and liabilities to the Member; and

<div align="center">

Page 5 of 9          **EXHIBIT A-6**

</div>

MCKIB_LP_0000058

(c)      the balance, if any, to the Member.

## ARTICLE 9

### Transfers of Company Interests

9.1     <u>Transfer of Company Interests</u>.  The Member shall have the authority to sell, transfer or otherwise dispose of all or any part of his interest in the Company at any time.  The transferee shall become a full Member upon satisfaction of all conditions in Section 9.2.

9.2     <u>Conditions Precedent to Transfer</u>.  Notwithstanding any other provision of this Article 9, no Company interest may be transferred unless and until:

(a)      all debts and obligations of the transferor to the Company (including any unpaid contributions) have been paid;

(b)      the transferor and the transferee have furnished to the Company all information necessary to permit the Company to file all required federal and state tax returns and other legally required returns or disclosures;

(c)      assumption, in form satisfactory to the Company, by the transferee of all of the debts and obligations of the transferor with respect to the transferred interest;

(d)      execution of this Agreement by the transferee; and

(e)      payment by the transferor or transferee of all reasonable costs and expenses incurred by the Company in effecting the transfer.

9.3     <u>Transfer at Death</u>.  If the Member is an individual, upon the death of the Member the Membership Units of the Member shall be transferred pursuant to the Member's Last Will and Testament (or under the laws of intestacy, if applicable), and any person who receives the interest shall be treated as a substituted Member under this Agreement and shall be entitled to all the rights and obligations of the Member under this Agreement. The transfer of such interest shall not relieve the Member's estate of any debts or obligations for which the Member was otherwise liable.

9.4     <u>Additional Members</u>.  Additional persons may be admitted to the Company as members and additional Membership Units may be created and issued to those persons and to the Member at the direction of the Member, on such terms and conditions as the Member may determine at the time of admission.  The terms of admission or issuance must specify the percentage of net profit and net loss allocable to such person and the capital contribution applicable thereto and may provide for the creation of different classes or groups of members having different rights, powers, and duties.  The Manager shall reflect the creation of any new class or group in a new Operating Agreement indicating the different rights, powers, and duties.  Any such admission also must comply with the requirements described elsewhere in this Agreement and is effective only after the new member has executed and delivered to the Company, as appropriate, a document including

MCKIB_LP_0000059

the new member's notice address and the new member's agreement to be bound by the terms of an agreement which reflects the existence of at least two members.

## ARTICLE 10

### Books of Account

The Company shall keep proper and complete books of account at all times during its existence.

## ARTICLE 11

### Representations of Member

11.1    <u>Representation</u>.  The Member hereby represents and warrants to the Company that the interest purchased by the Member is being purchased for the Member's own account with the intent of holding such interest for investment and without the intent of participating directly or indirectly in a distribution of such interest.  Such representation and warranty shall not be deemed to be limited or qualified in any way by any other provisions of this Agreement.

11.2    <u>Acknowledgment of Restrictions</u>.  The Member hereby acknowledges that the Member must bear the economic risk of an investment in the Company for an indefinite period of time because the interests in the Company have not been registered under the Securities Act of 1933, as amended, the Wyoming Securities Act, as amended, or any other state securities law (the "Securities Acts"), and may not be transferred or resold unless subsequently registered under the Securities Acts, or unless an exemption from such registration is available.

11.3    <u>Restrictions on Transfer</u>.  The Member hereby represents and warrants to the Company and agrees with the Company that the Member shall not sell, offer for sale, assign, transfer, hypothecate, or otherwise dispose of, or offer to dispose of, the Member's interest in the Company except in a transaction which is registered under the Securities Acts, unless the Member provides the Company with an opinion of counsel, which opinion and counsel are acceptable to the Company, that such registration is not required.

## ARTICLE 12

### Other Definitions

For purposes of this Agreement, the following terms have the following meanings:

12.1    <u>Certain Pronouns</u>.  The pronouns "he," "his," "him," or "who," with "Member," "Members," "Manager," or "Managers," as the antecedent, shall be deemed to refer also to a Member or Manager who is a woman, a partnership, a joint venture, an association, a corporation, a limited liability company, a trust, or an estate.

**EXHIBIT A-6**

MCKIB_LP_0000060

12.2     Manager.  The term "Manager" includes any successor Manager, or when there is more than one Manager, all such Managers and any of their successors.

12.3     Person.  "Person" means an individual, a partnership, a joint venture, an association, a corporation, a limited liability company, a trust, or an estate.

## ARTICLE 13

## Miscellaneous

13.1     Amendment.  This Agreement may be amended at any time or from time to time only by the Member.

13.2     Governing Law.  This Agreement and all amendments hereof shall be governed by the laws of the State of Wyoming.

13.3     Representatives.  This Agreement shall be binding upon the parties hereto and their respective executors, administrators, successors and assigns.

**(THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK)**

MCKIB_LP_0000061

IN WITNESS WHEREOF, the party hereto has hereunto set his respective hand all on the day and year first above written.

MEMBER:

FMK GROUP, LLC

By: _____
         Peyton S. Palaio, Manager

I:\Client Files\P\P0303\0001\Docs\Entity Structure\CC US Holdings, LLC\OP AGRMT of LP Ind., LLC 20190529 DR.docx

EXHIBIT A-6

MCKIB_LP_0000062

# EXHIBIT A-7

**Wyoming Secretary of State**
2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: May 23 2019  9:09AM**
**Original ID: 2019-000857706**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

CAG Holdings, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St Ste R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St Ste R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VI.**    The Company is to be managed by one or more Managers.

**VII.**   A Manager (if any) shall not be personally liable to the Company or its Members for monetary damages for breach of his duty of care or other duty as Manager, and the Company shall have the power to indemnify and hold harmless any Manager or Member from and against any and all claims and demands whatsoever arising in connection with the Company; provided that this provision shall eliminate or limit the liability of a Manager or Member only to the extent permitted from time to time by the Wyoming Limited Liability Company Act or any successor law or laws.

**Signature:**    *Matthew Paolillo*                              Date:  **05/23/2019**

Print Name:    **Matthew Paolillo**

Title:         **Organizer**

Email:         **mpaolillo@gomeldavis.com**

Daytime Phone #:  **(404) 223-5900**

**EXHIBIT A-7**

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**    ☑ An Individual        ☐ An Organization

## Filer Information:
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:    *Matthew Paolillo*                    Date:  **05/23/2019**

Print Name:   **Matthew Paolillo**

Title:        **Organizer**

Email:        **mpaolillo@gomeldavis.com**

Daytime Phone #:  **(404) 223-5900**



Secretary of State

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

# Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **CAG Holdings, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:  *Matthew Paolillo*                    Date:  **05/23/2019**

Print Name:  **Matthew Paolillo**

Title:  **Organizer**

Email:  **mpaolillo@gomeldavis.com**

Daytime Phone #:  **(404) 223-5900**

**EXHIBIT A-7**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**CAG Holdings, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **23rd** day of **May**, **2019** at **9:09 AM.**

Remainder intentionally left blank.



Filed Date: 05/23/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/23/2019

EXHIBIT A-8



Ed Murray, WY Secretary of State
FILED: 11/27/2015 10:24 AM
ID: 2015-000700537

# R.M.H. Holdings, Inc.

## Article I

The name of the corporation is R.M.H. Holdings, Inc..

## Article II

The name and address of the registered agent of the corporation is WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne, Wyoming 82001.

## Article III

The principal office of the corporation is located at: 1621 Central Avenue, Cheyenne, Wyoming 82001.

## Article IV

The corporation will have the authority to issue 50,000 Common Shares with No Par Value.

## Article V

Neither the Board of Directors of the corporation nor the Officers of the corporation are liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the corporation.

Received
NOV 2 0 2015
Secretary of State
Wyoming

Articles of Incorporation

Page 1 of 3

EXHIBIT A-8

## Article VI

The name and address of the incorporator of the corporation is WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne, WY 82001.

_Rose Garcia_        <u>11/20/2015</u>
Rose Garcia        Date
Assistant Secretary FOR
WyomingRegisteredAgent.com, Inc.

EXHIBIT A-8



Colorado Secretary of State
Date and Time: 12/26/2019 02:33 PM
ID Number: 20161704113

Document number: 20198042174
Amount Paid: $10.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

ABOVE SPACE FOR OFFICE USE ONLY

**Periodic Report**
filed pursuant to §7-90-301, et seq. and §7-90-501 of the Colorado Revised Statutes (C.R.S)

ID number: _____ 20161704113

Entity name: _____ R.M.H. Holdings, Inc

Jurisdiction under the law of which the
entity was formed or registered: _____ Wyoming

1. Principal office street address: _____ 23298 US Highway 160
_____ *(Street name and number)*

Springfield _____ CO _____ 81073
*(City)* _____ *(State)* _____ *(Postal/Zip Code)*
United States
*(Province – if applicable)* _____ *(Country – if not US)*

2. Principal office mailing address:   1880 West Oak Parkway
(if different from above) _____ *(Street name and number or Post Office Box information)*

Marietta _____ GA _____ 30062
*(City)* _____ *(State)* _____ *(Postal/Zip Code)*
Cobb _____ United States
*(Province – if applicable)* _____ *(Country – if not US)*

3. Registered agent name:  (if an individual) _____
_____ *(Last)* _____ *(First)* _____ *(Middle)* _____ *(Suffix)*
    or    (if a business organization)   Hoban Law Group

4. The person identified above as registered agent has consented to being so appointed.

5. Registered agent street address: _____ 730 17th Street
_____ *(Street name and number)*
Suite 420
Denver _____ CO _____ 80202
*(City)* _____ *(State)* _____ *(Postal/Zip Code)*

6. Registered agent mailing address: _____
(if different from above) _____ *(Street name and number or Post Office Box information)*

_____
*(City)* _____ *(State)* _____ *(Postal/Zip Code)*
_____
*(Province – if applicable)* _____ *(Country – if not US)*

**EXHIBIT A-8**

MCKIB_LP_0000170

Notice:
Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

7. Name(s) and address(es) of the
   individual(s) causing the document
   to be delivered for filing:

| Costello | Taylor | L | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

730 17th Street
*(Street name and number or Post Office Box information)*

Suite 420

| Denver | CO  80202 | |
|---|---|---|
| *(City)* | *(State)* | *(Postal/Zip Code)* |

United States
*(Province – if applicable)*     *(Country – if not US)*

*(The document need not state the true name and address of more than one individual. However, if you wish to state the name and address of any additional individuals causing the document to be delivered for filing, mark this box* ☐ *and include an attachment stating the name and address of such individuals.)*

Disclaimer:
This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

REPORT                           Page 2 of 2                           Rev. 12/01/2012

**EXHIBIT A-8**

MCKIB_LP_0000171

EXHIBIT A-9

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: May 29 2019 10:47AM**
**Original ID: 2019-000858630**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

NP Pharma Holdings, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VI.**   The Company is to be managed by one or more Managers.

**VII.**   A Manager (if any) shall not be personally liable to the Company or its Members for monetary damages for breach of his duty of care or other duty as Manager, and the Company shall have the power to indemnify and hold harmless any Manager or Member from and against any and all claims and demands whatsoever arising in connection with the Company; provided that this provision shall eliminate or limit the liability of a Manager or Member only to the extent permitted from time to time by the Wyoming Limited Liability Company Act or any successor law or laws.

**Signature:**   *Matthew Paolillo*          Date:   **05/29/2019**

Print Name:   **Matthew Paolillo**

Title:   **Organizer**

Email:   **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**

**EXHIBIT A-9** Page 1 of 4

*Wyoming*

**Secretary of State**

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☑ An Individual     ☐ An Organization

**<u>Filer Information:</u>**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:   *Matthew Paolillo*                              Date:   **05/29/2019**

Print Name:   **Matthew Paolillo**

Title:   **Organizer**

Email:   **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**



## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **NP Pharma Holdings, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Matthew Paolillo*                    Date: **05/29/2019**

Print Name:    **Matthew Paolillo**

Title:    **Organizer**

Email:    **mpaolillo@gomeldavis.com**

Daytime Phone #:    **(404) 223-5900**

**EXHIBIT A-9** Page 3 of 4

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF ORGANIZATION

**NP Pharma Holdings, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **29th** day of **May**, **2019** at **10:47 AM.**

Remainder intentionally left blank.



Filed Date: 05/29/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/29/2019

EXHIBIT A-10

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: Jul  2 2019  2:39PM**
**Original ID: 2019-000864122**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

NP Biotech, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Cloud Peak Law Group, P.C.
905 Broadway Street
Ste 100
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

201 East 5th St. STE 1200
Sheridan, Wyoming 82801

**IV. The principal office address of the limited liability company is:**

201 East 5th St. STE 1200
Sheridan, Wyoming 82801

**V. The organizer of the limited liability company is:**

Cloud Peak Law Group, P.C.
905 Broadway St. STE 100 Sheridan WY

**Signature:** *Bradley Davies*    Date: **07/02/2019**

Print Name: **Bradley Davies**

Title: **Authorized Individual**

Email: **reports@cloudpeaklaw.com**

Daytime Phone #: **(307) 683-0983**

**EXHIBIT A-10** Page 1 of 4



**Secretary of State**

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☐ An Individual   ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator or organizer. The following individual is signing on behalf of all Organizers or Incorporators.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

**Signature:**   *Bradley Davies*                     Date:  **07/02/2019**

Print Name:   **Bradley Davies**

Title:   **Authorized Individual**

Email:   **reports@cloudpeaklaw.com**

Daytime Phone #:   **(307) 683-0983**



Secretary of State

Wyoming Secretary of State
2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Cloud Peak Law Group, P.C.**, whose registered office is located at **905 Broadway Street, Ste 100, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **NP Biotech, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:    *Bradley Davies*                          Date:  **07/02/2019**

Print Name:    **Bradley Davies**

Title:    **Authorized Individual**

Email:    **reports@cloudpeaklaw.com**

Daytime Phone #:    **(307) 683-0983**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**NP Biotech, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **2nd** day of **July**, **2019** at **2:39 PM.**

Remainder intentionally left blank.



Filed Date: 07/02/2019

_Edward A. Buchanan_
Secretary of State

Filed Online By:

Bradley Davies

on 07/02/2019

**EXHIBIT A-10** Page 4 of 4

EXHIBIT A-11

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: May 23 2019  8:50AM**
**Original ID: 2019-000857697**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

CC US Holdings, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St Ste R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St Ste R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VI.** The Company is to be managed by one or more Managers.

**VII.** A Manager (if any) shall not be personally liable to the Company or its Members for monetary damages for breach of his duty of care or other duty as Manager, and the Company shall have the power to indemnify and hold harmless any Manager or Member from and against any and all claims and demands whatsoever arising in connection with the Company; provided that this provision shall eliminate or limit the liability of a Manager or Member only to the extent permitted from time to time by the Wyoming Limited Liability Company Act or any successor law or laws.

**Signature:**     *Matthew Paolillo*                    Date:  **05/23/2019**

Print Name:     **Matthew Paolillo**

Title:     **Organizer**

Email:     **mpaolillo@gomeldavis.com**

Daytime Phone #:     **(404) 223-5900**

EXHIBIT A-11

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**   ☑ An Individual      ☐ An Organization

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:    *Matthew Paolillo*                              Date:  **05/23/2019**

Print Name:   **Matthew Paolillo**

Title:        **Organizer**

Email:        **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**



Secretary of State

**Wyoming Secretary of State**
2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **CC US Holdings, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:     *Matthew Paolillo*                    Date:  **05/23/2019**

Print Name:     **Matthew Paolillo**

Title:     **Organizer**

Email:     **mpaolillo@gomeldavis.com**

Daytime Phone #:     **(404) 223-5900**

**EXHIBIT A-11** Page 3 of 4

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**CC US Holdings, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **23rd** day of **May**, **2019** at **8:50 AM.**

Remainder intentionally left blank.



Filed Date: 05/23/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/23/2019

**EXHIBIT A-11** Page 4 of 4

EXHIBIT A-12

**Ed Murray, WY Secretary of State**
**FILED: 05/06/2015 04:22 PM**
**ID: 2015-000686353**



# Articles of Incorporation

## Liv Group, Inc.

### Article I

The name of the corporation is Liv Group, Inc..

### Article II

The name and address of the registered agent of the corporation is WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne, Wyoming 82001.

### Article III

The principal office of the corporation is located at: 1621 Central Avenue, Cheyenne, Wyoming 82001.

### Article IV

The corporation will have the authority to issue 50,000 Common Shares with No Par Value.

### Article V

Neither the Board of Directors of the corporation nor the Officers of the corporation are liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the corporation.

Received
APR 30 2015
Secretary of State
Wyoming

**EXHIBIT A-12**

## Article VI

The name and address of the incorporator of the corporation is WyomingRegisteredAgent.com, Inc., 1621 Central Avenue, Cheyenne, WY 82001.


_Rose Garcia_                    4/30/2015
Rose Garcia                      Date
Assistant Secretary FOR
WyomingRegisteredAgent.com, Inc.

Articles of Incorporation                                      Page 2 of 3

EXHIBIT A-12

# Consent To Appointment

# by

# Registered Agent

I, WyomingRegisteredAgent.com, Inc., with a registered office located at 1621 Central Avenue, Cheyenne, Wyoming 82001, voluntarily consent to serve as the registered agent for *Liv Group, Inc.* on the date shown below.

The registered agent certifies that he is in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

The registered agent certifies that he is a domestic corporation or not-for-profit domestic corporation whose business office is identical with the registered office.

Executed this day April 30, 2015.


_Rose G_____
Rose Garcia
Assistant Secretary FOR
WyomingRegisteredAgent.com, Inc.

Articles of Incorporation                                                                 Page 3 of 3

**EXHIBIT A-12**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD F. MURRAY, III, SECRETARY OF STATE of the STATE OF WYOMING, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF INCORPORATION

## Liv Group, Inc.

Accordingly, the undersigned, by virtue of the authority vested in me by the law, hereby issues this Certificate.

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **6th** day of **May**, **2015**.



_____
Secretary of State

By: _____ Jessica Cockrell _____

Filed Date: 05/06/2015

**EXHIBIT A-12**

# EXHIBIT A-13

**Wyoming Secretary of State**
2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

WY Secretary of State
FILED: May 29 2019  8:33AM
Original ID: 2019-000858578

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

Pacific West Holdings, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**IV. The principal office address of the limited liability company is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**V. The organizer of the limited liability company is:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VI.**   The Company is to be managed by one or more Managers.

**VII.**   A Manager (if any) shall not be personally liable to the Company or its Members for monetary damages for breach of his duty of care or other duty as Manager, and the Company shall have the power to indemnify and hold harmless any Manager or Member from and against any and all claims and demands whatsoever arising in connection with the Company; provided that this provision shall eliminate or limit the liability of a Manager or Member only to the extent permitted from time to time by the Wyoming Limited Liability Company Act or any successor law or laws.

**Signature:**   *Matthew Paolillo*                              Date:   **05/29/2019**

Print Name:   **Matthew Paolillo**

Title:   **Organizer**

Email:   **mpaolillo@gomeldavis.com**

Daytime Phone #:   **(404) 223-5900**



**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

Secretary of State

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**    ☑ An Individual        ☐ An Organization

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:    *Matthew Paolillo*                    Date:  **05/29/2019**

Print Name:    **Matthew Paolillo**

Title:    **Organizer**

Email:    **mpaolillo@gomeldavis.com**

Daytime Phone #:    **(404) 223-5900**



**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **Pacific West Holdings, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:     *Matthew Paolillo*          Date:  **05/29/2019**

Print Name:     **Matthew Paolillo**

Title:     **Organizer**

Email:     **mpaolillo@gomeldavis.com**

Daytime Phone #:     **(404) 223-5900**

**EXHIBIT A-13**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

### CERTIFICATE OF ORGANIZATION

**Pacific West Holdings, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **29th** day of **May**, **2019** at **8:33 AM.**

Remainder intentionally left blank.



Filed Date: 05/29/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/29/2019

EXHIBIT A-13

# EXHIBIT A-14

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: May 23 2019 10:25AM**
**Original ID: 2019-000857732**

# Profit Corporation
# Articles of Incorporation

**I. The name of the corporation is:**

CAG International, Inc.

**II. The name and physical address of the registered agent of the corporation is:**

Registered Agents Inc.
30 N Gould St Ste R
Sheridan, WY 82801

**III. The mailing address of the corporation is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**IV. The principal office address of the corporation is:**

30 N Gould St. Ste. R
Sheridan, WY 82801

**V. The number, par value, and class of shares the corporation will have the authority to issue are:**

| | | | |
|---|---|---|---|
| Number of Common Shares: | 1,000 | Common Par Value: | $0.0100 |
| Number of Preferred Shares: | 0 | Preferred Par Value: | $0.0000 |

**VI. The name and address of each incorporator is as follows:**

Matthew Paolillo
245 Peachtree Center Ave. NE, Ste. 2400, Atlanta, GA, 30303

**VII.** The governing board of the Corporation shall be known as Directors, and the number of Directors may from time to time be increased or decreased in such a manner as shall be provided in the By-Laws of the Corporation, providing that the number of Directors shall not be reduced to fewer than one (1).

**VIII.** No Director or Officer of the Corporation shall be personally liable to the Corporation or any of its stockholders for damages for breach of fiduciary duty or any other duty as a Director or Officer involving any act or omission of any such Director or Officer; provided, however, that this provision shall eliminate or limit the liability of a Director or Officer only to the extent permitted from time to time by the Wyoming Business Corporation Act or any successor law or laws.  The Corporation shall, to the fullest extent permitted by Wyoming Statutes Section 17-16-850 et seq., pay for or reimburse the reasonable expenses incurred by every Director or Officer who is a party to a proceeding in advance of final disposition of the proceeding, in the manner specified by Wyoming Statutes Section 17-16-850 et seq.

**Signature:**     *Matthew Paolillo*     Date:  **05/23/2019**

Print Name:     **Matthew Paolillo**

**EXHIBIT A-14**

Title:          **Incorporator**

Email:          **mpaolillo@gomeldavis.com**

Daytime Phone #:    **(404) 223-5900**

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

Secretary of State

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Business Corporation Act, (W.S. 17-16-101 through 17-16-1804) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Incorporation that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

☑ I affirm, under penalty of perjury, that I have received actual, express permission from each of the following incorporators to add them to this business filing: Matthew Paolillo

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**    ☑ An Individual      ☐ An Organization

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Incorporation.**

| | | |
|---|---|---|
| **Signature:** | *Matthew Paolillo* | Date: **05/23/2019** |

Print Name:     **Matthew Paolillo**

Title:              **Incorporator**

Email:             **mpaolillo@gomeldavis.com**

Daytime Phone #:  **(404) 223-5900**

**EXHIBIT A-14**



**Secretary of State**

## Consent to Appointment by Registered Agent

**Registered Agents Inc.**, whose registered office is located at **30 N Gould St Ste R, Sheridan, WY 82801**, voluntarily consented to serve as the registered agent for **CAG International, Inc.** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Matthew Paolillo*                  Date: **05/23/2019**

Print Name:  **Matthew Paolillo**

Title:  **Incorporator**

Email:  **mpaolillo@gomeldavis.com**

Daytime Phone #:  **(404) 223-5900**

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF INCORPORATION

**CAG International, Inc.**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **23rd** day of **May**, **2019** at **10:25 AM.**

Remainder intentionally left blank.



Filed Date: 05/23/2019

Secretary of State

Filed Online By:

Matthew Paolillo

on 05/23/2019

**EXHIBIT A-14**

# EXHIBIT A-15

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**WY Secretary of State**
**FILED: Apr 29 2019 3:21PM**
**Original ID: 2019-000853729**

# Limited Liability Company
# Articles of Organization

**I. The name of the limited liability company is:**

Advanced Nutrition, LLC

**II. The name and physical address of the registered agent of the limited liability company is:**

Wyoming Registered Agent
1621 Central Ave
Cheyenne, WY 82001

**III. The mailing address of the limited liability company is:**

1621 Central Ave
Cheyenne, WY 82001

**IV. The principal office address of the limited liability company is:**

1621 Central Ave
Cheyenne, WY 82001

**V. The organizer of the limited liability company is:**

Wyoming Registered Agent
1621 Central Ave, Cheyenne WY 82001

**Signature:** *Rose Garcia*                    Date: **04/29/2019**

Print Name: **Rose Garcia**

Title: **Assistant Secretary**

Email: **info@wyomingregisteredagent.com**

Daytime Phone #: **(307) 637-5151**

**EXHIBIT A-15** Page 1 of 4



**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

Secretary of State

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Limited Liability Company Act, (W.S. 17-29-101 through 17-29-1105) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Organization that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

---

**W.S. 6-5-308. Penalty for filing false document.**

(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:

(i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;

(ii) Makes any materially false, fictitious or fraudulent statement or representation; or

(iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

---

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**  ☐ An Individual   ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator or organizer. The following individual is signing on behalf of all Organizers or Incorporators.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Organization.**

Signature:  *Rose Garcia*                    Date:  **04/29/2019**

Print Name:  **Rose Garcia**

Title:  **Assistant Secretary**

Email:  **info@wyomingregisteredagent.com**

Daytime Phone #:  **(307) 637-5151**



**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

Secretary of State

---

## Consent to Appointment by Registered Agent

**Wyoming Registered Agent**, whose registered office is located at **1621 Central Ave, Cheyenne, WY 82001**, voluntarily consented to serve as the registered agent for **Advanced Nutrition, LLC** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature: *Rose Garcia*                     Date: **04/29/2019**

Print Name:     **Rose Garcia**

Title:     **Assistant Secretary**

Email:     **info@wyomingregisteredagent.com**

Daytime Phone #:     **(307) 637-5151**

**EXHIBIT A-15** Page 3 of 4

# STATE OF WYOMING
## Office of the Secretary of State

I, EDWARD A. BUCHANAN, Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF ORGANIZATION

**Advanced Nutrition, LLC**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **29th** day of **April**, **2019** at **3:21 PM.**

Remainder intentionally left blank.



Filed Date: 04/29/2019

Secretary of State

Filed Online By:

Rose Garcia

on 04/29/2019

**2021**        **Limited Liability Company Annual Report**

Due on or Before:     April 1, 2021
ID:     2019-000853729
State of Formation:     Wyoming
License Tax Paid:     $50.00
AR Number:     06116350

<u>For Office Use Only</u>
Wyoming Secretary of State
Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
307-777-7311
https://wyobiz.wyo.gov/Business/AnnualReport.aspx

**Advanced Nutrition, LLC**

**1:  Mailing Address**

2400 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303

*Current Registered Agent:*
Wyoming Discount Registered Agent, Inc.
36 Shadow Brook Ln
Lander, WY 82520

**2:  Principal Office Address**

2550 Sandy Plains Road, Ste 225 #319
Marietta, GA 30066

Phone: (404) 223-5900
Fax: (404) 524-4755
Email:
p@drasupport.com;pfeuillebois@gomeldavis.com

• Please review the current Registered Agent information and, if it needs to be changed or updated, complete the <u>appropriate</u> Statement of Change form available from the Secretary of State's website at <u>http://soswy.state.wy.us</u>

---

I hereby certify under the penalty of perjury that the information I am submitting is true and correct to the best of my knowledge.

| | | |
|---|---|---|
| David  L. Watson | David  L. Watson | February 25, 2021 |
| Signature | Printed Name | Date |

---

**The fee is $50 or two-tenths of one mill on the dollar ($.0002), whichever is greater.**

**Instructions:**
1. Complete the required worksheet.
2. Sign and date this form and return it to the Secretary of State at the address provided above.

**EXHIBIT A-15**

# EXHIBIT B-1

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2021)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 88517421**
**Filing Date: 07/16/2019**

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 88517421 |
| **MARK INFORMATION** | |
| *MARK | OLISTICA |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | OLISTICA |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Olistica Life, LLC |
| *STREET | 1800 West Oak Parkway, Suite 214 |
| *CITY | Marietta |
| *STATE (Required for U.S. applicants) | Georgia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. and certain international addresses) | 30062 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited liability company |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 005 |
| *IDENTIFICATION | Natural food products, namely, plant-based and hemp-based products; Feedstock products, namely plant-based livestock feed; Pharmaceuticals, namely botanical active pharmaceuticals; Nutritional products, namely plant-based and hemp-based products sold as a component of nutritional products |
| **FILING BASIS** | SECTION 1(b) |
| **INTERNATIONAL CLASS** | 042 |
| *IDENTIFICATION | Scientific research and development of natural products, namely plant-based products used in connection with pharmaceuticals, natural foods, and livestock feed |
| **FILING BASIS** | SECTION 1(b) |

**EXHIBIT B-1**

| ATTORNEY INFORMATION | |
|---|---|
| **NAME** | Lynn Rzonca |
| **FIRM NAME** | Ballard Spahr LLP |
| **STREET** | 1735 Market Street, 51st Floor |
| **CITY** | Philadelphia |
| **STATE** | Pennsylvania |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 19103 |
| **PHONE** | 215-864-8109 |
| **FAX** | 2158648999 |
| **EMAIL ADDRESS** | rzoncal@ballardspahr.com |
| **AUTHORIZED TO COMMUNICATE VIA EMAIL** | Yes |
| **OTHER APPOINTED ATTORNEY** | Kristel Tupja |
| **CORRESPONDENCE INFORMATION** | |
| **NAME** | Lynn Rzonca |
| **FIRM NAME** | Ballard Spahr LLP |
| **STREET** | 1735 Market Street, 51st Floor |
| **CITY** | Philadelphia |
| **STATE** | Pennsylvania |
| **COUNTRY** | United States |
| **ZIP/POSTAL CODE** | 19103 |
| **PHONE** | 215-864-8109 |
| **FAX** | 2158648999 |
| *__EMAIL ADDRESS__ | rzoncal@ballardspahr.com; tupjak@ballardspahr.com; shorem@ballardspahr.com |
| *__AUTHORIZED TO COMMUNICATE VIA EMAIL__ | Yes |
| **FEE INFORMATION** | |
| **APPLICATION FILING OPTION** | TEAS RF |
| **NUMBER OF CLASSES** | 2 |
| **APPLICATION FOR REGISTRATION PER CLASS** | 275 |
| *__TOTAL FEE DUE__ | 550 |
| *__TOTAL FEE PAID__ | 550 |
| **SIGNATURE INFORMATION** | |
| **SIGNATURE** | /peyton palaio/ |
| **SIGNATORY'S NAME** | Peyton S. Palaio |
| **SIGNATORY'S POSITION** | Manager |
| **DATE SIGNED** | 07/16/2019 |

**EXHIBIT B-1**

# EXHIBIT B-2

PTO- 1553
Approved for use through 03/31/2024. OMB 0651-0054
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Trademark/Service Mark Statement of Use
# (15 U.S.C. Section 1051(d))

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 90167598 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 108 |
| **EXTENSION OF USE** | NO |
| **MARK SECTION** | |
| **MARK** | mark |
| **LITERAL ELEMENT** | JORDAN PROCESS |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font style, size or color. |
| **OWNER SECTION (current)** | |
| **NAME** | FMK GROUP, LLC |
| **MAILING ADDRESS** | 30 N Gould St Ste R |
| **CITY** | Sheridan |
| **STATE** | Wyoming |
| **ZIP/POSTAL CODE** | 82801 |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **EMAIL** | XXXX |
| **OWNER SECTION (proposed)** | |
| **NAME** | PNW HOLDINGS, LLC |
| **MAILING ADDRESS** | 30 N Gould St Ste R |
| **CITY** | Sheridan |
| **STATE** | Wyoming |
| **ZIP/POSTAL CODE** | 82801 |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **EMAIL** | XXXX |
| **CORRESPONDENCE INFORMATION (current)** | |
| **NAME** | Lynn E. Rzonca |
| **PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE** | rzoncal@ballardspahr.com |

**EXHIBIT B-2**

| | |
|---|---|
| **SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES)** | michaelsm@ballardspahr.com; shorem@ballardspahr.com; tmdocketing@ballardspahr.com |
| **DOCKET/REFERENCE NUMBER** | 00321486 |
| **CORRESPONDENCE INFORMATION (proposed)** | |
| **NAME** | Lynn E. Rzonca |
| **PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE** | rzoncal@ballardspahr.com |
| **SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES)** | michaelsm@ballardspahr.com; shorem@ballardspahr.com; tmdocketing@ballardspahr.com |
| **DOCKET/REFERENCE NUMBER** | 00321486 |
| **GOODS AND/OR SERVICES SECTION** | |
| **INTERNATIONAL CLASS** | 040 |
| **CURRENT IDENTIFICATION** | Industrial processing services for others for making cannabinoid and other rare botanicals products for use as active food, cosmetic, supplement, and industrial ingredients, with any of aforementioned cannabinoid and other rare botanicals containing less than .3 percent delta-9 THC on a dry weight basis |
| **GOODS OR SERVICES** | KEEP ALL LISTED |
| **FIRST USE ANYWHERE DATE** | 03/01/2021 |
| **FIRST USE IN COMMERCE DATE** | 03/01/2021 |
| **SPECIMEN FILE NAME(S)** | |
| **JPG FILE(S)** | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml1 4\SOU0004.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml14\SOU0005.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml14\SOU0006.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml14\SOU0007.JPG |
| **ORIGINAL PDF FILE** | SPN0-6880142142-202202080 84701599699_._JORDAN_PROCESS_specimen.pdf |
| **CONVERTED PDF FILE(S) (2 pages)** | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml14\SOU0002.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\901\675\90167598\xml14\SOU0003.JPG |
| **SPECIMEN DESCRIPTION** | printed marketing material and website pages showing the mark and describing the services |
| **WEBPAGE URL** | https://www.jordanprocess.com/ |
| **WEBPAGE DATE OF ACCESS** | 02/07/2022 |
| **REQUEST TO DIVIDE** | NO |
| **PAYMENT SECTION** | |
| **NUMBER OF CLASSES IN USE** | 1 |
| **SUBTOTAL AMOUNT [ALLEGATION OF USE FEE]** | 100 |

**EXHIBIT B-2**

| TOTAL AMOUNT | 100 |
|---|---|
| **SIGNATURE SECTION** | |
| DECLARATION SIGNATURE | /Mark Jennings/ |
| SIGNATORY'S NAME | Mark Jennings |
| SIGNATORY'S POSITION | Chief Operating Officer |
| DATE SIGNED | 02/10/2022 |
| SIGNATURE METHOD | Signed directly within the form |
| **FILING INFORMATION** | |
| SUBMIT DATE | Thu Feb 10 06:58:16 ET 2022 |
| TEAS STAMP | USPTO/SOU-XX.XX.XXX.XXX-2 0220210065816432335-90167 598-800417eee69f90b0109ba c39cab43968433dd27d22b4dc 5877c7ae6a8e9ec986-DA-581 41976-2022021006562649015 4 |

**EXHIBIT B-2**

PTO- 1553
Approved for use through 03/31/2024. OMB 0651-0054
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:
**MARK:** JORDAN PROCESS(Standard Characters, see https://tmng-al.uspto.gov/resting2/api/img/90167598/large)
**SERIAL NUMBER:** 90167598

**OWNER AND/OR ENTITY INFORMATION**
**The owner proposes to amend the following:**
**Current:** FMK GROUP, LLC, having an address of
      30 N Gould St Ste R
      Sheridan, Wyoming 82801
      United States
      Email: XXXX
**Proposed:** PNW HOLDINGS, LLC, having an address of
      30 N Gould St Ste R
      Sheridan, Wyoming 82801
      United States
      Phone:
      Email: XXXX

The owner is submitting the following allegation of use information:

For International Class 040:
Current identification: Industrial processing services for others for making cannabinoid and other rare botanicals products for use as active food, cosmetic, supplement, and industrial ingredients, with any of aforementioned cannabinoid and other rare botanicals containing less than .3 percent delta-9 THC on a dry weight basis

The mark is in use in commerce on or in connection with all of the goods/services, or to indicate membership in the collective organization listed in the application or Notice of Allowance or as subsequently modified for this specific class.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 03/01/2021, and first used in commerce at least as early as 03/01/2021, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) printed marketing material and website pages showing the mark and describing the services.

**JPG file(s):**
[Specimen File1](#)
[Specimen File2](#)
[Specimen File3](#)
[Specimen File4](#)
**Original PDF file:**
[SPN0-6880142142-202202080 84701599699_._JORDAN_PROC ESS_specimen.pdf](#)
**Converted PDF file(s)** (2 pages)
[Specimen File1](#)
[Specimen File2](#)

Webpage URL: https://www.jordanprocess.com/
Webpage Date of Access: 02/07/2022

The applicant is not filing a Request to Divide with this Allegation of Use form.

**Correspondence Information (current):**

**EXHIBIT B-2**

Lynn E. Rzonca
PRIMARY EMAIL FOR CORRESPONDENCE: rzoncal@ballardspahr.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): michaelsm@ballardspahr.com; shorem@ballardspahr.com; tmdocketing@ballardspahr.com

The docket/reference number is 00321486.

**Correspondence Information (proposed):**
Lynn E. Rzonca
PRIMARY EMAIL FOR CORRESPONDENCE: rzoncal@ballardspahr.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): michaelsm@ballardspahr.com; shorem@ballardspahr.com; tmdocketing@ballardspahr.com

The docket/reference number is 00321486.

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the applicant owner/holder and the applicant owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $100 will be submitted with the form, representing payment for the allegation of use for 1 class.

<div align="center">

**Declaration**

</div>

☑ The signatory believes that the applicant is the owner of the mark sought to be registered.
  **For a trademark or service mark application,** the mark is in use in commerce on or in connection with all the goods/services in the application or notice of allowance, or as subsequently modified.
  **For a collective trademark, collective service mark, collective membership mark application,** the applicant is exercising legitimate control over the use of the mark in commerce by members on or in connection with all the goods/services/collective membership organization in the application or notice of allowance, or as subsequently modified.
  **For a certification mark application,** the applicant is exercising legitimate control over the use of the mark in commerce by authorized users on or in connection with the all goods/services in the application or notice of allowance, or as subsequently modified, and the applicant is not engaged in the production or marketing of the goods/services to which the mark is applied, except to advertise or promote recognition of the certification program or of the goods/services that meet the certification standards of the applicant.

☑ The specimen(s) shows the mark as used on or in connection with the goods/services/collective membership organization in commerce.

☑ To the best of the signatory's knowledge and belief, no other persons, except, if applicable, authorized users, members, and/or concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services/collective membership organization of such other persons, to cause confusion or mistake, or to deceive.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Mark Jennings/     Date Signed: 02/10/2022
Signatory's Name: Mark Jennings
Signatory's Position: Chief Operating Officer
Signature method: Signed directly within the form

PAYMENT: 90167598
PAYMENT DATE: 02/10/2022

Serial Number: 90167598
Internet Transmission Date: Thu Feb 10 06:58:16 ET 2022
TEAS Stamp: USPTO/SOU-XX.XX.XXX.XXX-2022021006581643

<div align="right">

**EXHIBIT B-2**

</div>

2335-90167598-800417eee69f90b0109bac39ca
b43968433dd27d22b4dc5877c7ae6a8e9ec986-D
A-58141976-20220210065626490154



# ◯JORDAN PROCESS

## Who We Are

Jordan Process, A subsidiary of Olistica Life Sciences Group, is a full-service producer and manufacturer specializing in medicinal botanical products that provides clients with superior novel materials and botanical APIs.

We deliver standardized commodities of natural origin on an industrial scale by working with a carefully selected network of global suppliers and agricultural partners.

All offerings from Jordan Process are manufactured and processed at our state-of-the-art facilities across the globe, which are suited to meet a multitude of market needs.



**CXL** CANNABIS EXTRACT LIQUID

LOOK FOR OUR APPROVED MARK FOR CERTIFIED CXL PRODUCT

**CXL** (Cannabis Extract Liquid) is our line of standardized liquid products.

Produced using the highest quality manufacturing equipment and quality controls, to create liquid formulations to the exact customer specification.

Water soluble concentrates available on request.

### OIL OR AQUEOUS BASE?

Solution can be produced with an oil or aqueous base which allows manufacturers to easily integrate our CXL ingredients into any new or existing Tinctures, soft gels, topicals and beverages.



CANNABIS EXTRACT POWDER

· Jordan Process newest Cannabinoid Ingredients, CXP (Cannabis Extract Powder) is produced using our proprietary technology to bind the cannabinoid distillates with the organic fibers, allowing manufacturers to easily integrate our ingredients into new or existing natural product lines.

· CXP is made using nothing but all-natural ingredients and responsibly sourced organic fiber blends to guarantee that all products meet regulatory requirements and consumer specifications. Our full catalog of products rigorously adheres to all the highest standards for natural and organic-based products.

· Jordan Process offers a multifaceted turnkey solution by having the ability to provide ingredients ready to use in bulk for manufacturing or help to create the finished products through our partner Cascade Naturals.

· CXP is a sophisticated composition consisting of a standardized full spectrum oil offered with CBD/ CBG/ and CBN as well as customizable formulations to fulfill the exact ratios of the aforementioned cannabinoids.

· Wondering how our CXP products can be used in your current operations? Our CXP D5 and G5 products can be used to produce 25mg capsules. Looking for something more? CXP D10 and G10 are perfect for production of 50mg capsules or for using as a base to blend in other active ingredients to create your own unique finished product formulations. No matter what you are trying to achieve, we can create a custom solution for your specific needs.



LOOK FOR OUR APPROVED MARK FOR CERTIFIED CXP PRODUCT

## CXP D5

5% FULL SPECTRUM CBD
CBD 4-5%
THC < 0.3%

PRICE PER KG: $75.00
PALLET DISCOUNT PRICE
PER KG: $62.50

## CXP D10

5% FULL SPECTRUM CBD
CBD 9-10%
THC < 0.3%

PRICE PER KG: $125.00
PALLET DISCOUNT PRICE
PER KG: $100.00

## CXP G5

5% FULL SPECTRUM CBG
CBG 1-5%
THC < 0.3%

PRICE PER KG: $100.00
PALLET DISCOUNT PRICE
PER KG: $60.00

## CXP G10

10% FULL SPECTRUM CBG
CBG 9-10%
THC < 0.3%

PRICE PER KG: $175.00
PALLET DISCOUNT PRICE
PER KG: $150.00

## CXP 25mg

ENCAPSULATED
5% FULL SPECTRUM CBD

CONTACT US FOR PRICING
AND VOLUME DISCOUNTS

## CXP 50mg

ENCAPSULATED 10%
FULL SPECTRUM CBD

CONTACT US FOR PRICING
AND VOLUME DISCOUNTS

## CXP CUSTOM

CUSTOM CBD, CBG & CBN FORMULATIONS
MAXIMUM 15% CANNABINOID CONTENT
Coming Soon Organic Ingredients
CONTACT US FOR PRICING AND VOLUME DISCOUNTS

Sales Support t_W-Orders@Olisticagroup.com
Info Support Info@olisticagroup.com
www.jordanprocess.com



**EXHIBIT B-2**





**EXHIBIT B-2**



EXHIBIT B-2



JORDAN PROCESS

ABOUT    PRODUCTS    OUR PROCESS    RESOURCES    NEWS    OLUTICA FAMILY    CONTACT

Our Process
100% QUALITY  |  100% TRACEABILITY



## Our Process

By adhering to the most rigorous standards and accepting only the highest quality, we have been able to cultivate a system of protocols unsurpassed by any other competitor in the industry. Every step of the process has been comprehensively analyzed and streamlined to provide maximum quality without sacrificing an ounce of efficiency.

| 01. | 02. | 03. | 04. | 05. |
|-----|-----|-----|-----|-----|
| SOURCE & ORIGIN | RESEARCH & DEVELOPMENT | BULK EXTRACTION | STANDARDIZATION | INNOVATION |

01.

SOURCE & ORIGIN

### Starting at the Source

Our commitment to producing products at the highest quality starts with the ability to trace ingredients back to their origin. We understand that verification of origin is an essential step to securing your supply chain, which is why Jordan Process partners with managed global agricultural networks. This strong infrastructure allows our customers access to a network of greenhouses, farmland, and qualified botanical experts. Every source we partner with collaborates closely with our team throughout the ingredient production process to ensure full traceability allowing us to affirm the pedigree of our products.



02.

QUALITY CONTROL

### Quality by Design

Quality systems are a pillar of our business success, backed by science, we let quality management guide our production design and practices. Our process starts at the source and continues throughout our manufacturing sequences, which allows us to guarantee consistent and standardized deliverables. Once the raw materials arrive at our facility, we maximize human contact to reduce the risk of cross contamination. This allows us to maintain full traceability and assures a premium product free of fluctuations. Along with full traceability, all our capabilities and quality systems support both part 11 and all of the Current Good Manufacturing Practices (cGMP) outlined by the Food & Drug Administration.



03.

EXTRACTING THE INGREDIENT

### Bulk Extraction

Our proprietary extraction and refinement facilities are designed to process a wide range of botanicals using several standard and unique extraction methods and solvents. The ability to produce a wide variety of targeted compounds from prepared botanical feedstocks is the core process for producing active botanical ingredients.

Jordan Process state-of-the-art facilities are designed with flexibility in mind so that nearly any form of starting material can be introduced, managed, and transformed into your desired end-product. The total processing capacity of our facilities exceeds 200,000+ gallons.



04.

STANDARDIZATION

### The Finished Product You Deserve

Turning raw ingredients into standardized products involves a variety of sophisticated processes and techniques. Whether the final product is an oil, liquid, or powder, our ingredients are ready to formulate and are designed for ease of use in manufacturing of finished products. All products are rigorously tested and analyzed to assure quality and efficiency. Pipeline transparency adds an additional layer of assurance, providing a comprehensive view of the entire supply chain to clearly verify the origin of each specific ingredient and API.

Our constant innovation within the fundamental understanding of a process and its control factors enables us to repeatedly produce highly consistent and standardized ingredients. Our quality control measures over finished ingredients produce the predictable and consistent chemical and biological outcomes that manufacturers need from their ingredients to deliver a successful product to market.

OUR PRODUCTS



05.

RESEARCH & DEVELOPMENT

### Discovering the Future

At Jordan Process, our approach to innovative research and development relies on taking the best from the past to forge the future. Preserving and enhancing the systems that make our extensive quality control and full traceability possible is always top of mind and receives continual investment.

Our comprehensive team of experts works with you to solve problems using the fully customizable supply chain provided by our parent company, Olutica Life Sciences Group. This allows our team total control over the process without needing to outsource.



**EXHIBIT B-2**



**EXHIBIT B-2**



EXHIBIT B-2



**EXHIBIT B-2**



**EXHIBIT B-2**

**FEE RECORD SHEET**

**Serial Number:**  90167598

**RAM Sale Number:  90167598**

**Total Fees:**    $100

**RAM Accounting Date:  20220210**

| Transaction | Fee Code | Transaction Date | Fee per Class | Number of Classes | Total Fee |
|---|---|---|---|---|---|
| Statement of Use (SOU) | 7003 | 20220210 | $100 | 1 | $100 |

**Transaction Date:**    20220210

**EXHIBIT B-2**

# EXHIBIT B-3

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2021)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 88592495**
**Filing Date: 08/26/2019**

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 88592495 |
| **MARK INFORMATION** | |
| *MARK | COMPANION AG |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | COMPANION AG |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | FMK GROUP, LLC |
| *STREET | 30 N Gould St Ste R |
| *CITY | Sheridan |
| *STATE (Required for U.S. applicants) | Wyoming |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. and certain international addresses) | 82801 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited liability company |
| **STATE/COUNTRY WHERE LEGALLY ORGANIZED** | Wyoming |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 036 |
| *IDENTIFICATION | Providing farm management services for therapeutic plant processing operations, namely cannabis, kava, and kratom plant processing |
| **FILING BASIS** | SECTION 1(b) |
| **INTERNATIONAL CLASS** | 042 |
| *IDENTIFICATION | Providing agricultural co-op services, namely growing, harvesting, and handling therapeutic plant production; providing consultation services in the field of therapeutic plant production, namely cannabis, kava, and kratom plant production |

**EXHIBIT B-3**

| FILING BASIS | SECTION 1(b) |
|---|---|
| **ATTORNEY INFORMATION** | |
| NAME | Lynn E. Rzonca |
| ATTORNEY DOCKET NUMBER | 00322540 |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| INTERNAL ADDRESS | Ballard Spahr LLP |
| STREET | 1735 Market Street, 51st Floor |
| CITY | Philadelphia |
| STATE | Pennsylvania |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 19103-7599 |
| PHONE | 215-864-8109 |
| FAX | 215.864.8999 |
| EMAIL ADDRESS | rzoncal@ballardspahr.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | all of the firm of Ballard Spahr LLP |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Lynn E. Rzonca |
| INTERNAL ADDRESS | Ballard Spahr LLP |
| STREET | 1735 Market Street, 51st Floor |
| CITY | Philadelphia |
| STATE | Pennsylvania |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 19103-7599 |
| PHONE | 215-864-8109 |
| FAX | 215.864.8999 |
| *EMAIL ADDRESS | rzoncal@ballardspahr.com; tmdocketing@ballardspahr.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS RF |
| NUMBER OF CLASSES | 2 |
| APPLICATION FOR REGISTRATION PER CLASS | 275 |
| *TOTAL FEE DUE | 550 |
| *TOTAL FEE PAID | 550 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Mark Jennings/ |

**EXHIBIT B-3**

| SIGNATORY'S NAME | Mark Jennings |
|---|---|
| SIGNATORY'S POSITION | Manager |
| SIGNATORY'S PHONE NUMBER | 678-707-2355 |
| DATE SIGNED | 08/26/2019 |

**EXHIBIT B-3**

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2021)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 88592495**
**Filing Date: 08/26/2019**

## To the Commissioner for Trademarks:

**MARK:** COMPANION AG (Standard Characters, see mark)
The literal element of the mark consists of COMPANION AG. The mark consists of standard characters, without claim to any particular font style, size, or color.
The applicant, FMK GROUP, LLC, a limited liability company legally organized under the laws of Wyoming, having an address of
    30 N Gould St Ste R
    Sheridan, Wyoming 82801
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

International Class 036:  Providing farm management services for therapeutic plant processing operations, namely cannabis, kava, and kratom plant processing
Intent to Use: The applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services.

International Class 042:  Providing agricultural co-op services, namely growing, harvesting, and handling therapeutic plant production; providing consultation services in the field of therapeutic plant production, namely cannabis, kava, and kratom plant production
Intent to Use: The applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services.


The applicant hereby appoints Lynn E. Rzonca. Other appointed attorneys are all of the firm of Ballard Spahr LLP. Lynn E. Rzonca, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at
    Ballard Spahr LLP
    1735 Market Street, 51st Floor
    Philadelphia, Pennsylvania 19103-7599
    United States
    215-864-8109(phone)
    215.864.8999(fax)
    rzoncal@ballardspahr.com (authorized).
The attorney docket/reference number is 00322540.
Lynn E. Rzonca submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.
The applicant's current Correspondence Information:
    Lynn E. Rzonca
    Ballard Spahr LLP
    1735 Market Street, 51st Floor
    Philadelphia, Pennsylvania 19103-7599
    215-864-8109(phone)
    215.864.8999(fax)
    rzoncal@ballardspahr.com; tmdocketing@ballardspahr.com (authorized).

**Email Authorization:** I authorize the USPTO to send email correspondence concerning the application to the applicant, the applicant's attorney, or the applicant's domestic representative at the email address provided in this application. I understand that a valid email address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in the loss of TEAS Reduced Fee status and a requirement to submit an

**EXHIBIT B-3**

additional processing fee of $125 per international class of goods/services.

A fee payment in the amount of $550 has been submitted with the application, representing payment for 2 class(es).

<div align="center">

**Declaration**

</div>

☑ **Basis:**
**If the applicant is filing the application based on use in commerce under 15 U.S.C. § 1051(a):**

- The signatory believes that the applicant is the owner of the trademark/service mark sought to be registered;
- The mark is in use in commerce on or in connection with the goods/services in the application;
- The specimen(s) shows the mark as used on or in connection with the goods/services in the application; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

**And/Or**
**If the applicant is filing the application based on an intent to use the mark in commerce under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e):**

- The signatory believes that the applicant is entitled to use the mark in commerce;
- The applicant has a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

☑ To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /Mark Jennings/   Date: 08/26/2019
Signatory's Name: Mark Jennings
Signatory's Position: Manager
Payment Sale Number: 88592495
Payment Accounting Date: 08/26/2019

Serial Number: 88592495
Internet Transmission Date: Mon Aug 26 12:56:24 EDT 2019
TEAS Stamp: USPTO/BAS-XXX.XXX.XXX.XXX-20190826125624
618658-88592495-61020f0a8d6336f19567f26b
2c2295774e189f7a8b2a411edbbe1924d93e8df6
b-DA-56241857-20190826073414211350

**EXHIBIT B-3**

# COMPANION AG

EXHIBIT B-4

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 88444265 |
| **REGISTRATION NUMBER** | 6254103 |
| **MARK SECTION** | |
| **MARK** | O.P.M.S. OPTIMIZED PLANT MEDIATED SOLUTIONS (stylized and/or with design, see https://tmng-al.uspto.gov/resting2/api/img/88444265/large) |
| **OWNER SECTION(current)** | |
| **NAME** | Martian Sales, Inc. |
| **MAILING ADDRESS** | 109 East 17th Street, Suite 4292 |
| **CITY** | Cheyenne |
| **STATE** | Wyoming |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **ZIP/POSTAL CODE** | 82001 |
| **EMAIL** | XXXX |
| **OWNER SECTION(proposed)** | |
| **STATEMENT TEXT** | By submission of this request, the undersigned requests that the following be made of record for the owner/holder: |
| **NAME** | Martian Sales, Inc. |
| **MAILING ADDRESS** | 109 East 17th Street, Suite 4292 |
| **CITY** | Cheyenne |
| **STATE** | Wyoming |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **ZIP/POSTAL CODE** | 82001 |
| **EMAIL** | XXXX |
| **ATTORNEY SECTION (current)** | |
| **NAME** | Lawrence K. Nodine |
| **ATTORNEY BAR MEMBERSHIP NUMBER** | XXX |
| **YEAR OF ADMISSION** | XXXX |
| **U.S. STATE/ COMMONWEALTH/ TERRITORY** | XX |
| **FIRM NAME** | Ballard Spahr LLP |
| **STREET** | 999 Peachtree Street, NE, Suite 1000 |
| **CITY** | Atlanta |

**EXHIBIT B-4**

| STATE | Georgia |
|---|---|
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| POSTAL/ZIP CODE | 30309-3915 |
| PHONE | 678-420-9300 |
| FAX | 678-420-9301 |
| EMAIL | tmdocketing@ballardspahr.com |
| DOCKET/REFERENCE NUMBER(S) | 00318699 |
| **ATTORNEY SECTION (proposed)** | |
| STATEMENT TEXT | By submission of this request, the undersigned REVOKES the power of attorney currently of record, as listed above, and hereby APPOINTS the following new attorney: |
| NAME | John VanOphem |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | VanOphem IP Law PLC |
| STREET | 1585 S Hickory Ridge Rd |
| CITY | Milford |
| STATE | Michigan |
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| POSTAL/ZIP CODE | 48380 |
| PHONE | 2489310109 |
| EMAIL | john@vanophemiplaw.com |
| DOCKET/REFERENCE NUMBER(S) | 02076-0006 |
| **CORRESPONDENCE SECTION (current)** | |
| NAME | Lawrence K. Nodine |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | tmdocketing@ballardspahr.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | nodinel@ballardspahr.com; frankenfieldb@ballardspahr.com; watkinsjh@ballardspahr.com |
| DOCKET/REFERENCE NUMBER(S) | 00318699 |
| **CORRESPONDENCE SECTION (proposed)** | |
| NAME | John VanOphem |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | john@vanophemiplaw.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | jvanophe@yahoo.com |
| **SIGNATURE SECTION** | |
| SIGNATURE | /John VanOphem/ |

**EXHIBIT B-4**

| | |
|---|---|
| **SIGNATORY NAME** | John VanOphem |
| **SIGNATORY DATE** | 09/03/2024 |
| **SIGNATORY POSITION** | Attorney or record, MI P48804 |
| **SIGNATORY PHONE NUMBER** | 248-931-0109 |
| **ROLE OF AUTHORIZED SIGNATORY** | Owner/Holder not represented by an attorney |
| **SIGNATURE METHOD** | Signed directly within the form |
| **FILING INFORMATION SECTION** | |
| **SUBMIT DATE** | Tue Sep 03 11:42:42 ET 2024 |
| **TEAS STAMP** | USPTO/CAR-XXXX:XXXX:XXXX: XXXX:XXXX:XXXX:XXXX:XXXX- 20240903114242778821-8844 4259-85013c64072736ca2b7f 4cdbb75f987b36c48e615e736 5e2fff23b30f43b1d-N/A-N/A -20240903112919482365 |

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

To the Commissioner for Trademarks:

**MARK:** O.P.M.S. OPTIMIZED PLANT MEDIATED SOLUTIONS (stylized and/or with design, see https://tmng-al.uspto.gov/resting2/api/img/88444265/large)
**SERIAL NUMBER:** 88444265
**REGISTRATION NUMBER:** 6254103

**Owner Section (Current) :**
Martian Sales, Inc.
109 East 17th Street, Suite 4292
Cheyenne, Wyoming 82001
United States
XXXX

By submission of this request, the undersigned requests that the following be made of record for the owner/holder:

**Owner Section (proposed):**
Martian Sales, Inc.
109 East 17th Street, Suite 4292
Cheyenne, Wyoming 82001
United States
XXXX

**Attorney Section (Current):**
Lawrence K. Nodine of Ballard Spahr LLP
XX bar, admitted in XXXX, bar membership no. XXX, is located at
999 Peachtree Street, NE, Suite 1000
Atlanta, Georgia 30309-3915
United States
678-420-9300
678-420-9301
Email Address: tmdocketing@ballardspahr.com
Docket Reference Number(s):00318699.

By submission of this request, the undersigned REVOKES the power of attorney currently of record, as listed above, and hereby APPOINTS the following new attorney:

**Attorney Section (proposed):**
John VanOphem of VanOphem IP Law PLC
XX bar, admitted in XXXX, bar membership no. XXX, is located at
1585 S Hickory Ridge Rd
Milford, Michigan 48380
United States
2489310109
john@vanophemiplaw.com

Docket Reference Number(s): 02076-0006

John VanOphem submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**EXHIBIT B-4**

**Correspondence Section (Current):**
Lawrence K. Nodine
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: tmdocketing@ballardspahr.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): nodinel@ballardspahr.com; frankenfieldb@ballardspahr.com;
watkinsjh@ballardspahr.com
Docket Reference Number(s): 00318699

**Correspondence Section (proposed):**
John VanOphem
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: john@vanophemiplaw.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): jvanophe@yahoo.com
Docket Reference Number(s): 02076-0006

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the
owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic
Application System (TEAS).

Signature: /John VanOphem/      Date: 09/03/2024
Signatory's Name: John VanOphem
Signatory's Position: Attorney or record, MI P48804
Signatory's Phone Number: 248-931-0109
Signature method: Signed directly within the form

The signatory has confirmed that he/she is either: (1) the owner/holder; or (2) a person or persons with legal authority to bind the owner/holder.

Serial Number: 88444265
Internet Transmission Date: Tue Sep 03 11:42:42 ET 2024
TEAS Stamp: USPTO/CAR-XXXX:XXXX:XXXX:XXXX:XXXX:XXXX:
XXXX:XXXX-20240903114242778821-88444259-
85013c64072736ca2b7f4cdbb75f987b36c48e61
5e7365e2fff23b30f43b1d-N/A-N/A-202409031
12919482365

**EXHIBIT B-4**

EXHIBIT B-5

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 86110874**
**Filing Date: 11/05/2013**

*NOTE: Data fields with the* * *are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

---

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | O.P.M.s. KRATOM |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | O.P.M.s. KRATOM |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Martian Sales, Inc. |
| *STREET | 1880 West Oak Parkway, Ste. 214 |
| *CITY | Marietta |
| *STATE (Required for U.S. applicants) | Georgia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants only) | 30062 |
| EMAIL ADDRESS | XXXX |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| *STATE/COUNTRY OF INCORPORATION | Wyoming |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| *INTERNATIONAL CLASS | 005 |
| *IDENTIFICATION | Dietary and nutritional supplements |
| *FILING BASIS | SECTION 1(a) |
|     FIRST USE ANYWHERE DATE | At least as early as 01/01/2012 |
|     FIRST USE IN COMMERCE DATE | |

**EXHIBIT B-5**

| FIRST USE IN COMMERCE DATE | At least as early as 01/01/2012 |
|---|---|
| SPECIMEN<br>FILE NAME(S) | \\TICRS\EXPORT16\IMAGEOUT<br>16\861\108\86110874\xml1\ FTK0003.JPG |
| SPECIMEN DESCRIPTION | Mark as used on packaging of product sold to purchasers |

**ADDITIONAL STATEMENTS SECTION**

| | |
|---|---|
| *TRANSLATION<br>(if applicable) | |
| *TRANSLITERATION<br>(if applicable) | |
| *CLAIMED PRIOR REGISTRATION<br>(if applicable) | |
| *CONSENT (NAME/LIKENESS)<br>(if applicable) | |
| *CONCURRENT USE CLAIM<br>(if applicable) | |
| DISCLAIMER | No claim is made to the exclusive right to use KRATOM apart from the mark as shown. |

**ATTORNEY INFORMATION**

| | |
|---|---|
| NAME | Andrew B. Koplan |
| FIRM NAME | Andrew B. Koplan, P.C. |
| STREET | 5855 Sandy Springs Cir., Ste. 150 |
| CITY | Atlanta |
| STATE | Georgia |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 30328 |
| PHONE | 404-255-1600 |
| FAX | 404-255-7373 |
| EMAIL ADDRESS | andrew@koplanpc.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

**CORRESPONDENCE INFORMATION**

| | |
|---|---|
| *NAME | Andrew B. Koplan |
| FIRM NAME | Andrew B. Koplan, P.C. |
| *STREET | 5855 Sandy Springs Cir., Ste. 150 |
| *CITY | Atlanta |
| *STATE<br>(Required for U.S. applicants) | Georgia |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 30328 |
| PHONE | 404-255-1600 |
| FAX | 404-255-7373 |
| *EMAIL ADDRESS | andrew@koplanpc.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

**EXHIBIT B-5**

| FEE INFORMATION | |
|---|---|
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| *TOTAL FEE PAID | 275 |
| SIGNATURE INFORMATION | |
| *SIGNATURE | /Andrew B. Koplan/ |
| *SIGNATORY'S NAME | Andrew B. Koplan |
| *SIGNATORY'S POSITION | Attorney of record, Georgia bar member |
| SIGNATORY'S PHONE NUMBER | 404-255-1600 |
| *DATE SIGNED | 11/05/2013 |
| *SIGNATURE | /Andrew B. Koplan/ |
| *SIGNATORY'S NAME | Andrew B. Koplan |
| *SIGNATORY'S POSITION | Attorney of record, Georgia bar member |
| SIGNATORY'S PHONE NUMBER | 404-255-1600 |
| *DATE SIGNED | 11/05/2013 |

**EXHIBIT B-5**

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

<div align="center">

**Trademark/Service Mark Application, Principal Register**

**TEAS Plus Application**

**Serial Number: 86110874**
**Filing Date: 11/05/2013**

</div>

## To the Commissioner for Trademarks:

**MARK:** O.P.M.s. KRATOM (Standard Characters, see mark)
The literal element of the mark consists of O.P.M.s. KRATOM.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Martian Sales, Inc., a corporation of Wyoming, having an address of
    1880 West Oak Parkway, Ste. 214
    Marietta, Georgia 30062
    United States


requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
    International Class 005:  Dietary and nutritional supplements


In International Class 005, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 01/01/2012, and first used in commerce at least as early as 01/01/2012, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Mark as used on packaging of product sold to purchasers.
Specimen File1


No claim is made to the exclusive right to use KRATOM apart from the mark as shown.


The applicant's current Attorney Information:
    Andrew B. Koplan of Andrew B. Koplan, P.C.
    5855 Sandy Springs Cir., Ste. 150
    Atlanta, Georgia 30328
    United States


The applicant's current Correspondence Information:
    Andrew B. Koplan
    Andrew B. Koplan, P.C.
    5855 Sandy Springs Cir., Ste. 150
    Atlanta, Georgia 30328
    404-255-1600(phone)
    404-255-7373(fax)
    andrew@koplanpc.com (authorized)

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

<div align="center">

**Declaration**

</div>

**EXHIBIT B-5**

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Andrew B. Koplan/   Date Signed: 11/05/2013
Signatory's Name: Andrew B. Koplan
Signatory's Position: Attorney of record, Georgia bar member

Signature: /Andrew B. Koplan/   Date Signed: 11/05/2013
Signatory's Name: Andrew B. Koplan
Signatory's Position: Attorney of record, Georgia bar member


RAM Sale Number: 86110874
RAM Accounting Date: 11/06/2013

Serial Number: 86110874
Internet Transmission Date: Tue Nov 05 17:02:18 EST 2013
TEAS Stamp: USPTO/FTK-XX.XXX.XX.XXX-2013110517021812
1641-86110874-5005a5d04bae8c6f39a1591766
442e10da25ef643f70f39cab4278bd8655241-CC
-4365-20131105163535931339

**EXHIBIT B-5**

# O.P.M.s. KRATOM

**EXHIBIT B-5**



EXHIBIT B-5

# EXHIBIT B-6

**Generated on:** This page was generated by TSDR on 2024-10-02 11:56:40 EDT

**Mark:** MITRAGYN MITRA-LEAF

MITRAGYN MITRA-LEAF

| | | | |
|---|---|---|---|
| **US Serial Number:** | 88980046 | **Application Filing Date:** | Aug. 24, 2019 |
| **US Registration Number:** | 6310831 | **Registration Date:** | Mar. 30, 2021 |
| **Filed as TEAS RF:** | Yes | **Currently TEAS RF:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Office.

**Status:** Registered. The registration date is used to determine when post-registration maintenance documents are due.

**Status Date:** Mar. 30, 2021

**Publication Date:** Mar. 31, 2020 **Notice of Allowance Date:** May 26, 2020

## Mark Information

**Mark Literal Elements:** MITRAGYN MITRA-LEAF

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## Related Properties Information

**Child Of:** 88591439

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Kratom products, namely, herbal kratom supplements in the form of powder, crushed leaf, powder encapsulated in capsules, powder tablets, powder teabags, and leaf sold in bulk; kratom herbal tea for medicinal purposes; dietetic kratom food products adapted for medical use; powdered kratom herbal supplements for use as a drink additive; kratom in tincture form for medical purposes

**International Class(es):** 005 - Primary Class

**U.S Class(es):** 005, 006, 018, 044, 046, 051, 052

**Class Status:** ACTIVE

**Basis:** 1(a)

**First Use:** Oct. 2015    **Use in Commerce:** Oct. 2015

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | Yes |
| **Filed ITU:** | Yes | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |

**EXHIBIT B-6**

|                     |     |                          |     |
|---------------------|-----|--------------------------|-----|
| Filed 66A: | No | Currently 66A: | No |
| Filed No Basis: | No | Currently No Basis: | No |

## Current Owner(s) Information

Owner Name: NP Pharma Holdings, LLC

Owner Address: 30 N Gould St. Ste. R
Sheridan, WYOMING UNITED STATES 82801

Legal Entity Type: LIMITED LIABILITY COMPANY

State or Country WYOMING
Where Organized:

## Attorney/Correspondence Information

### Attorney of Record

Attorney Name: John VanOphem

Docket Number: 00322540

Attorney Primary
Email Address: john@vanophemiplaw.com

Attorney Email Yes
Authorized:

### Correspondent

Correspondent John VanOphem
Name/Address: VanOphem IP Law PLC
1585 S Hickory Ridge Rd
Milford, MICHIGAN UNITED STATES 48380

Phone: 248-931-0109

Correspondent e-mail: jvanophe@yahoo.com john@vanophemiplaw.com

Correspondent e-mail Authorized: Yes

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Nov. 05, 2022 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Nov. 05, 2022 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Nov. 05, 2022 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Jul. 14, 2021 | COUNTERCLAIM OPP. NO. 999999 | 269552 |
| Mar. 30, 2021 | REGISTERED-PRINCIPAL REGISTER | |
| Feb. 23, 2021 | NOTICE OF ACCEPTANCE OF STATEMENT OF USE E-MAILED | |
| Feb. 20, 2021 | ALLOWED PRINCIPAL REGISTER - SOU ACCEPTED | |
| Feb. 19, 2021 | TEAS/EMAIL CORRESPONDENCE ENTERED | |
| Feb. 18, 2021 | CORRESPONDENCE RECEIVED IN LAW OFFICE | |
| Feb. 18, 2021 | TEAS RESPONSE TO OFFICE ACTION RECEIVED | |
| Jan. 17, 2021 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Jan. 17, 2021 | NON-FINAL ACTION E-MAILED | |
| Jan. 17, 2021 | SU - NON-FINAL ACTION - WRITTEN | |
| Jan. 06, 2021 | STATEMENT OF USE PROCESSING COMPLETE | |
| Nov. 25, 2020 | USE AMENDMENT FILED | |
| Jan. 06, 2021 | DIVISIONAL PROCESSING COMPLETE | |
| Nov. 25, 2020 | DIVISIONAL REQUEST RECEIVED | |
| Dec. 21, 2020 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |
| Nov. 25, 2020 | TEAS REQUEST TO DIVIDE RECEIVED | |
| Nov. 25, 2020 | TEAS STATEMENT OF USE RECEIVED | |
| Nov. 25, 2020 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Nov. 23, 2020 | SOU EXTENSION 1 GRANTED | |
| Nov. 23, 2020 | SOU EXTENSION 1 FILED | |
| Nov. 23, 2020 | SOU TEAS EXTENSION RECEIVED | |
| May 26, 2020 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Mar. 31, 2020 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Mar. 31, 2020 | PUBLISHED FOR OPPOSITION | |

**EXHIBIT B-6**

| | |
|---|---|
| Mar. 11, 2020 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED |
| Feb. 27, 2020 | APPROVED FOR PUB - PRINCIPAL REGISTER |
| Feb. 26, 2020 | EXAMINER'S AMENDMENT ENTERED |
| Feb. 26, 2020 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED |
| Feb. 26, 2020 | EXAMINERS AMENDMENT E-MAILED |
| Feb. 26, 2020 | EXAMINERS AMENDMENT -WRITTEN |
| Feb. 12, 2020 | TEAS/EMAIL CORRESPONDENCE ENTERED |
| Feb. 12, 2020 | CORRESPONDENCE RECEIVED IN LAW OFFICE |
| Feb. 12, 2020 | TEAS RESPONSE TO OFFICE ACTION RECEIVED |
| Nov. 26, 2019 | NOTIFICATION OF NON-FINAL ACTION E-MAILED |
| Nov. 26, 2019 | NON-FINAL ACTION E-MAILED |
| Nov. 26, 2019 | NON-FINAL ACTION WRITTEN |
| Nov. 25, 2019 | ASSIGNED TO EXAMINER |
| Sep. 07, 2019 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED |
| Aug. 28, 2019 | NEW APPLICATION ENTERED |

# TM Staff and Location Information

| | |
|---|---|
| **TM Staff Information - None** | |
| **File Location** | |
| Current Location: PUBLICATION AND ISSUE SECTION | Date in Location: Feb. 20, 2021 |

# Proceedings

| **Summary** | |
|---|---|
| Number of Proceedings: | 1 |

| **Type of Proceeding: Opposition** | | | |
|---|---|---|---|
| Proceeding Number: | [91269552](#) | Filing Date: | May 26, 2021 |
| Status: | Terminated | Status Date: | Aug 12, 2022 |
| Interlocutory Attorney: | ANDREW P BAXLEY | | |

| **Defendant** | |
|---|---|
| Name: | Karmagreen, LLC |
| Correspondent Address: | DAVID E. WESLOW<br>WILEY REIN LLP<br>1776 K STREET NW<br>WASHINGTON DC UNITED STATES , 20006 |
| Correspondent e-mail: | [dweslow@wiley.law](#) , [akosak@wiley.law](#) |

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| MITRANOL | | [90138843](#) | |
| MITRAMED | | [90063007](#) | |

| **Plaintiff(s)** | |
|---|---|
| Name: | NP Pharma Holdings, LLC |
| Correspondent Address: | LYNN E. RZONCA<br>BALLARD SPAHR LLP<br>1735 MARKET STREET, 51ST FLOOR<br>PHILADELPHIA PA UNITED STATES , 19103-7599 |
| Correspondent e-mail: | [rzoncal@ballardspahr.com](#) , [tmdocketing@ballardspahr.com](#) , [shorem@ballardspahr.com](#) , [prestonm@ballardspahr.com](#) |

**Associated marks**

| Mark | Application Status | Serial Number | Registration Number |
|---|---|---|---|
| MITRAGYN | | [88980437](#) | [6291168](#) |

**EXHIBIT B-6**

| | | |
|---|---|---|
| MITRAGYN MITRA-ISOLATE | [88980045](#) | [6310830](#) |
| MITRAGYN MITRA-LEAF | [88980046](#) | [6310831](#) |
| MITRAGYN MITRA-PLUS | [88980047](#) | [6310832](#) |
| MITRAGYN | [88951340](#) | |
| MITRAGYN MITRA-ISOLATE | [88591440](#) | |
| MITRAGYN MITRA-LEAF | [88591439](#) | |
| MITRAGYN MITRA-PLUS | [88591438](#) | |

### Prosecution History

| Entry Number | History Text | Date | Due Date |
|---|---|---|---|
| 28 | TERMINATED | Aug 12, 2022 | |
| 27 | BD DECISION: OPP DISMISSED W/O PREJ | Aug 12, 2022 | |
| 26 | W/DRAW OF OPPOSITION | Aug 11, 2022 | |
| 25 | SUSPENDED | Jul 25, 2022 | |
| 24 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Jul 25, 2022 | |
| 23 | SUSPENDED | Jun 21, 2022 | |
| 22 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | Jun 21, 2022 | |
| 21 | SUSPENDED | May 19, 2022 | |
| 20 | P MOT TO SUSP W/ CONSENT PEND SETTL NEGOTIATIONS | May 19, 2022 | |
| 19 | D MOT FOR SUMMARY JGT DENIED | Apr 25, 2022 | |
| 18 | D REPLY IN SUPPORT OF MOTION | Jan 27, 2022 | |
| 17 | P OPP/RESP TO MOTION | Jan 07, 2022 | |
| 16 | P REPLY IN SUPPORT OF MOTION | Dec 29, 2021 | |
| 15 | EXTENSION OF TIME GRANTED; REMAIN SUSP PEND DISP OF MSJ | Dec 10, 2021 | |
| 14 | P MOT FOR EXT W/ CONSENT | Dec 09, 2021 | |
| 13 | D OPP/RESP TO MOTION | Dec 09, 2021 | |
| 12 | SUSP PEND DISP OF OUTSTNDNG MOT | Nov 22, 2021 | |
| 11 | P MOT FOR JGT ON PLEADINGS | Nov 19, 2021 | |
| 10 | D MOT FOR SUMMARY JUDGMENT | Nov 17, 2021 | |
| 9 | D APPEARANCE / POWER OF ATTORNEY | Sep 09, 2021 | |
| 8 | D CHANGE OF CORRESP ADDRESS | Sep 09, 2021 | |
| 7 | ANSWER TO COUNTERCLAIM | Aug 09, 2021 | |
| 6 | ANSWER TO COUNTERCLAIM DUE ( DUE DATE) | Jul 14, 2021 | Aug 13, 2021 |
| 5 | P CHANGE OF CORRESP ADDRESS | Jul 07, 2021 | |
| 4 | ANSWER AND COUNTERCLAIM ( FEE) | Jul 06, 2021 | |
| 3 | INSTITUTED | May 26, 2021 | |
| 2 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | May 26, 2021 | Jul 05, 2021 |
| 1 | FILED AND FEE | May 26, 2021 | |

**EXHIBIT B-6**

# EXHIBIT B-7

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 90167598 |
| **REGISTRATION NUMBER** | 6695157 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 108 |
| **MARK SECTION** | |
| **MARK** | JORDAN PROCESS (standard characters, see https://tmng-al.uspto.gov/resting2/api/img/90167598/large) |
| **ATTORNEY SECTION(current)** | |
| **NAME** | Lynn E. Rzonca |
| **ATTORNEY BAR MEMBERSHIP NUMBER** | XXX |
| **YEAR OF ADMISSION** | XXXX |
| **U.S. STATE/ COMMONWEALTH/ TERRITORY** | XX |
| **FIRM NAME** | BALLARD SPAHR LLP |
| **STREET** | 1735 MARKET STREET, 51ST FLOOR |
| **CITY** | PHILADELPHIA |
| **STATE** | Pennsylvania |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **POSTAL/ZIP CODE** | 19103-7599 |
| **PHONE** | 215-864-8109 |
| **FAX** | 215.864.8999 |
| **EMAIL** | rzoncal@ballardspahr.com |
| **DOCKET/REFERENCE NUMBER(S)** | 00321486 |
| **ATTORNEY SECTION (proposed)** | |
| **STATEMENT TEXT** | By submission of this request, the undersigned appoints the following new attorney, is newly appearing as the attorney, or updates the information of an existing attorney of record: |
| **NAME** | John VanOphem |
| **ATTORNEY BAR MEMBERSHIP NUMBER** | XXX |
| **YEAR OF ADMISSION** | XXXX |
| **U.S. STATE/ COMMONWEALTH/ TERRITORY** | XX |
| **FIRM NAME** | VanOphem IP Law PLC |
| **STREET** | 1585 S Hickory Ridge Rd |

**EXHIBIT B-7**

| CITY | Milford |
|---|---|
| STATE | Michigan |
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| POSTAL/ZIP CODE | 48380 |
| PHONE | 248-931-0109 |
| EMAIL | john@vanophemiplaw.com |
| DOCKET/REFERENCE NUMBER(S) | 00321486 |
| **CORRESPONDENCE SECTION(current)** | |
| NAME | Lynn E. Rzonca |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | rzoncal@ballardspahr.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | michaelsm@ballardspahr.com; shorem@ballardspahr.com; tmdocketing@ballardspahr.com |
| DOCKET/REFERENCE NUMBER(S) | 00321486 |
| **CORRESPONDENCE SECTION (proposed)** | |
| NAME | John VanOphem |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | john@vanophemiplaw.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | jvanophe@yahoo.com |
| DOCKET/REFERENCE NUMBER(S) | 00321486 |
| **SIGNATURE SECTION** | |
| SIGNATURE | /John VanOphem/ |
| SIGNATORY NAME | John VanOphem |
| SIGNATORY DATE | 11/05/2022 |
| SIGNATORY POSITION | Attorney of record, MI bar P48804 |
| SIGNATORY PHONE NUMBER | 2489310109 |
| ROLE OF AUTHORIZED SIGNATORY | Authorized U.S.-Licensed Attorney |
| SIGNATURE METHOD | Signed directly within the form |
| **FILING INFORMATION SECTION** | |
| SUBMIT DATE | Sat Nov 05 18:37:07 ET 2022 |
| TEAS STAMP | USPTO/CAR-XXXX:XXX:XXXX:X XXX:XXXX:XXXX:XXXX:XXXX-2 0221105183707617637-88983 946-800c2365f92459d2f75e4 f9f39ad01eafae273d26b111c da644a624563c278a0e1-N/A- N/A-20221105182302540397 |

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

To the Commissioner for Trademarks:

**MARK:** JORDAN PROCESS (standard characters, see https://tmng-al.uspto.gov/resting2/api/img/90167598/large)
**SERIAL NUMBER:** 90167598
**REGISTRATION NUMBER:** 6695157

**Attorney Section (Current):**
Lynn E. Rzonca of BALLARD SPAHR LLP
XX bar, admitted in XXXX, bar membership no. XXX, is located at
1735 MARKET STREET, 51ST FLOOR
PHILADELPHIA, Pennsylvania 19103-7599
United States
215-864-8109
215.864.8999
Email Address: rzoncal@ballardspahr.com
Docket Reference Number(s):00321486.


By submission of this request, the undersigned appoints the following new attorney, is newly appearing as the attorney, or updates the information of an existing attorney of record:

**Attorney Section (proposed):**
John VanOphem of VanOphem IP Law PLC
XX bar, admitted in XXXX, bar membership no. XXX, is located at
1585 S Hickory Ridge Rd
Milford, Michigan 48380
United States
248-931-0109
john@vanophemiplaw.com

Docket Reference Number(s): 00321486

John VanOphem submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Section (Current):**
Lynn E. Rzonca
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: rzoncal@ballardspahr.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): michaelsm@ballardspahr.com; shorem@ballardspahr.com;
tmdocketing@ballardspahr.com
Docket Reference Number(s): 00321486

**Correspondence Section (proposed):**
John VanOphem
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: john@vanophemiplaw.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): jvanophe@yahoo.com
Docket Reference Number(s): 00321486


**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

**EXHIBIT B-7**

Signature: /John VanOphem/      Date: 11/05/2022
Signatory's Name: John VanOphem
Signatory's Position: Attorney of record, MI bar P48804
Signatory's Phone Number: 2489310109
Signature method: Signed directly within the form

The signatory has confirmed that he/she is a U.S.-licensed attorney who is an active member in good standing of the bar of the highest court of a U.S. state (including the District of Columbia and any U.S. Commonwealth or territory); and he/she is currently the owner's/holder's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S.-licensed attorney not currently associated with his/her company/firm previously represented the owner/holder in this matter: the owner/holder has revoked their power of attorney by a signed revocation or substitute power of attorney with the USPTO; the USPTO has granted that attorney's withdrawal request; the owner/holder has filed a power of attorney appointing him/her in this matter; or the owner's/holder's appointed U.S.-licensed attorney has filed a power of attorney appointing him/her as an associate attorney in this matter.

Serial Number: 90167598
Internet Transmission Date: Sat Nov 05 18:37:07 ET 2022
TEAS Stamp: USPTO/CAR-XXXX:XXX:XXXX:XXXX:XXXX:XXXX:X
XXX:XXXX-20221105183707617637-88983946-8
00c2365f92459d2f75e4f9f39ad01eafae273d26
b111cda644a624563c278a0e1-N/A-N/A-202211
05182302540397

**EXHIBIT B-7**

# EXHIBIT B-8

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 97246097 |
| **REGISTRATION NUMBER** | 7057418 |
| **MARK SECTION** | |
| **MARK** | OLISTICA (standard characters, see https://tmng-al.uspto.gov/resting2/api/img/97246097/large) |
| **ATTORNEY SECTION (current)** | |
| **NAME** | Lynn E. Rzonca |
| **ATTORNEY BAR MEMBERSHIP NUMBER** | XXX |
| **YEAR OF ADMISSION** | XXXX |
| **U.S. STATE/ COMMONWEALTH/ TERRITORY** | XX |
| **FIRM NAME** | BALLARD SPAHR LLP |
| **STREET** | 1735 MARKET STREET, 51ST FLOOR |
| **CITY** | PHILADELPHIA |
| **STATE** | Pennsylvania |
| **STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY** | United States |
| **POSTAL/ZIP CODE** | 19103-7599 |
| **PHONE** | 215-864-8109 |
| **FAX** | 215.864.8999 |
| **EMAIL** | tmdocketing@ballardspahr.com |
| **DOCKET/REFERENCE NUMBER(S)** | 00321480 |
| **ATTORNEY SECTION (proposed)** | |
| **STATEMENT TEXT** | By submission of this request, the undersigned REVOKES the power of attorney currently of record, as listed above, and hereby APPOINTS the following new attorney: |
| **NAME** | John VanOphem |
| **ATTORNEY BAR MEMBERSHIP NUMBER** | XXX |
| **YEAR OF ADMISSION** | XXXX |
| **U.S. STATE/ COMMONWEALTH/ TERRITORY** | XX |
| **FIRM NAME** | VanOphem IP Law PLC |
| **STREET** | 1585 S Hickory Ridge Rd |
| **CITY** | Milford |

**EXHIBIT B-8**

| STATE | Michigan |
|---|---|
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| POSTAL/ZIP CODE | 48380 |
| PHONE | 2489310109 |
| EMAIL | john@vanophemiplaw.com |
| **CORRESPONDENCE SECTION (current)** | |
| NAME | Lynn E. Rzonca |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | tmdocketing@ballardspahr.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | rzoncal@ballardspahr.com; auerbachb@ballardspahr.com; michaelsm@ballardspahr.com |
| DOCKET/REFERENCE NUMBER(S) | 00321480 |
| **CORRESPONDENCE SECTION (proposed)** | |
| NAME | John VanOphem |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | john@vanophemiplaw.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | jvanophe@yahoo.com |
| **SIGNATURE SECTION** | |
| SIGNATURE | /John VanOphem/ |
| SIGNATORY NAME | John VanOphem |
| SIGNATORY DATE | 02/01/2024 |
| SIGNATORY POSITION | Attorney or record, MI P48804 |
| SIGNATORY PHONE NUMBER | 248-931-0109 |
| ROLE OF AUTHORIZED SIGNATORY | Authorized U.S.-Licensed Attorney |
| SIGNATURE METHOD | Signed directly within the form |
| **FILING INFORMATION SECTION** | |
| SUBMIT DATE | Thu Feb 01 17:08:09 ET 2024 |
| TEAS STAMP | USPTO/CAR-XXXX:XXXX:XXXX: XXXX:XXXX:XXXX:XXXX:XXXX- 20240201170809111666-9087 9287-8509fec55f84ef681f01 822a3d5eb10edd9930132c66e dd5927e5621d3fd7aed81-N/A -N/A-20240201170502573531 |

PTO- 2300
Approved for use through 07/31/2024. OMB 0651-0056
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Change Address or Representation Form

To the Commissioner for Trademarks:

**MARK:** OLISTICA (standard characters, see https://tmng-al.uspto.gov/resting2/api/img/97246097/large)
**SERIAL NUMBER:** 97246097
**REGISTRATION NUMBER:** 7057418

**Attorney Section (Current):**
Lynn E. Rzonca of BALLARD SPAHR LLP
XX bar, admitted in XXXX, bar membership no. XXX, is located at
1735 MARKET STREET, 51ST FLOOR
PHILADELPHIA, Pennsylvania 19103-7599
United States
215-864-8109
215.864.8999
Email Address: tmdocketing@ballardspahr.com
Docket Reference Number(s):00321480.


By submission of this request, the undersigned REVOKES the power of attorney currently of record, as listed above, and hereby APPOINTS the following new attorney:

**Attorney Section (proposed):**
John VanOphem of VanOphem IP Law PLC
XX bar, admitted in XXXX, bar membership no. XXX, is located at
1585 S Hickory Ridge Rd
Milford, Michigan 48380
United States
2489310109
john@vanophemiplaw.com

John VanOphem submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

**Correspondence Section (Current):**
Lynn E. Rzonca
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: tmdocketing@ballardspahr.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): rzoncal@ballardspahr.com; auerbachb@ballardspahr.com;
michaelsm@ballardspahr.com
Docket Reference Number(s): 00321480

**Correspondence Section (proposed):**
John VanOphem
PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE: john@vanophemiplaw.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): jvanophe@yahoo.com


**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the owner/holder and the owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).


Signature: /John VanOphem/      Date: 02/01/2024
Signatory's Name: John VanOphem
Signatory's Position: Attorney or record, MI P48804

**EXHIBIT B-8**

Signatory's Phone Number: 248-931-0109
Signature method: Signed directly within the form

The signatory has confirmed that he/she is a U.S.-licensed attorney who is an active member in good standing of the bar of the highest court of a U.S. state (including the District of Columbia and any U.S. Commonwealth or territory); and he/she is currently the owner's/holder's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S.-licensed attorney not currently associated with his/her company/firm previously represented the owner/holder in this matter: the owner/holder has revoked their power of attorney by a signed revocation or substitute power of attorney with the USPTO; the USPTO has granted that attorney's withdrawal request; the owner/holder has filed a power of attorney appointing him/her in this matter; or the owner's/holder's appointed U.S.-licensed attorney has filed a power of attorney appointing him/her as an associate attorney in this matter.

Serial Number: 97246097
Internet Transmission Date: Thu Feb 01 17:08:09 ET 2024
TEAS Stamp: USPTO/CAR-XXXX:XXXX:XXXX:XXXX:XXXX:XXXX:
XXXX:XXXX-20240201170809111666-90879287-
8509fec55f84ef681f01822a3d5eb10edd993013
2c66edd5927e5621d3fd7aed81-N/A-N/A-20240
201170502573531

**EXHIBIT B-8**

EXHIBIT C-1





MCKIB_LP_0000136

**EXHIBIT C-1**

EXHIBIT C-2

# Robert "Bob" Hoban - Bio

The following **Biographical Narrative** summarizes my relevant experience.

**Background:**

As set forth in more detail on the attached **Biographical Narrative**, Bob Hoban has served in a variety of 'firsts' as it relates to the global cannabis industry.

- Developing legal and business strategies for the first cannabis 'dispensaries' in the United States, nationwide (2009-);
- Serving as a cannabis public policy instructor/writer/publisher at the University of Denver and leading students on international cannabis-policy courses (2011-2016);
- Building the first state, national, and international cannabis-only commercial law firm (2008-);
- Litigating cases against governments which opened commercial cannabis industry activity (2009-);
- Addressing the United Nations CND (2018-2019);
- Participating in the World Economic Form (2020);
- Creating the commercial cannabis dispensary system in Colorado, and then doing the same in other states later to legalize;
- Creating the so-called CBD (cannabidiol) industry through legal and business advisory counseling (2010-);
- Advising U.S.-based governments on cannabis legislation and secondary regulations at all levels (2009-);
- Crafting cannabis legislation and regulatory frameworks for over thirty countries around the world (2014-);
- Working with the largest cannabis companies in the world as counselor, advisor (2016);
- Founding a global industrial hemp supply chain company focusing on genetics, farming, trading, distribution, and commoditization (IHS) (2014-);
- Shaping a global cannabis consultancy to serve Fortune 500 companies and governments around the world (GPS) (2019-);
- Speaking at events around the globe sponsored by governments, private businesses, trade organizations, and the like (2008-);
- Contributing columnist at *Forbes* – cannabis industry; and,
- Serving as an industry thought leader (writing series, podcasts, television and various media) (2008-).

Accolades and Industry Recognition:

- The *Business Insider* has named the Hoban Law Group a Top 7 international cannabis law firm.
- Mr. Hoban has been named a "Super Lawyer." Super Lawyers, part of Thomson Reuters, is a rating service of outstanding lawyers from more than 70 practice areas who have attained a high degree of peer recognition and professional achievement. The annual selections are made using a patented, multi-phase process that includes a

**EXHIBIT C-2**

statewide survey of lawyers, an independent research evaluation of candidates, and peer review by practice area. For more information, go to SuperLawyers.com.
- Mr. Hoban has achieved the Martindale-Hubbell AV Preeminent Peer Review Rating, awarded to only those lawyers with the highest ethical standards and professional ability, since 2013.
- He has consistently been named a "Cannabis Law Trailblazer" by the *National Law Journal*.
- He has been consistently recognized as one of "Denver's Top Cannabis Lawyers" for nearly a decade by *5280 Magazine*.
- *Green Entrepreneur* has named the Hoban Law Group as a "Top 100 Cannabis Company" for several years in a row.
- Mr. Hoban has received the prestigious "Industry Leadership Award" from the longstanding Hemp Industries Association (HIA) for the years 2018 and 2019.
- The *Green Market Report* has named Hoban Law Group a Top 11 national cannabis law firm.

All the while, his fundamental business skills and experience include:

- Creating/founding and selling multiple businesses;
- Building foundational structures and organizational designs;
- Managing dozens of personnel at any given time;
- Working with very large business and departmental budgets;
- Serving as a Board of Director in multiple businesses;
- Functioning as Chairman of the Board at various times;
- Attending to duties as a C-Suite executive/senior management over many years;
- Developing M&A portfolios for hundreds of companies over the years; and,
- Providing counsel and advisory services (legal and other) to entrepreneurs, leaders, and elected officials on numerous occasions.

### *Biographical Narrative*

### I.    Introduction – Cannabis Industry Expert

Bob Hoban sits at the center of the world's largest commercial cannabis industry network; a cannabis industry ecosystem that he has painstakingly cultivated since 2008. Since the cannabis industry became commercialized, he has been widely credited for creating the class of lawyers now known as "cannabis attorneys." He is known for the tremendous value that he places in his relationships and is not satisfied unless he can help his business clients thrive in this burgeoning global cannabis marketplace; a marketplace that he has played a significant role in establishing. Bob has earned a reputation as a cannabis industry dealmaker representing start-ups, entrepreneurs, and companies in all stages of development. Mr. Hoban has truly transcended the practice of law and is regularly involved in assembling and structuring large scale cannabis industry M&A transactions. Above all else, Bob is a cannabis industry expert.

**EXHIBIT C-2**

## II.    Attorney - The Hoban Law Group

Beginning in 2008, he deliberately constructed the Hoban Law Group (HLG – www.Hoban.law) to become the world's leading full-service commercial cannabis industry law firm; the first of its kind. Since that time, HLG has indeed become the leading cannabis industry law firm, with offices in seventeen states and ten nations abroad, and over fifty attorneys who specialize in all aspects of the commercial practice surrounding the cannabis industry. For nearly ten years, HLG has represented the cannabis industry's titans in every aspect of the commercial cannabis industry around the world. And he is largely responsible for the establishment and growth of the CBD industry due to his legal strategies, litigation matters, and policy efforts executed on behalf of HLG clients.

## III.    Visionary – Industry Leader – Entrepreneur – Business Executive

But Bob is not merely an attorney and visionary industry leader, he has founded, created, bought, and sold over fifteen of his own successful companies in the cannabis space. Mr. Hoban is an entrepreneur, an executive, a director, and an M&A specialist. He has served as a C-Suite executive in over ten companies, and has served as a director on a number of boards (including serving as the chairman of four separate boards) over the years, as well. He brings these non-legal skills to the table as a private consultant (through his separate global consulting business, Gateway Proven Strategies, LLC – www.GPS.global) in assessing business plans, developing acquisition portfolios, and the like for many of the world's leading cannabis companies.

## IV.    Academic – University Instructor

Bob is also an academic. From 2010-2016, Bob served as one of the nation's first cannabis policy instructors at the University of Denver, where he regularly lectured regarding cannabis topics (government regulations, public policy, and research-based policy courses), and where he led a University-sanctioned research practicum concerning the efficacy of marijuana regulation; the first of its kind in the U.S. He then taught several international travel courses concerning the emergence of the global cannabis industry. Because of this academic background, Bob has been asked to work with dozens of governments across the U.S., Asia, the E.U., and Latin America (over thirty different countries) on crafting their commercial cannabis public policy solutions (legislation and regulations). And he has served on a variety of national, state, and local task forces related to cannabis policy issues.

## V.    The Portfolio

As an academic, an attorney, an executive, and as an industry thought leader, Mr. Hoban has published a vast portfolio of thought-leadership pieces, peer reviewed publications, and the like. The Hoban Law Group was prominently featured in the book, *The Great Green Gold Rush*, by Kathleen Tracy and Michael Caldwell. And he has a book of his own in the publishing pipeline. Mr. Hoban's speaking engagements and keynotes globally have gained wide acclaim, and many are available online and through a variety of recorded media sources. Also, in recent years, he has served as a television host, panel-participant, and network television interviewee and expert on a variety of topics involving the cannabis industry. In recent months, Bob has developed a podcast with an increasing following concerning relevant topics related to global cannabis industry issues. These items, collectively, represent a platform that can be expanded, shifted, and/or channeled for business development purposes going forward. This portfolio fundamentally demonstrates the unapparelled knowledge and track record of success for over twelve years in the cannabis industry.

EXHIBIT C-2

## VI.    Industry Trailblazer

Bob is a Contributing Author for *Forbes* concerning the legal aspects pf the global cannabis industry. He has consistently been recognized as one of the most influential people in the global cannabis industry by a variety of organizations and publications over the course of the past ten-plus years. Since 2013, Bob has achieved the Martindale-Hubbell AV Preeminent Peer Review Rating, awarded to only those lawyers with the highest ethical standards and professional ability. He was recently named a "Cannabis Law Trailblazer" by the National Law Journal, and he has been consistently recognized as one of the "Top Cannabis Lawyers" for over a decade by numerous publications.

Bob frequently appears in media coverage as a legal expert on cannabis and has been a keynote speaker at dozens of cannabis events around the world. He has conducted hundreds of interviews regarding marijuana policy for international, national, state, and local media outlets. Major media outlets like the New York Times, the Los Angeles Times, Chicago Tribune, CNN, Rolling Stone, Forbes, VICE, MSNBC, and Bloomberg all have called on Bob for his unique perspective on the cannabis industry.

His LinkedIn Profile can be found here:  linkedin.com/in/rhoban

## VII.    Experience

- From 2001-02, Bob was a judicial clerk with Hon. Jack Berryhill in Colorado's 1st J.D.
- From 2002-2003, Bob clerked in the U.S. District Court for the District of Wyoming.
- In 2006, Bob was awarded the George Holley Outstanding Young Lawyer of the Year.
- Since 2010, Bob has been rated as "Superb" by Avvo.com
- Since 2013, Bob has been rated AV® PreeminentTM by Martindale-Hubbard.
- Since 2017, Bob Has been named as one of Denver's Top Marijuana Lawyers.
- Since 2019, Bob has been named a SuperLawyer.

### EDUCATION

- **UNIVERSITY OF COLORADO**, GRADUATE SCHOOL OF PUBLIC AFFAIRS, Ph.D., ABD, 2007
- **UNIVERSITY OF WYOMING**, COLLEGE OF LAW, JD, 2001
- **RUTGERS UNIVERSITY**, BS, 1997

### RELEVANT PROFESSIONAL EXPERIENCE

- **FORBES:**  2020-Present, *Contributing Author/Editor* (global cannabis and hemp issues)
- **OLISTICA LIFE SCIENCES GROUP:**  2020-Present, Atlanta, GA, Denver, CO, *Acting CEO* [www.olisticagroup.com]
- **GATEWAY PROVEN STRATEGIES:** 2019-Present, Denver, CO, *Chairman and Founder* [http://www.gps.global]
- **INTERNATIONAL HEMP SOLUTIONS:**  2015-2020, Denver, CO, *Chairman*
- **HOBAN LAW GROUP**: 2009-Present, Denver, CO, *Founder and President* [www.hoban.law]
- **MARTIN, LUBITZ AND HYMAN, LLC:** 2008-2009**,** Denver, CO, *Of Counsel*
- **FRANK** & **FINGER, P.C.:** 2006-2008, Evergreen, CO, *Partner*

**EXHIBIT C-2**

- **HALE FRIESEN, LLP:** 2003-2006, Denver, CO, *Associate Attorney*
- **U.S. DISTRICT COURT** (Hon. W. Beaman): 2002, *Law Clerk*
- **COLORADO DISTRICT COURT** (Hon. J. Berryhill): 2001, *Law Clerk*

## TEACHING EXPERIENCE

- **UNIVERSITY OF DENVER:** 2011-2017, Denver, CO, *Adjunct Professor/Lecturer.* Cannabis Policy, Political Science/Law & Society
- **LARAMIE COUNTY COMMUNITY COLLEGE:** 1999-2001, Laramie/Cheyenne, WY, *Adjunct Professor/Lecturer.* Business Law, Administration of Justice

## PROFESSIONAL SEMINARS – FACULTY/PRESENTER

- 2018-2020 – Too many national and international seminars and lectures to list
- NoCo Hemp Expo – Loveland, CO – March, 2017 – Keynote speaker on "Trump, Sessions and the Future of the Cannabis Industry"
- California Receivers Forum – Costa Mesa, CA – March, 2017 – Cannabis Receivership panel
- Texas A&M Law School Conference – Dallas, TX – February, 2017 – "Cannabis 101 for Investors" speaker
- Cultivated Synergy – Denver, CO – February, 2017 – "Expand Your National Brand"
- 2017 National Continuing Legal Education Conference – Snowmass, CO – January, 2017
- "Cannabis/Hemp Law 101: What Legal Practitioners Need to Know"
- The State of Marijuana 2016 Onboard the Queen Mary – Long Beach, CA – September, 2016 – "Once It's Legal, I'm getting Into the Business" – Presenter
- Hemp Industries Association Conference – Denver, CO – September, 2016
- Cannabis World Congress and Business Expo – Los Angeles, CA – September, 2016
- City of Boulder, Colorado Chamber of Commerce – August, 2016 – "Cannabis in the Workplace"
- NCIA Cannabis Business Summit – Oakland, CA – June, 2016 – "Starting and Operating a Successful Medical Cannabis Dispensary, Cultivation or Infused Products Company" – Seminar
- International Cannabis Association World Congress and Business Expo – NYC – June, 2016
- Viridian Cannabis Investment Series – Fort Lauderdale, FL – Sponsor - June, 2016
- MJ Biz Daily Conference, Orlando, FL – Featured Presenter – "The Status of CBD: Demand, Preferences & Possibilities" – May, 2016
- NoCo Hemp Expo – Moderator and Presenter – "Solving the Seed Puzzle," "Policy, Law and Banking," "Let's Talk Hemp" – April, 2016
- National Hemp Association Hemp Law Forum, Denver – Moderator and Speaker – March, 2016
- Hoban Law Group Client Networking Event, Denver – Moderator – February, 2016
- Colorado Bar Association CLE – Featured Presenter – "Land-use and Environmental Issues of Marijuana" - Vail, Colorado - January 2016
- Women Grow Denver Chapter Meeting – "Cannabis for PTSD" – November 2015

**EXHIBIT C-2**

- Bloomberg BNA Conference on Marijuana in Colorado – "Marijuana in Colorado: Advanced Tax, Legal and Accounting Considerations," – November 2015
- Medical Cannabis Summit – New York, NY - Featured Presenter - "Top Ten Issues for the Cannabis Investor" - October 2015
- Southwest Cannabis Conference and Expo, Phoenix, AZ – Moderator and Speaker – October, 2015
- National Cannabis Industry Association Conference, NYC – Panelist and Speaker – "Financing Your Marijuana Business," "Corporate Governance" – September, 2015
- Los Angeles Cannabis Congress – Speaker, "Hemp" - September, 2015
- Hoban Law Group Client Regulatory Form, Denver – August, 2015
- Pagosa Verde Renewable Energy Symposium - Featured Presenter concerning Hemp 101 – Legal Landscapes - August, 2015
- National Cannabis Chamber of Commerce Indo Expo, Denver – "Hemp Movement," – July, 2015
- Rocky Mountain Hemp Association Hemp Law Form, Denver – Moderator and Speaker, "The Murky Legality of Hemp" – July, 2015
- National Cannabis Industry Association Conference, Chicago – Featured Speaker – June, 2015
- World Cannabis Congress Conference, NYC – Featured Speaker – June, 2015
- CannaCosta Conference, Costa Rica – Featured Panelist and Speaker – June, 2015
- NCIA Chicago Cannabis Expo – Featured Speaker - May, 2015
- Tom Martino Troubleshooter Radio Show – Featured Guest re: MJ in Colorado – April, 2015
- Foxmoor Continuing Education Cannabis Summit – Featured Presenter concerning licensing and real estate as they relate to the marijuana industry in Colorado – March, 2015
- Young Professionals Organization – Guest Speaker – January, 2015
- Colorado Chapter of the Appraisal Institute - Featured Presenter concerning regulatory takings and the emerging marijuana industry in Colorado - August, 2014
- Pagosa Verde Renewable Energy Symposium - Featured Presenter concerning The Cannabis Question - Legal Landscapes - August, 2014
- CLE International Eminent Domain Annual Conference – Featured Presenter concerning marijuana and regulatory takings – August, 2013
- The Politics of Medical Marijuana – Denver University –2012
- Marijuana at the Crossroads – University of Denver Sturm College of Law – 2012
- Marijuana in the workplace – Denver University – MLA Program – 2011
- Eminent Domain Practice and Procedure – First Judicial District Bar Association CLE – 2010
- The Business of Marijuana – CLE – 2010
- Marijuana: Leases and Business Structure – CWA/WJEC – 2010

**COMMUNITY INVOLVEMENT**

- Former Board Member, Evergreen Jazz Festival
- Former Board Member, Colorado Trail Foundation

**EXHIBIT C-2**

- Middle School/High School Basketball Coach
- High School Mock Trial Competition Judge and Volunteer
- Collegiate and High School Basketball Official
- Colorado Property Rights Coalition, Co-Founder and Volunteer
- First Judicial District Bar Association (Former Trustee, Former Board of Governors Representative, Current Awards Committee Chairperson)

## EXTENDED RELEVANT WORK EXPERIENCE

- COLORADO 1st JUDICIAL DIST., HON. J.W. BERRYHILL: 2001-2002, Golden, CO. Law Clerk.
- U.S. DISTRICT COURT – WYOMING: Spring 2001, 2002-2003. Cheyenne, WY. Intern, Law Clerk, Staff Attorney.
- WYOMING ATTORNEY GENERAL: Fall 2000. Cheyenne, WY. Intern.
- COLLEGE OF LAW, PROF. ELAINE WELLE: 2000-2001. Laramie, WY. Research Assistant.
- WYOMING LEGAL RESEARCH SERVICES: May 2000-August 2001. Laramie, WY. Assistant Director.
- WYOMING LAW REVIEW: May 2000-May 2001. Laramie, WY. Author/Editor.
- NEW HAMPSHIRE STATE PUBLIC DEFENDER: Summer 2000. Concord, NH. Law Clerk.
- COLLEGE OF LAW, PROFESSOR JIM DWYER, PhD: May 1999-May 2000, Laramie, WY. Teaching and Research Assistant.
- WESTERN TRIAL ADVOCACY INSTITUTE: June-July 1999, Laramie, WY. Assistant to Director; Presenter.

## REPORTED CASES

- Cornerstone Group XXII, L.L.C. v. Wheat Ridge Urban Renewal, — P.3d —-, WL 2291146 (Colo. App.)
- Whalen v. Shepler, 104 P.3d 243, 244 (Colo.App. 2004)
- Jack Akin and Carole Stepe v. Four Corners Encampment, et al., — P.3d —-, 2007 WL 1150450 (Colo.App. 2007), Court of Appeals No.: 05CA1228.

## PUBLICATIONS

- Victim or the Crime: An Analysis of Hate Crime Legislation – 2000
- Vouchers Within Reason: A Child-Centered Approach to Education Reform – 2002
- "From New London to Telluride and Beyond: Legal Developments Surrounding Eminent Domain in Colorado from 2004-2009," co-authored by Jessica Peck and Bob Hoban – 2009.
- "Colorado's Emerging Medical Marijuana Legal Framework and Constitutional Rights," Bob Hoban – 2011
- December 2016: "Perspectives of Marijuana Policy in the U.S. and Latin America" – Public Policy Journal

EXHIBIT C-2

- August, 2016: "DEA Announcement is Not an Unexpected Blow to the Cannabis Industry" – White Paper
- June, 2016: "Sprung From Night Into The Sun: An Examination of Colorado's Marijuana Regulatory Framework Since Legalization," *Kentucky Journal for Equine, Agricultural and Natural Resources*, Volume 8, Issue No. 2
- March, 2016: "The Health Care Industry Cannot Continue to Ignore Medicinal Cannabis," - White Paper
- Numerous "Bob's Voice" publications found here – www.Hoban.law
- Forbes Publications found here - https://www.forbes.com/sites/roberthoban/#51f611941df6

## BAR ADMISSIONS

- Colorado
- Wyoming
- Oregon
- Washington
- Arizona
- U.S. District Court, Colorado
- U.S. District Court, Wyoming
- U. S. Bankruptcy Court, Colorado

## MEMBERSHIPS

- First Judicial District Bar Association: Board of Trustees, Board of Governors
- Colorado Bar Association: Board of Governors
- Denver Bar Association
- Colorado Cannabis Chamber of Commerce
- National Cannabis Industry Association
- National Cannabis Chamber of Commerce
- National Hemp Association
- Hemp Industries Association

## PRIOR (DISCLOSED) EXPERT WITNESS ENGAGEMENTS

- ARG Industries, LLC et al v. James Margulis, Esq. et al, Boulder County District CourtCase No. 2012CV587
- Workman, *et al.* v. Asnani, *et al.,* Superior Court of Arizona, Maricopa County; CV2015—008042
- Retained as nondisclosed expert numerous times
- Retained and case settled prior to disclosure requirements numerous times

**EXHIBIT C-2**

# EXHIBIT C-3



# Robert T. Hoban

## Strategic Advisor to Cannabis Industry Group

**rhoban@clarkhill.com**

**Denver**
**+1 303.674.7000**

After assisting with the establishment of Clark Hill's new-market Denver office and leading its Cannabis Industry Group to international recognition, in 2024, Robert T. Hoban elected to step away from the day-to-day practice of law, and will focus on non-legal advisory work in the cannabis space going forward. Bob sits at the center of the world's largest commercial cannabis industry network. He remains a Strategic Advisor to Clark Hill's AmLaw-leading Cannabis Industry Group. As the cannabis industry commercialized, Bob has been widely credited for creating the class of lawyers now known as "cannabis attorneys."

He has truly transcended the practice of law and had been regularly involved in assembling and structuring large-scale cannabis industry M&A transactions – over $1B in M&A activity since his entry into the cannabis sector over a dozen years ago. Bob has consistently been recognized as one of the most influential people in the global cannabis industry by a variety of organizations and publications over the course of the past dozen-plus years.

As an attorney, Bob was recognized nationwide by Chambers USA, Martindale-Hubbell (AV Preeminent® Rating), Superlawyers, as a "Cannabis Law Trailblazer" by the National Law Journal, and he has been consistently recognized as one of "Denver's Top Cannabis Lawyers" for more than a decade. Bob personally maintains relationships with Fortune 1000 companies, as well as numerous funds and government entities. He also works with leading companies in other emerging industries and technologies, such as legalized psychedelics.

**EXHIBIT C-3**

As a cannabis industry expert, Bob was recognized as one of the Top 42.0 influential cannabis industry pioneers by Forbes Magazine, and has been featured in consecutive years as one of the most influential voices in the Latin American cannabis sector by The Business Year (2021-2022). In the past dozen+ years, Bob has received numerous awards for his leadership, policy, and market development efforts across the world.

Bob is a founder of the leading international cannabis consultancy, Gateway Proven Strategies.

From 2010-2016, Bob served as one of the Nation's first cannabis policy instructors at the University of Denver, where he regularly lectured regarding cannabis policy topics, and led multiple international travel courses concerning the implementation of international cannabis regulation. Given this academic background, Bob has been engaged to develop legislation and/or regulation for over thirty (30) countries around the world, and has participated at the United Nations concerning cannabis policy reform in various forums over the past dozen+ years.

Bob was recognized in 2021 by Titan 100 recipient as one of Colorado's Top 100 CEO's & C-level executives. He has served as a C-Suite member on numerous occasions (CEO, CSO) for national and international cannabis companies, and presently sits on the Board of Directors for Glass House Brands, and as a Board Member for Athletes for Care, Regennabis, Chrystal Capital, Green Flower Media, the Global Cannabis Network Collective, and Akers Biosciences. In 2022, Bob completed a Fellowship for a Certificate in Cannabis Journalism at the University of Vermont.

Bob is a Forbes contributor and frequently appears in media coverage as an authority on cannabis and has been a keynote speaker at dozens of cannabis events around the world. He has conducted hundreds of interviews regarding marijuana policy for international, national, state, and local media outlets. Major media outlets like the New York Times, the Los Angeles Times, Chicago Tribune, CNN, Rolling Stone, Forbes, VICE, MSNBC, and Bloomberg all have called on Bob for his unique perspective on the cannabis industry.

Prior to joining Clark Hill, Bob deliberately constructed the Hoban Law Group (HLG) to become the world's leading full-service commercial cannabis industry law firm. For more than a decade, HLG represented the cannabis industry's titans in every aspect of the commercial cannabis industry around the world. In June of 2021, HLG combined with international law firm, Clark Hill.

## Industries

Cannabis

## Education

**EXHIBIT C-3**

J.D., University of Wyoming, Laramie, Wyoming

B.S., Rutgers University, New Brunswick, New Jersey

Ph.D., University of Colorado

## Recognitions

Ranked in Chambers USA, Cannabis Law, Band 4 (2024)

Martindale-Hubbell (AV Preeminent® Rating)

Named among Colorado Super Lawyers by Thomson Reuters (2021-2024)

"Cannabis Law Trailblazer" by the National Law Journal

"Denver's Top Cannabis Lawyers"

Legal Updates

## Drug Policies up in Smoke: What Legalization Means for Delaware Businesses

Legal Updates

## The Best Offense is a Good Defense: Quality Assurance, Consumer Protection, and the Role of Regulators

To achieve product parity in the cannabis space, legal-market producers must synthesize what is desired, a positive consumer consumption event, with what is compulsory, consumer protection. Few direct measures exist that ground consumer product preference for high-quality, terpene-rich cannabis with risk management strategies for herbal medicinal products like water activity.

Event

## New Jersey Cannabis: Finance, Real Estate, IP and Legal

Event

## Recreational Windfall: How to Prepare for Outside Players in Montana's Cannabis Industry

Join national cannabis service providers Clark Hill, MGO, and eXp Commercial for a deep dive into the challenges and opportunities facing operators in Montana's new adult-use cannabis industry.

News

## Robert Hoban To Speak on Cannabis Industry to Oireachtas Members

Legal Updates

## Updates to New Jersey's Adult-Use Cannabis Rules Would Expand Licensee Opportunities

In February 2021, New Jersey became one of the nineteen states to legalize cannabis for recreational use. The bill, A21 – "The New Jersey Cannabis Regulatory, Enforcement Assistance,

**EXHIBIT C-3**

Cannabis is expected to continue its torrid pace of growth on the East Coast. The Garden State is leading that charge and the four most challenging aspects are finance, real estate, IP and legal.

and Marketplace Modernization Act," regulates the use and possession of recreational marijuana and decriminalizes marijuana and hashish possession for individuals 21 years old and above.

Event

## Cocktail Reception Celebrating the Benzinga Capital Conference

Please join in continuing the festivities of Benzinga Capital Conference at Clark Hill.

Event

## The 3 'Cs' of International Cannabis: Context, Chain, and Capital

Join us as we examine the importance of the three essential Cs, and provide insight and direction for navigation in this complex and everchanging environment

Event

## Post-Merger Integration Challenges in the Cannabis Industry

Join us for a thoughtful discussion which will cover M&A project integration plan outlines. We will discuss the timeline for major resources, assets, and processes of the acquiring and acquired companies that will be combined in order to achieve the goals of the deal.

Event

## The Power of Receiverships in the Cannabis Industry

Join Clark Hill attorneys and industry leaders for this three-part discussion series to learn how financially struggling cannabusinesses can utilize the court system to obtain some financial breathing room, the history of receiverships in cannabis, and tips to bridge the gap between receiverships as a bankruptcy alternative and other workout solutions for cannabusinesses.

# Experience  —

In 2021, Robert Hoban was proudly involved in:

1.  Representation of a significant shareholder group in connection with the closing of one of the largest M&A deals in the cannabis industry.

**EXHIBIT C-3**

2. Representation of a major cannabis focused lending REIT in connection with a first-of-its-kind loans to a borrower in Nevada.

3. Representation as corporate and securities counsel by a major wellness brand with non-plant touching investments in the cannabis sector in connection with its pending U.S.-based IPO.

4. Representation of a leading private MSO as lead M&A counsel in connection with several acquisitions throughout the United States.

5. Acting as counsel to the promoter and General Partner of a new cannabis focused venture capital fund.

6. Retained as counsel to the promoter of a psychedelic focused private equity fund.

7. Prompt reversal of improperly executed IRS Notice of Levy on Cannabis Company, which would have shut them down.

8. Receivership counsel to cannabis business seeking to reform/reorganize where Chapter 11 bankruptcy disallowed.

9. LOI for potential acquisition of largest cannabis business in Montana.

10. Retention by the first public traded cannabis company operating under Panama's brand-new cannabis laws.

11. Recent retention by the USVI and the Country of Andorra (after having represented over thirty countries on these same matters globally, previously) to create their respective legislative and regulatory frameworks (drafting, oversight, and rulemaking guidance), and provision of ongoing advisory to the Executive Director of said country's cannabis oversight/regulatory agency.

12. Representation of CEA, Industries (NASDAQ: CEAD — Surna) – serving as outside General Counsel, efficiently guiding them through large portions of the NASDAQ uplisting process.

13. Oversight, strategic consultancy, and legal advisory concerning buildout, structure, and legal positioning of India-based company, which possess the only THC export license in India.  In addition, I served to domesticate various corporate structures, financial elements, and operations in the U.S. — ~$25MM.

14. Assisted CA company, who possesses a hemp derivative consumer product line and an extensive portfolio of intellectual property (cannabinoid-related and psychedelics-related) in its capital raise with various sources across the United States and Latin America — ~$15MM.

15. Facilitated cannabis seed registration in the E.U. (and other international locations) and advised concerning/facilitated numerous international cannabis seed shipments in global commerce.

16. Provided strategic advisory to leading edible brands concerning international expansion practices, patterns, and techniques.

17. Advised a subsidiary of one of the leading Canadian medical cannabis suppliers on the acquisition of European assets.

18. Advised biotech company on an exclusive worldwide licensing agreement concerning cannabis formulations, patents, and technology.

19. Advised on the conclusion of a joint venture agreement with a European pharmaceutical wholesaler.

20. Advised regarding the out-licensing of certain intellectual property for cannabis-related patents and formulations.

21. Advised North American based cannabis research company regarding the sale of service and production division to Latin American enterprise.

22. Latin American biotechnology company – Advised regarding the sale of a certain IP-portfolio for the treatment of various conditions with cannabis-related formulations.

23. European venture capital fund — Advised regarding the acquisition of shares in a German-based biotechnology company.

24. North American cannabis supply chain company — Advised regarding the restructuring of its distribution channels in LatAm and European countries.

25. Various clients in the life sciences sector — Advise in all types of transactions, including technology transfer agreements, R&D agreements, M&A transactions, private equity transactions, arbitration proceedings and litigation.

26. Led licensing deal in conjunction with Tyson 2.0.

27. Structured and facilitated Latin American M&A/acquisitions by U.S.-based client (after serving as interim CEO), which exceeded $40MM.

28. Worked with Latam consumer product companies to secure international shipping designations of hemp derived products with various global carriers (FedEx, DHL, UPS) to facilitate transactions exceeding $10MM.

29. Represented STEM Holdings in various acquisitions across the United States.

30. Structured and represented Gateway Proven Strategies (www.GOPS.global) in its capital raise offering documents ($50MM) and pitch materials, and structured and scaled the entity globally.

31. Successfully worked with client to obtain an outside ESG contract with Curaleaf.

Also of Interest:

Cannabis

Expands Cannabis Practice With Addition Of...

**EXHIBIT C-3**

'S Cannabis Team Racks Up Recognitions



The Clark Hill approach is equally pragmatic and growth-minded, which is why we understand our clients' toughest business challenges. Our multidisciplinary, global team of advisors focuses on smart legal solutions, delivered simply.

Contact Us

Policies & Disclaimers

Client Log-in

Payments





© 2024 Clark Hill PLC.

**EXHIBIT C-3**

EXHIBIT D-1



**EXHIBIT D-1**



**O.P.M.S.**

OPTIMIZED PLANT MEDIATED SOLUTIONS™

**All natural product in its all natural form.**
**Ingredients:** Mitragyna Speciosa (Kratom) Leaf- 600mg per capsule
(Mitragynine Content- 1.3%)- 7.8mg per capsule
(7-OH-Mitragynine Content- <0.045%)- <0.27mg per capsule
**Other Ingredients:** Gelatin Capsules. Capsules are used as carriers or containers for the
Mitragyna Speciosa, and to help facilitate the handling of raw powder.
**Total Mitragynines per package:**
Mitragynine- 234mg, 7-OH-Mitragynine- <8.1mg

**DIRECTIONS:**
Consult your healthcare professional to determine if this product is right for you, and if
so, how to use it safely.

**DISCLAIMER:**
By using this product you accept full responsibility for any adverse events or health
complications that may arise from its use. Manufacturers/Re-sellers assume no
responsibility or liability for the use or misuse of this product. Please see full disclaimer
at www.OPMSKratom.com.

**WARNING:**
This product contains botanical Kratom leaf capsules. Only for use as a botanical
specimen. Mitragyna Speciosa is an unapproved dietary ingredient. The
manufacturers/re-sellers of this product, therefore, cannot advise on its use. Ingesting
Mitragyna Speciosa can be dangerous. Consult your physician about potential
interactions, other possible complications, and precautionary measures before
considering this product. By opening this package you accept full responsibility for the
use of the product including but not limited to any adverse events or health
complications. Inform your physician of the alkaloid content, labeled on the package.
Manufacturers/Re-sellers assume no responsibility for the use or misuse of this product.
Keep out of reach of children. DO NOT USE IF YOU ARE PREGNANT, PLAN TO BECOME PREGNANT,
OR WHILE BREASTFEEDING. NOT FOR SALE TO MINORS! 18+ ONLY (21+ IN TENNESSEE).



6 16641 49655 5

AE SGMD30 22356
SN 17567963

DISTRIBUTED BY: Choice
Organics (213)-221-8049
3680 Wilshire Blvd.
Ste P04-1084
Los Angeles, CA 90010
info@OPMSKratom.com

**EXHIBIT D-1**

# EXHIBIT D-2



HOME     ABOUT     PRODUCTS     AUTHENTICITY     FAQS     DISCLAIMER     CONTACT

# Regulation Contact

Choice Organics

(213)221 8049

3680 Wilshire Blvd

Ste P04 – 1084

Los Angeles, CA 90010

***Warning:***

Only for use as a botanical specimen. Mitragyna speciosa is an unapproved dietary ingredient. The manufacturers/re-sellers of this product, therefore, cannot advise on its use. Ingesting Mitragyna speciosa can be dangerous. Consult your physician about potential interactions, other possible complications, and precautionary measures before considering this product. By opening this package, you accept full

**EXHIBIT D-2**

responsibility for the use of the product, including but not limited to any adverse events or health complications. Inform your physician of the alkaloid content labeled on the package. This product has been sterilized; all potential contaminants are removed for safety purposes. Manufacturers / Re-sellers assume no responsibility for the use or misuse of this product.

Keep out of reach of children. DO NOT USE IF YOU ARE PREGNANT, PLAN TO BECOME PREGNANT, OR WHILE BREASTFEEDING. NOT FOR SALE TO MINORS! 18+ ONLY. (21+ IN TENNESSEE).

Manufacturers / Re-sellers assume no responsibility for the use or misuse of this product.

**EXHIBIT D-2**

# EXHIBIT D-3



HOME     ABOUT     PRODUCTS     AUTHENTICITY     FAQS     DISCLAIMER     CONTACT

# Frequently asked Questions(FAQ) Silver

**Q: What does the O.P.M.S. Silver Logo look like?**



**Q: What color is the printed logo on the capsule for O.P.M.S. Silver?**

A:  O.P.M.S. Silver capsules feature a 3 leaf logo in a golden color.

*Q: Do all silver capsules have the printed logo?*

**EXHIBIT D-3**

A: All silver products in the bag and box/blister packs have the logo printed on the capsules, with minor exceptions. Please see next question for more information.

*Q: Why did I find an O.P.M.S. Silver bag with mixed printed and unprinted capsules?*

A: O.P.M.S., on occasion, has had to sell and package silver O.P.M.S. faster than its printing equipment could keep up with demand. In those rare instances, O.P.M.S. has had to package the printed silver capsules along with capsules that are unprinted.

# Gold

**Q: What does the O.P.M.S. Gold Logo look like?**



**Q: What color is the printed logo on the capsule for O.P.M.S. Gold?**

A: O.P.M.S. Gold capsules feature a 3-leaf logo in purple.

*Q: I saw O.P.M.S. Gold in a bag and even some in loose capsules in a jar, are these real?*

A: All O.P.M.S. Gold capsules in a bag are fake (counterfeit), and all O.P.M.S. Gold in a bulk jar is also fake (counterfeit). Beware – these fake O.P.M.S. Gold capsules have been found to contain synthetic cannabinoids and/or synthetic opioids.

*Q: What package size is available for the O.P.M.S. Gold?*

A: O.P.M.S. Gold sizes are 2ct, 3ct, and 5ct trapped blister packs.

*Q: Why is O.P.M.S. Gold a higher quality extract than others?*

**EXHIBIT D-3**

A: O.P.M.S. has a unique cold water extraction system that keeps the alkaloids intact. This is imperative in retaining certain alkaloids that are often damaged in extraction. During the most common processes used by our competitors, some significant alkaloids are flushed out in the process, leading to inferior products.

*Q: Are there any O.P.M.S. Gold capsules without the printed 3 leaf logo?*

A:No, O.P.M.S. Gold capsules are only offered with the printed 3 leaf logo.

*Q: What strain is O.P.M.S. Gold extract made from?*

A: O.P.M.S. Gold extract is made from Green Vein Maeng Da.

# Black

**Q: What does the O.P.M.S. Black Logo look like?**



**Q: What color is the printed logo on the capsule for O.P.M.S. Black?**

A: O.P.M.S. Black capsules feature a 3-leaf logo in a dark grey color.

*Q: Do all black capsules have the printed logo?*

A: Yes, all black capsules have the printed logo to prove their authenticity.

*Q: What package size is available for O.P.M.S. Black?*

A: O.P.M.S. Black sizes are 2ct, 3ct, and 5ct trapped blister packs.

# Authenticity

**EXHIBIT D-3**

*Q: Are there fake O.P.M.S. products on the market?*

A: A: There are many counterfeit (fake) O.P.M.S. kratom products on the market in silver, gold, and black.

*Q: What should I expect if I buy a fake O.P.M.S. product?*

A: Unfortunately, no one knows what's truly in these products. Some of these tested products are free of any dangerous ingredients, while others have tested positive for synthetic chemicals like Pfizer px-3 or synthetic opioids. This holds true for many fake/counterfeit kratom brands. It is a lot cheaper to adulterate a product versus putting in quality kratom that has been tested and/or extracted. Sometimes, these fake products feature low-quality kratom that hasn't been sterilized and tested for salmonella, feces, mold, heavy metals, or other common contaminants.

*Q: What is O.P.M.S. Platinum?*

A: O.P.M.S. Platinum is a fake product <u>and not</u> made by O.P.M.S. It has also been found to have synthetics in it.

## Packaging and Sizing Available

*Q:What packages and sizing are available in O.P.M.S. Silver?*

A: Silver is available in Capsule Bags (9.6g, 18g, 36g, 72g, 144g, and 288g), Powder Bags (1oz, 4oz, and 16oz) and Boxes of blister packs (9.6g, 19.2g, and 38.4g).

*Q: What strains are available in O.P.M.S. Silver?*

A: Three strains are available: Green Vein Thai, Green Vein Maeng Da, and Green Vein Malay. We recently added four strains: Red Vein Maeng Da, Red Vein Sumatra, Super Green Borneo, and White Vein Indo. These will be available in stores near you soon!

*Q: What veins are the O.P.M.S. Silver products?*

A: Our new packaging displays the vein on the front of each product. We provide: Green Vein Thai, Green Vein Maeng Da, Green Vein Malay, Red Vein Maeng Da, Red Vein Sumatra, Super Green Borneo, and White Vein Indo.



**EXHIBIT D-3**



*Q: Why is Malay mixed with Green and Red Vein?*

A: Malay is mixed with Green and Red vein to create the fuller spectrum of alkaloids and the values O.P.M.S. seek for this product.

# Silver Extract

*Q: Is O.P.M.S. Silver an extract?*

A: Silver is not an extract as much as it is a "1-time strength" product.

The alkaloid content is listed on the packaging. To maintain the alkaloid content from batch to batch, O.P.M.S. tests each batch's alkaloid profile and then mixes batches to match the alkaloid content it seeks listed for each strain.

# Quality

*Q: How do I know there is no salmonella in O.P.M.S.'s Silver kratom?*

A: O.P.M.S. tests each batch for salmonella and sterilizes all kratom products to eradicate any biological contaminants.

*Q: What does O.P.M.S. test for?*

A: O.P.M.S. tests its kratom's alkaloid levels and also for contaminants like salmonella, heavy metals, E. coli, molds, and other common toxins.

# Purchasing Directly From O.P.M.S.

**EXHIBIT D-3**

*Q: Can I buy O.P.M.S. directly as an individual?*

A: O.P.M.S. only sells to individuals via distributors and stores.

*Q: : I have a store. How do I purchase O.P.M.S. products from O.P.M.S.?*

A: O.P.M.S. does not sell directly to stores.  All sales of O.P.M.S. products are via authorized distributors of O.P.M.S.

*Q: How does a store know who is an authorized distributor of O.P.M.S.?*

A: Please send us an inquiry via our contact form and send as many details as possible. We will direct you to your nearest O.P.M.S. authorized distributor.

# Liquid O.P.M.S. Extract

**Q: What is O.P.M.S. Liquid?**

A: O.P.M.S. Liquid is a heavily bioavailable kratom extract.

**Q: What size is O.P.M.S. Liquid?**

A: 8ml and it comes in a small hourglass shape, sleeved plastic bottle. O.P.M.S. Liquid is available in two products – O.P.M.S. Gold Liquid Kratom and O.P.M.S. Black Liquid Kratom.

**Q: Did O.P.M.S. Liquid change its look recently?**

A: O.P.M.S. Gold Liquid has a new label as of April 2021. See the picture below. Additionally, the newly available O.P.M.S. Black Liquid is also pictured below. Both items are the same size.




**EXHIBIT D-3**

**Q: Did O.P.M.S. Liquid change its formulation with the label change?**

A: O.P.M.S. Liquid has not changed its formulation in several years. O.P.M.S. Gold Liquid has an updated label, but it's the same product and formula. O.P.M.S. Black Liquid has a different formula than O.P.M.S. Gold Liquid. Try O.P.M.S. Black for a full spectrum extract experience.

**Q: Why did O.P.M.S. Liquid change its label recently?**

A: The new look is to keep counterfeiters at bay and to comply with upcoming labeling regulations for Kratom in some states.

**Q: Why has the alkaloid content changed on the new label of O.P.M.S. Gold Liquid? Is there a different formula or less alkaloid?**

A: The only change to the product is the label, not the product itself or its formulation. Kratom contains a wide variety of different alkaloids, more than 20. Many of the alkaloids are various types of isomers of mitragynine, the principal alkaloid. A large number of the isomers have the exact same molecular weight as mitragynine. During standard analysis, these similar alkaloids are normally totalized in the overall quantity of mitragynine that is detected, based on the type of analytical instrument that is employed.

O.P.M.S. has made a continued effort to push the boundaries of technology to provide a better and more comprehensive analysis of the contents of its products. Recently, O.P.M.S. started using a more precise analytical method and more accurate instrumentation. This has allowed O.P.M.S. to identify all of the alkaloids individually, despite their structural similarity to mitragynine.

Now, O.P.M.S. can provide even more accurate analytical results than ever before. This establishes the exact quantity of mitragynine, rather than a totalized figure for all mitragynine as most other brands do. As a result, this will set a new industry standard in how the quantitative analysis of kratom's alkaloids are identified and assayed. It also helps O.P.M.S. more accurately list the alkaloid content in its products to meet upcoming regulations. O.P.M.S. strives to reassure our customers that the product is exactly the same as it always has been.

# General

*Q: How long has O.P.M.S. been on the market?*

A: O.P.M.S. has been selling kratom extract products to the public since 2009. O.P.M.S. was established in

**EXHIBIT D-3**

2005 with the goal of finding an alternative method of extracting Kratom without damaging the alkaloids during the process.

**Q: I read that O.P.M.S. products have chemicals in them, is this true?**

A: Absolutely not. O.P.M.S. products are the cleanest and purest kratom products on the market. Due to competitors having inferior products, this had led to lies and misconceptions to undermine high-quality O.P.M.S. products.

**Q: Is there synthetic mitragynine or 7-Hydroxymitragynine in any O.P.M.S. kratom products?**

A: No, O.P.M.S. will never put synthetic ingredients into any of its products, including synthetic alkaloids of kratom. Many companies do add synthetic 7-Hydroxymitragynine to their kratom products to enhance the effect. Until recently, many of these products were often referred to as "enhanced kratom."

**Q: Is enhanced kratom safe?**

A: The FDA's biggest concern with kratom has always been the levels of 7-Hydroxymitragynine that can cause severe toxicity, which can lead to organ failure. Enhanced kratom products often contain 4-10 plus times the amount of 7-Hydroxymitragynine found in kratom in its natural form. Recent legislation in several states banned enhancing kratom with anything, including synthetic 7-Hydroxymitragynine.

**Q: What is kratom in its natural form?**

A: Kratom in its natural form is not enhanced with any chemicals, synthetics, or any chemically altered alkaloids. Today, there is a big push with legislation and by the American Kratom Association to only allow kratom in its natural form to be sold on the market. O.P.M.S. has had this belief since its inception.

**Warning:**

Only for use as a botanical specimen. Mitragyna speciosa is an unapproved dietary ingredient. The manufacturers/re-sellers of this product, therefore, cannot advise on its use. Ingesting Mitragyna speciosa can be dangerous. Consult your physician about potential interactions, other possible complications, and precautionary measures before considering this product. By opening this package, you accept full responsibility for the use of the product, including but not limited to any adverse events or health complications. Inform your physician of the alkaloid content labeled on the package. This product has been

**EXHIBIT D-5**

sterilized; all potential contaminants are removed for safety purposes. Manufacturers / Re-sellers assume no responsibility for the use or misuse of this product.

Keep out of reach of children. DO NOT USE IF YOU ARE PREGNANT, PLAN TO BECOME PREGNANT, OR WHILE BREASTFEEDING. NOT FOR SALE TO MINORS! 18+ ONLY. (21+ IN TENNESSEE).

Manufacturers / Re-sellers assume no responsibility for the use or misuse of this product.

**EXHIBIT D-3**

# EXHIBIT D-4



Home | Products | Contact | FAQs

## What strains of Kratom does Whole Herbs carry?

Currently we carry, Green Vein Borneo, Green Vein Malay, Green Vein Maeng Da, Red Vein Bali & Green vein Indo.

## Does Kono Labs test its Kratom products?

Yes! Kono Labs prides itself in testing all of its products. We perform a full array of testing for purity of product and to ensure no presence of chemicals, heavy metals, feces, adulterates, and pesticides.

## Does Kono Labs have an e-commerce site or division?

No. Kono Labs only sells to brick and mortar stores and some websites.

## How do I store my Whole Herbs products?

Storing Whole Herbs Kratom is incredibly easy! We take special care and Ensure are Kratom is incredibly shelf stable. For the most part, as long as you store your Kratom away from moisture and direct sunlight your Kratom will remain fresh!

## I would like Kono Labs products in my store, how do I order?

Please use the contact form and in detail give your business information. Kono Labs will contact you.

## Does Whole Herbs Brand support the AKA?

Kono Labs, the parent company of Whole Herbs Kratom donates to the AKA monthly.

## What type of sterilization process is Whole Herbs using on its products?

The process and method in Which Kono Labs sterilizes it's products is a trade secret. Kono Labs uses a sterilization method that kills all types of salmonella.

ALL NATURAL KRATOM, KAVA & HEMP PRODUCTS
© Copyright 2019 KonoLabs. All Rights Reserved.
**Disclaimer** | **Authenticity**



**EXHIBIT D-4**

# EXHIBIT D-5

 Outlook

---

## RE: Young/Hernandez, Case: CC-23-01707-C - Motion to Compel Discovery from Martian and JOpen

---

**From** Payton, Gwendolyn <GPayton@ktslaw.com>

**Date** Sun 7/28/2024 3:16 PM

**To** Talis Abolins <tabolins@mctlaw.com>; Whitehead, Maeghan <MEWhitehead@ktslaw.com>; Daniel Delnero <daniel.delnero@bgdlc.com>

**Cc** Tamara J. Williams <twilliams@mctlaw.com>; Trey Allen <trey@allennolte.com>; Jennifer Nolte <jnolte@allennolte.com>; Brandi Wiginton <bwiginton@allennolte.com>; Hutton Sentell <hutton@schorrfirm.com>; Geoff Schorr <geoff@schorrfirm.com>; Mercedes Martinez <mercedes@schorrfirm.com>; Roberts, Monica <moroberts@ktslaw.com>; Allen, Jared <JAllen@ktslaw.com>

---

Talis, JOpen has control over the content of the website.

Thanks,

Gwendolyn

## Gwendolyn Payton

GPayton@ktslaw.com
Kilpatrick Townsend & Stockton LLP
1420 Fifth Avenue | Suite 3700 | Seattle, WA 98101
**T** 206 626 7714 | **F** 206 299 0414
My Profile | vCard

---

**From:** Talis Abolins <tabolins@mctlaw.com>
**Sent:** Thursday, July 25, 2024 2:02 PM
**To:** Whitehead, Maeghan <MEWhitehead@ktslaw.com>; Payton, Gwendolyn <GPayton@ktslaw.com>; Daniel Delnero <daniel.delnero@bgdlc.com>
**Cc:** Tamara J. Williams <twilliams@mctlaw.com>; Trey Allen <trey@allennolte.com>; Jennifer Nolte <jnolte@allennolte.com>; Brandi Wiginton <bwiginton@allennolte.com>; Hutton Sentell <hutton@schorrfirm.com>; Geoff Schorr <geoff@schorrfirm.com>; Mercedes Martinez <mercedes@schorrfirm.com>; Roberts, Monica <moroberts@ktslaw.com>; Allen, Jared <JAllen@ktslaw.com>
**Subject:** Re: Young/Hernandez, Case: CC-23-01707-C - Motion to Compel Discovery from Martian and JOpen

Also, as a token gesture of good faith, can you disclose today which individuals / entities are responsible for the konolabs website?

**Talis Abolins, Of Counsel**
tabolins@mctlaw.com | 206.487.7371

**mctlaw**
1325 4th Ave. Suite 1730
Seattle, WA 98101
Office: 888.952.5242

---

EXHIBIT D-5

EXHIBIT D-6

FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS) Black Liquid Kratom | FDA

# FDA Warns Consumers Not to Use Optimized Plant Mediated Solutions (OPMS) Black Liquid Kratom

July 26, 2024

## Audience

- Consumers who have recently purchased OPMS Black Liquid Kratom.

## Product

- OPMS Black Liquid Kratom sold online and in certain retail stores.



## Purpose

The FDA is advising consumers not to consume OPMS Black Liquid Kratom, which is sold online and in some retail stores. OPMS Black Liquid Kratom has been linked to serious adverse health effects, including death.

**EXHIBIT D-6**

# Summary of Problem and Scope

The FDA recently received an adverse event report of a person who died after using OPMS Black Liquid Kratom. This is one of many reports of serious adverse events individuals have reported experiencing after consuming OPMS Black Liquid Kratom. Other reported adverse health effects include withdrawal symptoms, addiction, digestive issues, restless leg syndrome, skin problems, aggressive behavior, increased anxiety, lack of energy, and inability to focus. The product label for OPMS Black Liquid Kratom indicates the presence of kratom alkaloids, mitragynine and 7-hydroxymitragynine (7-OH mitragynine).

Products containing kratom have been marketed as foods, including dietary supplements, or drugs with claims of therapeutic benefits. However, the FDA has not approved any prescription or over-the-counter drug products containing kratom or associated compounds, mitragynine and the more potent metabolite, 7-OH mitragynine. Furthermore, the FDA has serious safety concerns with the use of kratom in dietary supplements and conventional foods. Based on the available scientific data and information, the FDA has concluded that kratom is not lawfully marketed as a dietary supplement and cannot be lawfully added to conventional foods.

The FDA continues to warn consumers not to use kratom because of the risk of serious adverse events, including liver toxicity, seizures, and substance use disorder (SUD).

# FDA Actions/Response

The FDA continually evaluates adverse event reports of all products containing kratom.

The FDA is issuing this safety alert to warn consumers about serious adverse health effects associated with OPMS Black Liquid Kratom. We note that consumers may believe kratom products are safe because kratom is a plant material and is available online and in some retail stores such as vape/smoke shops. The FDA is investigating these complaints.

For more information, please visit FDA and Kratom (/news-events/public-health-focus/fda-and-kratom).

# Recommendation for Consumers

Consumers should not consume OPMS Black Liquid Kratom. The FDA encourages anyone who suspects they have experienced an adverse medical event to report this to the FDA.

To report a complaint or adverse event (illness or serious allergic reaction), visit Industry and Consumer Assistance (/food/resources-you-food/industry-and-consumer-assistance-hfp).

**EXHIBIT D-6**

# Additional Information

- FDA issues warnings to companies selling illegal, unapproved kratom drug products marketed for opioid cessation, pain treatment and other medical uses (/news-events/press-announcements/fda-issues-warnings-companies-selling-illegal-unapproved-kratom-drug-products-marketed-opioid)

- FDA oversees destruction and recall of kratom products; and reiterates its concerns on risks associated with this opioid (/news-events/press-announcements/fda-oversees-destruction-and-recall-kratom-products-and-reiterates-its-concerns-risks-associated)

- FDA Announces Seizure of Adulterated Dietary Supplements Containing Kratom (/news-events/press-announcements/fda-announces-seizure-adulterated-dietary-supplements-containing-kratom)

- Kratom seized in California by US Marshals Service (/news-events/press-announcements/kratom-seized-california-us-marshals-service)

**EXHIBIT D-6**

EXHIBIT D-7



# WHOLE HERBS

# GREEN VEIN
# MAENG DA
# KRATOM



ORGANIC
NON-GMO
SUSTAINABLE
HARVEST

225 GRAMS
8 OUNCES

## POWDER

**EXHIBIT D-7**

**WARNING:** This product contains botanical Kratom leaf powder. Only for use as a botanical specimen. Mitragyna Speciosa is an unapproved dietary ingredient. The manufacturers / re-sellers of this product, therefore, cannot advise on its use. Ingesting Mitragyna Speciosa can be dangerous. Consult your physician about potential interactions, other possible complications, and precautionary measures before considering this product. By opening this package you accept full responsibility for the use of the product including but not limited to any adverse events or health complications. Inform your physician of the alkaloid content, labeled on the package. Manufacturers / Re-sellers assume no responsibility for the use or misuse of this product. Keep out of reach of children. **DO NOT USE IF YOU ARE PREGNANT, PLAN TO BECOME PREGNANT, OR WHILE BREASTFEEDING. NOT FOR SALE TO MINORS! 18+ ONLY (21+ IN TENNESSEE).**

**Disclaimer:** By using this product you accept full responsibility for any adverse events or health complications that may arise from its use. Manufacturers/re-sellers assume no responsibility or liability for the use or misuse of this product.

**Directions:** Consult your healthcare professional to determine if this product is right for you, and if so, how to use it safely.

**Notice:** This package is to be sold "as is" and with no modification. In purchasing, and/or receiving, and/or opening this package, you are agreeing to pay a $50,000 fine per individual violation of the following terms and conditions: Contents are not; for individual sale, resale, to be split, repackaged, altered in any way, or to be used as an ingredient in any part of another product. For full legal notices go to www.KonoLabs.com

**All natural product in its all natural form.**



ORGANIC
NON-GMO
SUSTAINABLE
HARVEST

**Ingredients:** Mitragyna Speciosa (Kratom) Leaf
(Mitragynine Content- 1.3%)- 13mg per gram
(7-OH-Mitragynine content- <0.045%)- <0.45mg per gram
**Total Mitragynines per package:**
Mitragynine- 2925mg, 7-OH-Mitragynine- <101.25mg

**Distributed by:** Kono Labs
4533 MacArthur Boulevard  Suite #5130
Newport Beach, CA 92660
(424)-209-3768
Info@KonoLabs.com

WGMD225.34420
1401552



7  00598 11227  6

**EXHIBIT D-7**

# EXHIBIT E-1

1  STEPHEN L. RAM, State Bar No. 240769
    sram@stradlinglaw.com
2  LISA M. NORTHRUP, State Bar No. 293784
    lnorthrup@stradlinglaw.com
3  NICOLE L. CARBONEL, State Bar No. 329262
    ncarbonel@stradlinglaw.com
4  STRADLING YOCCA CARLSON & RAUTH
   A PROFESSIONAL CORPORATION
5  660 Newport Center Drive, Suite 1600
   Newport Beach, CA 92660-6422
6  Telephone: 949 725 4000
   Facsimile: 949 725 4100
7

8  Attorneys for Plaintiffs
   CLEANVIEW DISTRIBUTION GROUP LLC,
9  SMASH HIT TRADING LLC, and GREEN GOLD ICE LLC

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

| | |
|---|---|
| 13 CLEANVIEW DISTRIBUTION | CASE NO. 2:21-cv-07178 SB (JCx) |
| 14 GROUP LLC, a Wyoming limited | Hon.  Stanley Blumenfeld, Jr. |
| 15 liability company; SMASH HIT | [Magistrate judge:  Hon. Jacqueline |
| 16 TRADING LLC, a Wyoming | Chooljian] |
| 17 liability company; and GREEN GOLD ICE LLC, a Wyoming limited liability company, | |
| 18 Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| 19 vs. | **(1) FRAUD IN THE INDUCEMENT;** |
| 20 LGI HOLDINGS, LLC dba as | **(2) TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP;** |
| 21 Alphabet Wholesale, a Wyoming | **(3) BREACH OF CONTRACT;** |
| 22 limited liability company; OLISTICA LIFE SCIENCES GROUP, a business | **(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| 23 organization, form unknown; PEYTON | **(5) BREACH OF CONTRACT;** |
| 24 PALAIO, an individual; TED PALAIO, an individual; LAWRENCE | **(6) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| 25 LARSEN, an individual; MARK | **(7) UNJUST ENRICHMENT;** |
| 26 JENNINGS, an individual; JASON | **(8) DECLARATORY RELIEF; AND** |
| FOSTER, an individual; and DOES 1 | **(9) DECLARATORY RELIEF** |
| 27 through 10, inclusive, | **DEMAND FOR JURY TRIAL** |
| 28 Defendants. | *[Removal from Los Angeles County Superior Court on September 7, 2021]* |

Stradling Yocca
Carlson & Rauth
LAWYERS
Newport Beach

1       Plaintiffs Cleanview Distribution Group LLC ("Cleanview"), Smash Hit

2   Trading LLC ("Smash Hit"), and Green Gold ICE LLC ("Green Gold")

3   (collectively, "Plaintiffs") hereby bring this Complaint against Defendants LGI

4   Holdings, LLC dba Alphabet Wholesale ("LGI"), Olistica Life Sciences Group

5   ("Olistica"), Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, Jason

6   Foster and DOES 1 through 10, inclusive (collectively, "Defendants"), and alleges

7   as follows:

8                            **INTRODUCTION**

9       1.    Cleanview and its affiliated companies built a successful, integrated

10  business to import and distribute kratom (mitragyna speciosa), a plant indigenous

11  to Southeast Asia that may be processed for various uses, including as a fertilizer

12  or in alternative, holistic supplements.  Over the course of several years and the

13  significant investment of resources, the Cleanview companies cultivated extensive

14  relationships directly with a network of farmers in Indonesia to source kratom, and

15  developed a shipping operation and gained the expertise to import and distribute

16  the product for wholesale customers in the United States.

17      2.    Cleanview's success led to an offer to acquire the business from its

18  leading customer LGI dba Alphabet Wholesale in 2021.  Upon information and

19  belief, individual defendants Peyton Palaio, Lawrence Larsen, Ted Palaio, Mark

20  Jennings, and Jason Foster own, operate, and/or control LGI and as part of larger

21  web of companies, including Olistica Life Sciences Group ("Olistica") and

22  Optimized Plant Mediated Solutions ("OPMS").  Peyton Palaio and others

23  represented to Cleanview and its affiliated companies, Smash Hit and Green Gold

24  (collectively, the "Cleanview Companies"), that his network of companies,

25  especially through Olistica, is the largest kratom business in the United States.

26  Peyton Palaio stated his desire to expand to integrate the supply, import, and

27  distribution segments into its existing network, and eliminate supply chain

28  disruption, which he described as a means for Olistica and his companies to trace

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

2

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

1  kratom from its source to its end distribution.  Peyton Palaio and others courted the

2  Cleanview Companies with an opportunity to sell the business with a handsome

3  profit.

4         3.     In March 2021, the parties signed a memorandum of understanding

5  outlining the material terms of the proposed acquisition, valued in excess of $30

6  million.  The parties also signed a standard non-disclosure agreement to permit

7  LGI and its principals to conduct due diligence on the Cleanview business and

8  review its confidential information for the sole purpose of completing the proposed

9  transaction. Yet, the proposed transaction appears to have been nothing more than

10  a ruse to acquire Cleanview's confidential information, including its know-how

11  and receive introductions to farmers and other critical persons in Cleanview's

12  shipping and import operation, and use that information to compete with

13  Cleanview and then, baldly, demand that Cleanview release additional shipments

14  of kratom and fail to pay outstanding invoices.

15         4.     Cleanview demanded that LGI and its principals, including Peyton

16  Palaio (aka Peyton Palaia and Payton Palaio), Ted Palaio (aka Ted Palaia and Ted

17  Lavelle), and others cease and desist all of the improper uses of Cleanview's

18  confidential information that had only been provided under the auspices of the

19  NDA with the expectation that LGI would timely complete diligence and close the

20  proposed acquisition as provided in the MOU.  Instead, LGI responded with false

21  and inaccurate assertions that it was only using Cleanview's confidential

22  information for "diligence" that somehow extended to lobbying activities and

23  conspiring with Cleanview's supplier.  LGI's vague assurances that it was

24  "interested" in a resolution were nothing more than pretense because LGI has done

25  nothing for more than a month to advance the proposed transaction or even an

26  interim agreement that LGI itself proposed.  Upon information and belief, Peyton

27  Palaio, Ted Palaio and others used those delay tactics to buy themselves more time

28  to establish their competing venture using Cleanview's confidential information.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

3

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

1   For example, Defendants convinced Cleanview's supplier to end its contractual

2   relationship with Cleanview and begin a new relationship with Defendants;

3   Defendants only learned about the supplier and the contract through their

4   deliberate misuse of Cleanview's information provided under the NDA.

5          5.     The Cleanview Companies seek this Court's intervention to hold LGI,

6   its alter ego company Olistica, Peyton Palaio, Ted Palaio, and their myriad web of

7   shell companies responsible for the scheme to acquire Cleanview's confidential

8   information and compete with Cleanview, and all the other aspects of their

9   deliberate fraud.

10                               **PARTIES**

11         6.     Plaintiff Cleanview is a limited liability company in the state of

12   Wyoming with its principal place of business in Los Angeles, California.

13         7.     Plaintiff Smash Hit is a limited liability company in the state of

14   Wyoming with its principal place of business in Los Angeles, California.

15         8.     Plaintiff Green Gold is a limited liability company in the state of

16   Wyoming with its principal place of business in Los Angeles, California.

17         9.     On information and belief, Defendant LGI dba Alphabet Wholesale is

18   a limited liability company in the state of Wyoming.

19         10.    On information and belief, Defendant Olistica is a business entity of

20   unknown form and an alter ego of Defendant LGI.

21         11.    On information and belief, Defendant Peyton Palaio, also known as

22   Peyton Palaia, Payton Palaio, and Steve, is an individual.  Palaio has submitted

23   declarations to this Court attesting that he is the sole member of LGI.  Upon

24   information and belief, he owns or controls Olistica and unknown other companies.

25         12.    On information and belief, Defendant Lawrence Larsen, also known

26   as Lawrence Palaio and Lawrence Palaia, is an individual.  Upon information and

27   belief, he exercises ownership or control over LGI.

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003                                    2:21-cv-07178 SB (JCx)

13.     On information and belief, Defendant Ted Palaio, also known as Ted Palaia, Ted Lavelle, and Frank, is an individual.

14.     On information and belief, Mark Jennings is an individual and a director of LGI dba Alphabet Wholesale. Upon information and belief, he exercises ownership or control over LGI, Olistica, and unknown other companies.

15.     On information and belief, Jason Foster is an individual and is the Chief Financial Officer of Olistica.  Upon information and belief, he exercises ownership or control over LGI, Olistica, and unknown other companies.

16.     Plaintiffs do not know the true names and capacities of the Defendants sued in this action by the fictitious names DOES 1 through 10, inclusive.  Upon information and belief, Plaintiffs allege that each of the fictitiously named Defendants was in some manner responsible for, participated in or contributed to the matters and things of which Plaintiffs complain herein, and in some fashion, has legal responsibility therefor, but Plaintiffs are unable to determine each of the fictitiously named Defendants' true names without further discovery.  When the exact nature and identity of the fictitious Defendants who are responsible for participating and contributing to the matters and things herein alleged are ascertained by Plaintiffs, Plaintiffs will amend this pleading to set forth the same.

17.     Upon information and belief, Plaintiffs allege that each Defendant, including DOES 1-10, was and is the agent, employee, servant, subsidiary, partner, member, associate, or representative of each other Defendant, including DOES 1-10, and all of the acts and omissions alleged to have been done by the Defendants were done in the course and scope of the agency, employment, service, subsidiary relationship, partnership, membership, association, or representative relationship and with knowledge and consent of their respective principals, employers, masters, parent corporations, partners, members, associates, or representatives.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

5

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

**JURISDICTION AND VENUE**

18.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the citizenship of each of the Defendants is diverse from the citizenship of each of the Plaintiffs, and the amount in controversy exceeds $75,000.

19.     Venue is proper under 28 U.S.C. § 1441(a) because this case was removed from the Superior Court for the County of Los Angeles to the district in which the state action was pending. Venue is also proper under 28 U.S.C. § 1391(b)(2) because this district is where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, including performance of contracts alleged herein.

**GENERAL ALLEGATIONS**

**The Cleanview Companies Develop An Import And Distribution Business**

20.     The Cleanview Companies are owned by Lisa Wong ("Wong"), a California resident, and are managed by another California resident, John Thomas Bryant ("Bryant"). The Cleanview Companies maintain all of their business operations within Los Angeles County.  All employees, business offices, and the Cleanview companies' documents and records are located within Los Angeles County.

21.     The Cleanview Companies have developed an extensive, integrated business for the importation and distribution of wholesale kratom, a tropical evergreen tree that was been traditionally used in Southeast Asia for herbal and medicinal purposes.  Originally, the Cleanview Companies solely purchased kratom through an intermediate supplier and arranged shipping and importation, encountering challenges of a new business.

22.     Over time, the Cleanview Companies spent significant time and resources to cultivate relationships with farmers in Indonesia and form a network to source much greater amounts of kratom of consistent quality.  In turn, the

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4850-0932-1469v3/106261-0003

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

Cleanview Companies worked with suppliers and others to create a reliable shipping operation to transport the product from Indonesia into the United States, and facilitate delivery to wholesale customers from the Cleanview Companies' warehouses in Los Angeles County.

23.    As the Cleanview Companies grew in their expertise, the Cleanview Companies became one of the largest importers of kratom in the United States. Upon information and belief, competitors attempt to import kratom under a variety of government codes, but routinely have product held or even seized by U.S. Customs.  In contrast, the Cleanview Companies expressly label the product as kratom (mitragyna speciose).

**The Cleanview Companies Begin Supplying Kratom To Alphabet And LGI**

24.    LGI and the Cleanview Companies started establishing a business relationship in 2020.  In approximately April 2020, LGI representative Lawrence Larsen contacted Bryant in California and asked about purchasing kratom from the Cleanview Companies. After Bryant informed Larsen about the current inventory in the Cleanview Companies' California warehouse, Larsen agreed to purchase 40,000 kilograms or 40 metric tons of kratom.  At Larsen's request, LGI's first shipment was delivered from the Cleanview Companies' warehouse in California to an address in Oregon provided by Larsen.  At the time, Larsen did not identify any affiliation with LGI, he merely mentioned Alphabet Wholesale.

25.    On or about May 13, 2020, Larsen and Peyton Palaio, who represented himself to be LGI's principal, had a telephone call with Bryant in California.  Palaio described his current use of multiple suppliers and desire to move to a single supplier, who could trace kratom from the farm level to an end distribution point.  After that call, Bryant oversaw changes to the Cleanview Companies operations to satisfy the traceability component that Palaio desired.

26.    Between April 2020 and early October 2020, Larsen placed another 20 orders with the Cleanview Companies, each time calling Bryant in California,

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4850-0932-1469v3/106261-0003

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

1    each time the product arrived in the Cleanview Companies California warehouse

2    before final delivery to a location Larsen requested.

3        27.    As the relationship between LGI and the Cleaniew Companies

4    progressed, Bryant frequently engaged with Larsen and Peyton Palaio via text

5    messages, phone calls and Zoom meetings from his home in Los Angeles County,

6    where he worked from during the Covid pandemic.

7        28.    Larsen explained that Alphabet Wholesale (LGI) was part of a larger

8    organization that includes product lines under the brands Olistica and OPMS.

9    Larsen stated that these operations were the largest kratom businesses in the United

10   States.

11       29.    The Cleanview Companies' shipments and deliveries to Alphabet

12   Wholesale (LGI) were designated for agricultural uses, as the Cleanview

13   Companies had no control over Larsen and LGI's processing of the product and

14   ultimate use.  Larsen nor anyone else raised any objection to the designation.

15   Larsen nor anyone else ever suggested any testing or other requirements before

16   accepting delivery of product.  In fact, Larsen and Alphabet Wholesale (LGI)

17   never set any specification for the product, other than the quantities.

18   **Larsen And Peyton Palaio Propose An Exclusive Supply Agreement**

19       30.    By October 2020, Larsen informed Bryant during multiple phone calls

20   that he and Peyton Palaio were eager to make the Cleanview Companies the single

21   supplier to LGI and discontinue the use of other vendors. Based on the Cleanview

22   Companies' ability to reliably deliver large quantities of kratom and provide the

23   traceability Peyton Palaio wanted, Peyton Palaio and Larsen proposed an exclusive

24   supply agreement to make the Cleanview Companies their single supplier.  Among

25   others, Larsen and Palaio negotiated the terms of the supply agreement with Bryant

26   in California through multiple phone calls, e-mails, and texts.

27       31.    On or about October 26, 2020, Alphabet as a dba of LGI, and Smash

28   Hit and Green Gold entered into an Exclusive Supply Agreement (the "Supply

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

8

Agreement"), by which Smash Hit and Green Gold became LGI's exclusive supplier of kratom in exchange for Alphabet agreeing to pay set prices ranging from $12.25 to $13.50 per kg, depending on the quantity purchased.  Bryant, signed on behalf of Smash Hit and Green Gold, and received the executed ESA signed by Mark Jennings on November 2, 2020.  A true and correct copy of the Supply Agreement is attached hereto as Exhibit 1 and incorporated by reference herein.

32.   The Supply Agreement required Smash Hit and Green Gold to maintain an inventory of 800 metric tons available to meet LGI's needs.  Smash Hit and Green Gold, in turn, maintained that inventory in their warehouse facilities in Los Angeles County (and more recently expanded those warehouse facilities to meet LGII's supply demands as detailed below).

33.   The Supply Agreement required LGI's purchase of a minimum amount of kratom on a monthly basis, increasing from 275 metric tons to 300 metric tons.  This provision was a critical commitment for Smash Hit and Green Gold to become an exclusive supplier, representing over $3 million in monthly revenues.

34.   The Supply Agreement also provided LGI to obtain replacement for any kratom that did not meet "testing and specifications."  As part of the replacement process, the Supply Agreement required that LGI give written notice within 60 days of receipt of the shipment and to return any rejected product.  This provision was a safeguard for Smash Hit and Green Gold against claims of defective product and then re-sale of the same without providing Smash Hit and Green Gold an independent opportunity to test the product and take remedial action.  Because Smash Hit and Green Gold only intended to supply product under the agricultural designation, just as the Cleanview Companies had before the Supply Agreement, there is a limited universe of testing or defects that are possible, such as whether other agricultural product became intermixed with the

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4850-0932-1469v3/106261-0003

**EXHIBIT E-1**

1   kratom, such as bird feathers.  In fact, Larsen informed the Cleanview Companies

2   that following receipt of product, LGI sanitizes or sterilizes an entire shipment

3   before it begins to process the product.  Larsen even explained that because LGI

4   incorporates product into customer goods under Olistica and OPMS, the

5   sanitization is a necessary process.

6      35.   The Supply Agreement set an 18-month, renewable term, under which

7   Smash Hit and Green Gold became an exclusive supplier.

8      36.   Smash Hit and Green Gold performed under the Supply Agreement,

9   meeting each order from LGI under the terms of the agreement.  LGI never

10  informed Smash Hit or Green Gold of any specific testing or specifications for any

11  delivery, and never objected to the agricultural designation of the product.  Indeed,

12  Larsen once explained that LGI ceased using another kratom importer because it

13  added artificial coloring to the product.  He also emphasized the robust sanitization

14  process LGI followed.

15     37.   LGI placed orders under the Supply Agreement the same as it did

16  before— Larsen called Bryant in California to place the order, the Cleanview

17  Companies received the product at their warehouse, and then delivered to the

18  location Larsen requested.  Larsen placed 19 more orders in this manner.

19     38.   After LGI placed its orders, the Cleanview Companies would provide

20  LGI with corresponding invoices for those orders.  The Cleanview Companies

21  usually received payments on those invoices from an entity named Jopen LLC dba

22  A1 Wholesale and another entity named Liv Group, Inc., rather than LGI or

23  Alphabet Wholesale.

24     39.   While LGI usually paid by wire, Peyton Palaio arranged payment by

25  check on at least one occasion. LGI mistakenly sent the checks via UPS to

26  Wyoming and subsequently had the checks redirected to Cleanview's offices in

27  California.

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

10

FIRST AMENDED COMPLAINT                                    EXHIBIT E-1

4850-0932-1469v3/106261-0003                              2:21-cv-07178 SB (JCx)

**Peyton Palaio Proposes An Acquisition Of The Cleanview Companies**

40.    Satisfied with Smash Hit and Green Gold's product and performance under the Supply Agreement, Peyton Palaio proposed acquiring the Cleanview Companies' business in January 2021.  Specifically, on or around January 11, 2021, Peyton Palaio and Larsen had a phone call with Bryant.  Peyton Palaio described what he referred to as his company – Olistica – and made a presentation in a slide deck about Olistica.  At the time, he described LGI or Alphabet Wholesale as part of this larger Olistica organization that he operated and controlled.  Peyton Palaio explained that Olistica was undergoing clinical trials of kratom products, primarily in Canada and seeking regulatory approval to market and sell kratom products.  As part of the regulatory process, Peyton Palaio emphasized the importance of traceability from a farm through the whole supply, manufacturing, and distribution chain. Peyton Palaio stated that the Cleanview Companies' modifications to allow traceability were a first step, but he wanted greater control.  During this conversation, Peyton Palaio expressed his interest in acquiring the Cleanview Companies to achieve that control.  As part of the acquisition, LGI would also acquire from Cleanview certain real estate and warehouse facilities under construction in Indonesia.

41.    On or around January 28, 2021, Bryant participated in a Microsoft Teams Meeting with Larsen, Peyton Palaio, Jason Foster and another affiliate of Olistica, Mary Cerio.  During this meeting, Peyton Palaio introduced Ms. Cerio, explaining that she would have a significant role in a possible transaction and for any diligence by Peyton Palaio or the Olistica group.  Foster was introduced as the CFO of Olistica, and as the person who ensured the payment of the Cleanview Companies' invoices from the various other entities in Peyton Palaio's network of companies.  Peyton Palaio stated that Foster would have a significant role in diligence and the terms of the possible transaction.  During that call, Peyton Palaio

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

11

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003                                    2:21-cv-07178 SB (JCx)

continued his discussion of Olistica's network and its needs, and we continued our preliminary discussion of possible terms for a transaction.

42.  Over the next six (6) weeks, Larsen, Palaio, Foster and others began negotiating the terms for a deal with Bryant, located in California, via a series of text messages, telephone calls, and Zoom calls.  Palaio and Larsen, primarily, exchanged drafts and proposed revisions to a memorandum of understanding to memorialize the preliminary deal terms before the parties entered into a definitive agreement.

43.  In the meantime, LGI sent a notice on or about January 26, 2021, purporting to assert that product previously delivered was defective and provided various testing results.  The Cleanview Companies were surprised by the notice for multiple reasons, including that no testing or specifications had ever been agreed upon, the testing results suggested testing compatible with human consumption, and that the results were from before the product underwent sanitization as part of LGI or Olistica's normal operations.  Larsen and later Peyton Palaio immediately downplayed the notice; none of supposedly defective product was returned as required under the Supply Agreement.  Peyton Palaio and Larsen did not request replacement product until the memorandum of understanding

44.  Only in the drafts of the memorandum of understanding, did Byrant and the Cleanview Companies for the first time learn about LGI.  All prior invoices and the ESA were with Alphabet Wholesale.  Larsen, Peyton Palaio and others never sought to inform the Cleanview Companies that Alphabet Wholesale was a dba or trade name for LGI.  And, it did not matter, Peyton Palaio, in particular, more generally referred to "his" company in e-mails and conversations, and he only referred to Olistica by name.  Beyond that, all of the invoices were timely paid and gave the Cleanview Companies no reason to question or have a concern about the entities because they were dealing directly with the person who represented himself as a decision-maker.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

12

FIRST AMENDED COMPLAINT

4850-0932-1469v3/106261-0003

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

45.     On or around March 2, 2021, Peyton Palaio sent Bryant an email attaching a draft of the memorandum of understanding. In that email, Peyton Palaio mentioned that the terms relating to the leases for the Cleanview Companies offices in Los Angeles could be discussed further at a later time.

46.     On or around March 9, 2021, Peyton Palaio sent Bryant an email with further revisions to the memorandum of understanding. In that same email chain, Peyton Palaio requested a direct invoice from a supplier of the Cleanview Companies upon the signing of the final memorandum.

47.     After a series of discussions between and among Peyton Palaio and Larsen, and Bryant, Cleanview and LGI entered in a Memorandum of Understanding (the "MOU"), which outlined the basic terms for the acquisition of the Cleanview Companies.

48.     The MOU also incorporated as Exhibit A, a Confidentiality and Non-Disclosure Agreement (the "NDA").  The NDA covered all confidential information that the Cleanview Companies would provide in diligence and expressly limited LGI's use "solely in connection with the current or contemplated joint venture agreement" or the proposed acquisition.  Wong, a California resident, signed the MOU and NDA on behalf of Cleanview and Foster signed on behalf of LGI.  True and correct copies of the MOU and NDA are attached as Exhibit 2 and incorporated herein by reference.

49.     The MOU set forth general terms for the proposed transaction for its stated purpose to "acquire ownership in an established importation company," *i.e.*, Cleanview.  Rather than a conventional sale transaction, the MOU proposed a six (6) year term, wherein Cleanview would guarantee shipments of kratom to LGI. The MOU formulated the economic consideration as "royalty" payments or commissions for the shipments. Yet, the MOU also listed a number of "contingencies," that illustrate the change of control nature of the transaction, including "[s]uccessful transfer of control and ownership of the facilities (domestic

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003                                    2:21-cv-07178 SB (JCx)

1   and abroad)", the "[s]uccessful transfer of the lease for any warehousing facilities

2   …", and mere assistance for the transition of ownership.  The MOU also set forth

3   payment to Cleanview of a facility under construction in Indonesia.  Indeed,

4   Peyton Palaio proposed the royalty structure with the extended payment term

5   because he explained to Bryant that LGI did not have adequate working capital.

6   Indeed, Palaio touted his success and wealth from the kratom businesses to Bryant

7   on many occasions, but at the same time during the negotiations stated that LGI did

8   not have money to pay for a transaction or other components of the proposed

9   acquisition immediately.  Upon information and belief, LGI is undercapitalized

10  and Palaio and others received any funds and other assets of LGI leaving it as an

11  empty shell.

12       50.     For the anticipated diligence, Peyton Palaio and Larsen also insisted

13  that that an LGI representative visit and verify key persons and aspects of the

14  supply chain in Indonesia.  The MOU specifically requests "reasonable access" to

15  information consistent with Peyton Palaio and Larsen's requirement.

16  **As LGI Exploits Diligence To Acquire Cleanview's Confidential Information,**

17  **The Parties Negotiate A Definitive Agreement**

18       51.     After entering into the MOU and NDA, the Cleanview Companies

19  responded to standard diligence requests about operations under the auspices of the

20  NDA.  Bryant had multiple telephone calls and with Larsen and Peyton Palaio,

21  among others, to show and describe the dynamics of Cleanview's operations, from

22  the farmers and distributors in Indonesia, to the importation process.  The

23  Cleanview Companies also introduced the LGI to its main supplier, Indobotanical

24  Trading Company ("Indobotanical"), and provided a copy of the contract with

25  Indobotanical during diligence.

26       52.     Peyton Palaio identified that Ted Palaio or Ted Lavelle would

27  conduct the physical verification of key contacts and aspects of the business in

28  Indonesia.  The Cleanview Companies welcomed Ted Palaio, including arranging

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

14

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003                              2:21-cv-07178 SB (JCx)

1  sponsorship for his visit, a guide, and accommodations for him.  The Cleanview

2  Companies later arranged for Ted Palaio's wife to join him through their supplier

3  Indobotanical.

4      53.    During this time, Peyton Palaio, Larsen, and others began negotiating

5  terms of a definitive acquisition agreement with Bryant, who was located at his

6  offices and residence in Los Angeles County.  From March through May 2021,

7  Peyton Palaio had numerous conversations, e-mails and texts with Bryant to both

8  negotiate open terms and learn about the Cleanview operations.

9      54.     An LGI representative proposed an initial draft of the acquisition

10  agreement on April 12, 2021.  Peyton Palaio provided an updated draft on April

11  23, 2021.

12      55.    During the parties' conversations regarding the acquisition agreement

13  in April 2021, Peyton Palaio and Ted Palaio expressed their concern to Bryant

14  about disclosing the potential sale of the Cleanview Companies to Irvan Januardi

15  of Indobotanical.

16      56.    After Peyton Palaio sent the updated draft on April 23, 2021, Bryant

17  had multiple telephone calls and exchanged multiple text messages discussing

18  various aspects of the Cleanview Companies' operations as part of diligence under

19  the NDA and to negotiate the terms of the acquisition agreement.  For example, on

20  April 29, 2021, Bryant had a Zoom conference with Peyton Palaio and Ms. Cerio

21  from Olisitca, where the parties discussed altering the structure of a royalty or

22  commission payment structure of the draft acquisition agreement to a flat agreed

23  upon amount to acquire the Cleanview Companies.

24      57.    Peyton Palaio agreed to this new structure.  Under the royalty

25  structure, the total amount of economic consideration to Cleanview could greatly

26  fluctuate based upon total orders of kratom and other variables.  For the new

27  structure, Peyton Palaio and Bryant agreed upon $30 million as the principal

28  consideration for the Cleanview Companies for the acquisition agreement.

Stradling Yocca
Carlson & Rauth
Lawyers
Newport Beach

15

**EXHIBIT E-1**

58.    During this time, LGI continued to place kratom orders from the Cleanview Companies.  However, unlike before, the Cleanview Companies enabled LGI to place those orders with its supplier Indobotanical and pay for those invoices at cost.  The Cleanview Companies were willing to wait for payment for its portion of the fees until the acquisition was complete.

59.    Yet, despite the Cleanview Companies' openness and candor during diligence and availability to answer Peyton Palaio, Larsen, and Ted Palaio's questions, Peyton Palaio explained to Bryant that diligence and finalizing the acquisition agreement from LGI's side was taking longer to complete.

60.    By the end of May 2021, Peyton Palaio proposed a reimbursement agreement to ostensibly limit out-of-pocket costs for the Cleanview Companies while the acquisition agreement was completed, but would not directly compensate the Cleanview Companies for their work and efforts for continuing to supply kratom to LGI.  On or about May 24, 2021, Peyton Palaio, Bryant, and others participated in a conference call to discuss the reimbursement agreement and current draft of the definitive purchase agreement.  Bryant expressed his concerns over the nature of Ted Palaio's suspected lobbying of Indonesian government officials, but LGI representatives downplayed the issues, and the call concluded with the parties agreeing to continue the negotiations over the agreements.  Unbeknownst to the Cleanview Companies, Peyton Palaio, Ted Palaio, and others had no intention to continue negotiations.  Upon information and belief, Ted Palaio was inducing Indobotanical to end its contract with the Cleanview Companies and start a direct, multi-million contract with LGI.  Upon information and belief, Ted Palaio convinced Indobotanical's principal, Januardi, to cease communications with Bryant to accomplish this and avoid suspicion, on May 23, 2021, Ted Palaio sent a script to Januardi for him to deliver to Bryant stating that Januardi's mother was hospitalized, and in turn, Januardi did just that.  The May 24 call was just pretense for Peyton Palaio, buying time to complete his plot.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

FIRST AMENDED COMPLAINT

4850-0932-1469v3/106261-0003

EXHIBIT E-1

2:21-cv-07178 SB (JCx)

61.     On or about June 2, 2021, the Cleanview Companies supplied the last of the requested diligence items.  And, on or about June 3, 2021, the Cleanview Companies sent a revised draft of the reimbursement agreement to ensure the Cleanview Companies were compensated for their efforts in supplying kratom to LGI, and for payment of a growing number of outstanding payments. The revised draft sought payment for shipments already delivered and to complete payment for additional shipments being stored at the Cleanview Companies' California warehouse.

**The Cleanview Companies Learn Of Improper Use Of Their Confidential Information And Demand LGI Cease And Desist**

62.     The Cleanview Companies received no substantive response following the delivery the last diligence item and updated draft reimbursement agreement.  Upon information and belief, Ted Palaio was still in Indonesia and he was no longer conducting diligence, but instead actively establishing a competing enterprise using all of the information and contacts he received or derived from materials the Cleanview Companies supplied under the NDA.

63.     Upon information and belief,  Ted Palaio and others directly contacted farmers in the Cleanview Companies supply chain—farmers only were identified pursuant to the NDA—and began requesting that farmers undertake various changes to their practices, including drying processes.

64.     Upon information and belief, the Cleanview Companies are informed that Ted Palaio and the other LGI executives actively engaged with local Indonesian individuals and entities that are part of Cleanview's supply chain, including Indobotanical.  The Cleanview Companies are further informed that Ted Palaio on behalf of LGI has been meeting with and lobbying Indonesian government officials through the contacts that he received or were derived from materials and persons introduced him to under the protection of the NDA.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

17
FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003                                      2:21-cv-07178 SB (JCx)

65.     Prior to introducing LGI to Indobotanical, the Cleanview Companies had a fostered a productive business relationship with Indobotanical. Yet, after Indobotanical began working with the Defendants, LGI failed to pay several of Indobotanical's invoices.  As a result, many of Cleanview's shipments (destined for ultimate delivery to LGI) were delayed and put on hold until LGI or Cleanview remitted payment.  For the first time in the relationship between Indobotancial and the Cleanview Parties, Indobotancial threatened to engage in self-help if payment was not rendered.

66.     Bryant discussed the issue directly with Indobotanical.  When Bryant highlighted that Indobotanical invoices were directed to LGI since the date of the MOU and that Ted Palaio was staying as Indobotanical's guest, Indobotanical still blamed the Cleanview Companies, even though all Indobotanical had to do was ask Ted Palaio to render payment.  The Cleanview Companies were unaware that Ted Palaio and other LGI parties were luring Indobotanical to take that position on promises of a multi-million dollar contract.

67.     After receiving no response from LGI, on June 10, 2021, the Cleanview Companies demanded that LGI cease and desist any use of information or materials in breach of the terms of the NDA, and that LGI immediately pay the outstanding invoices.

68.     By letters dated June 28, 2021 and June 29, 2021, LGI responded to the Cleanview Companies efforts to have LGI comply with the MOU.  In one letter, LGI did not dispute its use of the confidential information, but claimed, for example, that lobbying a foreign government somehow qualified as diligence.  In another letter, LGI reasserted the mistaken assertions of defective product, when the parties never agreed to any testing regime, LGI never returned the supposedly defective product, and the MOU actually resolved the issue.  The Cleanview Companies responded by letters dated July 14, 2021.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

18

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

69.     LGI and its principals never signed the updated reimbursement agreement or provided any comments, or remitted any outstanding payments.  In short, LGI and its principals have not made any meaningful attempt to honor the MOU, NDA or the reimbursement agreement that they originally proposed.

70.     Despite the Cleanview Parties' continuous efforts to finalize the definitive agreement, Defendants have demonstrated their true intention—they never intended to complete the transaction or pay Cleanview, but instead intended to use those agreements and the promises to create their own competing enterprise using Cleanview's information.

71.     The Cleanview Companies are informed and believe that  LGI and its principals are intentionally misusing the Cleanview Companies' confidential information and interfering with its preexisting business relationships to cut the Cleanview Companies out of the deal and start their own kratom import and distribution business using the information and contacts that the Cleanview Companies provided pursuant to the NDA.  Upon information and belief, Ted Palaio and Peyton Palaio entered into new direct contracts with farmers and Indobotanicals for the benefit of LGI, Olistica, and other companies within the group, without any notice or consent from the Cleanview Companies.  Upon information and belief, Peyton Palaio used the name "Steve" and Ted Palaio used the name "Frank" in text messages and phone calls to individuals in Indonesia in an attempt to conceal their contact, and routinely switched to new smartphones as another concealment measure.

72.     Moreover, Peyton Palaio and Larsen have refused to accept delivery of additional kratom shipments that were still being stored in the Cleanview Companies' warehouse in California.  Peyton Palaio and Larsen also have failed to place any new orders for kratom despite the obligations in the Supply Agreement for nearly five (5) months.  These actions, among others, have forced the

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

19

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003                                    2:21-cv-07178 SB (JCx)

1   Cleanview Companies to cease active operations and destroyed the once thriving

2   business.

### FIRST CAUSE OF ACTION

### (Fraud In The Inducement)

### (Cleanview Against All Defendants Including LGI Holdings, LLC, Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, Jason Foster, and DOES 1 through 10, inclusive)

8       73.     Plaintiffs expressly incorporate paragraphs 1 through 72 above as

9   though fully set forth herein.

10      74.     Defendants made numerous false or misleading statements with the

11  intent to induce Clearview to enter into the MOU and NDA, and provide

12  information and materials under the NDA.  For example, in multiple telephone

13  conversations, Zoom conferences, and other communications from January

14  through May 2021, Peyton Palaio, Lawrence Larsen, Mark Jennings, and others

15  stated to Bryant that LGI wanted to purchase Cleanview and its affiliate

16  companies, Smash Hit and Green Gold, to acquire its business and agreed to honor

17  the MOU and NDA. During these conversations, Peyton Palaio informed Bryant

18  that Olistica was seeking regulatory approval to market and sell kratom products

19  and that as part of that regulatory process,  Peyton Palaio emphasized the

20  importance of tracing kratom from a farm through the whole supply,

21  manufacturing, and distribution chain.  Peyton Palaio stated that the Cleanview

22  Companies' modifications to allow traceability were a first step, but he wanted to

23  acquire the Cleanview Companies in order to achieve greater control.

24  Additionally, Peyton Palaio persuaded the Cleanview Parties to provide LGI with

25  discounted shipments of kratom and told Mr. Bryant that LGI's payments under

26  the definitive agreement would compensate Cleanview for a short interval of

27  discounted pricing.  In the NDA, LGI agreed to only use Cleanview's confidential

28  information "solely in connection with the current or contemplated joint venture

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

20

FIRST AMENDED COMPLAINT

EXHIBIT E-1

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

1  agreement between the parties and not for any purpose other than as authorized by

2  this Agreement without prior written consent of [Cleanview]."

3       75.    These statements and promises were false and misleading at the time

4  they were made because, upon information and belief, Defendants LGI, Olistica,

5  Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, and Jason Foster,

6  never had any intention of honoring the promises and covenants in the MOU and

7  NDA, but instead Defendants LGI, Olistica, Peyton Palaio, Ted Palaio, Lawrence

8  Larsen, Mark Jennings, and Jason Foster, intended to use the MOU and NDA to

9  gain Cleanview's confidential information and start a competing business, and

10  obtain discounted shipments while it established that business.

11       76.    These misrepresentations pertained to material facts.  Cleanview's

12  primary purpose in entering into the MOU and NDA was to timely negotiate and

13  complete a definitive purchase agreement for the acquisition of the Cleanview

14  business.  For example, the provisions in the NDA were material to ensure limited

15  use of Cleanview's confidential information and prevent any third party from

16  gaining a competitive advantage.  As another example, Cleanview only agreed to

17  discounted shipping in the MOU based upon the short, contractual time period in

18  that agreement and reciprocal promises for the definitive agreement.

19       77.    Cleanview reasonably relied on the representations as true.  Based on

20  these representations and those in the MOU and NDA, Cleanview entered into the

21  MOU and NDA, and provided information and materials under the NDA.  Soon

22  after, Peyton Palaio requested that a member of his team, Ted Palaio, visit and

23  meet individuals in Indonesia to verify aspects of the Cleanview Companies'

24  supply chain.  Cleanview began providing LGI with requested diligence

25  information containing Cleanview's confidential information, as defined in the

26  NDA, including making introductions to critical persons and entities in

27  Cleanview's operation that had been cultivated and used as part of their business.

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

21

1   Cleanview also facilitated the shipping to LGI of large quantities of kratom under

2   the discounted pricing in the MOU.

3       78.    Upon information and belief, Defendants obtained the Cleanview

4   Companies' confidential information for the sole purpose of creating a competing

5   enterprise to the detriment of Plaintiffs.  After Defendants were confronted about

6   their misuse of the Cleanview Companies' confidential information, Defendants

7   ceased all negotiations and communications with the Cleanview Companies.

8       79.    Cleanview has been damaged by the use and disclosure of its

9   confidential information and the failure to follow through with finalizing a

10  purchase agreement of the Cleanview Parties' business.   After Defendants

11  obtained the Cleanview Companies' confidential information, Defendants

12  effectively cut out Cleanview from the operation that it built, leaving the

13  Cleanview Companies to cease its active operations.

14      80.    Plaintiffs are entitled to rescind the MOU and NDA, and seek to

15  rescind the MOU and NDA and/or rescissionary damages.

16      81.    In the alternative, Cleanview is entitled to damages in an amount to be

17  proven at trial.

18      82.    Upon information and belief, the above-describes acts and conduct of

19  the Defendants LGI,  Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark

20  Jennings, and Jason Foster, was willful, malicious and oppressive and undertaken

21  with the intent to cause injury and damage to Cleanview, thereby justifying an

22  award of exemplary and punitive damages.

23      ///

24      ///

25      ///

26      ///

27      ///

28      ///

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

22

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

**SECOND CAUSE OF ACTION**

**(Tortious Interference With Contractual Relationship)**

**(Cleanview, Smash Hit, and Green Gold Against All Defendants Including**

**LGI Holdings, LLC, Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen,**

**Mark Jennings, Jason Foster, and DOES 1 through 10, inclusive)**

83.     Plaintiffs expressly incorporate paragraphs 1 through 82 above as though fully set forth herein.

84.     Cleanview, Smash Hit, and Green Gold have developed contacts and contractual relationships with kratom farmers, distributors, and suppliers in Indonesia, including a contract with Indobotanical.

85.     Pursuant to the NDA, Cleanview introduced Defendants LGI, Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, and Jason Foster, to these critical persons and entities, and provided various documents, including a copy of the contract with Indobotanicals.

86.     Defendants LGI, Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, and Jason Foster, have full knowledge of Cleanview, Smash Hit, and Green Gold's contractual relationships with these persons and entities because Cleanview, Smash Hit, and Green Gold are part of their supply chain that has been supplying LGI with kratom for more than one year.

87.     Defendants LGI,  Olistica, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark Jennings, and Jason Foster without any legal right or privilege to do so, intentionally interfered with Cleanview, Smash Hit, and Green Gold's contractual relationships with the intent to induce breach and cause disruption by, but not limited to the following acts, misconduct or omissions:

(i)     Failing to pay Indobotanical and other vendors' invoices, causing those entities to withhold shipments or services;

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

23

4850-0932-1469v3/106261-0003

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

1              (ii)     Misusing Cleanview's confidential information in order to

2 disrupt the Cleanview Companies' supply chain and preexisting business

3 relationships; and

4              (iii)    Conspiring to enter into their own agreements with the

5 individuals and entities that are part of Cleanview, Smash Hit, and Green Gold's

6 supply chain.

7       88.    Defendants LGI, Olisitica, Peyton Palaio, Ted Palaio, Lawrence

8 Larsen, Mark Jennings, and Jason Foster actions interfered with the Cleanview,

9 Smash Hit, and Green Gold's contractual rights and benefits.

10       89.    As a result thereof, Cleanview, Smash Hit, and Green Gold have

11 suffered damages in an amount to be proven at trial.

12       90.    Upon information and belief, the above-describes acts and conduct of

13 the Defendants LGI, Olisitca, Peyton Palaio, Ted Palaio, Lawrence Larsen, Mark

14 Jennings, and Jason Foster was willful, malicious and oppressive and undertaken

15 with the intent to cause injury and damage to Cleanview, thereby justifying an

16 award of exemplary and punitive damages

17 <div align="center">**THIRD CAUSE OF ACTION**</div>

18 <div align="center">**(Breach of the MOU and NDA)**</div>

19 <div align="center">**(Cleanview Against LGI, Olistica, and DOES 1-10)**</div>

20       91.    Plaintiffs expressly incorporate paragraphs 1 through 90 above as

21 though fully set forth herein.

22       92.    Cleanview entered into the written MOU and NDA with LGI on or

23 about March 10, 2021. True and correct copies of the MOU and NDA are attached

24 as **Exhibit 2.** Olistica is the alter ego of LGI.

25       93.    Under the NDA, LGI may use Cleanview's confidential information

26 for limited purposes.

27       94.    Defendants have breached the MOU and NDA, by among other

28 actions:

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

24

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003                               2:21-cv-07178 SB (JCx)

1          (i)    Actively engaging and entering into contracts with local

2   Indonesian individuals and entities that are part of the Cleanview's supply chain,

3   including Indobotanical, that Cleanview introduced to Defendants under the

4   protection of the NDA;

5          (ii)   Lobbying Indonesian government officials through the contact

6   that the LGI learned or derived from information provided under the protection of

7   the NDA;

8          (iii)  Misusing Plaintiffs' confidential information, including its

9   know-how, and received introductions to farmers and other critical contacts in

10  Plaintiffs' shipping and import operations, in order to compete with the Cleanview

11  Companies; and

12         (iv)   Failing to pay outstanding invoices due to Indobotanical and

13  other vendors.

14     95.   Cleanview has substantially performed all of its obligations owed to

15  LGI under the MOU and NDA, except for those that it is excused from performing.

16     96.   These breaches of the Agreement have caused Cleanview to suffer

17  substantial damages in an amount to be proven at trial, plus interest, costs and

18  attorneys' fees pursuant to section 6.1 of the NDA attached as Exhibit A to the

19  MOU.

20            **FOURTH CAUSE OF ACTION**

21  **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

22        **(Cleanview Against LGI, Olistica, and DOES 1-10)**

23     97.   Plaintiffs expressly incorporate paragraphs 1 through 96 above as

24  though fully set forth herein.

25     98.    Cleanview entered into the written MOU and NDA with LGI on or

26  about March 10, 2021.  True and correct copies of the MOU and NDA are attached

27  as **Exhibit 2.**

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

25

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003                                2:21-cv-07178 SB (JCx)

99.     Implied by those agreements is a covenant of good faith and fair dealing.  The implied covenant requires that neither party act in a manner that would injure the rights of the other party to receive the benefit of the agreement.  It requires the parties to act cooperatively in accordance with their agreed common purpose.

100.   LGI by its actions and by engaging in the wrongdoing described herein, breached the implied covenant by, among other things: failing to act fairly, honestly, and cooperatively with Cleanview and seeking to deprive Cleanview of the benefits of the MOU and NDA.

101.   Cleanview has substantially performed all of its obligations owed to the LGI under the MOU and NDA, except for those that it is excused from performing.

102.   As a direct and proximate result of the LGI's conduct, Cleanview has suffered damages in amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Breach of the Supply Agreement)**

**(Smash Hit and Green Gold Against LGI, Olistica, and DOES 1-10)**

103.   Plaintiffs expressly incorporate paragraphs 1 through 102 above as though fully set forth herein.

104.   Smash Hit and Green Gold entered into the written Supply Agreement with LGI dba Alphabet on or about October 26, 2020.  A true and correct copy of the Supply Agreement is attached as **Exhibit 1**.

105.   Under the Supply Agreement, LGI is required to exclusively purchase kratom in the United States from Smash Hit and Green Gold until the expiration of the agreement's term.  Alphabet is further required to make a minimum purchase of 300 metric tons per month starting on January 26, 2021.

106.   Defendants have breached the Agreement, by among other actions:

(i)      Using other suppliers for LGI's use in the United States;

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

26

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

1               (ii)     Failing to purchase the minimum requirements set forth in the

2 Supply Agreement or place any new orders for kratom for nearly five months;

3               (iii)    Refusing to accept delivery of additional kratom shipments that

4 were still being stored in the Cleanview Companies' warehouse in California; and

5               (iv)    Failing to pay outstanding invoices.

6     107.   Smash Hit and Green Gold have substantially performed all of their

7 obligations owed to LGI under the Supply Agreement, except for those that they

8 are excused from performing.

9     108.   These breaches of the Supply Agreement have caused Smash Hit and

10 Green Gold to suffer substantial damages in an amount to be proven at trial.

11 <div align="center">**SIXTH CAUSE OF ACTION**</div>

12 <div align="center">**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**</div>

13 <div align="center">**(Smash Hit and Green Gold Against LGI, Olistica, and DOES 1-10)**</div>

14     109.   Plaintiffs expressly incorporate paragraphs 1 through 108 above as

15 though fully set forth herein.

16     110.   Smash Hit and Green Gold entered into the written Supply Agreement

17 with LGI dba Alphabet on or about October 26, 2020.  A true and correct copy of

18 the Supply Agreement is attached as **Exhibit 1**.

19     111.   The implied covenant requires that neither party act in a manner that

20 would injure the rights of the other party to receive the benefit of the agreement.  It

21 requires the parties to act cooperatively in accordance with their agreed common

22 purpose.

23     112.   LGI by its actions and by engaging in the wrongdoing described

24 herein, breached the implied covenant by failing to cooperate and, among other

25 things: delivering improper notices of defect, when, among other things, the parties

26 never agreed upon any testing or specifications, using improper testing, and failing

27 to permit Smash Hit and Green Gold's own inspection of the purportedly defective

28 product.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

27

4850-0932-1469v3/106261-0003

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

113.   Smash Hit and Green Gold have substantially performed all of their obligations owed to LGI under the Supply Agreement, except for those that they are excused from performing.

114.   As a direct and proximate result of the LGI's conduct, Smash Hit and Green Gold have suffered damages in amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

### (Cleanview Against All Defendants)

115.   Plaintiffs expressly incorporate paragraphs 1 through 114 above as though fully set forth herein.

116.   Defendants have benefitted from, among other things: (i) utilizing Cleanview's confidential information obtained under the NDA to start a competing business; (ii) receiving discounted rates as set forth in the MOU based only upon the contemplated short, contractual period to finalize a deal; (iii) receiving shipments of kratom from Cleanview and failing to pay the invoices; and (iv) payment of the travel, lodging, and other costs for Ted Palaio's stay in Indonesia.

117.   Defendants have not paid Cleanview for the benefits it has received from Cleanview.

118.   As a direct and proximate result of Defendants' wrongful conduct, Defendants have been unjustly enriched to the detriment of Cleanview.

119.   It would be unjust, unfair, and inequitable to permit Defendants to retain these benefits.

120.   Cleanview demands restitution in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Declaratory Relief)

### (Smash Hit and Green Gold Against LGI and DOES 1-10)

121.   Plaintiffs expressly incorporate paragraphs 1 through 116 above as though fully set forth herein.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

28

FIRST AMENDED COMPLAINT

4850-0932-1469v3/106261-0003

**EXHIBIT E-1**

2:21-cv-07178 SB (JCx)

1    122.   There is a present and actual controversy regarding whether Smash

2    Hit and Green Gold breached the Supply Agreement.

3    123.   Smash Hit and Green Gold seek a declaratory judgment that Smash

4    Hit and Green Gold have not breached the Supply Agreement.

5                        **NINTH CAUSE OF ACTION**

6                          **(Declaratory Relief)**

7                 **(Cleanview Against LGI and DOES 1-10)**

8    124.   Plaintiffs expressly incorporate paragraphs 1 through 123 above as

9    though fully set forth herein.

10    125.   There is a present and actual controversy regarding whether

11    Cleanview has breached the MOU.

12    126.   Cleanview seeks a declaratory judgment that Cleanview has not

13    breached the MOU.

14                        **PRAYER FOR RELIEF**

15    WHEREFORE, Plaintiffs pray for judgment and relief against the

16    Defendants as follows:

17    **A.**   For general damages of at least $10 million ($10,000,000) according

18          to proof;

19    **B.**   For special damages according to proof;

20    **C.**   For rescission of the Agreement;

21    **D.**   For rescissionary damages according to proof;

22    **E.**   For punitive and exemplary damages as permitted by law;

23    **F.**   For restitution according to proof;

24    **G.**   A preliminary and permanent injunction restraining Defendants from,

25          among other acts, taking any actions based on or making any further

26          use of Cleanview's confidential information;

27    **H.**   For pre-judgment and post-judgment interest as provided by law;

28    **I.**   For costs;

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

29

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

1      **J.**     For reasonable attorneys' fees as provided in section 6.1 of the NDA;

2      and

3      **K.**     For such further or other relief as the Court deems just and proper.

4      <div align="center">**JURY DEMAND**</div>

5      Plaintiffs hereby demand a trial by jury on all issues.

DATED:  November 4, 2021

STRADLING YOCCA CARLSON &
RAUTH A PROFESSIONAL
CORPORATION


By:   */s/  Stephen L. Ram*
     Stephen L. Ram
     Lisa M. Northrup
     Nicole L. Carbonel
     Attorneys for Plaintiffs
     CLEANVIEW DISTRIBUTION
     GROUP LLC, SMASH HIT
     TRADING LLC, and GREEN GOLD
     ICE LLC

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

FIRST AMENDED COMPLAINT

**EXHIBIT E-1**

4850-0932-1469v3/106261-0003

2:21-cv-07178 SB (JCx)

# EXHIBIT E-2



FILED

12:01 pm, 3/30/22

Margaret Botkins
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

CLEANVIEW DISTRIBUTION GROUP, LLC, a Wyoming limited liability company; SMASH HIT TRADING, LLC, a Wyoming limited liability company; and GREEN GOLD ICE, LLC, a Wyoming limited liability company,

        Plaintiff,

VS.

LGI HOLDINGS, LLC, dba as Alphabet Wholesale, a Wyoming limited liability company,

        Defendants.

Case No. 21-CV-00208-ABJ

---

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

---

THIS MATTER comes before the Court on Defendant's Motion to Dismiss. ECF Nos. 70 & 71. Plaintiffs responded on January 7, 2022. ECF No. 87. Defendant replied to Plaintiffs' Response on January 21, 2022. ECF No. 89. The Court held a hearing on the matter on February 8, 2022. *See* ECF No. 91 & 92. Having considered the filings, applicable law, and being otherwise fully advised, the Court finds the motion should be **DENIED** in part and **GRANTED** in part. ECF Nos. 70 & 71.

**EXHIBIT E-2**
(Select pages)

## BACKGROUND

This case arises out of allegations of fraud, tortious interference, and breach of contract occurring from the business relationship between Plaintiffs and Defendant. *See* ECF No. 50 at ¶¶2–5. Plaintiffs Cleanview Distribution Group, LLC, Smash Hit Trading, LLC, and Green Gold Ice, LLC (collectively "Cleanview") are limited liability companies in the state of Wyoming with their principal places of business in the state of California. *Id.* at ¶¶6–8. Cleanview, owned by Lisa Wong and managed by John Thomas Bryant, developed and operated a profitable integrated business for the importation and distribution of wholesale kratom, a tropical evergreen tree grown in Southeast Asia. *Id.* at ¶¶20–21. Kratom has various uses, including as a fertilizer or as an ingredient in holistic supplements, although Cleanview imported kratom designated for agricultural uses. *Id.* at ¶1, 29. Defendant LGI Holdings, LLC ("LGI"), doing business as Alphabet Wholesale, is a limited liability company in the state of Wyoming. *Id.* at ¶9. LGI was interested in kratom for its product lines under the brands Olistica and OPMS, as they were seeking regulatory approval to market and sell kratom products. *Id.* at ¶¶28, 40. LGI wanted to work with Cleanview to acquire kratom from traceable sources to support their product development and approvals. *Id.* at ¶¶29, 30, 40.

The parties' business relationship began around April of 2020, when LGI contacted Cleanview wanting to purchase kratom. *Id.* at ¶24. Following the initial order, between April and October of 2020, LGI placed twenty kratom orders and during this period, Cleanview adjusted its operations after LGI indicated that traceability of product was important. *Id.* at ¶¶24–26. On October 26, 2020, following satisfactory performance

2

EXHIBIT E-2

by all, the parties entered into an eighteen-month renewable exclusive supply agreement ("ESA"). *Id.* at ¶¶31–32, 35; *see* ECF No. 50-1. The ESA set minimum amounts to be purchased at specified prices, contingencies for material rejected due to quality issues, and other terms, but left out certain terms such as quality and testing standards. *See* ECF No. 50 at ¶¶33–34, 36; ECF No. 50-1 at 2–3. LGI placed at least nineteen orders under the ESA. ECF No. 50 at ¶37.

In January of 2021, as the parties' business relationship progressed, LGI suggested acquiring the Cleanview business. *Id.* at ¶40. On March 10, 2021, following negotiations via meetings and other communications, the parties signed a memorandum of understanding ("MOU") and a non-disclosure agreement ("NDA"). *Id.* at ¶¶41–42, 44–48; *see* ECF No. 50-2. During the negotiation period, LGI sent a notice of deficient product pursuant to the ESA and the deficiency issue was resolved in the MOU. ECF No. 50 at ¶43; *see* ECF No. 50-2 at 3. The MOU outlined diligence items prior to enforceability, contingencies prior to purchase, and other terms for the negotiation of a purchase agreement between the parties. ECF No. 50 at ¶¶49–50; *see* ECF No. 50-2 at 2–4. The NDA restricted the use of information received for the purpose of conducting due diligence and otherwise working toward a finalized purchase agreement. ECF No. 50 at ¶48; *see* ECF No. 50-2 at 7–11.

Following the MOU and NDA, the parties did not enter into any further agreements. *See* ECF No. 50 at ¶¶51–72. According to Cleanview, LGI acquired confidential information under the guise of due diligence, and once LGI had enough information to establish its own integrated kratom import business, it cut all ties with

3

**IT IS FURTHER ORDERED** Defendant's Motion as to Claims Eight and Nine: Declaratory Relief is **GRANTED** and Claims Eight and Nine are **DISMISSED without prejudice.**

**IT IS FURTHER ORDERED** Defendant's Motion as to Punitive Damages is **DENIED.**

Dated this 29th day of March, 2022.

Alan B. Johnson
United States District Judge

**EXHIBIT E-2**

# EXHIBIT E-3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

AIDAN VIDRINE, INDIVUDALLY
AND AS NATURAL TUTRIX OF
THE MINOR CHILDREN, CARTER          CIVIL ACTION NO: 6:22-CV-00492-SMH-CBW
VIDRINE AND THOMAS VIDRINE          CHIEF JUDGE S. MAURICE HICKS, JR.

VERSUS

KONOLABS AND WHOLE HERBS
d/b/a WHOLE HERBS KRATOM

---

## MEMORANDUM IN SUPPORT OF
## MOTION FOR EXTENSION
## OF TIME TO EFFECT SERVICE

---

**MAY IT PLEASE THE COURT**:

The defendants in this matter, **Konolabs and Whole Herbs d/b/a Whole Herbs Kratom**, are selling and deriving substantial revenue from goods and products sold in the State of Louisiana. Plaintiff's deceased husband, Daniel Vidrine, bought and consumed the Green Vein Maeng Da Kratom from a gas station in Lafayette, Louisiana.

The label on the bottle of this product is pictured below:



1

**EXHIBIT E-3**

Counsel for plaintiff has performed an extensive search into the companies of Konolabs and Whole Herbs d/b/a Whole Herbs Kratom.  The phone number listed on the bottle (424-209-3768) is "no longer in service".   In the website konolabs.com there is an FAQ section which states "Kono Labs, the parent company of Whole Herbs Kratom, donates to the AKA monthly".[1]  The phone number listed at wholeherbskratom.com (844-377-7707) is answered by an automated recording stating all representatives are busy – please leave your name and number.

Plaintiff attempted service at the address listed on the bottle:  4533 Mac Arthur Boulevard, Suite 5130, Newport Beach, California  92660.  This service was returned marked *RETURN TO SENDER – NOT DELIVERABLE AS ADDRESSED – UNABLE TO FORWARD*.[2]

 Based on the information on the bottle, plaintiff searched the Secretary of State for Konolabs and Whole Herbs in California.  There was no listing for Whole Herbs or Whole Herbs d/b/a Whole Herbs Kratom.  There was a listing for Konolabs, Inc.[3]  A Certificate of Surrender was filed on January 3, 2020.  However, plaintiff attempted service at all addresses listed in the documents as follows:

    a.      755 Ohlone Avenue, Apt. #782, Albany, California 94706.  This service was returned marked *RETURN TO SENDER – UNABLE TO FORWARD*.[4]

---

[1] Exhibit A – Information from Konolabs' website

[2] Exhibit B – Copy of New Port Beach, California Service Returned

[3] Exhibit C – Documents from California Secretary of State on Konolabs, Inc.

[4] Exhibit D – Copy of Albany, California Service Returned

**EXHIBIT E-3**

  b.  679 3rd Street 5F, San Francisco, California 94107.  This service was returned marked *RETURN TO SENDER – INSUFFICIENT ADDRESS – UNABLE TO FORWARD*.[5]

  c.  85 Rio Robles East, #3207, San Jose, California 95134.  This service was returned marked *RETURN TO SENDER – UNABLE TO FORWARD*.[6]

The California documents also state that the corporation was terminated and that the corporation was formed in Delaware.  Plaintiff performed a search of the Delaware Secretary of State and found Konolabs, Inc. stating it surrendered on January 3, 2020; however, plaintiff attempted service on the Agent for Service of Process, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Plaintiff received the green card back; however, there has been no communication since.[7]

Plaintiff was unable to locate Whole Herbs or Whole Herbs Kratom through any Secretary of State website in the United States.  However, after a Google search, plaintiff found an address for Whole Herbs Kratom Online at 701 N. Truman Boulevard, Crystal City, Missouri 63019.[8]  Plaintiff also attempted service at this address.  Plaintiff received the green card back; however, there has been no communication since.[9]  Plaintiff has followed up with a certified letter requesting that this entity contact the undersigned to either confirm or deny whether they are the proper defendant in this matter.

In April, 2022, plaintiff hired a Private Investigator to assist in performing a due diligence investigation into these companies.

---

[5] Exhibit E – Copy of San Francisco, California Service Returned
[6] Exhibit F – Copy of San Jose, California Service Returned
[7] Exhibit G – Copy of Green Card from Delware
[8] Exhibit H – Copy of Google search of Whole Herbs
[9] Exhibit G - Copy of Green Card from Whole Herbs

**EXHIBIT E-3**

In summary, the defendant companies have purposefully made it incredibly difficult for plaintiff to effectuate service on said defendants.

Plaintiff respectfully requests this Honorable Court grant a 90 day extension to effectuate service on these defendants.

RESPECTFULLY SUBMITTED:

**MORROW, MORROW, RYAN, BASSETT & HAIK**

 /s/ P. Craig Morrow
P. CRAIG MORROW (#23536)
Post Office Drawer 1787
Opelousas, LA 70571-1787
Telephone: (337) 948-4483
Fax: (337) 942-5234
craigm@mmrblaw.com

*Attorneys for Complainant*

4

**EXHIBIT E-3**



(https://konolabs.com/)

Home     Products     Contact     FAQs

What strains of Kratom does Whole Herbs carry? ()                                    ▲

Currently, we carry Green Vein Borneo, Green Vein Malay, Green Vein Maeng Da, Red Vein
Bali, Red Vein Maeng Da, Green Vein Indo, and Yellow Vein Indo.

Does Kono Labs test its Kratom products? ()                                          ▲

Yes! Kono Labs prides itself on testing all of its products. We perform a full array of testing
for product purity and to ensure no presence of chemicals, heavy metals, feces,
adulterates, and pesticides.

Does Kono Labs have an e-commerce site or division? ()                              ▲

No, Kono Labs only sells to brick-and-mortar stores and some websites.

How do I store my Whole Herbs products? ()                                          ▲

Storing Whole Herbs Kratom is incredibly easy! We take special care to ensure our Kratom
is incredibly shelf-stable. For the most part, as long as you keep your Kratom away from
moisture and direct sunlight, your Kratom will remain fresh!

**EXHIBIT**

**EXHIBIT E-3**

I would like to carry Kono Labs products in my store. How do I order? ()

Please use the contact form and provide details about your business, and Kono Labs will contact you as soon as possible.

Does Whole Herbs Brand support the AKA? ()

Kono Labs, the parent company of Whole Herbs Kratom, donates to the AKA monthly.

What type of sterilization process does Whole Herbs use for its products? ()

The process and method Kono Labs uses to sterilize its products is a trade secret. Kono Labs uses a sterilization method that kills all types of salmonella.

ALL NATURAL KRATOM, KAVA & HEMP PRODUCTS
© Copyright 2022 KonoLabs. All Rights Reserved.
Disclaimer | Authenticity
(https://konolabs.com/? (https://konolabs.com/?
page_id=111) page_id=151)

**EXHIBIT E-3**



**EXHIBIT E-3**

7019 1640 0002 2334 9487

RTS

MAR 1 1 2022

MAR 1 1 2022

BC: 70571178787    23470053160-00767

NOT DELIVERABLE AS ADDRESSED
RETURN TO SENDER
UNABLE TO FORWARD

NIXIE    970    DE 1    0003/04/22

or on the front if space permits.

1. Article Addressed to:

Kono Labs
4533 MacArthur Blvd.
Suite 5130
Newport Beach, CA 92660

□ Agent
□ Addressee
C. Date of Delivery

D. Is delivery address different from item 1? □ Yes
If YES, enter delivery address below: □ No

3. Service Type
□ Adult Signature
□ Adult Signature Restricted Delivery
□ Certified Mail®
□ Certified Mail Restricted Delivery
□ Collect on Delivery
□ Collect on Delivery Restricted Delivery
□ Insured Mail
□ Insured Mail Restricted Delivery (over $500)

□ Priority Mail Express®
□ Registered Mail™
□ Registered Mail Restricted Delivery
□ Signature Confirmation™
□ Signature Confirmation Restricted Delivery

9590 9402 6923 1104 4336 97

2. Article Number (Transfer from service label)

7019 1640 0002 2334 9487

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

UNITED STATES POSTAGE
PITNEY BOWES
02 1P    $ 009.16⁰
0000939209    FEB 23 2022
MAILED FROM ZIP CODE 70570

MORROW, MORROW,
RYAN, BASSETT & HAIK
PERSONAL INJURY / MARITIME LAW

324 W. LANDRY ST. | POST OFFICE DRAWER 1787
#13481    OPELOUSAS LA 70571-1787

KonoLabs
4533 MacArthur Blvd., Ste. 5130
Newport Beach, CA  92660

1787



EXHIBIT
B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

AIDAN VIDRINE, INDIVUDALLY
AND AS NATURAL TUTRIX OF
THE MINOR CHILDREN, CARTER       CIVIL ACTION NO: 6:22-CV-00492-SMH-CBW
VIDRINE AND THOMAS VIDRINE       CHIEF JUDGE S. MAURICE HICKS, JR.

VERSUS

KONOLABS AND WHOLE HERBS
d/b/a WHOLE HERBS KRATOM

---

## MEMORANDUM IN SUPPORT OF
## THIRD MOTION FOR EXTENSION
## OF TIME TO EFFECT SERVICE

---

**MAY IT PLEASE THE COURT**:

Since the filing of plaintiff's Second Motion for Extension of Time to Effect Service, plaintiff has diligently continued her extensive search on the the defendants in this matter, **Konolabs and Whole Herbs d/b/a Whole Herbs Kratom**, to no avail.

On **August 26, 2022**, plaintiff served a subpoena duces tecum on the Tobacco Stop, the facility that sold the Green Vein Maeng Da Kratom to plaintiff's deceased husband, Daniel Vidrine. This subpoena duces tecum requested documents showing the name, address, location and identity of the person(s) and/or entities that sold Whole Herbs Kratom (manufactured by Konolabs) to the facility. The return date on the subpoena was **September 26, 2022**.[1] The documents received indicated that the Kratom products were being purchased by Tobacco Stop from OM Distributors, LLC.

---

[1] *See* Subpoena and Return for Tobacco Stop attached as Exhibit 1

**EXHIBIT E-3**

On **September 29, 2022**, plaintiff served a subpoena duces tecum on OM Distributors, LLC requesting documents showing the name, address, location and identity of the person(s) and/or entities that sold Whole Herbs Kratom (manufactured by Konolabs) to OM Distributors, LLC. [2]  The documents received in response to this subpoena duces tecum show the Kratom products being purchased from Eshaan Wholesale, LLC.  A subpoena duces tecum was issued on to Eshaan Wholesale, LLC on **November 1, 2022** with a return date of **December 1, 2022**.[3]

During plaintiff's research, it was discovered that another company with connections to Eshaan Wholesale, LLC sells Kratom products.  That company is Southern Wholesale, LLC.  A subpoena duces tecum was also issued to Southern Wholesale, LLC on **November 1, 2022** with a return date of **December 1, 2022**.[4]

Undersigned counsel hereby represents to this Honorable Court that the defendant manufacturers, Konolabs and Whole Herbs d/b/a Whole Herbs Kratom are selling this extremely dangerous and lethal substance to the residents of Louisiana.  Additionally, plaintiff respectfully submits that the defendant manufacturers are/have been taking nefarious and covert measures to avoid any responsibility for selling this dangerous substance to Louisiana citizens while continuing to profit from the sales of their product i.e. Kratom.  Undersigned counsel will continue to diligently "follow the money" until the defendant is formally served so that litigation proceedings can begin immediately.

---

[2] *See* Subpoena and Return for OM Distributors, LLC attached as Exhibit 2

[3] *See* Subpoena and Return for Eshaan Wholesale, LLC attached as Exhibit 3

[4] *See* Subpoena and Return for Southern Wholesale, LLC attached as Exhibit 4

**EXHIBIT E-3**

Therefore, plaintiff respectfully requests this Honorable Court grant an additional

60 days to effectuate service on said defendants.

RESPECTFULLY SUBMITTED:

**MORROW, MORROW, RYAN, BASSETT & HAIK**


 /s/ P. Craig Morrow
P. CRAIG MORROW (#23536)
Post Office Drawer 1787
Opelousas, LA 70571-1787
Telephone: (337) 948-4483
Fax: (337) 942-5234
craigm@mmrblaw.com

*Attorneys for Complainant*

**EXHIBIT E-3**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

AIDAN VIDRINE, INDIVUDALLY
AND AS NATURAL TUTRIX OF
THE MINOR CHILDREN, CARTER          CIVIL ACTION NO. 6:22-0492
VIDRINE AND THOMAS VIDRINE

VERSUS                              JUDGE S. MAURICE HICKS, JR.

KONOLABS AND WHOLE HERBS            MAGISTRATE JUDGE WHITEHURST
d/b/a WHOLE HERBS KRATOM

---

## ORDER

Considering the foregoing Motion of Voluntary Dismissal (Rec. Doc. 19),

**IT IS HEREBY ORDERED** that all claims and demands by and of Claimant,

**Aidan Vidrine, Individually and as Natural Tutrix of The Minor Children, Carter**

**Vidrine and Thomas Vidrine**, against defendants, **Konolabs and Whole Herbs d/b/**

**a Whole Herbs Kratom, Jacob Fletcher and Shaman Supplies, LLC**, be and

are hereby **DISMISSED WITHOUT PREJUDICE**.

_Shreveport_, Louisiana, this _21st_ day of _December_ 2023.

_____
UNITED STATES DISTRICT JUDGE

**EXHIBIT E-3**

# EXHIBIT E-4

Patrick D. Goggin, #182218
patrick@hoban.law
HOBAN LAW GROUP
16830 Ventura Blvd., Suite 360
Encino, CA 91436

730 17th Street, Suite 420
Denver, CO 80202
P: (303) 674-7000
F: (303) 382-4685

Attorneys for Plaintiff

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| **JOPEN, LLC**, a Texas limited liability company, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT AND JURY DEMAND** |
| **SEBASTIAN GUTHERY**, an individual; **NINE2FIVE, LLC**, a Nevada limited liability company; and **JOHN DOES 1-10**, | |
| Defendants. | |

Jopen, LLC ("Jopen"), by and through undersigned counsel, hereby submits its Complaint against Defendants Nine2Five, LLC ("Nine2Five"), Sebastian Guthery ("Guthery," and together with Nine2Five, the "Named Defendants"), and John Does 1-10, and in support thereof, states and alleges as follows:

**EXHIBIT E-4**

## INTRODUCTION

This is a dispute about how the Defendants — unified in plan and purpose by their common ringleader, Sebastian Guthrey — took Jopen's money for product they promised to supply, but never did, and how the Defendants then retained and transferred Jopen's purchase money amongst their various entities, affiliates, and outlets. Defendants delivered only a fraction of the agreed upon product. Despite negotiations and many promises, Defendants have not returned to Jopen the portion of its funds it paid and got no product in return, which totals $610,000. By this action, Jopen seeks to recoup the funds it paid for product it rightfully expected, and to hold Mr. Guthrey and his collection of company shields accountable for their wrongs.

## NAMED PARTIES

1.  Plaintiff Jopen is a Texas limited liability company, which conducts business in the State of Colorado.

2.  Defendant Guthery is an individual residing in the county of San Diego, California, with a mailing address of 4822 Chase Ct, Carlsbad, CA 92010-5658.

3.  Defendant Nine2Five is a Nevada limited liability company with a mailing address of 10082 Cheyenne Dawn Street, Las Vegas, NV 89183. On information and belief, Guthery is the sole member of Nine2Five. Nine2Five is in the business of selling kratom.

## JOHN DOES 1-10

4.  Upon information and belief, Guthery has established several other kratom companies affiliated with him and Nine2Five.

5.  Upon information and belief, Nine2Five KK (N.I.) Ltd ("Nine2Five KK"), a company incorporated in the United Kingdom, is one of the business entities described in paragraph 4. Upon information and belief, Guthery is the Company Director of Nine2Five KK.

2

EXHIBIT E-4

Upon information and belief, there are at least three additional businesses associated with Nine2Five KK and affiliated with Guthery and Nine2Five: Kratom Source USA, Green Leaf Kratom, and Zen Botanicals.

6. Upon information and belief, Kratom-K ("Kratom-K") is one of the business entities described in paragraph 4. Upon information and belief, Kratom-K is an online kratom retail store belonging to Guthery and affiliated with Nine2Five. Upon information and belief, an additional business entity, Omega Kratom, is associated with Kratom-K. Upon information and belief, Guthery wholly owns Omega Kratom.

7. Upon information and belief, paragraph 4 describes additional, yet-unnamed, companies whose identity may come to light in this litigation.

## JURISDICTION

8. Jurisdiction is proper in the Superior Court for the County of San Diego pursuant to Section 410.10 of the California Code of Civil Procedure, because it has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist. The amount in controversy exceeds the $25,000 jurisdictional minimum of this Court.

9. Venue is proper in the County of San Diego pursuant to Section 395 of the California Code of Civil Procedure because Defendant Sebastian Guthery is a resident of San Diego County.

## GENERAL ALLEGATIONS

10. On or about July 5, 2018, Jopen and Nine2Five entered into an agreement, whereby Nine2Five promised to deliver 80,000 kilograms of kratom powder (the "Product") in exchange for Jopen's payment of approximately $1,623,000.00.

3

**EXHIBIT E-4**

11. Nine2Five issued paid invoices and a transaction list to Jopen, evidencing a partially performed written agreement (the "Transaction"). A true and correct copy of the Transaction is attached hereto as **Exhibit 1** and incorporated herein by reference.

12. Pursuant to the Transaction, 10,000 kilograms of the Product is valued at approximately $200,000.00. *See, e.g.,* Exh. 1.

13. Pursuant to the Transaction, Jopen made the following payments for particular amounts of Product, inclusive of shipping and handling:

  a. On or about July 10, 2018, upon Defendants' instructions, Jopen paid $204,000.00 to Nine2Five via wire transfer for 10,000 kilograms of the Product. Exh. 2.

  b. On or about July 25, 2018, upon Defendants' instructions, Jopen paid $204,000.00 to Nine2Five via wire transfer for 10,000 kilograms of the Product. *Id.*

  c. On or about August 2, 2018, upon Defendants' instructions, Jopen paid $204,000.00 to Nine2Five via wire transfer for 10,000 kilograms of the Product. *Id.*

  d. On or about September 4, 2018, upon Defendants' instructions, Jopen paid $202,000.00 to Nine2Five via wire transfer for 10,000 kilograms of the Product. *Id.*

14. To date, Jopen has paid Nine2Five approximately $814,000.00.

15. To date, Jopen has received only approximately 10,000 kilograms of the Product.

16. Therefore, Jopen has paid a total of approximately $610,000.00 ("Unearned Funds") for Product it never received.

17. Despite numerous promises, Defendants never returned the Unearned Funds after they failed to provide the Product.

18. Because Nine2Five failed to deliver the Product, Jopen withheld remaining payments under the Transaction.

4

**EXHIBIT E-4**

19.     Between October 2018 and April 2019, Defendants made many oral and written representations that Defendants would pay back the Unearned Funds, which representations Jopen detrimentally relied upon in delaying legal action to recover the Unearned Funds.

20.     In January 2019, Defendants presented Plaintiff with a draft agreement of mutual recission, which included a promise to repay the Unearned Funds. In February, Plaintiff responded with a draft settlement agreement and promissory note and presented it to Defendants. Defendants strung settlement discussions along until at least April 2019, when they ceased communicating with Plaintiff and failed to execute settlement documents. Defendants were, thus, on notice of a potential lawsuit that Jopen had reasonably forestalled during settlement discussions.

21.     Despite their promises, Defendants failed to remit the owed refund to Jopen.

22.     Through its 2019 settlement discussions and exchange of settlement documents with Defendants, a September 2019 demand to Defendants, and prior correspondence and communications, Jopen put the Named Defendants on notice that the Unearned Funds were the subject of legal claims and that the Named Defendants were not the rightful possessors of those Unearned Funds.

23.     Neither Guthery nor Nine2Five responded to Jopen's correspondence or communications after April 2019.

24.     Upon information and belief, subsequent to receiving Jopen's notice and demand, the Named Defendants retained and/or transferred the Unearned Funds amongst John Does 1-10, their various affiliates and outlets.

25.     All conditions (whether precedent, subsequent, or otherwise) to the filing of this action have been satisfied, waived, or were futile.

5

**EXHIBIT E-4**

## ALTER EGO ALLEGATIONS

26.     At all relevant times, as alleged more fully herein, Defendant Guthery acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of Defendant Nine2Five, and in doing the things alleged herein, acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of the other Named Defendant.

28.     At all times relevant hereto, Defendant Nine2Five was the alter ego of Defendant Guthery, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants, such that any separateness between them has ceased to exist in that Defendant Guthery completely controlled, dominated, managed, and operated Defendant Nine2Five to suit his convenience.

29.     Specifically, at all times relevant hereto, Defendant Guthery (1) controlled the business and affairs of Nine2Five, including any and all of their affiliates; (2) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets for his own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (4) inadequately capitalized Nine2Five; (5) used the same office or business location and employed the same employees for all the corporate entities; (6) held himself out as personally liable for the debts of the corporate entities; (7) used the corporate entity as a mere shell, instrumentalities or conduits for himself and/or his individual businesses; (8) used the corporate entity to procure labor, services or merchandise for another person or entities; (9) manipulated the assets and liabilities between other corporate entities so as to concentrate the assets in one and the liabilities in another; (10) used corporate entities to conceal their ownership, management and financial interests and/or personal business activities; and/or (11) used the

**EXHIBIT E-4**

corporate entity to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

30.     At all times relevant thereto, Defendant Nine2Five was not only influenced and governed by Defendant Guthery, but there was such a unity of interest and ownership that the individuality, or separateness, of Guthery and Nine2Five has ceased, and that the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

31.     Jopen is informed and believes that at all relevant times mentioned herein, the acts of the business entities involved were performed by an employee, agent, officer, servant and/or representative of Guthery and Nine2Five.

### FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (against Nine2Five and Guthery)

32.     Jopen incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 31.

33.     The Transaction documents establish a valid and enforceable written contract.

34.     Jopen has partially performed its obligations under the contract, as evidenced by the Transaction, and its paying Nine2Five approximately $814,000.00. Any withheld payments under the Agreement are justified by Nine2Five's nonperformance of the Transaction.

35.     Nine2Five partially performed by delivering 10,000 (of the paid-for 40,000) kilograms of the Product that Jopen paid for pursuant to the written contract. Nine2Five, however, breached its obligations under the Transaction by failing to tender delivery of 30,000 kilograms, the vast majority, of the Product for which Jopen paid Defendants.

7

36. Accordingly, Defendants Guthery and Nine2Five breached the written contract by failing to refund Plaintiff approximately $610,000.00 after Defendants failed to deliver the paid for Product.

37. Jopen has suffered damages and continues to suffer damages, in an amount to be determined at trial, as a proximate result of Guthery and Nine2Five's breach of their written agreement with Plaintiff.

38. In the event the Transaction is construed to be an oral contract, equitable tolling and equitable estoppel preclude Defendants from asserting a statute of limitations defense.

39. Until at least April 2019, Defendants made repeated representations to Jopen that they would return the Unearned Funds and that a lawsuit would be unnecessary. Further, based on the settlement discussions and Jopen's September 2019 demand, Defendants were timely noticed of this action and are not prejudiced in any way by its filing.

40. Jopen reasonably relied upon Defendants' representations in delaying legal action.

41. Based on the foregoing, the statute of limitations period was equitably tolled until at least April 2019 and, therefore, Defendants are equitably estopped from claiming a statute of limitations defense.

### SECOND CLAIM FOR RELIEF
### CONVERSION OF PROPERTY
### (against Guthery and Nine2Five)

42. Jopen incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 41.

43. Guthery and Nine2Five's actions and omissions constituted a wrongful taking, detention, and conversion of Jopen's rightfully owned property, $610,000.

8

**EXHIBIT E-4**

44.     Guthery's and Nine2Five's exercise of exclusive control and dominion over Jopen's property after Jopen repeatedly demanded its return was wrongful and without legal right, title, or interest.

45.     Guthery and Nine2Five asserted such control and dominion with the intent to permanently deprive Jopen of its property.

46.     Jopen did not consent to the deprivation of its property by Defendants.

47.     Jopen incurred damages as a direct result of Guthery's and Nine2Five's actions.

48.     Guthery's and Nine2Five's theft and the resulting damages to Jopen were attended by circumstances of negligence, fraud, and willful and wanton misconduct.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(against Guthery and Nine2Five)**

</div>

49.     Jopen incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 48.

50.     Jopen provided a material benefit to Nine2Five in the form of approximately $814,000.00.

51.     Nine2Five only provided Product worth approximately $204,000.00.

52.     Guthery and Nine2Five retained approximately $610,000.00, despite promising to pay those funds back to Jopen so that Jopen would forego formal legal action.

53.     Guthery and Nine2Five have failed to pay the approximately $610,000.00 they promised to pay.

54.     Guthery and Nine2Five have ignored Jopen's demands for return of its Unearned Funds.

**EXHIBIT E-4**

55. Under the circumstances, it would be wholly inequitable, and to Plaintiff's detriment, to allow Guthery and Nine2Five to retain the benefit of the $610,000.00 paid after Jopen's delay in initiating legal action to recoup the same after Defendants' repeated promises to repay Jopen.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**ACCOUNT STATED**
**(against Guthery and Nine2Five)**

</div>

56. Plaintiff incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 55.

57. Nine2Five owes Plaintiff $610,000.00 from financial transactions (the "Account") agreed to on July 25, 2018, August 2, 2018, and September 4, 2018.

58. Jopen, on the one hand, and Guthery and Nine2Five, on the other hand, as evidenced by the Transaction documents produced by Defendants, agreed that the amount stated in the Account was the correct amount owed to Plaintiff.

59. Defendants' shipment of 10,000 kilograms of the Product after Jopen's July 10, 2018 $204,000 payment to Defendants evidences prior transactions and the relationship of debtor (Defendants) and creditor (Jopen) between the parties.

60. Guthery and Nine2Five, by words and conduct, and in writing, promised to pay the aforementioned amount to Jopen.

61. Neither Guthery nor Nine2Five ever disputed or objected to the amount stated and owed to Plaintiff: $610,000.00.

62. Neither Guthery nor Nine2Five has paid Jopen the amount owed.

63. Nine2Five and Guthery owe Plaintiff $610,000.00, due with interest accruing since the aforementioned dates, on the Account.

<div align="center">

10

</div>

<div align="right">

**EXHIBIT E-4**

</div>

### FIFTH CLAIM FOR RELIEF
### OPEN BOOK ACCOUNT
### (against Guthery and Nine2Five)

64.     Plaintiff incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 63.

65.     Nine2Five owes Plaintiff $610,000.00 from financial transactions (the "Account") agreed to on July 25, 2018, August 2, 2018, and September 4, 2018.

66.     Plaintiff and Defendants, in the regular course of business, kept written accounts of the debits and credits of the Transaction.

67.     Defendants never disputed or objected to the amount stated and owed to Plaintiff: $610,000.00.

68.     Defendants owe Plaintiff on the open book account.

69.     Defendants owe Plaintiff $610,000.00, due with interest accruing since the aforementioned dates, on the Account.

### SIXTH CLAIM FOR RELIEF
### FRAUDULENT TRANSFER (Civil Code § 3439)
### (against Guthery and Nine2Five)

70.     Plaintiff incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 69.

71.     Jopen has a right to payment from Defendants for $610,000, plus accrued interest.

72.     Upon information and belief, Defendants Guthery and Nine2Five have transferred Jopen's property as their own to John Does 1-10 and for which Guthery and Nine2Five did not receive a reasonably equivalent value in exchange for the transfer.

11

**EXHIBIT E-4**

73.     Upon information and belief, Guthery and Nine2Five transferred Jopen's property as their own after formal notice was provided to them that they, and the property, were subject to Jopen's legal claims.

74.     Upon information and belief, Guthery and Nine2Five transferred Jopen's property as their own with the intent to prevent Jopen from reaching the property in satisfaction of the noticed legal claims.

75.     Guthery and Nine2Five were insolvent at the time, or became insolvent as a result, of the transfer.

76.     Jopen has been harmed as a result of the transfer because it has been deprived of its $610,000 plus accrued interest.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**CIVIL CONSPIRACY**
**(against Guthery, Nine2Five, and John Does 1-10)**

</div>

77.     Plaintiff incorporates by reference herein all previously alleged paragraphs that are set forth above in Paragraphs 1 through 76.

78.     Guthery, Nine2Five, and John Does 1-10 collectively agreed to retain and/or transfer Jopen's stolen property for their benefit.

79.     Guthery, Nine2Five, and John Does 1-10 retained and/or transferred Jopen's stolen property for their benefit.

80.     Jopen is damaged in an amount to be proven at trial as a proximate cause of Guthery's, Nine2Five's, and John Does 1-10's retention and/or transfer of Jopen's stolen property for their benefit.

<div align="center">12</div>

<div align="right">**EXHIBIT E-4**</div>

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jopen, LLC respectfully requests an entry of judgment in its favor, and jointly and severally against Defendants Nine2Five, LLC and Sebastian Guthery, and that Plaintiff according to proof be awarded:

     a)  Actual damages including accrued interest;

     b)  Consequential damages;

     c)  Attorney fees and costs as allowed by contract or law;

     d)  Special and punitive damages as allowed by statute or other applicable law; and

     e)  Such other further relief this Court deems just, proper, and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial for all triable issues.

Dated: March 29, 2021

HOBAN LAW GROUP

s/ Patrick D. Goggin
Patrick D. Goggin
*Attorneys for Plaintiff*

13

**EXHIBIT E-4**

Nine2Five LLC
4225 Oceanside Blvd. Suite H-248
Oceanside, CA 92056
elly@edensethnos.com

## INVOICE

**BILL TO**
Innovo Activas
1880 west oak parkway
ste.214
Marietta, Georgia 30062
United States

**INVOICE #** 10452
**DATE** 07/23/2018
**DUE DATE** 07/23/2018

| SALES REP | SF INVOICE NUM |
|---|---|
| Chuck Adam | 00019825 |

| SERVICE | QTY | RATE | AMOUNT |
|---|---|---|---|
| FedEx Ground | 1 | 8,000.00 | 8,000.00 |
| Powder Kilo - Green Maeng Da | 20,000 | 20.00 | 400,000.00 |

| | | |
|---|---|---|
| PAYMENT | | 204,000.00 |
| BALANCE DUE | | **$204,000.00** |

**EXHIBIT 1**

**EXHIBIT E-4**

Nine2Five LLC
4225 Oceanside Blvd. Suite H-248
Oceanside, CA 92056
elly@edensethnos.com

# INVOICE

**BILL TO**
American Kratom- D
1880 west oak parkway
ste.214
Marietta, Georgia 30062
United States

**INVOICE #** 10221
**DATE** 07/05/2018
**DUE DATE** 07/05/2018

**SALES REP**
Chuck Adam

**SF INVOICE NUM**
00019594

| SERVICE | QTY | RATE | AMOUNT |
|---|---|---|---|
| Powder Kilo - Maeng Da | 20,000 | 20.00 | 400,000.00 |
| FedEx Ground | 1 | 8,000.00 | 8,000.00 |

| | | |
|---|---|---|
| PAYMENT | | 204,000.00 |
| BALANCE DUE | | **$204,000.00** |

**EXHIBIT 1**

**EXHIBIT E-4**

**Nine2Five LLC**
4225 Oceanside Blvd. Suite H-248
Oceanside, CA 92056
elly@edensethnos.com

# INVOICE

**BILL TO**
Innovo Activas
1880 west oak parkway
ste.214
Marietta, Georgia 30062
United States

**INVOICE #** 10539
**DATE** 07/30/2018
**DUE DATE** 07/30/2018

**SALES REP**
Chuck Adam

**SF INVOICE NUM**
00019914

| SERVICE | QTY | RATE | AMOUNT |
|---|---|---|---|
| FedEx Ground | 1 | 8,000.00 | 8,000.00 |
| Powder Kilo – Green Maeng Da | 20,000 | 20.00 | 400,000.00 |

| | | |
|---|---|---|
| PAYMENT | | 204,000.00 |
| BALANCE DUE | | **$204,000.00** |

**EXHIBIT 1**

**EXHIBIT E-4**

# EXHIBIT E-5

1

2

3

4

5

6

7    **ORDERED UNSEALED on 04/13/2023   s/ JulieOlser**   ~~SEALED~~                    **FILED**
                                                                          Feb 03 2023
8                         UNITED  STATES  DISTRICT  COURT          **CLERK, U.S. DISTRICT COURT**
                                                                  **SOUTHERN DISTRICT OF CALIFORNIA**
                                                                  BY      s/ andreas        DEPUTY
9                        SOUTHERN  DISTRICT  OF  CALIFORNIA

10                          August 2021 Grand Jury

11   UNITED STATES OF AMERICA,           Case No. **'23 CR0179 GPC**

12                    Plaintiff,         I N D I C T M E N T

13           v.                          Title 18, U.S.C., Sec. 371 -
                                         Conspiracy; Title 18, U.S.C.,
14   NINE2FIVE, LLC (1),                 Sec. 545 - Illegal Importation of
     SEBASTIAN GUTHERY (2),              Merchandise/Sale of Merchandise
15                                       Imported Contrary to Law;
                      Defendants.        Title 18, U.S.C., Sec. 1957 -
16                                       Money Laundering; Title 18,
                                         U.S.C., Sec. 2 - Aiding and
17                                       Abetting; Title 18, U.S.C.,
                                         Secs. 545 and 982(a)(2)(B) and
18                                       982(a)(1) - Criminal Forfeiture

19       The grand jury charges:

20                     INTRODUCTORY ALLEGATIONS

21       1.   At all times relevant herein, *Mitragyna speciosa*, commonly

22   known as kratom, was a plant, indigenous to Southeast Asia, whose leaves,

23   when ingested, have both narcotic and stimulant-like effects. According

24   to the U.S. Food and Drug Administration (FDA), the use of kratom is

25   associated with serious health risks, including but not limited to

26   seizures, liver damage, addiction, and death.  Side effects may also

27   include respiratory depression, nervousness, agitation, aggression,

28   sleeplessness, hallucinations, delusion, tremors, loss of libido,

MKP:nlv:San Diego:2/2/23                                          **EXHIBIT E-5**

1  constipation, nausea, vomiting, and severe withdrawal signs and
2  symptoms.

3     2.   On February 28, 2014, the FDA issued Import Alert 54-15, which
4  directed inspectors to detain products that appeared to contain kratom
5  as well as named product from specified firms without inspection, and
6  to deny them entry into the United States. The Import Alert stated that
7  the FDA had determined kratom to be a new dietary ingredient under
8  section 413(d) of the Act, and deemed products intended for human
9  consumption containing kratom to be adulterated food under
10 Section 402(f)(1)(B) of the Act because there was inadequate information
11 to provide reasonable assurance that the new dietary ingredient kratom
12 did not present a significant or unreasonable risk of illness or injury.
13 At all time relevant herein, the FDA Import Alert 54-15 was in effect.

14    3.   At all times relevant herein, defendant SEBASTIAN GUTHERY was
15 the owner and operator of defendant NINE2FIVE, LLC, a company located
16 in Carlsbad, California. The defendants engaged in the illegal
17 importation and sale of kratom for human consumption, falsely declaring
18 the kratom, upon importation, to be, among other things, green tea,
19 fertilizer, and a product used in dyeing fabric.

20                          Count 1

21                18 U.S.C. § 371 - Conspiracy

22    4.   The Introductory Allegations in paragraphs 1 and 3 are
23 incorporated herein as if set forth in full.

24    5.   Beginning on a date unknown to the grand jury but at least as
25 early as 2015, and continuing up to a date unknown but at least as late
26 as June 18, 2020, within the Southern District of California and
27 elsewhere, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY did knowingly

28

                          2

                                        **EXHIBIT E-5**

1 and willfully combine, conspire, and agree together and with others

2 known and unknown to the Grand Jury, to:

3      a.    Fraudulently and knowingly, import and bring into the United

4             States, merchandise, to wit: kratom, contrary to law, that is,

5             Section 542 of Title 18 and Section 331 of Title 21 of the

6             United States Code, all in violation of Title 18, United States

7             Code, Section 545; and

8      b.    sell merchandise after importation contrary to law, knowing

9             the merchandise to have been imported or brought into the

10            United States contrary to law, that is, Section 542 of

11            Title 18, all in violation of Title 18, United States Code,

12            Section 545; and

13      c.    knowingly engage in a monetary transaction in criminally

14            derived property of a value greater than $10,000 that is

15            derived from specified unlawful activity, that is, a violation

16            of Title 18 United States Code, Section 545, all in violation

17            of Title 18, United States Code, Section 1957.

18     6.    As a method and means of the conspiracy, defendants NINE2FIVE,

19 LLC and SEBASTIAN GUTHERY purchased kratom in Indonesia and imported it

20 into the United States, falsely declaring it to be, among other things,

21 green tea, fertilizer and a product used in dyeing fabric.

22     7.    As a further method and means of the conspiracy, defendants

23 imported the kratom using the names of multiple shell company consignees,

24 and through multiple ports of entry, to avoid detection by government

25 inspectors.

26     8.    As a further method and means of the conspiracy, the defendants

27 sold the kratom via the internet and shipped it to customers within the

28

3

**EXHIBIT E-5**

1  United States, receiving and transferring payments through approximately

2  50 bank accounts.

3      9.    As a further method and means of the conspiracy, the defendants

4  caused proceeds from the sale of the kratom, in increments of over

5  $10,000, totaling approximately $17 million, to be wired from financial

6  institutions in the United States to banks in Indonesia as payment for

7  the kratom.

8      10.   In furtherance of the conspiracy, and to effect the objects

9  thereof, the following overt acts, among others, occurred within the

10  Southern District of California, and elsewhere:

11      a.    On or about January 18, 2017, in Carlsbad, California,

12          defendant SEBASTIAN GUTHERY replied "Haha, Good copy!" when

13          receiving a Skype message from an agent in Indonesia, advising

14          that he was preparing a shipment of kratom to be declared as

15          "1000 kg of FloraFood Organic Fertilizer."

16      b.    On or about November 14, 2017, in Carlsbad, California,

17          defendants caused the wire transfer of $60,000 to the account

18          of a kratom supplier in Indonesia

19      c.    On or about December 6, 2017, in Carlsbad, California,

20          defendants caused the wire transfer of $70,000 to the account

21          of a kratom supplier in Indonesia.

22      d.    On or about February 23, 2018, in Carlsbad, California,

23          defendants caused the importation of 2,000 kg of kratom to a

24          consignee named Middleton Central, LLC, falsely declared to

25          be FloraFood Botanical soil conditioner (fertilizer).

26      e.    On or about February 26, 2018, in Carlsbad, California,

27          defendants caused the importation of 3,000 kg of kratom to a

28

4

**EXHIBIT E-5**

consignee named Sinclair Central, LLC, falsely declared to be FloraFood Botanical soil conditioner (*Eucheuma spinosum*).

f.    On or about March 8, 2018, in Carlsbad, California, defendants caused the importation of 9,820 kg of kratom to a consignee named Sinclair Central, LLC, falsely declared to be FloraFood Botanical soil conditioner (*Eucheuma spinosum*).

g.    On or about March 23, 2018, in Carlsbad, California, defendants caused the wire transfer of $30,000 to the account of a kratom supplier in Indonesia.

h.    On or about March 29, 2018, in Carlsbad, California, defendants caused the importation of 3,000 kg of kratom to a consignee named Middleton Central, LLC, falsely declared to be FloraFood Botanical soil conditioner (100% Green kelp, *E. spinosum*).

i.    On or about March 29, 2018, in Carlsbad, California, defendants caused the importation of 3,000 kg of kratom to a consignee named Middleton Central, LLC, falsely declared to be FloraFood Botanical soil conditioner (*Eucheuma spinosum*).

j.    On or about April 7, 2018, in Carlsbad, California, defendants caused the importation of 10,000 kg of kratom to a consignee named Middleton Central, LLC, falsely declared to be FloraFood Botanical soil conditioner (*Eucheuma spinosum*).

k.    On or about May 8, 2018, in Carlsbad, California, defendants caused the wire transfer of $63,000 to the account of a supplier of kratom in Indonesia.

l.    On or about May 14, 2018, in Carlsbad, California, defendants caused the wire transfer of $60,000 to the account of a supplier of kratom in Indonesia.

5

**EXHIBIT E-5**

1      m.   On or about May 15, 2018, in Carlsbad, California, defendants

2            caused the wire transfer of $60,000 to the account of a

3            supplier of kratom in Indonesia.

4      n.   On or about May 16, 2018, in Carlsbad, California, defendants

5            caused the importation of 9,600 kg of kratom to a consignee

6            named Middleton Central, LLC, falsely declared to be FloraFood

7            Botanical soil conditioner (*Eucheuma spinosum*).

8      o.   On or about October 31, 2019, in Santee, California,

9            defendants caused the commercial shipment of kratom to a

10           customer in the United States who purchased the product via

11           the internet.

12      p.   On or about November 26, 2019, in Santee, California,

13           defendants caused the commercial shipment of kratom to a

14           customer in the United States who purchased the product via

15           the internet.

16      q.   On or about April 2, 2020, in Carlsbad, California, defendants

17           caused the commercial shipment of kratom to a customer in the

18           United States who purchased the product via the internet.

19      r.   On or about April 17, 2020, in Carlsbad, California,

20           defendants caused the commercial shipment of kratom to a

21           customer in the United States who purchased the product via

22           the internet.

23      s.   On or about June 18, 2020, in Carlsbad, California, defendants

24           caused the commercial shipment of kratom to a customer in the

25           United States who purchased the product via the internet.

26 All in violation of Title 18, United States Code, Section 371.

27 //

28 //

6

**EXHIBIT E-5**

Counts 2-7

18 USC § 545 - Illegal Importation of Merchandise

11. The Introductory Allegations in paragraphs 1 through 3 are incorporated herein as if set forth in full.

12. On or about the dates set forth below, within the Southern District of California and elsewhere, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY did fraudulently and knowingly cause to be imported and brought into the United States, merchandise, to wit: kratom, contrary to law, that is: Section 542 of Title 18 of the United States Code, which prohibits the entry and introduction into the commerce of the United States of imported merchandise by means of materially false invoices and materially false statements;

| Count | Date |
|---|---|
| 2 | February 23, 2018 |
| 3 | February 26, 2018 |
| 4 | March 8, 2018 |
| 5 | March 29, 2018 (2 shipments) |
| 6 | April 7, 2018 |
| 7 | May 16, 2018 |

All in violation of Title 18, United States Code, Sections 545 and 2.

Counts 8-11

18 U.S.C. §§ 545 & 2 - Sale of Merchandise Imported Contrary to Law

13. The Introductory Allegations in paragraphs 1 through 3 are incorporated herein as if set forth in full.

14. On or about the dates set forth below, within the Southern District of California, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY caused to be sold and facilitated the sale of merchandise after importation, to wit, kratom, knowing such merchandise to have been

imported contrary to law, to wit: Section 542 of Title 18 of the United States Code, which prohibits the entry and introduction into the commerce of the United States of imported merchandise by means of materially false invoices and materially false statements;

| Count | Date |
|-------|------|
| 8 | October 31, 2019 |
| 9 | April 2, 2020 |
| 10 | April 17, 2020 |
| 11 | May 4, 2020 |

All in violation of Title 18, United States Code, Sections 545 and 2.

<div align="center">Counts 12-15</div>

<div align="center">18 U.S.C. §§ 1957 & 2 - Money Laundering</div>

15.    On or about the dates set forth below, within the Southern District of California, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY did knowingly engage in and caused another to be engaged in a monetary transaction in criminally derived property of a value greater than $10,000, as set forth below in Column C, which is derived from specified unlawful activity, that is, a violation of Title 18 United States Code, Section 545;

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| 12 | March 23, 2018 | wire transfer of $30,000 from a NINE2FIVE account at Wells Fargo Bank to Bank Negara Indonesia |
| 13 | May 8, 2018 | wire transfer of $63,000 from a NINE2FIVE account at Wells Fargo Bank to Bank Danamon Indonesia |

**EXHIBIT E-5**

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| 14 | May 14, 2018 | wire transfer of $60,000 from a NINE2FIVE account at Wells Fargo Bank to Bank Danamon Indonesia |
| 15 | May 15, 2018 | wire transfer of $60,000 from a NINE2FIVE account at Wells Fargo Bank to Bank Mandiri Indonesia |

All in violation of Title 18, United States Code, Sections 1957 and 2.

<div align="center">Criminal Forfeiture</div>

16.  Upon conviction of the charge alleged in Count 1 of the Indictment, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 545, and 982(a)(2)(B), all property, real or personal, which constitutes and is derived from proceeds obtained, directly and indirectly, as the result the violations of Section 545 of Title 18 of the United States Code, and, pursuant to Section 982(a)(1), all property, real or personal, involved in the offense of money laundering, or traceable to such property.  The property to be forfeited includes, but is not limited to the sum of $17 million.

17.  Upon conviction of one and more of the charges alleged in Counts 2 through 11 of the Indictment, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 545 and 982(a)(2)(B), all property, real or personal, which constitutes and is derived from proceeds obtained, directly or indirectly, as the result of the violations of Section 545 of Title 18 of the United States Code.  The property to be forfeited includes, but is not limited to, the sums set forth below:

//

<div align="center">9</div>

**EXHIBIT E-5**

| Count | Sum to be Forfeited |
|-------|---------------------|
| 2 | $12,860 |
| 3 | $19,290 |
| 4 | $63,142 |
| 5 | $39,580 |
| 6 | $64,300 |
| 7 | $61,728 |
| 8 | $135 |
| 9 | $135 |
| 10 | $135 |
| 11 | $129 |

18. Upon conviction of the one or more of the charges alleged in Counts 12 through 15 of the Indictment, defendants NINE2FIVE, LLC and SEBASTIAN GUTHERY shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in the offense of money, or traceable to such property. The property to be forfeited includes, but is not limited to the sums set forth below:

| Count | Sum to be Forfeited |
|-------|---------------------|
| 12 | $30,000 |
| 13 | $63,000 |
| 14 | $60,000 |
| 15 | $60,000 |

//
//
//
//
//

10

**EXHIBIT E-5**

1         19.  If any of the above-described forfeitable property, as a

2    results of any act or omission of defendants NINE2FIVE, LLC or SEBASTIAN

3    GUTHERY:

4              a.  Cannot be located upon the exercise of due diligence;

5              b.  Has been transferred or sold to, or deposited with, a

6                  third party;

7              c.  Has been placed beyond the jurisdiction of the Court;

8              d.  Has been substantially diminished in value; or

9              e.  Has been comingled with other property which cannot be

10                 subdivided without difficulty;

11   it is the intent of the United States, pursuant to Title 18, United

12   States Code, Section 982(b), and Title 28, United States Code,

13   Section 2461(c) to seek forfeiture of any other property of the

14   defendants up to the amounts alleged above as being subject to

15   forfeiture.

16   All in violation of pursuant to Title 18, United States Code,

17   Sections 545, 982(a)(2)(B), and 982(a)(1), and Title 28 United States

18   Code, section 2461(c).

19        DATED: February 3, 2023.

20

21

22

23   RANDY S. GROSSMAN
     United States Attorney
24

25   By: _____

26        MELANIE K. PIERSON
          Assistant U.S. Attorney
27

28

**EXHIBIT E-5**

# EXHIBIT E-6

RANDY S. GROSSMAN
United States Attorney
MELANIE K. PIERSON
Assistant U.S. Attorney
California Bar No. 112520
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Email:Melanie.Pierson@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br><br>SEBASTIAN GUTHERY (2),<br><br><br>       Defendant. | Case No.: 23cr179-TWR<br><br>**GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO TRAVEL INTERNATIONALLY** |

After pleading guilty to a felony offense involving Customs fraud related to the importation of kratom, defendant Guthery now seeks permission to travel to Indonesia, a country that does not have an extradition treaty with the United States. This request should be denied, as there is no compelling reason for such travel. Sentencing is two and a half months away. If the court accepts the defense recommendation of probation, the defendant can then travel there shortly. Since the government cannot recommend more than a year and a day, any custodial period imposed will be brief. Both this court and the government have an interest in a final resolution of this case, which outweighs any interest the defendant has in travel to a country with no extradition treaty with the United States.

//

**EXHIBIT E-6**

# I.
## STATEMENT OF RELEVANT FACTS

After Sebastian Guthery became sole owner of Nine2Five LLC in 2015, he employed his then-girlfriend, JP, to travel to Indonesia[1] and act as his agent to assist in arranging the purchase of the kratom and its transportation to the United States. JP worked in that capacity until her untimely death of a polydrug overdose (which included large amounts of kratom), in December of 2016.

Guthery paid Nine2Five LLC employees to open LLCs in which the employees were the sole members identified, which effectively concealed the involvement of Guthery and Nine2Five LLC[2]. Some of the employee's LLCs were used as the consignees to import the kratom, while others were used to open accounts for merchant processing of kratom sales. An LLC in the name of Guthery's former girlfriend JP, Procura Oils, was used to open a merchant processing account and another, Botanical K, was used as the return address for shipments of kratom purchased by undercover agents. An LLC in the name of JP's mother, Denspar Tile, was used as a consignee to import the kratom.

In 2019, in Nevada, Claudia Valladares Chevez ("Claudia") opened an LLC named Condor Global Service & Logistics, LLC ("Condor Global"), at an address in Carlsbad, California used by Nine2Five to receive mail[3]. On December 8, 2019, Condor Global was the consignee of a shipment of 13,220 kg of what was described as "fertilizer" from Indonesia, using the same harmonized tariff code used for the other shipments of kratom that Guthery had entered, falsely labeled as fertilizer.

Records obtained from a computer used at Guthery's kratom warehouse in Kansas revealed a number of emails written by Claudia. The emails, written in May of 2019, discuss what documentation was needed to create an account at a Customs brokerage for

---

[1] During the conspiracy alleged in the indictment, Guthery purchased all his kratom in Indonesia.
[2] These LLCs were filed in Nevada, all with the assistance of IH, an attorney who had lost his license to practice years earlier after being convicted of a drug-related felony offense.
[3] This LLC, opened with the assistance of IH, was dissolved in mid-2021.

"Farmland, Inc." to import items to the address of Guthery's Kansas warehouse. A company named "Farmland" would not raise the suspicions of Customs inspectors for importing "fertilizer," which was the false name that Guthery had used to import his kratom.

It is unknown whether Condor Global was used to process credit card purchases of kratom, as Guthery moved his merchant processing out of the United States during that period, after learning of the existence of a government investigation of his finances. A witness stated that Guthery called and "he said that his lawyers were telling him that his option -- he was probably – if he didn't leave he was gonna be arrested and he just had his baby and he was choosing to flee instead." The witness advised that Guthery left the United States for Costa Rica within a week.

On July 10, 2023, the day that trial was set to commence, Guthery pled guilty to Customs fraud (18 USC 542), and his firm, Nine2Five, LLC pled guilty to money laundering (18 USC 1957). Sentencing was set for October 6, 2023.

Guthery now seeks permission to travel for a month to Indonesia, a country that does not have an extradition treaty with the United States, although sentencing is but two and a half short months away.

Guthery's stated purpose for travel to visit Claudia, who he describes as his "partner" and the mother of his child. However, according to Claudia's mother, who was interviewed in March of 2023, her daughter had ended her relationship Guthery permanently and Guthery did not respect her daughter. The mother stated that Claudia was presently in Honduras helping her sister, but planned to return to the United States in the next month. Claudia's mother lives in Florida, where she had owned a Cuban coffee shop, which Claudia helped her close in February of 2023. She was interviewed by agents who were trying to locate Guthery after he was indicted. The mother made no mention of any need for care for Claudia's father. A copy of the memo of interview of the mother is attached as Exhibit 1.

About a month after the agent's interviewed Claudia's mother, Guthery was arrested at the airport[4] after returning to the United States. Guthery returned to the United States after the government advised his attorneys of the existence of the sealed indictment.

II

## POINTS AND AUTHORITIES

The defense argues that since Guthery returned to the United States after learning of the charges, he will not flee now. However, the "fact that defendant did not flee, despite opportunity to do so, is not indicative that he will not do so in the future." *United States v. Birges*, 523 F. Supp. 468, 471 (D. Nev. 1981), cited within *United States v. Vargas*, 2018 WL 3419252, at *1 (D. Nev. July 13, 2018).

On issues of bail after a guilty plea has been entered, under 18 USC 3143, the burden shifts to the defendant to show by clear and convincing evidence that he is not a flight risk or a danger to the community. *United States v. Wheeler*, 795 F. 2d 839, 840 (9th Cir.1986). In seeking to modify the conditions of bond to allow him to travel internationally after his plea of guilty plea, Guthery has not met this burden. Guthery seeks to travel to Indonesia, a country with no extradition treaty with the United States, and the very place where he obtained all the kratom that he illegally imported into the United States. The defendant provides no compelling reason for the requested bond modification, with sentencing so close at hand.

While the defense argues that there is no risk of flight or danger to the community because the defendant will continue to be supervised by pretrial services, "supervision" at such a distance is simply a legal fiction. In recognition of this fact, courts in this district routinely waive supervision of defendants who are outside of the United States.

Mr. Guthery states that he wishes to go to Indonesia to avoid the burden of travel for his partner Claudia, their child and Claudia's father. There are no known barriers to

---

[4] Guthery requested that he be allowed to enter the United States and surrender to the court a few days later, but this request was denied.

travel to the United States for Claudia and her child, other than her stated desire to continue caring for her father. No documentation was provided regarding the father's medical condition, and Claudia's mother made no mention of her daughter providing such care when interviewed in March. According to the motion, a caregiver in Indonesia has been employed to assist Claudia's father who is providing "exceptional" care at an affordable rate. No explanation has been provided regarding why this caretaker could not provide full time care for a period to allow Claudia and her daughter to travel to the United States.

Guthery may argue that it would be unaffordable for him to bring these individuals to the United States. Yet this is the same man who earlier told this court that there was no need for the standard condition of release regarding maintaining full time employment[5] because he had plenty of funds to support himself and wished to spend his time instead focused on assisting in the preparation of the case for trial. Surely a man with no need for employment has the means to hire help for the 18 hours[6] of travel it would take for them to come to the United States? After they arrive in the United States, Guthery himself could assist in caring for them, since he is not otherwise occupied with work.

Guthery attempts to paint a misleading picture for the court of a longstanding family unit, consisting of himself, his partner Claudia, his daughter, and Claudia's father, that his sole wish is to rejoin. This description is refuted by Claudia's mother, who told federal agents a month before Guthery appeared in San Diego that Guthery and her daughter were no longer a couple, that her daughter had been in Florida helping her a month earlier and she expected her back in Florida shortly. Claudia's mother described her daughter as living with her sister in Honduras, not in a house with Guthery in Indonesia. To the extent that the household described by Guthery exists, it must be of very recent origin (one month prior to his arrest) if the statements of the mother, who has no known reason to provide false information, are accurate. Moreover, Guthery seeks to

---

[5] The court granted the motion and permitted Guthery to remain on bond without seeking employment.
[6] www.travelmath.com

*Government's Response in Opposition to Defendant's Motion to Travel Internationally*

23cr179-TWR
**EXHIBIT E-6**

1   visit a person who was involved in his kratom importation business (demonstrated by her

2   participation in Condor Global, which imported at least one shipment of "fertilizer" that

3   likely was kratom). The facts suggest that any "partnership" between Guthery and

4   Claudia is more of a business nature than a personal one.

5        Sentencing is two and a half months away. If the court accepts the defense

6   recommendation of probation, the defendant can then travel there shortly. Since the

7   government cannot recommend more than a year and a day, any custodial period imposed

8   will be brief. Both this court and the government have an interest in a final resolution of

9   this case, which outweighs any interest the defendant has in travel to a country with no

10  extradition treaty with the United States. The defendant has shown no compelling reason

11  to support his need to travel, especially given the short period before sentencing.

12

13                                    III

14                               CONCLUSION

15        For the foregoing reasons, the Defendant's request to travel internationally to

16  Indonesia, a country with no extradition treaty with the United States, should be denied.

17  DATED: July 24, 2023

18                                              Respectfully submitted,

19                                              RANDY S. GROSSMAN
                                                United States Attorney
20
                                                Melanie K. Pierson
21                                              MELANIE K. PIERSON
                                                Assistant U.S. Attorney
22

23

24

25

26

27

28

# EXHIBIT E-7

Fayette father aims to bankrupt alleged synthetic pot dealer



LOCAL NEWS

# Fayette father aims to bankrupt alleged synthetic pot dealer

By Christian Boone

Aug 31, 2012

  

Though he's been arrested on charges of marijuana, methamphetamine and heroin possession, it's Peyton Palaio's alleged involvement with a quasi-legal drug that now has the attention of law enforcement and a grieving father.

"We're trying to cut the head off the snake," said David Burnett, whose 16-year-old son Chase drowned in the hot tub at his Fayette County home in March after smoking synthetic cannabis, commonly known as Spice or K2. Burnett and his wife Yvette have filed a wrongful death suit naming Palaio, 25, as the distributor who supplied the drug that ended up in Chase's hands. "We have to start at the top."

Advertisement

**EXHIBIT E-7**

Fayette father aims bankrupt alleged synthetic pot dealer

In July, the GBI executed search warrants on two labs and a distribution company, which share addresses in Atlanta and Marietta, owned by Palaio — part of the agency's "continuing effort to address the synthetic cannabinoid problem in Georgia at the direction of Governor Deal," said spokesman John Bankhead.

Outlawing its sale, as Georgia lawmakers did in March, has proven insufficient. Chemists working for synthetic pot distributors have repeatedly circumvented the ban by tweaking the substance's molecular structure, forcing the Georgia State Board of Pharmacy to issue three emergency rulings this summer reclassifying altered compounds as illegal Schedule I narcotics.

"Chase's Law," named for the McIntosh High School honor student and junior varsity soccer player, specifically outlawed AM-2201, which was found in Burnett's system. His father found an open package of "Mojo Diamond Extreme 100X Potpourri" — a brand name for synthetic pot — next to the hot tub where he drowned.

Palaio's attorney, Andrew Koplan, said Tuesday his client didn't even know what Mojo Extreme was when notified of the complaint against him.

"They've sued the wrong person," he said.

The AJC sought further comment from Koplan after obtaining a copy of the GBI search warrants on Thursday but he has yet to respond.

According to an affidavit taken in Cobb County Magistrate Court, GBI agents seized AM-2201 from Palaio's Marietta lab in July. Agents also uncovered company records detailing the

**EXHIBIT E-7**

purchase of more than 12,000 pounds of acetone, which is used to dissolve synthetic cannabinoid compounds into a spray that is then applied to plant material for sale.

Though packaged with a warning that it's "not for human consumption," synthetic pot has long been known as a cheap high — selling from $5 — by teens and young adults. Plus, it remains largely undetected by drug tests and is readily available at smoke shops and convenience stores.

"It's mind-boggling that it's still being sold," said David Burnett, adding that further lawsuits are likely. "It's disheartening, to say the least."

Burnett's attorney, Kristofer R. Schleicher, said distributors knew long before Burnett's death of the harmful effects of synthetic marijuana.

Advertisement

**EXHIBIT E-7**

"Even though [the distributor of the product] may not have thought this would kill someone, it was definitely reckless," he said.

Authorities have linked two other deaths in Georgia this year to synthetic marijuana use: Kelvin Melton, 26, of Athens, who died in February of a heart condition brought on by frequent use; and Dakota Dyer, 14, of Bremen, who, according to his parents, committed suicide in March after using the drug.

Similar incidents have been reported across the country, prompting a federal crackdown announced last month. The GBI is now coordinating its investigation with the U.S. Drug Enforcement Administration, Bankhead said.

Locally, the General Assembly is expected to address the loopholes exploited by synthetic pot chemists when it convenes in January.

Burnett, meanwhile, said he intends to remain a thorn in the side of all involved in the designer drug trade.

ADVERTISING



"They are profiting from selling poison," he said. "If our son's mistake in death can spare someone else's life, his death was not in vain."

## About the Author

**EXHIBIT E-7**

# EXHIBIT E-8

DocuSign Envelope ID: 043DFE2C-49D9-486D-BD5A-3953A076DC71

## SERVICES AND SUPPLY PROJECT AGREEMENT

This SERVICES AND SUPPLY PROJECT AGREEMENT ("Agreement") is entered into as of this (the "Effective Date"), by and between Cross Creek Limited Partnership, with an office located at [Address] ("Cross Creek"), and Companion Ag, Inc.Companion Ag, INC.Companion Ag, INC.a Wyoming corporation with an office located at 23298 US HWY 160 Springfield, CO ("Companion Ag, INC."). Cross Creek and Companion Ag, INC. may hereinafter be referred to as a "Party" and, collectively, as the "Parties."

## RECITALS

**WHEREAS,** Cross Creek is [an experienced agricultural expert in the field of hemp cultivation, and duly registered with the New Mexico Department of Agriculture ("CDA") to cultivate industrial hemp on real property located in Union County New Mexico comprising of approximately 500 Acres the "Property");

**WHEREAS,** Cross Creek and Companion Ag, INC. wish to collaborate to produce certain Raw Materials (as defined herein) and manufactured products, using resources contributed by each of Cross Creek and Companion Ag, INC., and sell them through Companion Ag, INC.'s distribution network.

**NOW, THEREFORE,** in consideration of the promises and covenants made herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1. **Supply of Materials and Services**.  For the Term (as defined herein), and except as otherwise set forth herein, Companion Ag, INC. and Cross Creek shall each provide the Services as listed on Exhibits A and B.

2. **Compliance with Laws**. In performing the Services listed on Exhibits A and B, each Party shall, comply with all applicable laws, ordinances, regulations and orders, including Section 7606 of the Agricultural Act of 2014 (Pub. L. 113-79) and applicable provisions of the Agriculture Improvement Act of 2018, collectively, the "Laws". Each Party shall ensure that, if it receives notice or becomes aware of any violation or potential violations of any Law, it promptly shall take such actions as may be necessary to prevent any further violations and promptly shall provide written notice to the other Party of such violations or potential violations. Further, Each Party hereby waives any defenses to the enforcement of this Agreement based on an "illegality of purpose" theory or related defenses.

3. **Profit Sharing**. In consideration of the Services provided by the Parties hereto, the Parties shall share in the profits from the sale of the Finished Products (as defined herein) by Companion Ag, INC. as follows:
   a. Split agreement will remain 15% Cross Creek/ 85% CompanionAg with the following production exceptions. All yield per acre figures will be based off of dry weight of milled, refined flower  material   after    milling    and   classification.

   | | | | |
   |---|---|---|---|
   | 1) | 15% | @ | 500-1000 lbs/acre |
   | 2) | 16.67% | @ | 1000-1500 lbs/acre |
   | 3) | 18.34% | @ | 1500-2000 lbs/acre |

   4) 20% @ 2000 lbs/acre+
4. Companion Ag, INC. shall retain the appropriate percentage of finished products value,  as listed

**EXHIBIT E-8**

Case No. 1:23-cv-02323-MDB   Document 1-3   filed 09/11/23   USDC Colorado   pg 3 of 13
Case 2:24-cv-00228-WBV-DPC   Document 122-44   Filed 06/30/25   Page 291 of 489
DocuSign Envelope ID: 0433DFE3C-A9B8-486D-BD5A-3253A076CC71

in table 3.a above, and Companion Ag, INC. shall remit the appropriate percentage, as listed in table 3.a above, of the finished products value to Cross Creek pursuant to the payment terms in Section 7 of this Agreement. Except as otherwise noted herein, each Party shall bear its own costs and expenses incurred in connection the Services provided under this Agreement.

5.  **Testing of Product**.

    a.  <u>Pre-Harvest Testing.</u>  Cross Creek shall provide representatives of Companion Ag, INC. with reasonable access to the Property in order to monitor cultivation. Cross Creek shall provide Companion Ag, INC. with not less than three (3) days' prior notice of any proprietary cannabinoid content testing prior to harvest as well as any scheduled CDA testing and harvest. Cross Creek shall permit representatives of Companion Ag, INC. to be present for such testing and shall provide Companion Ag, INC. with all testing results.

    b.  <u>Post Delivery Testing.</u>  Companion Ag, INC. may, but is not obligated to, test or engage an independent third party testing facility to test (a "<u>Testing Facility</u>"), the Raw Materials for compliance with the Laws. If such Testing Facility finds that a Product is not compliant with the Laws, Cross Creek will pay for all costs associated with such tests. If such Testing Facility finds that the Raw Materials are compliant with the Laws, Companion Ag, INC. will pay for all costs associated with such tests. Companion Ag, INC. or the Testing Facility that tests the Raw Materials may release the results of such tests to governmental authorities without Cross Creek's permission.

6.  **Delivery**. All Raw Materials shall be shipped 23298 US HWY 160, Springfield, Colorado. Title to and risk of loss on the Raw Materials shall remain with Companion Ag, INC. throughout the entire cultivation, delivery, and processing period.

7.  **Invoice; Payment Delivery Terms**.
    a.  Payments will be made to Cross Creek based on quantity of product invoiced during a given month. Payments to the growing party will be issued at the end of the month after the invoicing period.
    b.  Amount paid will be calculated based on average pricing figures listed in the index *Hemp Benchmarks* for the month prior to the invoicing period. The price paid to the growing party will be calculated using the midpoint between the listed low and assessed price on the index.
        i.  IE: Payments made to the client for the product sold from 1 Feb 2021 – 28 Feb 2021 will be issued on 30 March 2021, and will be calculated based off of the listed index pricing from 1 Jan 2021 – 31 Jan 2021.
    c.  In the event that the crop fails to produce 500 lbs/acre of milled, refined flower material, Cross Creek farms will only receive additional compensation from the sale of finished goods up to their total amount of projected farming costs over $600,000.00 at the signing of this contract.
    d.  The total amount paid to Cross Creek Farms for land lease and farming costs ($600,000.00) will be deducted from the first payment due to Cross Creek for finished goods sold.
    e.  In the event that more than 180 days have passed since the receival of the biomass by Jordan Process from Cross Creek Farms, and Jordan Process has failed to make the first payment for finished goods sold to Cross Creek Farms, Jordan Process shall remit a one-time payment to

EXHIBIT E-8

Cross Creek Farms in the amount of the total costs incurred by Cross Creek Farms in addition to the $600,000.00 to raise the crop. This amount will be withheld from the first payment from Jordan Process to Cross Creek Farms when finished goods sales are realized.

8.

9. **Term; Termination Fee**.

   a. Term; Renewal Term. The Term of this Agreement shall be for one year from the Effective Date (the "Term"). The Parties may renew this Agreement for additional terms upon execution of a writing signed by both parties.

   b. Termination. Notwithstanding any other provision of this Agreement to the contrary, either party may terminate this Agreement upon (i) any act or omission constituting gross negligence or willful misconduct by the other party; (ii) a breach by the other party of any term, condition, covenant, representation or warranty set forth in this Agreement that remains uncured forty five (45) days after receipt of written notice thereof; or (iii) the inability of the parties to agree on revised pricing for a period as such is reviewed and negotiated. Additionally, either Party may terminate this Agreement immediately if the other party files for bankruptcy or reorganization, becomes insolvent, or makes a general assignment for the benefit of its creditors.

   c. Effect of Termination. Upon a termination of this Agreement, (i) Companion Ag, INC. will pay all outstanding Cross Creek Profit Share amounts incurred prior to the date of termination; and (ii) both parties will fully cooperate in all phases of the termination, and each party will return to the other party all copies of Proprietary Information disclosed or provided to that party in written or other tangible form.  After termination neither party may retain or use the Proprietary Information in any fashion or form.  Neither party will have any liability to the other party for loss, cost or damage directly or indirectly resulting from any rightful termination, including but not limited to any loss of future profits, or any expenses incurred or claimed to have been incurred by the other party in reliance upon the continued effectiveness of this Agreement, provided, however, that the foregoing will not affect any indebtedness then due and owing between the parties or any other rights or remedies of the parties relating to the performance, nonperformance or other actions in violation of this Agreement.

8. **Representations and Warranties.**

   a. Representations and Warranties of Cross Creek. Cross Creek represents and warrants to Companion Ag, INC. as follows: (i) Cross Creek is a Limited Partnership duly organized and in good standing under the laws of the State of New Mexico ; (ii) the execution, delivery and performance of this Agreement by Cross Creek has been duly authorized by all necessary action on the part of Cross Creek's members, managers or officers, as applicable, and does not violate, conflict with, or require the consent or approval of any third party pursuant to, any contract or legally binding obligation to which Cross Creek is subject; (iii) Cross Creek shall not infringe upon any trademark, copyright, patent or other intellectual property right (collectively, "Intellectual Property"); (iv) this Agreement constitutes the valid and binding obligation of Cross Creek enforceable against Cross Creek in accordance with its terms. The provisions of this Section 8(a) shall survive termination of this Agreement.

3

**EXHIBIT E-8**

*Lm*

   **b.** <u>Representations and Warranties of Companion Ag, INC.</u>. Companion Ag, INC. represents and warrants to Cross Creek as follows: (i) Companion Ag, INC. is a corporation duly organized and in good standing under the laws of the State of Wyoming (ii) the execution, delivery and performance of this Agreement by Companion Ag, INC. has been duly authorized by all necessary action on the part of Companion Ag, INC.'s members, managers and officers, as applicable, and does not violate, conflict with, or require the consent or approval of any third party pursuant to, any state or local law or regulation applicable to Companion Ag, INC. or any contract or legally binding obligation to which Companion Ag, INC. is subject; and (iii) this Agreement constitutes the valid and binding obligation of Companion Ag, INC. enforceable against Companion Ag, INC. in accordance with its terms. The provisions of this Section 8(b) shall survive termination of this Agreement.

**9.** **<u>Confidentiality; Proprietary Information; Trade Secrets</u>**. All proprietary, confidential and secret business and technical information, including but not limited to formulas, recipes, plans or strategies, processing or equipment designs, methodologies and other technology, disclosed in writing, mechanically and/or orally, or ascertained by virtue of observation (the "<u>Proprietary Information</u>"), pursuant to this Agreement shall be maintained in secrecy by the receiving party, using the same safeguards as it uses to protect its own commercially confidential information of a similar character, but at least using reasonable care, and the receiving party shall not use, except for evaluation as provided herein, or disclose in any manner to any third party any such received Proprietary Information without the prior express written consent of the other party, unless or until such information is:

   **a.** proven to be already known to or otherwise in the possession of the receiving party at the time of receipt from the other party hereto pursuant to this Agreement as established by the receiving party's pre-existing written records;

   **b.** publicly available or otherwise in the public domain; or

   **c.** rightfully obtained by the receiving party from any third party without restriction and without breach of a similar Agreement by the receiving party; or

   **d.** proven to be independently developed by the receiving party by the receiving party's pre-existing written records; or

   **e.** disclosed without restriction pursuant to valid court order *provided* the receiving party has notified the furnishing party prior to such disclosure and cooperates with the furnishing party in the event the furnishing party elects to legally contest and avoid such disclosure.

Each Party expressly agrees that, for the purposes of this Agreement, Proprietary Information is not to be treated as in the public domain merely because each or any specific item of information is known to someone or is embraced by more general information in the public domain, and that all documents, drawings, spreadsheets, writings and information of any kind constituting confidential information is proprietary. The provisions of this Section 9 shall survive termination of this Agreement.

Cross Creek expressly acknowledges and agrees, that all rights in and to the Proprietary Information relating to the seed provided by Companion Ag, INC. (including the goodwill related thereto) shall remain vested in Companion Ag, INC. both during the Term and thereafter, and that all use of such Proprietary Information by Cross Creek and all goodwill derived therefrom shall inure solely to the benefit of and be on behalf of Companion Ag, INC.. The Licensee shall not: (a) assert rights to the Proprietary Information

4

**EXHIBIT E-8**

*Lm*

related to such seeds provided by Companion Ag, INC.; or (b) by itself, or through a third party, seek to replicate, clone, re-use, duplicate, reverse engineer or otherwise misappropriate such Proprietary Information related to such seed provided by Companion Ag, INC..

10. **Inspections and Testing/Reports**. Each Party shall maintain books and records with respect to the Services to be provided hereunder and the compensation to be paid hereunder, which shall be provided to the other Party for review as requested. Upon execution hereof, Companion Ag, INC. and/or its representatives will have the right at any time during regular operating hours, and after reasonable prior notice to Cross Creek, to: (i) inspect any production and/or storage facility of Cross Creek that produces or stores Raw Materials; (ii) inspect and audit Cross Creek's records relating to the production and delivery of Raw Materials; and (iii) test or cause to be tested samples of the Raw Materials, at Companion Ag, INC.'s cost and expense, that Cross Creek produces under this Agreement. Cross Creek will fully cooperate with Companion Ag, INC. in connection with all such inspections and tests. Companion Ag, INC.'s right to test, and actual testing of, samples of Raw Materials will in no manner relieve Cross Creek of its obligations under this Agreement to produce Raw Materials according to the specifications and to comply with all applicable governmental laws, rules and regulations in the manufacturing, selling and delivery of Raw Materials to Companion Ag, INC.. Upon execution hereof, Cross Creek and/or its representatives will have the right at any time during regular operating hours, and after reasonable prior notice to Companion Ag, INC., to: (i) inspect any production and/or storage facility of Companion Ag, INC. that produces or stores Finished Products; and (ii) inspect and audit Cross Creek's records relating to the production, delivery and/or sale of Finished Products.

11. **Dispute Resolution**. The Parties agree to work in good faith to participate in mediation prior to any Party bringing any legal claim related to this Agreement. In the event mediation does not resolve a dispute, such dispute will be determined by binding arbitration. The arbitrator will be selected from the roster of arbitrators at Judicial Arbiter Group, Inc. in Denver, Colorado ("JAG"), unless the Parties agree otherwise. If the Parties do not agree on the selection of a single arbitrator within ten (10) days after a demand for arbitration is made, then the arbitrator will be selected by JAG from among its available professionals. The arbitration will be held in Denver, Colorado, and proceed under the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), except the Parties are not be required to initiate the arbitration through the AAA nor pay any associated fees to the AAA. Arbitration of all disputes, and the outcome of the arbitration, will remain confidential between the Parties except as necessary to obtain a court judgment on the award or other relief or to engage in collection of the judgment. The substantially prevailing Party in any arbitration case will be entitled to attorney's fees, costs, and other relief deemed reasonable and necessary by the arbiter. BY AGREEING TO BINDING ARBITRATION THE PARTIES WAIVE THEIR RIGHT TO A JURY TRIAL AND WAIVE THE RIGHT TO APPEAL THE ARBITRATION AWARD UNDER MOST CIRCUMSTANCES

12. **No Liability for Certain Damages**.
NEITHER PARTY SHALL IN ANY EVENT BE LIABLE TO THE OTHER PARTY OR ITS RESPECTIVE SUBSIDIARIES, AFFILIATES, FRANCHISEES OR OPERATORS FOR ANY TYPE OF INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES (SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFITS OR BUSINESS OPPORTUNITY) ARISING FROM A PARTY'S PERFORMANCE OR FAILURE TO PERFORM UNDER ANY OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY SUCH DAMAGES ATTRIBUTABLE TO A BREACH OF ANY TERM OR PROVISION OF THIS AGREEMENT.

13. **Indemnity**. Each party shall defend and indemnify the other and such indemnified party's affiliates, shareholders, directors, employees, agents, successors and assigns from and against any and all loss, damage, injury, liability, cost or expense (including reasonable attorneys' fees and expenses) which

**EXHIBIT E-8**

DocuSign Envelope ID: 013DFE3C-49B9-486D-BD5A-3BF3A076EC71

any of them may suffer or incur as a result and to the extent of the gross negligence or intentional wrongful act or omission by the indemnifying party , or a breach by the indemnifying party of the terms and conditions of this Agreement. The indemnities in this Section 13 are contingent upon: (i) the indemnified party promptly notifying the indemnifying party in writing of any action or other proceeding which may give rise to a claim for indemnification hereunder; (ii) the indemnifying party being allowed to control the defense and settlement of such claim; and (iii) the indemnified party reasonably cooperating with the indemnifying party (at the indemnifying party's expense) in providing information relevant to the defense or settlement of a claim. The indemnified party shall have the right, at its option and expense, to participate in the defense of any action or proceeding through counsel of its own choosing.

14. **Insurance** Companion Ag has the right to insure Cross Creek's 500 acres underneath their crop insurance program, with the following inclusions for Cross Creek Farms:
   a. In the event of crop failure and subsequent insurance payout, the funds will be allocated accordingly:
   b. The first $600,000.00 will go to Companion Ag to cover their costs on the crop.
   c. Any additional funds will be distributed to Cross Creek Farms up to their additional costs of cultivation as projected in their farming costs proposal at planting.
   d. Any insurance funds paid out in addition to the above amounts will be distributed to Companion Ag.

15.

16. **Public Release of Information**. Neither party shall disclose, either directly or indirectly, to any other person or entity this Agreement, the terms herein or the existence or nature of the relationship created hereunder, without the prior written consent of the other party or unless required by law, *provided* the party receiving the request for disclosure required by law has notified the other party prior to such disclosure and cooperates with the other party in the event the other party elects to legally contest and avoid such disclosure.

17. **Entire Agreement.** This Agreement, together with the addendum and exhibits attached hereto and thereto, contain all of the terms and conditions agreed upon by the parties hereto with reference to the subject matter hereof and supersedes all prior agreements and negotiations with respect to the subject matter hereof.  This Agreement cannot be modified or changed except by written instrument signed by all parties hereto.

18. **Independent Contractor; Scope of Authority**.   The relationship between Cross Creek and Companion Ag, INC. is that of independent contractor, and nothing contained in this Agreement shall any party a partner, agent, employee, joint venturer, dealer or franchisee of any other party.  No party may bind another unless specifically authorized to do so in writing.

19. **Employees; Agents; Representatives**. Employees, agents and/or representatives, if any, of either party, who perform services for either party pursuant to this Agreement shall also be bound by the provisions of this Agreement.

20. **Assignment**. This Agreement shall be binding and inure to the benefit of the successors and permitted assigns of the parties hereto.  Neither party may assign this Agreement without the prior written approval of the other party.

21. **Expenses.** Each Party to this Agreement shall bear all of its own expenses in connection with the execution, delivery and performance of this Agreement and the transactions contemplated hereby, including without limitation all fees and expenses of its agents, representatives, counsel and accountants.

EXHIBIT E-8

DocuSign Envelope ID: 043DFE2C-4998-4860-BD5A-3053A076CC71

22. **Paragraph Headings**. The headings and subheadings of clauses contained herein are used for convenience and ease of reference and shall not limit the scope or intent of the clause.

23. **Force Majeure**. Neither party shall be liable to the other party for any failure or delay in performance of any obligation under this Agreement due to causes reasonably beyond the control of the other party charged with performance.

24. **Governing Law**. This Agreement shall be governed and construed in accordance with the laws of the State of Colorado with regard to the conflict of laws provisions thereof.

25. **Attorneys' Fees**. The substantially prevailing party in any action or proceeding brought to enforce or interpret this Agreement shall be awarded and receive its costs and reasonable attorneys' fees.

26. **Modification of Agreement**. The terms and conditions contained in this Agreement shall not be added to, modified, superseded or otherwise altered except by a written modification signed by authorized representatives of the parties. This Agreement supersedes all prior agreements and understandings between the parties regarding supply agreements and no amendment, change or modification hereof shall be binding unless in writing and signed by the parties hereto.

27. **No Waiver of Conditions**. No provision of this Agreement shall be deemed to have been waived, except if such waiver is contained in a written instrument executed by the party against whom such waiver is to be enforced. No waiver by a party of any term or condition of this Agreement shall constitute a waiver by such party of any prior, concurrent or subsequent breach or default of the same or any other term or condition of this Agreement.

28. **Notices and Correspondence**. All notices, demands, requests and other communications required or permitted hereunder shall be in writing and shall be (i) personally delivered with a written receipt of delivery; (ii) sent by a nationally recognized overnight delivery service requiring a written acknowledgement of receipt or providing a certification of delivery or attempted delivery; (iii) sent by certified or registered mail, postage prepaid, with return receipt requested; or (iv) sent by facsimile (receipt confirmed electronically and promptly confirmed by mail, overnight courier or personal delivery to the recipient), to the attention of the individual shown below at the address set forth below, or to such other address, attention of such individual, as either party may from time to time designate in writing to the other in accordance herewith. All notices shall be deemed effective when actually delivered as documented in a delivery or confirmation receipt.

| | |
|---|---|
| If to Companion Ag, INC.: | If to Cross Creek: |
| RMH Holdings, Inc. | Cross Creek LP |
| d/b/a Companion Ag, INC. Corporation | ATTN: Larry Mason |
| ATTN: Peyton Palaio | PO Box 854 |
| 1880 west oak parkway | Dalhart, TX 79022 |
| suite 214 | |
| Marietta, GA 30062 | |

28. **Counterparts; Signature**. This Agreement may be executed in several counterparts, and each counterpart shall constitute one Agreement binding on all parties hereto, notwithstanding that all of the

**EXHIBIT E-8**

parties are not signatory to an original or same counterpart. This Agreement may be executed by facsimile signature or electronically.

29. **Survival.** In the event that this Agreement is terminated or expires by its terms, such expiration or termination shall not affect any liability or other obligation which shall have accrued prior to such termination.

30. **Further Assurances.** Upon a Party's reasonable request, the other Party shall, at its sole cost and expense, execute and deliver all further documents and instruments, and take all further acts, as are reasonably necessary to give full effect to this Agreement.

<div align="center">SIGNATURE PAGE TO FOLLOW</div>

**EXHIBIT E-8**

Case No. 1:23-cv-02323-MDB   Document 1-3   filed 09/11/23   USDC Colorado   pg 10 of 13
DocuSign Envelope ID: 013DFE2C-49D3-486D-BDEA-3052A076CC71
Case 2:24-cv-00228-WBV-DPC   Document 132-44   Filed 06/30/25   Page 298 of 489

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and the year first above written.

**Cross Creek**                                          **Companion Ag, INC.**

By: _Larry Mason_   5-11-2020            By: _Peyton Palaio_
    Larry Mason, General Partner              Peyton Palaio, President

**EXHIBIT E-8**

# EXHIBIT F-1

 *molecules* 

*Article*

# Human Mitragynine and 7-Hydroxymitragynine Pharmacokinetics after Single and Multiple Daily Doses of Oral Encapsulated Dried Kratom Leaf Powder

**Marilyn A. Huestis** [1,*] ⓘ**, Martin A. Brett** [2] ⓘ**, John Bothmer** [3] **and Ramsey Atallah** [4]

1   Institute of Emerging Health Professions, Thomas Jefferson University, Philadelphia, PA 19107, USA
2   PK Consultant, 50259 Pulheim, Germany; martin.brett@gmx.net
3   JB Pharma Consulting, 6418PR Heerlen, The Netherlands; john.bothmer@jbpharmaconsult.nl
4   Della Terra Pharmaceuticals, Atlanta, GA 30309, USA; ramseya@dellaterrapharma.com
*   Correspondence: marilyn.huestis@jefferson.edu; Tel.: +1-410-544-2456

**Abstract:** Kratom leaves, consumed by millions worldwide as tea or ground leaf powder, contain multiple alkaloids, with mitragynine being the most abundant and responsible for most effects. Mitragynine is a partial μ-opioid receptor agonist and competitive antagonist at κ- and δ-opioid receptors; however, unlike morphine, it does not activate the β-arrestin-2 respiratory depression pathway. Due to few human mitragynine data, the largest randomized, between-subject, double-blind, placebo-controlled, dose-escalation study of 500–4000 mg dried kratom leaf powder (6.65–53.2 mg mitragynine) was conducted. LC-MS/MS mitragynine and 7-hydroxymitragynine plasma concentrations were obtained after single and 15 daily doses. Mitragynine and 7-hydroxymitragynine $C_{max}$ increased dose proportionally, and AUC was slightly more than dose proportional. The median mitragynine $T_{max}$ was 1.0–1.3 h after single and 1.0–1.7 h after multiple doses; for 7-hydroxymitragynine $T_{max}$, it was 1.2–1.8 h and 1.3–2.0 h. Steady-state mitragynine concentrations were reached in 8–9 days and 7-hydroxymitragynine within 7 days. The highest mean mitragynine $T_{1/2}$ was 43.4 h after one and 67.9 h after multiple doses, and, for 7-hydroxymitragynine, it was 4.7 and 24.7 h. The mean 7-hydroxy-mitragynine/mitragynine concentration ratios were 0.20–0.31 after a single dose and decreased (0.15–0.21) after multiple doses. These mitragynine and 7-hydroxymitragynine data provide guidance for future clinical kratom dosing studies and an interpretation of clinical and forensic mitragynine and 7-hydroxymitragynine concentrations.

**Keywords:** mass spectrometry; metabolism; analytical toxicology; mitragynine; kratom; 7-hydroxymitragynine



**Citation:** Huestis, M.A.; Brett, M.A.; Bothmer, J.; Atallah, R. Human Mitragynine and 7-Hydroxymitragynine Pharmacokinetics after Single and Multiple Daily Doses of Oral Encapsulated Dried Kratom Leaf Powder. *Molecules* **2024**, *29*, 984. https://doi.org/10.3390/molecules29050984

Academic Editor: Laura Mercolini

Received: 1 January 2024
Revised: 21 January 2024
Accepted: 26 January 2024
Published: 23 February 2024



**Copyright:** © 2024 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

The kratom (*Mitragyna speciosa* Korth.) tree is a Southeast Asian tropical evergreen in the Rubiaceae family related to the coffee tree [1]. The oral consumption of kratom leaves dates back hundreds of years in Southeast Asia, where the leaves are typically chewed fresh, brewed into a tea, or processed into tar-like extracts [2]. Millions consume kratom worldwide as food, dried leaf powders in capsules, concocted into beverages or teas, or as processed extracts [3–5].

Multiple alkaloids are present in kratom including mitragynine, speciogynine, speciociliatine, paynantheine, and other indoles and oxindoles [6–8], with their content varying based on geographic location, seasonal variation, and plant part used [9–11]. Mitragynine (IUPAC methyl (16E)-9,17-dimethoxy-16,17-didehydro-20β-corynan-16-carboxylate) is the most abundant alkaloid present in kratom and is responsible for many of its effects, although research into the contributions of kratom's other alkaloids is increasing [12–15]. Mitragynine is metabolized to 7-hydroxymitragynine (IUPAC methyl (2E)-2-[(2S,3S,7aS,12bS)-3-ethyl-7a-hydroxy-8- methoxy-1,2,3,4,6,7,7a,12b-octahydroindolo[2,3-a]quinolizin-2-yl]-3-methoxyprop-2-enoate), which is not found in measurable amounts in fresh kratom leaves [10,16]. Chemical structures

**EXHIBIT F-1**

*Molecules* **2024**, *29*, 984

for both mitragynine and its metabolite 7- hydroxymitragynine are shown in Figure 1. Mitragynine and 7-hydroxymitragynine are partial agonists of the human µ-opioid receptor and competitive antagonists at κ- and δ-opioid receptors [17]. Mitragynine has a lower affinity and potency than morphine at the µ-opioid receptor and is unable to induce comparable phosphorylation and GTPγS stimulation [18]. Unlike full µ-opioid agonists, such as morphine and fentanyl, mitragynine does not activate the β-arrestin-2 pathway implicated in the adverse effects of µ-opioid agonists including respiratory depression and constipation [19,20]. Reduced respiratory depression of mitragynine compared to codeine was reported more than 50 years ago [14].



**Figure 1.** Chemical structures of mitragynine and 7-hydroxy-mitragynine.

Furthermore, mitragynine and 7-hydroxymitragynine are also bound to adrenergic ($\alpha_1$ and $\alpha_2$) and serotonergic (5-HT$_{1A}$ and 5-HT$_{2B}$) receptors, producing a different profile of effects than prototypical opioids [16,21–23]. Currently, based on this unique pharmacology, there is substantial interest in the development of synthetic medicinal compounds built on the chemical scaffolding of kratom alkaloids for analgesia, namely, for the treatment of opioid withdrawal and opioid use disorder [17,19,24].

Despite the widespread availability and use of kratom, there are few controlled administration studies of mitragynine and 7-hydroxymitragynine exposure from well-characterized kratom products. In the only controlled kratom administration study prior to 2022, plasma mitragynine concentrations were determined in 10 chronic male kratom users after drinking different low kratom tea doses for 7 days [25]. More recently, mitragynine and 7-hydroxymitragynine pharmacokinetics were reported in five participants over 120 h after a single 39 mg mitragynine dose in 2 g kratom tea [26]. These authors also investigated the drug interactions of the same single kratom dose to 12 subjects [27].

Due to the dearth of controlled mitragynine and 7-hydroxymitragynine concentration data and the increasing intake of kratom around the world, pharmacokinetic data are needed for designing future kratom studies and for interpreting mitragynine and 7-hydroxymitragynine concentrations in clinical and forensic investigations. The primary objective of this study was to determine the pharmacokinetics of single doses (SDs), and, for the first time, 15 consecutive daily oral ascending doses (MDs) of dried kratom leaf powder in healthy adults. Pharmacokinetic data obtained after single and multiple dosing included the following: the time course of mitragynine and 7-hydroxymitragynine concentrations over 10 days after a single dose and 23 days after multiple dosing, dose-proportionality, times to reach steady state, half-lives and 7-hydroxy-mitragynine/mitragynine ratios.

## 2. Results

### 2.1. Participants

Twelve participants received active leaf powder (except 13 for the highest dose, due to one participant being replaced). A minimum of one SD or one MD pharmacokinetic parameter, in most cases, the C$_{max}$, was required for inclusion in the SD or MD pharmacokinetic dataset. If participants voluntarily withdrew or were withdrawn from the study due to

EXHIBIT F-1

*Molecules* **2024**, *29*, 984

adverse events, or failed to follow study protocols and were withdrawn during the SD or MD phases of the study, they did not have MD pharmacokinetic data. The pharmacokinetic study for MD occurred after the last MD, resulting in a smaller number of subjects with MD pharmacokinetic data. Table 1 includes participants' demographic data.

**Table 1.** Participants' demographic data.

| Mitragynine Dried Kratom Leaf Powder | 6.65 mg 500 mg | | 13.3 mg 1000 mg | | 26.6 mg 2000 mg | | 53.2 mg 4000 mg | |
|---|---|---|---|---|---|---|---|---|
| | SD | MD | SD | MD | SD | MD | SD | MD |
| # Subjects | 12 | 11 | 12 | 8 | 12 | 9 | 13 | 9 |
| Gender | 6 F 6 M | 6 F 5 M | 4 F 8 M | 3 F 5 M | 4 F 8 M | 3 F 6 M | 7 F 6 M | 4 F 5 M |
| Race | | | | | | | | |
| AI | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| Asian | 2 | 2 | 5 | 3 | 1 | 0 | 0 | 0 |
| Black | 0 | 0 | 0 | 0 | 4 | 2 | 1 | 1 |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| White | 10 | 9 | 7 | 5 | 7 | 7 | 9 | 5 |
| Ethnicity | 2 H 10 NH | 2 H 9 NH | 1 H 11 NH | 1 H 7 NH | 0 H 12 NH | 0 H 9 NH | 3 H 10 NH | 3 H 6 NH |
| Mean age (STD) years | 30.8 (9.3) | 31.3 (9.5) | 32.9 (9.4) | 33.1 (9.8) | 35.8 (11.4) | 38.4 (12.2) | 33.2 (9.8) | 32.4 (7.8) |
| BMI Kg/m$^2$ | 23.1 (2.7) | 22.8 (2.6) | 25.3 (2.6) | 25.3 (2.7) | 26.2 (3.4) | 25.7 (3.8) | 23.4 (2.9) | 23.9 (3.1) |

SD, single-dose phase; MD, multiple-dose phase; AI, American Indian or Alaska Native; H, Hispanic; NH, not Hispanic; STD, standard deviation; BMI, body mass index.

### 2.2. Bioanalysis

The analytical method for mitragynine and 7-hydroxymitragynine was fully validated according to the FDA Guidance for Industry (May 2018) and EMA Guideline on Bioanalytical Method Validation EMEA/CHMP/EWP/192217/2009 Rev.1 Corr. 2, effective February 2012. Blood was collected with $K_2$-EDTA anticoagulant and drawn at specified time points before centrifuging and removing plasma within 2 h. The sample pretreatment consisted of protein precipitation of 100 μL of plasma, and the internal standards were mitragynine-D3 and 7-hydroxymitragynine-D3. Mitragynine and 7-hydroxymitragynine were identified and quantified using reversed-phase ultra-high-performance liquid chromatography/tandem mass spectrometry with MS/MS detection. Carryover was not observed at the highest calibrator concentration. Table 2 includes the most important validation data for mitragynine and 7-hydroxymitragynine. Figure 2 includes LC-MS/MS chromatograms of a blank, the lower limit of quantification, and an authentic plasma sample collected at 1.33 h after one participant received 13.3 mg mitragynine in 1000 mg of dried kratom leaf, achieving 46 ng/mL mitragynine and 7.3 ng/mL 7-hydroxymitragynine plasma concentrations.

**Table 2.** Validation data for the LC-MS/MS quantification of mitragynine and 7-hydroxymitragynine in human plasma.

| Validation Parameter | Mitragynine | 7-Hydroxymitragynine |
|---|---|---|
| Linearity | 0.5–500 ng/mL | 0.5–100 ng/mL |
| Lower limit of quantification | 0.5 ng/mL | 0.5 ng/mL |
| Quality control (QC) concentrations | 0.5, 1.5, 250, and 375 ng/mL | 0.5, 1.5, 50, and 75 ng/mL |
| Within-run accuracy (% bias) | −11.7–11.2% | −9.7–13.6% |

*Molecules* **2024**, *29*, 984

**Table 2.** *Cont.*

| Validation Parameter | Mitragynine | 7-Hydroxymitragynine |
|---|---|---|
| Within-run precision (%CV) | 1.4–10% | 1.2–7.4% |
| Between-run accuracy (% bias) | −0.6–2.2% | 2.4–10.4% |
| Between-run precision (%CV) | 3.9–9.3% | 4.2–10% |
| Internal standard normalized matrix factors for low and high QC | 1.00–1.02 (CV 0.7–2.2%) | 0.995–1.04 (CV 1.0–2.0%) |
| 10-fold dilution integrity %bias (%CV) | −1.7% (3.0%) | −3.0 (2.8%) |
| Plasma stability for low and high QC | | |
| 22 °C for 23 h (% bias) | −0.6–4.4% | 4.4–5.8% |
| −20 °C for 404 days (% bias) | 6.7–9.1% | −1.5–−3.1% |
| −80 °C for 404 days (% bias) | 8.4–8.9% | 9.2–11.6% |
| 4 freeze-thaw cycles (% bias) | 0.4–5.3% | 4.6–10.3% |
| Autosampler stability 4 °C 241 h (% bias) | −2.9–0.1% | −2.9–−3.8% |



**Figure 2.** LC-MS/MS chromatograms of blank plasma, plasma fortified at the lower limit of quantification (0.5 ng/mL) for mitragynine and 7-hydroxymitragynine and an authentic plasma sample collected at 1.33 h after the participant received 13.3 mg of mitragynine in 1000 mg of dried kratom leaf, achieving plasma concentrations of 46 ng/mL of mitragynine and 7.3 ng/mL of 7-hydroxymitragynine. Arrows in the blank chromatogram indicate retention time of mitragynine and 7-hydroxymitragynine.

*2.3. Pharmacokinetics*

Figure 3 illustrates the mean ± standard deviation plasma concentration profiles of mitragynine and 7-hydroxymitragynine after SD and MD oral 500, 1000, 2000, and 4000 mg encapsulated dried kratom leaf powder doses containing 6.65, 13.3, 26.6, and 53.2 mg of mitragynine, respectively.

**EXHIBIT F-1**



**Figure 3.** Mean plasma concentration profiles of (**a**) mitragynine (including standard deviation bars) after a single dose (SD); (**b**) mitragynine after 15 multiple doses (MD); (**c**) 7-hydroxymitragynine after an SD; (**d**) 7-hydroxymitragynine after 15 MD mitragynine for all four dried kratom leaf powder doses. Each dose was administered to a different cohort of healthy male and female subjects.

Table 3 contains mean (standard deviation) and median (range) plasma mitragynine pharmacokinetic parameters after SD and MD kratom leaf powder. $C_{max}$ and AUC increased with each SD and MD escalation. The SD median $T_{max}$ was fairly consistent from 1.0 to 1.3 h over these doses and similar to mitragynine MD 1.0–1.7 h $T_{max}$. The median terminal half-life and time to last quantifiable concentration generally increased with the dose since plasma concentrations were detectable over a longer period. The highest mitragynine median $T_{1/2}$ was 42.9 h after the highest 53.2 mg SD, and 61.2 h after the 26.2 mg MD. Fluctuation of the mitragynine concentrations across the dosing interval after MD at steady state ranged from 3.3 to 5.6, with lower values observed at higher doses. Dose proportionality of mitragynine was demonstrated based on $C_{max}$ and $C_{max,ss}$ during SD and MD. However, $AUC_{0-Tlast}$ and $AUC_{0-tau,ss}$ did not fulfill the proportionality criterion, with increases slightly higher (1.42 SD and 1.33 MD) than dose proportionality predicted.

**Table 3.** Mean (standard deviation) and median (range) plasma pharmacokinetic parameters for mitragynine after administration of increasing single (SD) and 15 multiple doses (MD) of mitragynine in dried kratom leaf powder.

|  |  | Cohort 1 6.65 mg | Cohort 2 13.3 mg | Cohort 3 26.6 mg | Cohort 4 53.2 mg |
|---|---|---|---|---|---|
| Single dose |  | $n = 12$ | $n = 12$ | $n = 12$ | $n = 13$ |
| $C_{max}$ (ng/mL) | mean (STD) median (range) | 17.1 (15.2) 12.1 (1.8–61.5) | 32.1 (12.2) 29.0 (16.0–58.1) | 57.0 (25.1) 57.4 (20.4–90.0) | 125 (51.8) 130 (34.2–204) |
| $T_{max}$ (h) | median (range) | 1.0 (0.8–2.7) | 1.3 (0.8–1.7) | 1.3 (0.8–5.0) | 1.3 (0.8–2.0) |

**Table 3.** *Cont.*

| | | Cohort 1 6.65 mg | Cohort 2 13.3 mg | Cohort 3 26.6 mg | Cohort 4 53.2 mg |
|---|---|---|---|---|---|
| $T_{last}$ (h) | median | 12.0 | 23.4 | 71.6 | 120 |
| | (range) | (4.0–71.0) | (12.0–72.2) | (0.8–120) | (23.7–169) |
| $AUC_{0-24}$ (h*ng/mL) | mean (STD) | 41.4 (32.4) | 108 (40.6) | 244 (121) | 558 (250) |
| | median | 30.6 | 101 | 280 | 648 |
| | (range) | (3.6–111) | (52.8–183) | (3.3–375) | (155–970) |
| $AUC_{0-Tlast}$ (h*ng/mL) | mean (STD) | 45.8 (42.2) | 120 (57.7) | 305 (164) | 837 (466) |
| | median | 30.6 | 101 | 357 | 839 |
| | (range) | (3.6–137) | (52.8–237) | (3.3–480) | (179–1746) |
| $AUC_{0-inf}$ (h*ng/mL) | mean (STD) | 52.8 (51.1) | 136 (72.3) | 364 [1] (154) | 908 (520) |
| | median | 34.8 | 108 | 417 [1] | 903 |
| | (range) | (4.7–162) | (58.1–288) | (98.4–517) | (191–1951) |
| $AUC_{0-Tlast}/$ $AUC_{0-inf}$ | median | 0.91 | 0.92 | 0.92 | 0.93 |
| | (range) | (0.74–0.96) | (0.76–0.95) | (0.87–0.95) | (0.88–0.96) |
| $T_{1/2}$ (h) | mean (STD) | 8.5 (11.8) | 15.8 (16.3) | 29.3 [1] (17.5) | 43.4 (23.3) |
| | median | 3.7 | 10.5 | 28.2 [1] | 42.9 |
| | (range) | (1.5–35.0) | (2.4–53.9) | (4.4–55.2) | (8.3–84.5) |
| $CL/F$ (L/h) | mean (STD) | 278 (369) | 123 (58.1) | 102 [1] (79.8) | 94.0 (84.1) |
| | median | 191 | 123 | 63.7 [1] | 58.9 |
| | (range) | (40.9–1424) | (46.2–229) | (51.4–270) | (27.3–278) |
| $Vz/F$ (L) | mean (STD) | 1349 (808) | 1892 (1013) | 2875 (871) | 3788 (1287) |
| | median | 1017 | 1786 | 2544 | 3314 |
| | (range) | (549–2998) | (615–4438) | (1733–4084) | (2104–6173) |
| Multiple doses | | $n = 11$ | $n = 8$ | $n = 9$ | $(n = 9)$ |
| $C_{max,ss}$ (ng/mL) | mean (STD) | 21.4 (18.9) | 33.5 (7.43) | 74.6 (22.8) | 143 (50.4) |
| | median | 16.2 | 35.1 | 73.0 | 155 |
| | (range) | (2.8–60.1) | (21.8–43.1) | (42.4–109) | (64.3–215) |
| $T_{max,ss}$ (h) | median | 1.0 | 1.7 | 1.7 | 1.7 |
| | (range) | (0.8–2.3) | (1.0–4.0) | (1.0–3.0) | (1.0–3.0) |
| $T_{last,ss}$ (h) | median | 23.9 | 95.4 | 168 | 169 |
| | (range) | (4.0–240) | (23.5–239) | (71.5–240) | (72.4–383) |
| $AUC_{0-tau,ss}$ (h*ng/mL) | mean (STD) | 85.1 (84.1) | 175 (79.8) | 457 (191) | 958 (393) |
| | median | 60.1 | 163 | 554 | 1021 |
| | (range) | (5.5–263) | (93.4–354) | (144–655) | (227–1444) |
| $T_{1/2,ss}$ (h) | mean (STD) | 25.7 [2] (24.0) | 44.1 (24.2) | 67.9 [3] (20.6) | 51.1 (15.9) |
| | median | 14.6 [2] | 40.6 | 61.2 [3] | 48.6 |
| | (range) | (2.4–64.4) | (8.9–78.5) | (46.6–99.6) | (31.3–83.8) |
| $CL/F$ (L/h) | mean (STD) | 215 (333) | 87.4 (32.0) | 74.6 (48.0) | 74.7 (61.7) |
| | median | 111 | 81.5 | 48.0 | 52.1 |
| | (range) | (25.3–1200) | (37.6–142) | (40.6–185) | (36.8–234) |
| $Vz/F$ (L) | mean (STD) | 2980 (1606) | 4755 (2072) | 6020 [3] (3552) | 4855 (2392) |
| | median | 2843 | 4033 | 5139 | 4595 |
| | (range) | (738–5482) | (1825–7872) | (2945–14,135) | (2311–10,634) |
| $C_{av,ss}$ (ng/mL) | mean (STD) | 3.6 (3.5) | 7.4 (3.3) | 19.3 (8.1) | 39.9 (16.6) |
| | median | 2.5 | 6.9 | 23.4 | 42.9 |
| | (range) | (0.2–11.0) | (4.0–14.8) | (6.2–27.9) | (9.3–60.9) |
| $C_{trough}$ (ng/mL) | mean (STD) | 1.40 (1.79) | 2.74 (1.61) | 7.70 (3.71) | 20.5 (12.2) |
| | median | 0.9 | 2.5 | 8.8 | 21.3 |
| | (range) | (0–5.3) | (0.7–5.8) | (2.3–12.3) | (3.4–39.7) |
| Fluctuation | mean (STD) | 6.54 (2.28) | 4.66 (1.44) | 3.94 (1.41) | 3.53 (1.37) |
| | median | 5.6 | 5.0 | 3.4 | 3.3 |
| | (range) | (4.5–11.8) | (2.5–6.8) | (2.2–6.8) | (2.0–6.7) |

[1] $n = 11$; [2] $n = 10$; [3] $n = 8$; STD, standard deviation; CL/F, apparent clearance; Vz/F, apparent volume of distribution.

The mean (standard deviation) and median (range) plasma pharmacokinetic parameters for 7-hydroxymitragynine after SD and MD oral mitragynine in kratom leaf powder are shown in Table 4. 7-hydroxymitragynine $C_{max}$ and AUC were lower than those of

**EXHIBIT F-1**

mitragynine but also increased in a dose-appropriate manner after SD and MD. The median 7-hydroxymitragynine $T_{max}$ was similar to mitragynine at 1.2–1.8 h and 1.3–2.0 h after SD and MD, respectively. Apparent increases in median $T_{1/2}$ were seen with increasing doses as for mitragynine, with a median (range) $T_{1/2}$ of 4.0 h (1.7–11.4) and 9.1 h (2.2–71.6) after the highest SD and MD, respectively. 7-hydroxymitragynine MD fluctuation was 3.4–9.8, with lower values at higher doses. 7-hydroxymitragynine dose proportionality was confirmed based on $C_{max}$ and $C_{max,ss}$ after SD and MD but was slightly greater than dose-proportional (1.18-fold) based on $AUC_{0-Tlast}$ after SD and 1.32-fold after MD based on $AUC_{0-tau,ss}$. Multiple concentration peaks were observed in some participants more than 4 h after SD and MD, suggesting that food consumption 4 h after kratom leaf powder dosing might have contributed to these later concentration peaks.

**Table 4.** Mean (standard deviation) and median (range) plasma pharmacokinetic parameters for 7-hydroxymitragynine after increasing single (SD) and 15 multiple doses (MD) of mitragynine in dried kratom leaf powder.

| | | Cohort 1<br>6.65 mg | Cohort 2<br>13.3 mg | Cohort 3<br>26.6 mg | Cohort 4<br>53.2 mg |
|---|---|---|---|---|---|
| Single dose | | $n = 12$ | $n = 12$ | $n = 12$ | $n = 13$ |
| $C_{max}$<br>(ng/mL) | mean (STD)<br>median<br>(range) | 3.6 (1.9)<br>3.6<br>(1.5–8.6) | 6.6 (1.1)<br>7.0<br>(4.8–7.8) | 10.8 (3.7)<br>11.0<br>(4.3–16.0) | 22.7 (7.7)<br>21.7<br>(12.5–38.6) |
| $T_{max}$<br>(h) | median<br>(range) | 1.2<br>(0.8–2.7) | 1.5<br>(1.0–2.3) | 1.8<br>(0.8–5.0) | 1.7<br>(1.0–2.3) |
| $T_{last}$<br>(h) | median<br>(range) | 5.0<br>(3.5–9.0) | 9.0<br>(6.0–12.1) | 12.0<br>(0.75–12.0) | 23.3<br>(9.0–71.6) |
| $AUC_{0-24}$<br>(h*ng/mL) | mean (STD)<br>median<br>(range) | 9.7 (5.4)<br>9.0<br>(2.9–19.3) | 25.8 (6.7)<br>25.3<br>(14.7–37.6) | 47.7 (22.4)<br>54.3<br>(0.7–78.8) | 125 (69.7)<br>115<br>(40.2–319) |
| $AUC_{0-Tlast}$<br>(h*ng/mL) | mean (STD)<br>median<br>(range) | 9.7 (5.4)<br>9.0<br>(2.9–19.3) | 25.8 (6.7)<br>25.3<br>(14.7–37.6) | 47.7 (22.4)<br>54.3<br>(0.7–78.8) | 130 (84.2)<br>115<br>(40.2–380) |
| $AUC_{0-inf}$<br>(h*ng/mL) | mean (STD)<br>median<br>(range) | 11.2 (5.6)<br>10.5<br>(4.1–21.0) | 28.8 (7.6)<br>28.0<br>(16.4–41.8) | 58.2 [1] (20.4)<br>64.5 [1]<br>(27.6–85.7) | 136 (86.6)<br>123<br>(41.6–391) |
| $AUC_{Tlast}/$<br>$AUC_{0-inf}$ | median<br>(range) | 0.85<br>(0.71–0.92) | 0.90<br>(0.87–0.92) | 0.91<br>(0.81–0.95) | 0.96<br>(0.93–0.97) |
| $T_{1/2}$<br>(h) | mean (STD)<br>median<br>(range) | 1.7 (0.5)<br>1.7<br>(1.0–2.4) | 2.9 (0.9)<br>2.7<br>(1.5–4.5) | 3.2 [1] (0.8)<br>3.4<br>(1.9–4.5) | 4.7 (2.7)<br>4.0<br>(1.7–11.4) |
| Multiple doses | | $n = 11$ | $n = 8$ | $n = 9$ | $n = 9$ |
| $C_{max,ss}$<br>(ng/mL) | mean (STD)<br>median<br>(range) | 3.2 (1.5)<br>3.3<br>(1.4–5.6) | 5.9 (1.5)<br>5.6<br>(4.3–8.1) | 11.3 (3.5)<br>12.0<br>(6.9–17.4) | 21.8 (6.1)<br>20.9<br>(13.3–31.7) |
| $T_{max,ss}$<br>(h) | median<br>(range) | 1.3<br>(0.8–3.0) | 1.7<br>(1.0–4.0) | 1.7<br>(1.3–3.0) | 2.00<br>(1.3–3.5) |
| $T_{last,ss}$<br>(h) | median<br>(range) | 5.0<br>(3.5–12.0) | 12.0<br>(6.0–23.9) | 23.5<br>(9.0–47.6) | 48.3<br>(9.0–121) |
| $AUC_{0-tau,ss}$<br>(h*ng/mL) | mean (STD)<br>median<br>(range) | 10.1 (6.8)<br>7.2<br>(3.2–22.9) | 28.0 (13.7)<br>27.3<br>(13.5–55.7) | 67.8 (31.3)<br>67.7<br>(25.0–119) | 133 (45.0)<br>128<br>(105–161) |

**Table 4.** *Cont.*

|  |  | Cohort 1 6.65 mg | Cohort 2 13.3 mg | Cohort 3 26.6 mg | Cohort 4 53.2 mg |
|---|---|---|---|---|---|
| $T_{1/2,ss}$ (h) | mean (STD) median (range) | 2.4 (1.3) 1.9 (1.1–5.3) | 3.8 (2.3) 3.2 (1.5–8.4) | 8.3 (5.0) 9.0 (2.1–16.7) | 24.7 (24.7) 9.1 (2.2–71.6) |
| $C_{ave,ss}$ (ng/mL) | mean (STD) median (range) | 0.4 (0.3) 0.3 (0.1–1.0) | 1.2 (0.6) 1.1 (0.6–2.3) | 2.9 (1.3) 2.9 (1.0–5.0) | 5.5 (1.9) 5.4 (1.6–8.2) |
| $C_{trough}$ (ng/mL) | mean (STD) median (range) | 0.0 (0.0) 0 (0–0) | 0.1 (0.3) 0 (0–0.7) | 0.6 (0.6) 0.6 (0–1.3) | 1.7 (1.0) 1.6 (0–3.2) |
| Fluctuation | mean (STD) median (range) | 8.8 (2.2) 9.8 (5.9–11.3) | 5.6 (2.1) 5.3 (2.7–8.9) | 4.3 (1.8) 3.4 (2.7–6.9) | 4.1 (1.7) 3.7 (2.3–8.2) |

[1] $n = 11$; STD, standard deviation.

## 2.4. Ratios of 7-Hydroxymitragynine/Mitragynine Plasma Concentrations

7-hydroxymitragynine/mitragynine concentration ratios are shown in Figure 4. Mean ratios were 0.20–0.29 based on $C_{max}$ and 0.21–0.31 based on $AUC_{0-24}$ after a SD, with the highest ratios observed after the lowest 6.65 mg mitragynine dose. A similar pattern was seen with MD, with mean ratios of 0.16–0.21 based on $C_{max,ss}$ and 0.15–0.18 based on $AUC_{0-tau,ss}$. The ratio was generally higher after SD compared to MD and higher at the lower doses.



**Figure 4.** Mean ratios of 7-hydroxymitragynine/mitragynine plasma concentrations after (**a**) single (SD) and (**b**) multiple (MD) oral 6.65–53.2 mg mitragynine doses in dried kratom leaf powder.

## 2.5. Accumulation of Mitragynine and 7-Hydroxymitragynine during MD

Accumulation of mitragynine and 7-hydroxymitragynine was assessed by comparing $C_{max,ss}$ to $C_{max}$ and $AUC_{0-tau,ss}$ to $AUC_{0-24}$ for the MD and SD, respectively. For mitragy-

**EXHIBIT F-1**

nine, the accumulation was low to moderate across doses with $C_{max}$ ratios of 1.1–1.3 and AUC ratios of 1.6–1.9. Corresponding ranges for 7-hydroxymitragynine were lower: 0.9–1.0 and 1.0–1.3, indicating no or low 7-hydroxymitragynine accumulation after MD.

### 2.6. Time to Reach Steady State for Mitragynine and 7-Hydroxymitragynine during Multiple Dosing

Figure 5 illustrates the accumulation in mitragynine and 7-hydroxymitragyine after multiple dosing over four increasing kratom leaf powder doses. Based on the trough concentrations determined each MD day, the time to reach steady state for mitragynine was 8–9 days. For 7-hydroxymitragynine, the time to reach steady state was 7 days based on the two highest doses, as the number of trough samples above the assay quantification limit was insufficient for the two lowest doses.



**Figure 5.** Trough plasma (**a**) mitragynine and (**b**) 7-hydroxy-mitragynine concentrations (including standard deviation bars) on days 1–15 of consecutive 6.65–53.2 mg mitragynine doses in dried kratom leaf powder during the attainment of steady-state concentrations.

### 3. Discussion

This study was the first to provide extensive mitragynine and 7-hydroxymitragynine pharmacokinetic data in a controlled setting after increasing kratom leaf powder SD and MD. Intensive blood sampling up to 10 days after SD and 23 days after MD ensured well-characterized pharmacokinetic exposure parameters and terminal half-lives. Concentrations of 7-hydroxy-mitragynine originated primarily from mitragynine metabolism because its content in the kratom leaf powder was <0.01%.

In the current study, median mitragynine $T_{max}$ after SD and MD ranged from 1.0 to 1.7 h, with only slightly longer $T_{max}$ for 7-hydroxymitragynine (1.2–2.0 h). In two recent studies with kratom tea, the median $T_{max}$ for both compounds was 1.0 h [26,27]. The slightly longer $T_{max}$ in the present study may be due to the encapsulated kratom leaf powder formulation. Concentration–time curves for both analytes showed an initial rapid descent after $C_{max}$ for about 6 h and then a much slower terminal phase.

*Molecules* **2024**, *29*, 984

The individual mitragynine SD $C_{max}$ of 16.0–90.0 ng/mL (24 subjects) following 13.3–26.6 mg mitragynine was similar to the range reported by Trakulsrichai [25] of 18.5–105 ng/mL (9 subjects) following 10–23.6 mg mitragynine in kratom tea. However, subjects in the latter study received different low doses (6.3–11.5 mg) of kratom tea for 7 days prior to the pharmacokinetics profile day and were not asked to cease other kratom use. The contribution of this additional kratom consumption to the reported mitragynine concentrations is unclear.

Compared to the recent SD kratom tea investigations [26,27], the current study documented higher mitragynine exposure. The geometric mean $C_{max}$ and $AUC_{0-24}$ were 119 nM (approximately 47.5 ng/mL) and 388 h*nM (approximately 155 h*ng/mL) in six male and six female subjects following 39 mg mitragynine [27]. Our geometric mean results in 12 subjects were 51.0–113 ng/mL for $C_{max}$ and 169–493 h*ng/mL for $AUC_{0-24}$ across 26.6–53.2 mg mitragynine. 7-hydroxymitragynine exposure was similar between the two studies: $C_{max}$ and $AUC_{0-24}$, in the kratom tea study, were 31 nM (approximately 12.9 ng/mL) and 151 h*nM (or approximately 62.7 h*ng/mL) compared to the current study, with 10.2–21.6 ng/mL for $C_{max}$ and 34.2–110 h*ng/mL for $AUC_{0-24}$ across the dose range of 26.6–53.2 mg mitragynine. Differences in the liquid kratom tea and solid encapsulated leaf powder formulations likely impacted absorption.

Between-subject variability for $C_{max}$ and $AUC_{0-24}$ was quite high after SD and MD. For mitragynine, CV% was generally 30–60%, increasing up to 99% at the lowest 6.65 mg dose. For 7-hydroxymitragynine, between-subject variability was slightly lower at 20–55%, with the highest variability of 67%, again, at the lowest dose.

Mitragynine and 7-hydroxymitragynine terminal half-lives generally increased with increasing doses, as concentrations were measurable for longer at higher doses compared to lower doses. However, increases in terminal half-life were also observed between single and multiple dosing, which will be explored in future investigations.

The same issue of low concentrations after lower doses also affected $AUC_{0-inf}$, in some cases underestimating $AUC_{0-inf}$ and overestimating CL/F. For example, the mean CL/F of mitragynine for the lowest single 6.65 mg dose was much higher (278 L/h) than for the higher doses (94–123 L/h).

Accumulation factors for mitragynine comparing $C_{max,ss}$ and $AUC_{0-tau,ss}$ during MD at steady state with $C_{max}$ and $AUC_{0-24}$ after a SD were low to moderate, ranging from 1.1 to 1.3 and 1.6–1.9, respectively. Corresponding ranges of 0.9–1.0 and 1.0–1.3 were observed for 7-hydroxymitragine, indicating no or only low accumulation after MD. These results contradict the observed long terminal $T_{1/2}$, suggesting that higher accumulation ratios should have been found. Sahin and Benet [28] address the issue of the overprediction of accumulation from extended terminal half-lives and define the operational multiple dosing half-life ($t_{1/2,op}$) as being equal to the dosing interval at a steady state, where the maximum concentration at the steady state is twice the maximum concentration found for the first dose. It would be useful to define an operational or MD $T_{1/2}$ that is more relevant than the terminal $T_{1/2}$ for predicting the accumulation of mitragynine and 7-hydroxymitragynine after different dosing regimens.

7-hydroxymitragynine to mitragynine ratios were always higher after SD than MD, and the highest ratios were consistently after lower doses. Across the concentration–time profile, ratios generally increased to a maximum and then decreased over time. The decrease reflects the shorter half-life of the metabolite compared to the parent compound. The range of the median $C_{max}$ ratios observed at the top two doses was 0.18–0.21, which was similar to the median of 0.27 previously reported in a small number of subjects [27].

The CYP3A4 enzyme plays a major role in the metabolism of mitragynine to 7-hydroxymitragynine based on in vitro studies using human liver microsomes and S9 fractions [29]. Since CYP3A enzymes are the predominant phase 1 metabolism enzymes in the liver and intestine of dogs and men [30], it is of interest to compare the metabolic ratios of 7-hydroxymitragynine to mitragynine between dogs and humans. In one nonclinical study [31], 5 mg/kg mitragynine was administered orally to five beagle dogs, from which plasma concentration profiles were obtained for mitragynine and 7-hydroxymitragynine up to 24 h post-dose. The ratios of metabo-

EXHIBIT F-1

lite to parent compound were 11.3% and 12.6% for $C_{max}$ and AUC, respectively, about one-half of the ratios observed in the current human study.

The limitations of this study include the limited range of doses that were prescribed by the reviewing ethics committee and Health Canada. Future clinical studies will expand the administered dose range. The long terminal mitragynine $T_{1/2}$ requires an adequate washout in pharmacokinetic studies between treatments. After a SD, mitragynine concentrations were measurable in some subjects 10 days after dosing; however, in all cases, concentrations were <5% of $C_{max}$. The FDA guideline [32] recommends a washout of at least five half-lives or until concentrations in each subject are ≤5% of $C_{max}$. Here, a 10-day washout was adequate for a single kratom leaf powder dose containing up to 53.2 mg mitragynine; however, for the MD regimens, at least a 14-day washout period is recommended. After 15 MD, a steady state was reached in 7–9 days for both analytes. Visual inspection of the trough concentrations (Figure 5) suggested that, after day 10, a further slight increase in trough concentrations appears to occur at the highest 53.2 mg dose. It would be prudent to monitor trough concentrations over a longer period for higher doses to confirm steady state attainment.

In conclusion, a wealth of pharmacokinetic data were obtained from this largest kratom leaf powder administration study, providing much-needed new insights into the pharmacokinetic characteristics of mitragynine and 7-hydroxymitragynine over a range of increasing SD and MD. These data are of considerable help for the planning and design of future clinical kratom studies and, importantly, in interpreting clinical mitragynine and 7-hydroxymitragynine concentrations.

## 4. Materials and Methods

### 4.1. Study Design

A randomized, between-subject, double-blind, placebo-controlled, dose-escalation, single-site pharmacokinetic study of encapsulated dried kratom leaf powder was carried out for 10 days after SD, 15 days MD, and 23 days follow-up in healthy adults, with 12 participants receiving active kratom leaf powder per dose. There were 31 clinic visits over 47 days; participants fasted (≥10 h) before SD and during the last MD pharmacokinetic visits (Figure 6). Standardized meals were provided 4 and 10 h after the morning dose.



**Figure 6.** Study design showing dosing and in-person clinical visits (single dose (SD) follow-up phase days 1, 2, 3, 5, 7, and pre-dose day 10; 15 multiple doses (MDs), follow-up phase days 25, 26, 27, 29, 31, 34, 40, and 47), including two intensive pharmacokinetic (PK) days after a single oral mitragynine dose and on the last of 15 consecutive 6.65–53.2 mg daily mitragynine doses of dried kratom leaf powder.

**EXHIBIT F-1**

The study was conducted in accordance with the Declaration of Helsinki and approved by the Advarra Institutional Review Board (protocol code 00048457 on 20 June 2022). The Advarra Institutional Review Board is organized and operates in compliance with the US and Canadian regulations and policies governing research with human subjects. Advarra's IRB is registered with the FDA and OHRP; IRB Organization (IORG) Number: 0000635, FWA Number: 00023875, IRB Registration Number: 00000971. Advarra is fully accredited by the Association for the Accreditation of Human Research Protection Programs (AAHRPP). The Advarra Institutional Review Board and Health Canada approved the study. Informed consent was obtained from all subjects involved in the study.

*4.2. Study Population*

Non-smoking healthy males and females of 18–55 years with BMI $\geq$ 18.5 and $\leq$29.9 kg/m$^2$ participated. Participants self-reported being either kratom-naïve or had no kratom use for $\geq$12 months prior to the first study visit. Female participants of childbearing potential had negative pregnancy tests and were not breastfeeding; appropriate birth control was utilized by all participants throughout the study. No medications were permitted within 7 days (14 days for enzyme inducers) or 7 half-lives of day 0, whichever was longer. Randomization was stratified by sex for males/females per dose.

Participants were excluded if there was a known allergy to product ingredients or known genetic polymorphism of CYP4503A4, CYP2D6, or CYP1A2. Fasting was required 10 h prior to the familiarization visit and prior to the pre-dose blood sample on days 0 and 10–24. The presence of gastrointestinal, hepatic, renal, cardiovascular, respiratory, autoimmune, endocrine, neurological, or active psychiatric diseases was exclusionary.

Participants were excluded if there was an acute illness within 2 weeks of the single dose, a positive urine drug test at screening, a history of drug or alcohol abuse in the past 12 months, a Leeds Dependence Questionnaire score $\geq$ 21, or a consumption of $\geq$2 alcoholic beverages a day. Positive serology results for HIV, HBsAg, or HCV or a history of cancer were exclusionary. Participants were non-smokers who had not used nicotine patches or gums for >3 months prior to the first dose and had veins suitable for cannulation/repeated venipuncture. Caffeine intake was restricted for 24 h prior to the two pharmacokinetic study days and 12 h prior 5 h post each visit; alcohol and cannabinoids were restricted for 24 h prior to and 12 h post days 1–25 and day 47. Hepatic or renal dysfunction with ALT or AST $\geq$ 2X upper limit of normal (ULN) and serum creatinine or BUN $\geq$ 1.5X ULN were evaluated by the principal investigator. Participation in another research study or blood donation within four (4) weeks prior to single dosing was prohibited.

*4.3. Dosing*

The kratom dried leaf powder (MitraLeaf$^{TM}$) was manufactured by Johnson Foods, LLC., Kratom capsules were labeled according to ICH-GCP and Health Canada guidelines and stored at room temperature (20–25 °C) with relative humidity $\leq$65%. A large batch of dried kratom leaf was mixed in an industrial powder mixer to homogenize the powder. The powder was weighed and encapsulated, and quality control was performed to ensure adequate weight in the capsules. To determine the concentration of mitragynine in each capsule, Avomeen, the laboratory performing the LC-MS/MS analysis of the kratom powder, emptied 50 capsules of powder, mixed the powder well, and weighed an aliquot of the powder for analysis. The powder was extracted and analyzed using LC-MS/MS for mitragynine and 7-hydroxymitragynine. The Avomeen Certificate of Analysis showed 13.3 mg mitragynine in 1000 mg of the dried kratom leaf powder. Four cohorts of 12 different subjects received one of four increasing doses of 6.65 mg, 13.3 mg, 26.6 mg, and 53.2 mg mitragynine contained in 500, 1000, 2000, or 4000 mg leaf powder in 1, 2, 4, or 8 capsules, respectively, and 6 subjects at each dose received placebo. After 10 days of monitoring after the SD, 15 consecutive ascending doses of 6.65 mg, 13.3 mg, 26.6 mg, and 53.2 mg mitragynine in 500, 1000, 2000, or 4000 mg of leaf powder were administered, respectively, to participants. 7-hydroxymitragynine concentrations were <0.01% kratom leaf powder.

**EXHIBIT F-1**

Interim safety analyses included laboratory assessments (hemoglobin, liver, and kidney function tests, adverse events (AEs)), and an assessment of the Clinical Opiate Withdrawal Scale (COWS) and Subjective Opiate Withdrawal Scale (SOWS) after the completion of each dose cohort prior to the decision by medical staff to proceed to the next higher dose).

### 4.4. Blood Collection Timeline for Single and Multiple Dose Pharmacokinetic Study

Blood collections (total 484 mL) for the mitragynine and 7-hydroxymitragynine concentrations occurred prior to and 0.25, 0.5, 0.75, 1, 1.33, 1.67, 2, 2.33, 2.67, 3, 3.5, 4, 5, 6, 9, and 12 h after the single dose and after the 15th multiple dose. Participants returned to the clinic 24, 48, and 72 h—and 5, 7, and 10 days—after the SD for the daily post-dose blood collection. Participants fasted for $\geq$10 h prior to the pre-dose blood collection. Standardized meals were provided 4 and 10 h after the morning dose. Follow-up visits for MD occurred 1, 2, 3, 5, 7, 10, 16, and 23 days later, with a single blood collection in the morning. The follow-up phase began 24 h after the last MD, day 25, and ended on day 47 (end of study, EOS).

### 4.5. Pharmacokinetics

Pharmacokinetic parameters utilized standard non-compartmental methods (SAS version 9.4). Peak concentration ($C_{max}/C_{max,ss}$), time to reach $C_{max}$ ($T_{max}/T_{max,ss}$), time of last measurable concentration ($T_{last}/T_{last,ss}$), area-under-the-curve (AUC) from dosing to 24 h ($AUC_{0-24h}/AUC_{0-tau,ss}$) and 72 h ($AUC_{0-72}$), last observable concentration ($AUC_{0-Tlast}/AUC_{0-Tlast,ss}$), infinity ($AUC_{inf}$), terminal phase half-life ($T_{1/2}/T_{1/2,ss}$), terminal phase rate constant ($K_{el}/K_{el,ss}$), apparent total clearance ($CL/F/CL/F_{,ss}$), and ratio 7-hydroxymitragynine/mitragynine concentrations were determined. During MD, minimum concentration ($C_{min,ss}$), average concentration ($C_{av,ss}$), trough concentration ($C_{trough}$), and fluctuation (($C_{max,ss} - C_{min,ss})/C_{av,ss}$) during the dosing interval were also quantified. Accumulation of mitragynine and 7-hydroxymitragynine with MD was compared to SD AUC and $C_{max}$ at each dose.

### 4.6. Statistical Analysis

Analysis sets included all participants with sufficient data for the calculation of at least one pharmacokinetic parameter after SD or MD (SAS version 9.4). A power model for $C_{max}$ or $AUC_{0-T}$ after SD and $C_{max,ss}$ or $AUC_{0-tau}$ after MD investigated dose proportionality. The power model was pharmacokinetics parameter = $\alpha * dose^{\beta}$. A regression analysis was conducted using the log form of this equation: ln (pharmacokinetics parameter) = ln$\alpha$ + $\beta * $ln(dose) + $\varepsilon$. Estimates for $\alpha$ and the slope $\beta$ were obtained, with a 90% confidence interval calculated for $\beta$. The criterion for dose proportionality was sufficiently met if this 90% confidence interval was entirely contained within the interval ($1 + [\ln(0.5)/\ln(r)]$, $1 + [\ln(2)/\ln(r)]$), where r is the ratio of highest dose divided by the lowest dose. The time required for mitragynine and 7-hydroxymitragynine to reach a steady state was estimated using a Helmert coding approach. The model included the day as a fixed effect, the subject as a random effect, and the logarithm of the concentration as a response variable. Pair-wise contrasts were then estimated, enabling an assessment of the time to reach steady state.

**Author Contributions:** Conceptualization, M.A.H. and R.A.; methodology, M.A.H. and R.A.; formal analysis, M.A.H., J.B., M.A.B., and R.A.; investigation, M.A.H. and R.A.; resources, R.A.; data curation, M.A.H., J.B., M.A.B., and R.A.; writing—original draft preparation, M.A.H.; writing—review and editing, M.A.H., J.B., M.A.B., and R.A.; visualization, M.A.H. and R.A.; supervision, R.A.; project administration, R.A. All authors have read and agreed to the published version of the manuscript.

**Funding:** Johnson Foods: LLC. paid for the clinical study on its dried kratom leaf powder product MitraLeaf to be performed by SGS Nutrasource, Guelph, Ontario, Canada. Huestis, Brett, Bothmer, and Atallah are paid consultants to Johnson Foods, LLC. Atallah is an employee of Della Terra Pharmaceuticals.

**Institutional Review Board Statement:** The study was conducted in accordance with the Declaration of Helsinki and approved by the Advarra Institutional Review Board (Pro00048457). The Advarra

**EXHIBIT F-1**

*Molecules* **2024**, *29*, 984

Institutional Review Board is organized and operates in compliance with the US and Canadian regulations and policies governing research with human subjects. Advarra's IRB is registered with the FDA and OHRP; IRB Organization (IORG) Number: 0000635, FWA Number: 00023875, IRB Registration Number: 00000971. Advarra is fully accredited by the Association for the Accreditation of Human Research Protection Programs (AAHRPP). The Advarra Institutional Review Board and Health Canada approved the study.

**Informed Consent Statement:** Informed consent was obtained from all subjects involved in the study.

**Data Availability Statement:** The data presented in this study are available upon request from Ramsey Atallah, Della Terra Pharmaceuticals.

**Conflicts of Interest:** Johnson Foods, LLC., paid for this clinical study on its dried kratom leaf powder product MitraLeaf to be performed by SGS Nutrasource, Guelph, Ontario, Canada. Huestis, Brett, Bothmer and Atallah are paid consultants to Johnson Foods, LLC. Atallah is an employee of Della Terra Pharmaceuticals. Huestis and Atallah are also consultants for the American Kratom Association, which had no role in this study or publication.

## References

1.  Brown, P.N.; Lund, J.A.; Murch, S.J. A botanical, phytochemical and ethnomedicinal review of the genus Mitragyna korth: Implications for products sold as kratom. *J. Ethnopharmacol.* **2017**, *202*, 302–325. [CrossRef]
2.  Grundmann, O. Patterns of Kratom use and health impact in the US-Results from an online survey. *Drug Alcohol Depend.* **2017**, *176*, 63–70. [CrossRef]
3.  Covvey, J.R.; Vogel, S.M.; Peckham, A.M.; Evoy, K.E. Prevalence and characteristics of self-reported kratom use in a representative US general population sample. *J. Addict. Dis.* **2020**, *38*, 506–513. [CrossRef]
4.  Williams, R.S.; Nikitin, D. The internet market for Kratom, an opioid alternative and variably legal recreational drug. *Int. J. Drug Policy* **2020**, *78*, 102715. [CrossRef]
5.  Schimmel, J.; Amioka, E.; Rockhill, K.; Haynes, C.M.; Black, J.C.; Dart, R.C.; Iwanicki, J.L. Prevalence and description of kratom (*Mitragyna speciosa*) use in the United States: A cross-sectional study. *Addiction* **2021**, *116*, 176–181. [CrossRef] [PubMed]
6.  Laforest, L.C.; Kuntz, M.A.; Kanumuri, S.R.R.; Mukhopadhyay, S.; Sharma, A.; O'Connor, S.E.; McCurdy, C.R.; Nadakuduti, S.S. Metabolite and Molecular Characterization of Mitragyna speciosa Identifies Developmental and Genotypic Effects on Monoterpene Indole and Oxindole Alkaloid Composition. *J. Nat. Prod.* **2023**, *86*, 1042–1052. [CrossRef] [PubMed]
7.  Shellard, E.J. The alkaloids of Mitragyna with special reference to those of Mitragyna speciosa, Korth. *Bull. Narc.* **1974**, *26*, 41–55. [PubMed]
8.  Eisenman, S.W. The Botany of Mitragyna speciosa (Korth.) Havil. and Related Species. In *Kratom and Other Mitragynines: The Chemistry and Pharmacology of Opioids from a Non-Opium Source*, 1st ed.; Raffa, R.B., Ed.; CRC Press: Boca Raton, FL, USA, 2014; pp. 57–76.
9.  Leksungnoen, N.; Andriyas, T.; Ngernsaengsaruay, C.; Uthairatsamee, S.; Racharak, P.; Sonjaroon, W.; Kjelgren, R.; Pearson, B.J.; McCurdy, C.R.; Sharma, A. Variations in mitragynine content in the naturally growing Kratom (*Mitragyna speciosa*) population of Thailand. *Front. Plant Sci.* **2022**, *13*, 1028547. [CrossRef] [PubMed]
10. Zhang, M.; Sharma, A.; León, F.; Avery, B.; Kjelgren, R.; McCurdy, C.R.; Pearson, B.J. Effects of Nutrient Fertility on Growth and Alkaloidal Content in Mitragyna speciosa (Kratom). *Front. Plant Sci.* **2020**, *11*, 597696. [CrossRef] [PubMed]
11. Zhang, M.; Sharma, A.; León, F.; Avery, B.; Kjelgren, R.; McCurdy, C.R.; Pearson, B.J. Plant growth and phytoactive alkaloid synthesis in kratom [*Mitragyna speciosa* (Korth.)] in response to varying radiance. *PLoS ONE* **2022**, *17*, e0259326. [CrossRef] [PubMed]
12. Kamble, S.H.; Berthold, E.C.; Kanumuri, S.R.R.; King, T.I.; Kuntz, M.A.; Leon, F.; Mottinelli, M.; McMahon, L.R.; McCurdy, C.R.; Sharma, A. Metabolism of Speciociliatine, an Overlooked Kratom Alkaloid for its Potential Pharmacological Effects. *AAPS J.* **2022**, *24*, 86. [CrossRef]
13. Ismail, I.; Wahab, S.; Sidi, H.; Das, S.; Lin, L.J.; Razali, R. Kratom and Future Treatment for the Opioid Addiction and Chronic Pain: Periculo Beneficium? *Curr. Drug Targets* **2019**, *20*, 166–172. [CrossRef]
14. Macko, E.; Weisbach, J.A.; Douglas, B. Some observations on the pharmacology of mitragynine. *Arch. Int. Pharmacodyn. Ther.* **1972**, *198*, 145–161.
15. Prozialeck, W.C.; Avery, B.A.; Boyer, E.W.; Grundmann, O.; Henningfield, J.E.; Kruegel, A.C.; McMahon, L.R.; McCurdy, C.R.; Swogger, M.T.; Veltri, C.A.; et al. Kratom policy: The challenge of balancing therapeutic potential with public safety. *Int. J. Drug Policy* **2019**, *70*, 70–77. [CrossRef]
16. Matsumoto, K.; Hatori, Y.; Murayama, T.; Tashima, K.; Wongseripipatana, S.; Misawa, K.; Kitajima, M.; Takayama, H.; Horie, S. Involvement of mu-opioid receptors in antinociception and inhibition of gastrointestinal transit induced by 7-hydroxymitragynine, isolated from Thai herbal medicine Mitragyna speciosa. *Eur. J. Pharmacol.* **2006**, *549*, 63–70. [CrossRef]

**EXHIBIT F-1**

17. Kruegel, A.C.; Gassaway, M.M.; Kapoor, A.; Váradi, A.; Majumdar, S.; Filizola, M.; Javitch, J.A.; Sames, D. Synthetic and Receptor Signaling Explorations of the Mitragyna Alkaloids: Mitragynine as an Atypical Molecular Framework for Opioid Receptor Modulators. *J. Am. Chem. Soc.* **2016**, *138*, 6754–6764. [CrossRef]

18. Stolt, A.C.; Schröder, H.; Neurath, H.; Grecksch, G.; Höllt, V.; Meyer, M.R.; Maurer, H.H.; Ziebolz, N.; Havemann-Reinecke, U.; Becker, A. Behavioral and neurochemical characterization of kratom (*Mitragyna speciosa*) extract. *Psychopharmacology* **2014**, *231*, 13–25. [CrossRef] [PubMed]

19. Váradi, A.; Marrone, G.F.; Palmer, T.C.; Narayan, A.; Szabó, M.R.; Le Rouzic, V.; Grinnell, S.G.; Subrath, J.J.; Warner, E.; Kalra, S.; et al. Mitragynine/Corynantheidine Pseudoindoxyls As Opioid Analgesics with Mu Agonism and Delta Antagonism, Which Do Not Recruit beta-Arrestin-2. *J. Med. Chem.* **2016**, *59*, 8381–8397. [CrossRef] [PubMed]

20. Eastlack, S.C.; Cornett, E.M.; Kaye, A.D. Kratom-Pharmacology, Clinical Implications, and Outlook: A Comprehensive Review. *Pain Ther.* **2020**, *9*, 55–69. [CrossRef] [PubMed]

21. Prozialeck, W.C.; Jivan, J.K.; Andurkar, S.V. Pharmacology of kratom: An emerging botanical agent with stimulant, analgesic and opioid-like effects. *J. Am. Osteopath. Assoc.* **2012**, *112*, 792–799. [PubMed]

22. Obeng, S.; Kamble, S.H.; Reeves, M.E.; Restrepo, L.F.; Patel, A.; Behnke, M.; Chear, N.J.; Ramanathan, S.; Sharma, A.; Leon, F.; et al. Investigation of the Adrenergic and Opioid Binding Affinities, Metabolic Stability, Plasma Protein Binding Properties, and Functional Effects of Selected Indole-Based Kratom Alkaloids. *J. Med. Chem.* **2020**, *63*, 433–439. [CrossRef]

23. Henningfield, J.E.; Rodricks, J.V.; Magnuson, A.M.; Huestis, M.A. Respiratory effects of oral mitragynine and oxycodone in a rodent model. *Psychopharmacology* **2022**, *239*, 3793–3804. [CrossRef] [PubMed]

24. National Institute on Drug Abuse. Kratom. Available online: https://nida.nih.gov/research-topics/kratom (accessed on 5 October 2023).

25. Trakulsrichai, S.; Sathirakul, K.; Auparakkitanon, S.; Krongvorakul, J.; Sueajai, J.; Noumjad, N.; Sukasem, C.; Wananukul, W. Pharmacokinetics of mitragynine in man. *Drug Des. Devel. Ther.* **2015**, *9*, 2421–2429. [CrossRef]

26. Tanna, R.S.; Nguyen, J.T.; Hadi, D.L.; Manwill, P.K.; Flores-Bocanegra, L.; Layton, M.E.; White, J.R.; Cech, N.B.; Oberlies, N.H.; Rettie, A.E.; et al. Clinical Pharmacokinetic Assessment of Kratom (*Mitragyna speciosa*), a Botanical Product with Opioid-like Effects, in Healthy Adult Participants. *Pharmaceutics* **2022**, *14*, 620. [CrossRef] [PubMed]

27. Tanna, R.S.; Cech, N.B.; Oberlies, N.H.; Rettie, A.E.; Thummel, K.E.; Paine, M.F. Translating Kratom-Drug Interactions: From Bedside to Bench and Back. *Drug Metab. Dispos.* **2023**, *51*, 923–935. [CrossRef]

28. Sahin, S.; Benet, L.Z. The operational multiple dosing half-life: A key to defining drug accumulation in patients and to designing extended release dosage forms. *Pharm. Res.* **2008**, *25*, 2869–2877. [CrossRef]

29. Kamble, S.H.; Sharma, A.; King, T.I.; León, F.; McCurdy, C.R.; Avery, B.A. Metabolite profiling and identification of enzymes responsible for the metabolism of mitragynine, the major alkaloid of *Mitragyna speciosa* (kratom). *Xenobiotica* **2019**, *49*, 1279–1288. [CrossRef]

30. Court, M.H. Canine cytochrome P-450 pharmacogenetics. *Vet. Clin. N. Am. Small Anim. Pract.* **2013**, *43*, 1027–1038. [CrossRef] [PubMed]

31. Maxwell, E.A.; King, T.I.; Kamble, S.H.; Raju, K.S.R.; Berthold, E.C.; Leon, F.; Avery, B.A.; McMahon, L.R.; McCurdy, C.R.; Sharma, A. Pharmacokinetics and Safety of Mitragynine in Beagle Dogs. *Planta Med.* **2020**, *86*, 1278–1285. [CrossRef] [PubMed]

32. Center for Drug Evaluation and Research. FDA Bioavailability Guideline: Bioavailability Studies Submitted in NDAs or INDs—General Considerations Guidance for Industry. Available online: https://www.fda.gov/media/121311/download (accessed on 16 November 2023).

**Disclaimer/Publisher's Note:** The statements, opinions and data contained in all publications are solely those of the individual author(s) and contributor(s) and not of MDPI and/or the editor(s). MDPI and/or the editor(s) disclaim responsibility for any injury to people or property resulting from any ideas, methods, instructions or products referred to in the content.

**EXHIBIT F-1**

# EXHIBIT G-1



Photos by IRENE BARLIAN, photo illustration and graphic design by RON BORRESEN | Times

# THE KRATOM TRAIL
### Tracing a meandering supply chain

**Kratom can follow a unique and winding path.** From the time leaves are harvested from trees in Southeast Asia to when finished products are sold to consumers, it can make more than a dozen stops along the kratom trail — logging more than 15,000 miles from the rainforests of Borneo to gas stations and smoke shops around Tampa Bay. Though tracking a specific shipment of kratom from starting point to end point is nearly impossible, the Tampa Bay Times was able to determine an approximate supply chain route for O.P.M.S. — one of the most popular kratom brands on the market. Kratom under the O.P.M.S. brand moves around a lot from different locations where it can be treated, refined, made into extracts and packaged.

## How kratom is processed and distributed before it arrives in the country

**1. Kapuas Hulu, West Kalimantan**
In this region of Indonesia on the island of Borneo, farmers in a collection of villages harvest leaves and stuff them into bags. The demand for kratom in the U.S. is about 4,000 tons a month. Almost all of it originates in Indonesia.

**2. Pontianak**
**Distance:** 312 miles
This port city on Borneo is one of the nation's processing hubs for kratom. The dried leaves are sent to be milled and ground into a fine powder. The product is also tested.

**3. Surabaya**
**Distance:** 548\* miles
**Miles so far:** 860
Fine kratom powder packed into compact boxes is loaded onto cargo ships at this much larger port city across the Java Sea, where the kratom will depart for its roughly four-week voyage.

**4. Oakland, Calif.**
**Distance:** 8,412\* miles
**Miles so far:** 9,272
This U.S. port is the most popular destination for Indonesian kratom. After about 30 days at sea, it arrives. It's hard to pinpoint exactly how much kratom enters the country, as some importers have smuggled it in claiming it was another substance like fertilizer. And which U.S. port gets the second-most kratom shipments? That would be Tampa at 14%.

*estimated miles

## How kratom is processed and distributed once it arrives in the United States

**5. Marietta, Ga.** The product travels **2,579 miles (11,851 miles so far)** from Oakland to this Atlanta suburb. The outpost serves as a receiving center or hub for kratom that will become O.P.M.S. products. Batches are kept here while samples are tested in Michigan for heavy metals, contaminants and potency. If the samples test clean, the kratom keeps moving. From here it can take two paths. Raw powder capsules go one way, and kratom that is destined to be made into extracts goes another.

### CAPSULES AND POWDER

**6. Fort Worth, Texas**
**Distance:** 826 miles
**Miles so far:** 12,677
Kratom destined for capsules or powder comes to a lab here to be treated for bacterial contaminants.

**7. Marietta**
**Distance:** 826 miles
**Miles so far:** 13,503
After it's sterilized, the kratom returns to the Georgia hub and will shuttle between two nearby locations.

**8. Alpharetta, Ga.**
**Distance:** 27 miles
**Miles so far:** 13,530
Powdered kratom is blended and milled inside another building without any company signage. The kratom goes next to a different Marietta building.

**9. Marietta**
**Distance:** 26 miles
**Miles so far:** 13,556
Capsules are filled and boxed up.

**10. Marietta**
**Distance:** 5.4 miles
**Miles so far:** 13,561
The kratom returns to the Marietta receiving warehouse before being sent to Dallas. Blind bills of lading are used so that the destination can't be traced.

**11. Dallas**
**Distance:** 794 miles
**Miles so far:** 14,355
O.P.M.S. kratom gets its distinctive packaging and labeling at A1 Wholesale.

**12. Dallas**
**Distance:** 1.7 miles
**Miles so far:** 14,357
At 1.7 miles, this is the shortest stop along the kratom trail. Kratom comes here, another A1 Wholesale location, where orders placed through Party Nuts, an online wholesaler, are fulfilled.

**13. Tampa Bay**
**Distance:** 1,171 miles
**Total miles traveled:** 15,528
O.P.M.S. products are sold at smoke shops and gas stations throughout Tampa Bay and around Florida. They have been linked to multiple overdose deaths in the state.



**NOTE:** It's illegal to possess kratom in Alabama. One trucker carrying O.P.M.S. through the state said he was told the cargo was "vitamins."

### EXTRACTS

**6. Springfield, Colo.**
**Distance:** 1,234 miles
**Miles so far:** 13,085
Powder made into extracts goes to this rural outpost. Workers at Jordan Process heat raw powder multiple times and mix it with chemicals to boost the herb's potency and to purify it. Earlier this year, staff told a regulator they were dealing with a benign plant — not kratom. Just a few months before that, however, they acknowledged handling kratom.

**7. Marietta**
**Distance:** 1,234 miles
**Miles so far:** 14,319
Kratom returns from Colorado to the Marietta receiving center before moving on.

**8. Alpharetta**
**Distance:** 27 miles
**Miles so far:** 14,346
Extract products arrive at the milling center before heading to a different Marietta building.

**9. Marietta**
**Distance:** 26 miles Miles so far:** 14,372
Some extract powder is placed into capsules stamped with three-leaf logos. Others are liquefied and mixed with chocolate sauce and food-grade alcohol to give two of the products — O.P.M.S. Black Liquid and O.P.M.S. Gold Liquid — their distinctive flavor. Drums filled with extract are readied for shipping, but workers don't know where it's going exactly.

**10. Marietta**
**Distance:** 794 miles
**Miles so far:** 14,337
The kratom returns to the Marietta receiving warehouse before being shipped to Dallas.

**11. Dallas**
**Distance:** 5 miles
**Miles so far:** 15,171
O.P.M.S. extracts are labeled and bottled at A1 Wholesale.

**12. Dallas**
**Distance:** 1.7 miles
**Miles so far:** 15,173
At a nearby warehouse, orders are fulfilled and sent around the country, including Tampa Bay.

**13. Tampa Bay**
**Distance:** 1,171 miles
**Total miles traveled:** 16,344
The O.P.M.S. brand includes roughly a dozen products, ranging from dried leaf powders to potent liquid shots that can be found in numerous locations around Tampa Bay and Florida.

**EXHIBIT G-1**

Graphic reporting by Hannah Critchfield, Langston Taylor and Irene Barlian
Source: Times research. Miles are approximations based on travel distances using Google Maps. Shipping distances are estimates. Nautical miles traveled were converted to miles.

EXHIBIT G-2

# U.S. Department of Labor
Occupational Safety and Health Administration



## Notice of Alleged Safety or Health Hazards
March 2, 2023 9:40 AM

| Complaint Number | | 2001425 | |
|---|---|---|---|
| Establishment Name / DBA | LP Ind, LLC /Jordan Process | | |
| Site Address | 23298 Highway 160<br><br>SPRINGFIELD, CO  81073 | | |
| | Site Phone | (719) 529-0758 | Site FAX | |
| Mailing Address | 23298 Highway 160<br><br>Springfield, CO  81073 | | |
| Management Official | Candy Mason | Phone | (719) 529-0758 |
| Type of Business | | E-mail | candym@olisticagroup.com |
| Ownership | Private Sector | Site Activity NAICS | 325411 -Medicinal and Botanical Manufacturing |

**HAZARD DESCRIPTION/LOCATION.** Describe briefly the hazard(s) which you believe exist. Include the approximate number of employees exposed to or threatened by each hazard. Specify the particular building or worksite where the alleged violation exists.

1.) Approximately 200 employees are exposed to potentially hazardous byproducts from the kratom production process which include alkaloids and opioids. Potentially hazardous byproducts were not evaluated nor was a hazard classification determined. Contrary to 1910.1200(d)(1)

2.) Approximately 200 employees are not trained on potentially hazardous byproducts from the kratom production process which include alkaloids and opioids. Contrary to 1910.1200(e)(1)(i) and 1910.1200(h)(1)

3.) The employer did not develop safety data sheets for byproducts of the kratom manufacturing process. Contrary to 1910.1200(g)(1)

**EXHIBIT G-2**

**U.S. Department of Labor**

Occupational Safety and Health Administration
Englewood Area Office
7935 East Prentice Avenue, Suite 209
Greenwood Village, CO 80111



February 22, 2023

LP Ind, LLC
DBA Jordan Process
23298 Highway 160
Springfield, CO 81073

RE: CLI 2001425

Dear Candy Mason

The Occupational Safety and Health Administration (OSHA) has received a notice of safety and/or health hazards at your worksite at:

   LP Ind, LLC
   DBA Jordan Process
   23298 Highway 160
   Springfield, CO 81073

We notified you by email of these alleged hazards on February 22, 2023. The specific nature of the alleged hazards is as follows:

1.) Approximately 200 employees are exposed to potentially hazardous byproducts from the kratom production process which include alkaloids and opioids. Potentially hazardous byproducts were not evaluated nor was a hazard classification determined. Contrary to 1910.1200(d)(1)

2.) Approximately 200 employees are not trained on potentially hazardous byproducts from the kratom production process which include alkaloids and opioids. Contrary to 1910.1200(e)(1)(i) and 1910.1200(h)(1)

3.) The employer did not develop safety data sheets for byproducts of the kratom manufacturing process. Contrary to 1910.1200(g)(1)

We have not determined whether the hazards, as alleged, exist at your workplace; and we do not intend to conduct an inspection at this time. However, since allegations of violations and/or hazards have been made, we request that you immediately investigate the alleged conditions and make any necessary corrections or modifications. Please advise me in writing, no later than **February 28, 2023** of the results of your investigation. You must provide supporting documentation of your findings, including any applicable measurements or monitoring results, and photographs/video which you believe would be helpful, as well as a description of any corrective action you have taken or are in the process of taking, including photographs and documentation of the corrected condition. Please email EAO.UPA@dol.gov or fax (303) 843-4515 with your response, addressed to Chad Vivian, Area Director.

This letter is not a citation or a notification of proposed penalty which, according to the OSHAct, may be issued only after an inspection or investigation of the workplace. It is our goal to assure that hazards are promptly identified and eliminated. Please take immediate corrective action where needed. We encourage employee participation in investigating and responding to any alleged hazard. **If we do not receive a response from you by February 28, 2023, indicating what appropriate action has been taken or that no hazard exists and why, an OSHA**

**EXHIBIT G-2**

**inspection will be conducted.** An inspection may include a review of the following: injury and illness records, hazard communication, personal protective equipment, emergency action or response, bloodborne pathogens, confined space entry, lockout/tagout, and related safety and health issues.

Please note, however, that OSHA selects for inspection a random sample of cases where we have received letters in which employers have indicated satisfactory corrective action. This policy has been established to ensure that employers have actually taken the action asserted in their letters.

OSHA offers consultation services, without charge, to assist employers in identifying and correcting occupational safety and health hazards and to provide assistance in the development of safety and health management programs. The variety of services available or the scheduling of those services may be limited by the consultation project's requirement to give priority to small businesses in high hazard industries and by its backlog. However, you may be able to obtain similar services from your insurance carrier or private consultant in a more timely fashion. To discuss or request the services, call or write your State consultation project at the following address:

> Occupational Health and Safety
> Environmental Health
> Rm. 133, Environmental Health Bldg.
> Colorado State University
> Fort Collins, CO 80523
> (970) 491-6151

You are requested to post a copy of this letter where it will be readily accessible for review by all of your employees and return a copy of the signed Certificate of Posting to this office. In addition, you are requested to provide a copy of this letter and your response to it to a representative of any recognized employee union or safety committee if these are at your facility. Failure to do this may result in an on-site inspection. The complainant has been furnished a copy of this letter and will be advised of your response. Section 11(c) of the OSHAct provides protection for employees against discrimination because of their involvement in protected safety and health related activity.

If you have any questions concerning this matter, please contact the investigator on this case, at the Englewood Area Office at (303) 843-4500. Your personal support and interest in the safety and health of your employees is appreciated.

Sincerely,

(b) (7)(C)

Chad Vivian
Area Director

Enclosure(s)

**EXHIBIT G-2**



February 27, 2023

Chad Vivian, Area Director
(b) (7)(C) Compliance
Safety and Health Officer
Occupational Safety and Health Administration
Englewood Area Office
7935 East Prentice Avenue, Suite 209
Greenwood Village, CO 80111

Dear Mr. Vivian,

Pursuant to your letter to Ms. Candy Mason dated February 22, 2023, please find enclosed responses and supporting evidence that the three alleged hazardous conditions do not exist or had already been addressed by LP Ind., LLC (DBA Jordan Process) prior to receipt of this notice.

This document contains a table of contents and a response and supporting documentation for each alleged hazard.

If you have any further questions or concerns, please do not hesitate to reach out to Candy Mason.

    Candy Mason
    Email:
    candym@jordanprocess.com
    Phone: 719-529-0758

We truly appreciate your time and consideration in reviewing this matter.

Sincerely,

*Candy Mason*

Candy Mason, Operations Manager

**EXHIBIT G-2**



**JORDAN**
PROCESS

**Table of Contents**

Alleged Hazard #1 ..................................................................................................................3

    Response........................................................................................................................3

    Supporting Documentation .........................................................................................4

        Alleged Hazard #1_Attachment #1_PPE_Assessment ..........................................4

Alleged Hazard #2 ................................................................................................................14

    Response......................................................................................................................14

    Supporting Documentation .......................................................................................15

        Alleged Hazard #2_Attachment #1_Hazardous Communication Program .........................15

        Alleged Hazard #2_Attachment #2_PriorAndFutureDocumentation/TrainingExamples ..................28

Alleged Hazard #3 ................................................................................................................43

    Response......................................................................................................................43

    Supporting Documentation .......................................................................................44

        Alleged Hazard #3_Attachment #1_ProcessBuildingRightToKnow/Compliance/SDSwall ..................44

        Alleged Hazard #3_Attachment #2_SDSBook/Mitragynine(kratom)SafetyDataSheetPhotos ............45

        Alleged Hazard #3_Attachment #3_FrontOfficeRightToKnow/Compliance/SDSwall .......................48

        Alleged Hazard #3_Attachment #4_ Mitragynine(kratom)SafetyDataSheetPhotos...........................49

**EXHIBIT G-2**



**Alleged Hazard #1:**
Approximately 200 employees are exposed to potentially hazardous byproducts from the kratom production process which include alkaloids and opioids. Potentially hazardous byproducts were not evaluated nor was a hazard classification determined. Contrary to 1910.1200(d)(1)

**Response:**
This allegation contains several claims that are false or misleading:

*"Approximately 200 employees are exposed to potentially hazardous byproducts from the kratom production process which include alkaloids and opioids."*
- The facility total head count is between 90-100, of which only a small sub-set work directly with the byproducts of on-site extraction processes. This potential exposure is limited to approximately 15 members of our Production & Quality departments, who have been trained and are authorized to enter the finished products clean room and mill/package product.
- Kratom and its constituents (Mitragynine and 7-Hydroxymitragynine) are not considered controlled substances in the United States. Evaluations of whether to schedule kratom were conducted by authorities including the US Health and Human Services and WHO Expert Committee on Drug Dependence, both of whom elected not to proceed with scheduling based on evidence reviewed. Additionally, the State of Colorado is currently drafting rules and regulations to oversee the processing, distribution, and sale of kratom related products within the state of Colorado.
- Kratom and its constituents are, in fact, very distinct from opioids and should not be considered as such on the basis of all three key defining features of an opioid: botanical origin, chemical structure, and pharmacology. Some have falsely stated in the past that because Mitragynine binds the mu opioid receptor (MOR), that it is thus an opioid, but this is not true. Mitragynine has been proven to bind the MOR at different binding sites from morphine, which results in provably distinct mechanisms of action.

*"Potentially hazardous byproducts were not evaluated nor was a hazard classification determined. Contrary to 1910.1200(d)(1)"*
- As required by our PPE Program, a PPE Hazard Assessment (attached) was performed prior to commencement of operations on site. The SDS for the constituent of concern (Mitragynine) in these byproducts was consulted, which states that there are no occupational exposure limits established, and that there were no known acute or chronic toxicity concerns. Due to Kratom and Mitragynine being relatively new in the natural health products industry, there is limited published literature on the subject of toxicity. As a measure of caution, we assigned a medium level risk for respiratory hazard, and a minor level risk for skin exposure, and require respirator masks with particulate filtration, as well as nitrile gloves, despite the SDS not requiring this. The members of our Production and Quality departments who are authorized to enter this work area and handle these byproducts are trained and required to wear this PPE.

**Supporting Documentation:**

**EXHIBIT G-2**

**EXHIBIT G-2**

**Alleged Hazard #2:**
Approximately 200 employees are not trained on potentially hazardous byproducts from the Kratom production process which include alkaloids and opioids. Contrary to 1910.1200(e)(1)(i) and 1910.1200(h)(1)

**Response:**
Attached for review are the hazardous materials and communications programs and protocols that are in place at the Jordan Process facility.

The facility maintains the attached documents to serve as guidelines for our facility safety and training programs, which all staff members are required to undergo immediately upon hiring. Each staff member will also sign off at the end of each training session.

The Safety Coordinator conducts weekly safety meetings/trainings and covers all sections of OSHA 1910.1200 standard multiple times throughout the year.

The allegation that there are 200 employees working at this facility is false, as there are approximately 100 employees at this facility. The allegation that this product contains opioids is false as well, please see response to Alleged Hazard #1 above.

**EXHIBIT G-2**



**Alleged Hazard #3:**
The employer did not develop safety data sheets for byproducts of the kratom manufacturing process. Contrary to 1910.1200(g)(1)

**Response:**
Jordan Process' Quality Control Department provides Safety Data Sheets for every chemical/material used in the mitragynine (kratom) extraction process, as well as Safety Data Sheets for any other chemical used on site for extraction, cleaning, maintenance, etc.. The Safety Department maintains and revises the hazardous material list and Safety Data Sheets as provided by the QC department.

Please find attached, photographs of our Right To Know Information Compliance Center in our Front Office and Process Building, as well as the Safety Data Sheet for the root compound specified in the allegation.


**Supporting Documentation:**

**EXHIBIT G-2**



**JORDAN**
P R O C E S S

Alleged Hazard #3_Attachment #1_ProcessBuildingRighttoKnow/Compliance/SDS wall photo



Jordan Process | 23298 Highway 160 | Springfield, CO 81073

**EXHIBIT G-2**



**JORDAN**
PROCESS

Alleged Hazard #3_Attachment #2_ProcessBuildingSDSBook/Mitragynine(kratom)SDS



**EXHIBIT G-2**

**JORDAN**
PROCESS

**Safety Data Sheet**
acc. to OSHA HCS

Printing date 08/11/2022

Revision date 08/11/2022

## 1 Identification

· **Product identifier**
· **Trade name:** Mitragynine
· **Article number:** 11151
· **CAS Number:**
4098-40-2
· **EC number:**
663-118-9
· **Application of the substance / the mixture**
This product is for research use - Not for human or veterinary diagnostic or therapeutic use.
· **Details of the supplier of the safety data sheet**
· **Manufacturer/Supplier:**
Cayman Chemical Co.
1180 E. Ellsworth Rd.
Ann Arbor, MI 48108
USA

· **Information department:** Product safety department
· **Emergency telephone number:**
During normal opening times: +1 (734) 971-3335
US/CANADA: 800-424-9300
Outside US/CANADA: 703-741-5970

## 2 Hazard(s) identification

· **Classification of the substance or mixture**

 GHS07

Eye Irrit. 2A   H319 Causes serious eye irritation.
Skin Sens. 1  H317 May cause an allergic skin reaction.
· **Label elements**
· **GHS label elements**
The substance is classified and labeled according to the Globally Harmonized System (GHS).
· **Hazard pictograms**

 GHS07

(Contd. on page 2)
US

EXHIBIT G-2

JORDAN
PROCESS

Safety Data Sheet
acc. to OSHA HCS
Page 1/8

EXHIBIT G-2

# JORDAN
## PROCESS

Alleged Hazard #3_ Attachment #3_FrontOfficeRightToKnow/Compliance/SDSwall



**EXHIBIT G-2**

**JORDAN**
PROCESS

Alleged Hazard #3_Attachment #4_ Mitragynine(kratom)SafetyDataSheetPhotos



Safety Data Sheet
acc. to OSHA HCS

Page 1/8

Printing date 08/11/2022

Revision date 08/11/2022

**1 Identification**

· Product identifier
· Trade name: Mitragynine
· Article number: 11151
· CAS Number:
4098-40-2
· EC number:
863-118-9
· Application of the substance / the mixture
This product is for research use - Not for human or veterinary diagnostic or therapeutic use.
· Details of the supplier of the safety data sheet
· Manufacturer/Supplier:
Cayman Chemical Co.
1180 E. Ellsworth Rd.
Ann Arbor, MI 48108
USA

· Information department: Product safety department
· Emergency telephone number:
During normal opening times: +1 (734) 971-3335
US/CANADA: 800-424-9300
Outside US/CANADA: 703-741-5970

**2 Hazard(s) identification**

· Classification of the substance or mixture

GHS07

Eye Irrit. 2A   H319 Causes serious eye irritation.
Skin Sens. 1  H317 May cause an allergic skin reaction.

· Label elements
· GHS label elements
The substance is classified and labeled according to the Globally Harmonized System (GHS).
· Hazard pictograms

GHS07

(Cont'd. on page 2)

**EXHIBIT G-2**

# JORDAN
## PROCESS



EXHIBIT G-2

EXHIBIT G-3

We collect cookies for vital website function and to better serve our customers. By continuing to browse you agree to the storing of cookies on your device. See our privacy policy for details. | I Understand |

⚠️ IMPORTANT UPDATE FROM CAYMAN

Starting at 12 p.m. EST on November 22nd, 2024 Cayman will be implementing essential upgrades to our system that will cause a slight delay in order processing and shipping.

We appreciate your understanding and will be adding a free Cayman Squish Fish to any domestic orders placed by November 21st, 2024. Please contact Customer Service with any questions or to place an order.

🔍 Search

# Mitragynine

## Item No. 11151



( Download Product Insert (PDF) )  ( Download GC-MS (PDF) )  ( Download Safety Data Sheet (SDS) (PDF) )

| BULK & CUSTOM | 🔖 BOOKMARK |
|---|---|

| 1 mg
$81
In stock | − 0 + | 🛒 |
| 5 mg
$355
In stock | − 0 + | 🛒 |

*An Analytical Reference Material*

## Features

· This product is qualified as a Reference Material that has been manufactured and tested to meet ISO/IEC 17025 and ISO 17034 international standards
· This product is intended to be used as an analytical reference standard
· Bulk material is available for qualified institutions; please contact our sales department for pricing

## Product Categories

| PRODUCT TYPE | ∧ |
|---|---|
| Biochemicals (22,507) | − |
| Analytical Standards (5,311) | − |
| Reference Materials (480) | |
| Drugs of Abuse (3,763) | |

| RESEARCH AREA | ∧ |
|---|---|
| Forensic Chemistry & Toxicology (3,816) | − |
| Opioids (802) | − |

**EXHIBIT G-3**

## Product Relationships

CERTIFIED REFERENCE MATERIAL(S) ⌄

METABOLITE(S) ⌄

ISOMER(S) ⌄

LABELED VERSION(S) ⌄

## Synonyms

Synonyms        **9-methoxy Corynantheidine**

## Technical Information

| | |
|---|---|
| Formal Name | (αE,2S,3S,12bS)-3-ethyl-1,2,3,4,6,7,12,12b-octahydro-8-methoxy-α-(methoxymethylene)-indolo[2,3-a]quinolizine-2-acetic acid, methyl ester |
| CAS Number | 4098-40-2 |
| Molecular Formula | $C_{23}H_{30}N_2O_4$ |
| Formula Weight | 398.5 |
| Purity | ≥98% |
| Formulation | A neat solid |
| (Request formulation change) | |
| Solubility | **Ethanol: 5 mg/ml** |
| (Learn about Variance in Solubility) | **Methanol: 10 mg/ml** |
| SMILES | O=C(OC)/C([C@H]([C@H]([CC)C1)CC(N1CC2)C3=C2C4=C(OC)C=CC=C4N3)=C/OC |
| InChi Code | InChI=1S/C23H30N2O4/c1-5-14-12-25-10-9-15-21-18(7-6-8-20(21)28-3)24-22(15)19(25)11-16(14)17(13-27-2)23(26)29-4/h6-8,13-14,16,19,24H,5,9-12H2,1-4H3/b17-13+/t14?,16-,19?/m0/s1 |
| InChi Key | LELBFTMXCIIKKX-DVKZKMAMSA-N |

## Shipping & Storage Information

| | |
|---|---|
| Storage | -20°C |
| Shipping | Room Temperature in continental US; may vary elsewhere |
| Stability | ≥ 3 years |



Forensic Lab Guide Wall Posters

**EXHIBIT G-3**

Discover our collection of drug identification, naming, and metabolism posters for your lab. We offer all of our posters at no cost to help support the forensic community.

REQUEST YOURS

## Product Description

Mitragynine (Item No. 11151) is an analytical reference material categorized as an opioid.[1,2] Mitragynine and its derivatives have been identified in products sold as incense.[3] This product is intended for research and forensic applications.

**WARNING** This product is **not** for human or veterinary use.

## Tools

🔗 Download free InChI key software

🔗 Synthetic Cannabinoid Flipbook

🔗 GC-MS Drug Identification Tool

📄 Chemical Structure Database

📄 Cayman Spectral Library

## Certificates of Analysis & Batch Specific Data

**Get Batch-Specific Data and Documents by Batch Number**

Provide batch numbers separated by commas to download or request available product inserts, QC sheets, certificates of analysis, data packs, and GC-MS data.

| Add your batch numbers here... | GO |

## Researchers Also Purchased

❮                                                                             ❯

5-methoxy DALT

## References & Product Citations

**Product Description References**

1. Matsumoto, K., Mizowaki, M., Suchitra, T., *et al.* Central antinociceptive effects of mitragynine in mice: Contribution of descending noradrenergic and serotonergic systems. *Eur. J. Pharmacol.* **317(1),** 75-81 (1996).

2. Takayama, H., Ishikawa, H., Kurihara, M., *et al.* Studies on the synthesis and opioid agonistic activities of mitragynine-related indole alkaloids: Discovery of opioid agonists structurally different from other opioid ligands. *J. Med. Chem.* **45(9),** 1949-1956 (2002).

**EXHIBIT G-3**

3. Kikura-Hanajiri, R., Uchiyama, N., and Goda, Y. Survey of current trends in the abuse of psychotropic substances and plants in Japan. *Leg. Med. (Tokyo)* **13(3),** 109-115 (2011).

**Product Citations**

Kim, K., Shahsavarani, M., Garza-García., J.J.O., *et al.* Biosynthesis of kratom opioids. *New Phytol.* (2023).

Basiliere, S., and Kerrigan, S. Identification of metabolites and potential biomarkers of kratom in urine. *J. Chromatogr. B Analyt. Technol. Biomed. Life Sci.* **1140,** 121971 (2020).

## Technical Support & Resources

Visit our FAQ

**Contact Us**

Toll Free Phone (USA and Canada Only): (888) 526-5351
Direct Phone: (734) 975-3888

Request Technical Support     ⌄

---

CAYMAN CHEMICAL     +

CONFERENCES     +

TOOLS & RESOURCES     +

OUR PARTNERS     +

TERMS, CONDITIONS & LOGISTICS     +

CONTACT INFO     +

  

**EXHIBIT G-3**



# Safety Data Sheet
## acc. to OSHA HCS

Printing date 08/11/2022                                                    Revision date 08/11/2022

## 1 Identification

· **Product identifier**
· **Trade name: Mitragynine**
· **Article number:** 11151
· **CAS Number:**
4098-40-2
· **EC number:**
863-118-9
· **Application of the substance / the mixture**
This product is for research use - Not for human or veterinary diagnostic or therapeutic use.

· **Details of the supplier of the safety data sheet**
· **Manufacturer/Supplier:**
Cayman Chemical Co.
1180 E. Ellsworth Rd.
Ann Arbor, MI 48108
USA

· **Information department:** Product safety department
· **Emergency telephone number:**
During normal opening times: +1 (734) 971-3335
US/CANADA: 800-424-9300
Outside US/CANADA: 703-741-5970

## 2 Hazard(s) identification

· **Classification of the substance or mixture**

 GHS07

Eye Irrit. 2A   H319 Causes serious eye irritation.
Skin Sens. 1 H317 May cause an allergic skin reaction.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
· **Label elements**
· **GHS label elements**
The substance is classified and labeled according to the Globally Harmonized System (GHS).
· **Hazard pictograms**



GHS07

(Contd. on page 2)
US

**EXHIBIT G-3**

Page 2/8
Case 2:24-cv-00228-WBV-DPC    Safety Data Sheet    Filed 06/30/25    Page 340 of 489
acc. to OSHA HCS

Printing date 08/11/2022                                                           Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 1)

· **Signal word** Warning
· **Hazard statements**
H319 Causes serious eye irritation.
H317 May cause an allergic skin reaction.
· **Precautionary statements**

| | |
|---|---|
| P261 | Avoid breathing dust/fume/gas/mist/vapors/spray |
| P264 | Wash thoroughly after handling. |
| P272 | Contaminated work clothing must not be allowed out of the workplace. |
| P280 | Wear protective gloves / eye protection / face protection. |
| P302+P352 | If on skin: Wash with plenty of water. |
| P305+P351+P338 | If in eyes: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing. |
| P333+P313 | If skin irritation or rash occurs: Get medical advice/attention. |
| P321 | Specific treatment (see on this label). |
| P337+P313 | If eye irritation persists: Get medical advice/attention. |
| P363 | Wash contaminated clothing before reuse. |
| P501 | Dispose of contents/container in accordance with local/regional/national/international regulations. |

· **Classification system:**
· **NFPA ratings (scale 0 - 4)**



Health = 2
Fire = 0
Reactivity = 0

· **HMIS-ratings (scale 0 - 4)**



Health = 2
Fire = 0
Reactivity = 0

· **Other hazards**
· **Results of PBT and vPvB assessment**
· **PBT:** Not applicable.
· **vPvB:** Not applicable.

## 3 Composition/information on ingredients

· **Chemical characterization: Substances**
· **CAS No. Description**
4098-40-2 Mitragynine
· **Identification number(s)**
· **EC number:** 863-118-9

## 4 First-aid measures

· **Description of first aid measures**
· **After inhalation:**
Supply fresh air and to be sure call for a doctor.
In case of unconsciousness place patient stably in side position for transportation.
· **After skin contact:** Immediately wash with water and soap and rinse thoroughly.
· **After eye contact:**
Rinse opened eye for several minutes under running water. If symptoms persist, consult a doctor.

(Contd. on page 3)
US

**EXHIBIT G-3**

Page 3/8
Case 2:24-cv-00228-WBV-DPC **Safety Data Sheet** Filed 06/30/25 Page 341 of 489
acc. to OSHA HCS

Printing date 08/11/2022                                                    Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 2)
· **After swallowing:** If symptoms persist consult doctor.
· **Information for doctor:**
· **Most important symptoms and effects, both acute and delayed**
May cause anemia, cough, CNS depression, drowsiness, headache, heart damage, lassitude (weakness, exhaustion), liver damage, narcosis, reproductive effects, teratogenic effects.
No further relevant information available.
· **Indication of any immediate medical attention and special treatment needed**
No further relevant information available.

## 5 Fire-fighting measures

· **Extinguishing media**
· **Suitable extinguishing agents:**
Use fire fighting measures that suit the environment.
A solid water stream may be inefficient.
· **Special hazards arising from the substance or mixture** No further relevant information available.
· **Advice for firefighters**
· **Protective equipment:** No special measures required.

## 6 Accidental release measures

· **Personal precautions, protective equipment and emergency procedures** Not required.
· **Environmental precautions:** Do not allow to enter sewers/ surface or ground water.
· **Methods and material for containment and cleaning up:** Pick up mechanically.
· **Reference to other sections**
See Section 7 for information on safe handling.
See Section 8 for information on personal protection equipment.
See Section 13 for disposal information.
· **Protective Action Criteria for Chemicals**
· **PAC-1:** Substance is not listed.
· **PAC-2:** Substance is not listed.
· **PAC-3:** Substance is not listed.

## * 7 Handling and storage

· **Handling:**
· **Precautions for safe handling**
No special precautions are necessary if used correctly.
Avoid breathing dust/fume/gas/mist/vapours/spray.
Avoid prolonged or repeated exposure.
Keep away from sources of ignition.
Take precautionary measures against static discharge.re.
· **Information about protection against explosions and fires:** No special measures required.

· **Conditions for safe storage, including any incompatibilities**
· **Storage:** Store in accordance with information listed on the product insert.
· **Requirements to be met by storerooms and receptacles:** No special requirements.
· **Information about storage in one common storage facility:** Not required.
· **Further information about storage conditions:** Keep receptacle tightly sealed.

(Contd. on page 4)
US

**EXHIBIT G-3**

Printing date 08/11/2022                                                              Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 3)

· **Specific end use(s)** No further relevant information available.

## 8 Exposure controls/personal protection

· **Additional information about design of technical systems:** No further data; see item 7.

· **Control parameters**
· **Components with limit values that require monitoring at the workplace:** Not required.
· **Additional information:** The lists that were valid during the creation were used as basis.

· **Exposure controls**
· **Personal protective equipment:**
· **General protective and hygienic measures:**
Keep away from foodstuffs, beverages and feed.
Immediately remove all soiled and contaminated clothing.
Wash hands before breaks and at the end of work.
Avoid contact with the eyes.
Avoid contact with the eyes and skin.
· **Breathing equipment:** Not required.
· **Protection of hands:**

 Protective gloves

The glove material has to be impermeable and resistant to the product/ the substance/ the preparation.
Due to missing tests no recommendation to the glove material can be given for the product/ the preparation/ the chemical mixture.
Selection of the glove material on consideration of the penetration times, rates of diffusion and the degradation
· **Material of gloves**
The selection of the suitable gloves does not only depend on the material, but also on further marks of quality and varies from manufacturer to manufacturer.
· **Penetration time of glove material**
The exact break through time has to be found out by the manufacturer of the protective gloves and has to be observed.
· **Eye protection:**

 Tightly sealed goggles

## 9 Physical and chemical properties

· **Information on basic physical and chemical properties**
· **General Information**
· **Appearance:**
    **Form:**                            Solid
    **Color:**                           Not determined.
· **Odor:**                              Characteristic
· **Structural Formula**                 C23H30N2O4
· **Molecular Weight**                   398.5 g/mol

(Contd. on page 5)
US

**EXHIBIT G-3**

Printing date 08/11/2022                                                      Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 4)

| | |
|---|---|
| · **Odor threshold:** | Not determined. |
| · **pH-value:** | Not applicable. |
| · **Change in condition**<br>    **Melting point/Melting range:**<br>    **Boiling point/Boiling range:** | Undetermined.<br>Undetermined. |
| · **Flash point:** | Not applicable. |
| · **Flammability (solid, gaseous):** | Product is not flammable. |
| · **Decomposition temperature:** | Not determined. |
| · **Auto igniting:** | Not determined. |
| · **Danger of explosion:** | Product does not present an explosion hazard. |
| · **Explosion limits:**<br>    **Lower:**<br>    **Upper:** | Not determined.<br>Not determined. |
| · **Vapor pressure:** | Not applicable. |
| · **Density:**<br>· **Relative density**<br>· **Vapor density**<br>· **Evaporation rate** | Not determined.<br>Not determined.<br>Not applicable.<br>Not applicable. |
| · **Solubility in / Miscibility with**<br>    **Water:** | Not determined. |
| · **Partition coefficient (n-octanol/water):** | Not determined. |
| · **Viscosity:**<br>    **Dynamic:**<br>    **Kinematic:**<br>    **SOLUBILITY** | Not applicable.<br>Not applicable.<br>Ethanol: 5 mg/ml; Methanol: 10 mg/ml |
| · **Other information** | No further relevant information available. |

## 10 Stability and reactivity

· **Reactivity** No further relevant information available.
· **Chemical stability**
· **Thermal decomposition / conditions to be avoided:**
  No decomposition if used according to specifications.
· **Possibility of hazardous reactions** No dangerous reactions known.
· **Conditions to avoid** No further relevant information available.
· **Incompatible materials:** strong oxidizing agents
· **Hazardous decomposition products:** strong oxidizing agents, carbon monoxide, nitrogen oxides

## 11 Toxicological information

· **RTECS Number** NM3474000

(Contd. on page 6)

**EXHIBIT G-3**

Printing date 08/11/2022                                          Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 5)

· **Information on toxicological effects**
· **Acute toxicity:**

· **LD/LC50 values that are relevant for classification:**

| Intraperitoneal TDLO | 5 mg/kg (mouse) |
|---|---|

· **Primary irritant effect:**
· **on the skin:** No irritant effect.
· **on the eye:** Irritating effect.
· **Sensitization:** Sensitization possible through skin contact.
· **Additional toxicological information:**

· **Carcinogenic categories**
· **IARC (International Agency for Research on Cancer)** Substance is not listed.
· **NTP (National Toxicology Program)** Substance is not listed.
· **OSHA-Ca (Occupational Safety & Health Administration)** Substance is not listed.

## 12 Ecological information

· **Toxicity**
· **Aquatic toxicity:** No further relevant information available.
· **Persistence and degradability** No further relevant information available.
· **Behavior in environmental systems:**
· **Bioaccumulative potential** No further relevant information available.
· **Mobility in soil** No further relevant information available.
· **Additional ecological information:**
· **General notes:**
Water hazard class 1 (Self-assessment): slightly hazardous for water
Do not allow undiluted product or large quantities of it to reach ground water, water course or sewage system.
· **Results of PBT and vPvB assessment**
· **PBT:** Not applicable.
· **vPvB:** Not applicable.
· **Other adverse effects** No further relevant information available.

## 13 Disposal considerations

· **Waste treatment methods**
· **Recommendation:**
Must not be disposed of together with household garbage. Do not allow product to reach sewage system.

· **Uncleaned packagings:**
· **Recommendation:** Disposal must be made according to official regulations.

## 14 Transport information

| · **UN-Number** | |
|---|---|
| · **DOT, IMDG, IATA** | not regulated |

| · **UN proper shipping name** | |
|---|---|
| · **DOT, IMDG, IATA** | not regulated |

(Contd. on page 7)

**EXHIBIT G-3**

Printing date 08/11/2022                                                            Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 6)

| · **Transport hazard class(es)** | |
|---|---|
| · **DOT, ADN, IMDG, IATA** | |
| · **Class** | not regulated |
| · **Packing group** | |
| · **DOT, IMDG, IATA** | not regulated |
| · **Environmental hazards:** | Not applicable. |
| · **Special precautions for user** | Not applicable. |
| · **Transport in bulk according to Annex II of MARPOL73/78 and the IBC Code** | Not applicable. |
| · **UN "Model Regulation":** | not regulated |

## 15 Regulatory information

· **Safety, health and environmental regulations/legislation specific for the substance or mixture**
No further relevant information available.
· **Sara**
· **Section 355 (extremely hazardous substances):** Substance is not listed.
· **Section 313 (Specific toxic chemical listings):** Substance is not listed.
· **TSCA (Toxic Substances Control Act):** Substance is not listed.
· **Hazardous Air Pollutants** Substance is not listed.
· **Proposition 65**
· **Chemicals known to cause cancer:** Substance is not listed.
· **Chemicals known to cause reproductive toxicity for females:** Substance is not listed.
· **Chemicals known to cause reproductive toxicity for males:** Substance is not listed.
· **Chemicals known to cause developmental toxicity:** Substance is not listed.

· **Carcinogenic categories**
· **EPA (Environmental Protection Agency)** Substance is not listed.
· **TLV (Threshold Limit Value)** Substance is not listed.
· **NIOSH-Ca (National Institute for Occupational Safety and Health)** Substance is not listed.
· **Chemical safety assessment:** A Chemical Safety Assessment has not been carried out.

## 16 Other information

All chemicals may pose unknown hazards and should be used with caution. This SDS applies only to the material as packaged. If this product is combined with other materials, deteriorates, or becomes contaminated, it may pose hazards not mentioned in this SDS. Cayman Chemical Company assumes no responsibility for incidental or consequential damages, including lost profits, arising from the use of these data. It shall be the user's responsibility to develop proper methods of handling and personal protection based on the actual conditions of use. While this SDS is based on technical data judged to be reliable, Cayman Chemical Company assumes no responsibility for the completeness or accuracy of the information contained herein.

· **Department issuing SDS:** Environment protection department.
· **Contact:** -
· **Date of preparation / last revision** 08/11/2022 / -
· **Abbreviations and acronyms:**
IMDG: International Maritime Code for Dangerous Goods
DOT: US Department of Transportation
IATA: International Air Transport Association

(Contd. on page 8)
US

**EXHIBIT G-3**

Page 8/8
Case 2:24-cv-00228-WBV-DPC **Safety Data Sheet** Filed 06/30/25 Page 346 of 489
acc. to OSHA HCS

Printing date 08/11/2022                                                           Revision date 08/11/2022

**Trade name: Mitragynine**

(Contd. from page 7)

EINECS: European Inventory of Existing Commercial Chemical Substances
CAS: Chemical Abstracts Service (division of the American Chemical Society)
NFPA: National Fire Protection Association (USA)
HMIS: Hazardous Materials Identification System (USA)
LC50: Lethal concentration, 50 percent
LD50: Lethal dose, 50 percent
PBT: Persistent, Bioaccumulative and Toxic
vPvB: very Persistent and very Bioaccumulative
NIOSH: National Institute for Occupational Safety
OSHA: Occupational Safety & Health
TLV: Threshold Limit Value
PEL: Permissible Exposure Limit
REL: Recommended Exposure Limit
Eye Irrit. 2A: Serious eye damage/eye irritation – Category 2A
Skin Sens. 1: Skin sensitisation – Category 1
· **\* Data compared to the previous version altered.**

US

**EXHIBIT G-3**

# EXHIBIT G-4

# Jordan Process LLC

## General Information

**Facility name:** Jordan Process LLC

**Facility address:** 23298 US Highway 160, Springfield, CO 81073

**EPA ID number:** COR000254656

**Notification:** large quantity generator of hazardous waste (LQG)

**Type of inspection:** Compliance Evaluation Inspection

**Inspection date:** May 17, 2023

| **Pre-arranged:** Yes | **Time in:** 9:00 am | **Time out:** 12:00 pm |
|---|---|---|
| **Facility contact and title:** Charles Smith, Chief Manufacturing Officer | | |
| **Facility phone number:** 970-443-0824 | | |
| **Participants:** Dan Goetz, CDPHE<br>Charles Smith, Chief Manufacturing Officer, Candy Mason, OPS Manager, Shannen Poe, QC Manager, Jared Leathers, Safety Coordinator Jordan Process | | |
| **Previously inspected:** No previous compliance evaluation inspections have been performed at this facility. | | |
| **Product or service:** This facility manufactures a broad spectrum alkaloid which is sent to clients for additional processing. | | |
| **Facility start date:** July 2021 | **Number of employees:** Approximately 85 | **Shifts:** 24/7 |

## Facility Inspection

On the morning of May 17, 2023, inspector Dan Goetz from the Colorado Department of Public Health and Environment, Hazardous Materials and Waste Management Division (the Division) conducted a compliance evaluation inspection at Jordan Process located at 23298 US Highway 160, Springfield, CO 81073.

**EXHIBIT G-4**

Upon arrival at the facility, the inspector met Charles Smith, Chief Manufacturing Officer, Candy Mason, OPS Manager, Shannen Poe, QC Manager, and Jared Leathers, Safety Coordinator at Jordan Process. At that time, the inspector presented his identification and credentials and an opening conference was held.

Jordan Process produces a broad spectrum alkaloid from a biomass called uncaria gambir. The alkaloid is sent to other manufacturers for additional processing. This facility was previously operated as a hemp growing facility until Jordan Process bought the operation and began their current operation. Jordan Process does not grow or process hemp. The facility is 36 acres consisting of twelve buildings. The facility mixes the uncaria gambir with solvents in a tank which is followed by mass filtration, distillation, acid/base extraction, liquid to liquid separation, distillation and solids recovery. Hazardous waste is generated during the liquid to liquid separation process consisting of 5% ethyl acetate and water with a flash point between 32-40 degrees Fahrenheit (D001). The hazardous waste ethyl acetate is piped to a 20k gallon hazardous waste above-ground storage tank. When the above-ground storage tank is full the hazardous waste is transferred to 275-gallon totes. This is the only hazardous waste stream produced at this facility.

Since the organic content of the waste solvent consists of 5% ethyl acetate and water with a concentration of organics being less than 10% by weight, 6 CCR 1007-3 Part 265, Subpart BB does not apply to the equipment that contains or contacts the waste solvent.

**Previous inspections and process changes from previous inspections:** The facility has not been previously inspected.

**Current generator status:** The facility is notified and operating as a large quantity generator of hazardous waste.

**Current hazardous waste streams:** Jordan Process primarily generates the following hazardous waste streams:

- Ethyl acetate (D001)
- Universal waste batteries

**Hazardous waste accumulation areas:** Accompanied by facility personnel, the inspector toured select areas of the Jordan Process facility where hazardous waste is generated and accumulated. The inspector evaluated the following areas of the facility:

**90-Day Area:** Open area behind the buildings containing 339 275-gallon totes containing ethyl acetate liquid hazardous waste. All totes were properly labeled with the words "hazardous waste", included an indication of the hazard, were marked with accumulation start dates (from the time of generation at the 20k tank), in good condition, closed with proper aisle space and inspected weekly. No violations were observed.

**Above-Ground Storage Tank:** One 20k above-ground storage tank properly labeled with the words "hazardous waste" and an indication of the hazard "flammable". The location of the tank is greater than 50 feet from the property line and is inspected daily. The tank has secondary containment (double-walled) with

**EXHIBIT G-4**

leak detection (interstitial system). All ancillary equipment is double walled piping. There is a dedicated waste loading area including a berm. All 6 CCR 1007-3, Section 265 Subpart J regulations were reviewed regarding this tank (listed later in this report). Mr. Smith indicated this tank was installed in 2021and has not leaked since put into operation. No violations were observed.

**Used oil:** On the day of this inspection, Jordan Process generates used oil from machine maintenance activities and stores the used oil in 55-gallon drums. No used oil drums were observed during this inspection.

**Hazardous waste treatment:** On the day of this inspection, Jordan Process was not conducting generator treatment.

**Wastewater treatment unit/discharge permit:** On the day of this inspection, Jordan Process was not discharging wastewater.

**Fire protection district:** Jordan Process is located within the Springfield Fire Department.

<div align="center">**Document Review**</div>

The following documents associated with the management of hazardous waste were reviewed at the time of this inspection:

- **Training and associated records**: Training records including training content, dates of training and job descriptions for personnel involved with the management of hazardous waste were reviewed. No issues with the facility training records were identified on the day of this inspection.

- **Contingency plan**: The facility's contingency plan and quick reference guide were reviewed. No issues with the facility contingency plan/quick reference guide were identified on the day of this inspection.

- **Manifests and LDR documentation**: Hazardous waste manifests and land disposal restriction notification forms dating back to 2021 were reviewed. No issues with the facility manifests and LDR documentation were identified on the day of this inspection.

- **Inspection Logs**: 90-day accumulation containers and the hazardous waste above-ground storage tank inspection logs were reviewed. No violations were observed.

<div align="right">**EXHIBIT G-4**</div>

**Coverage Areas**

**Generator coverage areas:** The following coverage areas applicable to a large quantity generator were evaluated during this inspection.

**General requirements (6 CCR 1007-3, sections 262.9, 262.11, 262.13 and 262.18):**

- **Generator annual fees (6 CCR 1007-3, section 262.9).** No issues were identified on the day of the inspection.

- **Hazardous waste determination and recordkeeping (6 CCR 1007-3, section 262.11).** No issues were identified on the day of the inspection.

- **Generator category determination (6 CCR 1007-3, section 262.13).** No issues were identified on the day of this inspection.

- **EPA identification number and re-notification (6 CCR 1007-3, section 262.18).** No issues were identified on the day of the inspection.

**General on-site hazardous waste management, storage and operating requirements (6 CCR 1007-3, sections 262.15 and 262.17)**: The following on-site hazardous waste management, storage and operating requirements were evaluated during this inspection:

- **On-site 90-day accumulation time limit (6 CCR 1007-3, section 262.17(a)):** No issues were identified on the day of the inspection.

- **Marking and labeling 90-day accumulation containers and tanks (6 CCR 1007-3, section 262.17(a)(5)):** No issues were identified on the day of the inspection.

- **Marking and labeling SAA containers (6 CCR 1007-3, section 262.15(a)(5)).** No issues were identified on the day of this inspection.

- **Weekly inspections - 90-day accumulation containers (6 CCR 1007-3, section 262.17(a)(1)(v):** No issues were identified on the day of the inspection.

- **Weekly inspections – satellite accumulation area (SAA) containers (6 CCR 1007-3, section 262.15(a)(9):** No issues were identified on the day of this inspection.

- **Management of 90-day accumulation containers (6 CCR 1007-3, section 262.17(a)(1):**

  - **Condition of containers**: (6 CCR 1007-3, section 262.17(a)(1)(ii)) No issues were identified on the day of the inspection.

**EXHIBIT G-4**

- **Open Containers: (6 CCR 10076-3, section 262.17(a)(1)(iv))** No issues were identified on the day of the inspection.

- **Incompatible wastes: (6 CCR 1007-3, section 262.17(a)(1)(vii))** No issues were identified at the time of this inspection.

- **Management of satellite accumulation containers (6 CCR 1007-3, section 262.15):**

  - **At or near the point of generation (6 CCR 1007-3, section 262.15(a):** No issues were identified at the time of this inspection.

  - **Condition of containers (6 CCR 1007-3, section 262.15(a)(1)):** No issues were identified at the time of this inspection.

  - **Incompatible wastes (6 CCR 1007-3, section 262.15(a)(3):** No issues were identified at the time of this inspection.

  - **Open containers (6 CCR 1007-3, section 262.15(a)(4):** No issues were identified at the time of this inspection.

- **Preparedness and prevention (6 CCR 1007-3, sections 262.17(a)(6) and Part 262, Subpart M)**

  - **Maintenance and operation of facility (6 CCR 1007-3, section 262.251):** No issues were identified on the day of this inspection.

  - **Required equipment (6 CCR 1007-3, section 262.252):** No issues were identified on the day of this inspection.

  - **Aisle space (6 CCR 1007-3, section 262.255):** No issues were identified on the day of this inspection.

  - **Arrangements with local authorities (6 CCR 1007-3, section 262.256):** No issues were identified on the day of this inspection.

  - **Contingency plan (6 CCR 1007-3, sections 262.260 and 262.261)** No issues were identified on the day of this inspection.

- **Training (6 CCR 1007-3, section 262.17(a)(7)):** No issues were identified at the time of this inspection.

**Manifest requirements (6 CCR 1007-3, sections 262.20 – 262.27) and requirements for recyclable materials utilized for precious metal recovery (6 CCR 1007-3, section 267.70):** No issues were identified at the time of this inspection.

**EXHIBIT G-4**

**Recordkeeping and reporting requirements (6 CCR 1007-3, sections 262.40 – 262.44):** No issues were identified on the day of this inspection.

## Other Coverage Areas

**Notification requirements (6 CCR 1007-3, Part 99):** No issues were identified on the day of this inspection.

**Permit requirements (6 CCR 1007-3, Part 100):** No issues were identified on the day of this inspection.

**Land disposal restrictions (6 CCR 1007-3, Part 268):** No issues related to LDR paperwork were identified on the day of this inspection.

**Used oil requirements (6 CCR 1007-3, Part 279):** No issues were identified at the time of this inspection.

**Universal waste requirements (6 CCR 1007-3, Part 273):** No issues were identified at the time of this inspection.

**Tank Systems - 6 CCR 1007-3, Section 265 Subpart J**

- Tank Integrity (6 CCR 1007 -3, Section 265.192). No violations were observed during this inspection.

- Containment and Detection of Releases (6 CCR 1007 -3, Section 265.193). The 20k above-ground storage tank secondary containment (double walled) and a secondary containment basin which was observed during the inspection to be well maintained which also includes a leak detection system. Ancillary equipment is double walled with leak detection (interstitial). No violations were observed during this inspection.

- General Operating Requirements (6 CCR 1007 -3, Section 265.194). The facility uses spill and overfill prevention controls. No violations were observed during this inspection.

- Inspections (6 CCR 1007 -3, Section 265.195). Daily inspections were conducted as required. No leaks have been detected with this tank system since installed and operating (circa 2021). No violations were observed during this inspection.

- Special Requirements for Ignitable or Reactive Wastes (6 CCR 1007 -3, Section 261.198). At the time of this inspection, Jordan Process was found to be in compliance with the special provisions for the management of ignitable hazardous waste in tank systems. The waste was stored or treated in such a way that it is protected from any material or conditions that may cause the waste to ignite. The waste tanks were located far enough from the nearest property line to meet the requirements of the National Fire Protection Association's "Flammable and Combustible Liquids Code." No violations were observed during this inspection.

**EXHIBIT G-4**

**Compliance Assistance/Close-out Meeting**

The inspector conducted a closeout conference with Mr. Smith prior to leaving the facility. During the close-out meeting, the inspector provided facility personnel with verbal information on the Colorado Hazardous Waste Regulations.

A Notice of Inspection (Attachment 1) was completed by Dan Goetz and signed by Mr. Smith as the facility representative. A copy of the Notice of Inspection was left with facility personnel prior to leaving the facility.

**Signature Block**

Prepared by: _____          June 30, 2023
               Dan Goetz                                    Date

**Attachments**

1.     Notice of Inspection

**EXHIBIT G-4**

# EXHIBIT G-5



**Leak Test Report**

Page 1 of 1

VEGA Americas, Inc.
4241 Allendorf Drive
Cincinnati, Ohio 45209 USA
toll: 1.800.FOR.LEVEL (367 5383)
fax: 513.272.0133

CUID:  551873
Email:  Toddk@olisticagroup.com

| Customer Information: | Todd Kindorf | Analyzed By: | Heather Bigler |
|---|---|---|---|
| | Jordan Process | Equipment No.: | 311445 / NS-0167 |
| | Olistica Life Sciences | Calibration Due: | 2/26/2022 |
| | 23298 US Highway 160 | Analysis Date: | 6/24/2021 |
| | Springfield CO 81073-9627 | Sources Analyzed: | 1 |

VEGA Americas is authorized by the Ohio Department of Health, License Number 03214310002

Ohio Administrative Code (OAC) - 3701:1-38-24 ( E ) A sealed source shall be considered to be leaking if the presence of one hundred eighty-five becquerels (0.005 microcurie) or more of removable contamination on any test sample is identified.

**Results:**

| Serial # | Isotope | mCi | Source Holder | Customer ID | Date Collected | Test Result |
|---|---|---|---|---|---|---|
| 4401CR | Cs-137 | 2.00 | SHLD-1 | CV-602 | 6/21/2021 | <0.005 µCi |

| Analyzed By: | Heather Bigler | *Heather Bigler* | Date: | 6/24/2021 |
|---|---|---|---|---|
| Validated By: | Heidi Dallman | *Heidi Dallman* | Date: | 6/24/2021 |

**EXHIBIT G-5**

# EXHIBIT G-6

# GEORGIA BUREAU OF INVESTIGATION
## CANTON REGIONAL DRUG ENFORCEMENT OFFICE
## INVESTIGATIVE CASE SUMMARY

**75-0104-21-12**

On Monday, June 18, 2012, at approximately 1:30 p.m., GBI Assistant Special Agent in Charge KEN HOWARD and GBI Special Agent MIKE CORDERO traveled to 3760 Chattahoochee Summit, Atlanta, Georgia.  Agents did so for the purpose of interviewing MARK DANIEL REILLY.  REILLY was not at the residence.  Agent HOWARD made contact with his mother and she telephoned REILLY.  Agent HOWARD spoke to REILLY on the phone and REILLY said that he resided at 3760 Chattahoochee Summit.  REILLY agreed to meet Agents at the home.

At approximately 2:00 p.m., REILLY arrived.  He was driving a white, Cadillac that displayed Georgia tag number BXQ 5832 (see attached).  The vehicle is registered to Reilly at ████████████████████████████  Agent HOWARD identified himself as a GBI Agent and displayed his credentials.  Agent HOWARD told REILLY that he had been identified as a local synthetic marijuana and bath salts distributor and that Agent HOWARD wished to interview him about this.  REILLY told Agent HOWARD that he wished to be represented by a lawyer.  REILLY attempted to telephone an individual whom he identified as his attorney.  Agent HOWARD told REILLY that new emergency rules applied to the distribution of synthetic marijuana and he stated that he was aware.  Agent HOWARD informed him that this visit should serve as notice to REILLY that law enforcement was aware of his activities.  Agent HOWARD concluded the interview.

**PROPERTY OF GBI**

Further dissemination is prohibited without written approval of a
GBI Supervisor

EXHIBIT _____

**EXHIBIT G-6**

## GEORGIA BUREAU OF INVESTIGATION
## CANTON REGIONAL DRUG ENFORCEMENT OFFICE
## INVESTIGATIVE CASE SUMMARY

**75-0104-21-12**

On June 20, 2012, GBI ASAC KEN HOWARD received, from the GBI Intelligence Unit, an Intelligence Information Analysis on MARK DANIEL REILLY (see attached). While analyzing Georgia Secretary of State incorporation records, Agent HOWARD previously identified REILLY as an employee of LM Supply, LLC.  Agent HOWARD observed, in the current analysis, that REILLY is also associated with Lunar Labs, LLC.  The business address is 1880 West Oak Parkway, Suite 214 Marietta, Georgia.  Agent HOWARD queried the company on Google, and a web-site came up (http://lunar-labs.com/) and it states that it's a company that manufactures and distributes "high quality herbal supplements" (see attached).

**ATTACHMENTS:**

1.  Intel Analysis on REILLY
2.  Web Page Lunar Labs

**ID DATA:**

**REILLY, MARK DANIEL  (Previously Submitted)**

SPECIAL AGENT IN CHARGE, ASST KEN E HOWARD:                    *KH*
6/21/2012

keh: 6/21/2012

**PROPERTY OF GBI**

Further dissemination is prohibited without written approval of a
GBI Supervisor

EXHIBIT  _____

**EXHIBIT G-6**



# EXHIBIT G-7

# GEORGIA BUREAU OF INVESTIGATION
## CANTON REGIONAL DRUG ENFORCEMENT OFFICE
### INVESTIGATIVE SUMMARY

**75-0106-21-12**

On Tuesday, July 10, 2012, at approximately 11:20 a.m., GBI Assistant Special Agent in Charge KEN HOWARD was located at 1880 West Oak Parkway, Suite 214, Marietta, Cobb County, Georgia.   This is a business known as LUNAR LABS/OMERTA LABS LLC.  Several minutes prior to this, Agent HOWARD noted the arrival of PAYTON SHEA PALAIO.   PALAIO entered the building and identified himself to Agent HOWARD as the owner.   Agent HOWARD requested an interview and PALAIO consented.   He first requested that he use his telephone to contact his lawyer.   PALAIO telephoned an unidentified subject and after a brief conversation terminated the phone call.   Agent HOWARD requested that PALAIO make no further telephone calls.   Agent HOWARD informed PALAIO that a Search Warrant had been obtained for the property.   Agent HOWARD and PALAIO proceeded to PALAIO'S upstairs office.   Agent HOWARD advised PALAIO of his Miranda Rights by reading them from a GBI Miranda Waiver Form (see attached).   Agent HOWARD also obtained a digital recording of this interview.   The recording was downloaded to a CD and documented on GBI Receipt for Property E – 530923 (see attached).   PALAIO provided the following information:

PAYTON SHEA PALAIO, date of birth█████-1986, resides at ████████████, ████Georgia and has a cellular telephone number of ████████.   PALAIO asked if he was under arrest and Agent HOWARD told him that he was not.   PALAIO said he was willing to talk to Agent HOWARD to a limited extent.   He said any line of questions that are not threatening he will answer.   He identified himself as the owner of LUNAR LABS LLC and OMERTA LABS LLC.   He said there was no other business associated with this building.   Agent HOWARD prompted him about WG DISTRIBUTION and he said that it operates from another location.   PALAIO said he

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

**EXHIBIT G-7**

**75-0106-21-12**

consults on chemistry and pharmacology through WG DISTRIBUTION.    PALAIO elaborated that he studied chemistry for nine years with mentors who are PhD's.    He has no degree from any college.    He studied under Dr. AMIN RAMEN for four years. This was the bulk of his education.    He has also studied on his own.    He has attended seminars on dietary supplements.    PALAIO knows about the products on the Search Warrant but they are not his products.    PALAIO hesitated to identify the owner of the products listed on the Search Warrant.    He said that he was not comfortable identifying this subject.    He elaborated that this individual purchases energy and weight loss supplements from PALAIO'S business.    The bulk of PALAIO'S business is mood altering substances like five hour energy drinks.    When asked, he stated that five hour energy drinks is not one of his products, it's just an example of what he does.    He said he sells bulk generic products primarily.    These are items such as Kratom and IFizz. IFizz is one of his particular brand name products.    He said that he sells generic bulk products that are bought by other companies labeled and marketed and sold by those companies under their own brand.    PALAIO said that he does not manufacture synthetic cannabinoids.    PALAIO said that he cannot say what he has done in the past (indicating to Agent HOWARD that he has distributed synthetic cannabinoids previously).    He contradicted himself next and said he used synthetic cannabinoids years ago but that is the limit of his involvement.    PALAIO is not involved at all in synthetic cannabinoids, bath salts etc.

PALAIO sells Kratom to Guci Herbal (JEFFREY BAUCOM/MICHAEL SHEPARD/JUSTIN CHUMLEY) in bulk generic form.    Agent HOWARD asked PALAIO if Guci Herbal distributes synthetic cannabinoids, and from whom do they obtain the synthetic cannabinoids.    PALAIO said that he heard they obtain the synthetic cannabinoids from Nutragenomics.    He stated that JEFF BAUCOM, from Guci Herbal,

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

**EXHIBIT G-7**

**75-0106-21-12**

has talked to PALAIO about this.  JEFF BAUCOM told him that Nutragenomics was the source of supply.  This conversation took place in the last month.  He said that he has talked to him within the past month about concerns he has about business with Nutragenomics.  When asked about specific criminal activity PALAIO said that he is not comfortable talking about some things.

Agent HOWARD specifically asked him at this point about MARK REILLY.  PALAIO consented that he sells supplements to REILLY in the form of Kratom, sexual enhancement pills, and consults for REILLY.  REILLY is a distributor that buys bulk generic products.  PALAIO stated that he does not know what brands REILLY distributes to retailers.  It should be noted that this is contradictory to evidence Agent HOWARD observed on shelves in the laboratory warehouse.  Agent HOWARD observed Aztec products, products believed to be distributed by MARK REILLY and on behalf of PEYTON PALAIO, and also believed to be synthetic cannabinoids, packaged in boxes in the warehouse.  The name MARK REILLY appeared on the box with the address of 1880 West Oak Parkway, Suite 214.  PALAIO said that their relationship is limited.  REILLY operates a business out of his home.  Agent HOWARD had to ask PALAIO several times about the business location.  Finally, when prompted by Agent HOWARD with the ██████████ address (that of MARK REILLY) PALAIO consented that REILLY resides at the ██████████ address.  This is a suspected address for MARK REILLY previously identified through Intelligence Analysis.  PALAIO said "I don't want to incriminate any of my clients or myself so that is my concern".  PALAIO elaborated that REILLY also does business from his Mom's home on ████████████████████████  According to PALAIO Kratom is the majority of PALAIO'S business.  He does business all over the Country selling product to convenience stores and smoke shops.  Kratom is a relaxation agent, according to

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

EXHIBIT G-7

**75-0106-21-12**

PALAIO, that is ingested in capsule form.   Forty percent (40%) of his business is Kratom, thirty percent (30%) energy supplements, and thirty percent (30%) male enhancement products.

PALAIO used to do business with Nutragenomics and its owner DREW GREEN. PALAIO was aware of the "other business" that DREW GREEN and Nutragenomics was involved in.  He did business with them for sexual enhancement products only.  He stopped doing business with them over a difference in opinion.  When asked what the difference of opinion was he elaborated he was not comfortable talking about this topic.

Agent HOWARD asked PALAIO if he could describe the process of manufacturing Kratom.  PALAIO began to describe the process and Agent HOWARD asked him to wait for the arrival of GBI DOFS Scientist JIM GORDON to sit in on this part of the conversation.

During the description of the manufacture of Kratom and other supplements PALAIO never mentioned the use of Damiana or any other green leafy bulk materials (like those previously observed by Agent HOWARD in the warehouse – 500 plus pounds).  He also never mentioned Acetone.  As previously learned in this investigative case file, WG DISTRIBUTION and PAYTON PALAIO are responsible for the purchase of more than twelve thousand (12,000) pounds of Acetone since January 2011.  The last purchase was June of 2012 for seven hundred (700) plus pounds of Acetone.  When prompted about the use of Acetone, PALAIO said he uses it as a cleaner not in products.  Agent HOWARD later asked Crime Lab Scientist JIM GORDON if Acetone was observed during the search of the lab.  DOFS Scientist GORDON told Agent HOWARD that he observed several small bottles of low grade Acetone.  DOFS Scientist GORDON

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

**EXHIBIT G-7**

<u>75-0106-21-12</u>

stated that he could think of no legitimate use for bulk Acetone in the type of facility run by PALAIO.    PALAIO  said Acetone is not used in Kratom.    PALAIO  said he had hydrochloric  acid in small amounts and small amounts of Acetone all in labeled containers.    PALAIO  said he does not use a lot of Acetone.

PALAIO  then volunteered  that he doesn't always keep up with inventory.    Agent HOWARD asked PALAIO  what UR144 was and PALAIO  said synthetic  cannabinoid. Agent HOWARD asked PALAIO  about A796 and PALAIO  said synthetic  cannabinoid. Agent HOWARD asked PALAIO  about A834 and PALAIO  said "same stuff".    Agent HOWARD told PALAIO  that he was reading to him from PALAIO'S  own sales documents.    Agent HOWARD had located the sale documents on PALAIO'S  desk. PALAIO  said "honest to God" he didn't know about that – "I'm not involved  in any illegitimate  business right now" (see attached documents).

Agent HOWARD asked PALAIO  what is Sexy, Aztec, and Aztec Red?    PALAIO  said these are products which do not belong to his company.    PALAIO  said that he may advise on profit and loss statements for other companies but these are not his products. Sexy and Aztec are not synthetic  cannabinoids  manufactured  or sold by PALAIO. PALAIO  said he may have offered advice on the distribution  of these cannabinoids. PALAIO  stated that they were MARK  REILLY'S  product.    PALAIO  made this statement after, as earlier documented,  PALAIO  said that he did not know REILLY'S  brand of synthetic  cannabinoids.    PALAIO  said he does not know specifically what the products are.    PALAIO  stated he does not know if they are synthetic  cannabinoids.    When asked again if PALAIO  knew if they were synthetic  cannabinoids  PALAIO  said he would not answer that question.

**PROPERTY OF GBI**
Further  dissemination  is prohibited
w ithout w ritten approval of a GBI Supervisor

393800

EXHIBIT ____30____

EXHIBIT G-7

**75-0106-21-12**

PALAIO said that L&M Supply LLC is owned by MARK REILLY. Agent HOWARD asked PALAIO about WG DISTRIBUTION LLC sales of UR144 reflected on the sales sheets. PALAIO said this isn't a line of questioning he is comfortable discussing without his attorney present.

Agent HOWARD asked PALAIO who the owner of TMDK was and PALAIO said BILLY CHRISTIANSON. PALAIO said that CHRISTIANSON possibly operates off of Terrell Mill Road. PALAIO said he does not know the address.

Agent HOWARD asked PALAIO if he knew who operated TKO Novelties and PALAIO said KELLY O'DONNELL. PALAIO said O'DONNELL buys legal items from PALAIO. PALAIO does not have an address for O'DONNELL on site. He has business paperwork with the address at another location. Agent HOWARD asked for that location and PALAIO said this not a line of questioning he feels comfortable discussing. PALAIO elaborated that he will continue to talk on the surface; not about details.

Agent HOWARD asked about Nutraconnect and he identified the owner as JEFF BAUCOM. Agent HOWARD asked about Bold Scents and PALAIO identified DAVE RAMMS.

PALAIO identified CORY LLOYD as his "right hand man". PALAIO would not consent to a search of his Apple IPhone 4S. Agent HOWARD requested that CMANS Task Force Agent NATHAN LUCA seize the IPhone pending the application for a Search Warrant for records.

Agent HOWARD asked for the business address for WG DISTRIBUTION. PALAIO

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___30___

**EXHIBIT G-7**

<u>**75-0106-21-12**</u>

stammered and could not provide a physical address.   After a few seconds PALAIO said that the address was Blackmon something.   PALAIO said he had an address somewhere for tax purposes but could not give the physical address.

The interview with PALAIO concluded at approximately 12:20 p.m.   Documents, seized from the Omerta Labs/Lunar Labs, as well as those seized from the home of PALAIO, were later scanned.   The scanned documents were transferred, by Agent HOWARD, to DVD (see attached).

<u>**ATTACHMENTS**</u>

  Miranda Waiver on PALAIO

GBI EVIDENCE RECEIPT E - 530923                                             (Attachments)

  Sales Documents

  DVD of Scanned Omerta Documents                                       (Attachments)

<u>**ID DATA:**</u>

**PALAIO, PAYTON SHEA**
ADDRESS: ███████████████████
███████████

COUNTRY: UNITED STATES

SPECIAL AGENT IN CHARGE KEN E HOWARD:   7/11/2012
mar:   7/16/2012                                   *KH*

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

393800

EXHIBIT ____30____

**EXHIBIT G-7**

# GEORGIA BUREAU OF INVESTIGATION
## CANTON REGIONAL DRUG ENFORCEMENT OFFICE
## INVESTIGATIVE SUMMARY

**75-0106-21-12**

On Tuesday, July 10, 2012, GBI SPECIAL AGENT JOHN COBB assisted GBI ASSISTANT SPECIAL AGENT IN CHARGE KEN HOWARD with the execution of a search warrant at Omerta Labs and Lunar Labs located at 1880 West Oak Parkway, Suite 214, Marietta, Cobb County, Georgia. During the execution of the search warrant, at approximately 11:40pm, AGENT COBB conducted an interview with MARK ELLIOT JENNINGS. The interview was conducted inside JENNINGS' office.

AGENT COBB informed JENNINGS that AGENTS were conducting a criminal investigation in reference to synthetic marijuana and bath salts. AGENT COBB informed JENNINGS that he was not in custody. AGENT COBB read and presented JENNINGS with a Miranda Rights Waiver form, attached. JENNINGS indicated that he wanted to speak with AGENT COBB and signed the Miranda Rights Waiver form indicating that he would answers questions. The Miranda Waiver was witnessed by GBI SPECIAL AGENT JAMIE SKELTON. AGENT COBB informed JENNINGS that at any point he could discontinue answering questions and terminate the interview. JENNINGS stated essentially the following.

JENNINGS has worked for Lunar Labs for approximately one year as the Director of Operations. JENNINGS was hired by PEYTON SHEA PALAIO to assist with starting up the business of Lunar Labs. JENNINGS stated that he had set up the lab equipment at Lunar Labs. JENNINGS met PALAIO at a party approximately two years ago.

JENNINGS stated that as Director of Operations he oversees production and helps formulate compounds. JENNINGS has recently been working on trying to get the lab

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___32___

EXHIBIT G-7

**75-0106-21-12**

FDA Compliant and "CGMP" (Current Good Manufacturing Practices) industry compliant.

When asked what kind of products Lunar Labs sells, JENNINGS informed AGENT COBB that Lunar Labs does not sell anything. JENNINGS stated that at the current time Lunar labs is not FDA certified to sell anything. JENNINGS stated that they are working towards sales. JENNINGS stated that they do "contract" research and analytical work at the lab for dietary supplements.

When further questioned about the "contract" work, JENNINGS began being evasive and stated to AGENT COBB that he didn't know what kind of products they were making at Lunar Labs. JENNINGS then stated they were "powders" and "dietary supplements." Upon further questioning JENNINGS stated that "Omega six" is a dietary supplement. JENNINGS stated that he did not know who the contracts were with. JENNINGS stated that he didn't know much because he was like a "General Manager."

When asked how the business operated without selling a product, JENNINGS stated that they have investors. JENNINGS stated that he did not know who the investors where. JENNINGS stated that the investors and contracts are handled by PALAIO.

When questioned, JENNINGS stated that he knew nothing about synthetic cannabinoids and bath salts.

When questioned about Omerta Labs and WG Distribution, JENNINGS stated that they have not decided exactly what Omerta Labs is going to be. JENNINGS stated that one lab will be for sale and one lab will be for research. JENNINGS stated that he had never

393665

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___32___

**EXHIBIT G-7**

**75-0106-21-12**

heard of WG Distribution.

When questioned about the following: Relaxinol, Mad Hatter, Purple Haze Max, Head Trip, Ultra Weekend, Extreme Herbal Incense, The Wizard of Oz – Pineapple, Crystaal Bubbly, Fairly Legal, Zombie Hoe, Alotha, and Mr. Babloo, JENNINGS stated that he had never heard of the items except for Head Trip. JENNINGS stated that he had once seen Head Trip for sale in a gas station.

When asked if AGENTS could conduct a search of JENNINGS phone, JENNINGS stated that he did not give consent to conduct a search of his phone.

When questioned about how many people worked at the facility, JENNING stated they have "two sales guys, one marketing." At this time, JENNINGS realized that he had contradicted his previous statement about not selling any products. JENNINGS informed AGENT COBB that he no longer wanted to speak with AGENT COBB.

AGENT COBB informed JENNINGS that if he decided to cooperate with the investigation in the future he could contact ASAC HOWARD or AGENT COBB at a later date. AGENT COBB provided JENNINGS with the Office number to the GBI's West Metro Regional Drug Enforcement Office. The interview with JENNINGS concluded at approximately 12:15pm.

**ATTACHMENTS**

MIRANDA WARNING Miranda waiver form                    (Attachments)

393665

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___ 32 ___

**EXHIBIT G-7**

# GEORGIA BUREAU OF INVESTIGATION
## CANTON REGIONAL DRUG ENFORCEMENT OFFICE
## INVESTIGATIVE SUMMARY

**75-0106-21-12**

On Wednesday, December 12, 2012, at approximately 3:00 p.m., GBI ASAC KEN HOWARD received, from the GBI Department of Forensic Sciences (DOFS), an analysis report for items seized during the search of Lunar/Omerta Labs on July 10, 2012 (see attached).   Agent HOWARD reviewed the report and observed the following:

Analysis of Evidence submission #004B.01 (50 foil packages containing leafy material labeled "Sexy") confirmed the presence of XLR-11 and UR-144.   Analysis of evidence submission #004B.02 (47 foil packages containing leafy material labeled "Aztec Warrior Exotic Smudging Herbs") confirmed the presence of UR-144.   Analysis of evidence submission #004B.03 (3 foil packages containing leafy material labeled "Aztec Warrior Herbal Potpourri") confirmed the presence of UR-144.   Analysis of evidence submission #007A (one package containing solid material) confirmed the presence of JWH-122 and UR-144.   All items were seized from the office of MARK JENNINGS.   JENNINGS identified himself, to GBI Special Agent JOHN COBB as Operations Director for Lunar Labs.   Evidence submission #007A was located by GBI Special Agent GRAHAM RUSK and listed on GBI Evidence Receipt for Property #E-551213.   Upon discovery, Agent RUSK pointed out the discovery to Agent HOWARD.   Agent HOWARD observed that the material was concealed in a plastic bag and wrapped in a blue T-shirt.   The package was further concealed beneath JENNINGS' desk.

Agent HOWARD requested, through GISAC, an Intelligence Information Analysis on JENNINGS  (see attached).

Page 1 of 1

409965

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____

**EXHIBIT G-7**

# GEORGIA BUREAU OF INVESTIGATION
# CANTON REGIONAL DRUG ENFORCEMENT OFFICE
# INVESTIGATIVE SUMMARY

**75-0106-21-12**

On Friday, December 14, 2012, at approximately 3:00 p.m., GBI ASAC KEN HOWARD reviewed documents seized from Lunar/Omerta Labs on July 10, 2012. Agent HOWARD observed the following:

An email string, including, PEYTON SHEA PALAIO, MARK REILLY, ROBERT HARRIS (American International Biotechnology, LLC), ADAM LIBBY (American International Biotechnology, LLC), SHERRI GONTER (Lunar Labs Employee) and KAREN CARTER (American International Biotechnology, LLC) beginning, March 5, 2012. The string begins with an email from PALAIO to GONTER. PALAIO instructs GONTER to set up an account with AI Biotech and remind them that PALAIO met with them at the Champs Trade Show (Las Vegas, NV). Furthermore, it instructs GONTER to remind "them" that he works with "MARK" from LM Supply. PALAIO instructed GONTER to pay for the account with his WG Distribution debit card. PALAIO'S instructions were to set up a test run for cannabinoids and that the analysis reports should read "Does Not Contain". The string consists of GONTER requesting that AI Biotech, in reference to questions regarding "Sexy XXX & Aztec Red", send Lunar Labs state by state analysis reports (including new bills, FL HB1175 & GA SB370), as well as "broad" analysis reports. CARTER later responded, on March 23, 2012, 12:33 p.m., that JWH-122 had been detected in samples of "Aztec Red". CARTER asked if GONTER "Do you still want the state reports? Sample Sexy XXX is okay and I will have those reports to you shortly." In a March 20, 2012 exchange, GONTER sends a link to CARTER for Georgia Senate Bill 370.

Agent's Note: Georgia Senate Bill 370, also known as Chase's Law, was enacted

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____

**EXHIBIT G-7**

**75-0106-21-12**

March 27, 2012.   This resulted in the scheduling of JWH-122 as a schedule 1 drug in the state of Georgia.

GONTER responded, March 23, 2012, at 2:43 p.m. with "Hi Karen, Please do not generate reports for Aztec Red."

Agent HOWARD attached a copy of the email string and analysis reports to this summary.

Agent HOWARD located a consulting agreement, between LM Supply and WG Distribution, LLC effective June 1, 2011.   The agreement identifies LM Supply as the "Company" and WG Distribution as "Consultant".   The agreement also identifies MARK REILLY as owner of the "Company" and PEYTON PALAIO as "Consultant" (see attached). amount of $1225.00.

Agent HOWARD located a receipt payable to "Alien Records" for "Extortion Fee" (see attached).

Agent's Note:   Alien Records is the business owned and operated by DANIEL ZOOK.

Agent HOWARD located what appears to be a sales call template (handwritten).   The template outlines how the WG Distribution sales representative should, for the purpose of selling "Buddha Herbal Incense", address a potential retail customer (see attached).

Agent HOWARD located an asset purchase agreement, dated June 14, 2011, between MARK REILLY (buyer) and PEYTON SHEA PALAIO (seller).   The agreement outlines

**PROPERTY OF GBI**
Further dissemination is prohibited
w ithout w ritten approval of a GBI Supervisor

EXHIBIT _____

**EXHIBIT G-7**

<u>75-0106-21-12</u>

the transfer of assets "Aztec Warrior, Sexy, Buddha Gold, Buddha Diamond, and Smoke 911 House blend" (see attached).

Agent's Note:   Documented previously, and below, PALAIO (WG Distribution, Lunar Labs, Omerta Labs) continued to manufacture and distribute the above products.

Agent HOWARD located AI Biotech, LLC analysis reports and an AI Biotech order sheet (see attached).   The order sheet was on AI Biotech letterhead and identifies the customer as WG Distribution, 1880 West Oak Pkwy #214, Marietta, Georgia 30062. The phone number listed is 678-402-1123 and the email contact is sherri@lunar-labs.com.   Samples requested are BC'S Finest and God's Gift with a "report format" of DNC (Does Not Contain).   Under payment options the type of card listed is VISA, card █████████████, expiration date ██████, security code ████

Agent's Note:   BC'S Finest and God's Gift are products of TMDK (BILLY CHRISTIAN).

The AI Biotech Analysis reports range between March 7, 2012, and April 2, 2012.   The reports are from KAREN CARTER, Ph.D., addressed to TMDK, Dear Billy, 2740 Holly Ridge Circle, Marietta, Georgia, for BC'S Finest and God's Gift.   The reports are addressed to LM Supply, 1880 West Oak Pkwy, #214, Marietta, Georgia, Dear Mr. REILLY, for Sexy, Aztec Warrior Herbal Potpourri, and to Whom it may concern for Sexy XXX, Sexy, and Aztec Warrior Herbal Potpourri.

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____

**EXHIBIT G-7**

# EXHIBIT G-8

# GEORGIA BUREAU OF INVESTIGATION
# CANTON REGIONAL DRUG ENFORCEMENT OFFICE
# INVESTIGATIVE SUMMARY

**75-0106-21-12**

On Monday, October 8, 2012, at approximately 1:25 p.m., GBI Assistant Special Agent in Charge KEN HOWARD met DREW GREEN and his Attorney STUART MONES. ASAC HOWARD did so for the purpose of conducting an interview, pursuant to a Federal Proffer out of the LaFayette, Louisiana United States Attorney's Office, with GREEN.   GREEN told Agent HOWARD the following:

GREEN became acquainted with KEVIN LOUIE (W/M) during the summer of 2009. LOUIE resides in Canada.   LOUIE ran a company known as EXERCISE SCIENCE and NATURE SCIENCE.   LOUIE told GREEN and his business partner TOMMY MALONE that a significant amount of money could be made distributing synthetic cannabinoids. At the time LOUIE was distributing a product identified as "Serenity".   LOUIE asked GREEN and MALONE to invest money in the business.   In turn LOUIE would provide customers to purchase bulk synthetic cannabinoid compounds.   MALONE and GREEN invested twenty-five thousand ($25,000.00) dollars each in the purchase of synthetic cannabinoids.   LOUIE referred them to BOYLE CHEMICAL COMPANY in Shanghai, China.   He provided a telephone number and email contact for ANDREW ZHANG. GREEN made contact with ZHANG via email and telephone.   He then had a sales rep, for NUTRAGENOMICS, ALEC TUNIDOR, conduct purchases of bulk synthetic cannabinoid compounds from BOYLE CHEMICAL.   GREEN, MALONE, and TUNIDOR initially purchased kilogram amounts of synthetic cannabinoids.   They received their first shipment in September of 2009.   The first fifty thousand ($50,000.00) dollars was spent for 4 to 5 kilograms of JWH18 and JWH073.   GREEN combined the JWH18 and JWH073 because he heard the JWH18 caused severe anxiety attacks in users.   LOUIE then put NUTRAGENOMICS in touch with buyers.   In turn NUTRAGENOMICS shipped

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___99___

**EXHIBIT G-8**

**75-0106-21-12**

the bulk synthetic cannabinoid compounds to customers.   LOUIE was paid a commission fee.     A short time later LOUIE cut contact with NUTRAGENOMICS  and went into business on his own.

GREEN contacted JOHNNY IPPOLITTO.    IPPOLITTO has a background in marketing. GREEN asked IPPOLITTO to help market the synthetic cannabinoid  compounds. GREEN still had approximately 70% of the initial 4 to 5 kilograms of synthetic cannabinoid compounds left.   IPPOLITTO  conducted Internet  queries and informed GREEN that Internet customers seeking information  about purchases of synthetic cannabinoid  compounds were not currently being referred, on line, to any particular distributor.   IPPOLITTO  informed GREEN that he could channel Internet  queries to the NUTRAGENOMICS  website.   IPPOLITTO  built the website, at the instruction of GREEN, and had it up and running by January of 2010.   The website was identified  as RESEARCHCHEMICALZ.COM.    Business began to come in rapidly.   In less than 14 days NUTRAGENOMICS  had one hundred  thousand ($100,000.00)  dollars in sales of synthetic cannabinoid  compounds.   MALONE  came on board as a partner and TUNIDOR  as a sales repesentative  to assist with the business.   In February of 2010 NUTRAGENOMICS  and RESEARCHCHEMICALZ.COM  generated two hundred  twenty thousand ($220,000.00)  dollars in synthetic cannabinoid  compound sales.   At this time, GREEN stated that NUTRAGENOMICS  and RESEARCHCHEMICALZ.COM  was dominating  the Web market.   The following  month NUTRAGENOMICS  generated  six hundred  thousand ($600,000.00)  dollars in sales.   The next month NUTRAGENOMICS generated  over one million ($1,000,000.00)  dollars in sales.   Due to the growth of the company GREEN contacted a car salesman, from whom he had previously  purchased vehicles, KAGAN  SCOTT.   GREEN asked SCOTT to come on as a salesman.   SCOTT agreed and began working as a salesman for

404759

**PROPERTY OF GBI**

Further  dissemination  is prohibited
w ithout w ritten approval of a GBI Supervisor

EXHIBIT ___99___

**EXHIBIT G-8**

<u>75-0106-21-12</u>

NUTRAGENOMICS.   In April of 2010, GREEN asked his workout partner, PRESTON ACKERMAN, to come on as a sales representative.   GREEN initially met ACKERMAN at a local bank prior to establishing a relationship as a workout partner.

RESEARCHCHEMICALZ.COM set up a distribution telephone number in February of 2010.   The process was that if a customer wished to purchase less than 50 grams of synthetic cannabinoid compound they could do so online at RESEARCHCHEMICALZ.COM.   If a customer wished to purchase more than 50 grams of synthetic cannabinoids, the customer was required to call the 1-800 number.

During this time TUNIDOR, a recovering drug addict and alcoholic, relapsed into drug abuse.   GREEN learned that he was selling GHB, cocaine, and marijuana.   GREEN learned, from SCOTT, that on one occasion TUNIDOR brought a half kilogram of cocaine to the NUTRAGENOMICS Office.   TUNIDOR was fired.   GREEN learned, following the firing, that TUNIDOR had stolen customers/distributors, from NUTRAGENOMICS, and was selling product through a white male subject identified as RICHARD BARRY.   At the time BARRY was living in Georgia, however, has moved to South Carolina.

KAGAN SCOTT had customers, identified as Indian male brothers, in southwest Atlanta. They are big distributors, nationwide, of synthetic cannabinoids.   One of the individuals owned a distribution center in southwest Atlanta and multiple convenience stores.   This individual was identified as SHAUKAT "SUNNY" SAYANE.   SAYANE was arrested in DeKalb County Georgia for a cigarette tax criminal violation.   At SAYANE'S distribution center, convenience store owners from around the Metro Atlanta area would travel to purchase items to be sold at convenience stores.   They could also purchase, at

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

404759

EXHIBIT ___99___

**EXHIBIT G-8**

75-0106-21-12

this location, synthetic cannabinoids for retail sale.   GREEN does not recall if SCOTT actually sold synthetic compounds to SAYANE, however, recalled that SCOTT was attempting to gain SAYANE as a customer.   GREEN recalled that NUTRAGENOMICS could not match the price requested by SAYANE.

GREEN continued to sell the "Serenity" product, originally marketed by LOUIE, in tablet, capsule, and liquid form.   The "Serenity" product contained legal organic compounds. On one occasion, however, there was a mistake at NUTRAGENOMICS and JWH18 was distributed as "Serenity".   This was a mistake made due to the fact that "Serenity", in its basic form, bears a strong resemblance to JWH18.   GREEN then elaborated that "Serenity" did contain DMAA (1,3-dimethylamylamine).   GREEN believes that this substance is currently on a list of items to be banned by the Federal Government. GREEN used DMAA to cut mephedrone, methylone, and other bath salts being distributed.   He elaborated that other distributors were doing the same.

When GREEN learned of the first ban of synthetic cannabinoid compounds he called a summit in December of 2010.   This meeting was attended by DAN FRANCIS, BARRY COVERT, PEYTON PALAIO, DON WIRTSHAFTER, TOMMY MALONE, BEAU KENNY (Virginia), BOYD BARROW, JOSH ESPINOZA, MATT CUTHBERTSON (California), MATT BROWN (California), DAVID GABBAY (Dallas, Texas), JOSH BECKER (Idaho), LAWRENCE SHAHWAN (one of ACKERMAN'S largest customers from Texas), CHRIS EDGE (Chicago), and multiple other individuals who GREEN knew to be large scale synthetic cannabinoid distributors.   These individuals traveled to the Roswell, Georgia area from around the Nation.   GREEN had established relationships with all of these individuals through the distribution of synthetic cannabinoid and bath salt compounds. GREEN estimated that the meeting was attended by 50 to 60 people.

404759

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___99___

EXHIBIT G-8

**75-0106-21-12**

The meeting took place at the Embassy Suites off of Exit 7 in Roswell, Fulton County, Georgia.   GREEN and MALONE agreed to arrange the meeting while DAN FRANCIS and DON WIRTSHAFTER coordinated the meeting.   BARRY COVERT and BEAU KENNY helped organize the meeting.   The purpose of this meeting was to discuss compliance with the new Law and to also discuss a set of rules to keep the synthetic compounds out of the hands of children.   It was GREEN'S idea to place a label on items for retail which stated that the product was for those 21years of age and over.   GREEN was not able to obtain a majority agreement on this topic, however, and they finally agreed to place a 19 years of age and up requirement on the items packaged for retail.

GREEN and MALONE started the Georgia Retail Compliance Association.   Most of the individuals at the meeting described above were currently members of the Coalition of Cognitive Liberty.   The Coalition of Cognitive Liberty is a team of attorneys that were experts in the field of synthetic cannabinoids and bath salts.   Member fees were five thousand ($5,000.00) to ten thousand ($10,000.00) dollars towards the end of the memberships.   This was a one-time fee.   This covered legal consultation and research on synthetic cannabinoids and bath salts.   The Coalition of Cognitive Liberty established a bank account with Wells Fargo.   Membership fees were funneled to the Wells Fargo bank account.

GREEN changed after December of 2010 and began to distribute JWH81 and JWH250. He had his product tested by RTP Laboratories and requested that the lab display what the product did not contain in order that competitors could not steal the formulas.   In other words, GREEN did not want the contents, of his product, displayed on the reports. GREEN also started purchasing WIN compounds and mixing WIN

404759

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT _____99_____

**EXHIBIT G-8**

**75-0106-21-12**

compounds such as WIN 55212-2 and WIN 48.   He primarily used the WIN 48 because it was easier to obtain.   He mixed WIN 48 with multiple other compounds.   This was a continuous game played by GREEN and other competitors to protect their formulas. GREEN learned, through conversations with a scientist at RTP Laboratories that no testing standards existed for the WIN compounds.   By using the WIN compounds GREEN believed he would prevent competitors from stealing his formula and/or prevent identification by Law Enforcement of the formula.   GREEN could sell this blended product for more money because it was "proprietary".   GREEN mixed WIN 48 compound with JWH compounds and AM 2201 compounds and encouraged individuals to label their retail packages "JWH Free".

GREEN had a Dell laptop on which he conducted most of his NUTRAGENOMICS business.   This laptop was seized at an apartment he shared with ROBERT "BRAD" DAWSON in California by Federal Authorities.   GREEN stated that if he could access that laptop he could provide further information about business relationships.

NUTRAGENOMICS generated sixteen million ($16,000,000.00) dollars in gross sales in 2010.   GREEN purchased bulk synthetic cannabinoid compounds and bath salt compounds from China and from Mountain Industries.   Mountain Industries was in Florida but moved to California.   JIM LLEWELYN and ALEX REECE were the business owners.   LLEWELYN was the Financier of this business.   JIM LLEWELYN'S email address is ████████.   NUTRAGENOMICS began to purchase 60 to 65 per cent of their synthetic compounds from Mountain Industries.   NUTRAGENOMICS' profitability ranged around 46%.   GREEN estimated that three thousand (3,000) kilograms of synthetic cannabinoid compounds were purchased by and subsequently distributed by NUTRAGENOMICS between March 2011 and May 2012 of analog or

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ____99____

**EXHIBIT G-8**

<u>75-0106-21-12</u>

banned substances.

GREEN identified PEYTON PALAIO as a customer of NUTRAGENOMICS.    PALAIO dealt directly with KAGAN SCOTT after ALEC TUNIDOR was fired.  PALAIO previously dealt with TUNIDOR.    PALAIO started out as a small customer who visited the NUTRAGENOMICS office many times.    GREEN recalled going to a Braves game with PALAIO and his girlfriend on one occasion.  PALAIO steadily increased his business and grew to be a large scale distributor of synthetic cannabinoid compounds.   PALAIO also distributed bath salts.    PALAIO stopped doing business with NUTRAGENOMICS around April 2011 because he entered into an agreement with BEAU KENNY, JOSH BECKER, and DAVID GABBAY to purchase bulk compounds directly from China. GREEN provided Agent HOWARD with business invoices documenting sales of synthetic cannabinoids and bath salts by NUTRAGENOMICS to PALAIO. (See attached) GREEN reviewed the invoices with Agent HOWARD and explained some of the coded language.    For instance, Bonsai 73 was code name for JWH 73.    The number 10, under the quantity column, reflected 10 grams purchased.    PALAIO also purchased methylone, CB4 (code for synthetic cannabinoid blend), AM4 (code for AM 2201 synthetic cannabinoid blend), and MFX-2.    MFX-2 was a blend of methylone and DMAA.    DMAA cuts the harsh side effects of methylone.    MFX-2 is a bath salt compound.   The progression of the invoices reflected the price of compounds purchased by PALAIO steadily declining as the bulk purchases increased.   The price started going down because PALAIO started to learn of competitors and the market price for the compounds.    GREEN used code names on the invoices to throw off competitors to prevent them from stealing formulas.   Cash transactions were completed for some of the transactions by PALAIO and other customers.   The cash transactions were completed in person or by mail.   On the invoices in the price column where the

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ___99___

**EXHIBIT G-8**

<u>75-0106-21-12</u>

number zero appear reflects a cash transaction.   KAGIN SCOTT would be able to identify brand names distributed by PALAIO.   PEYTON PALAIO'S email address is ████████████████████

GREEN identified JEREMY NICHOLS of Red Dawn Products as a distributor of synthetic cannabinoids.   NICHOLS distributed synthetic cannabinoids to the Love Shack, Inserection, and Starship.   DARREN BAITZ, of Alabama, previously purchased bulk cannabinoids from NUTRAGENOMICS.   He in turn packaged the cannabinoids and sold them to JEREMY NICHOLS for distribution.

KAGAN SCOTT'S telephone number is ███████████.   He has a second number of ██████████.   SCOTT is currently working with AARON KRISFALUSI and MATT RYCYK.   Both are prior employees of NUTRAGENOMICS.   They work under the business name MARKED PRODUCTS LLC.   KAGIN SCOTT previously did business with MITCH CHAMBERS.   CHAMBERS also sold mephedrone (bath salts).   Agent HOWARD knows through his investigation that MITCH CHAMBERS was responsible for the Zombie line of synthetic cannabinoid products.

SCOTT also had a customer identified as MATT GRAYSON of NATURE'S CHEMISTRY LLC.   MATT GRAYSON'S telephone number is ██████████.   GRAYSON is a New York State supplier of synthetic cannabinoids.   GRAYSON'S email address is ████████████████████.   GRAYSON partnered with KEVIN LOUIE after KEVIN LOUIE left NUTRAGENOMICS.

In May 2012 GREEN started BLUE MOON HOLDINGS LLC.   He furnished new laptops to ACKERMAN, SCOTT and BRAD LNU.   GREEN told them the new laptops were

404759

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

EXHIBIT ____ 99

**EXHIBIT G-8**

**75-0106-21-12**

encrypted to defeat Law Enforcement in the event of a raid.   He instructed them not to use their old laptops.   GREEN recalled SCOTT and ACKERMAN destroying paper documents.   He recalled that this was done after a NUTRAGENOMICS employee was interdicted by HSI Agents in Georgia.   GREEN'S Information Technologies contract employee is RYAN BRENTS.   He runs his own business identified as Atlanta Technologies Incorporated.   Agent HOWARD, GREEN, and MONES agreed to meet at a later date to further the interview.

AGENTS NOTE:   TOMMY MALONE,  DREW GREEN,  DAN FRANCIS,  ALEXANDER REECE,  JOSH ESPINOZA,  BOYD BARROW,  RICHARD BUSWELL,  DANIEL STANFORD,  AND  BARRY DOMINGUE  have been indicted in Lafayette, Louisiana. The interview  concluded  at approximately  3:15 p.m.


**ATTACHMENTS**
  NUTRAGENOMICS/PALAIO  Sales  Invoices                    (Attachments)

**PROPERTY OF GBI**
404759                              Further  dissemination  is prohibited          EXHIBIT ___99___
                                 w ithout w ritten approval of a GBI Supervisor

                                                                  **EXHIBIT G-8**

# EXHIBIT H-1

1

2

3

4

5          IN THE CIRCUIT COURT OF THE STATE OF OREGON

6              FOR THE COUNTY OF MULTNOMAH

7

| | |
|---|---|
| ESTATE OF DANIEL SCOTT PAUL by and through KATHRYN ANN PAUL as Personal Representative, an Oregon citizen, ) ) ) | Case No. 21CV33403 |
| Plaintiff, ) ) ) | **DECLARATION OF MARK REILLY IN SUPPORT OF DEFENDANT MARTIAN SALES INC.'S MOTION TO DISMISS PURSUANT TO ORCP 21A(2)** |
| v. ) ) | |
| OPMS (a/k/a Optimized Plant Mediated Solutions; O.P.M.S.; OPMS Solutions, Inc.; OPMS Solutions Group LLC; OPMS Solutions; OPMS Wholesale; OPMS Tech 2, LLC; and/or Choice Organics); Martian Sales, Inc.; South Sea Ventures (d/b/a South Sea Ventures, LLC; MIT 45; Santiano Novasio and/or Crown Trading); Christopher Novasio (a/k/a Santiano Christopher Novasio; and Christopher David James Novasio); Weece's Market; KS Food Market; and John Does 1-20; ) ) ) ) ) ) ) ) ) ) ) | **Oral Argument Requested** |
| Defendants. ) ) ) | |

8

9

10

11

12

13

14

15

16

17

18

19

20        I, Mark Reilly, declare as follows:

21        1.      I am the president of Martian Sales Inc. ("Martian Sales"). I make this declaration

22   on personal knowledge and in support of Martian Sales' Motion to Dismiss pursuant to ORCP

23   21A(2).

24        2.      Martian Sales is a Wyoming corporation.  When it was first formed in 2012,

25   Martian Sales had its principal place of business in Cheyenne, Wyoming.  It currently has its

26   principal place of business in Marietta, Georgia.  Martian Sales has never maintained its

Page 1    DECLARATION OF MARK REILLY IN SUPPORT OF DEFENDANT MARTIAN SALES
          INC.'S MOTION TO DISMISS PURSUANT TO ORCP 21A(2)

EXHIBIT H-1

1  headquarters or any other offices in Oregon.  Martian Sales has no employees in Oregon, does not

2  own any property in Oregon, does not have any bank accounts in Oregon, does not maintain a post

3  office box in Oregon, does not have a registered agent in Oregon, is not registered to do business

4  in Oregon and does not otherwise regularly engage in any type of business activities in Oregon.

5      3.      Martian Sales is the owner of certain intellectual property consisting of the trade

6  names and marks for O.P.M.S. brand kratom products.  Beginning in 2014 and continuing since

7  then, Martian Sales has licensed the exclusive right to use the O.P.M.S. trade names and marks to

8  a third party for use in connection with products manufactured, distributed or sold by that third

9  party.  A true and correct copy of the 2014 license agreement is attached to this declaration as

10  Exhibit 1.

11      4.      I understand that the plaintiff in this case claims that Daniel Scott Paul's death in

12  July 2019 was caused, at least in part, by toxicity due to consuming kratom from packages bearing

13  the O.P.M.S. brand.  Martian Sales did not then and does not now manufacture, market, distribute

14  or sell, or participate in any other party's manufacture, marketing, distribution or sale of, O.P.M.S.

15  brand kratom products.  Martian Sales is not involved in and does not exercise any control over

16  how O.P.M.S. brand kratom products are marketed or distributed for sale to the public, including

17  to residents of Oregon.

18      I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF

19  MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS

20  EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

21

22      Dated this 23 day of November, 2021.

23

24      _____

25      Mark Reilly

26

Page 2    DECLARATION OF MARK REILLY IN SUPPORT OF DEFENDANT MARTIAN SALES
          INC.'S MOTION TO DISMISS PURSUANT TO ORCP 21A(2)

DUNN CARNEY ALLEN HIGGINS & TONGUE LLP
Attorneys at Law
851 SW Sixth Avenue, Suite 1500
Portland, OR  97204-1357
503.224.6440 / Fax: 503.224.7324

EXHIBIT H-1

## INTELLECTUAL PROPERTY LICENSE AGREEMENT

**THIS AGREEMENT** is made as of October 1, 2014 (hereinafter the "Effective Date") by and between Martian Sales Inc., a Wyoming corporation ("Licensor") and LICENSEE NAME __ERI WAHYU HIDAYAT__, of COUNTRY and STATE __WEST JAVA , INDONESIA__ ("Licensee") (together, the "Parties").

### RECITALS

**WHEREAS,** Licensor owns and claims the rights to the intellectual property for trade names, marks associated with the trade names, images that may be related to the trade names, associated or related trade names, brands or brand identities belonging to the O.P.M.S , O.P.M.S Kratom,. O.P.M.S. Gold, O.P.M.S. Silver and any other O.P.M.S. product (the "Intellectual Property").

**WHEREAS,** Licensee desires to license the right to use the Intellectual Property connection with its business operated in Indonesia.

**NOW, THEREFORE,** the Parties hereby agree as follows:

1.    License. Licensor grants to Licensee a limited, exclusive license, with no right to sublicense or transfer, for use solely in connection with the marketing and sale of goods manufactured, processed, packaged, distributed or sold by Licensee.  Licensee may have goods manufactured and packaged by third parties.

2.    Royalty Fee. Licensee to pay to Licensor, upon the sooner of the Termination of this Agreement or once every ten (10) years, a Royalty Fee of USD $1,000,000.00.  If the Agreement is terminated sooner than 10 years, the Royalty Fee due will be prorated on a monthly basis.

3.    Termination.  This license will continue for ten (10) years, so long as Licensee is not in default of this Agreement.
    a.    The License granted to Licensee hereunder may be terminated by either Party at any time, for any reason, upon thirty (30) days' notice.
    b.    Each party may terminate this Agreement immediately upon notice to the other party if the other party commits a breach of any term of this Agreement which is not capable of remedy, or, in the case of a breach capable of being remedied, has failed within fifteen (15) days after receipt of notice from the other party, to remedy such breach to the reasonable satisfaction of the other party; provided, however, that Licensor shall have the right to terminate this Agreement immediately upon notice to Licensee if License, as determined by Licensor in its sole discretion, willfully commits a breach of this Agreement.
    c.    Licensor shall have no obligation to compensate or indemnify Licensee, except as otherwise expressly provided herein, in the event Licensor terminates this Agreement.
    d.    Upon termination of this Agreement for any reason, the License granted to Licensee hereunder shall immediately terminate and Licensee shall have no further right to use

**EXHIBIT H-1**

the Intellectual Property for any purpose, including but not limited to, using the Intellectual Property in connection with the marketing, packaging, or sale of goods.

    c.    Within fifteen (15) days after such termination, Licensee will return or, at Licensor's election, destroy all copies of all packaging and other printed materials bearing the Intellectual Propertys.

    f.    Sections 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 of this Agreement shall survive the Termination of this Agreement.

    4.    Quality Control.  Licensee agrees that goods or services associated with the Intellectual Property will be of the highest quality. The Licensee will conduct itself in a manner so as to preserve the goodwill associated with the Intellectual Property and will not do anything that would damage or depreciate such goodwill and will cooperate with Licensor in taking such actions as are reasonably necessary or desirable to ensure quality compliance, as may be reasonably specified by Licensor from time to time.

    5.    Assignment.  This Intellectual Property License may not be assigned, sublicensed or otherwise transferred without prior consent from Licensor which may be granted, conditioned or denied at Licensor's sole discretion.

    6.    Retention of Ownership.  Licensee acknowledges that Licensor is the owner of the Intellectual Property and that Licensor retains all ownership rights, subject to the limited license granted pursuant to this Intellectual Property License Agreement, and that Licensor makes no representations or warranties, express or implied, except as expressly set forth in this Agreement. All usage of the name shall inure to the benefit of Licensor. Licensor has the right, but not the obligation, to apply to register the Intellectual Property, in all forms and variations, as a Intellectual Property or service mark, as the case may be, with any or all state, federal or foreign Intellectual Property authorities as Licensor shall, in its sole discretion, determine. Licensee shall cooperate with Licensor to sign all documents, provide adequate specimens and information, and to take all steps reasonably necessary to allow Licensor to register the Intellectual Property as so determined. Licensee may request that Licensor or Licensor may decide to amend, modify or otherwise add to the Intellectual Property's forms, uses, or variations. If such Intellectual Property Modifications occur, Licensor may include those in this Agreement for no additional Royalty Fee. The terms and conditions of this Agreement remain in effect for any Intellectual Property Modifications included for Licensee's use.

    7.    Responsibility for Licensed Products/Services.  Licensee shall be solely responsible for and assume all costs and liabilities related to: (a) the quality of the licensed products and services bearing the Intellectual Property, (b) any defect in or of licensed products (whether such defect be in materials, workmanship or design) or failure of the licensed services, (c) product liability of the licensed products, (d) conformance of licensed products/services will strictly adhere with all applicable laws, rules, regulations and standards of any country in which the licensed products are sold, including any government or regulatory authority (i.e., FDA), health, consumer product, and agricultural regulations, etc. and (e) the promotion, sale, documentation and marketing of licensed products/services. Licensee shall be solely responsible for the payment and discharge of any taxes or duties relating to any transactions of Licensee, its subsidiaries, employees, contractors, agents or sublicensees, in connection with the manufacture, use, distribution, or sale, of licensed products or services.

    8.    Indemnification.  Licensee shall indemnify and defend Licensor against any and all claims, costs, damages and expenses, including reasonable attorneys' fees and expenses, arising out of any claim by a third party against Licensee or Licensor for infringement based on Licensee's use of the Intellectual Property.  Licensee must provide Licensor prompt notice of any claim giving rise to such indemnity.  If a claim of infringement by a third party occurs,

Licensor may demand by notice (the "Termination Notice") at any time that Licensee terminate the use of the Intellectual Property, and Licensee shall terminate the use of the Intellectual Property immediately upon receipt of the Termination Notice.  Licensee shall defend, indemnify and hold Licensor and/or any of its affiliates, subsidiaries, agents and assignees, harmless from and against any and all claims, demands, causes of action, liability, loss, damage, judgements or expenses (including without limitation reasonable attorneys' fees, expenses and court costs) (collectively, the "Claims") arising out of or related to (x) Licensee's design, manufacturing, distribution, shipment, labeling, sale, advertisement or promotion of goods or the labeling, packaging, advertising and promotional materials for the goods (other than Claims solely related to the Intellectual Property), including, but not limited to, any Claim for personal injury, wrongful death or any similar matter; (y) Licensee's breach of any of its representations, warranties, covenants or other obligations hereunder; and (z) Licensee's gross negligence or willful misconduct.  Licensor shall have the right to defend any such claim or suit through counsel of its own choice at Licensee's expense.

9.   Relationship.  Nothing in this Agreement shall be construed as creating a joint venture, partnership, agency or employment relationship between the Parties. Except as specified herein, neither party shall have the right, power or implied authority to create any obligation or duty, express orimplied, on behalf of the other party hereto.

10.   Disputes.  The rights and liabilities of the Parties arising out of or relating to this Agreement will be governed by the laws of the state of **Wyoming** and any disputes between the Parties will be submitted to binding arbitration in **Wyoming** under the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award may be entered in any court of competent jurisdiction; provided, however, that either party may seek preliminary injunctive or other equitable relief in court pending arbitration to prevent irreparable harm. The prevailing party in any arbitration or litigation shall be entitled to recover all reasonable expenses thereof, including attorneys' fees in connection with such proceedings or any appeal thereof.

11.   Covenants of Licensee.  Licensee covenants and agrees that:

a.   it shall at all times conduct its business related to its manufacturing, labeling, packaging, marketing, use, offer for sale and sale of goods and the Intellectual Property in strict compliance with all health, safety and other laws, ordinances, orders, rules and regulations (state, federal, municipal or promulgated by other agencies or bodies having or claiming jurisdiction), and all applicable industry standards, including product requirements and standards for human consumption if such use is chosen during the Licensees' marketing and sale of any products using the Intellectual Property, and will observe the highest standards of quality and fair dealing with customers;
b.   all goods manufactured, processed, distributed and sold hereunder will be merchantable and fit for the purpose for which they are intended;
c.   all goods will conform in all respects to the samples approved by Licensor and that Licensee will not distribute or sell any goods which are of a quality or standard inferior to or different from the approved quality or are injurious to the reputations and goodwill associated with the Intellectual Property; and,
d.   Licensee shall not use third parties to manufacture or package goods unless such third parties have signed an acknowledgment provided by Licensor.
e.   Licensor shall not be responsible for providing any formulas or direction towards the manufacturing, composition, marketing, sale or end use of the products which the Licensee uses the Intellectual Property on, that is being licensed as a part of this Agreement.

12.   Intellectual Property.

**EXHIBIT H-1**

   a. Licensee agrees not to context or otherwise challenge or attack Licensor's rights in and to the Intellectual Property or the validity of the Intellectual Property or the license granted herein during the term here of and thereafter. Licensee further agrees not to do anything either by act of omission or commission which might impair, jeopardize, violate, or infringe the Intellectual Property, or to misuse or bring into dispute the Intellectual Property or otherwise diminish Licensor's goodwill with respect to the Intellectual Property, as determined by Licensor in its sole discretion. Licensee shall not use the Intellectual Property as part of its company name, corporate name or trade name except with the prior consent of Licensor, which consent will not be unreasonably withheld. Licensee shall not register or attempt to register the Intellectual Property or similar intellectual property during the term of this Agreement or thereafter, or aid or abet anyone else doing so.

   b. Licensee shall prominently display the appropriate notice(s) in conjunction with any and all use of the Intellectual Property, as indicated in the Intellectual Property Guidelines. Licensee shall not use any other Intellectual Property or design in combination with any Intellectual Property without Licensor's prior approval. Licensee agrees that it will not use the Intellectual Property in a misleading or confusing manner, nor in a manner that misrepresents any relationship between the Parties. Licensee hereby acknowledges Licensor's right, title and interest in and to the Intellectual Property and agrees not to claim any title to the Intellectual Property or any right to use the Intellectual Property except as permitted by this Agreement. Any goodwill associated with the use of the Intellectual Property by Licensee will inure solely to the benefit of the Licensor. Licensor reserves the right to object to unfair use or misuse of its Intellectual Property or other violations of applicable law. Nothing contained herein shall prevent Licensor or any of its licensees or distributors from manufacturing, distributing, or selling any products or services of any kind with the Intellectual Property in any territory in the world.

13. Limitation of Liability. In no event shall Licensor be liable to Licensee, regardless of the form of action or theory of recovery for any indirect, special, exemplary, consequential, incidental or punitive damages, or for lost profits or business interruption losses arising from or in connection with this Agreement or any alleged or actual breach thereof, even if Licensee has been advised of the possibility of such damages. The Licensee accepts full responsibility both legally and otherwise for any and all use of the Intellectual Property.

14. Independent Contractors. The relationship of Licensor and Licensee established by this Agreement is that of independent contractors, and neither party shall be considered or deemed to be an agent, employee, joint venturer or partner of the other party as a result of this Agreement. Neither Party shall have the right, power or authority to assume, create, or incur any expense, liability or other obligation, express or implied, on behalf of the other and shall not represent itself as an agent of the other party or as otherwise authorized to act for or on behalf of the other party. Neither party shall be responsible for the payment of workers' compensation, disability benefits, unemployment insurance, and for the withholding of income taxes, social security or business license taxes for the other party's employees.

15. Miscellaneous. In the event that any provision of this license would be held illegal, invalid or unenforceable by a court or any jurisdiction, Licensor will be allowed to immediately terminate this license without any legal formality and Licensee shall terminate the use of the Intellectual Property immediately upon receipt of the notice of the decision of Licensor. This Agreement shall be interpreted under the laws of the State of Wyoming. Parties agree to submit any dispute arising out of this Agreement to, and consent to the jurisdiction of, the courts of the State of Wyoming or any Federal District Court having jurisdiction within such state. This Agreement supersedes all prior understandings, oral or written, with respect to the subject matter hereof and shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns. No amendment or change in this Agreement may be made except in writing signed by the Parties. Any waiver under this Agreement shall be in writing,

**EXHIBIT H-1**

and no waiver or absence of granting a waiver shall be deemed a waiver or a continuing waiver.

16.     Notices. All notices, approvals and requests hereunder shall be verbal or in writing.

17.     Confidentiality. From and after the Effective Date, Licensee shall, and shall cause their affiliates, subsidiaries, agents and assignees to hold in confidence any and all information, whether written or oral, concerning the Licensor and the Intellectual Propertys. If Licensee is compelled to disclose any information by judicial or administrative process or by other requirements of Law, Licensee shall promptly notify Licensor and shall disclose only that portion of such information which Licensees are advised by counsel is legally required to be disclosed, provided that Licensee shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information. Licensee acknowledges that a breach or threatened breach of this Section 17 would give rise to irreparable harm to Licensor, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Licensee of any such obligations, Licensor shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

IN WITNESS WHEREOF, the Parties have entered into this Intellectual Property License Agreement, with an effective of 4t day of _October_, 2014

Licensee: ERI WAHYU HIDAYAT

Dated: OCTOBER 3Rd 2014

By: ERI WAHYU HIDAYAT

Address:
Jl IR H JUANOA NO 539
BANDUNG, WEST JAVA
Signature:

Licensor:  Martian Sales Inc.

Dated:  10/01/14

By:  Mark Reilly

Address:  1621 Central Ave.
          Cheyenne, WY 82001

Signature:

**EXHIBIT H-1**

1

2

3

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **DECLARATION OF MARK REILLY**

4

**IN SUPPORT OF DEFENDANT MARTIAN SALES INC.'S MOTION TO DISMISS**

5

**PURSUANT TO ORCP 21A(2)** was served on:

6

7   Jennifer J. Middleton
    Johnson Johnson Lucas & Middleton, P.C.
8   975 Oak St., Suite 1050
    Eugene, OR 97401-3124

9       *Attorneys for Plaintiff*

10

11

12  Michael J. Cowgill
    Michele Stephan
13  Talis M. Abolins
    Maglio Christopher & Toale
14  1325 4th Ave. #1730
    Seattle, WA 98101

15      *Attorneys for Plaintiff (Pro Hac Vice)*

16

17

18  John R. Barhoum
    Chock Barhoum LLP
19  121 SW Morrison, Suite 415
    Portland, OR 97204

20      *Attorneys for Defendant Weece's Market*

21

22

23  James M. Daigle
    James M. Daigle PC
24  210 SW Morrison St, Suite 600
    Portland, OR 97204

25      *Attorneys for Defendants South Seas Ventures*
        *dba Crown Trading dba MIT 45 dba Santiano*
26      *Novasio dba South Sea Ventures, LLC and*
        *Christopher Novasio aka Christopher David*
        *James Novasio aka Santiano Christopher*
        *Novasio*

| | |
|---|---|
| ☐ | By hand delivery |
| ☑ | By first-class mail* |
| ☐ | By overnight mail |
| ☐ | By e-mail: |
| | jmiddleton@justicelawyers.com |
| ☑ | Via Electronic Service through the electronic filing system provided by the Oregon Judicial Department |

| | |
|---|---|
| ☐ | By hand delivery |
| ☑ | By first-class mail* |
| ☐ | By overnight mail |
| ☐ | By e-mail: |
| | mcowgill@mctlaw.com |
| | mstephan@mctlaw.com |
| | tabolins@mctlaw.com |
| ☑ | Via Electronic Service through the electronic filing system provided by the Oregon Judicial Department |

| | |
|---|---|
| ☐ | By hand delivery |
| ☑ | By first-class mail* |
| ☐ | By overnight mail |
| ☐ | By e-mail: |
| | John.barhoum@chockbarhoum.com |
| ☑ | Via Electronic Service through the electronic filing system provided by the Oregon Judicial Department |

| | |
|---|---|
| ☐ | By hand delivery |
| ☑ | By first-class mail* |
| ☐ | By overnight mail |
| ☐ | By e-mail: |
| | jamie@daigle.law |
| ☑ | Via Electronic Service through the electronic filing system provided by the Oregon Judicial Department |

Page 1    CERTIFICATE OF SERVICE

**EXHIBIT H-1**

1

2

John M. Eickelberg
Law Offices of Julie D. Elkins
PO BOX 258829
Oklahoma City, OK 73125

☐ By hand delivery
☑ By first-class mail*
☐ By overnight mail
☐ By e-mail:
  john.eickelberg@farmersinsurance.com
☑ Via Electronic Service through the
  electronic filing system provided by
  the Oregon Judicial Department

*Attorneys for Defendant KS Food Market*

*With first-class postage prepaid and deposited in Portland, Oregon.

DATED this 23rd day of November, 2021.

DUNN CARNEY ALLEN HIGGINS & TONGUE LLP

By: _____
    Brian R. Talcott, OSB No. 965371
    Email:    btalcott@dunncarney.com
    Donald E. Templeton, OSB No. 860954
    Email:    dtempleton@dunncarney.com
    Attorneys for Defendant MARTIAN SALES INC.

Page 2   CERTIFICATE OF SERVICE

**EXHIBIT H-1**

EXHIBIT H-2

STEPHEN L. RAM, State Bar No. 240769
 sram@stradlinglaw.com
LISA M. NORTHRUP, State Bar No. 293784
 lnorthrup@stradlinglaw.com
NICOLE L. CARBONEL, State Bar No. 329262
 ncarbonel@stradlinglaw.com
STRADLING YOCCA CARLSON & RAUTH
A PROFESSIONAL CORPORATION
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: 949 725 4000
Facsimile: 949 725 4100

Attorneys for Plaintiffs
CLEANVIEW DISTRIBUTION GROUP LLC,
SMASH HIT TRADING LLC, and GREEN GOLD ICE LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CLEANVIEW DISTRIBUTION GROUP LLC, a Wyoming limited liability company; SMASH HIT TRADING LLC, a Wyoming limited liability company; and GREEN GOLD ICE LLC, a Wyoming limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>LGI HOLDINGS, LLC, a Wyoming limited liability company; ALPHABET WHOLESALE, a business organization, form unknown; ALPHABET WHOLESALE, INC., a corporation; ALPHABET WHOLESALE, LLC, a limited liability company; PEYTON PALAIO, an individual; TED PALAIO, an individual; LAWRENCE LARSEN, an individual; MARK JENNINGS, an individual; MARK JENNINGS, individually and as a director of | CASE NO. 2:21-cv-07178 SB (JCx)<br><br>Hon.  Stanley Blumenfeld, Jr.<br><br>[Magistrate Judge:  Hon. Jacqueline Chooljian]<br><br>**DECLARATION OF JOHN THOMAS BRYANT IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS COMPLAINT, OR ALTERNATIVELY TO TRANSFER VENUE**<br><br>Date:   November 19, 2021<br>Time:   8:30 a.m.<br>Judge:  Hon. Stanley Blumenfeld, Jr.<br>Place:  Courtroom 6C<br><br>*[Removal from Los Angeles County Superior Court on September 7, 2021]*<br><br>Trial Date:  November 7, 2022 |

**EXHIBIT H-2**

Alphabet Wholesale, business form
unknown; MARK JENNINGS,
individually and doing business as
Alphabet Wholesale; JASON
FOSTER, an individual; and DOES 1
through 10, inclusive,

        Defendants.

**EXHIBIT H-2**

## <u>Declaration of John Thomas Bryant</u>

I, John Thomas "Tommy" Bryant, declare as follows:

1.      I manage the day-to-day operations for plaintiffs Cleanview Distribution Group LLC ("Cleanview"), Smash Hit Trading LLC ("Smash Hit"), and Green Gold ICE LLC ("Green Gold"), and together with Smash Hit and Cleanview, the "Cleanview Companies") in the above entitled action.  I make this Declaration in support of Plaintiffs' Opposition to Motion to Dismiss Complaint, or Alternatively to Transfer Venue.  I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness thereto, I could and would competently do so.

2.      I am a California resident with my primary residence located in Rancho Palos Verdes.

3.      The Cleanview Companies maintain their business offices in Wilmington, California, including a warehouse in Wilmington.  All employees of the Cleanview Companies are located in California and work out of those business offices.  The Cleanview Companies' records and files, and computers, smartphones and other electronic storage devices are all located within Los Angeles County, along with my own records, files, computers, and electronic devices used for the operations of the Cleanview Companies.

4.      Due to the Covid-19 pandemic, at all times relevant described below, my conversations and business communications have either been from my home in Rancho Palos Verdes or the business offices of the Cleanview Companies.

### Lawrence Larsen Places A First Order On Behalf of Alphabet Wholesale (LGI Holdings, LLC)

5.      I met Lawrence Larsen in Las Vegas, Nevada approximately two years ago.  As part of our initial introduction, I mentioned that I lived and worked in California.  Since that time, I periodically had phone conversations with him.

**EXHIBIT H-2**

6.    During one of the periodic conversations, in approximately April 2020, Mr. Larsen and I spoke when I was in my home office. For the first time, Mr. Larsen inquired about purchasing kratom from the Cleanview Companies. I informed him of the current inventory in our California warehouse and Mr. Larsen agreed to purchase 40,000 kilograms or 40 metric tons. Attached hereto as **Exhibit 1** is a true and correct copy of Invoices Nos. 701 and 702 reflecting Mr. Larsen's original order on behalf of a company he identified as Alphabet Wholesale (only recently through the pending lawsuit, I have been informed that Alphabet Wholesale is a trade name or fictitious name for LGI Holdings, LLC).

7.    Based upon the information Mr. Larsen conveyed to me, the first shipment was delivered from the Cleanview Companies' warehouse in California to the address in Oregon that he provided.

8.    On or about May 13, 2020, I had a telephone conversation with Mr. Larsen and Peyton Palaio, while I was in my home and I mentioned to them the California location of my home as we briefly chatted about the impact of the Covid 19 pandemic on our personal lives. At the time, Mr. Larsen and Mr. Palaio stated that they operated the largest kratom business in the U.S., that currently had contracted with eight or more suppliers. Mr. Palaio asked about the Cleanview Companies' operations, including the source of its kratom, because Mr. Palaio explained his companies would like to track and trace kratom from farmer to their end distribution point, but that their current vendors were not in a position to do so. I explained that the Cleanview Companies could accommodate that request with some modifications to the current operations. Mr. Palaio stated that he was interested in moving to a single supplier over the current eight or more vendors, if such traceability could be established.

9.    As a result of that call with Mr. Palaio, I oversaw changes to the Cleanview Companies operations in order to have unique tracking from each farm

**EXHIBIT H-2**

that continued through the entirety of the import and final delivery to Alphabet (or LGI) for future orders.

10.     From the original order in approximately April 2020, Mr. Larsen placed additional orders for kratom with me.  Typically, Mr. Larsen would call me on my cell phone that has a local (424) area code for Los Angeles and through the entirety of the orders discussed below, I had those conversations while I was in my home.  In many of those conversations, we often chatted about the California weather and my location to ride out the Covid-19 pandemic.  For each order, Mr. Larsen would discuss his company's needs and I would discuss what amount of product was immediately available or in transit to the U.S.  Then, Mr. Larsen and I would discuss the price and quantity, and I would arrange for shipment from the Cleanview Companies' warehouse in California to the destination requested by Mr. Larsen.  Following each of those telephone conversations, the Cleanview Companies, mostly through Green Gold, issued invoices for those orders after the product was in transit to the destination requested by Mr. Larsen:

a.     Attached hereto as **Exhibit 2** is a true and correct copy of Invoice No. 703 for 109,000 kilograms;

b.     Attached hereto as **Exhibit 3** is a true and correct copy of Invoice No. 704 for 4,000 kilograms;

c.     Attached hereto as **Exhibit 4** is a true and correct copy of Invoice No. 705 for 15,000 kilograms;

d.     Attached hereto as **Exhibit 5** is a true and correct copy of Invoice No. 706 for 1,200 kilograms;

e.     Attached hereto as **Exhibit 6** is a true and correct copy of Invoice No. 707 for 12,325 kilograms;

f.     Attached hereto as **Exhibit 7** is a true and correct copy of Invoice No. 708 for 4,775 kilograms;

**EXHIBIT H-2**

g.      Attached hereto as **Exhibit 8** is a true and correct copy of Invoice No. 709 for 2,000 kilograms;

h.      Attached hereto as **Exhibit 9** is a true and correct copy of Invoice No. 710 for 9,000 kilograms;

i.      Attached hereto as **Exhibit 10** is a true and correct copy of Invoice No. 711 for 114,000 kilograms;

j.      Attached hereto as **Exhibit 11** is a true and correct copy of Invoice No. 712 for a total of 925 kilograms;

k.      Attached hereto as **Exhibit 12** is a true and correct copy of Invoice No. 713 for 2,500 kilograms;

l.      Attached hereto as **Exhibit 13** is a true and correct copy of Invoice No. 714 for 7,000 kilograms;

m.      Attached hereto as **Exhibit 14** is a true and correct copy of Invoice No. 715 for 7,000 kilograms;

n.      Attached hereto as **Exhibit 15** is a true and correct copy of Invoice No. 716 for 36,000 kilograms;

o.      Attached hereto as **Exhibit 16** is a true and correct copy of Invoice No. 717 for a total of 180,000 kilograms;

p.      Attached hereto as **Exhibit 17** is a true and correct copy of Invoice No. 718 for a total of 89,650 kilograms;

q.      Attached hereto as **Exhibit 18** is a true and correct copy of Invoice No. 719 for a total of 72,000 kilograms;

r.      Attached hereto as **Exhibit 19** is a true and correct copy of Invoice No. 720 for a total of 36,000 kilograms

s.      Attached hereto as **Exhibit 20** is a true and correct copy of a second Invoice No. 720 for a total of 89,925; the second invoice was the result of a clerical oversight, but it represents a separate order;

**EXHIBIT H-2**

t.     Attached hereto as **Exhibit 21** is a true and correct copy of Invoice No. 721 for a total of 72,000 kilograms; and

u.     Attached hereto as **Exhibit 22** is a true and correct copy of Invoice No. 722 for a total of 36,000 kilograms.

11.     The Cleanview Companies received payments on the above invoices from an entity named Jopen LLC dba A1 Wholesale.

**Larsen and Palaio Propose An Exclusive Supply Agreement To Ensure Alphabet or LGI's Supply Needs Are Satisfied**

12.     As the relationship between LGI and the Cleanview Companies progressed,  I engaged with Mr. Larsen, Mr. Palaio and others with their companies, via texts messages and phone calls.  I had each of those phone conversations or electronic communications from my home.

13.      By October 2020, Mr. Larsen told me on multiple phone calls that he and Mr. Palaio were eager to make the Cleanview Companies the single supplier to Alphabet (that I now understand to be LGI) and discontinue the use of other vendors.  During the month of October 2020, I had additional phone conversations with Mr. Larsen and Mr. Palaio about the terms for a possible supply agreement.

14.     Attached hereto as **Exhibit 23** is a true and correct copy of e-mail correspondence dated October 21, 2020 from Mr. Larsen to me with a draft of the supply agreement as its attachment.  In the cover e-mail, Mr. Larsen noted that "P" (which I understood to mean Peyton or Mr. Palaio) would have a few additional revisions.

15.     After reviewing the draft dated October 21, 2020, I had more telephone conversations with Mr. Larsen and Mr. Palaio, including one on or about October 26, 2020.  I was concerned about Section 1(a)(vi) that dealt with rejected material.  To that point in time, Alphabet, LGI, Mr. Larsen, Mr. Palaio, nor anyone else had rejected any product supplied.  During a conversation with Mr. Larsen and

**EXHIBIT H-2**

Mr. Palaio on or about October 26, I requested that the agreement require Alphabet (or LGI) to return any product that it considered defective, and they agreed to do so.  During that same conversation, I also discussed other provisions, including the Exclusivity provision in Section 4, and Mr. Larsen and Mr. Palaio agreed to certain revisions.

16.     On or around October 26, 2020, I signed the ESA from my home office in Rancho Palos Verdes.  Attached hereto as **Exhibit 24** is a true and correct copy of an e-mail dated November 2, 2020 from Mr. Larsen to me, along with its attachment of the fully executed Excusive Supply Agreement ("ESA").

17.     The ESA required that the Cleanview Companies maintain an inventory of 800 metric tons of kratom in the U.S.  To meet that obligation, the Cleanview Companies maintained that inventory in their warehouse in Wilmington.

18.     After execution of the ESA, Mr. Larsen continued to call me in California to place orders, as he had before the ESA, and the Cleanview Companies prepared the following invoices corresponding to those orders:

a.     Attached hereto as **Exhibit 25** is a true and correct copy of Invoice No. 723 for a total of 108,000 kilograms;

b.     Attached hereto as **Exhibit 26** is a true and correct copy of Invoice No. 724 for a total of 72,000 kilograms;

c.     Attached hereto as **Exhibit 27** is a true and correct copy of Invoice No. 725 for a total of 36,000 kilograms;

d.     Attached hereto as **Exhibit 28** is a true and correct copy of Invoice No. 726 for a total of 144,000 kilograms;

e.     Attached hereto as **Exhibit 29** is a true and correct copy of Invoice No. 727 for a total of 90,000 kilograms;

f.     Attached hereto as **Exhibit 30** is a true and correct copy of Invoice No. 728 for a total of 54,000 kilograms;

**EXHIBIT H-2**

g.      Attached hereto as **Exhibit 31** is a true and correct copy of Invoice No. 729 for a total of 108,000 kilograms;

h.      Attached hereto as **Exhibit 32** is a true and correct copy of Invoice No. 730 for a total of 108,000 kilograms;

i.      Attached hereto as **Exhibit 33** is a true and correct copy of Invoice No. 3001 for a total of 68,000 kilograms;

j.      Attached hereto as **Exhibit 34** is a true and correct copy of Invoice No. 3002 for a total of 76,000 kilograms;

k.      Attached hereto as **Exhibit 35** is a true and correct copy of Invoice No. 731 for a total of 54,000 kilograms;

l.      Attached hereto as **Exhibit 36** is a true and correct copy of Invoice No. 3003 for a total of 18,000 kilograms;

m.      Attached hereto as **Exhibit 37** is a true and correct copy of Invoice No. 732 for a total of 54,000 kilograms;

n.      Attached hereto as **Exhibit 38** is a true and correct copy of Invoice No. 733 for a total of 54,000 kilograms;

o.      Attached hereto as **Exhibit 39** is a true and correct copy of Invoice No. 734 for a total of 54,000 kilograms;

p.      Attached hereto as **Exhibit 40** is a true and correct copy of Invoice No. 735 for a total of 126,000 kilograms;

q.      Attached hereto as **Exhibit 41** is a true and correct copy of Invoice No. 736 for a total of 36,000 kilograms;

r.      Attached hereto as **Exhibit 42** is a true and correct copy of Invoice No. 737 for a total of 54,000 kilograms;

s.      Attached hereto as **Exhibit 43** is a true and correct copy of Invoice No. 738 for a total of 36,000 kilograms; and

t.      Attached hereto as **Exhibit 44** is a true and correct copy of Invoice No. 3004 for a total of 24,000 kilograms.

**EXHIBIT H-2**

19.     The Cleanview Companies received payments on the above invoices from an entity named Jopen LLC dba A1 Wholesale and another entity named Liv Group, Inc., except for Invoice Nos. 738 and 3004 which are still outstanding.

**Mr. Palaio Proposes An Acquisition Of The Cleanview Companies And Mr. Palaio And Others Negotiate A Memorandum Of Understanding**

20.     Attached hereto as **Exhibit** 45 is a true and correct copy of an e-mail dated January 11, 2021 from Mr. Palaio to me, including its attachment of a slide deck regarding a company named Olistica Life Sciences Group ("Olistica"). Later that same day, I had a telephone call with Mr. Palaio and Mr. Larsen, while I was in my home in California. During the call, Mr. Palaio proudly described that Alphabet and other companies that paid invoices from the Cleanview Companies were part of this larger entity Olistica that spanned kratom and other botanicals across the globe. In particular, Mr. Palaio explained that Olistica was undergoing clinical trials of kratom products, primarily in Canada and seeking regulatory approval to market and sell kratom products. As part of the regulatory process, Mr. Palaio emphasized the importance of traceability from a farm through the whole supply, manufacturing, and distribution chain – Mr. Palaio was far more detailed in this conversation than previous conversations about traceability. Mr. Palaio stated that the Cleanview Companies' modifications to allow traceability were a first step, but he wanted greater control. Mr. Palaio then surprised me by stating that he was interested in acquiring the Cleanview Companies to achieve that control. That was the first of several preliminary calls.

21.     Attached hereto as **Exhibit 46** is a true and correct copy of an e-mail dated January 19, 2021 from Mr. Larsen for a Zoom call for January 20, 2021. And, on or about January 20, 2021, I participated in a Zoom call with Mr. Larsen

**EXHIBIT H-2**

and Mr. Palaio about Olistica and the possible sale of the Cleanview Companies, and we had a preliminary discussion of possible terms for such a transaction.

22.    Attached hereto as **Exhibit 47** is a true and correct copy of an e-mail dated January 26, 2021 from Mr. Larsen for a Microsoft Teams Meeting call for January 28, 2021.  On or about January 28, 2021, I participated in a Microsoft Teams call with Mr. Larsen, Mr. Palaio, Mary Cerio, and Jason Foster.  Mr. Palaio introduced Ms. Cerio, explaining that she would have a significant role in a possible transaction and for any diligence by Mr. Palaio or the Olistica group.  Mr. Foster was introduced as the CFO of Olistica, and as the person who ensured the payment of the Cleanview Companies' invoices from the various other entities in Mr. Palaio's network of companies.  Mr. Palaio stated that Mr. Foster would have a significant role in diligence and the terms of the possible transaction.  During that call, Mr. Palaio continued his discussion of Olistica's network and its needs, and we continued our preliminary discussion of possible terms for a transaction.

23.    Over the next six (6) weeks approximately, I had a series of telephone calls, texts, and e-mail communications with Mr. Palaio, Mr. Larsen, Mr. Foster, Ms. Cerio, and others about the terms of a potential sale of the Cleanview Companies.  For all of those conversations and communications, I was in my home in California.  Ultimately, we agreed to memorialize the terms in a Memorandum of Understanding ("MOU").  Attached hereto as **Exhibit 48** is a true and correct copy of an e-mail dated March 2, 2021 from Mr. Palaio to me and its attachments, including a draft of the MOU.  Mr. Palaio refers to the conversations that I had with him and later he refers to a conversation that I had with "L," who I understood to mean Mr. Larsen.  Mr. Palaio also referred to leases for the Cleanview Companies offices in Los Angeles, which I had brought up in prior calls.  At the conclusion of Mr. Palaio's e-mail, he proposed another telephone call to discuss the draft of the MOU and I had that call with him on or about March 2.

**EXHIBIT H-2**

24.     Following the March 2 draft of the MOU and our call, I had additional conversations with Mr. Palaio and Mr. Larsen.  Attached hereto as **Exhibit 49** is a true and correct copy of an e-mail string dated March 9, 2021 through March 10, 2021 that included Mr. Palaio, Ms. Cerio, Mr. Larsen, and me regarding various concerns and revisions to the MOU.

25.     Attached hereto as **Exhibit 50** is a true and correct copy of e-mail string dated March 9, 2021 to March 10, 2021 that included Mr. Palaio, Mr. Foster, Ms. Cerio, Mr. Larsen, and me about the certain revisions to the MOU and then seeking a direct invoice from a supplier of the Cleanview Companies upon the signing of the final MOU.

## The Cleanview Companies Provide Requested Diligence Information Under The MOU And Its Non-Disclosure Agreement

26.     After the signing of the MOU and its Non-Disclosure Agreement on or about March 10, 2021 until June 2021, I continued to have frequent telephone calls, texts, and e-mail communications with Mr. Palaio, Mr. Larsen, Ms. Cerio, and Mr. Foster; I had those communications primarily from my home and the business offices of the Cleanview Companies in California.

27.     On or about April 5, 2021, Mr. Palaio began sending me text messages about various aspects of the Cleanview Companies' business, diligence, and the terms for a definitive purchase and sale agreement (the "PSA").  Attached hereto **as Exhibit 51** is a true and correct copy of the initial text messages exchanged between Mr. Palaio and I on April 5, 2021, that included his references to telephone calls between us, again with Mr. Palaio referring to himself as "P".

28.     Attached hereto as **Exhibit 52** is a true and correct copy of additional text messages between Mr. Palaio and me from April 9, 2021 and April 12, 2021, that refers to a call that I had with Ms. Cerio and inquiring into the status of the draft PSA.  The text string includes a video that I shared of the location in

**EXHIBIT H-2**

Indonesia where a facility was being built that was part of the MOU and the contemplated PSA.

29.     Attached hereto as **Exhibit 53** is a true and correct copy of an e-mail dated April 12, 2021 from Ms. Cerio to me with copies to Mr. Palaio and Mr. Larsen and its attachment of a draft of the PSA.  Following receipt of that draft, I had a telephone call with Mr. Palaio regarding various terms.

30.     Attached hereto as **Exhibit 54** is a true and correct copy of text messages between Mr. Palaio and me from April 20, 2021 through April 22, 2021, regarding a payment he incorrectly sent to the Cleanview Companies in Wyoming and that Mr. Palaio had re-routed to the Cleanview Companies' business offices in California.

31.     Attached hereto as **Exhibit 55** is a true and correct copy of text messages between Mr. Larsen, Mr. Foster, Ms. Cerio and me from April 16, 2021 through April 27, 2021.  Among other things, Mr. Foster asks for information to process payment and to send to the Cleanview Companies' offices in California.

32.     Attached hereto as **Exhibit 56** is a true and correct copy of an e-mail string dated from April 19, 2021 through April 27, 2021 that included Mr. Foster, Mr. Palaio, Mr. Larsen and me, and its attachments.

33.     Attached hereto as **Exhibit 57** is a true and correct copy of an e-mail dated April 23, 2021 from Mr. Palaio to me and its attachment of an updated draft of the PSA.  In the e-mail, Mr. Palaio suggested a call to discuss the terms of the PSA and we had that call on or about April 23, 2021, when Mr. Palaio described various revisions to the PSA from the earlier draft and his reasons for them.

34.     I continued to have frequent telephone calls and exchange text messages with Mr. Palaio, Mr. Larsen, and Ms. Cerio after April 23, 2021 to discuss various aspects of the Cleanview Companies' operations as part of diligence under the NDA and to negotiate the terms of the PSA.  For example, I had a Zoom conference with Mr. Palaio and Ms. Cerio on or about April 29, 2021,

where we discussed altering the structure of a royalty or commission payment structure of the draft PSA to a flat agreed upon amount to acquire the Cleanview Companies.  Shortly after that conversation, I had another telephone conversion with Mr. Palaio where he agreed to this new structure and agreed upon $30 million as the principal consideration for the Cleanview Companies for the PSA.

### The Cleanview Companies Accommodate Ted Palaio To Conduct Diligence, But The Plot Unfolds To Destroy The Once Thriving Cleanview Business

35.     Around the time of the MOU, Mr. Palaio had stated that as part of diligence, a member of his team would need to visit and meet individuals in Indonesia to verify aspects of the Cleanview Companies' supply chain.  Later, Mr. Palaio proposed to send his "uncle" Ted Palaio to verify those contacts; I am informed that Ted Palaio also uses the name Ted Lavelle.  To assist, I coordinated with a supplier of the Cleanview Companies, Irvan Januardi of Indobotanical Trading Company to sponsor Ted Palaio's visa, arrange lodging, transportation, guides, and appointments with various key individuals in the Cleanview Companies' supply chain.

36.     Attached hereto as **Exhibit 58** is a true and correct copy of text messages from April 18, 2021 to April 19, 2021 between Peyton Palaio and me regarding conversations that I had with Ted Palaio and his diligence in Indonesia. As part of the text string, I included a screenshot from a text from "T Thailand" who was Ted Palaio.  At the time, Ted Palaio and Peyton Palaio had been concerned about disclosing the potential sale of the Cleanview Companies to Mr. Januardi of Indobotanical Trading Company, which is referenced in the text string.

37.     On or about April 19, 2021, I spoke with Ted Palaio from my home in California about diligence and discussing the acquisition of the Cleanview Companies with Mr. Januardi.

**EXHIBIT H-2**

38.     Over the next few weeks, I had nearly daily text messages and phone calls with Ted Palaio as he was traveling in Indonesia to meet key individuals within the supply chain and the tour the facility that was being built as part of the PSA.  For each of those calls and texts, I was primarily at my home in California.

39.     Ted Palaio's stay in Indonesia began open-ended and, in fact, his wife joined him (again sponsored by Mr. Januardi).  I soon became concerned that Ted Palaio was no longer just meeting and verifying individuals and aspects of the supply chain because I had been informed that he was actively lobbying local Indonesian government officials for changes to laws regarding kratom using contacts he learned from the Cleanview Companies.

40.     On or about May 24, 2021, I participated in a conference call with Peyton Palaio, Ms. Cerio, and various attorneys for Peyton Palaio and the Cleanview Companies.  During that call, I confronted Peyton Palaio with my concerns about Ted Palaio's activities.  He did not respond himself to my concerns, but others, including Ms. Cerio, tried to downplay the issue and suggest that I was mistaken.

41.     Soon after, the PSA negotiations completely stalled and Ted Palaio was still in Indonesia (I am informed that Ted Palaio only departed from Indonesia in October 2021).  Peyton Palaio, Mr. Larsen, and Mr. Foster had failed to pay various invoices from the Cleanview Companies and separate invoices from Indobotanical Trading Company.

42.     Moreover, Peyton Palaio and Mr. Larsen have refused to accept delivery of additional kratom shipments that were still being stored in the Cleanview Companies' warehouse in Wilmington.  Peyton Palaio and Mr. Larsen also have failed to place any new orders for kratom despite the obligations in the ESA for nearly five (5) months.  These actions, among others, have forced the Cleanview Companies to cease active operations and destroyed the once thriving business.

**EXHIBIT H-2**

43.     The text messages with Peyton Palaio, Mr. Larsen, Ted Palaio, Ms. Cerio, Mr. Foster, and others that are provided as Exhibits to this declaration are a sample of the text messages that I had with them; the entirety of the text messages span hundreds of pages.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JOHN THOMAS BRYANT

**EXHIBIT H-2**

# Exhibit 1

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

| INVOICE NO. 701 | 04/29/2020 |
|---|---|

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 20,000 kilograms | Agricultural supplies | $13.50 | $270,000 |
| 1 | Shipping | $2,100 | $2,100 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| SUBTOTAL | $272,100 |
|---|---|
| TOTAL | $272,100 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: █████████████████
█████████████████████
Account name: ████████████
Routing # for wire : ████████
Routing # for ACH: █████████
Account #: ████████

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

| INVOICE NO. 702 | 04/30/2020 |
|---|---|

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 20,000 kilograms | Agricultural supplies | $13.50 | $270,000 |
| 1 | Shipping | $2,100 | $2,100 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | |
|---|---|
| SUBTOTAL | $272,100 |
| TOTAL | $272,100 |

Thank you for your business!

Bank information for wires:
Bank name:
Bank address:

Account name:
Routing # for wire :
Routing # for ACH
Account #

**EXHIBIT H-2**

# Exhibit 4

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

| INVOICE NO. 705 | 06/04/2020 |
|---|---|

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 15,000 kilograms | Agricultural supplies | $16.00 | $240,000 |
| 1 | Shipping | $5,000 | $5,000 |

*****SOLD FOR AGRICULTURE PURPOSES*****

| | |
|---|---|
| SUBTOTAL | $245,000 |
| TOTAL | $245,000 |

Thank you for your business!

Bank information for wires:
Bank name:
Bank address:

Account name:
Routing # for wire :
Routing # for ACH:
Account #:

**EXHIBIT H-2**

# Exhibit 24

**EXHIBIT H-2**

**From:** Apex Endeavors Inc. <apexendeavors@pm.me>
**To:** tommylisa888@yahoo.com <tommylisa888@yahoo.com>
**Sent:** Monday, November 2, 2020, 11:33:51 AM PST
**Subject:** Fwd: Signed Supply Agreement

Done! Here you go brother

See attached sign wholesale supply agreement


Sent with ProtonMail Secure Email.

**EXHIBIT H-2**

## EXCLUSIVE SUPPLY AGREEMENT

This Exclusive Supply Agreement ("Agreement") by and between the <u>DBA Alphabet Wholesale</u> ("Alphabet Wholesale"), and <u>Smash Hit Trading LLC, Green Gold ICE LLC, any of their partners, affiliates, owners or subsidiaries</u> ("Partner") is being entered into this 26 day of oct 2020 (the "Effective Date").

WHEREAS, Alphabet Wholesale wishes to engage with Partner to secure certain supply arrangements. Specifically, Alphabet Wholesale wishes to afford Partner an opportunity to serve as its supplier relating to the supply of kratom (mitragyna speciosa) in a relationship where by the seller will maintain an exclusive relationship to the buyer and not solicit or sell kratom ( Mitragyna Speciosa ) to  other buyers.

WHEREAS, the Partner wishes to Supply Alphabet Wholesale with material relating to kratom (mitragynia specisoa). Partner will maintain a certain inventory in order to meet increasing demand, and agrees to continue to increase stock of inventory at Alphabet Wholesale's discretion, at anytime, in order to meet demand, without increasing the agreed upon price set here within.

NOW, THERFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.      RESPONSIBILITIES.

(a)     Of the Partner:

    (i)     maintain an inventory of 800 metric tons of kratom materials (mitragyna speciosa) at all times.  This inventory must be immediately accessible and safely secured and stored in the U.S. If inventory requirements are not met, Partner will bear all costs associated with shipping the requested product via air freight, without changing the price/Kg agreed upon.

    (ii)    have inventory on hand distributed between different colors, to be determined by Alphabet Wholesale  and can be changed at any time.

    (iii)   fully disclose any and all circumstances that currently exist or that could arise during the Term (as defined herein) that could be (or cause) a conflict of interest between the respective interests of Alphabet Wholesale and the Partner; and,

Initials _____ , _____

1

**EXHIBIT H-2**

    (iv)    provide full access to the physical facilities for Companion Ag Program(training, oversight, auditing, and access to facility security/ surveillance systems and records and ability to inform Partner on changes or exclusion of certain farmers or producer or sellers of kratom).

    (v)    provide inventory of incoming material at sea on a monthly basis or upon requested

    (vi)    immediately replace any material supplied that does not pass incoming material testing and specifications.  This replacement must include an additional 25% over the given amount returned of additional kratom to be sent out within 24 hours of receiving notice of rejection.  Rejected material must be returned to Partner at the Partner's expense.  Partner will bear all costs associated with replacement of rejected material.

    (vii)    apply a coding system to all incoming shipments that will give traceability back to the farmer that shipped the material.

    (viii)    exclusively supply Alphabet Wholesale with kratom materials (mitragynina speciosa) no matter how or where it was sourced from. Partner may not sell or fulfill any other vendors orders or requests for kratom or related materials or goods in this category. Partner will terminate effective immediately upon execution of this agreement the pre-existing relationships and future opportunities for the sale of kratom and related goods .

    (ix)    allow for direct communication with farmers to help implement GAP procedures and  at their farms. Partner agrees to terminate relationship with any farms that ___ _____ deem to be an unfit source of raw materials.

    (x)    share any and all previous/ current client information in order to help expand operations. This should include contact name, #, email, quantities purchased, pricing, and frequency of purchases and assist in facilitating the sale of Kratom and related goods to those parties where requested by Alphabet Wholesale

(b)    Of Alphabet Wholesale shall:

    (i)    purchase a minimum of 275 metric tons per month for the 1st 3 months after signing of this contract. After 3 months, the minimum amount purchased monthly by Alphabet Wholesale will increase to 300+ metric tons per month.

    (ii)    ensure that incoming shipments are tested within 60 days of receipt and that any rejections of shipments are reported to Partner within that time frame.

Initials _*Mj*_ , _TB_

2

    (iii)    provide feedback on materials from specific farms and help to choose premiere farms to help avoid any contaminated material or not-to-spec shipments.  Through the Companion Ag Program shall be responsible for the oversight of the providers, farms, distributors and providers of kratom working with the Partner.

**EXHIBIT H-2**

2.   PRICING

    a) Partner agrees to sell and Alphabet Wholesale agrees to purchase 275 tons/ month at $13.50 and agrees to $13.00/Kg for quantities exceeding 300 tons per month and maintain that purchase price up to 400 tons/ month. This will be the maximum price for kratom, dispite market fluctuations.

    b) If and when purchase quantity exceeds 400 tons/month, the price will decrease to $12.25/Kg

    c) all payments will be made after the material is delivered, QC approved and accepted into inventory. Payments will be remitted within 21 days of inventory entry to facilities

3.   TERM AND TERMINATION.

(a)   Term. This Agreement will become effective as of the Effective Date. Unless terminated earlier in accordance with this Section, this Agreement will continue until 18 months from the Effective Date (the "Term"). This term is renewable upon mutual written agreement of the Parties for an additional five-year term. The parties agree to commence discussions on renewal at minimum 6 months prior to renewal and agree to use best efforts to extend the engagement.

(b)   Termination. This Agreement may be terminated:

    (i)   by Alphabet Wholesale on provision of 120 days written notice to the other party and by Partner in the event that it provides 120 days written notice which may occur only if ;

    (ii)   by either party for a material breach of any provision of this Agreement by the other party, if the other party's material breach is not cured within 15 business days of receipt of written notice of the breach, except for non-payment of product by Alphabet Wholesale; or

Initials _MJ_ , _TB_

3

    (iii)   Alphabet Wholesale at any time and without prior notice if the Partner is convicted of any crime or offense, fails or refuses to comply with the written policies or reasonable directives of Alphabet Wholesale, or takes an action or fails to take action and such action or inaction constitutes gross negligence or willful misconduct as determined by Alphabet Wholesale in its reasonable discretion.

    (iv) the product is deemed to be not legal, or contaminated material cannot be remedied and the supply chain or Partner falls short of meeting the requirements and deliverable quantities of kratom aforementioned in this agreement.

**EXHIBIT H-2**

4.    NO CONFLICT OF INTEREST; EXCLUSIVITY;  The Partner hereby represents and warrants to Alphabet Wholesale that, to the best of its knowledge, it is not currently obliged under any existing contract or other duty that conflicts with or is inconsistent with this Agreement.  During the Term, this Agreement shall be exclusive on the part of the Partner and Partner may not provide the same or similar supply services to any other party.  The Partner acknowledges and agrees that Alphabet Wholesale may enter into similar arrangements with other parties outside of USA.

5.    CONFIDENTIAL INFORMATION.  During the Term and for a period of 5 years thereafter, each party shall retain in confidence and not disclose to any third-party Confidential Information obtained from the other under this Agreement. "Confidential Information" means proprietary information, technical data, trade secrets, or know-how, including, but not limited to, research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, or other business information disclosed to one party by the other, either directly or indirectly. Neither party will use Confidential Information except for the express purpose of performing this Agreement. The Partner may use the Confidential Information to the extent necessary for negotiations, discussions, and consultations with Alphabet Wholesale personnel or authorized representatives or for any other purpose Alphabet Wholesale may hereafter authorize in writing. Alphabet Wholesale and its affiliates cannot use any of the Partner's farms unless authorized by the Partner in writing.

Alphabet Wholesale
By: _____
Name: Mark Jennings
Title:  Director
Date: 11/02/2020

Smash Hit Trading LLC
By: _____
Name:  THOMAS BRYANT
Date:  10-26-2020

4

**EXHIBIT H-2**

# Exhibit 25

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 723                                          11/06/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3546083 (720 boxes – 83 green, 280 white, 157 red, 200 yellow) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3546082 (720 boxes – 160 green, 240 white, 320 red) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3549886 (720 boxes – 720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3549887 (720 boxes – 720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3553968 (720 boxes – 160 green, 320 white, 240 red) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3553967 (720 boxes – 600 green, 120 red) | $13.50/kg | $243,000 |
| 6 | Shipping | $6,950 | $41,700 |
|  | *****SOLD FOR AGRICULTURE PURPOSES***** |  |  |

|  |  |
|---|---|
| SUBTOTAL | $1,499,700 |
| TOTAL | $1,499,700 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ███████████
███████████
Account name: ███████████
Routing # for wire : ███████
Routing # for ACH: ██████
Account #: ██████

**EXHIBIT H-2**

# Exhibit 26

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 724                                    11/13/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3567253 (720 boxes –720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3567256 (720 boxes – 720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3567255 (720 boxes – 720 red) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3567254 (720 boxes – 560 green, 160 red) | $13.50/kg | $243,000 |
| 4 | Shipping | $7,000 | $28,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

|  |  |
|---|---|
| SUBTOTAL | $1,000,000 |
| TOTAL | $1,000,000 |

Thank you for your business!

Bank information for wires:
Bank name: ████████████
Bank address: ████████████████
████████████████
Account name: ████████████████
Routing # for wire ██████████
Routing # for ACH ████████
Account ████████

**EXHIBIT H-2**

Exhibit 27

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 725                                                11/17/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3586418 (720 boxes –480 green, 240 red) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3586419 (720 boxes – 720 green) | $13.50/kg | $243,000 |
| 2 | Shipping | $6,900 | $13,800 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | | |
|---|---|---|
| | SUBTOTAL | $499,800 |
| | TOTAL | $499,800 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ████████████

Account name: ████████████
Routing # for wire : ██████
Routing # for ACH: ███████
Account #: ██████

**EXHIBIT H-2**

# Exhibit 28

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 726                                          12/07/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3638458 (720 boxes –80 green, 640 red) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3638504 (720 boxes – 80 green, 640 white) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3638539 (720 boxes –720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3638540 (720 boxes – 720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3631201 (720 boxes –720 green) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3631202 (720 boxes – 160 green, 160 red, 400 white) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3638541 (720 boxes –320 green, 280 red, 120 white) | $13.50/kg | $243,000 |
| 18,000 kg | BOL #3638583 (720 boxes – 480 green, 240 white) | $13.50/kg | $243,000 |
| 8 | Shipping | $7,000 | $56,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | |
|---|---|
| SUBTOTAL | $2,000,000 |
| TOTAL | $2,000,000 |

Thank you for your business!

Bank information for wires:
Bank name: ▮▮▮▮▮▮▮▮▮▮▮
Bank address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
Account name: ▮▮▮▮▮▮▮▮▮▮▮
Routing # for wire : ▮▮▮▮▮▮
Routing # for ACH ▮▮▮▮▮▮
Account # ▮▮▮▮▮▮

**EXHIBIT H-2**

# Exhibit 29

**EXHIBIT H-2**

Green Gold ICE LLC

30 N Gould St., Suite R

Sheridan, WY 82801

(424) 477-4286

## INVOICE NO. 727                                           12/11/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3664996 (720 boxes –520 white, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3664999 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3664998 (720 boxes –240 green, 480 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3670336 (720 boxes – 720 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3670338 (720 boxes –240 red, 480 white) | $12.75/kg | $229,500 |
| 5 | Shipping | $7,000 | $35,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | | |
|---|---|---|
| SUBTOTAL | | $1,182,500 |
| TOTAL | | $1,182,500 |

Thank you for your business!

Bank information for wires:

Bank name: ███████████

Bank address: ████████████

Account name: ███████████

Routing # for wire : ██████

Routing # for ACH: ██████

Account #: ██████

**EXHIBIT H-2**

# Exhibit 30

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 728 — 12/17/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3691101 (720 boxes –720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3691103 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3691104 (720 boxes –160 green, 160 red, 400 white) | $12.75/kg | $229,500 |
| 3 | Shipping | $7,000 | $21,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | |
|---|---|
| SUBTOTAL | $709,500 |
| TOTAL | $709,500 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ███████████████
████████████████
Account name: ██████████████████
Routing # for wire ████████
Routing # for ACH ██████████
Account # █████████

**EXHIBIT H-2**

Exhibit 31

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 729                                    12/23/2020

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3699249 (720 boxes –720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3699232 (720 boxes – 720 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3699268 (720 boxes –440 red, 80 white, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3699266 (720 boxes –600 green, 120 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3705409 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3705388 (720 boxes –520 green, 200 yellow) | $12.75/kg | $229,500 |
| 6 | Shipping | $7,000 | $42,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | | |
|---|---|---|
| | SUBTOTAL | $1,419,000 |
| | TOTAL | $1,419,000 |

Thank you for your business!

Bank information for wires:
Bank name: ████████████
Bank address: ████████████████

Account name: ███████████████
Routing # for wire : ████████
Routing # for ACH: ████████
Account #: ███████

**EXHIBIT H-2**

# Exhibit 32

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 730                                                01/01/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3720125 (720 boxes –720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3720126 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3720133 (720 boxes –80 green, 440 white, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3720131 (720 boxes –160 green, 560 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3720130 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3720128 (720 boxes –720 green) | $12.75/kg | $229,500 |
| 6 | Shipping | $7,000 | $42,000 |
|  | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | |
|---|---|
| SUBTOTAL | $1,419,000 |
| TOTAL | $1,419,000 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ████████████████
Account name: ██████████████
Routing # for wire ████████
Routing # for ACH: █████████
Account #: █████████

**EXHIBIT H-2**

# Exhibit 33

# Invoice 3001

## Smash Hit Trading LLC

30 N Gould St., Suite R
Sheridan, WY 82801
Tel: 424-477-4286

| Date | To | Ship To |
|------|-----|---------|
| January 13, 2021 | Alphabet Wholesale | Same as recipient |
| | 411 S Richey St. | |
| | Pasadena, TX 77506 | |

**Instructions**

Terms: Due on Receipt

| Quantity | Description | Unit Price | Total |
|----------|-------------|-----------|-------|
| 18,000 kg | BOL #3761641 (720 boxes – 80 green, 80 red, 560 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3761114 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3761112 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 14,000 kg | BOL #3761641 (560 boxes – 560 red) | $12.75/kg | $178,500 |
| 4 | Shipping | $7,000 | $28,000 |
| | ***SOLD FOR AGRICULTURAL PURPOSES*** | | |
| | | Subtotal | $895,000 |
| | | **Total Due By** | **$895,000** |

Thank you for your business!

Bank information for wires:

Bank name: ████████

Bank address: ████████████████████
████████████
████████████████
████████████

Account name: ███████████████████

Routing # for wire : ████████████

Account #: ████████████

**EXHIBIT H-2**

# Exhibit 34

**EXHIBIT H-2**

# Invoice 3002

## Smash Hit Trading LLC

30 N Gould St., Suite R
Sheridan, WY 82801
Tel: 424-477-4286

| Date | To | Ship To |
|---|---|---|
| January 21, 2021 | Alphabet Wholesale | Same as recipient |
| | 411 S Richey St. | |
| | Pasadena, TX 77506 | |

### Instructions
Terms: Due on Receipt

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 18,000 kg | BOL #3778025 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3778023 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3778022 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #37778021 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 4,000 kg | 160 boxes red | $12.75/kg | $51,000 |
| 4 | Shipping | $7,000 | $28,000 |
| | ***SOLD FOR AGRICULTURAL PURPOSES*** | | |
| | | Subtotal | $997,000 |
| | | **Total Due By** | **$997,000** |

Thank you for your business!

Bank information for wires:
Bank name: ▮▮▮▮
Bank address: ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮
Account name: ▮▮▮▮▮▮▮▮
Routing # for wire : ▮▮▮▮▮
Account #: ▮▮▮▮▮▮

**EXHIBIT H-2**

Exhibit 35

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 731                                01/29/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3809779 (720 boxes –720 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3809780 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3809781 (720 boxes – 720 white) | $12.75/kg | $229,500 |
| 3 | Shipping | $7,000 | $21,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | SUBTOTAL | $709,500 |
|---|---|---|
| | TOTAL | $709,500 |

Thank you for your business!

Bank information for wires:
Bank name: ██████████
Bank address: ███████████████

Account name: █████████████
Routing # for wire : ██████████
Routing # for ACH: ████████
Account #: ██████

**EXHIBIT H-2**

Exhibit 36

**EXHIBIT H-2**

# Smash Hit Trading LLC

30 N Gould St., Suite R
Sheridan, WY 82801
Tel: 424-477-4286

**Invoice 3003**

| Date | To | Ship To |
|---|---|---|
| January 29, 2021 | Alphabet Wholesale | Same as recipient |
| | 411 S Richey St. | |
| | Pasadena, TX 77506 | |

**Instructions**

Terms: Due on Receipt

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 18,000 kg | BOL #3809782 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 1 | Shipping | $7,000 | $7,000 |
| | ***SOLD FOR AGRICULTURAL PURPOSES*** | | |
| | | Subtotal | $236,500 |
| | | **Total Due By** | **$      , 00** |

Thank you for your business!

Bank information for wires:
Bank name: ███
Bank address: ███████

███████

Account name: █████
Routing # for wire : ███
Account #: █████

**EXHIBIT H-2**

# Exhibit 37

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

| INVOICE NO. 732 | 02/12/2021 |
|---|---|

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3847475(720 boxes –720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3847476 (720 boxes – 360 red, 360 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3847477 (720 boxes – 560 green, 160 white) | $12.75/kg | $229,500 |
| 3 | Shipping | $7,000 | $21,000 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | SUBTOTAL | $709,500 |
|---|---|---|
| | TOTAL | $709,500 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ████████████████
████████████████
Account name: ████████████████
Routing # for wire : ███████████
Routing # for ACH: ███████████
Account #: ████████

**EXHIBIT H-2**

Exhibit 38

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 733                                                   03/18/2021

| BILL TO | SHIP TO | TERMS |
|---------|---------|-------|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|----------|-------------|------------|-------|
| 18,000 kg | BOL #3947653 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3955698 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3947656 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 3 | Shipping | $6,500 | $19,500 |
|  | *****SOLD FOR AGRICULTURE PURPOSES***** |  |  |

| | SUBTOTAL | $708,000 |
|---|----------|----------|
| | TOTAL | $708,000 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: █████████████
Account name: █████████████
Routing # for wire : ██████████
Routing # for ACH: █████████
Account #: ██████

**EXHIBIT H-2**

# Exhibit 39

EXHIBIT H-2

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 734                                          03/26/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3977355 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3977357 (720 boxes – 720 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3977354 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 3 | Shipping | $6,500 | $19,500 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | |
|---|---|
| SUBTOTAL | $708,000 |
| TOTAL | $708,000 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ██████████████
Account name: ████████████
Routing # for wire : ████████
Routing # for ACH: █████████
Account #: ██████

**EXHIBIT H-2**

# Exhibit 40

EXHIBIT H-2

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 735      04/01/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #3986338 (720 boxes –520 green, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3986101 (720 boxes – 400 green, 320 red) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #3992739 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL# 3992741 (720 boxes – 320 green, 200 red, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL 3992870 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 18,000 kg | BOL# 3992872 (720 boxes – 320 red, 400 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL 3992874 (720 boxes – 80 green, 400 red, 40 white, 200 yellow) | $12.75/kg | $229,500 |
| 7 | Shipping | $6,700 | $46,900 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | | |
|---|---|---|
| | SUBTOTAL | $1,653,400 |
| | TOTAL | $1,653,400 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ██████████████
Account name: ███████████████
Routing # for wire ██████
Routing # for ACH: ███████
Account #: █████████

**EXHIBIT H-2**

Exhibit 41

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 736         04/08/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #4014030 (720 boxes —120 red, 600 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #4014033 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 2 | Shipping | $6,600 | $13,200 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | SUBTOTAL | $472,200 |
|---|---|---|
| | TOTAL | $472,200 |

Thank you for your business!

Bank information for wires:
Bank name: ▮▮▮▮▮▮▮
Bank address: ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
Account name: ▮▮▮▮▮▮
Routing # for wire: ▮▮▮▮▮
Routing # for ACH: ▮▮▮▮▮
Account #: ▮▮▮▮

**EXHIBIT H-2**

Exhibit 42

**EXHIBIT H-2**

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 737                                                    04/14/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale | Same as recipient | Due on receipt |
| 411 S Richey St. | | |
| Pasadena, TX 77506 | | |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #4044368 (720 boxes – 720 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #4044480 (720 boxes – 720 white) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #4044481 (720 boxes – 480 green, 160 red, 80 white) | $12.75/kg | $229,500 |
| 3 | Shipping | $6,700 | $20,100 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

| | | |
|---|---|---|
| | SUBTOTAL | $708,600 |
| | TOTAL | $708,600 |

Thank you for your business!

Bank information for wires:
Bank name: ███████████
Bank address: ████████████████
███████████████
Account name: ██████████████
Routing # for wire : ████████
Routing # for ACH: ██████████
Account #: ███████

**EXHIBIT H-2**

# Exhibit 43

EXHIBIT H-2

Green Gold ICE LLC
30 N Gould St., Suite R
Sheridan, WY 82801
(424) 477-4286

## INVOICE NO. 738                                    05/10/2021

| BILL TO | SHIP TO | TERMS |
|---|---|---|
| Alphabet Wholesale<br>411 S Richey St.<br>Pasadena, TX 77506 | Same as recipient | Due on receipt |

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| 18,000 kg | BOL #4113905 (720 boxes – 400 green, 120 white, 200 yellow) | $12.75/kg | $229,500 |
| 18,000 kg | BOL #4113906 (720 boxes – 720 green) | $12.75/kg | $229,500 |
| 2 | Shipping | $6,700 | $13,400 |
| | *****SOLD FOR AGRICULTURE PURPOSES***** | | |

|  | SUBTOTAL | $472,400 |
|---|---|---|
|  | TOTAL | $472,400 |

Thank you for your business!

Bank information for wires:
Bank name: █████████
Bank address: ███████████
███████████
Account name: ██████████
Routing # for wire ███████
Routing # for ACH: ████████
Account ███████

**EXHIBIT H-2**

Exhibit 44

**EXHIBIT H-2**

# Smash Hit Trading LLC

30 N Gould St., Suite R
Sheridan, WY 82801
Tel: 424-477-4286

**Invoice 300**

| Date | To | Ship To |
|---|---|---|
| June 2, 2021 | Alphabet Wholesale | Same as recipient |
| | 411 S Richey St. | |
| | Pasadena, TX 77506 | |

**Instructions**

Terms: Due on Receipt

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 24,000 kg | (960 boxes – 640 white, 320 green) | $12.75/kg | $306,000 |
| 1 | Shipping | $7,000 | $7,000 |
| | ***SOLD FOR AGRICULTURAL PURPOSES*** | | |
| | | Subtotal | $313,000 |
| | | **Total Due By** | **$     ,000** |

Thank you for your business!

Bank information for wires:
Bank name: █████
Bank address: ████████████
███████
███████████
Account name: ████████████
Routing # for wire : ██████
Account # ████████

**EXHIBIT H-2**

# Exhibit 45

**EXHIBIT H-2**

**From:** BioLife <biolife@protonmail.com>
**To:** tommylisa888@yahoo.com <tommylisa888@yahoo.com>
**Cc:** Apex Endeavors Inc. <apexendeavors@pm.me>
**Sent:** Monday, January 11, 2021, 12:01:43 PM PST
**Subject:** Items for review for our call

Tommy,

I hope you and your family had a great Christmas and a happy New Years!

In preparation for our call today, I wanted to introduce you to a bit more of what our organization is involved in.  I figured it may be helpful to send over one of our slide decks and the link to our corporate homepage http://olisticagroup.com

Im looking forward to our call today and the opportunity to catch up.

Thanks
Payton

1

**EXHIBIT H-2**



EXHIBIT H-2

# About Olistica

*The leader in the natural products revolution*

## Our Mission

- To promote the use of plant-based therapeutics in modern medicine, and to provide access to these products worldwide.

- To apply industry-leading technologies and capabilities across the value-chain of plant-based medicines, feedstock alternatives, managed agriculture, health and nutrition.

- To produce engineered natural products through commercially scalable, sustainable processes.



ACCESS

INNOVATION

QUALITY

WELL-BEING

**EXHIBIT H-2**

2

# Global Market Leadership

Olistica Life Sciences Group has established international operations to support its objective:
To become a global leader in medicines derived from botanicals and natural products.

Our global presence spans four continents:

**North America**
- Co-op farming
- Agricultural processing
- Botanical ingredient manufacturing
- Finished products formulation, manufacturing and packing
- Pharmaceutical & clinical R&D
- Sales, marketing, distribution

**South America**
- Co-op farming
- Agricultural processing
- Botanical ingredient manufacturing

**Europe**
- Finished products manufacturing and packing
- Sales, marketing , distribution

**Asia**
- Co-op farming
- Agricultural processing
- Botanical ingredient manufacturing
- Sales, marketing, distribution

EXHIBIT H-3

# Olistica Life Sciences – Summary of Capabilities

**Through its complementary business units, Olistica Life Sciences has assembled the critical components for succeeding in the competitive marketplace for plant-derived medicines.  For example:**

 Cannabis & botanical genetics banks, including hundreds of varieties, and a genetic library of highly stable, unique varieties

 Commercial-scale growing, cultivation, harvest, upstream and downstream processing, all standardized and readily scalable

 Harvesting, bulk botanical processing into standardized, extractable feedstock

 Growing site evaluation and stewardship, weed suppression, pest management, remediation

 Lab-to-pilot scale extraction line, fully tested, validated and cGMP-compliant

 Commercial protocols for feminized cannabis seed strains, cloning protocols, environmental stabilization, plant genetic markers

 Standardized processes for finished products and ingredients manufacturing

 Clinical IP related to standardized products

 Distribution channels

 Customized, aggregated, collaborative platform for actionable data accessible to all stakeholders

**EXHIBIT H-2**

4



QUALITY | INNOVATION

Olistica is shaping the future of medicine

EXHIBIT H-2

# Setting the Quality Standard



## Our Emphasis on Quality

Our quality standards, based on deep scientific expertise, regulatory excellence, and robust manufacturing processes, place Olistica among the world's leaders in botanical APIs.

Our products are used in health and nutritional products, and in R&D initiatives around the world.

Our manufacturing facilities adhere to global pharmacopoeia standards, including internationally recognized current Good Manufacturing Practices (cGMPs).

6

EXHIBIT H-2

## Advancing science and regulation for plant-based therapies

### Our work with leading regulatory agencies

Olistica and its clinical research partner, Nutrasource, work with Health Canada, ANVISA-in Brazil, EMA and EMEA-in Europe and other global regulatory agencies to advance clinical trials and regulatory submissions for select products and indications. We have strategically designed our clinical programs to enable us to seek approvals for certain products in foods, natural health products, dietary supplements, botanical drugs, OTC and pharmaceutical markets.



7

EXHIBIT H-2



**Every product we develop and sell undergoes extensive analysis for key quality attributes, which assures the suitability of these products for research, development, and manufacturing**



*data-controlled*
*+*
*data-driven*

IDENTITY        COMPOSITION        PURITY        STRENGTH

8

# Data Equals Understanding

Robust data harvesting and management is key to Olistica's vision. Our data management platform centralizes relevant sales, marketing, product usage, physician and researcher feedback, and clinical data within one accessible platform.

A centralized, validated data repository provides transparency into our clinical programs. Additionally, the data support claims related to safety, efficacy, and intellectual property.



EXHIBIT H-2

9

# Our data management platform

A hub for clinical data from physicians, researchers, universities, and consumers



For physicians, a resource for treating patients with plant-based therapeutics

A self-validating model that will allow for more rapid clinical approval of finished goods, providing assurance to customers of product quality and efficacy

The ability to identify scientific and market trends, for exploring new clinical indication, and to engage in predictive market forecasting

For regulators, a high-quality repository for easy access to product data and approvals in different markets

A repository for data from various resources (physicians, researchers, universities, and other institutions)

**EXHIBIT H-2**

Olistica Life Sciences, its business units and commercial partners maintain facilities designed and constructed according to international standards for sanitation, safety, and compliance. Our facilities conform to the following guidelines and standards:

## US FDA cGMP guidelines



## EU cGMP guidelines





OSHA 29 CFR-1910 (occupational safety)

## International Building Code, including NFPA 5000

## International Fire Code



EXHIBIT H-2

# COMPANY STRUCTURE & OPERATING MODEL

### AGRICULTURE

### MANUFACTURING

### BIOTECHNOLOGY



1

**Companion Ag**



2

**Jordan Process**



3

**Cascade Naturals**



4

**Cannopy Corp.**

5

**NP BioPharma**

Companion Ag is a modern co-op that manages select commercial agricultural crops through an innovative, biotech-oriented, networked model.

Jordan Process is a manufacturer of bio-material feedstocks, botanical ingredients and cannabinoid APIs that meet nutraceutical and pharmaceutical compliance requirements for APIs.

Cascade Naturals is a formulator and manufacturer of dietary supplements, natural health products, cosmeceuticals and other naturally derived consumer goods.

Cannopy Corporation is a technology and aggregation hub focusing on utilizing hemp as a biomaterial feedstock for industrial applications.

NP Biopharma is a pioneering biopharmaceutical firm that specializes in natural product-based therapies. Investigating natural products from around the world, we are working to benchmark the reintegration of natural medicines into conventional therapeutics.

*Olistica Life Sciences Group leads scientific discovery, R&D, nutraceutical and pharmaceutical IP development, and clinical research with an emphasis on natural therapeutics.*

EXHIBIT H-2

# COMPANION AG

Our cooperative agricultural platform, Companion AG, serves as an agri-technology hub for centralizing genetics, farming practices, equipment, processes, agronomic IP, management of farming and commercial crop production, guaranteed access to commoditizing or processing the crops and access to end-use markets. We focus on medicinal plants, botanicals, and biomaterial feedstock alternatives or sustainable materials feedstocks. Our programs range in size from one-acre farms to those with more than 10,000 acres in agricultural production. The platform gives all participants an equal opportunity to benefit from Companion Ag resources, including:

› Concierge farming services

› Individual consultation evaluations

› Land area and soil analysis

› Assessment and design of water and irrigation systems

› Management and oversight to ensure the success of each partner farm

› Refined financial analysis based on years of experience

› Seed or clone selection from a robust genetic bank

› Equipment and training programs

› Good Agricultural Practices

› Seeding, plant reproduction, cultivation, harvesting and handling practices

› Access to plant experts of diverse backgrounds with global experience

› Security protocols and design

› Grading and quality assessment of crops

› Guaranteed processing / commoditization of crops and access to end-use markets

› Transportation and logistics

› Transformation from agricultural goods to tradable commodities

› Guaranteed purchase of goods and delivery to end markets

**EXHIBIT H-2**

# JORDAN PROCESS

Jordan Process is a full-service processor and manufacturer of novel materials and botanical APIs specializing in cannabis and medicinal botanical processing. We offer a broad array of manufacturing solutions in numerous facilities to fit our client's needs. Jordan Process works with global suppliers and agricultural partners to commoditize and enrich the derivatives of natural products. At Jordan Process we pride ourselves on the design of our fully cGMP, hands-off, facilities. From the time materials are delivered from agricultural sites to the point at which they leave as either a novel material or a finished API, they are never touched by a human – all of our processes are entirely automated and meet all FDA requirements for API. manufacturing.

# PRINCIPAL PROCESSES

## Materials Classification

Our facilities are designed to maximize the potential uses of agricultural crops and their component parts, employing novel separation processes that yield commodity streams ready for manufacturing of finished goods or further refinement.  Our capability to classify and separate multi-component agricultural feedstock provides distinct and refined products for many industries' use, allowing the commoditization of all available derivatives.
Capacities exceed 120 metric tons daily

## Extraction & Refinement

The extraction of the targeted compounds from prepared botanical feedstocks is the core  of the process for production of botanical active ingredients.  Our extraction and refinement facilities are designed to process different botanicals with a wide range of characteristics, both in the starting material and in the desired end products.
Capacities exceed 30 metric tons daily

## API Isolation

Purification trains for isolating alkaloids, cannabinoids and a host of other bioactive compounds for the production of botanical APIs are the principal features of our capabilities and expertise.  Our depth of experience in method and process development provides for commercially scalable solutions that optimize the efficiency and quality for purification of botanical drug substances.
Capacities exceed 2 metric tons daily

**EXHIBIT H-2**

14

# Cascade Naturals

Cascade Naturals is a top-tier designer, formulator and manufacturer of nutraceuticals, cosmeceuticals and natural health products. We pride ourselves on producing the highest quality products on the market by offering unique differentiation through proven efficacy and clinical viability. We offer various product lines designed to fit specific market niches:

- **Our physician-oriented products are accompanied with guided training programs to help practitioners effectively incorporate natural therapies into their conventional treatment plans. In addition, these physician-oriented products are supported by an integrated data platform that tracks efficacy and patient response, a value-add that is beneficial for physicians and patients alike;**
- **Big-box retailer products and private labeling;**
- **Products suitable for internet marketing products; and**
- **MLM product lines.**

Our data-driven and quality-minded approach and our stringent quality control processes ensure that only the best and most consistent products reach our distribution channels. Our three domestic manufacturing facilities boast full cGMP accreditations. Our areas of manufacturing expertise include:

### 1 Solid Dose Manufacturing

3,000,000 capsules daily

2,000,000 tablets daily

500,000 soft gels daily

250,000 gummies daily

### 2 Liquid Manufacturing

6000 gallons daily

275,000 shot bottles daily

100,000 1 oz. tincture bottles daily

40,000 8-12 oz. bottles daily

### 3 Powderized formulations

**Effervescents**

**Sublinguals**

**Topicals**

**Transdermals**

**EXHIBIT H-2**

# Cannopy Biomaterials

Pioneer in Biomaterial feedstock alternatives

**Canopy Corporation is a company that specializes in biomaterial feedstock alternatives and industrial supplements that offer renewable or recyclable features. We have built a basis of technology and IP in sectors such as paper products, fibers, bio-plastics, bio-fuels, construction and foods. The core objective of our business is the development of scalable technologies that can be applied to industries that lack sustainability and have a finite supply of commodity feedstocks. To meet this goal:**



We have developed a network of top commodity producers and manufacturers from around the globe from varying industries whose conventional infrastructure can be adapted to modern and novel materials and uses.



We build global networks of farms/farmers/ co-ops/producers and establish manufacturing partnerships with commodity processors and producers.



We target specific plants and crops that offer low-environmental impact that could provide supplemental alternatives to non-renewables.



We license technology to manufacturers and provide them with industrial quantities of sustainable raw materials from our farming networks to produce a new generation of commodity goods.

**EXHIBIT H-2**

# NP BioPharma

**NP BioPharma is a leader in private-sector clinical research supporting the safety and efficacy of a range of therapeutic botanical products, including cannabis, mitragyna speciosa, kava, echinacea and countless others.**



Drawing upon molecular genetics, epitranscriptomics, molecular biology, modern pharmacology, and natural products chemistry, our experts have advanced the understanding of a plant's genetic factors and derivatives, and the design of scalable isolation methlogies to support the safe and appropriate uses of plant-based therapeutics.

Our ultimate objective is to assist in reintegrating natural therapeutics into conventional medicine.

Our collaborations with Nutrasource Diagnostics and Pinney Associates are advancing the foundational regulatory science behind plant-based therapeutics.

6 phase one clinical studies ongoing in Canada, Latin America and the EU built to fit a global regulatory model.  All based on natural product derivatives.

Our investments in toxicology, pharmacokinetics, pharmacodynamics, and clinical development across a range of product types and formulations inform global regulators as they structure regulations appropriate for botanical APIs, and as those regulations evolve.

**EXHIBIT H-2**

# COMMUNITY OUTREACH & SUSTAINABILITY



**ACCESS PROGRAMS**

We provide finished products to local markets at significant discounts to support local population health and wellness.

**PHILANTHROPY**

We allocate a portion of our profits to locally managed not-for-profit organizations in support of access to quality healthcare.

**PHYSICIAN OUTREACH**

We support outreach to educate physicians about plant-based medicine.

**EDUCATION**

Our company provides education and training at local schools in the communities in which we work.

*We are committed to, and mindful of, the*
*United Nations Sustainable Development Goals*



EXHIBIT H-2

# Exhibit 51

**EXHIBIT H-2**

**Messages exported from: Tommy's iPhone (+14244774286)**
**With: The Man (6463983573)**
PDF created with Decipher TextMessage (deciphertools.com)

**4/5/2021 1:13 PM**

The Man (6463983573)

Hey Tommy, it's P. This is my cell. Anytime you need anything in future please don't hesitate to call or text me. Really glad we were able to connect today. Very much looking forward to the future and again my apologies for the other night.

**4/5/2021 1:14 PM**
Tommy's iPhone (+14244774286)



Absolutely feel the same. I felt like an asshole after. Thanks P

**4/5/2021 2:25 PM (Viewed 4/5/2021 2:29 PM)**

The Man (6463983573)

Thank you for sending that fda doc over. Much appreciated.

**4/5/2021 2:30 PM**
Tommy's iPhone (+14244774286)

Anytime P. Our operation took on fda and never abandoned. Alll Clear sir

**4/5/2021 2:30 PM (Viewed 4/5/2021 2:32 PM)**

The Man (6463983573)

Liked "Anytime P. Our operation took on fda and never abandoned. Alll Clear sir"

**4/5/2021 5:24 PM**
Tommy's iPhone (+14244774286)

Fyi P. We actually beat them at 6 different districts

**4/5/2021 5:25 PM**
Tommy's iPhone (+14244774286)

We never abandoned at all. I really wanted to set precedents. So that os what you are getting. ALL CLEAR

**4/5/2021 5:26 PM**
Tommy's iPhone (+14244774286)

Enjoy the evening. Just wanted you to know that between us

**4/5/2021 8:46 PM (Viewed 4/5/2021 8:47 PM)**

The Man (6463983573)

Hey, just getting back to my phone, my bad for not hitting you back earlier. Was doing dinner and stuff with the family.
6 times is a great record. That's awesome.

1

**EXHIBIT H-2**

EXHIBIT H-3

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD**

| | |
|---|---|
| NP PHARMA HOLDINGS, LLC, | |
| Opposer, | Opposition No. 91269552 |
| v. | Marks: MITRANOL and MITRAMED |
| KARMAGREEN, LLC, | Serial Nos. 90/138,843 and 90/063,007 |
| Applicant. | |

## DECLARATION OF MARK JENNINGS

I, Mark Jennings, declare as follows:

1.  I am the Chief Operating Officer of NP Pharma Holdings, LLC ("NP Pharma"), and have been employed by NP Pharma since it was formed.

2.  I submit this Declaration in response to Karmagreen, LLC's Motion for Partial Summary Judgment, filed in this proceeding.

3.  NP Pharma develops, manufactures, and distributes unique botanical dietary and nutritional supplements and food ingredients, including goods that contain or are derived from the plant named "kratom".

4.  As Chief Operating Officer of NP Pharma, I oversee clinical.development strategies, go-to-market strategies and regulatory submissions for market approval of NP Pharma's unique botanical dietary and nutritional supplements, and food ingredients.

5.  As part of my responsibilities at NP Pharma, I have been involved in NP Pharma's work on dietary and nutritional supplements that contain or are derived from kratom. In particular, I have been involved in the development, promotion, sales, and branding of NP Pharma's dietary and nutritional supplements that contain or are derived from kratom, including trademark



JF 30(b)(6)  MIANO
11/22/24
**EXHIBIT 33**

**EXHIBIT H-3**

applications to register NP Pharma's MITRAGYN, MITRAGYN MITRA-LEAF, MITRAGYN MITRA-PLUS, and MITRAGYN MITRA-ISOLATE marks.

6.   Since 2015, NP Pharma has used its MITRAGYN, MITRAGYN MITRA-LEAF, MITRAGYN MITRA-PLUS, and MITRAGYN MITRA-ISOLATE marks for dietary and nutritional supplements that contain or are derived from kratom.

7.   As a result of my 10 years of experience in this industry, I am familiar with the terminology used to refer to kratom and products that contain or are derived from kratom by NP Pharma, its consumers, its competitors, and related industry groups such as the American Kratom Association.

8.   In my experience, NP Pharma's MITRAGYN mark has no meaning in the industry, and to NP Pharma's consumers and competitors, other than trademark significance—*i.e.*, to identify NP Pharma as the source of its products bearing the MITRAGYN mark.

9.   I am unaware of anyone ever having used the term "mitragyn" as the name of kratom or any products that contain or are derived from kratom—including the class of dietary and nutritional supplements that contain or are derived from kratom offered by NP Pharma.

10.  I reviewed the websites of multiple competitors of NP Pharma—King Kratom, 1836 Kratom, Happy Hippo Herbals, Just Kratom, Kraken Kratom, and Golden Monk—and to my knowledge none of those websites uses the term "mitragyn" at all.

11.  I also reviewed the website of the American Kratom Association and, to my knowledge, that website does not use the term "mitragyn" at all.

12.  In my experience, NP Pharma's competitors use terms like "powder", "capsules", "tea", or "extract" when they refer generically to dietary and nutritional supplements that contain or are derived from kratom.  In my experience, NP Pharma's competitors use the term "kratom" or

2                                    **EXHIBIT H-3**

"*mitragyna speciosa*" when they want to refer generically to kratom itself. Indeed, my review of

the websites of NP Pharma's competitors and the American Kratom Association confirmed their

use these terms.

The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his own knowledge are true and all statements made on information and belief are believed to be true.

Date: January 7, 2022                    By: _____

                                              Mark Jennings
                                              Chief Operating Officer
                                              NP Pharma Holdings, LLC

**EXHIBIT H-3**