## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **KATHLEEN MOLLER,** | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION NO.** |
| | * | **2:24-CV-228-WBV-DPC** |
| **MARTIAN SALES, INC.; JOPEN,** | * | |
| **LLC; JOHNSON FOODS, LLC; LP** | * | **THE HONORABLE WENDY B. VITTER** |
| **IND., LLC; CAG HOLDINGS, LLC;** | * | |
| **RMH HOLDINGS, LLC; ABC** | * | **MAGISTRATE JUDGE DONNA PHILLIPS** |
| **INSURANCE COMPANY and John** | * | **CURRAULT** |
| **Does 1-4,** | * | |
| **Defendants.** | * | |

### BRIEF IN SUPPORT OF DEFENDANT JOPEN, LLC'S
### MOTION FOR SPOLIATION OF EVIDENCE

Defendant JOpen, LLC ("Defendant" or "JOpen, LLC") hereby submits this brief in support of its Motion for Spoliation of Evidence under Federal Rule of Civil Procedure 37(e).

### I.     INTRODUCTION

Plaintiff brought a wrongful death lawsuit against Defendants under the Louisiana Products Liability Act, alleging that O.P.M.S. Silver kratom caused Harmony Moller's ("Harmony") death on February 6, 2023.  ECF No. 100.  But Plaintiff destroyed relevant evidence that would have allowed Defendant to present essential defenses to Plaintiff's claims and the required element of causation in fact.  Plaintiff picked and chose what she preserved, and "coincidentally" claims she preserved only the product she decided to sue and threw everything else away.  She admits she threw all the evidence away because she did not want it to be discovered.  As a result, Defendant's ability to rebut causation is severely compromised, and Defendant is thus entitled to multiple adverse inferences, as outlined below.

This critical spoliated evidence includes (1) multiple other drugs, supplements, and other products that could have caused or contributed to Harmony's death, and (2) Harmony's blood

specimen samples that Plaintiff failed to take action to preserve, as was her legal duty upon reasonably anticipating her filing of this lawsuit that was brought in January 2024.  ECF No. 1.

First, on the day of Harmony's death, Plaintiff claims she went into Harmony's room and threw everything away *except for* one supplement and the two O.P.M.S. Silver kratom packages that are the subject of this lawsuit.  Defendant is only aware of all the spoliated evidence because of discovery obtained from third parties, including police body camera footage and crime scene photographs from the St. Tammany Parish Sheriff's Office.[1]  The loss of this critical evidence significantly limits or eliminates Defendant's ability to challenge (1) that Harmony ingested the O.P.M.S. kratom products; and (2) that kratom caused the alleged harm to her heart that contributed to her death.

Second, Plaintiff failed to fulfill her legal duty to preserve Harmony's blood specimen samples (which were available at the time that Plaintiff filed her lawsuit) on January 24, 2024, but subsequently destroyed.  This is particularly harmful because there is strong evidence to suggest that Harmony's specimen samples that were used in the toxicology screening could have been cross contaminated with an unrelated individual's specimen samples.

If Plaintiff had not destroyed this evidence, Defendant could have tested the evidence itself. The spoliated evidence included unlabeled or unpackaged substances and could have been a kratom product manufactured by another party.  Moreover, the spoliated evidence included illegal marijuana products and could have been unreasonably dangerous in and of themselves.  In addition, because the blood specimens were also destroyed, Defendant cannot conduct additional

---

[1] While some of this evidence is captured in crime scene photos, not all of the Spoliated Evidence is clearly visible in photos, nor can the complete contents of the items that are visible be accurately assessed through the existing photos.

screening, which is material to whether the blood specimens were contaminated, and even if they were not, whether the O.P.M.S. Silver kratom products caused the alleged harm.

Based on Plaintiff's spoliation and the relevance of that evidence, Defendant is entitled to an adverse inference that Plaintiff is unable to prove causation because the spoliated evidence compromises Defendant's ability to present a defense to Plaintiff's claims. Without causation, Plaintiff's claims fail. Plaintiff must prove not only causation in fact, but also that the product defect was the most probable or proximate cause of the injury, and the proximate cause of an injury is any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred. *See Landry v. Apache Corp., et al.*, No. 606-CV-00262, 2008 WL 3548468 (W.D. La. Mar. 18, 2008); *Wheat v. Pfizer, Inc.,* 31 F.3d 340, 342 (5th Cir. 1994); *Pickett v. RTSHelicopter,* 128 F.3d 925, 929 (5th Cir. 1997); *Fabre v. B.F. Goodrich,* 218 So. 2d 617 (La. 1969)

In the alternative, Defendant is entitled to the following adverse inferences: (1) that the spoliated evidence included an alternate source of kratom; (2) that the spoliated evidence presented alternative causes or contributors to Harmony's death; (3) that the spoliated evidence would have contained labels that would have presented evidence to rebut the presumption that Harmony would have read and heeded any additional warning; and (4) that the spoliated blood specimens would have shown (a) that the blood specimens were contaminated with specimen samples from another individual and (b) the presence of other drugs or substances in Harmony's postmortem blood that were alternative causes or contributors to Harmony's death.

## II.     FACTUAL BACKGROUND

Harmony died on February 6, 2023.  Dkt. 100 at ¶ 30.  Immediately prior to her death, Harmony was ill and told Plaintiff she thought she had food poisoning.[2]  Harmony told Plaintiff she had been vomiting[3] and took Phenergan (Promethazine) and Zofran (ondansetron) for her nausea, neither of which were prescribed to her.[4]  Plaintiff found Harmony unconscious in her bedroom, where she was later pronounced dead.[5]

There were multiple items (other than the O.P.M.S. Kratom products) found in or near Harmony's bedroom that could have caused or contributed to her death.  They included drug paraphernalia (a grinder and glass pipe), prescription medications (most belonging to other individuals), marijuana products, vaping devices, numerous prescription medications (most belonging to other individuals), numerous over-the-counter drugs, numerous empty alcohol bottles, caffeine and weight-loss pills, dietary and herbal supplements and unidentified or unlabeled ground substances that look like kratom ("Spoliated Evidence").[6]

---

[2]  Ex. 1, STPSO000001 (the St. Tammany Parish Sheriff's Office "Incident Report"), at STPSO000001 ("MOTHER THINKS IT WAS POSSIBLE FOOD POISONING"); Ex. 3, Excerpts of K. Moller Dep. 220:7–11, 225:8–10, Dec. 14, 2025; Ex. 3, ST. TAMMANYFD_MOLLER00001 (the St. Tammany Parish Fire Department EMS Records), at 00002 ("Pt's mother stated the pt thought she had food poisoning the last two days and had taken Phenergan earlier today").

[3]  Ex. 1, at STPSO00009, 000012; Ex. 2, at 220:7–11 (Harmony told Plaintiff "she was going to try to drink fluids because it was like food poisoning" because "her stomach was upset"), 225:8–10 (Harmony told Plaintiff "she thought she might have got food poisoning").

[4]  Ex. 2, at 227:12–229:2 (Harmony and Ivan Moller woke up not feeling good, and Harmony took some of Ivan's medications, including Zofran and Phenergan, for her nausea).

[5]  Ex. 2, at 240:24–241:11.

[6]  *See, e.g.*, Ex. 2, at 263:19–277; Exs. 4–7, K. Moller Dep. Exs. 14, 17, 18, 27 (photos of items from Harmony's dresser in her bedroom); Exs. 8–10, K. Moller Dep. Exs. 19, 21, 22 (photos of items from Harmony's dresser in her bedroom); Exs. 11–12, K. Moller Dep. Exs. 28, 29 (photos of the O.P.M.S. kratom packages and items found in a bag in the room near Harmony's bedroom); Exs. 28-30, Dr. Ronald Wharton Dep. Exs. 6, 8, 9, Feb. 23, 2026 (photos of items from Harmony's dresser in her bedroom).

Plaintiff testified that on the day of Harmony's death, she discarded the Spoliated Evidence within hours of Harmony's death.[7]  Plaintiff testified that "each thing that the police had laid out [she] was going through piece by piece" and "looking at stuff" and "throwing it into the bag to throw away."[8]  She stated that she put everything but the O.P.M.S. kratom packages and one supplement "into the bag to go into the garbage."[9]  Plaintiff initially testified that she did not find any "prescription drugs," "medicines," or "marijuana" when she was "cleaning" and "look[ing] at everything in Harmony's room."[10]  After being confronted with the crime scene photos, Plaintiff admitted she "threw everything away[,]" including the following unidentified substances:[11]

- a "round container . . . with something in it" that she "assum[ed] [was] marijuana" or "residue from marijuana" even though she acknowledged that she "do[es] not have the expertise to check" what the product was;

- a "silver foil packet" of the type commonly associated with street drugs without knowing "what was in the packet";

- another "container" without "check[ing] what was in that container";

- another "silver foil baggie[]" of the type commonly associated with street drugs without "check[ing] what was in it"; and

- a "container that's unzipped" with "little bits of materials that might be on the bag" and "inside of the container."

Plaintiff was asked about "what looks like leaf material," and she responded she did not know

---

[7] *See generally, id.* at 263:19–277.
[8] *Id.*, at 190:5–8.
[9] *Id.* at 188:5–190:13.
[10] *Id.* at 193:10–195:14.
[11] *Id.* at 263:19–277:8.

what it was, but "it's no longer on this earth."[12]  Plaintiff also threw out CBD and marijuana products, including a marijuana product with a warning label that states "it may not be transported outside the state of Illinois."[13]  Plaintiff testified repeatedly, she "tossed everything."  This includes everything found in the bag along with the O.P.M.S. kratom products.[14]

Plaintiff admits she did this because she wanted to hide them from being discovered.  She testified she "threw everything away" because "[t]he last thing [she] needed, being a nurse, is to have any of that in my house" and she "wanted to make sure that nothing bad happened as a result of having the marijuana residue" was "concerned" about "los[ing] her license" and wanted to "protect [her]self."[15]

It is undisputed that Harmony Moller had a coronary anomaly and that a sudden cardiac event was the primary cause of her death.[16]  The St. Tammany Parish Coroner's Office ("STPCO") listed her cause of death to be "[a]bnormally high left coronary ostia takeoff exacerbated by mitragynine use."[17]  Dr. DeFatta, the medical examiner for STPCO who conducted Harmony's autopsy testified that "her main death was due to cardiac abnormalities that was exacerbated by mitragynine."[18]

---

[12] *Id.* at 270:7–18.
[13] *Id.* at 277:9–17; 264:9–25; 272:25–273:25.
[14] *Id.* at 188:12–17; 277:4–5; 280:5–6; *see also id*. at 190:23–24; 265:19–20; 266:10–11.
[15] *Id.* at 268:8–23.
[16] Ex. 13, Excerpts from Dollar Dep. 87, Feb. 6, 2026; Ex. 14, Excerpts from Gandy Dep. 71, Feb. 13, 2026; Ex. 15, Excerpts from Thundiyil Dep. 151–52, Jan. 16, 2026; Ex. 16, Excerpts from Wang Dep. 98–99, Jan. 15, 2026; Ex. 17, Excerpts from Wharton Dep. 214:18–215:16, Feb. 23, 2026; Ex. 18, Defendant's Expert Report of Dr. Edward Boyer ("Boyer Rpt."), at ¶ 79.
[17] Ex. 19, ST.TAMMANYCORONER_MOLLER00001 (St. Tammany Parish Coroner's Office "STPCO" Records), at 00004.
[18] Ex. 20, Excerpts from DeFatta Dep. 137:18–20, Feb. 25, 2026; *see also* TAC at ¶¶ 30, 33 ("A postmortem examination of Harmony Moller determined that the cause of death was 'Abnormally high left coronary ostia takeoff exacerbated by Mitragynine use' *secondary* to the ingestion of Kratom.") (emphasis added).

Dr. DeFatta testified he was not aware Harmony was not feeling well and suspected she had food poisoning.[19]  Dr. DeFatta did not review the crime scene photos nor did he watch the body camera footage.  Dr. DeFatta was not aware of any of the Spoilated Evidence found in or around Harmony's bedroom.[20]

STPCO ordered a limited toxicology screening through NMS Labs.  STPCO did not conduct the most comprehensive postmortem toxicology panel available at NMS Labs.[21]  For example, no screening was done that would have quantified the amount of caffeine even though there were multiple caffeine supplements and weight-loss pills (*e.g.*, Zantrex Black) that contain high caffeine content found in the same bag as the O.P.M.S. Kratom products.[22] STPCO also failed to test for numerous other substances which were either in Harmony's possession (*e.g.*, yohimbine) or that her mother testified she consumed (*e.g.*, ondansetron).[23]  Yohimbine – found in Mini-Thin energy supplements that were in Harmony's possession increases heart rate and blood pressure."[24]  Further, there was no toxicology testing done to screen for food poisoning.[25]

There were seven total specimens sent to NMS Labs for toxicology screening for Harmony Moller's case.[26]  This included the following samples:

- Sample 001 – 3mL of femoral blood (labeled as Moller, H.)

- Sample 002 – 3mL of femoral blood (labeled as Moller, H.)

- Sample 003 – 1.75 mL of vitreous fluid (labeled as Harmony Moller)

---

[19] Ex. 20, at 127:1–5.
[20] *Id.* at 117:9–119:11; 123:23–124:7; 134:14–17.
[21] *Id.* at 70:3–23.
[22] *Id.* at 188:18–24; Ex. 21, Excerpts from Dr. Edward Boyer Dep. 136:21–4, Feb. 17, 2026; Ex. 12 (showing Zantrex Black still in the bag in the photograph).
[23] Ex. 20, at 147:7–148:13; 165:21–24.
[24] Ex. 21, at 137:18–19.
[25] Ex. 20, at 117:24–118:11.
[26] *See* Ex. 19, at 00014.

- Sample 004 – 1.75 mL of vitreous fluid (labeled as Harmony Moller)

- Sample 005 – 2 mL of vitreous fluid (labeled as Kenneth Stegall)

- Sample 006 – 1.25 mL (labeled as Kenneth Stegall);

- Sample 007 - and a liver tissue sampled labeled as 230206-996.

All seven samples show the exact same "Collection Date/Time" of "02/07/2023 11:39." *Id.* All seven samples, including the samples for Kenneth Stegall, an unrelated individual, were shipped to NMS Labs for testing. *Id.* They were all shipped in the same FedEx envelope.[27] Dr. DeFatta, the medical examiner who conducted the autopsy, confirmed that "[t]he chain of custody starts when we send it to NMS Labs by the FedEx slip" and there is no chain of custody information prior to that point.[28] Dr. DeFatta testified he "do[es not] know why these two samples labeled as vitreous fluid from Kenneth Stegall were included in that."[29] Dr. DeFatta did not "have any knowledge of how samples from Kenneth Stegall were transported at the same time as Harmony Moller's samples[.]" *Id.* He admitted it "[h]ad to be a mistake[]" and [t]hey're not going to take four vitreous samples, obviously, so it's somebody else's." *Id.*

The NMS Labs records show that Sample 007, the liver tissue, which was only labeled with a number, had a note under "Test(s) Ordered" that states "LEAKY: Leaking Samples."[30] The NMS Labs records indicate that the package was sealed, but each individual specimen sample was not sealed.[31] NMS Labs website states the following: "Submitting Samples: Instructions for

---

[27] Ex. 27, NMS_MOLLER00001 (Excerpts from NMS Labs document production), at 00013.
[28] Ex. 20, at 156:12–157:18.
[29] *Id.* at 153:10–154:14.
[30] Ex. 27, at 00023.
[31] *Id.*, at 00020–23.

Accuracy" for "Postmortem Analysis" and "[i]n Forensic Cases, each specimen container must be individually labeled and sealed."[32]

The NMS Labs records indicate that Sample 001 was used to run the test NMS Labs test 8042: Postmortem, Expanded w/Vitreous Alcohol Confirmation, Blood.[33]  Sample 003 was used to run NMS Labs test 1919FL: Electrolytes and Glucose Panel (Vitreous), Fluid (Forensic).  *Id.* The toxicology screening test results for Sample 001 and Sample 003 form of the NMS Labs toxicology report included in the STPCO autopsy records.[34]

NMS Labs provided its toxicology report to STPCO on February 24, 2024 ("NMS Lab Report").[35]  The NMS Lab Report clearly stated that the blood specimens were to be destroyed one year after the report was issued unless NMS Labs was notified to retain the blood specimens.[36]

Plaintiff filed her wrongful death lawsuit on January 24 2024.  ECF No. 100.  In the initial complaint, Plaintiff was represented by the same law firms that still represent her in this matter. At that time, the blood specimens were still preserved at NMS Labs and had not yet been destroyed.[37]  Plaintiff did not send a preservation notice to STPCO until May 2, 2024, *over three months*, after the filing of her initial Complaint.[38]

The blood and liver sample specimens were destroyed by NMS Labs in March 2024.  The "Parent Container[s]" for the samples used in the NMS Labs toxicology screening for Harmony Moller (Sample 001 and Sample 003) were stored by NMS Labs until they were discarded on

---

[32] Ex. 22, NMS Labs Website – Submitting Samples: Instructions for accuracy.
[33] Ex. 27, at 00020-25.
[34] Ex. 19, at 00014–18 (showing only Sample 001 and 003 as "Specimen Sources").
[35] *Id.*, at 00014.
[36] Ex. 20, at 175:19–22; Ex. 19, at 00017.
[37] Ex. 20, at 174:7–14.
[38] *Id.*, at 198:21–199:15; Ex. 23, DeFatta Dep. Ex. 2.

March 1, 2024 and March 2, 2024.[39]  The additional samples of femoral blood and vitreous fluid labeled as Harmony Moller (Sample 002 and Sample 004) were stored by NMS labs until they were discarded on March 2, 2024.  The liver sample, which was not labeled except with a number, was stored until it was discarded on 3/15/2024.

### III.    LEGAL STANDARD

Spoliation is "the destruction or the significant and meaningful alteration of evidence." *Van Winkle v. Rogers*, 82 F.4th 370, 374–75 (5th Cir. 2023) (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)).  "A spoliation claim has three elements: (1) the spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith."  *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 573–74 (5th Cir. 2020).

If a party seeks an adverse inference as a sanction for spoliation, the following must be established: "(1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 Fed.

---

[39] The "Parent Container" for Sample 001 was stored by NMS Labs from 2/11/2023 until it was "discard[ed]" on 3/1/2024.  Ex. 27, at 00025, 00029–31.  The "Parent Container" for Sample 002 was stored by NMS Labs from 2/11/2023 until it was "discard[ed]" on 3/2/2024.  *Id.*  The "Parent Container" for Sample 003 was stored by NMS Labs from 2/11/2023 until it was discarded on 3/2/2024.  *Id.* The "Parent Container" for Sample 004 was stored by NMS Labs from 2/11/2023 until it was "discard[ed]" on 3/2/2024.  *Id.*  The "Parent Container" for Sample 005 and Sample 006 were returned on 2/20/2023.  *Id.*  The "Parent Container" for Sample 007 was stored by NMS Labs from NMS Labs from 2/11/2023 until it was "discard[ed]" on 3/15/2024.  *Id.*

Appx. 565, 574 (5th Cir. 2020) (citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598 (5th Cir. 2010)).

If spoliation is established, and a party is entitled to an adverse inference, the Court may impose sanctions on the spoliator. The seriousness of such sanctions depends on the consideration of the following: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *2 (E.D. La. June 12, 2000) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

## IV.    ARGUMENT

Each element of a spoliation claim is met here. First, Plaintiff had control over, and a duty to preserve, the Spoliated Evidence and the blood specimens. Second, Plaintiff intentionally destroyed all of the relevant Spoliated Evidence in and around Harmony's bedroom and the blood specimens. The Spoliated Evidence is plainly relevant to this wrongful death litigation where the central issue is Harmony's cause of death. Third, Plaintiff's culpable state of mind can be inferred from her selective preservation of the O.P.M.S. kratom packages alone, and Plaintiff's failure to fulfill her clear legal duty to preserve relevant evidence resulted in the destruction of blood specimens demonstrates bad faith.

**A.    Defendant can prove each element of a spoliation claim.**

**1.    Plaintiff had control over and a duty to preserve the evidence.**

"A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence might be relevant."

*Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 615–16 (S.D. Tex. 2010)). "Identifying the trigger for when a party should have reasonably anticipated litigation is challenging, as it varies based on the facts and circumstances." C*oastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 Fed. Appx. 565, 574 (5th Cir. 2020).

> ### a. Plaintiff had control over and a duty to preserve the Spoliated Evidence as they were in Plaintiff's home and she reasonably anticipated litigation.

Plaintiff had control over and a duty to preserve the Spoliated Evidence in or near Harmony's room at the time of her death. Harmony "live[d] in [Plaintiff's] current home from 2021 to the time of her death."[40] After Harmony's death, and after the detectives, medical personnel, officers, and coroners left Plaintiff's home, Plaintiff was informed that her house "wasn't a crime scene" and thus the contents of the home were fully in Plaintiff's control.[41] This included the Spoliated Evidence

Plaintiff had a duty to preserve the Spoliated Evidence because it was clear that Harmony's cause of death was unknown. This was not a minor slip and fall case with an obvious cause – it was a sudden death with an unknown cause. The duty to preserve attaches "when a party should have known that the evidence may be relevant to future litigation." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. July 19, 2006). Plaintiff's own testimony underscores "the foreseeability of the need for the evidence in the future." *Pelas v. EAN Holdings, L.L.C.*, No. CIV.A. 11-2876, 2012 WL 2339685, at *4 (E.D. La. June 19, 2012). Plaintiff testified that, after Harmony's death, and after all medical personnel had left, she opened bottles and looked through

---

[40] Ex. 2, at 13:7–8.
[41] *Id.* at 268:17–18.

the items "trying to find out what was going on" and "what happened" "to see if there was anything unusual or that might explain what had happened [to Harmony]."[42]   Moreover, Plaintiff testified that she identified the "Maeng Da tea" packaging as significant enough to keep and review because turning it over caused a "whoa" reaction.[43]   Plaintiff's explanation that she kept the O.P.M.S. kratom products because she did not know what they were is undermined by her repeated testimony that she threw out other unidentified "residue" and substances that she did not and could not identify.[44]

This selective preservation of evidence shows that Plaintiff clearly knew and  "should have known" that the Spoliated Evidence was relevant to a potential future dispute over Harmony's cause of death.  *See Consol. Aluminum Corp.*, 244 F.R.D. at 339.  As such, Plaintiff knew or should have known that the Spoliated Evidence in Harmony's room would be key in determining Harmony's cause of death and the circumstances surrounding her death.  Plaintiff picked and chose what she preserved, and "coincidentally" claims she preserved only the product she decided to sue. More, admits she threw all the evidence away because she did not want it to be discovered.

### b.    Plaintiff had control over and a duty to preserve the blood specimens because she was obligated to preserve evidence.

"A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation."  *Dotson v. Edmonson*, No. CV 16-15371, 2018 WL 501511, at *1 (E.D. La. Jan. 22, 2018).  Plaintiff filed her initial complaint in this wrongful death action on January 24, 2024.  *See* ECF No. 1.  At some point prior to this date, but unquestionably

---

[42] *Id.* at 187:18–22; 272:19–21.
[43] *Id.* at 189:16.
[44] *Id.* at 267:14–268:14.

– at the time of the filing of her Complaint, Plaintiff had a duty to preserve evidence relevant to her lawsuit. *Dotson*, 2018 WL 501511, at *1 (E.D. La. Jan. 22, 2018).

Evidence in the possession of the coroner's office who conducted the autopsy whose finding on cause of death is the basis of her Complaint is indisputably relevant. To fulfill her legal duty, Plaintiff was required to send a preservation letter to STPCO office to preserve evidence at the time she reasonably anticipated litigation, which would have included the blood specimens. The blood specimens in this case were preserved at the time Plaintiff filed her complaint, and due to her unjustified delay (over three months) in notifying STPCO of its preservation obligations, the blood specimens were subsequently destroyed in March 2024.

## 2.    Plaintiff intentionally destroyed the evidence with a culpable state of mind.[45]

The second prong of the spoliation analysis is whether the party "intentionally destroyed evidence with culpable state of mind." *Lou v. Lopinto*, No. 21-80, 2022 WL 16685539, at *6 (E.D. La. Nov. 2, 2022). Culpability can be shown not just through affirmative evidence, but indirectly as well, as "the selective preservation of relevant evidence in the face of imminent litigation can evince bad faith[.]" *Disedare v. Brumfield*, No. CV 22-2680, 2024 WL 1526699, at *12 (E.D. La. Apr. 9, 2024) (quoting *Miramontes v. Peraton, Inc.*, No. 3:21-CV-3019, 2023 WL 3855603, at *6 (N.D. Tex. June 6, 2023)); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 475–76 (E.D. Pa. 2020) ("Selective preservation can also reflect intent."); *see also Sanchez v. Thomas*, No. 1-22-CV-01197-DII, 2024 WL 4706583, at *5 (W.D. Tex. Oct. 9, 2024) (noting that the "selective preservation of evidence…suggests bad faith."). Courts have "substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the

---

[45] Courts address the second and third elements of a spoliation claim together. *See Lou v. Lopinto*, No. 21-80, 2022 WL 16685539, *6 (E.D. La. Nov. 2, 2022) (referring to these elements together as the "second prong of the analysis").

witnesses in a particular case, and other factors given that direct evidence of intent rarely exists." *Lou*, 2022 WL 16685539, at *16.

      **a.**    **Plaintiff's culpability is inferred by her selective preservation of the O.P.M.S. Silver kratom packages.**

There is no question of culpability: Plaintiff admits that she got rid of the evidence because she did not want anyone to find it. Plaintiff's culpability in intentionally destroying the Spoliated Evidence is also evident from her selective preservation of the evidence. Plaintiff repeatedly testified that on the day Harmony died she went to Harmony's bedroom, went through items "piece by piece" and threw everything away, including several unknown substances that Plaintiff could not identify. Of the multitude of Spoliated Evidence, she threw everything away *except for* the O.P.M.S. Silver kratom packages and one supplement. This "selective preservation" — discarding nearly everything except for the evidence that supports Plaintiff's claims in this matter — supports an inference of intent to deprive Defendant of the use of relevant evidence. *See Rimkus Consulting*, 688 F. Supp. 2d at 615 ("Intent to deprive" can be inferred from selective destruction).

      **b.**    **Plaintiff's failure to take action to preserve relevant evidence to her wrongful death lawsuit caused the blood specimens to be destroyed which constitutes a culpable state of mind.**

Plaintiff's failure to ensure the blood specimens were preserved is evidence of intentional destruction with a culpable state of mind. The blood specimens from Harmony were collected on February 7, 2023, and sent to NMS Labs for testing. The seven specimen samples provided for toxicology screening in Harmony Moller's case were erroneously commingled with two samples of vitreous fluid for a completely unrelated individual (Kenneth Stegall). It is unclear whether the liver tissue sample belonged to Harmony Moller or Kenneth Stegall. All seven samples showed the same exact collection time of 02/07/2023 11:39." All seven specimen samples were shipped to NMS Labs in the same FedEx envelope. NMS Labs records show that none of the seven

specimen samples were "[s]ealed."[46]  Each sample has "No" listed in the "Sample Sealed" column under "Sample Information."[47]  The NMS Labs records show that one of the samples (Sample 007 for the liver tissue) was "LEAKY: Leaking Samples."[48]  The instructions on NMS Labs website for "Collecting Samples for Forensic Testing" and "Instructions for Accuracy" require each specimen container must be individually labeled and sealed.  These instructions were not followed, and the specimens were not individually sealed.

Dr. DeFatta has no knowledge regarding how the samples from Kenneth Stegall were transported with Harmony Moller's samples and stated it "[h]ad to be a mistake[.]"  There is no way of assessing the impact of this "mistake," as Dr. DeFatta confirmed there is no "chain of custody" information until the samples are shipped to NMS Labs by FedEx.  There are no chain of custody records showing how the seven specimens – for *two separate* individuals – were taken on the same date, at the same exact time and then sent to the STPCO.  There are also no chain of custody records to show how the specimens were handled while they were at STPCO, during the three days before they were received by NMS Labs on February 10, 2023.

All of these facts give rise to a strong presumption that Harmony Moller's specimen samples provided to NMS labs were cross-contaminated with the specimen samples of another individual.  They were labeled as taken at the exact same time despite belonging to two separate individuals, shipped together in one FedEx envelope and each specimen sample was not sealed, as required by NMS labs for "accuracy."

On February 24, 2023, NMS Labs issued its toxicology report.  In that report, it stated that "[u]nless alternate arrangements are made by you, the remainder of the submitted specimens will

---

[46] Ex. 27, at 00020–23.
[47] *Id.*
[48] *Id.* at 00023.

16

be discarded one (1) year from the date of this report."[49]  Plaintiff filed this lawsuit on January 24, 2024, at which time Harmony's blood specimens were still preserved at NMS Labs.  But Plaintiff did not send a preservation notice to STPCO until May 2024, at which time the blood specimens had been destroyed.[50]

These facts have been shown to be sufficient for spoliation.  In *Waters v. AIG Claims, Inc.*, the plaintiff brought a spoliation claim based on the destruction of decedent's vitreous blood samples, as they were "the only remaining objective evidence with which the Waterses could have challenged the cardiac blood results."  608 F. Supp. 3d 1120, 1136 (M.D. Ala. 2022).  AIG and its counsel were responsible for instructions to preserve or destroy the blood sample, but "failed to instruct the vendor to preserve the samples."  *Id.* at 1139.  In response to the spoliation claim, AIG argued that "there was merely an inadvertent omission on its part in not instructing NMS Labs to preserve or return the samples[.]"  *Id.* at 1140.  The court was not just unpersuaded, but found AIG's position to be "very troubling, as it condones destruction by inaction."  *Id.*  As such, the court definitively found that AIG had spoliated the blood sample and thus allowed an adverse inference that testing would have revealed a lower blood alcohol content than what was indicated by the test results.  *Id.*

The Court should come to the same conclusion here.  Plaintiff's failure to ensure that Harmony's blood specimens were preserved, whether by "inadvertent omission" or "destruction by inaction," is nonetheless an intentional destruction.  *Id.* at 1140.  Plaintiff filed a wrongful death lawsuit without notifying the STPCO of its duty to preserve evidence which would be plainly relevant to the claims at issue.  *See Russell v. Univ. of Texas*, 234 Fed. Appx. 195, 208 (5th Cir.

---

[49] Ex. 19, at 00017.
[50] Ex. 27, 00025, 29–31.

2007) (noting that there is a "stronger argument for spoliation" if the moving party can show that the evidence was destroyed "after [the spoliator] had notice of their relevance to her claim"). Thus, in failing to meet her obligation to preserve relevant evidence after she commenced litigation, Plaintiff allowed "the only remaining objective evidence" to be destroyed. *Waters*, 608 F. Supp. 3d at 1136. This failure shows culpability in Plaintiff's intentional destruction of the blood specimens.

**B.    Defendant is entitled to an adverse inference based on Plaintiff's destruction of the Spoliated Evidence and the blood specimens.**

Once spoliation is shown, a party can then seek an adverse inference instruction. To do so, the party must establish the following: "that (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 Fed. Appx. 565, 574 (5th Cir. 2020) (citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598 (5th Cir. 2010)).

The first two elements have already been established. Plaintiff had control over the evidence and an obligation to preserve it. *See supra* Section III.A.1. And Plaintiff intentionally destroyed the evidence with a culpable state of mind. *See supra* Section III.A.2. The third element, whether the destroyed evidence was relevant, is also met.

**1.    The Spoliated Evidence is plainly relevant in determining whether there were alternative causes or contributors to Harmony's death.**

The Spoliated Evidence in Harmony's bedroom that was in her possession at the time she died is highly relevant in determining her cause of death. *See Bard v. Brown Cty.*, 970 F.3d 738, 766 (6th Cir. 2020) (there was a genuine dispute as to the manner of death because the noted cause

of death was asphyxiation and the defendants argued he died by hanging, but plaintiff disagreed and argued that hanging was not possible  -- and thus it was "relevant and material to plaintiff's argument that Goldson died in a different manner.").

If Plaintiff had not destroyed the Spoliated Evidence, there are many ways that Defendant could have used the evidence to present a defense.  First, Defendant could have tested the Spoliated Evidence.  To prove her case, Plaintiff must show that Harmony ingested the O.P.M.S. Silver products and that those products caused the alleged harm to her heart that contributed to her death.

But Plaintiff has yet to present any affirmative evidence that Harmony ingested O.P.M.S. Silver kratom.  Indeed, Plaintiff even admitted that she was unaware that her daughter had ever consumed kratom before her death, let alone O.P.M.S. Silver.[51]  Just because the O.P.M.S. Silver kratom packages were near Harmony when she died, and then mitragynine showed up on Harmony Moller's toxicology report, does not definitively conclude that Harmony ingested O.P.M.S. Silver, or ingested *only* O.P.M.S. Silver kratom products, which then caused her death.[52]  Thus, the Spoliated Evidence could have contained kratom products manufactured by someone other than Defendants.  Plaintiff's spoliation of unknown and unpackaged ground substances with a similar appearance to kratom prevents Defendant from knowing whether other kratom products (alternative sources of mitragynine) were among the substances in Harmony's possession.

Further, these products themselves, including marijuana products (which were illegal in Louisiana) could have been unreasonably dangerous in and of themselves.[53]  Without access to

---

[51] Ex. 2, at 197:6–9.

[52] Ex. 20, at 134:4–13 (noting that the NMS Labs expanded panel only picks up mitragynine – it does not detect the source of the sample or, for example, a particular brand); *see also* Ex. 24, Excerpts from Paustenbach Dep. 43:18–44:12, Feb. 13, 2026 (testifying that the existence of the O.P.M.S. Silver kratom packages does not mean she actually ingested the kratom from those packages, despite Plaintiff's assumption otherwise).

[53] *See* Ex. 2, at 264:9–265:20 (noting marijuana residue on Harmony's dresser).

this physical evidence, Defendant has no way of ruling out these items as potential causes or contributors of Harmony's death. This is a wrongful death case based on alleged consumption of only one single product (O.P.M.S. Silver Kratom) – out of countless other potentially harmful products in Harmony's possession including marijuana products, vaping products, prescription medications, over-the-counter drugs, caffeine and weight-loss pills, dietary and herbal supplements and unidentified or unlabeled ground substances. The Spoliated Products are directly relevant to causation and alternative explanations for Harmony Moller's death.

Second, if Plaintiff had not thrown away the contents of Harmony Moller's room, and if Plaintiff had fulfilled her legal duty to ensure the that Harmony Moller's blood specimens were preserved, Defendant could have requested that certain substances be screened for in the blood specimens.

The toxicology screening that was conducted was limited and did not screen for numerous substances. Without such physical evidence, and without access to the blood specimens, the toxicology report is not sufficient to show everything that Harmony ingested prior to her death. Moreover, if Plaintiff had not thrown away the contents of Harmony Moller's room, Defendant could have fully assessed the labels on the Spoliated Evidence to rebut the presumption that Harmony would have read and heeded any additional warning in a failure to warn claim.

    **2.**    **The blood specimens (which were discarded by NMS Labs after Plaintiff failed to take action to preserve them) are relevant to testing (1) whether the specimens were contaminated and (2) for alternative causes or contributors to Harmony's death.**

Harmony's blood specimens were discarded by NMS Labs after Plaintiff failed to fulfil her obligation to cause the evidence to be preserved. First, these blood specimens are relevant because they could have been tested for cross-contamination. As explained above, the records demonstrate a strong presumption that Harmony's blood specimens – that were the basis for the toxicology

testing in this case – were commingled with the specimens of another individual. A "mistake" was made and unsealed specimens for another individual were shipped in the same envelope as Harmony Moller's unsealed specimens. If Defendant still had access to the blood specimens, they could test for contamination. This significantly hinders Defendant's ability to challenge the reliability of the toxicology evidence.

Second, they are relevant to Defendant's ability to test for other items that Harmony ingested and that could have caused or contributed to Harmony's death. STPCO only ordered limited toxicology screening that did not test for everything that Harmony did or could have ingested. For example, Plaintiff affirmatively testified that Harmony took Zofran (Ondansetron) the night before she died, which would not have been tested in the expanded panel.[54] This evidence alone rebuts any argument that the toxicology report was a "thorough and reliable" test.[55]

As another example, NMS Labs' test for caffeine was "a presumptive positive, it wasn't confirmed."[56] No screening was done that would have quantified the amount of caffeine even though there were multiple caffeine supplements and weight-loss pills (*e.g.*, Zantrex Black) that contain high caffeine content found in the same bag as the O.P.M.S. Kratom products.[57] But Dr. DeFatta testified that if he "knew that Ms. Moller had an energy supplement containing caffeine and Yohimbine," he "probably would have asked [NMS Labs] to run a level on the caffeine."[58] And "if the caffeine level was higher [Dr. DeFatta] could have made that contributory as well."[59]

---

[54] *Id.* at 228:10–11; Ex. 20, at 154:10–22.
[55] Ex. 17, at 250:23–251:10 (assuming that the postmortem labs would "test for everything if they're going to be thorough and reliable").
[56] Ex. 20, at 177:6–7; Ex. 21, at 253:2–7.
[57] *See* Ex. 12.
[58] Ex. 20, at 137:4–9.
[59] *Id.* at 189:17–19.

No such levels were run by Plaintiff, despite Spoliated Evidence near Harmony when she died containing a significant amount of caffeine. For example, there were caffeine supplements,[60] and "mini-thin pills,"[61] a product which contains caffeine.[62] These were not items that the medical examiner had knowledge of at the time of Harmony's autopsy, and even the medical examiner testified that if he had known of these products, he would have asked for a definitive measure of caffeine. Since, at higher doses of caffeine the "heart rate goes up," "blood pressure may go up, and too much caffeine at very high doses can result in death,"[63] Defendant would have sought more definitive testing for caffeine if the blood specimens had not been spoliated.

The blood specimens are further relevant because NMS Labs did not test for yohimbine, which is present in the "mini thin pills" that were in Harmony's room.[64] Though Plaintiff will argue that "there's no evidence that it was in her system at the time [Harmony] died,"[65] "the assertion that it's not present cannot be disproven[.]"[66] Yet again, "[y]ou cannot detect what you cannot measure."[67] Yohimbine is significant for the causation analysis here because it "increases heart rate and blood pressure,"[68] and since Harmony's cause of death was noted as "Abnormally high left coronary ostia takeoff,"[69] any supplement that interacts with the heart is relevant in determining the cause or contributors to Harmony's death.

---

[60] *See* Ex. 12 (showing Natrol High Caffeine supplements and Zantrex Black in the same bag where the O.P.M.S. Silver kratom packages were found)

[61] Ex. 25, K. Moller Dep. Ex. 26 (a still photograph taken from body cam video showing an officer holding up a mini-thin bottle in Harmony's bedroom).

[62] *See* Ex. 20, at 137:1–3.

[63] Ex. 26, Excerpts from M. Huestis Dep. 189:21–190:2, Jan. 20, 2026.

[64] *See* Ex. 20, at 137:1–3; Ex. 21, at 135:23–25.

[65] Ex. 21, at 137:20–21.

[66] *Id.* at 137:8–9; *see also id.* at 136:23–24 ("Yohimbine is not reported on one [toxicology report]. It is not detected on the other [toxicology report].")

[67] *Id.* at 142:10.

[68] *Id.* at 137:18–19.

[69] Ex. 19, at 00004.

22

In addition, next to the O.P.M.S. Silver kratom packages was a bottle of "Apetropics One Chews, CPD + Lion's Mane + Cordyceps."[70]  Dr. DeFatta, familiar with Lion's Mane, testified that the drug panel used by NMS Labs for Harmony's blood sample would not have picked up the components of Lion's Mane.[71]  This is particularly relevant because the Apetropics bottle was found in the same bag as the O.P.M.S. Silver kratom packages at issue here.[72]

If Harmony's blood specimens had been retained, and if Defendant had an opportunity to re-test the sample, Defendant would have requested tests for (1) cross-contamination and (2) many additional items that were not detected on the expanded panel.  Indeed, if the blood specimens had not been spoliated, "the testing results could have rebutted [Plaintiff's allegation] that [Harmony's] death was [caused by O.P.M.S. Silver kratom]—or confirmed it.  This evidence was crucial to both parties."  *Waters v. AIG Claims, Inc.*, 608 F. Supp. 3d 1120, 1138 (M.D. Ala. 2022).

**C.    Defendant is entitled to an adverse inference as a result of Plaintiff's spoliation of relevant evidence.**

Defendant is entitled to an adverse inference that Plaintiff is unable to prove causation, which is fatal to her products liability claims.  Defendant has established spoliation and the Court may impose sanctions on Plaintiff.  The appropriate sanction depends on the consideration of the following: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future."  *Menges v. Cliffs Drilling Co.*, No. CIV. A. 99-2159, 2000 WL 765082, at *2 (E.D. La. June 12, 2000).  "The determination of an

---

[70] Ex. 12.
[71] Ex. 20, at 143:2–16.
[72] *See* Exs. 11, 12.

appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis." *Kellar v. Union Pac. R.R. Co.*, No. CV 21-02045, 2024 WL 3818535, at *16 (E.D. La. July 26, 2024), *report and recommendation adopted,* No. CV 21-2045, 2024 WL 4649244 (E.D. La. Oct. 17, 2024).

First, Defendant has established that Plaintiff had a culpable state of mind when she destroyed the Spoliated Evidence and failed to preserve the blood specimens. Next, Defendant has been severely prejudiced by Plaintiff's spoliation. "A party suffers prejudice where it cannot present 'evidence essential to its underlying claim.'" *Kellar*, 2024 WL 3818535, at 17 (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010)). "Generally, courts find prejudice where a party's ability to present its case or to defend is compromised." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Md. 2010).

The main issue in this litigation is whether Defendant's products caused Harmony Moller's death on February 6, 2023. Defendant's ability to present its defense has been severely compromised by Plaintiff's spoliation. First, without access to the Spoliated Evidence, Defendant was unable to test whether any of those products contained kratom, which would rebut Defendant's liability in its entirety, or test whether any of the Spoliated Evidence on their own could have caused Harmony's death, which would rebut causation.

Second, without having a reliable inventory of the Spoliated Evidence, Defendant was unable to articulate other items to test for in the toxicology report, which further compromises Defendant's ability to rebut causation.

Third, this is a failure to warn case where Plaintiff is alleging that additional warning labels on O.P.M.S. Silver products should have existed to prevent the alleged harm. As such, evidence about Plaintiff disregarding other warning labels is relevant to rebut the presumption that Plaintiff

24

would have read and heeded any such additional warnings. If Plaintiff had not destroyed the Spoliated Evidence, Defendant could have examined and used the other labels, containers, and other substances in its defense.

Finally, without access to the blood specimens, Defendant was unable to conduct a thorough and reliable expanded test to determine (1) if the blood specimens were contaminated with the specimens of another individual and (2) all possible substances that Harmony ingested prior to her death. This further prejudices Defendant's ability to rebut causation, as there were many other substances that could have been tested for that could have caused Harmony's death.

As such, based on Plaintiff's spoliation, the relevance of the evidence that was spoliated, and the prejudice to Defendant as a result of such spoliation, Defendant is entitled to an adverse inference that Plaintiff is unable to prove causation, which is fatal to her products liability claims.

In the alternative, Defendant is entitled to the following adverse inferences: (1) that the Spoliated Evidence included an alternate source of kratom; or (2) that the Spoliated Evidence presented alternative causes or contributors to Harmony's death; (3) that the Spoliated Evidence would have contained labels that would have presented evidence to rebut the presumption that Harmony would have read and heeded any additional warning; (4) that the blood specimens would have shown (a) that the blood specimens were contaminated with specimen samples from another individual and (b) the presence of other drugs in Harmony's postmortem blood that were alternative causes or contributors to Harmony's death.

### V.    CONCLUSION

Defendant respectfully requests that this Court grant its Motion for Spoliation of Evidence.

Dated this 2nd day of March, 2026.

Respectfully Submitted

25

By:  */s/ Gwendolyn C. Payton*

**Gwendolyn C. Payton** *(pro hac vice)*
**Hayley R. Ambler**
Louisiana State Bar No. 25848

**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
Telephone:    (206) 497-9600
Facsimile:    (206) 299-0414
Email:  hambler@ktslaw.com
Email:  gpayton@ktslaw.com

**Maeghan E. Whitehead** *(*admitted *pro hac vice)*
**KILPATRICK TOWNSEND & STOCKTON LLP**
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7138
(214) 279-4456
mewhitehead@ktslaw.com

**COUNSEL FOR DEFENDANT**

## CERTIFICATE OF SERVICE

This is to certify that on the 2nd day of March, 2026, a copy of the foregoing document was filed with the Clerk of Court and served on all counsel of record via the Court's ECF System.


*/s/ Gwendolyn C. Payton*
Gwendolyn C. Payton