**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KATHLEEN MOLLER** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-228**<br>**c/w 24-781** |
| **MARTIAN SALES, INC., ET AL.** | **SECTION: D (2)** |

## ORDER AND REASONS

Before the Court is a Motion to Dismiss, filed by JOpen, LLC ("JOpen") and LP IND., LLC; CAG Holdings, LLC; RMH Holdings, LLC; Martian Sales, Inc.; Johnson Foods, LLC; Nuza, LLC; Calibre Manufacturing, LLC; FMK Group, Inc.; PNW Holdings, LLC; CC US Holdings, LLC; Peyton Palaio; Mark Jennings; David Gabbay; and Mark Reilly ("Jurisdictional Defendants").[1] Plaintiff Kathleen Moller ("Moller") Opposes the Motion.[2] JOpen and Jurisdictional Defendants have filed a Reply.[3]

Also before the Court is Plaintiff's Motion for Partial Summary Judgment – Determination of Piercing the Veil, Single Business Enterprise, and Alter Ego for Jurisdictional Purposes.[4] JOpen and Jurisdictional Defendants Oppose the Motion.[5] With leave of Court,[6] Plaintiff filed a Supplemental Memorandum in support of her

---

[1] R. Doc. 122.
[2] R. Doc. 130.
[3] R. Doc. 148.
[4] R. Doc. 132.
[5] R. Doc. 143. Plaintiff did not file a Reply in support of her Motion for Partial Summary Judgment.
[6] R. Doc. 215.

Motion for Partial Summary Judgment,[7] and JOpen and Jurisdictional Defendants filed a Response to Plaintiff's Supplemental Memorandum.[8]

After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** JOpen and Jurisdictional Defendants' Motion to Dismiss[9] and **DENIES AS MOOT** Plaintiff's Motion for Partial Summary Judgment.[10]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The Court has set forth a comprehensive recitation of the factual and procedural background in a previous Order and Reasons.[11] The Court, therefore, provides the factual and procedural background solely as pertinent to the instant Motion.

This is an action for the wrongful death of Plaintiff's daughter, Harmony Moller, who died on February 6, 2023 allegedly resulting from the ingestion of kratom marketed, manufactured, and distributed by JOpen and Jurisdictional Defendants ("OPMS Kratom").[12]    On January 24, 2024, Plaintiff, Kathleen Moller, filed a Complaint in this Court against Martian Sales, Inc., JOpen, LLC, Johnson Foods,

---

[7] R. Doc. 226.

[8] R. Doc. 229.

[9] R. Doc. 122.

[10] R. Doc. 132.

[11] *See* R. Doc. 184.

[12] R. Doc. 100. According to Plaintiff, "Kratom is the name given to botanical products derived from the leaves of the *Mitragyna Speciosa* tree, which grows in Southeast Asia."  R. Doc. 100 at ¶ 34. Plaintiff alleges that "Kratom contains dozens of psychoactive compounds or alkaloids," and that, "[t]he two most-studied alkaloids are mitragynine and 7-hydroxymitragynine.  These two alkaloids bind to the same opioid brain receptors as morphine.  Like opiates, these compounds can lead to analgesia (release of pain), euphoria, and sedation."  *Id*. at ¶ 36.  Plaintiff further alleges that "[b]oth of these alkaloids were found in the whole blood extracted from the decedent on February 7, 2023, and reported in the decedent's autopsy report."  *Id*.

LLC, LP IND, LLC, CAG Holdings, LLC, RMH Holdings, LLC, and Olistica Life Sciences Group.[13]

Moller filed a Third Amendment Complaint on March 24, 2025 (the "Complaint"), adding nine Jurisdictional Defendants, including Nuza, LLC,[14] Calibre Manufacturing, LLC,[15] FMK Group, Inc.,[16] PNW Holdings, LLC,[17] CC US Holdings, LLC,[18] Peyton Palaio,[19] Mark Jennings,[20] Mark Reilly,[21] and

---

[13] R. Doc. 1.

[14] "Defendant NUZA is a Wyoming limited liability company with citizenship in Wyoming. Its principal place of business in Wyoming. The State of Wyoming does not require limited liability companies incorporated within Wyoming to identify its members. Upon information and belief, Peyton Shea Palaio is the only known member of NUZA." R. Doc. 100 at p. 3, ¶ 7.

[15] "Defendant CALIBRE is a Wyoming limited liability company with its principal place of business in Wyoming. The State of Wyoming does not require limited liability companies incorporated within Wyoming to identify its members. Upon information and belief, Peyton Shea Palaio is the only known member of CALIBRE." R. Doc. 100 at p. 3, ¶ 9.

[16] "Made Defendant herein, Defendant FMK GROUP, INC. ('FMK') was and is a Wyoming corporation with its principal place of business in Wyoming . . . FMK owned or co-owns a trademark associated to the Olistica brand, which is a surrogate for the OPMS kratom brand. FMK is one of the many alter egos and shell companies involved in OPMS kratom." R. Doc. 100 at p. 5, ¶ 16.

[17] "Made Defendant herein, Defendant PNW Holdings, LLC (d/b/a Cascade Naturals) ('PNW') was and is a Wyoming limited liability company with its principal place of business in Wyoming. PNW own or co-owns a trademark associated to the Olistica brand, which is a surrogate for the OPMS kratom brand. PNW is one of the many alter egos and shell companies involved in OPMS kratom." R. Doc. 100 at p. 6, ¶ 17.

[18] "Made Defendant herein, Defendant CC US Holdings, LLC (also doing business as Centralized Services; Olistica; Olistica Group; Liv Group, Inc.; Della Terra Pharmaceuticals; NP Pharma Holdings, LLC; O.P.M.S.; Precision Biologics; NP Biotech; Canopy Corporation; Innovo Activas; and Evolutionary Organics) ('CC US') was and is a Wyoming limited liability company with its principal place of business in Wyoming. CC US manages all administrative services including accounting and payment of employees for various named entities and individuals." R. Doc. 100 at p. 6, ¶ 19.

[19] "Made Defendant herein, Peyton Shea Palaio ('Palaio') is an individual who is associated with multiple entities involved in the kratom business . . . Palaio is also the ringleader and mastermind behind several Defendant entities, including MARTIAN SALES.; LP; FMK; PNW; and CC US. Palaio is heavily and directly involved in the operations of the OPMS kratom enterprise, which operates through a clandestine, secretive, and purposely opaque web of affiliates, shell companies, alter egos, business names, assumed names, and/or trade names." R. Doc. 100 at p. 7, ¶ 21.

[20] "Made Defendant herein, Mark Jennings ('Jennings') is an individual who is closely associated and involved with the kratom business operations of Olistica Life Sciences Group and the O.P.M.S. brand. Upon information and belief, Jennings is the current chief executive officer of Olistica Life Sciences Group. Jennings is directly involved in managing and maintaining the secrecy of the supply chain and distribution practices of Olistica and its network of associated entities." R. Doc. 100 at p. 7, ¶ 22.

[21] Made Defendant herein, Mark Daniel James Reilly ('Reilly') (a/k/a Chris Dockery) is an individual who is closely associated and directly involved with the kratom business operations of the O.P.M.S. brand. Reilly is the owner and operator of MARTIAN SALES. Reilly is implicated in, among other

David Gabbay.[22]

The Complaint asserts a wrongful death claim under Louisiana Civil Code article 2315.2 and two products liability claims under Louisiana's Products Liability Act, La. R.S. 9:2800.51, *et seq.*[23] Under the Louisiana Products Liability Act, Moller asserts that the OPMS Kratom product consumed by Harmony Moller was unreasonably dangerous due to a failure to warn and a design defect, ultimately leading to the death of Harmony Moller.[24]

Moller specifically contends that JOpen and Jurisdictional Defendants "are alter egos of one another and operate as a single business enterprise through a secretive web of affiliates, individuals, shell companies, alter egos, business names, assumed names, and/or trade names[,]" which includes but are not limited to:

> Aether, LLC; Aghosh Corp.; Axis Holdings, LLC; Johnson Foods, LLC; LP IND., LLC; CAG Holdings, LLC; RMH Holdings, LLC; Lunar Labs, LLC; Martian Sales, Inc.; Kono Labs; Highway 160 Way, LLC; PFI, LLC; Nuza LLC; Nuza; Nuza Logistics; Calibre Manufacturing, LLC; Advanced Nutrition; Uziel, LLC; 1099 Industrial, LLC; 1100 Alpha, LLC; Engaged Investments, LLC; Olistica Life Sciences Group; Olistica; Olistica Group; Interactive Earth Sciences Corp.; Liv Group, Inc.; Cascade Naturals; Della Terra Pharmaceuticals; NP Pharma Holdings, LLC; OPMS; Choice Organics; Jordan Process; Precision Biologics; Eyal Gabbey; Petyon Shea Palaio; Mark Jennings; Mark Reilly; Biopharmaceutical Technology Services, Inc.; Liv Group, Inc.; Robert "Bob" Hoban; NP Biotech; Precision Biologics; FMK Group, Inc.; PNW

---

[22] things, managing and maintaining the O.P.M.S. brand, contracting for the importation or acquisition of raw kratom for O.P.M.S. brand products, and contracting for the manufacture and distribution of O.P.M.S. brand kratom. Upon information and belief Reilly's work is in part done under a pseudonym, Chris Dockery." R. Doc. 100 at p. 8, ¶ 24.

[22] R. Doc. 100. "Made Defendant herein, Eyal David Gabbay ('Gabbay') is an individual who is closely associated and directly involved with the kratom business operations of the O.P.M.S. brand. Gabbay is the owner and operator of JOPEN. Gabbay is implicated in, among other things, managing and maintaining the importation or acquisition of raw kratom for O.P.M.S. brand products, and the national distribution of O.P.M.S. brand kratom." R. Doc. 100 at p. 8, ¶ 23.

[23] R. Doc. 100.

[24] *Id.* at pp. 16–17.

4

Holdings, LLC; JOPEN, LLC; LP, Ind., LLC; Beeman Inc.; LGI Holdings, LLC; Axis Holdings, LLC; Calibre Manufacturing, LLC; Savro Management, LLC; Advanced Nutrition, LLC; Admin Assist, LLC; Precision Biologics, Inc; Companion Agriculture; NP Biopharma; Della Terra Pharmaceutical; Aether LLC; Allied Manufacturing Services, LLC; Telescaph Inter Texas, LLC; CC US Holdings, LLC; Peyton Shea Palaio; Mark Jennings; Eyal David Gabbay; and Mark Reilly (a/k/a Chris Dockery).[25]

Accordingly, Moller submits that JOpen and Jurisdictional Defendants are one in the same, thereby making the actions of JOpen attributable to all Jurisdictional Defendants.[26]

Moller additionally alleges that "OPMS Kratom is manufactured, packaged, distributed, and sold by the OPMS defendants via the stream of commerce throughout the United States to herbal stores, gas stations, corner stores, and smoke shops where it is primarily marketed as an herbal medicine or supplement to treat a variety of ailments such as pain, mental health, opioid withdrawal[,] and constitutes as 'product' as defined by La. R.S. 9:2800.53 (3)."[27] Accordingly, Moller argues that "[a]s a direct and proximate result of the manufacture and distribution of its unreasonably dangerous and defective product to Harmony Moller, as aforesaid, Defendants are strictly liable to Plaintiff in damages for her parents' grief, loss of companionship and consortium, love, affection, and support due to her wrongful death . . . ."[28]

---

[25] *Id.* at p. 9 (citation modified).
[26] *See id.*
[27] R. Doc. 100 at p. 16.
[28] *Id.* at p. 17, ¶ 64.

On May 23, 2025, JOpen and Jurisdictional Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6).[29]

**A. Rule 12(b)(2) Motion to Dismiss**

JOpen and Jurisdictional Defendants contend that the Court lacks both general and specific personal jurisdiction over all Defendants, except for JOpen.[30] Initially addressing choice of law principles, Jurisdictional Defendants contend that Louisiana courts would apply Wyoming law for veil-piercing theories and therefore this Court should apply Wyoming law in its veil-piercing analysis.[31] Jurisdictional Defendants refute Moller's argument in her Complaint that "JOpen's contacts may be imputed to the other Defendants because all Defendants are 'alter egos of one another and operate as a single business enterprise.'"[32] Because Moller has failed to allege any of the necessary factors in determining whether veil-piercing is appropriate under Wyoming law, Jurisdictional Defendants contend that there is no factual basis for the Court to assert specific personal jurisdiction via a veil-piercing theory.[33] Alternatively, insofar as Moller's Complaint alleges that Jurisdictional Defendants are subject to specific personal jurisdiction pursuant to the stream of commerce doctrine, Jurisdictional Defendants advise that "[t]here is no factual or

---

[29] R. Doc. 122.

[30] R. Doc. 122-1 at p. 12. "JOpen does not dispute that it is subject to the jurisdiction of this Court." *Id.* at p. 3 n.2. The Court, therefore, only considers the Rule 12(b)(2) Motion to Dismiss as it pertains to Jurisdictional Defendants.

[31] *Id.* at p. 13.

[32] *Id.* at p. 13 (quoting R. Doc. 100 at p. 9).

[33] *Id.* at p. 14.

legal basis for [asserting] [the] stream of commerce [doctrine] over" Jurisdictional Defendants.[34]

Moller has filed an Opposition, in which she asserts that her Complaint plausibly establishes personal jurisdiction over Jurisdictional Defendants.[35] First, Moller avers that it is well-settled that a Court may impute minimum contacts of one entity based on a veil-piercing theory under Louisiana law,[36] and her factual allegations set forth in her Complaint "are sufficient at the pleading stage to support a finding of jurisdiction over all defendants."[37] In her Complaint, Moller asserts that:

> Defendants have orchestrated an illicit kratom enterprise based on a product that is smuggled into the United States, labeled "not for human consumption," and Defendants are indeed selling kratom for human consumption. Under federal and state law, the Defendants' aggressive national campaign to promote and profit from the sale of OPMS kratom products in Louisiana is sufficient contact with Louisiana for purposes of due process, and maintaining that jurisdiction in this state is foreseeable, and consistent with traditional notions of fair play and substantial justice.[38]

Solely as to her veil-piercing argument, Moller incorporates by reference all additional facts[39] set forth in her Motion for Partial Summary Judgment –

---

[34] *Id.* at p. 13.

[35] R. Doc. 130 at p. 12.

[36] Moller contends that Jurisdictional Defendants should be estopped from asserting that Wyoming's veil-piercing law controls because Jurisdictional Defendants have first raised such choice of law question in their Motion to Dismiss. R. Doc. 130 at p. 9 n.5. Moller further advises that "[i]f this Court does not find estoppel, the Court need not make a finding of choice of law at this point because both WY and LA recognize similar veil piercing laws." *Id.*

[37] *Id.* at p. 12.

[38] *Id.* at pp. 12–13.

[39] R. Doc. 130 at p. 2; R. Doc. 130-2 at p. 7. The Court finds it appropriate to consider the factual allegations set forth in Moller's Motion for Partial Summary Judgment, R. Doc. 132, as they have been properly incorporated by reference with specificity and clarity allowing Defendants to ascertain the nature and extent of the incorporated facts. *See* Fed. R. Civ. P. 10(c)("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176 (5th Cir. 2006)(finding that the Federal Rules of Civil Procedure allow for incorporation by reference if such incorporation contains a degree of specificity

Determination of Piercing the Veil, Single Business Enterprise, and Alter Ego for Jurisdictional Purposes.[40] With leave of Court, Plaintiff filed a Supplemental Memorandum and Evidence in Support of Plaintiff's Motion for Partial Summary Judgment, in which Plaintiff provides as follows:

Martian Sales holds the OPMS trademark, which includes a specific logo design. JOpen, distributes OPMS kratom products across the U.S., and devised the false "Choice Organics" distributorship identified on the product label. JOpen pays Martian Sales a yearly licensing fee. Products include various forms of kratom, specifically OPMS Silver, which is the product at issue in this case.

Sourcing and manufacturing (encapsulation and liquids) of OPMS kratom was handled first by Advanced Nutrition, then by Nuza, LP, and Calibre. OPMS kratom packaging was performed by JOpen in Dallas, Texas. Finished OPMS kratom products are then distributed to retail locations nationwide, including Louisiana, where the product was legal at the time of Harmony Moller's death in February 2023.

Defendants' discovery has indicated that based on the date of death, February 2023, the OPMS products at issue would have been manufactured and encapsulated by Defendants Nuza and Calibre and then packaged and distributed by Defendant JOpen.

The deposition of Mr. Peyton Palaio was taken October 9, 2025. Mr. Palaio's family are the beneficiaries of a trust that owns Johnson Foods, a Defendant in this case. Mr. Palaio also acts as an "advisor" to Johnson

---

and clarity to allow a respondent to determine the nature and extent of the incorporation). The Court is satisfied that Moller's incorporation by reference has allowed JOpen and Jurisdictional Defendants to respond to the nature and extent of the incorporation, which is evidenced by JOpen and Jurisdictional Defendants' incorporation by reference of their Opposition to Plaintiff's Motion for Summary Judgment. *See* R. Doc. 148 at p. 3. The Court therefore treats the factual allegations set forth in Moller's Motion for Partial Summary Judgment, R. Doc. 132, as part of the factual allegations in its Opposition to the instant Motion, R. Doc. 130.

[40] For the sake of brevity, the Court does not recite the factual allegations set forth in Moller's Motion for Partial Summary Judgment in the factual background. The Court, however, addresses the substantive factual allegations in Part III of this Order and Reasons and fully considers all facts set forth therein in reaching its holding. Insofar as Plaintiff incorporates by reference all additional facts and exhibits in support of Plaintiff's Motion for Partial Summary Judgment, the Court reminds counsel of Local Civil Rule 7.7. Local Civil Rule 7.7 provides that "[e]xcept with prior leave of court, a trial brief or memorandum supporting or opposing a motion must not exceed 25 pages, excluding exhibits, and a reply brief or memorandum must not exceed 10 pages, excluding exhibits." Incorporation by reference should not be used to circumvent Local Civil Rule 7.7.

> Foods. He confirmed that: 1) Nuza currently sources and supplies raw kratom for OPMS;  2) One of his family trusts also owns Calibre, in addition to Johnson Foods and Nuza;  3) Calibre processes kratom for OPMS and Martial Sales;  and 4) JOpen is the Texas based distributor and the entity that collects, investigate and responds to customer complaints or adverse event reports.
>
> Another deposition taken after Plaintiff's Partial Motion for Summary Judgment was taken under advisement was that of Eyal David Gabbay. Mr. Gabbay as owner, operator, and corporate spokesman testified on behalf of JOpen on October 16, 2025. He also testified in his personal capacity in cases involving injury or death related to OPMS (and other kratom products), including this matter. He testified that 1) JOpen worked with Reilly and OPMS since 2012 and "pays the bills for OPMS," and 2) JOpen was "selling OPMS Kratom at its inception."[41]

Moreover, Moller invokes the decision of a Louisiana state court, which found that some of the Defendants in the above-captioned matter were subject to specific personal jurisdiction in Louisiana, and a Colorado state court decision, finding same in Colorado, in support of its Motion for Partial Summary Judgment.[42] In response to Plaintiff's Supplemental Memorandum, JOpen and Jurisdictional Defendants counter that "[t]he Deposition Testimony of Peyton Palaio and David Gabbay confirms that Defendants are distinct corporate entities for jurisdictional purposes."[43] And as a final point, JOpen and Jurisdictional Defendants point out that the specific "orders from other courts do not negate the clear record in this case."[44]

Turning back to Moller's Opposition to JOpen and Jurisdictional Defendants' Motion to Dismiss, Moller alternatively pleads that, pursuant to the stream of commerce theory, "[t]he massive national sales and distribution network described

---

[41] R. Doc. 226 at pp. 1–3.
[42] *Id.* at pp. 4–5.
[43] R. Doc. 229 at p. 2 (citation modified).
[44] *Id.* at p. 3 (citation modified).

by the FDA and other referenced documents and sources, if true, as the Court must assume at this point, demonstrate a nation-wide sales and distribution of this product to support 'minimum contacts' and personal jurisdiction of the single business enterprise."[45]

Addressing the Fifth Circuit's three-step framework in determining whether the Court may assert specific personal jurisdiction over a defendant,  Moller first argues that Jurisdictional Defendants purposefully availed themselves to Louisiana, as Jurisdictional Defendants have taken intentional actions to exploit the Louisiana kratom industry.[46] Second, Moller argues that Harmony Moller's death is directly attributable to the Jurisdictional Defendants' actions because Harmony Moller's "autopsy report plausibly supports the allegation that Plaintiff's wrongful death product liability claims were related to the Defendants' conduct in creating a secretive web of shell companies that import an illicit product into the United States and then pursue the distribution and sale of that product to Louisiana consumers."[47] Third, Moller contends that subjecting Jurisdictional Defendants to personal jurisdiction in Louisiana would not offend the traditional notions of fair play and substantial justice, since, according to Moller, any "inconvenience for these Defendants to defend themselves in the forum they actively profit from does not outweigh the interest in ensuring that injured Louisiana citizens receive the protection of state product

---

[45] R. Doc. 130 at p. 14.
[46] *Id.* at p. 16.
[47] *Id.* at p. 17.

liability laws."[48] Thus, Moller provides that the Court may properly exercise personal jurisdiction over the Jurisdictional Defendants.[49]

In Reply, Jurisdictional Defendants assert that because jurisdictional discovery has taken place, Moller must establish personal jurisdiction by a preponderance of the evidence, as opposed to the lesser standard of *prima facie*.[50] Regardless, Jurisdictional Defendants aver that Moller has failed to plead any factors in addressing whether veil-piercing is warranted under Wyoming law and thus Plaintiff has failed to meet her burden of establishing personal jurisdiction.[51] And in response to Moller's incorporation of her facts in support of her Motion for Partial Summary Judgment,[52] Jurisdictional Defendants likewise incorporate by reference their Opposition to Plaintiff's Motion for Partial Summary judgment, thereby making such factual allegations a part of its Reply for all purposes.[53]

Addressing Moller's alternative argument that each Jurisdictional Defendant is subject to personal jurisdiction under the stream of commerce theory, Jurisdictional Defendants maintain that Moller has failed to allege specific acts of Jurisdictional Defendants that illustrate minimum contacts have been established to Louisiana.[54] Moreover, Jurisdictional Defendants contend that Moller's reference to Defendant's national sales campaign is unsupported by the record.[55] Thus, according

---

[48] *Id.* at p. 19.
[49] *Id.*
[50] R. Doc. 148 at p. 2.
[51] *Id.* at pp. 3–4.
[52] R. Doc. 130 at p. 2; R. Doc. 130-2 at p. 7.
[53] R. Doc. 148 at p. 3. *See* Fed. R. Civ. P. 10(c); *Carroll*, 470 F.3d at 1176; *supra* note 39; *but see supra* note 40.
[54] R. Doc. 148 at p. 5.
[55] *Id.*

11

to Jurisdictional Defendants, their Motion to Dismiss for Lack of Personal Jurisdiction should be granted.

**B. Rule 12(b)(6) Motion to Dismiss**

JOpen and Jurisdictional Defendants also seek to dismiss Moller's Complaint pursuant to Rule 12(b)(6) for failure to state a claim under the Louisiana Products Liability Act.[56] JOpen and Jurisdictional Defendants specifically contend that the Court should dismiss Moller's claim under the Louisiana Products Liability Act because she "fails to allege that Defendants are manufacturers of the product at issue."[57] JOpen and Jurisdictional Defendants further explain that:

> Plaintiff does not allege that any Defendant is a manufacturer. Plaintiff merely alleges that OPMS kratom is imported, packaged, distributed, and sold through a complex web of companies that includes Defendants, and that through its various alter egos and agents, OPMS Kratom is manufactured, packaged, distributed, and sold by the OPMS defendants via the stream of commerce throughout the United States. This bare assertion that that the Defendants together manufacture O.P.M.S. via a stream of commerce is insufficient.[58]

JOpen and Jurisdictional Defendants allege that "[j]urisdictional discovery has made clear that Calibre is the only possible manufacturer of the kratom product at issue."[59]

Additionally, JOpen and Jurisdictional Defendants assert that Moller "fails to allege a design defect claim[,]" as Moller "does not allege that the design of any Defendant's kratom product was defective, nor could she. [Moller] claims that a safe design for kratom products is impossible . . . which is not a design defect claim under

---

[56] R. Doc. 122-1 at p. 17.
[57] *Id.*
[58] *Id.* (citation modified).
[59] *Id.* at p. 18.

the LPLA."[60] Lastly, JOpen and Jurisdictional Defendants argue that Moller fails to allege a failure to warn claim "because the risks she alleges that Defendants should have warned about are undisputedly not known or knowable to any Defendant. Nor could she state a failure to warn claim for this reason."[61] JOpen and Jurisdictional Defendants further rebut Moller's allegation "that kratom should not be manufactured or distributed by anyone based on danger to human health that is unknown to science, and so the warning should have said do not buy this product. That does not align with the LPLA standards or what Plaintiff admits is known medical science."[62] Therefore, JOpen and Jurisdictional Defendants maintain that Moller's Complaint should be dismissed under Rule 12(b)(6).[63]

Moller has filed an Opposition, arguing that she has properly stated claims under the Louisiana Products Liability Act.[64] Initially, Moller discredits Jurisdictional Defendants' argument that she has failed to allege that each Jurisdictional Defendant is a manufacturer.[65] According to Moller, JOpen and Jurisdictional Defendants "ignore Plaintiff's allegations, including but not limited to, 'On February 6, 2023, Harmony Moller, a 36-year-old female, died as the result of the ingestion of OPMS brand kratom which she purchased in Mandeville, Louisiana[]' . . . Or the allegations concerning the presence of kratom in the autopsy results after her death."[66] Thus, Moller contends that she has properly alleged that JOpen and

---

[60] *Id.*
[61] *Id.* at p. 21.
[62] *Id.* at p. 23.
[63] *Id.*
[64] R. Doc. 130 at p. 19.
[65] *Id.* at p. 20.
[66] *Id.* (quoting R. Doc. 100 at p. 10, ¶¶ 30, 33).

each Jurisdictional Defendant is a manufacturer under the Louisiana Products Liability Act.[67]

Moller further argues that she states a defective design claim.[68] According to Moller, "the *process* of altering and adulterating a natural, whole leaf plant is the 'design' issue in this case. The alternate 'design' or process might be, for example, to distribute whole leaf *Mitragyna Speciosa*[,]" as opposed to the processed *Mitragyna Speciosa* sold by JOpen and Jurisdictional Defendants.[69] And as to JOpen and Jurisdictional Defendants' failure to warn argument, Moller argues that JOpen and Jurisdictional Defendants failed to warn that "kratom is unlawfully imported, wrongfully distributed[,] marketed and sold for human consumption without the required premarket verification of safety, causes dependence, addiction, and withdrawal in regular users, is 63 times more deadly than other natural products, and can cause death."[70] Therefore, Moller contends that JOpen and Jurisdictional Defendants' Rule 12(b)(6) Motion should be denied.[71]

JOpen and Jurisdictional Defendants have filed a Reply.[72] As to Moller's allegation of a design defect, JOpen and Jurisdictional Defendants aver that "Plaintiff's effort to state a design defect cause of action by attempting to adopt FDA statements and alleging that Defendants violated federal law or FDA regulations fails."[73] Pertaining to Moller's allegation of a failure to warn, JOpen and

---

[67] *Id.*
[68] *Id.* at p. 21.
[69] *Id.* (emphasis original).
[70] *Id.* at p. 22.
[71] *Id.* at p. 23.
[72] R. Doc. 148.
[73] *Id.* at p. 9.

14

Jurisdictional Defendants contend that "Plaintiff cannot allege a failure to warn claim based on a broad-brush allegation that kratom should be illegal or that Defendants should have warned consumers not to buy the product. Defendants' product is legal, and Plaintiff must allege a known risk about which any Defendant failed to warn consumers."[74] Therefore, according to JOpen and Jurisdictional Defendants, their Rule 12(b)(6) Motion should be granted.[75]

## II.    LEGAL STANDARD

### A. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

"Personal jurisdiction, [like subject matter jurisdiction], is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'"[76]   Because personal jurisdiction is a "threshold ground[] for denying audience to a case on the merits," a court usually addresses the threshold personal jurisdiction claim before reaching a claim on the merits.[77]

When a nonresident defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the burden of establishing jurisdiction belongs to the plaintiff.[78] A plaintiff, however, "need only present a prima facie case of personal jurisdiction to satisfy that burden[;] '[p]roof by a preponderance

---

[74] *Id.* at pp. 9–10.

[75] *Id.* at p. 10. JOpen and Jurisdictional Defendants do not address their argument that Moller has failed to allege that they are manufacturers under the Louisiana Products Liability Act. *See* R. Doc. 148.

[76] *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (quoting *Emps. Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)).

[77] *Id.* at 584–85; *accord Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012).

[78] *Hebert v. Wing Sale, Inc.*, 337 F. Supp. 3d 714, 717 (E.D. La. 2018) (citing *Luv N' Care v. Insta-Mix, Inc.*, 438 F. 3d 465, 469 (5th Cir. 2006)).

15

of the evidence is not required.'" [79]  The Court takes all uncontroverted allegations in the complaint as true and resolves conflicts in the plaintiff's favor.[80]  The Court may consider affidavits, interrogatories, depositions, or any combination of the recognized methods of discovery.[81]

The Court may exercise personal jurisdiction over a nonresident defendant only if two requirements are satisfied: (1) the forum state's long-arm statute confers personal jurisdiction; and (2) the exercise of jurisdiction does not exceed the boundaries of due process.[82]  Because the limits of Louisiana's long-arm statute are co-extensive with the limits of constitutional due process, the inquiry is simply whether this Court's exercise of jurisdiction over the defendant would offend due process.[83]

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations."[84]  As explained by the U.S. Supreme Court, "where individuals 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that

---

[79] *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019) (citing *Stripling v. Jordan Prod. Co.*, LLC, 234 F.3d 863, 869 (5th Cir. 2000) and quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).
[80] *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994).
[81] *Jobe v. ATR Marketing, Inc.,* 87 F.3d 751, 752 (5th Cir. 1996).
[82] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006).
[83] *See In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 F.3d 521, 547 (5th Cir. 2014).
[84] *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

have been voluntarily assumed."[85]    Accordingly, under federal due process requirements, the Court analyzes whether the nonresident defendant has certain minimum contacts with the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[86]

There are two types of jurisdiction: general jurisdiction and specific jurisdiction. Jurisdictional Defendants allege that the Court lacks both general and specific personal jurisdiction.[87]  "'[G]eneral' or 'all purpose' jurisdiction . . . permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (e.g., domicile)."[88]  General jurisdiction is proper where a defendant's "affiliations with the [forum] State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."[89]  In contrast, "specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation," and requires that "the defendant's suit-related conduct . . . create a substantial connection with the forum State."[90]  The Fifth Circuit applies a three-step analysis for the specific jurisdiction inquiry:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the

---

[85] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985).
[86] *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (internal citation and quotation marks omitted).
[87] R. Doc. 122-1 at p. 12.
[88] *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014).
[89] *Bauman*, 571 U.S. at 139 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).
[90] *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)) (cleaned up).

17

defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.[91]

Jurisdiction is proper where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State.[92] Thus, where the defendant "deliberately" has engaged in significant activities within a state, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum state's laws, it is presumptively reasonable to require him to submit to the burdens of litigation in that forum as well.[93]

**B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant can seek dismissal of a complaint, or any part of it, for failure to state a claim upon which relief may be granted.[94]  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[95]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[91] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

[92] *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957); *see also Kulko v. California Superior Court*, 436 U.S. 84, 94 (1976).

[93] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 784 (1984); *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 648 (1950).

[94] Fed. R. Civ. P. 12(b)(6).

[95] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

liable for the misconduct alleged."[96]  But, no matter the factual content, a claim is not plausible if it rests on a legal theory that is not cognizable.[97]  In ruling on a motion to dismiss, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the non-moving party.[98] A court is generally prohibited from considering information outside the pleadings but may consider documents outside of the complaint when they are: (1) attached to the motion; (2) referenced in the complaint; and (3) central to the plaintiff's claims.[99]  The Court can also consider matters of public record and matters subject to judicial notice.[100] The Court, however, is not bound to accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.[101]  "Dismissal is appropriate when the complaint on its face shows a bar to relief."[102]

### C. Louisiana Products Liability Act

The Louisiana Products Liability Act ("LPLA") "establishes the exclusive theories of liability for manufacturers for damage caused by their products."[103] To

---

[96] *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 678) (quotation marks omitted).

[97] *Shandon Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010).

[98] *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018).

[99] *Maloney Gaming Mgmt., LLC v. St. Tammany Parish*, 456 Fed. Appx. 336, 340–41 (5th Cir. 2011).

[100] *Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodaux, Inc.*, No. CIV.A. 10-4443, 2013 WL 1513406, at *3 (E.D. La. Apr. 11, 2013). Jurisdictional Defendants, JOpen, and Plaintiff have asked the Court to take judicial notice of certain facts. *See* R. Doc. 122 at pp. 10–11 and R. Doc. 130 at p. 8. Unless specifically noted by the Court in this Order and Reasons, the Court has not taken judicial notice of these facts.

[101] *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

[102] *Cutrer v. McMillan*, 308 Fed. App. 819, 820 (5th Cir. 2009) (quotation and internal quotation marks omitted).

[103] LA. REV. STAT. § 9:2800.52. Since the Court hears this case pursuant to diversity jurisdiction, the Court applies the substantive law of the forum state – Louisiana law. *See Learmonth v. Sears, Roebuck and Co.*, 710 F.3d 249, 258 (5th Cir. 2013)("A federal court sitting in diversity applies the substantive law of the forum state.").

successfully assert a claim under the LPLA, a claimant must prove: "(1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else."[104] A product is unreasonably dangerous "if and only if " it is unreasonably dangerous in its (1) construction or composition; (2) design; (3) failure to adequately warn; or (4) nonconformity to an express warranty.[105] Therefore, the LPLA limits a claimant "to four theories of recovery: construction or composition defect, design defect, inadequate warning, and breach of express warranty."[106]

## III.   ANALYSIS

Before reaching the merits, the Court addresses and resolves three preliminary issues. First, when a "court is confronted by a motion raising a combination of Rule 12(b) defenses, it will address the jurisdictional issues before considering whether a claim was stated by the complaint, although there is no requirement that jurisdictional issues be considered in a particular order."[107] Therefore, the Court will first consider whether it has personal jurisdiction over the Jurisdictional Defendants

---

[104] *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 261 (5th Cir. 2002)(citing LA. REV. STAT. § 9:2800.54).

[105] LA. REV. STAT. § 9:2800.54(B)(1 )–(4); *see also Rhodes v. Covidien LP*, Civil Action No. 18-10667, 2019 WL 2162845, at *2 (E.D. La. May 17, 2019)(Vance, J.)("A product is unreasonably dangerous for the purposes of the statute 'if and only if' it is unreasonably dangerous either (1) in construction or composition, (2) in design, (3) because of inadequate warning, or (4) because of nonconformity to an express warranty.").

[106] *Fuller v. Eisai Inc.*, 513 F.Supp.3d 710, 717 (E.D. La. 2021)(Africk, J.)(citation modified).

[107] 5B Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, FEDERAL PRACTICE AND PROCEDURE § 1351 (4th ed. 2025).

before addressing whether Moller has sufficiently plead a claim under the LPLA pursuant to JOpen and Jurisdictional Defendants' Rule 12(b)(6) motion.

Second, the Court determines the appropriate state substantive law to apply in a veil-piercing analysis. Although Louisiana courts have not expressly determined the appropriate choice of law for veil-piercing theories, the Fifth Circuit has predicted that Louisiana courts would turn to the law of the state in which the defendant corporation was incorporated. In line with this prediction, the Court applies Wyoming veil-piercing law,[108] as Jurisdictional Defendants are all either corporations that are incorporated in Wyoming or are limited liability companies formed in Wyoming.[109]

Third, the Court addresses the standard of proof required to establish personal jurisdiction. Jurisdictional Defendants contend that because the Court has allowed Moller to engage in jurisdictional discovery,[110] Moller must establish personal jurisdiction by satisfying the preponderance of the evidence standard, as opposed to making a *prima face* case.[111] The Court disagrees. The Fifth Circuit is clear that "[w]hen the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting

---

[108] Moller concedes that "both WY and LA recognize similar veil piercing laws." R. Doc. 130 at p. 9 n.5.
[109] R. Doc. 100 at pp. 1–8. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 647 (5th Cir. 2002)("[W]e agree with the district court's determination that the Louisiana State Supreme Court would most likely conclude that the law of the state of incorporation governs the determination when to pierce a corporate veil."); *Louisiana Newpack Shrimp, Inc. v. Ocean Feast of China, Ltd.*, Civil Action No. 19-12948-WBV-KWR, Civil Action No. 20-782-WBV-KWR, 2021 WL 516631, at *7 n.81 (E.D. La. Feb. 11, 2021)(Vitter, J.); *see also Soriano v. Gulf Coast Lift, LLC*, Civil Action No. 12–2744., 2014 WL 949145, at *8 (E.D. La. Mar. 11, 2014)(Vance, J.)("Because Gulf Coast is a Louisiana limited liability company, Louisiana law governs the Court's decision on piercing the corporate veil.").
[110] R. Doc. 54.
[111] R. Doc. 148 at p. 2.

a *prima facie* case that personal jurisdiction is proper.'"[112] To aid in its determination, "the district court may consider the contents of the record before the court at the time of the motion, including 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'"[113] But when a district court holds an evidentiary hearing on personal jurisdiction, however, a plaintiff "must establish personal jurisdiction by a preponderance of the evidence."[114] Here, because the Court did not hold an evidentiary hearing on personal jurisdiction, and merely authorized jurisdictional discovery, Moller need only establish a *prima facie* case of personal jurisdiction.[115]

Having resolved these three preliminary issues, the Court next analyzes whether Moller has met her *prima facie* burden of establishing specific personal jurisdiction over Jurisdictional Defendants either pursuant to a veil-piercing theory or the stream of commerce theory. The Court then addresses whether Moller has stated a claim against JOpen under the LPLA. For the reasons set forth below, the Court determines that Moller has failed to meet her *prima facie* burden of

---

[112] *Quick Technologies, Inc. v. Sage Group, PLC*, 313 F.3d 338, 343 (5th Cir. 2002)(quoting *Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir. 1994)).

[113] *Id.* (quoting *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir.1985)); *see also Sangha v. Navig8 ShipManagement Private Limited*, 882 F.3d 96, 101 (5th Cir. 2018)("The district court is not obligated to consult only the assertions in the plaintiff's complaint in determining whether a *prima facie* case for jurisdiction has been made. Rather, the district court may consider the contents of the record at the time of the motion.")(citation modified).

[114] *In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 F.3d 521, 529 (5th Cir. 2014).

[115] *See, e.g., IntelliGender, LLC v. Soriano*, No. 2:10–CV–125–TJW., 2011 WL 903342, at *10 (E.D. Tex. Mar. 15, 2011) ("Even though the Court has received discovery materials and allowed jurisdictional discovery, because the Court has not held a full and fair hearing, the Court must not act as fact finder and should construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts." (citing *Walk Haydel & Assoc., Inc. v. Coastal Power Prod. Co.,* 517 F.3d 235, 241 (5th Cir. 2008))).

establishing specific personal jurisdiction over Jurisdictional Defendants under either a veil-piercing theory or the stream of commerce theory. The Court, however, finds that Moller has sufficiently stated a claim against JOpen under the LPLA.

**A. The Court lacks specific personal jurisdiction over the Jurisdictional Defendants pursuant to a veil-piercing theory.**

Jurisdictional Defendants assert that the Court may not lawfully exercise specific personal jurisdiction by imputing JOpen's contacts to the other Jurisdictional Defendants pursuant to Wyoming veil-piercing law.[116] Moller, in turn, claims that this Court may impute JOpen's minimum contacts to Jurisdictional Defendants under the single business enterprise theory under Louisiana law, as she contends that "Defendants have combined to profit by promoting, distributing and/or selling kratom through 'a complex web of companies that includes Defendants' who are referred to in the Complaint as the 'OPMS enterprise' and 'one of the largest kratom distributors in the United States.'"[117] The Court, turning to Wyoming veil-piercing law, determines that Moller has failed to establish a *prima facie* case for exercising personal jurisdiction over the Jurisdictional Defendants.[118]

---

[116] R. Doc. 122-1 at p. 13.

[117] R. Doc. 130 at p. 11 (quoting R. Doc. 100 at p. 15). While Plaintiff argues that the Court should apply Louisiana law, she acknowledges that "both WY and LA recognize similar veil piercing laws." R. Doc. 130 at p. 9 n.5.

[118] Insofar as Moller argues that Jurisdictional Defendants should be estopped from asserting that Wyoming's veil-piercing law controls because Jurisdictional Defendants failed to raise such argument earlier, the Court finds judicial estoppel inapplicable. *See Anadarko Petroleum Corp. v. Alternative Environmental Solutions, Inc.*, No. 25-20059, 2026 WL 590148, at *3 (5th Cir. Mar. 3, 2026) ("'Judicial estoppel has three elements: (1) The party against whom it is sought has asserted a legal position that is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently.'" (quoting *In re Flugence*, 738 F.3d 126, 129 (5th Cir. 2013))).

Under Wyoming law, the minimum contacts of one entity may be imputed to another entity in limited circumstances, such as "where it is apparent that the parent abused the corporate form and acted in disregard of corporate separateness."[119] "The concept of piercing the corporate veil is a judicially created remedy for situations where corporations have not been operated as separate entities as contemplated by statute and, therefore, are not entitled to be treated as such. The determination of whether the doctrine applies centers on whether there is an element of injustice, fundamental unfairness, or inequity."[120] The Wyoming Supreme Court considers the following factors in determining whether to pierce a corporation's veil under Wyoming law:

> commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation

---

[119] *See Rizas v. Vail Resorts, Inc.*, Case No. 08–CV–139–J, 2009 WL 10664835, at *6 (D. Wyo. June 16, 2009).

[120] *Kaycee Land and Livestock v. Flahive*, 46 P.3d 323, 326 (Wyo. 2002)(citation modified).

by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity.[121]

Pertaining to limited liability companies, however, the Wyoming Supreme Court has enumerated the following two-part veil-piercing test pursuant to the 2010 Wyoming Limited Liability Company Act:

(1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity.[122]

If these two elements are met, Wyoming courts may elect to pierce a limited liability company veil.[123] In determining whether this two-part veil-piercing test is met, courts turn to Wyoming Statute § 17-29-304, which provides in pertinent part:

(c) For purposes of imposing liability on any member or manager of a limited liability company for the debts, obligations or other liabilities of the company, a court shall consider only the following factors no one (1) of which, except fraud, is sufficient to impose liability:

(i) Fraud;

(ii) Inadequate capitalization;

(iii) Failure to observe company formalities as required by law; and

---

[121] *Id.* at 325 (citation modified).
[122] *Mantle v. North Star Energy & Construction LLC*, 2019 WY 29, ¶ 127, 437 P.3d 758, 799 (Wyo. 2019)(quoting *GreenHunter Energy, Inc. v. Western Ecosytems Technology, Inc.*, 2014 WY 144, ¶ 27, 337 P.3d 454, 462 (Wyo. 2014)).
[123] *Id.*

(iv) Intermingling of assets, business operations and finances of the company and the members to such an extent that there is no distinction between them.

(d) In any analysis conducted under subsection (c) of this section, a court shall not consider factors intrinsic to the character and operation of a limited liability company, whether a single or multiple member limited liability company. Factors intrinsic to the character and operation of a limited liability company include but are not limited to:

(i) The ability to elect treatment as a disregarded or pass-through entity for tax purposes;

(ii) Flexible operation or organization including the failure to observe any particular formality relating to the exercise of the company's powers or management of its activities;

(iii) The exercise of ownership, influence and governance by a member or manager;

(iv) The protection of members' and managers' personal assets from the obligations and acts of the limited liability company.[124]

Further, a "limited liability company's 'operation is intended to be much more flexible than a corporation's.'"[125] Applying the above principles and veil-piercing factors, the Court addresses each Defendant in turn.[126]

---

[124] WYO. STAT. ANN. § 17-29-304(c)-(d); *see also GreenHunter Energy, Inc.*, 2014 WY 144, ¶¶ 27–37, 337 P.3d at 463–64.

[125] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 19, 337 P.3d at 461 (quoting *Kaycee*, 46 P.3d at 328).

[126] To the extent Moller suggests that it is problematic that Defendants are represented by a single law firm, the Court finds no credence in such argument. R. Doc. 130 at p. 12 n.6. The Court is confident that counsel for both sides are following their jurisdiction's Model Rules of Professional Conduct. Further, insofar as Moller argues that Defendants have "intentionally incorporated themselves in Wyoming[]" to partake in corporate fraud and avoid liability, the Court is unpersuaded. R. Doc. 132-1 at p. 23. As aptly pointed out by Jurisdictional Defendants, "[c]ourts must be mindful of how limited liability companies are commonly operated in Wyoming, as they cannot ignore the realities of the marketplace. Because of the flexibility and decentralized management allowed by this innovative business entity, entrepreneurs find it attractive for small start-ups, and in many cases these legitimately do not require more than a single member with little capital. The limited liability company can be used for a variety of businesses with lawful purposes, from a member whose only assets are herded across the Wyoming prairie to one that is publicly traded and operates around the world." *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 35, 337 P.3d at 464; *see* R. Doc. 143 at p. 13. Finally, as to Moller's suggestion that some of the Defendants' involvement in other lawsuits demonstrates those

*1.    Martian Sales, Inc.*

Jurisdictional Defendants assert that piercing Martian Sales, Inc.'s ("Martian Sales") corporate veil is unwarranted.[127] In support,[128] Jurisdictional Defendants provide an affidavit of Mark Reilly, owner of Martian Sales, who attests to the following:

> 10.  Martian Sales is not affiliated with, owned by, or under common control with any other Defendant, whether through subsidiaries, parent companies, or otherwise.
>
> 11.  Martian Sales does not have common offices, common property, common accounting systems, common directors and officers, or common employees with any other Defendant.
>
> 12.  Martian Sales does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant.
>
> 13.   Martian Sales exerts no authority over the internal business operations or daily operations of any other Defendant.[129]

Moller, in contrast, sets forth three grounds for piercing the corporate veil as to Martian Sales: commingling of funds; fraudulent representations in this suit; and a shared online presence with JOpen.[130] As to the commingling of funds, Moller contends that "there is clear of commingling of funds" because "JOpen and Martian Sales operated for almost ten years without a single written agreement, while JOpen effectively funded Martian Sales' entire operation."[131] Moller explains that JOpen

---

Defendants' secretive tactics and abuse of corporate formalities, the Court reminds counsel that "[t]he mere filing of a lawsuit does not demonstrate that a defendant has broken the law[.]" *Jones v. Nueces County, Tex.*, 589 Fed. Appx. 682, 688 (5th Cir. 2014).

[127] R. Doc. 122-1 at p. 14

[128] R. Doc. 122-1 at p. 4.

[129] R. Doc. 122-7 at p. 3.

[130] R. Doc. 132-1 at pp. 19–27.

[131] *Id.* at p. 19.

pays for Martian Sales' manufacturing costs and offers donations on behalf of Martian Sales to the American Kratom Association ("AKA").[132] In sum, Moller contends that "JOpen is not only paying for Martian's bills, but is directed to pay whatever operational costs arise throughout the entire stream of commerce for OPMS kratom and for non-OPMS production work, such as lobbying by the AKA."[133]

Regarding fraudulent representations, Moller claims that Martian Sales entered into an Intellectual Property Agreement[134] with an Indonesian company in 2014 and has purposefully mischaracterized its Intellectual Property Agreement in prior lawsuits "to support the false claim that it is not involved in the manufacture and distribution of OPMS kratom[,]" when in fact it is a supply agreement.[135] According to Moller, Martian Sales "has not hesitated to perpetuate fraud on a court and on a harmed plaintiff. It has now admitted that prior representations in litigation were false. Martian is not credible, and it is clear its action is part of a broader fraudulent effort to avoid liability."[136]

Lastly, Moller asserts that Martian Sales' shared online presence with JOpen evinces a relationship in which Martian Sales and JOpen "are effectively one and the same, as Martian truly does nothing of substance in furtherance of the production and sale of OPMS kratom."[137] According to Moller, Martian Sales owns

---

[132] *Id.* at p. 20–21.
[133] *Id.* at p. 21.
[134] R. Doc. 132-12.
[135] R. Doc. 132-1 at p. 25.
[136] *Id.*
[137] *Id.* at p. 26.

OPMSkratom.com, but JOpen only has access to the website and actively manages the website.[138]

Jurisdictional Defendants, in Reply, assert that Martian Sales has not engaged in commingling of funds with JOpen, as "the record is clear that JOpen and Martian Sales have at all times had a [distinct], contractual relationship that governs both scope of work and payment."[139] As further explained by Jurisdictional Defendants:

> Prior to the memorialization of their agreement in 2020, Martian Sales and JOpen had a task based compensation structure. JOpen and Martian Sales then entered into a Distribution Agreement, through which JOpen paid, and continues to pay, Martian Sales a flat fee. As stated fully in the testimony, JOpen at times pays bills on Martian Sales' behalf upon receiving revenue from sales. This in no way constitutes a "commingling of funds" or abuse of corporate formalities.[140]

Regarding Martian Sales' alleged fraudulent representation of its Intellectual Property Agreement, Jurisdictional Defendants contend that "[e]verything in the record, including the relevant agreements and testimony relied on by Plaintiff, confirms that Martian Sales contracts with other entities to do the manufacture and distribution of kratom products that use its trademark . . . It has made no 'fraudulent representation' in so stating."[141] Lastly, as to Martian Sales' alleged impermissible shared online presence with JOpen, Jurisdictional Defendants aver that there is nothing improper with JOpen managing the OPMS kratom website, as "JOpen is required to do so under the arms-length governing agreement."[142]

---

[138] *Id.*
[139] R. Doc. 143 at p. 11.
[140] *Id.* (citation modified).
[141] *Id.* at p. 14 (citing R. Doc. 132-17).
[142] *Id.* at p. 15; *see* R. Doc. 132-47 (SEALED).

The Court finds that Moller fails to establish a *prima facie* case for piercing the corporate veil of Martian Sales, a Wyoming corporation with its principal place of business in Wyoming,[143] on the three grounds asserted. First, as to the commingling of funds, the record reflects that Martian Sales initially possessed a task-based compensation structure with JOpen and subsequently entered into contract processing agreements and distribution agreements with other Jurisdictional Defendants, including but not limited to JOpen.[144]  It is axiomatic that merely contracting with a company is not grounds for piercing the corporate veil. And to hold otherwise would lead to a result *ad absurdum*. The Court considers JOpen's compensation to Martian Sales not "to be commingling of funds[,] but an arm's length transaction[,]"[145] as both parties have competing economic interests under the task-based compensation structure agreement and distribution agreement.[146]

Nor does the Court make any finding that Martian Sales has made a "fraudulent representation" of its Intellectual Property Agreement. Under Wyoming law, "the elements of a claim for relief for fraud are a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action, and the plaintiff must reasonably believe the representation to be true."[147] And "fraud will not be imputed to any party

---

[143] R. Doc. 132-2 at pp. 2–3 (citing R. Doc. 49 at p. 2).
[144] *See* R. Doc. 132-47 (SEALED).
[145] *Kloefkorn-Ballard Const. and Development, Inc. v. North Big Horn Hosp. Dist.*, 683 P.2d 656, 661 (Wyo. 1984).
[146] *See* R. Doc. 132-47 (SEALED).
[147] *White v. Shane Edeburn Const., LLC*,  2012 WY 118, ¶ 26, 285 P.3d 949, 957 (Wyo. 2012)(citation modified).

when the facts and circumstances out of which it is alleged to arise are consistent with honesty and purity of intention."[148]

Here, Moller merely alleges that Martian Sales' characterization of its Intellectual Property Agreement shows that "Martian is not credible, and it is clear its action is part of a broader fraudulent effort to avoid liability."[149] Moller does not allege to what damage she has suffered a result of Martian Sales' characterization of its Intellectual Property Agreement. Instead, Plaintiff only advises that the Intellectual Property Agreement "makes no reference to supplying raw kratom to Martian."[150]    Further, Moller neither address what action Martian Sales was attempting to induce from its characterization, nor does Moller address whether she believed Martian Sales' characterization to be true. In sum, Martian Sales' characterization of its Intellectual Property Agreement in prior lawsuits, at this stage, is irrelevant to this Motion to Dismiss and does not provide a basis to pierce Martian Sales' veil. Because "[f]raud must be established by clear, unequivocal and convincing evidence, and will never be presumed[,]" the Court determines that the record is void of evidence proving Martian Sales has committed fraud.[151]

Finally, JOpen's active management of the OPMS Kratom website, pursuant to Article II of the Distribution Agreement between Martian Sales and JOpen, does not support piercing Martian Sales' veil.[152] Martian Sales and JOpen's Distribution

---

[148] *Id.* (citation modified).
[149] R. Doc. 132-1 at p. 25.
[150] *Id.*
[151] *Shane Edeburn Const., LLC*, 2012 WY 118, ¶ 26, 285 P.3d at 957 (internal quotation marks removed).
[152] R. Doc. 132-47 (SEALED).

Agreement is an arm's length agreement in which the parties contracted for JOpen to manage the website on behalf of Martian Sales. The Court refuses to disturb the parties' freedom to contract for any lawful and mutual beneficial purpose, such as operating a website.[153]

For the reasons set forth above, the Court declines to pierce Martian Sales' veil and impute JOpen's minimum contacts upon it.[154] Martian Sales is not subject to specific personal jurisdiction under a veil-piercing theory.

### 2. *LP, Ind., LLC*

Jurisdictional Defendants argue that JOpen's minimum contacts cannot be imputed upon LP, IND., LLC ("LP") through piercing its veil.[155] Jurisdictional

---

[153] *See Oliver v. Quynn*, 2013 WY 70, ¶ 27, 303 P.3d 1119, 1128 (Wyo. 2013) ") ("[W]e are more disposed to sustain an agreement in restraint of trade when it is between two businesses . . . We do 'not lightly interfere with the freedom of contract between parties.'" (quoting *Pennant Serv. Co. v. True Oil Co., LLC,* 2011 WY 40, ¶ 30, 249 P.3d 698, 710 (Wyo. 2011))).

[154] Insofar as Moller argues that JOpen's corporate veil should be pierced, the Court declines to do so for identical reasons as Martian Sales. As advised by Jurisdictional Defendants, "JOpen does not interact or coordinate with any other named Defendant regarding the marketing, distribution, or sale of kratom products. David Gabbay is the manager of JOpen. JOpen is not affiliated with, owned by, or under common control with any other Defendant, whether through subsidiaries, parent companies, or otherwise. JOpen is adequately capitalized and observes all corporate formalities as a Texas-based company. JOpen does not have common offices, common property, common accounting systems, common directors and officers, or common employees with any other Defendant. JOpen does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant. JOpen exerts no authority over the internal business operations or daily operations of any other Defendant." R. Doc. 122-1 at pp. 3–4 (citation modified). Such factors are consistent with Texas law, which applies to JOpen as a Texas LLC. *See* R. Doc. 100 at p. 2; *see also Plan B Holdings, LLC. V. RSLLP*, 681 S.W.3d 443, 458 (Tex. Ct. App. 2023)(finding that piercing the corporate veil of an LLC is warranted when a "holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on [a] obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate[]"). The record evinces no conduct of such nature as to JOpen or any Jurisdictional Defendant.

[155] R. Doc. 122-1 at p. 5.

Defendants provide the affidavit of LP's manager, Mark Jennings, in support of their claims.[156] Jennings attests to the following:

> 6. LP is adequately capitalized and observes all corporate formalities as a Wyoming company.
>
> 7. Defendants CAG and RMH are affiliates of LP that all operate separately.
>
> 8. LP does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.
>
> 9. LP does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant.
>
> 10. LP exerts no authority over the internal business operations or daily operations of any other Defendant.[157]

Moller, in turn, contends that LP intentionally lacks general liability and product liability insurance for her claims.[158] Therefore, according to Moller, "[t]his lack of insurance is a fundamental form of undercapitalization and breach of fiduciary duty."[159] In addition to undercapitalization allegations, Moller asserts that LP, CAG Holdings, LLC, and RMH Holdings, LLC, all operate "out of the same facility in Springfield Colorado[,]" and all are managed by Mark Jennings.[160] According to Moller, "[t]his overlap in office space and officers is another factor within the totality of the circumstances regarding a finding of veil piercing."[161]

---

[156] *Id.* (citing R. Doc. 122-11).
[157] R. Doc. 122-11 at pp. 2–3.
[158] R. Doc. 132-1 at p. 21.
[159] *Id.* at p. 22 (citing R. Doc. 132-38 at p. 3.).
[160] *Id.* at pp. 25–26.
[161] *Id.* at p. 26.

In Reply, Jurisdictional Defendants contend that Moller's allegations of LP's undercapitalization is without merit, as she offers no authority in support "for her contention that this is evidence of undercapitalization, let alone evidence sufficient to warrant veil-piercing."[162] And insofar as Moller alleges that veil-piercing is warranted based on the shared addresses and same management, Jurisdictional Defendants contend that such practice "is common for affiliated entities and in no way evinces improper corporate form."[163]

Moller fails to meet her *prima facie* burden of establishing that LP's veil should be pierced under Wyoming's two-prong veil-piercing test for limited liability companies. The record reflects that LP is a Wyoming limited liability company with FMK Group, Inc. as its sole member.[164] FMK Group, Inc. is a corporation incorporated in Wyoming with its principal place of business in Wyoming.[165] In determining whether the two-prong test is met, Wyoming courts consider various factors such as "fraud, inadequate capitalization, and the degree to which the business and finances of the company and the member are intermingled."[166]

Moller first asserts that LP has inadequate capitalization for its failure to have insurance covering Moller's claims.[167] "Undercapitalization is a factor to consider in LLC veil-piercing analysis, but the weight we give it depends on the degree of

---

[162] R. Doc. 143 at p. 12 (citing *Shoemaker v. Giacalone*, 34,809 (La. App. 2 Cir. 6/20/01), 793 So.2d 230, 234).

[163] *Id.* at p. 15 (citing authority).

[164] R. Doc. 132-2 at p. 4 (citing R. Doc. 49 at p. 2).

[165] *Id.* (citing R. Doc. 49 at p. 2).

[166] *Mantle*, 2019 WY 29, ¶ 127, 437 P.3d at 799.

[167] R. Doc. 132-1 at pp. 22–23.

undercapitalization and the reason for it."[168] Where an "LLC [is] continually undercapitalized by choice, [and] not by external forces[,]" there is a greater justification to pierce a limited liability company veil.[169] The Wyoming Supreme Court has stated that "evidence of the adequacy of insurance coverage," along with testimony concerning the amounts of insurance carried by comparable businesses, may be considered in analyzing whether undercapitalization exists.[170] But adequacy of insurance coverage is merely one factor in a complex undercapitalization analysis,[171] and undercapitalization is merely one factor in determining whether veil-piercing is warranted.[172] The Court finds that LP's failure to obtain liability insurance weighs, albeit slightly, in favor of piercing the limited liability company veil.

Second, Moller asserts that LP engages in an impermissible intermingling of business operations and finances.[173] The Wyoming Supreme Court has held that the following factors support a finding of intermingling:

> 1) the LLC used its member's accounting department and the same accountants managed the finances of both entities; (2) the entities had the same business address and creditors of the LLC mailed their invoices to the member's address for processing; (3) the LLC's tax returns were consolidated with the tax returns of the member; (4) the

---

[168] *Mantle*, 2019 WY 29, ¶ 128, 437 P.3d at 799.

[169] *Id.* (internal quotation marks omitted).

[170] *Atlas Const. Co. v. Slater*, 746 P.2d 352, 356 (Wyo. 1987).

[171] *See id.* ("Whatever the courts' requirements in terms of inadequacy of assets, courts must still consider many varying factors relevant to their deliberations.")(citation modified).

[172] *See, e.g., Ledford v. Keen*, 9 F.4th 335, 342 (5th Cir. 2021)("we agree with the district court that Ledford's evidence amounts to nothing more than evidence of undercapitalization, which is insufficient standing alone to support a veil-piercing theory under Texas law."). Although *Ledford* interprets Texas law, the Court finds such case nonetheless persuasive in its illustration of the variety of factors that must be analyzed when piercing the corporate veil because, Texas law, like Wyoming law, instructs courts to consider multiple factors in a veil-piercing analysis.

[173] R. Doc. 132-1 at pp. 25–26.

> LLC did not have any employees independent of the member and the member directly paid its employees for work done for the LLC; (5) the LLC had no revenue separate from the member; (6) the member manipulated the assets and liabilities such that the member reaped all benefits of the LLC's activities while the LLC was saddled with all losses and liabilities.[174]

Although LP concedes that it is an affiliate of Jurisdictional Defendants CAG Holdings, LLC and RMH Holdings, LLC, mere affiliate status is insufficient to warrant veil-piercing.[175] LP further clarifies, importantly, that it operates separately from both CAG Holdings, LLC and RMH Holdings, LLC.[176] Moller has failed to provide any evidence that there is "no distinction" between LP, CAG Holdings, LLC and RMH Holdings, LLC.[177]

Moreover, the fact that LP has the same manager as other Jurisdictional Defendants in Mark Jennings is not grounds for veil-piercing. Wyoming Statute § 17-29-304 provides that a court "shall not consider factors intrinsic to the character and operation of a limited liability company," including "[t]he exercise of ownership, influence and governance by a member or manager[.]" Thus, the Court is left with the fact that CAG Holdings, LLC, RMH Holdings, LLC, and LP all operate out of the same office in Colorado and the fact that LP does not have general liability insurance for Moller's claim in its veil-piercing analysis. "It bears repeating that limited liability is the rule, and piercing is the rare exception to be applied only in cases involving exceptional circumstances."[178] Plaintiff has failed to show that this is one of those

---

[174] *Mantle*, 2019 WY 29, ¶ 129, 437 P.3d at 799–800.
[175] R. Doc. 122-11.
[176] *Id.*
[177] *Id.*
[178] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 39, 337 P.2d at 465.

rare exceptions. The Court therefore declines to pierce LP's limited liability company veil.

### 3. CAG Holdings, LLC

Jurisdictional Defendants argue that the Court cannot impute JOpen's minimum contacts to CAG Holdings, LLC ("CAG") and thus CAG is not subject to specific personal jurisdiction by this Court.[179] Jurisdictional Defendants submit the affidavit of Mark Jennings, former manager of CAG, in support of their argument.[180] Jennings attests to the following:

> 4. CAG is no longer in operation, but formerly operated a manufacturing facility that processed industrial hemp, and had no involvement with kratom.
>
> 5. CAG has never done business in Louisiana.
>
> 6. CAG is adequately capitalized and observes all corporate formalities as a Wyoming company.
>
> 7. Defendants LP and RMH are affiliates of CAG that all operate separately.
>
> 8. CAG does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.
>
> 9. CAG does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant.
>
> 10. CAG exerts no authority over the internal business operations or daily operations of any other Defendant.[181]

---

[179] R. Doc. 122-1 at p. 6.
[180] *Id.*; R. Doc. 122-16.
[181] R. Doc. 122-16 at pp. 2–3.

Moller, in opposition, argues that CAG does not have any general liability insurance policies or product liability insurance policies associated with OPMS Kratom and therefore is intentionally undercapitalized.[182] Further, Moller asserts that because CAG, LP, and RMH Holdings, LLC are operated out of the same facility in Springfield, Colorado, the Court should pierce CAG's veil.[183] In Reply, Jurisdictional Defendants aver that CAG's shared office with other Jurisdictional Defendants is a common occurrence and does not evince improper corporate form.[184] Thus, according to Jurisdictional Defendants, the Court should not pierce CAG's limited liability company veil.[185]

Moller fails to provide any record evidence satisfying Wyoming's two-prong veil-piercing test for limited liability companies. The record indicates that CAG is a Wyoming limited liability company with FMK Group, Inc. as its sole member.[186] FMK Group, Inc. has its principal place of business in Wyoming and is incorporated in Wyoming.[187] Moller alleges that CAG is undercapitalized and engages in an impermissible intermingling of business operations with other Jurisdictional Defendants.[188] As to inadequate capitalization, the Wyoming Supreme Court has explained that "undercapitalization is a relative concept," in which "[s]ome businesses need a great deal of capital, others very little, and of course there are the

---

[182] R. Doc. 132-1 at p. 22 (citing R. Doc. 132-39).
[183] *Id.* at p. 26.
[184] R. Doc. 143 at p. 14.
[185] *Id.*
[186] R. Doc. 132-2 at p. 4 (citing R. Doc. 49 at p. 3).
[187] *Id.* (citing R. Doc. 49 at p. 3).
[188] R. Doc. 132-1 at pp. 22, 26.

in-betweens."[189] Regarding general liability insurance for injuries related to OPMS Kratom, CAG needed zero capital. CAG was never involved with any sort of kratom, and it is no longer in existence.[190] Therefore, "the weight to be given to this factor" is very low, as it contradicts the fundamental principles of business for CAG, as a processor of industrial hemp, to obtain general liability insurance policies for kratom related injuries.[191]

Further, pertaining to Moller's argument that CAG shares a common manager, Mark Jennings, with RMH, NUZA, Calibre, and LP, the Court reiterates that it is unable to consider Mark Jennings' role with CAG pursuant to Wyoming Statute § 17-29-304. Therefore, only one factor – common offices – weighs in favor of piercing CAG's veil. Plaintiff has failed to meet her *prima facie* burden of establishing personal jurisdiction, and the Court requires more evidence for such a drastic remedy, especially for a limited liability company.[192]

### 4. RMH Holdings, LLC

Jurisdictional Defendants claim that RMH Holdings, LLC ("RMH") is not subject to specific personal jurisdiction in this Court under a veil-piercing theory.[193] In support of its Motion, Jurisdictional Defendants submit the affidavit of Mark Jennings, who also serves as the manager of RMH,[194] who declares to the following:

---

[189] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 32, 337 P.3d at 463–64.
[190] R. Doc. 122-16.
[191] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 32, 337 P.3d at 463.
[192] *See GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 20, 337 P.3d at 461 ("A limited liability company's 'operation is intended to be much more flexible than a corporation's.'" (quoting *Kayce Land and Livestock*, 46 P.3d at 328)).
[193] R. Doc. 122-1 at p. 14.
[194] R. Doc. 122-1 at p. 6 (citing R. Doc. 122-19).

4. RMH operates a manufacturing facility that processes industrial hemp, and has no involvement with kratom.

5. RMH has never done business in Louisiana.

6. RMH is adequately capitalized and observes all corporate formalities as a Wyoming company.

7. Defendants LP and CAG are affiliates of RMH that all operate separately.

8. RMH does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.

9. RMH does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant.

10. RMH exerts no authority over the internal business operations or daily operations of any other Defendant.[195]

Moller, in turn, alleges that Jurisdictional Defendants are a single business enterprise that have collaborated to develop a nationwide kratom marketing and distributing campaign. According to Moller, this is evidenced through the sharing of common officers and directors between LP, CAG, and RMH.[196] Jurisdictional Defendants, in Reply, contend that the common offices and overlapping managers between LP, CAG, and RMH are common-practice, and thus the Court should not find specific personal jurisdiction against RMH under a veil-piercing theory.[197] The Court finds Jurisdictional Defendants' argument persuasive.

---

[195] R. Doc. 122-19 at pp. 2–3.
[196] R. Doc. 132-1 at pp. 25–26.
[197] R. Doc. 143 at pp. 14–15.

The evidence reflects that RMH is a Wyoming limited liability company with Western Wall Management, Inc. as it sole member.[198] Western Wall Management, Inc. is a corporation incorporated in Wyoming and with its principal place of business in Wyoming.[199] Identical to its analysis with CAG, the Court finds that RMH's lack of insurance for kratom related injuries bears no weight on its veil-piercing analysis, as the record evidence reflects that RMH has no involvement with kratom as an industrial hemp processor.[200] Further, also explained above, the fact that Mark Jennings is the manager of LP, CAG, and RMH is not to be considered in a limited liability company veil-piercing analysis under Wyoming law.[201] Thus, all the Court is left with is that RMH shares a common office with LP and CAG. Again, this is insufficient to pierce a limited liability company veil, and the Court thus does not have specific personal jurisdiction against RMH under any veil-piercing theory.

### 5.    *Johnson Foods, LLC*

Jurisdictional Defendants contend that there is no basis for exercising personal jurisdiction over Johnson Foods, LLC ("Johnson Foods") under a veil-piercing theory.[202] In particular, Jurisdictional Defendants offer an affidavit of Mark

---

[198] R. Doc. 132-2 at p. 4 (citing R. Doc. 49 at p. 3). The Court acknowledges that RMH has been listed as RMH Holdings, Inc. and RMH Holdings, LLC at different points throughout the record. *Compare* R. Doc. 49 at p. 3, ¶ 5 *and* R. Doc. 122-19 at p. 2, *with* R. Doc. 122-18 at p. 2. Regardless, the Court finds that the result would not change under either a corporate or limited liability company veil piercing analysis.

[199] R. Doc. 132-2 at p. 4 (citing R. Doc. 49 at p. 3).

[200] R. Doc. 122-19.

[201] WYO. STAT. ANN. § 17-29-304.

[202] R. Doc. 122-1 at p. 6.

Jennings, manager of Johnson Foods, in support of their Motion.[203] Jennings declares

to the following:

> 4. Johnson Foods had no common ownership or control with any other Defendant at any relevant time.
>
> 5. Johnson Foods has never marketed, distributed, or sold any kratom-containing products (or any other products) in Louisiana.
>
> 6. Johnson Foods has never done business in Louisiana.
>
> 7. Johnson Foods is adequately capitalized and observes all corporate formalities as a Wyoming company.
>
> 8. Johnson Foods does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.
>
> 9. Johnson Foods does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of any other Defendant.
>
> 10. Johnson Foods exerts no authority over the internal business operations or daily operations of any other Defendant.[204]

Moller, in turn, claims that Johnson Foods has commingled corporate and

shareholder funds and has failed to follow statutory formalities in transacting

business activities.[205] Specifically, Moller avers that Johnson Foods is fully funded

through Jurisdictional Defendants JOpen and David Gabbay, and claims that

Telescaph Inter Texas, LLC was formed by Gabbay to obtain "blind reports" on

marketing kratom internationally and is Johnson Food's sole client.[206] As further

explained by Moller:

---

[203] R. Doc. 143 at p. 5 (citing R. Doc. 122-22).
[204] R. Doc. 122-22 at pp. 2–3.
[205] R. Doc. 132-1 at p. 19.
[206] *Id.* at p. 21.

The facts indicate that Johnson Foods worked with Mr. Jennings with regards to Telescaph. Moreover, Johnson Foods' work has focused on submission of a New Dietary Ingredient Notification (NDIN) and advocacy work related to kratom. That NDIN is allegedly for Johnson Foos' [sic] own kratom brand, Mitravida. Of note, the NDIN was created through direct collaboration with Mr. Jennings and Mr. Palaio and other OPMS related entities such as NP Biotech and NP Pharma Holdings. Mr. Jennings, a former manager of Johnson Foods, and Mr. Palaio were instrumental in coordinating a clinical study for the NDIN in Canada. In sum, Johnson Foods has apparently done anything but the work its sole client, Telescaph Inter Texas, contracted it to do. There is no reasonable business explanation for why Telescaph would fund Johnson Foods to engage in the business it has done. The only logical inference is that Mr. Gabbay wanted a "blind" funder of Johnson Foods to assist it in submission of an NDIN and advocacy work that would benefit JOpen and the broader OPMS enterprise.[207]

As a final point, Moller takes issue with Johnson Foods' financial statements.[208] Moller specifically contends that Johnson Foods' 2022 tax return is irreconcilable with its 2023 profit and loss statement.[209] She further argues that "Johnson Foods' 2023 profit and loss statement [] indicates involvement with product sales to the extent it notes $26,198 of 'Raw Materials' under Costs of Good Sold. Notably that entry contradicts the 2023 Form 1120S which shows no purchases during the years and lists only $715,591 in 'Consulting Costs.' The balance sheet further indicates no inventory at the beginning and end of the tax year."[210] And the "'Consulting Costs,' which must be associated to Johnson Foods work for its only client, Telescaph Inter Texas, LLC, includes costs for 'Advocacy,' advertising and marketing, consulting costs, raw material purchases, and legal and professional services, which do not

---

[207] *Id.* at pp. 21–22.
[208] R. Doc. 132-2 at p. 9.
[209] *Id.* at pp. 9 –10.
[210] *Id.* at p. 10 (citing R. Docs. 132-35 and 132-36).

logically or clearly connect to work done for Telescaph."[211] Thus, according to Moller, the limited liability company veil should be pierced as to Johnson Foods.[212]

In Reply, Jurisdictional Defendants claim that Moller's allegations that Telescaph Inter Texas, LLC must be paying Johnson Foods for advocacy work benefiting JOpen and other Jurisdictional Defendants is without merit.[213] Jurisdictional Defendants specifically point to the Rule 30(b)(6) deposition of Johnson Foods' corporate representative, who testified that "Johnson Foods has done a variety of work for Telescaph including market research, the development of a go-to-market plan, and concept testing."[214] According to Jurisdictional Defendants, "[t]here is nothing in the record to support Plaintiff's contention of any improper commingling of funds with respect to Johnson Foods."[215] The Court, again, agrees.

Plaintiff does not establish a *prima facie* case for exercising personal jurisdiction under Wyoming's veil-piercing test. Based on evidence in the record, Johnson Foods is a Wyoming limited liability company with Alexander Cohen as its sole member.[216] Cohen is a resident of Georgia.[217] Moller alleges that Johnson Foods has inadequate capitalization as evidenced by its financial statements and engages in intermingling of business operations with other Jurisdictional Defendants through

---

[211] *Id.* (citing R. Docs. 132-35 and 132-36).

[212] R. Doc. 132-1 at pp. 21–22.

[213] R. Doc. 143 at p. 12.

[214] *Id.*

[215] *Id.*

[216] R. Doc. 132-2 at p. 3 (citing R. Doc. 47).

[217] *Id.* (citing R. Doc. 47). Although Johnson Foods is a citizen of Georgia for purposes of diversity of citizenship, it does not change the Court's application of Wyoming law to its veil-piercing analysis as Johnson Foods was formed in Wyoming. *See Louisiana Newpack Shrimp, Inc.*, 2021 WL 516631, at *7 n.81.

shared offices.[218] The Court acknowledges that Johnson Food's failure to maintain general liability of product liability insurance for its OPMS Kratom products is one factor that weighs in favor of piercing its limited liability company veil. But Johnson Foods' lack of insurance is not the only consideration in an undercapitalization analysis.

"In determining whether a limited liability company is undercapitalized, courts must compare the amount of capital to the amount of business to be conducted and the obligations which must be satisfied."[219] In analyzing Johnson Food's financial statements, the Court finds that Johnson Foods is not undercapitalized. Although Johnson Food's Profit and Loss Statement for the period beginning in January 2023 and ending in December 2023 demonstrates a net loss for that period, it is not clearly saddled with losses.[220] There is no record evidence that there is routinely no money in its operating account or frequently receives money transfers from its member Alexander Cohen.[221] Put differently, it does not appear that "the LLC was continually undercapitalized by choice," and it is possible that Johnson Foods could be operating a net loss due to market factors.[222] Moller's conclusory allegations regarding the intent of certain line items in Johnson Foods' financial statements,[223] without more,

---

[218] R. Doc. 132-1 at pp. 20–23.

[219] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 32, 337 P.3d at 463.

[220] R. Doc. 132-36 at p. 3.

[221] *Mantle*, 2019 WY 29, ¶ 127, 437 P.3d at 799 ("In *GreenHunter*, we found the LLC was undercapitalized because when the plaintiff's invoices were submitted to the LLC, it often had no money in its operating account, and . . . it received periodic money transfers from its member, which decided how much money would be transferred to the LLC to pay specific bills it decided to pay, and when.")(citation modified).

[222] *Id.*

[223] *See* R. Doc. 132-2 at pp. 9–10.

does not warrant a finding of undercapitalization. And even assuming *arguendo* that the Court found that Johnson Foods was undercapitalized pursuant to its lack of insurance and financial statements, undercapitalization alone is insufficient to impose liability through veil-piercing.[224]

Further, Mark Jennings' role as manager of Johnson Foods and other Jurisdictional Defendants cannot support piercing a limited liability company veil.[225] The same can be said for Plaintiff's argument that Johnson Foods' veil should be pierced because "Palaio's family [sic] are the beneficiaries of a trust that owns Johnson Foods" and Palaio "acts as an 'advisor' to Johnson Foods."[226] Moreover, Moller's conclusory allegations that "[t]here is no reasonable business explanation for why Telescaph would fund Johnson Foods to engage in the business it has done[,] [and] [that] [t]he only logical inference is that Mr. Gabbay wanted a 'blind' funder of Johnson Foods to assist it in submission of an NDIN and advocacy work that would benefit JOpen and the broader OPMS enterprise[]" have been refuted by Jurisdictional Defendants.[227]

Johnson Foods' corporate representative testified that he conducted a wide range of services for Telescaph, Inc., including analyzing economic, market, and consumer data pertaining to COVID-19 and conducting supply chain analyses and concept testing.[228] Such work was partially "related to kratom, but in general it was

---

[224] *See* WYO. STAT. ANN. § 17-29-304.
[225] *See id.*
[226] R. Doc. 226 at p. 2.
[227] R. Doc. 132-1 at p. 22.
[228] R. Doc. 143-2 at pp. 8–10.

related to supplements at large[.]"[229] Plaintiff has failed to provide evidence to rebut this testimony. The fact that Johnson Foods and Telescaph, Inc. have a contractual business relationship does not provide a basis to pierce Johnson Foods' limited liability company veil. Overall, the Court is only left with the fact that Johnson Foods' may be potentially undercapitalized. Undercapitalization alone, however, is insufficient to pierce the veil under Wyoming law. Therefore, the Court declines to pierce Johnson Foods' veil.

### 6.    *Nuza, LLC*

Jurisdictional Defendants aver that the Court cannot exercise specific personal jurisdiction over Nuza, LLC ("Nuza") by imputing JOpen's minimum contacts to Nuza through veil-piercing.[230] In support of its argument, Jurisdictional Defendants provide an affidavit of Mark Jennings, also a manager at Nuza, who attests to the following facts, in pertinent part:

4. Nuza is a logistics company that assists in sourcing and transporting kratom from the manufacturer to the distributor.

5. Nuza does not distribute, sell, design, manufacture, or market kratom products in Louisiana.

6. Nuza has never done business in Louisiana.

7. Nuza is adequately capitalized and observes all corporate formalities as a Wyoming company.

8. Nuza does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.

---

[229] *Id.* at p. 11.
[230] R. Doc. 122-1 at p. 6.

9. Nuza does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant and does not utilize the services of any employee of any other Defendant.

10. Nuza exerts no authority over the internal business operations or daily operations of any other Defendant.[231]

Moller, however, contends that Nuza is an alter ego of other Jurisdictional Defendants as a part of a "single business enterprise through a secretive web of affiliates, individuals, shell companies, alter egos, business names, assumed names, and/or trade names[.]"[232] In Reply, Jurisdictional Defendants state that Moller has failed to analyze any veil-piercing factor under Wyoming law, and therefore, personal jurisdiction does not exist over Nuza.[233] The Court agrees with Jurisdictional Defendants.

The record reflects that Nuza is Wyoming limited liability company with Amitol, LLC as its sole member.[234] Amitol, LLC is a limited liability company formed in Wyoming, and Western Wall Management, Inc. is the sole member of Amitol, LLC.[235] Western Wall Management, Inc. is a corporation organized under the laws of Wyoming and has its principal place of business in Wyoming.[236]

Similar to her arguments as to other Jurisdictional Defendants, Moller fails to meet her burden because she provides mere conclusive allegations without addressing any factors as to why veil-piercing is warranted. Moller has not

---

[231] R. Doc. 122-23 at pp. 2–3.
[232] R. Doc. 100 at p. 9.
[233] R. Doc. 148.
[234] R. Doc. 132-2 at p. 4 (citing R. Doc. 124 at p. 2).
[235] *Id.* (citing R. Doc. 124 at p. 2).
[236] *Id.* (citing R. Doc. 124 at p. 2).

controverted any of Jurisdictional Defendants' allegations, nor does the record provide any evidence to the contrary. As already explained, Mark Jennings' role as a manager for various Jurisdictional Defendants may not be considered in a limited liability company veil-piercing analysis.[237] Further, Nuza's role as a logistics company that sources and transports kratom from the manufacturer to the distributor is not grounds for veil-piercing. In fact, Nuza's role as an effective middleman between kratom manufacturers and distributors further magnifies the independent nature of Nuza compared to other Jurisdictional Defendants. Because Plaintiff has failed to set forth a *prima facie* case to establish personal jurisdiction, the Court declines to impute JOpen's minimum contacts to that of Nuza and finds that it lacks specific personal jurisdiction over Nuza pursuant to a veil-piercing theory.

### 7.    *Calibre Manufacturing, LLC*

Jurisdictional Defendants claim that Moller is unable to impute JOpen's minimum contacts to Calibre Manufacturing, LLC ("Calibre") under a veil-piercing theory.[238] In support of their assertion, Jurisdictional Defendants provide another affidavit from Mark Jennings, this time pertaining to Calibre.[239] Jennings, who is also a manager at Calibre, attests to the following facts, in pertinent part:

> 4. Calibre is a kratom manufacturer that puts kratom powder into capsules and liquids.
>
> 5. Calibre then sends the bulk kratom product to JOpen in Texas for packaging and distribution.

---

[237] *See* WYO. STAT. ANN. § 17-29-304.

[238] R. Doc. 122-1 at p. 6.

[239] R. Doc. 122-24.

6. Calibre does not distribute, sell, design, manufacture, or market kratom products in Louisiana.

7. Calibre has never done business in Louisiana.

8. Calibre is adequately capitalized and observes all corporate formalities as a Wyoming company.

9. Calibre does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.

10. Calibre does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant and does not utilize the services of any employee of any other Defendant.

11. Calibre exerts no authority over the internal business operations or daily operations of any other Defendant.[240]

Moller disagrees and argues that veil-piercing is warranted because Mark Jennings manages various Jurisdictional Defendants, including Calibre.[241] In Reply, Jurisdictional Defendants maintain that Moller's failure to address any factors of a veil-piercing analysis precludes imputing JOpen's minimum contacts to Calibre under a veil-piercing theory.[242] The Court, again, agrees.

Moller fails to satisfy the two-part veil-piercing test enumerated by the Wyoming Supreme Court. The record demonstrates that Calibre is a limited liability company formed in Wyoming, and Estoral, LLC is its sole member.[243] Estoral, LLC's

---

[240] *Id.* at pp. 2–3.
[241] R. Doc. 132-1 at p. 26.
[242] R. Doc. 148.
[243] R. Doc. 132-2 at p. 4 (citing R. Doc. 124 at p. 3).

sole member is Western Wall Management, Inc., which is a corporation incorporated in Wyoming with its principal place of business in Wyoming.[244]

Moller only alleges that there is an impermissible intermingling of business operations between Calibre and other Jurisdictional Defendants.[245] Again, Jennings' role as a manager at Calibre does not bear any weight on a limited liability company veil-piercing analysis.[246] Thus, Moller does not properly raise any issues of fraud, inadequate capitalization, or intermingling that would support piercing a limited liability company veil under Wyoming law.  Merely contracting with another company, as Moller suggests,[247] is insufficient to support the assertion that Calibre is an alter ego of other named Jurisdictional Defendants. If such argument was correct, all companies in privity of contract would be considered as the same entity for a veil-piercing analysis – an *ad absurdum* result the Court refuses to adopt. The Court therefore declines to impute JOpen's contacts upon Calibre and finds that Plaintiff has failed to establish a *prima facie* case of personal jurisdiction.

  *8.    FMK Group, Inc.*

Jurisdictional Defendants argue that Moller is unable to impute JOpen's minimum contacts to FMK Group, Inc. ("FMK"), as Moller merely states that she owns or co-owns "a trademark associated to the Olistica brand, which is a surrogate for the OPMS kratom brand[.]"[248] In support of their argument, Jurisdictional

---

[244] *Id.* (citing R. Doc. 124 at p. 3).
[245] R. Doc. 132-1 at p. 26.
[246] *See* WYO. STAT. ANN. § 17-29-304.
[247] R. Doc. 130-2 at p. 5 ("Martian Sales states that at or around the incident date alleged, Martian Sales contracted with the following kratom manufactures [sic] . . . Calibre . . . .")(citation modified).
[248] R. Doc. 122-1 at p. 8 (citation modified).

Defendants submit the affidavit of Mark Jennings.[249] Jennings attests to the following:

> 4. FMK does not distribute, sell, design, manufacture, or market kratom products in Louisiana or anywhere.
>
> 5. FMK has never done business in Louisiana.
>
> 6. FMK is adequately capitalized and observes all corporate formalities as a Wyoming company.
>
> 7. FMK does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.
>
> 8. FMK does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant and does not utilize the services of any employee of any other Defendant.
>
> 9. FMK exerts no authority over the internal business operations or daily operations of any other Defendant.[250]

Moller disagrees and argues that FMK is a part of a secret web of alter egos with JOpen[251] that sells kratom to Louisiana residents because it, like other Jurisdictional Defendants, is managed by Mark Jennings and shares the same address as CAG, RMH, LP, and FMK.[252]  In Reply, Jurisdictional Defendants contend that "to the extent some Defendants have a shared officer or address, that is common for affiliated entities and in no way evinces improper corporate form."[253]

---

[249] R. Doc. 122-25.
[250] R. Doc. 122-25 at pp. 2–3.
[251] R. Doc. 100 at p. 9.
[252] R. Doc. 130-2 at p. 6. In her Complaint, Moller avers that "FMK is one of the many alter egos and shell companies involved in OPMS kratom." R. Doc. 100 at p. 16.
[253] R. Doc. 143 at p. 14.

Moller has not satisfied its *prima facie* burden of establishing that piercing FMK's corporate veil is warranted under Wyoming law. The record reflects FMK is a corporation incorporated in Wyoming with its principal place of business in Wyoming.[254]

Owning or co-owning a trademark for a brand associated with multiple Jurisdictional Defendants does not warrant veil-piercing. Instead, Moller must show more to warrant such an extreme remedy, such as the failure to observe corporate formalities under Wyoming law.[255] But Moller does not. Although shared managers and offices between entities may slightly weigh in favor of piercing a corporate veil, this factor alone is insufficient to pierce the corporate veil. Lastly, and perhaps most importantly, as sworn to in the affidavit of Mark Jennings, FMK "has never been involved in the distribution, sale, design, manufacture or marketing of kratom, in Louisiana or anywhere."[256] Therefore, the Court finds that veil-piercing is unwarranted as to FMK.

### 9.    *PNW Holdings, LLC*

Jurisdictional Defendants claim that, like FMK, PNW Holdings, LLC ("PNW") "has never been involved in the distribution, sale, design, manufacture or marketing of kratom, in Louisiana or anywhere[,]"[257] and thus the Court should not impute the contacts of JOpen to PNW.[258] In further support of their argument, Jurisdictional

---

[254] R. Doc. 132-2 at p. 4 (citing R. Doc. 124 at p. 2).
[255] *Kaycee Land and Livestock v. Flahive*, 46 P.3d at 325.
[256] R. Doc. 122-1 at p. 8 (citing R. Doc. 122-25 at p. 2.).
[257] R. Doc. 122-1 at p. 8.
[258] *Id.*

Defendants submit the affidavit of Mark Jennings, who makes the following declaration:

> 4. PNW does not distribute, sell, design, manufacture, or market kratom products in Louisiana or anywhere.

> 5. PNW has never done business in Louisiana.

> 6. PNW is adequately capitalized and observes all corporate formalities as a Wyoming company.

> 7. PNW does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.

> 8. PNW does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant and does not utilize the services of any employee of any other Defendant.

> 9. PNW exerts no authority over the internal business operations or daily operations of any other Defendant.[259]

Moller, in contrast, contends that PNW, like CAG, RMH, LP, Calibre, Nuza, and FMK, are all managed by Mark Jennings and is therefore a part of the complex web of companies distributing katrom across the United States.[260] In Reply, Jurisdictional Defendants reiterate that it is common for affiliated entities to have a shared officer and thus "in no way evinces improper corporate form."[261]

Moller falls short of satisfying Wyoming's two-prong limited liability company veil-piercing test. The record indicates that PNW is a Wyoming limited liability company with FMK, a corporation incorporated in Wyoming and with its principal

---

[259] R. Doc. 122-26 at pp. 2–3.
[260] R. Doc. 130 at p. 11; R. Doc. 130-2 at p. 6.
[261] R. Doc. 143 at p. 14.

place of business in Wyoming, as its sole member.[262] The only allegations Moller advances are that the fact that Mark Jennings is the manager of PNW and other Jurisdictional Defendants and that PNW co-owns the trademark associated with the Olistica brand.[263] Jurisdictional Defendants, however, provide that PNW is "adequately capitalized and observes all corporate formalities as a Wyoming company. PNW does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant; and does not utilize the services of any employee of JOpen or Martian Sales. PNW exerts no authority over the internal business operations or daily operations of any other Defendant."[264]

Again, Mark Jennings' role as a manager of PNW bears no weight in the veil-piercing analysis of a limited liability company.[265] Further, merely co-owning a trademark with FMK that is associated with other Jurisdictional Defendants is not the type of "certain extraordinary circumstances" warranting piercing a limited liability company veil.[266] The Court therefore declines to do so.

### 10.   CC US Holdings, LLC

Jurisdictional Defendants allege that there is no basis in the record for the Court to impute JOpen's minimum contacts upon CC US Holdings, LLC ("CC US"), as Moller only claims that CC US provides administrative services as to other

---

[262] R. Doc. 132-2 at p. 4 (citing R. Doc. 124 at p. 2).
[263] R. Doc. 132-44 at p. 19.
[264] R. Doc. 122-1 at pp. 8–9.
[265] WYO. STAT. ANN. § 17-29-304.
[266] *GreenHunter Energy, Inc.*, 2014 WY 144, ¶ 26, 337 P.3d at 462 (stating that the 2010 Wyoming Limited Liability Company Act allows "a limited liability company's veil to be pierced under certain extraordinary circumstances[]").

Jurisdictional Defendants.[267] Again in support, Jurisdictional Defendants provide an affidavit from Mark Jennings.[268] Jennings attests to the following:

> 3. CC US Holdings is a Wyoming limited liability company, which provides management and accounting services for LP, CAG, RMH, and a number of other companies.
>
> 4. CC US Holdings does not distribute, sell, design, manufacture, or market kratom products in Louisiana or anywhere.
>
> 5. CC US Holdings has never done business in Louisiana.
>
> 6. CC US Holdings is adequately capitalized and observes all corporate formalities as a Wyoming company.
>
> 7. CC US Holdings does not have common offices, common property, common accounting systems, common directors and officers, or common employees with JOpen or Martian Sales.
>
> 8. CC Holdings does not finance any other Defendant; does not pay the salaries, expenses or losses of any other Defendant and does not utilize the services of any employee of any other Defendant.
>
> 9. CC US Holdings exerts no authority over the internal business operations or daily operations of any other Defendant.[269]

Moller counters that because CC US provides "IT, HR, and accounting services for various OPMS Defendants[,]"[270] it "is effectively a management entity for the OPMS supply and manufacturing chain, covering accounting, administration, and management[]" and therefore its corporate veil should be pierced.[271] Jurisdictional Defendants, in Reply, contend that "CC US Holdings' provision of accounting and

---

[267] R. Doc. 122-1 at p. 9.
[268] *Id.* (citing R. Doc. 122-27).
[269] R. Doc. 122-27 at pp. 2–3.
[270] R. Doc. 130-2 at p. 6
[271] R. Doc. 132-1 at p. 22. Moller also contends that "CC US is a centralized management entity for LP, CAG, RMH, Calibre, Nuza, NP Pharma Holdings, LLC, and PWH, LLC, providing accounting, administration, and management services for those entities." R. Doc. 132-2 at p. 10.

management services for other companies is in no way evidence of commingling of funds or improper corporation formation. Moreover, none of these entities have affiliation with, or common control with, JOpen."[272]

Moller has failed to establish a *prima facie* case for veil-piercing under Wyoming law by simply alleging that there is an impermissible intermingling of business operations between CC US and other Jurisdictional Defendants. The record reflects that CC US is a limited liability company formed in Wyoming with FMK – a corporation incorporated in Wyoming and with its principal place of business in Wyoming – as its sole member.[273]

As an initial matter, even if proven, "[i]ntermingling of assets, business operations, and finances is also insufficient to justify piercing the veil standing alone."[274] Thus, CC US's providing of accounting and management services to various Jurisdictional Defendants does not warrant veil-piercing. The Wyoming Supreme Court has supported a finding of intermingling when an "LLC use[s] its member's accounting department and the same accountants manage[] the finances of both entities[.]"[275] The scenario before the Court, however, is distinguishable. CC US has one member, FMK.[276] There is no record evidence that CC US is using FMK's accounting department or accountants. Instead, CC US provides its own accounting services for various Jurisdictional Defendants, including FMK.[277]

---

[272] R. Doc. 143 at p. 11 n.5.

[273] R. Doc. 132-2 at p. 4 (citing R. Doc. 124 at p. 2).

[274] *Mantle*, 2019 WY 29, ¶ 129, 437 P.3d at 799.

[275] *Id.* at 799–800; see R. Doc. 132-1 at pp. 25–26.

[276] R. Doc. 132-2 at p. 4 (citing R. Doc. 124).

[277] *Id.* (citing R. Doc. 124).

Serving as a management entity for multiple companies, who are affiliates, is not evidence of any wrongdoing. Further, the fact that one company handles accounting services for multiple entities does not mean that the multiple entities have *shared* accounting.[278] And once again, Jurisdictional Defendants provide that CC US is adequately capitalized and observes all corporate formalities under Wyoming law.[279] Nor does the record reflect that CC US is "involved in the distribution, sale, design, manufacture or marketing of kratom, in Louisiana or anywhere."[280] Moller has failed to satisfy Wyoming's two-prong limited liability company veil-piercing analysis.

> 11. *Peyton Palaio, Mark Jennings, Mark Reilly, and David Gabbay*

Jurisdictional Defendants allege that Peyton Palaio ("Palaio"), Mark Jennings, Mark Reilly ("Reilly"), and David Gabbay ("Gabbay") should be dismissed because they have "never conducted any business in the state of Louisiana."[281] Moller counters that Palaio, Jennings, Reilly, and Gabbay "are the alter egos of the [Defendant] entities for jurisdictional purposes[,]" and therefore should be subject to personal jurisdiction in this Court.[282] In Reply, Jurisdictional Defendants assert that it is well-settled that exceptional circumstances must exist for an individual to be

---

[278] If this were true, then all clients of an accounting firm would be deemed to have shared accounting, providing one factor in favor of piercing the corporate veil. Such interpretation would lead to a result *ad absurdum*.

[279] R. Doc. 143-1 at p. 26–27.

[280] *Id.* at p. 26.

[281] R. Doc. 122-1 at pp. 9–10.

[282] R. Doc. 132 at p. 1.

held personally liable for the actions of corporate entities, and none exist here.[283] The Court agrees.[284]

"Certain business entities, such as corporations and LLCs, are separate and distinct from their owners[]" under Wyoming law.[285] "[T]his separateness of identity insulates the entity's owners from personal liability for the entity's obligations, liabilities, and debts.[286] Such protection from personal liability, however, does not extend to behavior bringing about injustice.[287] "To avoid injustice, the common law 'allowed courts to pierce the veil of limited liability' in exceptional circumstances."[288] Here, since the Court has already determined that piercing the veil as to Jurisdictional Defendants is unwarranted, the Court finds there is no legal basis to hold Palaio, Jennings, and Reilly personally liable for their actions under Wyoming law.

The same is true for Gabbay under Texas law.[289] JOpen consents to personal jurisdiction in this Court.[290] But since the Court has already found that there is no

---

[283] R. Doc. 143 at p. 16.

[284] Defendants also provide that "whether Plaintiff can assert causes of action against the individual Defendants as alter egos of the corporate Defendants they serve turns on the laws of corporation formation for those entities." R. Doc. 143 at p. 16. Defendants thus contend that for Palaio, Jennings, and Reilly, Wyoming law applies, and Texas law applies for Gabbay. The Court agrees. *See Energy Coal v. CITGO Petroleum Corporation*, 836 F.3d 457, 462 (5th Cir. 2016)("Louisiana courts look to the state of incorporation not just when deciding issues involving piercing, which as noted above is a close relative of the single business enterprise theory, but also when deciding more general questions of corporate structure."); *Soriano*, 2014 WL 949145, at *8 ("Because Gulf Coast is a Louisiana limited liability company, Louisiana law governs the Court's decision on piercing the corporate veil.").

[285] *Mantle*, 2019 WY 29, ¶ 126, 437 P.3d at 798 (citing *GreenHunter*, 2014 WY 144, ¶ 12, 337 P.3d at 459).

[286] *Id.* at 798–99.

[287] *Id.* at 799.

[288] *Id.* (quoting *GreenHunter*, 2019 WY 29, ¶ 126, 337 P.3d at 459).

[289] *See supra* notes 154, 284. Because JOpen is a Texas limited liability company, the Court finds that Texas law applies to Gabbay.

[290] R. Doc. 122-1 at p. 3 n.2.

basis for piercing the corporate veil of JOpen,[291] the Court likewise determines that there is no legal basis to hold Gabbay personally liable for JOpen's conduct under Texas law.[292] Having found that Palaio, Jennings, Reilly, and Gabbay are not personally liable in this suit, the Court ends its specific personal jurisdiction analysis as to Jurisdictional Defendants Palaio, Jennings, Reilly, and Gabbay and those defendants are dismissed from this suit.

In sum, the Court finds that the record is devoid of evidence that would warrant the piercing of the veil as to any Jurisdictional Defendants. Having determined that veil-piercing is unwarranted, the Court finds that there is no legal basis to hold the individual Jurisdictional Defendants personally liable for the actions of their respective business entities. Veil-piercing is one of the most extreme remedies in business law,[293] and the record does not support such extreme measure.[294]

## B. The Court lacks specific personal jurisdiction over the Jurisdictional Defendants under the stream of commerce theory.

In addition to a veil-piercing theory, Jurisdictional Defendants allege that they are not subject to specific personal jurisdiction in this Court under the stream of

---

[291] *See supra* note 154.

[292] *See Plan B Holdings, LLC v. RSLLP*, 681 S.W.3d 443, 458 (Tex. Ct. App. 2023)("[U]nder a theory of 'alter ego,' which is one theory for 'piercing the corporate veil[]' . . . an owner of a corporation or limited liability company can, in limited circumstances, be held personally liable for the debts of the business entity. In general, an owner or officer of a corporation is not liable for corporate debts[.]").

[293] *See generally Carpenter Properties, Inc. v. JP Morgan Chase Bank Nat. Ass'n*, 647 Fed. Appx. 444, 454 (5th Cir. 2016)(explaining that, under Mississippi law, "the courts have reserved piercing the veil for factual circumstances which are clearly extraordinary—where to do otherwise would subvert the ends of justice")(citation modified).

[294] This finding renders as moot Moller's Motion for Partial Summary Judgment – Determination of Piercing the Veil, Single Business Enterprise, and Alter Ego For Jurisdictional Purposes. R. Doc. 132. The Court, using the same facts set forth in the Motion for Partial Summary Judgment via incorporation by reference, finds that Moller has failed to establish a *prima facie* case to piercing the veil as to the Jurisdictional Defendants.  Therefore, the Court finds that Moller is not entitled to summary judgment as a matter of law regarding piercing the veil of Jurisdictional Defendants.

commerce doctrine.[295] Jurisdictional Defendants contend that although JOpen is subject to jurisdiction based on the stream of commerce theory, "[t]here is no factual or legal basis for stream of commerce jurisdiction over any other Defendant."[296] Moller, in Opposition, avers that "[t]he stream of commerce analysis is satisfied in this matter[]" pursuant to the Fifth Circuit's three-prong analysis utilized in determining whether a court may exercise specific personal jurisdiction over a defendant.[297]

First, Moller argues that "Defendants purposefully transacted business within Louisiana and committed the tortious acts alleged in the complaint within Louisiana. Thus, Defendants have purposefully availed themselves of Louisiana."[298] Second, Moller advances that her injuries are directly related to Jurisdictional Defendants' actions, as "Plaintiff's autopsy report plausibly supports the allegation that Plaintiff's wrongful death product liability claims were related to the Defendants' conduct in creating a secretive web of shell companies that import an illicit product into the United States and then pursue the distribution and sale of that product to Louisiana consumers."[299] Third, Moller argues that subjecting Jurisdictional Defendants to personal jurisdiction in Louisiana would not offend the traditional notions of fair play and substantial justice because "it would be an absurd injustice to allow the Defendants to escape jurisdiction in Louisiana while simultaneously reaping the

---

[295] R. Doc. 122-1 at pp. 12–13.
[296] *Id.* at p. 13.
[297] R. Doc. 130 at p. 14.
[298] *Id.* at p. 16.
[299] *Id.* at p. 17.

profits from their illicit web of companies promoting their kratom brands to Louisiana consumers."[300] Thus, according to Moller, specific personal jurisdiction exists against the Jurisdictional Defendants.[301]

Jurisdictional Defendants have filed a Reply, in which they allege that "the record evidence is clear that the [] Defendants simply are not in the 'stream of commerce,' and the evidence submitted by Plaintiff does not compel a different conclusion."[302] Namely, Jurisdictional Defendants argue that Moller fails to allege, identify, and list specific acts by each Defendant demonstrating that each Defendant "purposefully avail[ed] itself of the privilege of doing business in Louisiana."[303] Therefore, according to Jurisdictional Defendants, exercising specific personal jurisdiction is improper.[304]

With these principles in mind, the Court considers whether it may exercise specific personal jurisdiction pursuant to the Fifth Circuit's three-step test for determining whether due process allows for the exercise of  specific personal jurisdiction.[305] For the reasons set forth below, the Court's analysis starts – and ends

---

[300] *Id.* at p. 18.

[301] *Id.* at p. 19.

[302] R. Doc. 148 at p. 5.

[303] *Id.*

[304] *Id.*

[305] "To exercise specific jurisdiction, a court must determine: (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *LLOG Exploration Company, L.L.C. v. Federal Flange, Inc.*, Civil Action No. 17-2323, 2019 WL 4038599, at *4 (E.D. La. Aug. 27, 2019)(Ashe, J.)(quoting *Seiferth*, 472 F.3d at 271).

– with the first step, whether Jurisdictional Defendants have purposefully availed themselves, or established minimum contacts, to the state of Louisiana.[306]

*1. Plaintiff fails to establish that Jurisdictional Defendants have minimum contacts with Louisiana.*

Plaintiff states that her "allegations and referenced sources detail how the OPMS Defendants purposefully exploit Louisiana's market through a stream of commerce targeted directly at Louisiana kratom consumers. These are not minor, isolated, or random contacts. These are intentional and knowing actions taken to exploit the Louisiana market for kratom."[307] In support of her assertion, Moller directs the Court to the following paragraphs in her Complaint:

> All Defendants named herein are alter egos of one another and operate as a single business enterprise through a secretive web of affiliates, individuals, shell companies, alter egos, business names, assumed names, and/or trade names, including but not limited to: Aether, LLC; Aghosh Corp.; Axis Holdings, LLC; Johnson Foods, LLC; LP IND., LLC; CAG Holdings, LLC; RMH Holdings, LLC; Lunar Labs, LLC; Martian Sales, Inc.; Kono Labs; Highway 160 Way, LLC; PFI, LLC; Nuza LLC; Nuza; Nuza Logistics; Calibre Manufacturing, LLC; Advanced Nutrition; Uziel, LLC; 1099 Industrial, LLC; 1100 Alpha, LLC; Engaged Investments, LLC; Olistica Life Sciences Group; Olistica; Olistica Group; Interactive Earth Sciences Corp.; Liv Group, Inc.; Cascade Naturals; Della Terra Pharmaceuticals; NP Pharma Holdings, LLC; OPMS; Choice Organics; Jordan Process; Precision Biologics; Eyal Gabbey; Petyon Shea Palaio; Mark Jennings; Mark Reilly; Biopharmaceutical Technology Services, Inc.; Liv Group, Inc.; Robert "Bob" Hoban; NP Biotech; Precision Biologics; FMK Group, Inc.; PNW

---

[306] Because the limits of Louisiana's long-arm statute are co-extensive with the limits of constitutional due process, the inquiry is simply whether this Court's exercise of jurisdiction over the defendant would offend due process. *See In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 at 547; *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991)(citing *Hanna v. Plumer*, 380 U.S. 460 (1965))("*Erie* requires that federal courts apply substantive state law when adjudicating diversity-jurisdiction claims, but in doing so apply federal procedural law to the proceedings."); *Luv N' Care, Ltd.*, 438 F.3d at 469 ("The forum state may create, and this court would be bound to apply, additional jurisdictional restrictions by statute . . . but Louisiana's 'long-arm' statute extends jurisdiction to the constitutional limit . . . so the two inquiries in this case fold into one.").

[307] R. Doc. 130 at p. 15.

Holdings, LLC; JOPEN, LLC; LP, Ind., LLC; Beeman Inc.; LGI Holdings, LLC; Axis Holdings, LLC; Calibre Manufacturing, LLC; Savro Management, LLC; Advanced Nutrition, LLC; Admin Assist, LLC; Precision Biologics, Inc; Companion Agriculture; NP Biopharma; Della Terra Pharmaceutical; Aether LLC; Allied Manufacturing Services, LLC; Telescaph Inter Texas, LLC; CC US Holdings, LLC; Peyton Shea Palaio; Mark Jennings; Eyal David Gabbay; and Mark Reilly (a/k/a Chris Dockery). The entities involved in the single business enterprise continues to evolve.

. . . .

All Defendants named herein make up and are hereinafter referred to as the "OPMS defendants," or simply "defendants."

. . . .

On February 6, 2023, Harmony Moller, a 36-year-old female, died as the result of the ingestion of OPMS brand Kratom which she purchased in Mandeville, Louisiana.

. . . .

A postmortem examination of Harmony Moller determined that the cause of death was "Abnormally high left coronary ostia takeoff exacerbated by Mitragynine use" secondary to the ingestion of Kratom.

. . . .

Unable to verify kratom's safety, the Kratom industry has instead been built upon clandestine and fraudulent business activities, including the unlawful importation of Kratom as "plant food," "incense," "cosmetic" powders, and other legal items.

. . . .

Despite these efforts, the industry is successfully smuggling billions of dollars' worth of Kratom across the border. Once it gets past customs and border officials, the Kratom is quickly channeled into chains of distribution managed by individuals and entities generating huge profits from millions of consumers. Despite the serious risks of kratom use, profit-seeking companies continue to market kratom products with unproven and deceptive claims about its safety and ability to cure, treat or prevent medical conditions and diseases. The FDA's examples of

illegal claims include statements such as: "many people use kratom to overcome opiate addiction," and kratom is frequently used "as a natural alternative" to treat various health conditions, replacing opiate prescriptions.

. . . .

The OPMS defendants have profited from unfair and deceptive business practices by promoting, distributing and/or selling dangerous Kratom products to Louisiana residents, including Harmony Moller.

. . . .

OPMS kratom is imported, packaged, distributed, and sold through a complex web of companies that includes Defendants. This web is referred to herein as the OPMS enterprise.

. . . .

The OPMS enterprise is one of the largest kratom distributors in the United States, including Louisiana.

. . . .

Despite its prominence in the kratom industry, the OPMS enterprises' evasive tactics and abuse of corporate forms has been highlighted by recent investigative reports, as well as public filings in multiple lawsuits and claims brought by those harmed by its misconduct.

. . . .

OPMS Kratom is manufactured, packaged, distributed, and sold by the OPMS defendants via the stream of commerce throughout the United States to herbal stores, gas stations, corner stores, and smoke shops where it is primarily marketed as an herbal medicine or supplement to treat a variety of ailments such as pain, mental health, opioid withdrawal and constitutes as "product" as defined by La. R.S. 9:2800.53 (3).

. . . .

As a direct and proximate result of the manufacture and distribution of its unreasonably dangerous and defective product to Harmony Moller, as aforesaid, Defendants are strictly liable to Plaintiff in damages for

> Harmony Moller's conscious pain, suffering, fear, and grief in anticipation of death.
>
> . . . .
>
> As a direct and proximate result of the manufacture and distribution of its unreasonably dangerous and defective product to Harmony Moller, as aforesaid, Defendants are strictly liable to Plaintiff in damages for her parents' grief, loss of companionship and consortium, love, affection, and support due to her wrongful death pursuant to La. C.C. art. 2315.2.[308]

Despite citing to the above paragraphs in her Complaint to support her assertion that personal jurisdiction exists, Moller fails to set forth a *prima facie* case establishing that Jurisdictional Defendants have minimum contacts with Louisiana.

"In the context of products-liability cases, like the case presently before us, an analysis involving a stream-of-commerce metaphor is often employed to assess whether the non-resident defendant has minimum contacts with the forum."[309]  The stream of commerce doctrine permits "personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."[310] The Fifth Circuit has explained:[311]

> Under that test, mere foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce, but the defendant's contacts must be more than random, fortuitous, or

---

[308] R. Doc. 100 at pp. 9–10, 14–17, ¶¶ 25, 26, 30, 33, 48, 51, 53, 54, 55, 56, 58, 62, and 64.

[309] *Zoch v. Magna Seating (Germany) GmbH*, 810 Fed. Appx. 285, 289 (5th Cir. 2020); *see also Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013)("In cases involving a product sold or manufactured by a foreign defendant, this Circuit has consistently followed a 'stream-of-commerce' approach to personal jurisdiction[.]").

[310] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980).

[311] The Court acknowledges that the appropriate standard under the stream-of-commerce doctrine "divides the circuits, with ours having embraced Justice Brennan's more expansive view." *In re DePuy Orthopaedics, Incorporated, Pinnacle Hip Implant Products Liability Litigation*, 888 F.3d 753, 778 (5th Cir. 2018)(citing *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 373 (5th Cir. 2010)).

attenuated, or of the unilateral activity of another party or third person.[312]

"The foreseeability required in the products liability context is 'not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'"[313] "Ultimately, foreseeability in the stream-of-commerce context can be proven in one of two ways, (1) either the quantity of defendant's actual or attempted sales (advertising or marketing) is high enough that the defendant can reasonably anticipate being haled into the forum state or (2) the defendant has specific knowledge or expectation that its specific injury-causing product is being sold in the forum state."[314] In sum, "[p]ersonal jurisdiction does not turn on labels or *relative* connection to the forum."[315] Rather, courts must "look to 'the relationship among the defendant, the forum, and the litigation.'"[316]

Here, Moller merely alleges that Jurisdictional Defendants, as alter egos of one another, injected OPMS Kratom into the United States's stream of commerce, and therefore it was reasonably foreseeable that OPMS Kratom would end up in Louisiana.[317] While Moller seemingly centers her argument on foreseeability, she fails to specifically allege that any Jurisdictional Defendant satisfies the definition of foreseeability.

---

[312] *Ainsworth,* 716 F.3d at 177 (citation modified).

[313] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006)(quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297).

[314] *Boat Service of Galveston, Inc. v. NRE Power Systems, Inc.*, 429 F.Supp.3d 261, 269 (E.D. La. 2019)(Barbier, J.)(citing *World-Wide Volkswagen Corp.*, 444 U.S. at 297–98).

[315] *DePuy*, 888 F.3d at 779 (emphasis original).

[316] *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

[317] R. Doc. 130 at p. 16.

Although "*mere* foreseeability or awareness is a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce,"[318] foreseeability is not "the mere likelihood that a product will find its way into the forum State."[319] Moller, in attempting to show foreseeability, alleges that all Jurisdictional Defendants engaged in "deceptive business practices by promotion, distributing, and/or selling dangerous kratom products to Louisiana residents, including Harmony Moller."[320] Moller's analysis ends there. The only factual allegations Moller asserts that potentially ties Jurisdictional Defendants to Louisiana is the fact that Harmony Moller purchased OPMS kratom in Mandeville, Louisiana, and that Harmony Moller, a Louisiana resident, died as a result of ingesting OPMS Kratom. Moller does not point to a specific act, phone call, email, letter, or conversation from Jurisdictional Defendants to anyone in Louisiana. Further, Moller fails to point to any specific contract with a Louisiana citizen or any contract directing that work be completed in Louisiana.

Additionally, Moller does not name any specific product that is sold in Louisiana, other than that OPMS kratom was bought in Mandeville, Louisiana. She alleges that Jurisdictional Defendants sell kratom to herbal stores, gas stations, corner stores, and smoke shops around the United States but fails to identify any such stores in Louisiana.[321] Moller also does not provide any data regarding

---

[318] *Ainsworth*, 716 F.3d at 177 (citation modified)(emphasis added).
[319] *Seiferth*, 472 F.3d at 274.
[320] R. Doc. 130 at p. 4 (citing R. Doc. 100 at p. 15, ¶ 53).
[321] *See* R. Doc. 130 at p. 4 (citing R. Doc. 100 at p. 16, ¶ 58).

Jurisdictional Defendants' sales to customers in Louisiana.[322] As explained by another Section of this Court, the significance of sales evidence is that it can establish "the reasonableness of an inference that [a defendant] had or should have had an expectation that its [products] would wind up in Louisiana so as to support the conclusion that [a defendant] should reasonably anticipate being haled into court there on issues related to its [products]."[323]

Moller's assertion that Jurisdictional Defendants engaged in an "aggressive national campaign to promote and profit from the sale of OPMS kratom products in Louisiana" is insufficient to find that Jurisdictional Defendants purposefully availed themselves to the benefit of conducting business in Louisiana. As an initial matter, Moller offers no specific details on how Jurisdictional Defendants targeted Louisiana. Plaintiff provides no evidence regarding any specific marketing campaigns, marketing data relating to Louisiana, or even a specific advertisement directed toward Louisiana consumers. At best, Moller's assertion is that Jurisdictional Defendants' national campaign to promote OPMS Kratom foreseeably resulted in the products ending up in Louisiana. Even assuming *arguendo* that this is true, "[t]hese facts may reveal an intent to serve the U.S. market, but they do not show that [Defendants] purposefully availed itself of the [Louisiana] market."[324]

---

[322] *See LLOG Exploration Company, L.L.C.*, 2019 WL 4038599, at *7 (finding that a defendant purposefully availed itself to Louisiana when it, among other things, "sold over $16 million in goods directly to at least six different Louisiana customers[]").
[323] *Id.* at *8.
[324] *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011).

69

The Court finds that subjecting Jurisdictional Defendants to specific personal jurisdiction would run afoul of Justice Breyer's concurrence in *McIntyre v. Nicastro*, adopted by the Fifth Circuit as the opinion that "'furnished the narrowest grounds for the decision.'"[325] In *McIntyre*, Justice Breyer "criticized New Jersey's test for personal jurisdiction, which would subject a foreign defendant to jurisdiction so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'"[326] Justice Breyer further "cautioned against such a test that would 'rest jurisdiction . . . upon no more than the occurrence of a product-based accident in the forum State' and 'permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue.'"[327]

Moller asks the Court to subject Jurisdictional Defendants to specific personal jurisdiction solely based on Jurisdictional Defendants' national marketing campaign that ultimately led to Harmony Moller's purchase and ingestion of OPMS Kratom in Mandeville, Louisiana.[328] Adopting Moller's approach would impermissibly allow Louisiana "to assert jurisdiction in a products-liability suit against any domestic

---

[325] *Zoch*, 810 Fed. Appx at 290 (quoting *Ainsworth*, 716 F.3d at 178).

[326] *Zoch*, 810 Fed. Appx. at 290–91 (quoting *McIntyre*, 564 U.S. at 891 (Breyer, J., concurring)).

[327] *Id.* at 291 (quoting *McIntyre*, 564 U.S. at 891 (Breyer, J., concurring)).

[328] *See* R. Doc. 100; R. Doc. 226 at p. 2 ("Finished OPMS kratom products are then distributed to retail locations nationwide, including Louisiana, where the product was legal at the time of Harmony Moller's death in February 2023.").

manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue."[329]  The Court determines that is inappropriate based on Supreme Court precedent.

"The touchstone for stream-of-commerce analysis is not the defendant's specific knowledge, nor its control, nor a traceable route of the goods; instead, it is the defendant's purposeful availment of the forum through the stream of its goods rather than its agents."[330] In *Ainsworth*, the Fifth Circuit affirmed the United States District Court for the Southern District of Mississippi's finding of specific personal jurisdiction against Moffett Engineering, Ltd., an Irish manufacturer of forklifts.[331] The Fifth Circuit specifically reasoned that:

> The facts in the record establish that Moffett could have "reasonably anticipated" being haled into court in Mississippi. Cargotec sells or markets Moffett products in all fifty states, and Moffett makes no attempt to limit the territory in which Cargotec sells its products. From 2000 through September 2010, Moffett sold 13,073 forklifts to Cargotec, worth approximately 254,000,000. Cargotec sold 203 of those forklifts, worth approximately 3,950,000, to customers in Mississippi. Those Mississippi sales accounted for approximately 1.55% of Moffett's United States sales during that period. Moreover, the record indicates that Moffett designed and manufactures a forklift for poultry-related uses. Thus, even though Moffett did not have specific knowledge of sales by Cargotec in Mississippi, it reasonably could have expected that such sales would be made, given the fact that Mississippi is the fourth largest poultry-producing state in the United States.[332]

---

[329] *McIntyre*, 564 U.S. at 891 (Breyer, J., concurring).
[330] *LLOG Exploration Company, L.L.C.*, 2019 WL 4038599 at *7 (citing *DePuy*, 888 F.3d at 778).
[331] *Ainsworth*, 716 F.3d at 179.
[332] *Id.*

Here, the Court's holding is not premised on the fact that Jurisdictional Defendants did not have particularized knowledge of the destination of its kratom products. Rather, it is based on Moller's fundamental failure to provide specific record evidence addressing Jurisdictional Defendants' specific relationship to Louisiana.[333] Unlike *Ainsworth*, Moller has failed to provide any evidence regarding the timeframe in which OPMS Kratom was sold in Louisiana, the amount of OPMS Kratom sold in Louisiana, the monetary value of the sales of OPMS Kratom in Louisiana, and how much Louisiana sales of OPMS Kratom comprise of Jurisdictional Defendants' total sales across the country.[334] Nor has Moller submitted any evidence that Louisiana is a large consumer of kratom products, which, if provided, may be analogous to Mississippi's role as a large poultry producer in *Ainsworth*.[335]

The Court granted Moller roughly six months to conduct jurisdictional discovery in the above-captioned matter.[336] As a result of such jurisdictional efforts, Moller submitted to the Court nearly 1,000 pages[337] of exhibits relating to the Jurisdictional Defendants' Motion to Dismiss and its Motion for Partial Summary Judgment. The Court, after conducting a thorough review of the voluminous record, finds it insufficient to exercise specific personal jurisdiction over Jurisdictional Defendants. Whether it is deposition testimony, discovery responses, articles of

---

[333] *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solana County*, 480 U.S. 102, 112 (1987)("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.").

[334] *See id.*

[335] *See id.*

[336] R. Doc. 54.

[337] *See* R. Docs. 130-1 through 130-10; R. Docs. 132-3 through R. Doc. 132-51; R. Docs. 226-1 through 226-4.

organization, purchase orders and invoices, tax forms, financial statements, or news articles related to kratom,[338] the record evidence does not form any connection to Louisiana that would constitute minimum contacts with the state of Louisiana on behalf of Jurisdictional Defendants. Such evidence is insufficient to satisfy Moller's *prima facie* burden of demonstrating that Jurisdictional Defendants have purposefully availed themselves to conducting business in Louisiana.

Because Moller has not made a *prima facie* showing that Jurisdictional Defendants have established minimum contacts in Louisiana, the Court need not consider whether the cause of action arises out of or results from the defendant's forum-related contacts and whether subjecting Jurisdictional Defendants to personal jurisdiction would offend the traditional notions of fair play and substantial justice. Accordingly, the Court finds that it lacks specific personal jurisdiction over Jurisdictional Defendants.

### C.  Moller has stated a plausible claim under the Louisiana Products Liability Act.

JOpen argues that Moller has failed to state a claim that JOpen and each Jurisdictional Defendant is a manufacturer, has failed to state a claim for a design defect, and that Moller has failed to state a failure to warn claim under the LPLA.[339] Because the Court has determined that it lacks personal jurisdiction as to all Jurisdictional Defendants, the Court analyzes each element in turn solely as it pertains to JOpen.

---

[338] *See, e.g.,* R. Docs. 132-3 through R. Doc. 132-51.
[339] R. Doc. 148 at pp. 6–10.

*1. Manufacturer*

JOpen avers that Moller fails to allege that any Defendant, including JOpen, is a manufacturer under the LPLA.[340] Moller, in turn, contends that Defendants' assertion is incorrect because she has properly alleged that Harmony Moller has died as a result of JOpen's kratom product.[341] The Court agrees with Moller.

Under the LPLA, a manufacturer is "person or entity who is in the business of manufacturing a product for placement into trade or commerce."[342] Additionally, "[a] seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage[]" is also a manufacturer under the LPLA.[343] In sum, manufacturing a product "means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product."[344]

Here, Moller contends that "[t]he OPMS defendants are a 'manufacturer(s)' as defined by La. R.S. 9:2800.53 (1)."[345] Moller further alleges that "OPMS Kratom is manufactured, packaged, distributed, and sold by the OPMS defendants via the stream of commerce throughout the United States to herbal stores, gas stations, corner stores, and smoke shops . . . ."[346] And in her Complaint, Moller's definition of "OPMS defendants" includes JOpen.[347] Therefore, the Court finds that Moller has

---

[340] R. Doc. 122-1 at p. 1.
[341] R. Doc. 130 at p. 20.
[342] LA. REV. STAT. § 9:2800.53(1).
[343] LA. REV. STAT. § 9:2800.53(1)(b).
[344] LA. REV. STAT. § 9:2800.53(1).
[345] R. Doc. 100 at p. 16, ¶ 59.
[346] *Id.* at ¶ 58.
[347] *Id.* at p. 9, ¶¶ 25, 26.

plead facts in support of the required element of an LPLA claim, that JOpen is a manufacturer of the product.

*2. Design Defect*

JOpen alleges that Moller fails to allege a design defect under the LPLA because she has failed to identify an alternative design.[348] Moller disagrees and states that "[p]otential alternative designs would include selling a kratom product that complies with applicable federal regulations regarding safety or designing a product without using processed kratom that might comply with applicable safety regulations. Or designing a process that does not adulterate whole leaf kratom."[349]

The Court finds that Moller has adequately stated a claim for a design defect under the LPLA. A plaintiff establishes a design-defect claim under the LPLA by demonstrating that:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.[350]

The second prong of the statute "involves a risk-utility analysis[,]"[351] in which courts must analyze whether the product contains an adequate warning.[352] Thus, "[t]o state a claim for unreasonably dangerous design, the plaintiff must (1) allege how the

---

[348] R. Doc. 122-1 at p. 20.
[349] R. Doc. 130 at p. 21.
[350] *Johnson v. Teva Pharmaceuticals USA, Inc.*, 758 F.3d 605, 612 (5th Cir. 2014)(quoting LA. REV. STAT. § 9:2800.56).
[351] *Id.* (citing *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir. 2000)).
[352] *Id.* (citing LA. REV. STAT. § 9:2800.56).

design is defective or how the design relates to the injury and (2) demonstrate the existence of a specific alternate design."[353] An "occurrence of an injury does not give rise to the presumption that the design was unreasonably dangerous."[354] Furthermore, "[a] conclusory allegation that an alternate design exists will not suffice, but the plaintiff need not allege in detail 'that the product's design would cause the claimant's damage,' that 'the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design,' and 'the adverse effect, if any, of such alternative design on the utility of the product.'"[355]

Here, "Plaintiff does not merely state in a conclusory fashion that an alternative exists; rather, [s]he identifies [an] alternative design."[356] Moller specifically alleges, for example, that JOpen could distribute whole leaf *Mitragyna Speciosa*, as opposed its adulterated kratom product.[357] Further, she adequately alleges how the design is defective, as she contends that JOpen's kratom product does not comply with federal regulations and thus is unreasonably dangerous.[358] Moreover, Moller alleges that adulterated kratom, such as JOpen's, causes "a wide range of adverse events, including . . . death[,]" precisely the injury in the above-

---

[353] *Robertson v. AstraZeneca Pharmeceuticals, LP*, Civil Action No: 15–438., 2015 WL 5823326, at *4 (E.D. La. Oct. 6, 2015)(Barbier, J.)(citing *Kennedy v. Pfizer, Inc.,* No. 12–01858, 2013 WL 4590331, at *4 (W.D. La. Aug. 28, 2013)).

[354] *Id.* (citing *Kennedy*, 2013 WL 4590331, at *3).

[355] *Id.* (quoting *Becnel v. Mercedes–Benz USA, LLC,* No. 14–0003, 2014 WL 4450431, at *4 (E.D.La. Sept. 10, 2014) (Barbier, J.)).

[356] *Becnel*, 2014 WL 445043, at *4.

[357] R. Doc. 130 at p. 21.

[358] *Id.* at pp. 20–21.

captioned matter.[359] The Court therefore finds that Moller has plausibly stated a design defect claim under the LPLA.

*3. Failure to Warn*

JOpen alleges that Moller has not plead a failure to warn claim under the LPLA, as "the risks she alleges that Defendants should have warned about are undisputedly not known or knowable to any Defendant."[360] In contrast, Moller counters that she has adequately plead a failure to warn claim under the LPLA because JOpen:

> [F]ailed to warn Harmony Moller and other Louisiana kratom consumers about the "risk of sudden death by heart failure and/or great vessel failure, congenital heart or blood vessel conditions its failure to warn of the opioid like effects of kratom and the pathological consequences of use of an atypical opiate like kratom, the failure to specify a maximum single dose warning, the failure to warn that undefined overdose could cause injury or sudden death . . . ."[361]

The Court agrees with Moller.

"To successfully maintain a failure-to-warn claim under the LPLA, a plaintiff must demonstrate that the product in question has a potentially damage-causing characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic."[362] "To meet the first prong of this test, we have indicated that a plaintiff must provide evidence about the 'cause, frequency, severity, or consequences' of the dangerous characteristic in question."[363]

---

[359] *Id.* at p. 22.
[360] R. Doc. 122-1 at p. 21.
[361] R. Doc. 130 at p. 22 (quoting R. Doc. 100 at p. 16, ¶ 61).
[362] *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 264 (5th Cir. 2002)(citing *Grenier v. Med. Eng'g Corp.,* 243 F.3d 200, 205 (5th Cir. 2001).
[363] *Id.* (citing *Grenier*, 243 F.3d at 205).

Moller has provided evidence regarding the dangerous characteristic in question, as she provides that JOpen "failed to warn Harmony Moller that kratom is unlawfully imported, wrongfully distributed marketed and sold for human consumption without the required premarket verification of safety, causes dependence, addiction, and withdrawal in regular users, is 63 times more deadly than other natural products, and can cause death."[364] Moller specifies that JOpen failed to use reasonable care in providing an adequate warning through JOpen's failure to provide any sort of warnings "nor any instructions regarding first aid or medical intervention at any stage of a user's symptoms . . . ."[365] Accordingly, the Court finds that Moller has sufficiently stated a failure to warn claim against JOpen under the LPLA.

In sum, when faced with a Rule 12(b)(6) Motion to Dismiss, the Court must accept "'all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff[.]'"[366] "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'"[367] Applying the above principles, Moller has plead enough factual content to allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged[]"[368] under the LPLA. The Court therefore denies JOpen's Rule 12(b)(6) Motion to Dismiss.

---

[364] R. Doc. 130 at p. 22.

[365] R. Doc. 100 at p. 17, ¶ 61.

[366] *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009)(quoting *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)).

[367] *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)(citation modified).

[368] *Ashcroft*, 556 U.S. at 678.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.**[369]

**IT IS FURTHER ORDERED** Jurisdictional Defendants' Rule 12(b)(2) Motion to Dismiss[370] is **GRANTED** and that Plaintiff's claims against Jurisdictional Defendants, LP IND., LLC; CAG Holdings, LLC; RMH Holdings, LLC; Martian Sales, Inc.; Johnson Foods, LLC; Nuza, LLC; Calibre Manufacturing, LLC; FMK Group, Inc.; PNW Holdings, LLC; CC US Holdings, LLC; Peyton Palaio; Mark Jennings; David Gabbay; and Mark Reilly, are **DISMISSED WITHOUT PREJUDICE.** JOpen, LLC shall remain as the sole Defendant in the above-captioned matter.

**IT IS FURTHER ORDERED** that JOpen's Rule 12(b)(6) Motion to Dismiss[371] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment – Determination of Piercing the Veil, Single Business Enterprise, and Alter Ego For Jurisdictional Purposes[372] is **DENIED AS MOOT.**

New Orleans, Louisiana, March 30, 2026.

**WENDY B. VITTER**
**United States District Judge**

---

[369] R. Doc. 122.
[370] *Id.*
[371] *Id.*
[372] R. Doc. 132.